IN THE UNTIED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

GREGORY HOLDEN (PETITIONER)          CIVIL ACTION.NO. 06-5202

VS.

**FILED**

DISTRICT ATTORNEY's OFFICE   **JUN 0 2 2017**
OF PHILADELPHIA, et.al;   KATE BARKMAN, Clerk
(RESPONDENTS)             By_____Dep. Clerk



PETITION-MOTION UNDER RULE 60(b)(6) REQUESTING RE-OPENING OF HIS CASE, BASED UPON UNITED STATES SUPREME COURT RECENT DECISION BUCK V. DAVIS, 197 L.ED. 2D 1 (2017). THE BUCK DECISION HELD THAT HE DEMONSTRATED BOTH INEFFECTIVE ASSISTANCE OF COUNSEL UNDER STRICKLAND V. WASHINGTON AND ENTITLEMENT TO RELIEF UNDER RULE 60 (b)(6): THE PETITIONER ALSO REQUEST FOR APPOINTMENT OF COUNSEL?:

TO: THE HONORABLE DISTRICT JUDGE J. CURTIS JOYNER:

### FACTUAL BACKGROUND

(1). The Petitioner full procedural history is amply developed in Civil Action NO.06-cv-5202. The petitioner submits that he is a pro se litigant and his pleading's are to be held to a less stringent standard than practicing professional lawyers. Under Haines v. Kerner, 92 S.Ct. 594 (1974).

(2). On September 21, 2007, the Honorable J. Curtis J. Joyner, denied petitioner's first writ of habeas corpus as [time-barred].

(3). On December 16, 1980, the Petitioner allegedly and (3) three cohorts robbed a man. During the course of the robbery; Petitioner's alleged cohorts shot the victim whom later died of six gunshot wounds to his chest and abdomen (N.T. 5/13/83, 38, 61-63). On June 24, 1983, a jury sitting before Judge David N. Savitt convicted petitioner of second degree murder, robbery, possessing an instrument of a crime and criminal conspiracy. On April 23, 1984, Judge Savitt sentenced petitioner to a term of life imprisonment for second degree murder and a current term of one to two years for possessing an instrument of a crime.

1

(4). Petitioner's (trial counsel) did not file his direct appeal; i.e. his requested direct appeal. This created the beginning of petitioner's (defective) process for (30) years through the state courts and federal courts.

(5). On November 22, 1985, petitioner filed his first pro-se, PCRA petition. Counsel was appointed and filed an amended petition. **"Relief was denied and the appeal from that denial was dismissed after counsel failed to file a brief".** Petitioner instituted pro se, his second PCRA proceeding, on August 30, 1999, relief was denied on September 28, 1999. On June 14, 2005, petitioner filed his third PCRA petition. When that petition was **"dismissed as ("untimely")**,Mr. Holden filed another pro se appeal asserting that the sentencing counsel was ineffective for not filing a direct appeal. see Com vs. Holden, 915 A.2d 143 (Pa. Super. 2006). (unpublished memorandum) affirmed.

(6). On October 24, 2007, Petitioner Mr. Holden pro se filed his fourth PCRA petition; seeking reinstatement of both his direct appellate rights from the denial of his first petition.

(7). On June 3, 2009, this request was denied by the Superior Court.

(8). On November 22, 2006, the petitioner filed his first federal habeas corpus petition, which was subsequently denied as (untimely) filed on September 21, 2007. Thereafter, Petitioner file a 60 (b) motion which was denied.

(9). On November 14, 2007, the petitioner filed for C.O.A. on the denial of 60(b) relief. That request was subsequently denied.

(10). On August 26, 2010, the Petitioner/Plaintiff Mr. Holden filed a 1983 Civil Action Complaint; which was subsequently denied on October 18th, 2011 without prejudice; because Mr. Holden was unable to serve the defendants.; DKT.NO.10-4642.

(11). On or about January 3, 2016, Petitioner filed a 60(d)(1) motion which was subsequently denied.

(12). Now Comes Petitioner pro se, moving for Rule 60(b)(6) relief; under United States Supreme Court recent decision Buck v. Davis, 197 L.ed.2d 1 (2018); because Mr. Holden is identical situated as defendant Buck. Both defendants suffered ineffectiveness of counsel under Strickland vs. Washington, and both defendants are entitled to 60(b)(6) relief.

## STANDARD ON FED.R.CIV. P. 60(b)(6)

Permits a court to [reopen] a judgement for any other reasons that justifies relief. Fed.R.Civ.P. 60 (b) vests wide discretion in courts, but judicial precedent hold that relief under Rule 60(b)(6) is available only in extraordinary circumstances. In determining whether extraordinary circumstances are present, a court may consider a wide range of factors. These may include, in an appropriate case, **the risk of injustice to the parties and the risk of undermining the public's confidence in the judicial process**. See Buck, supra.

In the Buck case, the US Supreme Court held that he demonstrated [prejudice] under Strickland v. Washington, as a result of his trial counsel introducing expert testimony through Dr. Quijano's" concerning Buck's skin color. According to Dr. Quijano, Buck would always be black and that immutable characteristic carried with it an "increased probability" of future violence. Id.at 19. This was hard statistical evidence-from an expert-to guide an otherwise speculative inquiry. The Court held the effect of Dr. Quijano's testimony on Buck's sentencing cannot be (197 L.ed.2d. 21) dismissed as "de minimis" Buck has demonstrated prejudice.

Further, the court held that Buck was entitled to relief under Rule 60(b)(6) and the "whole purpose" of Rule 60 (b) "is to make an exception to finality" (citing Gonzalez, 545 U.S., at 529. An in Buck case, the state's interest in finality deserves light weight. When Texas recognized that the infusion of race into proceedings similar to Saldano's warranted confession of error, it effectively acknowledged that the people of Texas lack interest in enforcing a capital sentence obtained on so flawed a basis. In concluding that the value of finality does not demand that we leave the District Court's judgment in place, we do no more than acknowledge what Texas itself recognized (17) years ago.

Continuing in Buck, Our Rule 60 (b)(6) analysis has thus far omitted one significant element. When Buck, first sought federal habeas relief in 2004. Coleman barred the District Court from hearing his claim. Today, however, a claim of ineffective assistance of trial counsel defaulted in a Texas postconviction proceeding maybe reviewed in federal court if state habeas counsel was constitutional ineffective in failing to raise it, and the claim has "some merit" Martinez, 566 U.S., at 14, see Trevino, 569 U.S., at _____, 133 S.Ct. 1911. Buck only can obtain relief under Martinez and Trevino, and his case could be re-open. Not under Coleman.

In the current case, Mr. Holden should be entitled to Rule 60 (b)(6) relief, because a claim of ineffective assistance of trial counsel defaulted in a "Pennsylvania" postconviction proceeding may be reviewed in federal court if state habeas counsel was constitutionally ineffective in failing to raise it, ("similar to Buck and Texas postconviction proceedings") if the claim has "some merit" Martinez, 566 U.S. at 14, see Trevino, 569 U.S., at _____, Petitioner Holden, like defendant Buck could not obtain relief unless he is entitled to the benefit of this rule-that is, unless Martinez and Trevino, not Coleman, would govern his case if it were re-opened.

It would be be error to deny Mr. Holden 60(b)(6) relief, when he has demonstrated ineffective assistance of trial counsel under the Sixth Amendment and he has been shut-out of state and federal court on procedural grounds, i.e. [time-barred] and his first habeas petition should be re-opened, based upon recent decision Buck, supra.

Trial counsel Lydia Kirkland whom represented Petitioner at trial, did not filed his required direct appeal. She was deposed by first PCRA counsel William A. Meehan, Jr. Esq., on October 28, 1992, at which time she [alleged] that Petitioner, nor his family never advised her to appeal. However, the United States Supreme Court mandates that there is a constitutional duty to "consult" with the defendant about an appeal when there is a reason to believe that a rational defendant would want to appeal. The court defined "consult" as advising the defendant about the ["advantages"] and ["disadvantages"] of taking and appeal, and making a reasonable duty to discover the defendant's wishes. see Evitts v. Lucey, 469 U.S. 387 (1985). also see. In Roe v. Flores-Ortega, 528 U.S. 668 (2000). The court held that criminal defense attorney's have a constitutional duty to "consult" with and **advise criminal defendants of their appellate rights.** ("This did not occur") and trial counsel Lydia Kirkland has denied Petitioner his Sixth Amendment Constitutional right's to a direct appeal and as a result Mr. Holden has demonstrated [prejudice], similar to defendant Buck. See case law attached for court convenience.

## CONCLUSION

Therefore, Mr. Holden habeas corpus petition should be re-opened under Strickland vs. Washington, because he has demonstrated [prejudiced] and he is entitled to 60 (b)(6) relief, under Buck.

Further, Mr. Holden should be [granted] appointment of counsel under Tabron vs. Grace, 6 F.3d 147 (1993) given the complexity of the issues and his case?

4

FOR THIS REQUEST PETITIONER FOREVER PRAY.

Respectfully Submitted

Gregory Holden (Petitioner)
#AY-2898
1000 FOLLIES.RD.
SCI.DALLAS.PA. 18612

DATED: __6 - 1__, 2017

**SERVED UPON**

(2): Copies: To; Clerk
601 Market. St.
Phila. Pa. 19106

(1): One Copy;
To; (ADA) Office
3 South Penn Square
Phila. Pa. 19107-3799

# EXHIBIT

# A

## DUANE EDWARD BUCK, PETITIONER v. LORIE DAVIS, DIRECTOR, TEXAS DEPARTMENT OF CRIMINAL JUSTICE, CORRECTIONAL INSTITUTIONS DIVISION
## SUPREME COURT OF THE UNITED STATES
## 197 L. Ed. 2d 1; 2017 U.S. LEXIS 1429; 85 U.S.L.W. 4037; 26 Fla. L. Weekly Fed. S 419
## No. 15-8049.
## October 5, 2016, Argued
## February 22, 2017, Decided

**Notice:**

**The LEXIS pagination of this document is subject to change pending release of the final published version.**

**Editorial Information: Prior History**

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUITBuck v. Stephens, 623 Fed. Appx. 668, 2015 U.S. App. LEXIS 14755 (5th Cir. Tex., 2015)

**Disposition:**
        623 Fed. Appx. 668, reversed and remanded.

**Counsel**        **Christina A. Swarns** argued the cause for petitioner.
        **Scott A. Keller** argued the cause for respondent.

**Judges:** ROBERTS, C. J., delivered the opinion of the Court, in which KENNEDY, GINSBURG, BREYER, SOTOMAYOR, and KAGAN, JJ., joined. THOMAS, J., filed a dissenting opinion, in which ALITO, J., joined.

**CASE SUMMARY**It was error to deny a prisoner a COA to pursue his Sixth Amendment claims on appeal where he demonstrated ineffective assistance when his attorney called an expert who testified about a connection between his race and the likelihood of violence, and that error entitled him to relief under Fed. R. Civ. P. 60(b)(6).

**OVERVIEW:** HOLDINGS: [1]-Because a reviewing court inverted the statutory order of operations by deciding the merits of an appeal and then denying the COA based on adjudication of the actual merits, it placed too heavy a burden on the prisoner at the COA stage; [2]-For Sixth Amendment purposes, the prisoner demonstrated prejudice during the sentencing phase where his attorney called an expert who testified about a connection between his race and the likelihood of violence, and it was reasonably probable that the death sentence would not have been imposed otherwise; [3]-Denying a Fed. R. Civ. P. 60(b)(6) motion was error where it was clear that the prisoner may have been sentenced to death due to his race, the State had admitted that sentencing based on race considerations was error in other cases, and it was inappropriate to consider race no matter how it was injected into the proceeding.

**OUTCOME:** Judgment reversed; case remanded. 6-2 Decision; 1 Dissent.

**LexisNexis Headnotes**

*Constitutional Law > Bill of Rights > Fundamental Rights > Criminal Process > Assistance of*

SCTHOT                                       1

© 2017 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

*Counsel*
***Criminal Law & Procedure > Habeas Corpus > Exhaustion of Remedies > Exceptions***
***Criminal Law & Procedure > Habeas Corpus > Procedural Default > Cause & Prejudice Standard > Proof of Cause***

In 2012, judicial precedent modified the unqualified statement in case law that an attorney's ignorance or inadvertence in a postconviction proceeding does not qualify as cause to excuse a procedural default. When a state formally limits the adjudication of claims of ineffective assistance of trial counsel to collateral review, a prisoner may establish cause for procedural default if (1) the state courts did not appoint counsel in the initial-review collateral proceeding, or appointed counsel in that proceeding was ineffective under the Strickland standards; and (2) the underlying claim is a substantial one, which is to say that the claim has some merit.

***Civil Procedure > Judgments > Relief From Judgment > Extraordinary Circumstances***

Fed. R. Civ. P. 60(b) enumerates specific circumstances in which a party may be relieved of the effect of a judgment, such as mistake, newly discovered evidence, fraud, and the like. The Rule concludes with a catchall category, Fed. R. Civ. P. 60(b)(6), providing that a court may lift a judgment for any other reason that justifies relief. Relief is available under Rule 60(b)(6), however, only in extraordinary circumstances, and judicial precedent explains that such circumstances will rarely occur in the habeas context.

***Criminal Law & Procedure > Habeas Corpus > Appeals > Certificate of Appealability***

To obtain a certificate of appealability, a petitioner is required to make a substantial showing of the denial of a constitutional right. 28 U.S.C.S. § 2253(c)(2).

***Criminal Law & Procedure > Habeas Corpus > Appeals > Certificate of Appealability***

A state prisoner whose petition for a writ of habeas corpus is denied by a federal district court does not enjoy an absolute right to appeal. Federal law requires that he first obtain a certificate of appealability (COA) from a circuit justice or judge. 28 U.S.C.S. § 2253(c)(1). A COA may issue only if the applicant has made a substantial showing of the denial of a constitutional right. 28 U.S.C.S. § 2253(c)(2). Until the prisoner secures a COA, the Court of Appeals may not rule on the merits of his case.

***Criminal Law & Procedure > Habeas Corpus > Appeals > Certificate of Appealability***

The certificate of appealability (COA) inquiry is not coextensive with a merits analysis. At the COA stage, the only question is whether the applicant has shown that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further. This threshold question should be decided without full consideration of the factual or legal bases adduced in support of the claims. When a court of appeals sidesteps the COA process by first deciding the merits of an appeal, and then justifying its denial of a COA based on its adjudication of the actual merits, it is in essence deciding an appeal without jurisdiction.

***Criminal Law & Procedure > Habeas Corpus > Appeals > Certificate of Appealability***

A court of appeals should limit its examination at the certificate of appealability stage to a threshold inquiry into the underlying merit of the claims, and ask only if the district court's decision was debatable.

***Criminal Law & Procedure > Habeas Corpus > Appeals > Certificate of Appealability***

SCTHOT                                    2

© 2017 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

When a court of appeals properly applies the certificate of appealability (COA) standard and determines that a prisoner's claim is not even debatable, that necessarily means the prisoner has failed to show that his claim is meritorious. But the converse is not true. That a prisoner has failed to make the ultimate showing that his claim is meritorious does not logically mean he failed to make a preliminary showing that his claim was debatable. Thus, when a reviewing court inverts the statutory order of operations and first decides the merits of an appeal, then justifies its denial of a COA based on its adjudication of the actual merits, it has placed too heavy a burden on the prisoner at the COA stage. Judicial precedent flatly prohibits such a departure from the procedure prescribed by 28 U.S.C.S. § 2253.

**Criminal Law & Procedure > Habeas Corpus > Appeals > Certificate of Appealability**

A claim can be debatable even though every jurist of reason might agree, after the certificate of appealability (COA) has been granted and the case has received full consideration, that petitioner will not prevail. 28 U.S.C.S. § 2253 sets forth a two-step process: an initial determination whether a claim is reasonably debatable, and then, if it is, an appeal in the normal course. Judicial precedent does not mean to specify what procedures may be appropriate in every case. But whatever procedures are employed at the COA stage should be consonant with the limited nature of the inquiry.

**Criminal Law & Procedure > Counsel > Effective Assistance > Tests**
**Constitutional Law > Bill of Rights > Fundamental Rights > Criminal Process > Assistance of Counsel**

The Sixth Amendment right to counsel is the right to the effective assistance of counsel. A defendant who claims to have been denied effective assistance must show both that counsel performed deficiently and that counsel's deficient performance caused him prejudice.

**Constitutional Law > Bill of Rights > Fundamental Rights > Criminal Process > Assistance of Counsel**
**Criminal Law & Procedure > Counsel > Effective Assistance > Tests**

The Strickland standard's first prong sets a high bar. A defense lawyer navigating a criminal proceeding faces any number of choices about how best to make a client's case. The lawyer has discharged his constitutional responsibility so long as his decisions fall within the wide range of professionally competent assistance. It is only when the lawyer's errors were so serious that counsel was not functioning as the counsel guaranteed by the Sixth Amendment that Strickland's first prong is satisfied.

**Criminal Law & Procedure > Sentencing > Capital Punishment > General Overview**

It would be patently unconstitutional for a state to argue that a defendant is liable to be a future danger because of his race.

**Criminal Law & Procedure > Counsel > Effective Assistance > Tests**
**Constitutional Law > Bill of Rights > Fundamental Rights > Criminal Process > Assistance of Counsel**

To satisfy the Strickland standard, a litigant must also demonstrate prejudice, i.e., a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.

**Criminal Law & Procedure > Sentencing > Capital Punishment > Aggravating Circumstances**

© 2017 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

A jury may conclude that a crime's vicious nature calls for a sentence of death.

*Criminal Law & Procedure > Habeas Corpus > Appeals > Certificate of Appealability*

A litigant seeking a certificate of appealability must demonstrate that a procedural ruling barring relief is itself debatable among jurists of reason; otherwise, the appeal would not deserve encouragement to proceed further.

*Civil Procedure > Judgments > Relief From Judgment > Extraordinary Circumstances*

Fed. R. Civ. P. 60(b)(6) permits a court to reopen a judgment for any other reason that justifies relief. Fed. R. Civ. P. 60(b) vests wide discretion in courts, but judicial precedent holds that relief under Rule 60(b)(6) is available only in extraordinary circumstances. In determining whether extraordinary circumstances are present, a court may consider a wide range of factors. These may include, in an appropriate case, the risk of injustice to the parties and the risk of undermining the public's confidence in the judicial process.

*Civil Procedure > Judgments > Relief From Judgment > General Overview*

The whole purpose of Fed. R. Civ. P. 60(b) is to make an exception to finality.

*Criminal Law & Procedure > Habeas Corpus > Review > Scope of Review*

States can waive a Teague defense by failing to raise it in a timely manner.

*Criminal Law & Procedure > Habeas Corpus > Review > Scope of Review*

Judicial precedent observes that a State's failure to raise a Teague argument at the petition stage is particularly significant in deciding whether such an exercise of discretion is appropriate. When a legal issue appears to warrant review, certiorari is granted in the expectation of being able to decide that issue.

## Syllabus

{197 L. Ed. 2d 6} Petitioner Duane Buck was convicted of capital murder in a Texas court. Under state law, the jury was permitted to impose a death sentence only if it found unanimously and beyond a reasonable doubt that Buck was likely to commit acts of violence in the future. Buck's attorney called a psychologist, Dr. Walter Quijano, to offer his opinion on that issue. Dr. Quijano had been appointed to evaluate Buck by the presiding judge and had prepared a report setting out his conclusions. To determine the likelihood that Buck would act violently in the future, Dr. Quijano had considered a number of statistical factors, including Buck's race. Although Dr. Quijano ultimately concluded that Buck was unlikely to be a future danger, his report also stated that Buck was statistically more likely to act violently because he is black. The report read, in relevant part: ``**Race.** Black: Increased probability.'' App. 19a. Despite knowing the contents of the report, Buck's counsel called Dr. Quijano to the stand, where he testified that race is a factor ``know[n] to predict future dangerousness.'' *Id.,* at 146a. Dr. Quijano's report was admitted into evidence at the close of his testimony. The prosecution questioned Dr. Quijano about his conclusions on race and violence during cross-examination, and it relied on his testimony in summation. During deliberations, the jury requested and received the expert reports admitted into evidence, including Dr. Quijano's. The jury returned a sentence of death.

Buck contends that his attorney's introduction of this evidence violated his Sixth Amendment right to the

SCTHOT                                         4

© 2017 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

effective assistance of counsel. Buck failed to raise this claim in his first state postconviction proceeding. While that proceeding was pending, this Court received a petition for certiorari in *Saldano* v. *Texas*, 530 U. S. 1212, 120 S. Ct. 2214, 147 L. Ed. 2d 246, a case in which Dr. Quijano had testified that the petitioner's Hispanic heritage weighed in favor of a finding of future dangerousness. Texas confessed error on that ground, and this Court vacated the judgment below. Soon afterward, the Texas Attorney General issued a public statement identifying six similar cases in which Dr. Quijano had testified. Buck's was one of them. In the other five cases, the Attorney General confessed error and consented to resentencing. But when Buck filed a second state habeas petition alleging that his attorney had been ineffective in introducing Dr. Quijano's testimony, the State did not confess error, and the court dismissed the petition as an abuse of the writ on **{197 L. Ed. 2d 7}** the ground that Buck had failed to raise the claim in his first petition.

Buck then sought federal habeas relief under 28 U. S. C. §2254. The State again declined to confess error, and Buck's ineffective assistance claim was held procedurally defaulted and unreviewable under *Coleman* v. *Thompson*, 501 U. S. 722, 111 S. Ct. 2546, 115 L. Ed. 2d 640. This Court's later decisions in *Martinez* v. *Ryan*, 566 U. S. 1, 132 S. Ct. 1309, 182 L. Ed. 2d 272, and *Trevino* v. *Thaler*, 569 U.S. ___, 133 S. Ct. 1911, 185 L. Ed. 2d 1044, modified the rule of *Coleman*. Had they been decided before Buck filed his federal habeas petition, Buck's claim could have been heard on the merits provided he had demonstrated that (1) state postconviction counsel had been constitutionally ineffective in failing to raise the claim, and (2) the claim had some merit. Following the decision in *Trevino*, Buck sought to reopen his §2254 case under Federal Rule of Civil Procedure 60(b)(6). To demonstrate the ``extraordinary circumstances'' required for relief, *Gonzalez* v. *Crosby*, 545 U. S. 524, 535, 125 S. Ct. 2641, 162 L. Ed. 2d 480, Buck cited the change in law effected by *Martinez* and *Trevino*, as well as ten other factors, including the introduction of expert testimony linking Buck's race to violence and the State's confession of error in similar cases. The District Court denied relief. Reasoning that ``the introduction of any mention of race'' during Buck's sentencing was ``*de minimis*,'' the court concluded, first, that Buck had failed to demonstrate extraordinary circumstances; and second, that even if the circumstances were extraordinary, Buck had failed to demonstrate ineffective assistance under *Strickland* v. *Washington*, 466 U. S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674. Buck sought a certificate of appealability (COA) from the Fifth Circuit to appeal the denial of his Rule 60(b)(6) motion. The Fifth Circuit denied his application, concluding that he had not shown extraordinary circumstances justifying relief from the District Court's judgment.

*Held*:

1. The Fifth Circuit exceeded the limited scope of the COA analysis. The COA statute sets forth a two-step process: an initial determination whether a claim is reasonably debatable, and, if so, an appeal in the normal course. 28 U. S. C. §2253. At the first stage, the only question is whether the applicant has shown that ``jurists of reason could disagree with the district court's resolution of his constitutional claims or . . . could conclude the issues presented are adequate to deserve encouragement to proceed further.'' *Miller-El* v. *Cockrell*, 537 U. S. 322, 327, 123 S. Ct. 1029, 154 L. Ed. 2d 931. Here, the Fifth Circuit phrased its determination in proper terms. But it reached its conclusion only after essentially deciding the case on the merits, repeatedly faulting Buck for having failed to demonstrate extraordinary circumstances. The question for the Court of Appeals was not whether Buck had shown that his case is extraordinary; it was whether jurists of reason could debate that issue. The State points to the Fifth Circuit's thorough consideration of the merits to defend that court's approach, but this hurts rather than helps its case. Pp. 12-15.

© 2017 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

2. Buck has demonstrated ineffective {197 L. Ed. 2d 8} assistance of counsel under Strickland. Pp. 15-20.

(a) To satisfy Strickland, a defendant must first show that counsel performed deficiently. 466 U. S., at 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674. Buck's trial counsel knew that Dr. Quijano's report reflected the view that Buck's race predisposed him to violent conduct and that the principal point of dispute during the penalty phase was Buck's future dangerousness. Counsel nevertheless called Dr. Quijano to the stand, specifically elicited testimony about the connection between race and violence, and put Dr. Quijano's report into evidence. No competent defense attorney would introduce evidence that his client is liable to be a future danger because of his race. Pp. 15-17.

(b) Strickland further requires a defendant to demonstrate prejudice-``a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U. S., at 694, 104 S. Ct. 2052, 80 L. Ed. 2d 674. It is reasonably probable that without Dr. Quijano's testimony on race and violence, at least one juror would have harbored a reasonable doubt on the question of Buck's future dangerousness. This issue required the jury to make a predictive judgment inevitably entailing a degree of speculation. But Buck's race was not subject to speculation, and according to Dr. Quijano, that immutable characteristic carried with it an increased probability of future violence. Dr. Quijano's testimony appealed to a powerful racial stereotype and might well have been valued by jurors as the opinion of a medical expert bearing the court's imprimatur. For these reasons, the District Court's conclusion that any mention of race during the penalty phase was de minimis is rejected. So is the State's argument that Buck was not prejudiced by Dr. Quijano's testimony because it was introduced by his own counsel, rather than the prosecution. Jurors understand that prosecutors seek convictions and may reasonably be expected to evaluate the government's evidence in light of its motivations. When damaging evidence is introduced by a defendant's own lawyer, it is in the nature of an admission against interest, more likely to be taken at face value. Pp. 17-20.

3. The District Court's denial of Buck's Rule 60(b)(6) motion was an abuse of discretion. Pp. 20-26.

(a) Relief under Rule 60(b)(6) is available only in ``extraordinary circumstances." Gonzalez, 545 U. S., at 535, 125 S. Ct. 2641, 162 L. Ed. 2d 480. Determining whether such circumstances are present may include consideration of a wide range of factors, including ``the risk of injustice to the parties" and ``the risk of undermining the public's confidence in the judicial process." Liljeberg v. Health Services Acquisition Corp., 486 U. S. 847, 863-864, 108 S. Ct. 2194, 100 L. Ed. 2d 855. The District Court's denial of Buck's motion rested largely on its determination that race played only a de minimis role in his sentencing. But there is a reasonable probability that Buck was sentenced to death in part because of his race. This is a disturbing departure from the basic premise that our criminal law punishes people for what they do, not who they are. That it concerned race {197 L. Ed. 2d 9} amplifies the problem. Relying on race to impose a criminal sanction ``poisons public confidence" in the judicial process, Davis v. Ayala, 576 U. S. ___, ___, 135 S. Ct. 2187, 192 L. Ed. 2d 323, a concern that supports Rule 60(b)(6) relief. The extraordinary nature of this case is confirmed by the remarkable steps the State itself took in response to Dr. Quijano's testimony in other cases. Although the State attempts to justify its decision to treat Buck differently from the other five defendants identified in the Attorney General's public statement, its explanations for distinguishing Buck's case from Saldano have nothing to do with the Attorney General's stated reasons for confessing error in that case. Pp. 20-24.

(b) Unless Martinez and Trevino, rather than Coleman, would govern Buck's case were it reopened, his

© 2017 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

claim would remain unreviewable and Rule 60(b)(6) relief would be inappropriate. The State argues that *Martinez* and *Trevino* would not govern Buck's case because they announced a ``new rule'' under *Teague* v. *Lane*, 489 U. S. 288, 109 S. Ct. 1060, 103 L. Ed. 2d 334, that does not apply retroactively to cases (like Buck's) on collateral review. This argument, however, has been waived: the State failed to advance it in District Court, before the Fifth Circuit, or in its brief in opposition to Buck's petition for certiorari. Pp. 24-26.

623 Fed. Appx. 668, reversed and remanded.

### Opinion

**Opinion by:**          ROBERTS

### Opinion

Chief Justice Roberts delivered the opinion of the Court.

A Texas jury convicted petitioner Duane Buck of capital murder. Under state law, the jury could impose a death sentence only if it found that Buck was likely to commit acts of violence in the future. Buck's attorney called a psychologist to offer his opinion on that issue. The psychologist testified that Buck probably would not engage in violent conduct. But he also stated that one of the factors pertinent in assessing a person's propensity for violence was his race, and that Buck was statistically more likely to act violently because he is black. The jury sentenced Buck to death.

Buck contends that his attorney's introduction of this evidence violated his Sixth Amendment right to the effective assistance of counsel. This claim has never been heard on the merits in any court, because the attorney who represented Buck in his first state postconviction proceeding failed to raise it. In 2006, a Federal District Court relied on that failure-properly, under then-governing law-to hold that Buck's claim was procedurally defaulted and unreviewable.

In 2014, Buck sought to reopen that 2006 judgment by filing a motion under Federal Rule of Civil Procedure 60(b)(6). He argued that this Court's decisions in *Martinez* v. *Ryan*, 566 U. S. 1, 132 S. Ct. 1309, 182 L. Ed. 2d 272 (2012), and *Trevino* v. *Thaler*, 569 U. S. ___, 133 S. Ct. 1911, 185 L. Ed. 2d 1044 **{197 L. Ed. 2d 10}** (2013), had changed the law in a way that provided an excuse for his procedural default, permitting him to litigate his claim on the merits. In addition to this change in the law, Buck's motion identified ten other factors that, he said, constituted the ``extraordinary circumstances'' required to justify reopening the 2006 judgment under the Rule. See *Gonzalez* v. *Crosby*, 545 U. S. 524, 535, 125 S. Ct. 2641, 162 L. Ed. 2d 480 (2005).

The District Court below denied the motion, and the Fifth Circuit declined to issue the certificate of appealability (COA) requested by Buck to appeal that decision. We granted certiorari, and now reverse.

I

A

On the morning of July 30, 1995, Duane Buck arrived at the home of his former girlfriend, Debra Gardner. He was carrying a rifle and a shotgun. Buck entered the home, shot Phyllis Taylor, his stepsister, and then shot Gardner's friend Kenneth Butler. Gardner fled the house, and Buck followed.

© 2017 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

So did Gardner's young children. While Gardner's son and daughter begged for their mother's life, Buck shot Gardner in the chest. Gardner and Butler died of their wounds. Taylor survived.

Police officers arrived soon after the shooting and placed Buck under arrest. An officer would later testify that Buck was laughing at the scene. He remained ``happy'' and ``upbeat'' as he was driven to the police station, ``[s]miling and laughing'' in the back of the patrol car. App. 134a-135a, 252a.

Buck was tried for capital murder, and the jury convicted. During the penalty phase of the trial, the jury was charged with deciding two issues. The first was what the parties term the ``future dangerousness'' question. At the time of Buck's trial, a Texas jury could impose the death penalty only if it found-unanimously and beyond a reasonable doubt-``a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society.'' Tex. Code Crim. Proc. Ann., Art. 37.071, §2(b)(1) (Vernon 1998). The second issue, to be reached only if the jury found Buck likely to be a future danger, was whether mitigating circumstances nevertheless warranted a sentence of life imprisonment instead of death. See §2(e).

The parties focused principally on the first question. The State called witnesses who emphasized the brutality of Buck's crime and his evident lack of remorse in its aftermath. The State also called another former girlfriend, Vivian Jackson. She testified that, during their relationship, Buck had routinely hit her and had twice pointed a gun at her. Finally, the State introduced evidence of Buck's criminal history, including convictions for delivery of cocaine and unlawfully carrying a weapon. App. 125a-127a, 185a.

Defense counsel answered with a series of lay witnesses, including Buck's father and stepmother, who testified that they had never known him to be violent. Counsel also called two psychologists to testify as experts. The first, Dr. Patrick Lawrence, observed that Buck had previously served time in prison and had been held in minimum custody. From this he concluded that Buck ``did not present any problems in the prison setting.'' Record in No. 4:04-cv-03965 **{197 L. Ed. 2d 11}** (SD Tex.), Doc. 5-116, pp. 12-13. Dr. Lawrence further testified that murders within the Texas penal system tend to be gang related (there was no evidence Buck had ever been a member of a gang) and that Buck's offense had been a ``crime of passion'' occurring within the context of a romantic relationship. *Id.,* at 4, 19, 21. Based on these considerations, Dr. Lawrence determined that Buck was unlikely to be a danger if he were sentenced to life in prison. *Id.,* at 20-21.

Buck's second expert, Dr. Walter Quijano, had been appointed by the presiding judge to conduct a psychological evaluation. Dr. Quijano had met with Buck in prison prior to trial and shared a report of his findings with defense counsel.

Like Dr. Lawrence, Dr. Quijano thought it significant that Buck's prior acts of violence had arisen from romantic relationships with women; Buck, of course, would not form any such relationships while incarcerated. And Dr. Quijano likewise considered Buck's behavioral record in prison a good indicator that future violence was unlikely. App. 36a, 39a-40a.

But there was more to the report. In determining whether Buck was likely to pose a danger in the future, Dr. Quijano considered seven ``statistical factors.'' The fourth factor was ``race.'' His report read, in relevant part: ``4. **Race.** Black: Increased probability. There is an over-representation of Blacks among the violent offenders.'' *Id.,* at 19a.

Despite knowing Dr. Quijano's view that Buck's race was competent evidence of an increased probability of future violence, defense counsel called Dr. Quijano to the stand and asked him to discuss the ``statistical factors'' he had ``looked at in regard to this case.'' *Id.,* at 145a-146a. Dr. Quijano responded that certain factors were ``know[n] to predict future dangerousness'' and, consistent with his report, identified race as one of them. *Id.,* at 146a. ``It's a sad commentary,'' he testified, ``that minorities, Hispanics and black people, are over represented in the Criminal Justice

© 2017 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

System." *Ibid.* Through further questioning, counsel elicited testimony concerning factors Dr. Quijano thought favorable to Buck, as well as his ultimate opinion that Buck was unlikely to pose a danger in the future. At the close of Dr. Quijano's testimony, his report was admitted into evidence. *Id.,* at 150a-152a.

After opening cross-examination with a series of general questions, the prosecutor likewise turned to the report. She asked first about the statistical factors of past crimes and age, then questioned Dr. Quijano about the roles of sex and race: ``You have determined that the sex factor, that a male is more violent than a female because that's just the way it is, and that the race factor, black, increases the future dangerousness for various complicated reasons; is that correct?" *Id.,* at 170a. Dr. Quijano replied, ``Yes." *Ibid.*

During closing arguments, defense counsel emphasized that Buck had proved to be ``controllable in the prison population," and that his crime was one of ``jealousy, . . . passion and emotion" unlikely to be repeated in jail. *Id.,* at 189a-191a. The State stressed the crime's brutal nature and Buck's lack of remorse, along with the inability of Buck's own experts to guarantee that he would not act violently **{197 L. Ed. 2d 12}** in the future-a point it supported by reference to Dr. Quijano's testimony. See *id.,* at 198a-199a (``You heard from Dr. Quijano, . . . who told you that . . . the probability did exist that [Buck] would be a continuing threat to society.").

The jury deliberated over the course of two days. During that time it sent out four notes, one of which requested the ``psychology reports" that had been admitted into evidence. *Id.,* at 209a. These reports-including Dr. Quijano's-were provided. The jury returned a sentence of death.

B

Buck's conviction and sentence were affirmed on direct appeal. *Buck* v. *State*, No. 72,810 (Tex. Crim. App., Apr. 28, 1999). His case then entered a labyrinth of state and federal collateral review, where it has wandered for the better part of two decades.

Buck filed his first petition for a writ of habeas corpus in Texas state court in 1999. The four claims advanced in his petition, however, were all frivolous or noncognizable. See *Ex parte Buck*, No. 699684-A (Dist. Ct. Harris Cty., Tex., July 11, 2003), pp. 6-7. The petition failed to mention defense counsel's introduction of expert testimony that Buck's race increased his propensity for violence.

But Dr. Quijano had testified in other cases, too, and in 1999, while Buck's first habeas petition was pending, one of those cases reached this Court. The petitioner, Victor Hugo Saldano, argued that his death sentence had been tainted by Dr. Quijano's testimony that Saldano's Hispanic heritage ``was a factor weighing in the favor of future dangerousness." App. 302a. Texas confessed error on that ground and asked this Court to grant Saldano's petition for certiorari, vacate the state court judgment, and remand the case. In June 2000, the Court did so. *Saldano* v. *Texas*, 530 U. S. 1212, 120 S. Ct. 2214, 147 L. Ed. 2d 246.

Within days, the Texas Attorney General, John Cornyn, issued a public statement concerning the cases in which Dr. Quijano had testified. The statement affirmed that ``it is inappropriate to allow race to be considered as a factor in our criminal justice system." App. 213a. In keeping with that principle, the Attorney General explained that his office had conducted a ``thorough audit" and ``identified eight more cases in which testimony was offered by Dr. Quijano that race should be a factor for the jury to consider in making its determination about the sentence in a capital murder trial." *Ibid.* Six of those cases were ``similar to that of Victor Hugo Saldano"; in those cases, letters had been sent to counsel apprising them of the Attorney General's findings. *Id.,* at 213a-214a. The statement closed by identifying the defendants in those six cases. Buck was one of them. *Id.,* at 215a-217a. By the close of 2002, the Attorney General had confessed error, waived any available procedural defenses, and

SCTHOT                                    9

© 2017 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

consented to resentencing in the cases of five of those six defendants. See *Alba* v. *Johnson*, 232 F. 3d 208 (CA5 2000) (Table); Memorandum and Order in *Blue* v. *Johnson*, No. 4:99-cv-00350 (SD Tex.), pp. 15-17; Order in *Garcia* v. *Johnson*, No. 1:99-cv-00134 (ED Tex.), p. 1; Order in *Broxton* v. *Johnson*, No. 4:00-cv-01034 (SD Tex.), pp. 10-11; Final Judgment in *Gonzales* v. *Cockrell*, No. 7:99-cv-00072 (WD Tex.), p. 1.

Not, however, in Buck's. In 2002, **{197 L. Ed. 2d 13}** Buck's attorney filed a new state habeas petition alleging that trial counsel had rendered ineffective assistance by introducing Dr. Quijano's testimony. The State was not represented by the Attorney General in this proceeding-the Texas Attorney General represents state respondents in federal habeas cases, but not state habeas cases-and it did not confess error. Because Buck's petition was successive, the Texas Court of Criminal Appeals dismissed it as an abuse of the writ. *Ex parte Buck*, Nos. 57,004-01, 57,004-02 (Tex. Crim. App., Oct. 15, 2003) ( *per curiam*).

Buck turned to the federal courts. He filed a petition for habeas corpus under 28 U. S. C. §2254 in October 2004, by which time Attorney General Cornyn had left office. See *Buck* v. *Dretke*, 2006 U.S. Dist. LEXIS 101377, 2006 WL 8411481, *2 (SD Tex., July 24, 2006). Buck sought relief on the ground that trial counsel's introduction of Dr. Quijano's testimony was constitutionally ineffective. The State responded that the state court had dismissed Buck's ineffective assistance claim because Buck had failed to press it in his first petition, raising it for the first time in a procedurally improper second petition. The State argued that such reliance on an established state rule of procedure was an adequate and independent state ground precluding federal review. Texas acknowledged that it had waived similar procedural defenses in Saldano's case. But it argued that Buck's case was different because ``[i]n Saldano's case Dr. Quijano *testified for the State*''; in Buck's, ``it was Buck who called Dr. Quijano to testify.'' Answer and Motion for Summary Judgment in No. 4:04-cv-03965 (SD Tex.), p. 20.

Buck countered that, notwithstanding his procedural default, the District Court should reach the merits of his claim because a failure to do so would result in a miscarriage of justice. Buck did not argue that his default should be excused on a showing of ``cause'' and ``prejudice''-that is, cause for the default, and prejudice from the denial of a federal right. And for good reason: At the time Buck filed his §2254 petition, our decision in *Coleman* v. *Thompson*, 501 U. S. 722, 752-753, 111 S. Ct. 2546, 115 L. Ed. 2d 640 (1991), made clear that an attorney's failure to raise an ineffective assistance claim during state postconviction review could not constitute cause. The District Court rejected Buck's miscarriage of justice argument and held that, because of his procedural default, his ineffective assistance claim was unreviewable. *Buck* v. *Dretke*, 2006 U.S. Dist. LEXIS 101377, 2006 WL 8411481, at *8. Buck unsuccessfully sought review of the District Court's ruling. See *Buck* v. *Thaler*, 345 Fed. Appx. 923 (CA5 2009) ( *per curiam*) (denying application for a COA), cert. denied, 559 U.S. 1072, 130 S. Ct. 2096, 176 L. Ed. 2d 730 (2010).

In 2011, Buck sought to reopen his case, arguing that the prosecution had violated the Equal Protection and Due Process Clauses by asking Dr. Quijano about the relationship between race and future violence on cross-examination and referring to his testimony during summation. Buck also argued that the State's decision to treat him differently from the other defendants affected by Dr. Quijano's testimony justified relieving him of the District Court's adverse judgment. The Fifth Circuit disagreed, see *Buck* v. *Thaler*, 452 Fed. Appx. 423, 427-428 **{197 L. Ed. 2d 14}** (CA5 2011) ( *per curiam*), and we denied certiorari, *Buck* v. *Thaler*, 565 U. S. 1022, 132 S. Ct. 32, 181 L. Ed. 2d 411 (2011). Buck, still barred by *Coleman* from avoiding the consequences of his procedural default, did not pursue his ineffective assistance claim.

C

© 2017 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

In 2012, this Court ``modif[ied] the unqualified statement in *Coleman* that an attorney's ignorance or inadvertence in a postconviction proceeding does not qualify as cause to excuse a procedural default." *Martinez*, 566 U. S., at 9, 132 S. Ct. 1309, 182 L. Ed. 2d 272. We held that when a state formally limits the adjudication of claims of ineffective assistance of trial counsel to collateral review, a prisoner may establish cause for procedural default if (1) ``the state courts did not appoint counsel in the initial-review collateral proceeding," or ``appointed counsel in [that] proceeding . . . was ineffective under the standards of *Strickland* v. *Washington*, 466 U. S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)"; and (2) ``the underlying . . . claim is a substantial one, which is to say that . . . the claim has some merit." *Id.,* at 14, 132 S. Ct. 1309, 182 L. Ed. 2d 272.

By its terms, *Martinez* did not bear on Buck's ineffective assistance claim. At the time of Buck's conviction and appeal, Texas did not formally require criminal defendants to reserve such claims for collateral review. In *Trevino*, however, the Court concluded that the exception announced in *Martinez* extended to state systems that, as a practical matter, deny criminal defendants ``a meaningful opportunity" to press ineffective assistance claims on direct appeal. 569 U. S., at ___, 133 S. Ct. 1911, 185 L. Ed. 2d 1044, 1056. The Court further concluded that the system in Texas, where petitioner had been convicted, was such a system. *Ibid.* The upshot: Had *Martinez* and *Trevino* been decided before Buck filed his §2254 petition, a federal court could have reviewed Buck's ineffective assistance claim if he demonstrated that (1) state postconviction counsel had been constitutionally ineffective in failing to raise it, and (2) the claim had ``some merit." *Martinez*, 566 U. S., at 14, 132 S. Ct. 1309, 182 L. Ed. 2d 272.

D

When *Trevino* was decided, Buck's third state habeas petition was pending in Texas court. That petition was denied in November 2013. *Ex parte Buck*, 418 S. W. 3d 98 (Tex. Crim. App. 2013) ( *per curiam*). Two months later, Buck returned to federal court, where he filed a motion to reopen his §2254 case under Federal Rule of Civil Procedure 60(b)(6). Rule 60(b) enumerates specific circumstances in which a party may be relieved of the effect of a judgment, such as mistake, newly discovered evidence, fraud, and the like. The Rule concludes with a catchall category-subdivision (b)(6)-providing that a court may lift a judgment for ``any other reason that justifies relief." Relief is available under subdivision (b)(6), however, only in ``extraordinary circumstances," and the Court has explained that ``[s]uch circumstances will rarely occur in the habeas context." *Gonzalez*, 545 U. S., at 535, 125 S. Ct. 2641, 162 L. Ed. 2d 480.

In his motion, Buck identified 11 factors that, in his view, justified reopening the judgment. These included his attorney's introduction of expert **{197 L. Ed. 2d 15}** testimony linking Buck's race to violence, the central issue at sentencing; the prosecution's questions about race and violence on cross-examination and reliance on Dr. Quijano's testimony in summation; the State's confession of error in other cases in which Dr. Quijano testified, but its refusal to concede error in Buck's case; and the change in law effected by *Martinez* and *Trevino*, which, if they had been decided earlier, would have permitted federal review of Buck's defaulted claim. App. 283a-285a.

The District Court denied relief on two grounds. First, the court concluded that Buck had failed to demonstrate extraordinary circumstances. To that end, the court observed that a change in decisional law is rarely extraordinary by itself. *Buck* v. *Stephens*, 2014 U.S. Dist. LEXIS 185635, 2014 WL 11310152, *4 (SD Tex., Aug. 29, 2014). It further determined that the State's ``promise" not to oppose resentencing did not count for much, reasoning that ``Buck's case is different in critical respects from the cases in which Texas confessed error" in that Buck's lawyer, not the prosecutor, had first elicited the objectionable testimony. 2014 U.S. Dist. LEXIS 185635, [WL] at *4-*5. The court also dismissed the contention that the nature of Dr. Quijano's testimony argued for reopening the case. Although ``the

© 2017 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

introduction of any mention of race was," in the court's view, ``ill[ ]advised at best and repugnant at worst," it was also ``*de minimis*": Dr. Quijano had discussed the connection between race and violence only twice. 2014 U.S. Dist. LEXIS 185635, [WL] at *5. The court accordingly concluded that Buck had failed to make out the predicate for Rule 60(b)(6) relief.

Second, the court determined that-even if the circumstances *were* extraordinary-Buck's claim would fail on the merits. The court noted that under *Strickland*, Buck was obliged to show that counsel's performance was both deficient and prejudicial. The court held that Buck's lawyer had indeed performed deficiently in calling Dr. Quijano to give testimony that ``len[t] credence to any potential latent racial prejudice held by the jury." 2014 U.S. Dist. LEXIS 185635, 2014 WL 11310152, at *6. But, the court concluded, Buck had failed to demonstrate prejudice. It observed that Buck's crime had been ``horrific." *Ibid.* And the court had already concluded that ``the introduction of any mention of race was . . . *de minimis.*" 2014 U.S. Dist. LEXIS 185635, [WL] at *5. For those reasons, it held, Buck had failed to show a reasonable probability that he would not have been sentenced to death but for Dr. Quijano's testimony about race and violence.

Buck sought to appeal the denial of his Rule 60(b)(6) motion. He accordingly filed an application for a COA with the Fifth Circuit. To obtain a COA, Buck was required to make ``a substantial showing of the denial of a constitutional right." * 28 U. S. C. §2253(c)(2).

The Fifth Circuit denied a COA, concluding that Buck's case was ``not extraordinary at all in the habeas {197 L. Ed. 2d 16} context." *Buck* v. *Stephens*, 623 Fed. Appx. 668, 673 (2015). The panel agreed with the District Court that *Martinez* and *Trevino* were not significant factors in the analysis. It characterized most of the other factors Buck had identified as ``variations on the merits" of his claim, which was ``at least unremarkable as far as [ineffective assistance] claims go." 623 Fed. Appx., at 673. The panel likewise rejected Buck's argument that he was entitled to relief because the State had issued a press release indicating that his case would be treated like Saldano's, and then had confessed error in the other cases identified as similar in the statement, but not in Buck's. *Id.,* at 674. Because Buck had ``not shown extraordinary circumstances that would permit relief under Federal Rule of Civil Procedure 60(b)(6)," the panel ``den[ied] the application for a COA." *Id.,* at 669.

Buck's motion for rehearing en banc was denied over two dissenting votes. *Buck* v. *Stephens*, 630 Fed. Appx. 251 (CA5 2015) ( *per curiam*). We granted certiorari. *Buck* v. *Stephens*, 578 U. S. ___, 136 S. Ct. 2409, 195 L. Ed. 2d 779 (2016).

II

A state prisoner whose petition for a writ of habeas corpus is denied by a federal district court does not enjoy an absolute right to appeal. Federal law requires that he first obtain a COA from a circuit justice or judge. 28 U. S. C. §2253(c)(1). A COA may issue ``only if the applicant has made a substantial showing of the denial of a constitutional right." §2253(c)(2). Until the prisoner secures a COA, the Court of Appeals may not rule on the merits of his case. *Miller-El* v. *Cockrell*, 537 U. S. 322, 336, 123 S. Ct. 1029, 154 L. Ed 2d 931 (2003).

The COA inquiry, we have emphasized, is not coextensive with a merits analysis. At the COA stage, the only question is whether the applicant has shown that ``jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Id.,* at 327, 123 S. Ct. 1029, 154 L. Ed. 2d 931. This threshold question should be decided without ``full consideration of the factual or legal bases adduced in support of the claims." *Id.,* at 336, 123 S. Ct. 1029, 154 L. Ed. 2d 931. ``When a court of appeals sidesteps [the COA] process by first deciding the merits of an appeal, and then justifying its denial of a COA based on its adjudication of the actual merits, it is in essence deciding an

© 2017 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

appeal without jurisdiction." *Id.,* at 336-337, 123 S. Ct. 1029, 154 L. Ed. 2d 931.

The court below phrased its determination in proper terms-that jurists of reason would not debate that Buck should be denied relief, 623 Fed. Appx., at 674-but it reached that conclusion only after essentially deciding the case on the merits. As the court put it in the second sentence of its opinion: ``Because [Buck] has not shown extraordinary circumstances that would permit relief under Federal Rule of Civil Procedure 60(b)(6), we deny the application for a COA." *Id.,* at 669. The balance of the Fifth Circuit's opinion reflects the same approach. The change in law effected by *Martinez* and *Trevino,* the panel wrote, was ``not an extraordinary circumstance." 623 Fed. Appx., at 674. **{197 L. Ed. 2d 17}** Even if Texas initially indicated to Buck that he would be resentenced, its ``decision not to follow through" was ``not extraordinary." *Ibid.* Buck ``ha[d] not shown why" the State's alleged broken promise ``would justify relief from the judgment." *Ibid.*

But the question for the Fifth Circuit was not whether Buck had ``shown extraordinary circumstances" or ``shown why [Texas's broken promise] would justify relief from the judgment." *Id.,* at 669, 674. Those are ultimate merits determinations the panel never reached. We reiterate what we have said before: A ``court of appeals should limit its examination [at the COA stage] to a threshold inquiry into the underlying merit of [the] claims," and ask ``only if the District Court's decision was debatable." *Miller-El,* 537 U. S., at 327, 348, 123 S. Ct. 1029, 154 L. Ed. 2d 931.

The dissent does not accept this established rule, arguing that a reviewing court that deems a claim nondebatable ``must necessarily conclude that the claim is meritless." *Post,* at 2 (opinion of Thomas, J.). Of course when a court of appeals properly applies the COA standard and determines that a prisoner's claim is not even debatable, that necessarily means the prisoner has failed to show that his claim is meritorious. But the converse is not true. That a prisoner has failed to make the ultimate showing that his claim is meritorious does not logically mean he failed to make a preliminary showing that his claim was debatable. Thus, when a reviewing court (like the Fifth Circuit here) inverts the statutory order of operations and ``first decid[es] the merits of an appeal, . . . then justif[ies] its denial of a COA based on its adjudication of the actual merits," it has placed too heavy a burden on the prisoner *at the COA stage. Miller-El,* 537 U. S., at 336-337, 123 S. Ct. 1029, 154 L. Ed. 2d 931. *Miller-El* flatly prohibits such a departure from the procedure prescribed by §2253. *Ibid.*

The State defends the Fifth Circuit's approach by arguing that the court's consideration of an application for a COA is often quite thorough. The court ``occasionally hears oral argument when considering whether to grant a COA in a capital case." Brief for Respondent 50. Indeed, in one recent case, it ``received nearly 200 pages of initial briefing, permitted a reply brief, considered the parties' supplemental authorities, invited supplemental letter briefs from both sides, and heard oral argument before denying the request for a COA." *Id.,* at 50-51.

But this hurts rather than helps the State's case. ``[A] claim can be debatable even though every jurist of reason might agree, after the COA has been granted and the case has received full consideration, that petitioner will not prevail." *Miller-El,* 537 U. S., at 338, 123 S. Ct. 1029, 154 L. Ed. 2d 931. The statute sets forth a two-step process: an initial determination whether a claim is reasonably debatable, and then-if it is-an appeal in the normal course. We do not mean to specify what procedures may be appropriate in every case. But whatever procedures are employed at the COA stage should be consonant with the limited nature of the inquiry.

Given the approach of the court below, it is perhaps understandable that the parties have essentially briefed and argued the underlying **{197 L. Ed. 2d 18}** merits at length. See, *e.g.,* Brief for Petitioner 32 (``[T]rial counsel rendered deficient performance under *Strickland."); id.,* at 39 (``[T]here is a reasonable probability that Dr. Quijano's race-as-dangerousness opinion swayed the judgment of jurors in favor of death." (internal quotation marks and alteration omitted)); *id.,* at 59 (Buck ``has

SCTHOT                                          13

© 2017 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

demonstrated his entitlement to relief under Rule 60(b)(6)"); Brief for Respondent 40 (``The particular facts of petitioner's case do not establish extraordinary circumstances justifying relief from the judgment." (boldface type deleted)). With respect to this Court's review, §2253 does not limit the scope of our consideration of the underlying merits, and at this juncture we think it proper to meet the decision below and the arguments of the parties on their own terms.

III

Buck's request for a COA raised two separate questions for the Fifth Circuit, one substantive and one procedural: first, whether reasonable jurists could debate the District Court's conclusion that Buck was not denied his right to effective assistance of counsel under *Strickland*; and second, whether reasonable jurists could debate the District Court's procedural holding that Buck had not made the necessary showing to reopen his case under Rule 60(b)(6).

A

We begin with the District Court's determination (not specifically addressed by the Fifth Circuit) that Buck's constitutional claim failed on the merits. The Sixth Amendment right to counsel ``is the right to the effective assistance of counsel." *Strickland*, 466 U. S., at 686, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (quoting *McMann* v. *Richardson*, 397 U. S. 759, 771, n. 14, 90 S. Ct. 1441, 25 L. Ed. 2d 763 (1970)). A defendant who claims to have been denied effective assistance must show both that counsel performed deficiently and that counsel's deficient performance caused him prejudice. 466 U. S., at 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674.

1

*Strickland*'s first prong sets a high bar. A defense lawyer navigating a criminal proceeding faces any number of choices about how best to make a client's case. The lawyer has discharged his constitutional responsibility so long as his decisions fall within the ``wide range of professionally competent assistance." *Id.,* at 690, 104 S. Ct. 2052, 80 L. Ed. 2d 674. It is only when the lawyer's errors were ``so serious that counsel was not functioning as the 'counsel' guaranteed . . . by the Sixth Amendment" that *Strickland*'s first prong is satisfied. *Id.,* at 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674.

The District Court determined that, in this case, counsel's performance fell outside the bounds of competent representation. We agree. Counsel knew that Dr. Quijano's report reflected the view that Buck's race disproportionately predisposed him to violent conduct; he also knew that the principal point of dispute during the trial's penalty phase was whether Buck was likely to act violently in the future. Counsel nevertheless (1) called Dr. Quijano to the stand; (2) specifically elicited testimony about the connection between Buck's race and the likelihood of future violence; and (3) put into evidence Dr. Quijano's **{197 L. Ed. 2d 19}** expert report that stated, in reference to factors bearing on future dangerousness, ``**Race.** Black: Increased probability." App. 19a, 145a-146a.

Given that the jury had to make a finding of future dangerousness before it could impose a death sentence, Dr. Quijano's report said, in effect, that the color of Buck's skin made him more deserving of execution. It would be patently unconstitutional for a state to argue that a defendant is liable to be a future danger because of his race. See *Zant* v. *Stephens*, 462 U. S. 862, 885, 103 S. Ct. 2733, 77 L. Ed. 2d 235 (1983) (identifying race among factors that are ``constitutionally impermissible or totally irrelevant to the sentencing process"). No competent defense attorney would introduce such evidence about his own client. See *Buck* v. *Thaler*, 565 U. S., at 1022, 132 S. Ct. 32, 181 L. Ed. 2d 411 (statement of Alito, J., joined by Scalia and Breyer, JJ., respecting denial of certiorari) (Buck's case ``concerns bizarre and objectionable testimony").

2

© 2017 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

To satisfy *Strickland*, a litigant must also demonstrate prejudice-``a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'' 466 U. S., at 694, 104 S. Ct. 2052, 80 L. Ed. 2d 674. Accordingly, the question before the District Court was whether Buck had demonstrated a reasonable probability that, without Dr. Quijano's testimony on race, at least one juror would have harbored a reasonable doubt about whether Buck was likely to be violent in the future. The District Court concluded that Buck had not made such a showing. We disagree.

In arguing that the jury would have imposed a death sentence even if Dr. Quijano had not offered race-based testimony, the State primarily emphasizes the brutality of Buck's crime and his lack of remorse. A jury may conclude that a crime's vicious nature calls for a sentence of death. See *Wong* v. *Belmontes*, 558 U. S. 15, 130 S. Ct. 383, 175 L. Ed. 2d 328 (2009) ( *per curiam*). In this case, however, several considerations convince us that it is reasonably probable-notwithstanding the nature of Buck's crime and his behavior in its aftermath-that the proceeding would have ended differently had counsel rendered competent representation.

Dr. Quijano testified on the key point at issue in Buck's sentencing. True, the jury was asked to decide two issues-whether Buck was likely to be a future danger, and, if so, whether mitigating circumstances nevertheless justified a sentence of life imprisonment. But the focus of the proceeding was on the first question. Much of the penalty phase testimony was directed to future dangerousness, as were the summations for both sides. The jury, consistent with the focus of the parties, asked during deliberations to see the expert reports on dangerousness. See App. 187a-196a, 198a-203a, 209a.

Deciding the key issue of Buck's dangerousness involved an unusual inquiry. The jurors were not asked to determine a historical fact concerning Buck's conduct, but to render a predictive judgment inevitably entailing a degree of speculation. Buck, all agreed, had committed acts of terrible violence. Would he do so again?

Buck's prior violent acts had occurred outside of prison, and within **{197 L. Ed. 2d 20}** the context of romantic relationships with women. If the jury did not impose a death sentence, Buck would be sentenced to life in prison, and no such romantic relationship would be likely to arise. A jury could conclude that those changes would minimize the prospect of future dangerousness.

But one thing would never change: the color of Buck's skin. Buck would always be black. And according to Dr. Quijano, that immutable characteristic carried with it an ``[i]ncreased probability'' of future violence. *Id.,* at 19a. Here was hard statistical evidence-from an expert-to guide an otherwise speculative inquiry.

And it was potent evidence. Dr. Quijano's testimony appealed to a powerful racial stereotype-that of black men as ``violence prone.'' *Turner* v. *Murray*, 476 U. S. 28, 35, 106 S. Ct. 1683, 90 L. Ed. 2d 27 (1986) (plurality opinion). In combination with the substance of the jury's inquiry, this created something of a perfect storm. Dr. Quijano's opinion coincided precisely with a particularly noxious strain of racial prejudice, which itself coincided precisely with the central question at sentencing. The effect of this unusual confluence of factors was to provide support for making a decision on life or death on the basis of race.

This effect was heightened due to the source of the testimony. Dr. Quijano took the stand as a medical expert bearing the court's imprimatur. The jury learned at the outset of his testimony that he held a doctorate in clinical psychology, had conducted evaluations in some 70 capital murder cases, and had been appointed by the trial judge (at public expense) to evaluate Buck. App. 138a-141a. Reasonable jurors might well have valued his opinion concerning the central question before them. See *Satterwhite* v. *Texas*, 486 U. S. 249, 259, 108 S. Ct. 1792, 100 L. Ed. 2d 284 (1988) (testimony

© 2017 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

from ``a medical doctor specializing in psychiatry'' on the question of future dangerousness may have influenced the sentencing jury).

For these reasons, we cannot accept the District Court's conclusion that ``the introduction of any mention of race'' during the penalty phase was ``*de minimis.*'' 2014 U.S. Dist. LEXIS 185635, 2014 WL 11310152, at *5. There were only ``two references to race in Dr. Quijano's testimony''-one during direct examination, the other on cross. *Ibid.* But when a jury hears expert testimony that expressly makes a defendant's race directly pertinent on the question of life or death, the impact of that evidence cannot be measured simply by how much air time it received at trial or how many pages it occupies in the record. Some toxins can be deadly in small doses.

The State acknowledges, as it must, that introducing ``race or ethnicity as evidence of criminality'' can in some cases prejudice a defendant. Brief for Respondent 31. But it insists that this is not such a case, because Buck's own counsel, not the prosecution, elicited the offending testimony. We are not convinced. In fact, the distinction could well cut the other way. A prosecutor is seeking a conviction. Jurors understand this and may reasonably be expected to evaluate the government's evidence and arguments in light of its motivations. When a defendant's own lawyer puts in the offending evidence, it is in the nature of an admission against interest, more likely to be taken at face value.

The effect of Dr. Quijano's testimony on Buck's sentencing cannot be **{197 L. Ed. 2d 21}** dismissed as ``*de minimis.*'' Buck has demonstrated prejudice.

B

1

We now turn to the lower courts' procedural holding: that Buck failed to demonstrate that he was entitled to have the judgment against him reopened under Rule 60(b)(6). We have held that a litigant seeking a COA must demonstrate that a procedural ruling barring relief is itself debatable among jurists of reason; otherwise, the appeal would not ``deserve encouragement to proceed further.'' *Slack* v. *McDaniel,* 529 U. S. 473, 484, 120 S. Ct. 1595, 146 L. Ed. 2d 542 (2000) (quoting *Barefoot* v. *Estelle,* 463 U. S. 880, 893, n. 4, 103 S. Ct. 3383, 77 L. Ed. 2d 1090 (1983)).

The Rule 60(b)(6) holding Buck challenges would be reviewed for abuse of discretion during a merits appeal, see 11 C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure §2857 (3d ed. 2012), and the parties agree that the COA question is therefore whether a reasonable jurist could conclude that the District Court abused its discretion in declining to reopen the judgment. See Brief for Petitioner 54-57; Brief for Respondent 34.

Buck brought his Rule 60(b) motion under the Rule's catchall category, subdivision (b)(6), which permits a court to reopen a judgment for ``any other reason that justifies relief.'' Rule 60(b) vests wide discretion in courts, but we have held that relief under Rule 60(b)(6) is available only in ``extraordinary circumstances.'' *Gonzalez,* 545 U. S., at 535, 125 S. Ct. 2641, 162 L. Ed. 2d 480. In determining whether extraordinary circumstances are present, a court may consider a wide range of factors. These may include, in an appropriate case, ``the risk of injustice to the parties'' and ``the risk of undermining the public's confidence in the judicial process.'' *Liljeberg* v. *Health Services Acquisition Corp.,* 486 U. S. 847, 863-864, 108 S. Ct. 2194, 100 L. Ed. 2d 855 (1988).

In the circumstances of this case, the District Court abused its discretion in denying Buck's Rule 60(b)(6) motion. The District Court's conclusion that Buck ``ha[d] failed to demonstrate that this case presents extraordinary circumstances'' rested in large measure on its determination that ``the introduction of any mention of race''-though ``ill[ ]advised at best and repugnant at worst''-played only a ``*de minimis*'' role in the proceeding. 2014 U.S. Dist. LEXIS 185635, 2014 WL 11310152, at *5. The

SCTHOT

 **16**

© 2017 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

Fifth Circuit, for its part, failed even to mention the racial evidence in concluding that Buck's claim was ``at least unremarkable as far as [ineffective assistance] claims go." 623 Fed. Appx., at 673. But our holding on prejudice makes clear that Buck may have been sentenced to death in part because of his race. As an initial matter, this is a disturbing departure from a basic premise of our criminal justice system: Our law punishes people for what they do, not who they are. Dispensing punishment on the basis of an immutable characteristic flatly contravenes this guiding principle. As petitioner correctly puts it, ``[i]t stretches credulity to characterize Mr. Buck's [ineffective assistance of counsel] claim as run-of-the-mill." Brief for Petitioner 57.

This departure from basic principle was exacerbated because it concerned **{197 L. Ed. 2d 22}** race. ``Discrimination on the basis of race, odious in all aspects, is especially pernicious in the administration of justice." *Rose* v. *Mitchell*, 443 U. S. 545, 555, 99 S. Ct. 2993, 61 L. Ed. 2d 739 (1979). Relying on race to impose a criminal sanction ``poisons public confidence" in the judicial process. *Davis* v. *Ayala*, 576 U. S. ___, ___, 135 S. Ct. 2187, 192 L. Ed. 2d 323, 344 (2015). It thus injures not just the defendant, but ``the law as an institution, . . . the community at large, and . . . the democratic ideal reflected in the processes of our courts." *Rose*, 443 U. S., at 556, 99 S. Ct. 2993, 61 L. Ed. 2d 739 (internal quotation marks omitted). Such concerns are precisely among those we have identified as supporting relief under Rule 60(b)(6). See *Liljeberg*, 486 U. S., at 864, 108 S. Ct. 2194, 100 L. Ed. 2d 855.

The extraordinary nature of this case is confirmed by what the State itself did in response to Dr. Quijano's testimony. When the case of Victor Hugo Saldano came before this Court, Texas confessed error and consented to resentencing. The State's response to Saldano's petition for certiorari succinctly expressed the injustice Saldano had suffered: ``the infusion of race as a factor for the jury to weigh in making its determination violated his constitutional right to be sentenced without regard to the color of his skin." App. 306a.

The Attorney General's public statement, issued shortly after we vacated the judgment in Saldano's case, reflected this sentiment. It explained that the State had responded to Saldano's troubling petition by conducting a ``thorough audit" of criminal cases, finding six similar to Saldano's ``in which testimony was offered by Dr. Quijano that race should be a factor for the jury to consider." *Id.*, at 213a. The statement affirmed that ``it is inappropriate to allow race to be considered as a factor in our criminal justice system." *Ibid.* Consistent with this position–and to its credit–the State confessed error in the cases of five of the six defendants identified in the Attorney General's statement, waiving all available procedural defenses and consenting to resentencing.

These were remarkable steps. It is not every day that a State seeks to vacate the sentences of five defendants found guilty of capital murder. But then again, these were–as the State itself put it at oral argument here–``extraordinary" cases. Tr. of Oral Arg. 41; see *Buck* v. *Thaler*, 565 U. S., at 1030, 132 S. Ct. 32, 181 L. Ed. 2d 411 (Sotomayor, J., joined by Kagan, J., dissenting from denial of certiorari) (``Especially in light of the capital nature of this case and the express recognition by a Texas attorney general that the relevant testimony was inappropriately race charged, Buck has presented issues that 'deserve encouragement to proceed further.'" (quoting *Miller-El*, 537 U. S., at 327, 123 S. Ct. 1029, 154 L. Ed. 2d 931)).

To be sure, the State has repeatedly attempted to justify its decision to treat Buck differently from the other five defendants identified in the Attorney General's statement, including on asserted factual grounds that the State has been required to abjure. See Brief for Respondent 46, n. 10 (the State's initial opposition to Buck's habeas petition ``erroneously" argued that Buck was treated differently because defense counsel, not the State, called Dr. Quijano as a witness; that was also true of two of the other **{197 L. Ed. 2d 23}** defendants). The State continues its efforts before this Court, arguing

© 2017 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

that Buck's was the only one of the six cases in which defense counsel, not the prosecution, first elicited Dr. Quijano's opinion on race. See also *post*, at 8 (opinion of Thomas, J.).

But this is beside the point. The State's various explanations for distinguishing Buck's case have nothing to do with the Attorney General's stated reasons for confessing error in *Saldano* and the cases acknowledged as similar. Regardless of which party first broached the subject, race was in all these cases put to the jury ``as a factor . . . to weigh in making its determination.'' App. 306a. The statement that ``it is inappropriate to allow race to be considered as a factor in our criminal justice system'' is equally applicable whether the prosecution or ineffective defense counsel initially injected race into the proceeding. *Id.,* at 213a. The terms of the State's announcement provide every reason for originally including Buck on the list of defendants situated similarly to Saldano, and no reason for later taking him off.

In opposition, the State reminds us of the importance of preserving the finality of judgments. Brief for Respondent 34. But the ``whole purpose'' of Rule 60(b) ``is to make an exception to finality.'' *Gonzalez*, 545 U. S., at 529, 125 S. Ct. 2641, 162 L. Ed. 2d 480. And in this case, the State's interest in finality deserves little weight. When Texas recognized that the infusion of race into proceedings similar to Saldano's warranted confession of error, it effectively acknowledged that the people of Texas lack an interest in enforcing a capital sentence obtained on so flawed a basis. In concluding that the value of finality does not demand that we leave the District Court's judgment in place, we do no more than acknowledge what Texas itself recognized 17 years ago.

2

Our Rule 60(b)(6) analysis has thus far omitted one significant element. When Buck first sought federal habeas relief in 2004, *Coleman* barred the District Court from hearing his claim. Today, however, a claim of ineffective assistance of trial counsel defaulted in a Texas postconviction proceeding may be reviewed in federal court if state habeas counsel was constitutionally ineffective in failing to raise it, and the claim has ``some merit.'' *Martinez*, 566 U. S., at 14, 132 S. Ct. 1309, 182 L. Ed. 2d 272; see *Trevino*, 569 U. S., at ___, 133 S. Ct. 1911; 185 L. Ed. 2d 1044, 1053. Buck cannot obtain relief unless he is entitled to the benefit of this rule-that is, unless *Martinez* and *Trevino*, not *Coleman*, would govern his case were it reopened. If they would not, his claim would remain unreviewable, and Rule 60(b)(6) relief would be inappropriate. See 11 Wright & Miller, Federal Practice and Procedure §2857 (showing ``a good claim or defense'' is a precondition of Rule 60(b)(6) relief ).

Until merits briefing in this Court, both parties litigated this matter on the assumption that *Martinez* and *Trevino* would apply if Buck reopened his case. See Pet. for Cert. 27-28; Brief in Opposition 11-13; Amended Application for Certificate of Appealability and Brief in Support 26, Respondent-Appellee's Opposition to Pet. for En Banc Rehearing 9-11, and Respondent's Opposition to Application for Certificate of Appealability 15-17 in **{197 L. Ed. 2d 24}** No. 14-70030 (CA5); Amended Response to Motion for Relief from Judgment in No. 4:04-cv-03965 (SD Tex.), pp. 11-13. But the State's brief adopts a new position on this issue. The State now argues that those cases announced a ``new rule'' that, under *Teague* v. *Lane*, 489 U. S. 288, 109 S. Ct. 1060, 103 L. Ed. 2d 334 (1989) (plurality opinion), does not apply retroactively to cases (like Buck's) on collateral review. Brief for Respondent 38-40. Buck responds that *Teague* analysis applies only to new rules of criminal procedure that govern trial proceedings-not new rules of habeas procedure that govern collateral proceedings-and that the State has in any event waived its *Teague* argument. Reply Brief 20.

We agree that the argument has been waived. See *Danforth* v. *Minnesota*, 552 U. S. 264, 289, 128 S. Ct. 1029, 169 L. Ed. 2d 859 (2008) (``States can waive a *Teague* defense . . . by failing to raise it in a timely manner . . . .''). It was not advanced in District Court, before the Fifth Circuit, or in the State's



© 2017 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

brief in opposition to Buck's petition for certiorari. Although we may reach the issue in our discretion, we have observed before that a State's failure to raise a *Teague* argument at the petition stage is particularly ``significant'' in deciding whether such an exercise of discretion is appropriate. *Schiro* v. *Farley*, 510 U. S. 222, 228-229, 114 S. Ct. 783, 127 L. Ed. 2d 47 (1994). When ``a legal issue appears to warrant review, we grant certiorari in the expectation of being able to decide that issue.'' *Id.,* at 229, 114 S. Ct. 783, 127 L. Ed. 2d 47. If we were to entertain the State's eleventh-hour *Teague* argument and find it persuasive, Buck's *Strickland* and Rule 60(b)(6) contentions-the issues we thought worthy of review-would be insulated from our consideration. We therefore decline to reach the *Teague* question and conclude that *Martinez* and *Trevino* apply to Buck's claim. We reach no broader determination concerning the application of these cases.

C

For the foregoing reasons, we conclude that Buck has demonstrated both ineffective assistance of counsel under *Strickland* and an entitlement to relief under Rule 60(b)(6). It follows that the Fifth Circuit erred in denying Buck the COA required to pursue these claims on appeal.

The judgment of the United States Court of Appeals for the Fifth Circuit is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

© 2017 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

IN THE UNTIED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA


GREGORY HOLDEN (PETITIONER)          CIVIL ACTION.NO._____

VS.


DISTRICT ATTORNEY's OFFICE
OF PHILADELPHIA, et.al;
(RESPONDENTS)


**PETITION-MOTION UNDER RULE 60(b)(6) REQUESTING RE-OPENING OF HIS
CASE, BASED UPON UNITED STATES SUPREME COURT RECENT DECISION BUCK
V. DAVIS, 197 L.ED. 2D 1 (2017). THE BUCK DECISION HELD THAT HE
DEMONSTRATED BOTH INEFFECTIVE ASSISTANCE OF COUNSEL UNDER
STRICKLAND V. WASHINGTON AND ENTITLEMENT TO RELIEF UNDER RULE 60
(b)(6):**
**THE PETITIONER ALSO REQUEST FOR APPOINTMENT OF COUNSEL?:**


TO: THE HONORABLE DISTRICT JUDGE J. CURTIS JOYNER:

### FACTUAL BACKGROUND

(1). The Petitioner full procedural history is amply
developed in Civil Action NO.06-cv-5202. The petitioner submits
that he is a pro se litigant and his pleading's are to be held to
a less stringent standard than practicing professional lawyers.
Under Haines v. Kerner, 92 S.Ct. 594 (1974).

(2). On September 21, 2007, the Honorable J. Curtis J.
Joyner, denied petitioner's first writ of habeas corpus as
[time-barred].

(3). On December 16, 1980, the Petitioner allegedly and (3)
three cohorts robbed a man. During the course of the robbery;
Petitioner's alleged cohorts shot the victim whom later died of
six gunshot wounds to his chest and abdomen (N.T. 5/13/83, 38,
61-63). On June 24, 1983, a jury sitting before Judge David N.
Savitt convicted petitioner of second degree murder, robbery,
possessing an instrument of a crime and criminal conspiracy. On
April 23, 1984, Judge Savitt sentenced petitioner to a term of
life imprisonment for second degree murder and a current term of
one to two years for possessing an instrument of a crime.

②

1

(4). Petitioner's (trial counsel) did not file his direct appeal; i.e. his requested direct appeal. This created the beginning of petitioner's (defective) process for (30) years through the state courts and federal courts.

(5). On November 22, 1985, petitioner filed his first pro-se, PCRA petition. Counsel was appointed and filed an amended petition. **"Relief was denied and the appeal from that denial was dismissed after counsel failed to file a brief".** Petitioner instituted pro se, his second PCRA proceeding, on August 30, 1999, relief was denied on September 28, 1999. On June 14, 2005, petitioner filed his third PCRA petition. When that petition was **"dismissed as ("untimely")**,Mr. Holden filed another pro se appeal asserting that the sentencing counsel was ineffective for not filing a direct appeal. see Com vs. Holden, 915 A.2d 143 (Pa. Super. 2006). (unpublished memorandum) affirmed.

(6). On October 24, 2007, Petitioner Mr. Holden pro se filed his fourth PCRA petition; seeking reinstatement of both his direct appellate rights from the denial of his first petition.

(7). On June 3, 2009, this request was denied by the Superior Court.

(8). On November 22, 2006, the petitioner filed his first federal habeas corpus petition, which was subsequently denied as (untimely) filed on September 21, 2007. Thereafter, Petitioner file a 60 (b) motion which was denied.

(9). On November 14, 2007, the petitioner filed for C.O.A. on the denial of 60(b) relief. That request was subsequently denied.

(10). On August 26, 2010, the Petitioner/Plaintiff Mr. Holden filed a 1983 Civil Action Complaint; which was subsequently denied on October 18th, 2011 without prejudice; because Mr. Holden was unable to serve the defendants.; DKT.NO.10-4642.

(11). On or about January 3, 2016, Petitioner filed a 60(d)(1) motion which was subsequently denied.

(12). Now Comes Petitioner pro se, moving for Rule 60(b)(6) relief; under United States Supreme Court recent decision Buck v. Davis, 197 L.ed.2d 1 (2016); because Mr. Holden is identical situated as defendant Buck. Both defendants suffered ineffectiveness of counsel under Strickland vs. Washington, and both defendants are entitled to 60(b)(6) relief.

2

## STANDARD ON FED.R.CIV. P. 60(b)(6)

Permits a court to [reopen] a judgement for any other reasons that justifies relief. Fed.R.Civ.P. 60 (b) vests wide discretion in courts, but judicial precedent hold that relief under Rule 60(b)(6) is available only in extraordinary circumstances. In determining whether extraordinary circumstances are present, a court may consider a wide range of factors. These may include, in an appropriate case, **the risk of injustice to the parties and the risk of undermining the public's confidence in the judicial process**. See Buck, supra.

In the Buck case, the US Supreme Court held that he demonstrated [prejudice] under Strickland v. Washington, as a result of his trial counsel introducing expert testimony through Dr. Quijano's" concerning Buck's skin color. According to Dr. Quijano, Buck would always be black and that immutable characteristic carried with it an "increased probability" of future violence. Id.at 19. This was hard statistical evidence-from an expert-to guide an otherwise speculative inquiry. The Court held the effect of Dr. Quijano's testimony on Buck's sentencing cannot be (197 L.ed.2d. 21) dismissed as "de minimis" Buck has demonstrated prejudice.

Further, the court held that Buck was entitled to relief under Rule 60(b)(6) and the "whole purpose" of Rule 60 (b) "is to make an exception to finality" (citing) Gonzalez, 545 U.S., at 529. An in Buck case, the state's interest in finality deserves light weight. When Texas recognized that the infusion of race into proceedings similar to Saldano's warranted confession of error, it effectively acknowledged that the people of Texas lack interest in enforcing a capital sentence obtained on so flawed a basis. In concluding that the value of finality does not demand that we leave the District Court's judgment in place, we do no more than acknowledge what Texas itself recognized (17) years ago.

Continuing in Buck, Our Rule 60 (b)(6) analysis has thus far omitted one significant element. When Buck, first sought federal habeas relief in 2004. Coleman barred the District Court from hearing his claim. Today, however, a claim of ineffective assistance of trial counsel defaulted in a Texas postconviction proceeding maybe reviewed in federal court if state habeas counsel was constitutional ineffective in failing to raise it, and the claim has "some merit" Martinez, 566 U.S., at 14, see Trevino, 569 U.S., at _____, 133 S.Ct. 1911. Buck only can obtain relief under Martinez and Trevino, and his case could be re-open. Not under Coleman.

In the current case, Mr. Holden should be entitled to Rule 60 (b)(6) relief, because a claim of ineffective assistance of trial counsel defaulted in a "Pennsylvania" postconviction proceeding may be reviewed in federal court if state habeas counsel was constitutionally ineffective in failing to raise it, ("similar to Buck and Texas postconviction proceedings") if the claim has "some merit" Martinez, 566 U.S. at 14, see Trevino, 569 U.S., at _____, Petitioner Holden, like defendant Buck could not obtain relief unless he is entitled to the benefit of this rule-that is, unless Martinez and Trevino, not Coleman, would govern his case if it were re-opened.

It would be be error to deny Mr. Holden 60(b)(6) relief, when he has demonstrated ineffective assistance of trial counsel under the Sixth Amendment and he has been shut-out of state and federal court on procedural grounds, i.e. [time-barred] and his first habeas petition should be re-opened, based upon recent decision Buck, supra.

Trial counsel Lydia Kirkland whom represented Petitioner at trial, did not filed his required direct appeal. She was deposed by first PCRA counsel William A. Meehan, Jr. Esq., on October 28, 1992, at which time she [alleged] that Petitioner, nor his family never advised her to appeal. However, the United States Supreme Court mandates that there is a constitutional duty to "consult" with the defendant about an appeal when there is a reason to believe that a rational defendant would want to appeal. The court defined "consult" as advising the defendant about the ["advantages"] and ["disadvantages"] of taking and appeal, and making a reasonable duty to discover the defendant's wishes. see Evitts v. Lucey, 469 U.S. 387 (1985). also see. In Roe v. Flores-Ortega, 528 U.S. 668 (2000). The court held that criminal defense attorney's have a constitutional duty to "consult" with and **advise criminal defendants of their appellate rights.** ("This did not occur") and trial counsel Lydia Kirkland has denied Petitioner his Sixth Amendment Constitutional right's to a direct appeal and as a result Mr. Holden has demonstrated [prejudice], similar to defendant Buck. See case law attached for court convenience.

## CONCLUSION

Therefore, Mr. Holden habeas corpus petition should be re-opened under Strickland vs. Washington, because he has demonstrated [prejudiced] and he is entitled to 60 (b)(6) relief, under Buck.

Further, Mr. Holden should be [granted] appointment of counsel under Tabron vs. Grace, 6 F.3d 147 (1993) given the complexity of the issues and his case?

FOR THIS REQUEST PETITIONER FOREVER PRAY.

Respectfully Submitted

Gregory Holden (Petitioner)
#AY-2898
1000 FOLLIES.RD.
SCI.DALLAS.PA. 18612

DATED: __6-1__ , 2017

**SERVED UPON**

(2): Copies: To; Clerk
601 Market. St.
Phila. Pa. 19106

(1): One Copy;
To; (ADA) Office
3 South Penn Square
Phila. Pa. 19107-3799

5

# EXHIBIT

# A

---

**DUANE EDWARD BUCK, PETITIONER v. LORIE DAVIS, DIRECTOR, TEXAS DEPARTMENT OF CRIMINAL JUSTICE, CORRECTIONAL INSTITUTIONS DIVISION**
**SUPREME COURT OF THE UNITED STATES**
**197 L. Ed. 2d 1; 2017 U.S. LEXIS 1429; 85 U.S.L.W. 4037; 26 Fla. L. Weekly Fed. S 419**
**No. 15-8049.**
**October 5, 2016, Argued**
**February 22, 2017, Decided**

---

**Notice:**

**The LEXIS pagination of this document is subject to change pending release of the final published version.**

**Editorial Information: Prior History**

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUITBuck v. Stephens, 623 Fed. Appx. 668, 2015 U.S. App. LEXIS 14755 (5th Cir. Tex., 2015)

**Disposition:**
            623 Fed. Appx. 668, reversed and remanded.

**Counsel**                        **Christina A. Swarns** argued the cause for petitioner.
                            **Scott A. Keller** argued the cause for respondent.
**Judges:** ROBERTS, C. J., delivered the opinion of the Court, in which KENNEDY, GINSBURG, BREYER, SOTOMAYOR, and KAGAN, JJ., joined. THOMAS, J., filed a dissenting opinion, in which ALITO, J., joined.

**CASE SUMMARY**It was error to deny a prisoner a COA to pursue his Sixth Amendment claims on appeal where he demonstrated ineffective assistance when his attorney called an expert who testified about a connection between his race and the likelihood of violence, and that error entitled him to relief under Fed. R. Civ. P. 60(b)(6).

**OVERVIEW:** HOLDINGS: [1]-Because a reviewing court inverted the statutory order of operations by deciding the merits of an appeal and then denying the COA based on adjudication of the actual merits, it placed too heavy a burden on the prisoner at the COA stage; [2]-For Sixth Amendment purposes, the prisoner demonstrated prejudice during the sentencing phase where his attorney called an expert who testified about a connection between his race and the likelihood of violence, and it was reasonably probable that the death sentence would not have been imposed otherwise; [3]-Denying a Fed. R. Civ. P. 60(b)(6) motion was error where it was clear that the prisoner may have been sentenced to death due to his race, the State had admitted that sentencing based on race considerations was error in other cases, and it was inappropriate to consider race no matter how it was injected into the proceeding.

**OUTCOME:** Judgment reversed; case remanded. 6-2 Decision; 1 Dissent.

**LexisNexis Headnotes**

*Constitutional Law > Bill of Rights > Fundamental Rights > Criminal Process > Assistance of*

SCTHOT                                        1

© 2017 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

***Counsel***
***Criminal Law & Procedure > Habeas Corpus > Exhaustion of Remedies > Exceptions***
***Criminal Law & Procedure > Habeas Corpus > Procedural Default > Cause & Prejudice Standard >***
***Proof of Cause***

In 2012, judicial precedent modified the unqualified statement in case law that an attorney's ignorance or inadvertence in a postconviction proceeding does not qualify as cause to excuse a procedural default. When a state formally limits the adjudication of claims of ineffective assistance of trial counsel to collateral review, a prisoner may establish cause for procedural default if (1) the state courts did not appoint counsel in the initial-review collateral proceeding, or appointed counsel in that proceeding was ineffective under the Strickland standards; and (2) the underlying claim is a substantial one, which is to say that the claim has some merit.

***Civil Procedure > Judgments > Relief From Judgment > Extraordinary Circumstances***

Fed. R. Civ. P. 60(b) enumerates specific circumstances in which a party may be relieved of the effect of a judgment, such as mistake, newly discovered evidence, fraud, and the like. The Rule concludes with a catchall category, Fed. R. Civ. P. 60(b)(6), providing that a court may lift a judgment for any other reason that justifies relief. Relief is available under Rule 60(b)(6), however, only in extraordinary circumstances, and judicial precedent explains that such circumstances will rarely occur in the habeas context.

***Criminal Law & Procedure > Habeas Corpus > Appeals > Certificate of Appealability***

To obtain a certificate of appealability, a petitioner is required to make a substantial showing of the denial of a constitutional right. 28 U.S.C.S. § 2253(c)(2).

***Criminal Law & Procedure > Habeas Corpus > Appeals > Certificate of Appealability***

A state prisoner whose petition for a writ of habeas corpus is denied by a federal district court does not enjoy an absolute right to appeal. Federal law requires that he first obtain a certificate of appealability (COA) from a circuit justice or judge. 28 U.S.C.S. § 2253(c)(1). A COA may issue only if the applicant has made a substantial showing of the denial of a constitutional right. 28 U.S.C.S. § 2253(c)(2). Until the prisoner secures a COA, the Court of Appeals may not rule on the merits of his case.

***Criminal Law & Procedure > Habeas Corpus > Appeals > Certificate of Appealability***

The certificate of appealability (COA) inquiry is not coextensive with a merits analysis. At the COA stage, the only question is whether the applicant has shown that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further. This threshold question should be decided without full consideration of the factual or legal bases adduced in support of the claims. When a court of appeals sidesteps the COA process by first deciding the merits of an appeal, and then justifying its denial of a COA based on its adjudication of the actual merits, it is in essence deciding an appeal without jurisdiction.

***Criminal Law & Procedure > Habeas Corpus > Appeals > Certificate of Appealability***

A court of appeals should limit its examination at the certificate of appealability stage to a threshold inquiry into the underlying merit of the claims, and ask only if the district court's decision was debatable.

***Criminal Law & Procedure > Habeas Corpus > Appeals > Certificate of Appealability***

© 2017 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

When a court of appeals properly applies the certificate of appealability (COA) standard and determines that a prisoner's claim is not even debatable, that necessarily means the prisoner has failed to show that his claim is meritorious. But the converse is not true. That a prisoner has failed to make the ultimate showing that his claim is meritorious does not logically mean he failed to make a preliminary showing that his claim was debatable. Thus, when a reviewing court inverts the statutory order of operations and first decides the merits of an appeal, then justifies its denial of a COA based on its adjudication of the actual merits, it has placed too heavy a burden on the prisoner at the COA stage. Judicial precedent flatly prohibits such a departure from the procedure prescribed by 28 U.S.C.S. § 2253.

### Criminal Law & Procedure > Habeas Corpus > Appeals > Certificate of Appealability

A claim can be debatable even though every jurist of reason might agree, after the certificate of appealability (COA) has been granted and the case has received full consideration, that petitioner will not prevail. 28 U.S.C.S. § 2253 sets forth a two-step process: an initial determination whether a claim is reasonably debatable, and then, if it is, an appeal in the normal course. Judicial precedent does not mean to specify what procedures are may be appropriate in every case. But whatever procedures are employed at the COA stage should be consonant with the limited nature of the inquiry.

### Criminal Law & Procedure > Counsel > Effective Assistance > Tests
### Constitutional Law > Bill of Rights > Fundamental Rights > Criminal Process > Assistance of Counsel

The Sixth Amendment right to counsel is the right to the effective assistance of counsel. A defendant who claims to have been denied effective assistance must show both that counsel performed deficiently and that counsel's deficient performance caused him prejudice.

### Constitutional Law > Bill of Rights > Fundamental Rights > Criminal Process > Assistance of Counsel
### Criminal Law & Procedure > Counsel > Effective Assistance > Tests

The Strickland standard's first prong sets a high bar. A defense lawyer navigating a criminal proceeding faces any number of choices about how best to make a client's case. The lawyer has discharged his constitutional responsibility so long as his decisions fall within the wide range of professionally competent assistance. It is only when the lawyer's errors were so serious that counsel was not functioning as the counsel guaranteed by the Sixth Amendment that Strickland's first prong is satisfied.

### Criminal Law & Procedure > Sentencing > Capital Punishment > General Overview

It would be patently unconstitutional for a state to argue that a defendant is liable to be a future danger because of his race.

### Criminal Law & Procedure > Counsel > Effective Assistance > Tests
### Constitutional Law > Bill of Rights > Fundamental Rights > Criminal Process > Assistance of Counsel

To satisfy the Strickland standard, a litigant must also demonstrate prejudice, i.e., a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.

### Criminal Law & Procedure > Sentencing > Capital Punishment > Aggravating Circumstances

SCTHOT                                              3

© 2017 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

A jury may conclude that a crime's vicious nature calls for a sentence of death.

### Criminal Law & Procedure > Habeas Corpus > Appeals > Certificate of Appealability

A litigant seeking a certificate of appealability must demonstrate that a procedural ruling barring relief is itself debatable among jurists of reason; otherwise, the appeal would not deserve encouragement to proceed further.

### Civil Procedure > Judgments > Relief From Judgment > Extraordinary Circumstances

Fed. R. Civ. P. 60(b)(6) permits a court to reopen a judgment for any other reason that justifies relief. Fed. R. Civ. P. 60(b) vests wide discretion in courts, but judicial precedent holds that relief under Rule 60(b)(6) is available only in extraordinary circumstances. In determining whether extraordinary circumstances are present, a court may consider a wide range of factors. These may include, in an appropriate case, the risk of injustice to the parties and the risk of undermining the public's confidence in the judicial process.

### Civil Procedure > Judgments > Relief From Judgment > General Overview

The whole purpose of Fed. R. Civ. P. 60(b) is to make an exception to finality.

### Criminal Law & Procedure > Habeas Corpus > Review > Scope of Review

States can waive a Teague defense by failing to raise it in a timely manner.

### Criminal Law & Procedure > Habeas Corpus > Review > Scope of Review

Judicial precedent observes that a State's failure to raise a Teague argument at the petition stage is particularly significant in deciding whether such an exercise of discretion is appropriate. When a legal issue appears to warrant review, certiorari is granted in the expectation of being able to decide that issue.

### Syllabus

{197 L. Ed. 2d 6} Petitioner Duane Buck was convicted of capital murder in a Texas court. Under state law, the jury was permitted to impose a death sentence only if it found unanimously and beyond a reasonable doubt that Buck was likely to commit acts of violence in the future. Buck's attorney called a psychologist, Dr. Walter Quijano, to offer his opinion on that issue. Dr. Quijano had been appointed to evaluate Buck by the presiding judge and had prepared a report setting out his conclusions. To determine the likelihood that Buck would act violently in the future, Dr. Quijano had considered a number of statistical factors, including Buck's race. Although Dr. Quijano ultimately concluded that Buck was unlikely to be a future danger, his report also stated that Buck was statistically more likely to act violently because he is black. The report read, in relevant part: ``Race. Black: Increased probability.'' App. 19a. Despite knowing the contents of the report, Buck's counsel called Dr. Quijano to the stand, where he testified that race is a factor ``know[n] to predict future dangerousness.'' Id., at 146a. Dr. Quijano's report was admitted into evidence at the close of his testimony. The prosecution questioned Dr. Quijano about his conclusions on race and violence during cross-examination, and it relied on his testimony in summation. During deliberations, the jury requested and received the expert reports admitted into evidence, including Dr. Quijano's. The jury returned a sentence of death.

Buck contends that his attorney's introduction of this evidence violated his Sixth Amendment right to the

SCTHOT                                                    4

© 2017 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

effective assistance of counsel. Buck failed to raise this claim in his first state postconviction proceeding. While that proceeding was pending, this Court received a petition for certiorari in *Saldano* v. *Texas*, 530 U. S. 1212, 120 S. Ct. 2214, 147 L. Ed. 2d 246, a case in which Dr. Quijano had testified that the petitioner's Hispanic heritage weighed in favor of a finding of future dangerousness. Texas confessed error on that ground, and this Court vacated the judgment below. Soon afterward, the Texas Attorney General issued a public statement identifying six similar cases in which Dr. Quijano had testified. Buck's was one of them. In the other five cases, the Attorney General confessed error and consented to resentencing. But when Buck filed a second state habeas petition alleging that his attorney had been ineffective in introducing Dr. Quijano's testimony, the State did not confess error, and the court dismissed the petition as an abuse of the writ on **{197 L. Ed. 2d 7}** the ground that Buck had failed to raise the claim in his first petition.

Buck then sought federal habeas relief under 28 U. S. C. §2254. The State again declined to confess error, and Buck's ineffective assistance claim was held procedurally defaulted and unreviewable under *Coleman* v. *Thompson*, 501 U. S. 722, 111 S. Ct. 2546, 115 L. Ed. 2d 640. This Court's later decisions in *Martinez* v. *Ryan*, 566 U. S. 1, 132 S. Ct. 1309, 182 L. Ed. 2d 272, and *Trevino* v. *Thaler*, 569 U.S. ___, 133 S. Ct. 1911, 185 L. Ed. 2d 1044, modified the rule of *Coleman*. Had they been decided before Buck filed his federal habeas petition, Buck's claim could have been heard on the merits provided he had demonstrated that (1) state postconviction counsel had been constitutionally ineffective in failing to raise the claim, and (2) the claim had some merit. Following the decision in *Trevino*, Buck sought to reopen his §2254 case under Federal Rule of Civil Procedure 60(b)(6). To demonstrate the ``extraordinary circumstances'' required for relief, *Gonzalez* v. *Crosby*, 545 U. S. 524, 535, 125 S. Ct. 2641, 162 L. Ed. 2d 480, Buck cited the change in law effected by *Martinez* and *Trevino*, as well as ten other factors, including the introduction of expert testimony linking Buck's race to violence and the State's confession of error in similar cases. The District Court denied relief. Reasoning that ``the introduction of any mention of race'' during Buck's sentencing was ``*de minimis*,'' the court concluded, first, that Buck had failed to demonstrate extraordinary circumstances; and second, that even if the circumstances were extraordinary, Buck had failed to demonstrate ineffective assistance under *Strickland* v. *Washington*, 466 U. S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674. Buck sought a certificate of appealability (COA) from the Fifth Circuit to appeal the denial of his Rule 60(b)(6) motion. The Fifth Circuit denied his application, concluding that he had not shown extraordinary circumstances justifying relief from the District Court's judgment.

*Held*:

1. The Fifth Circuit exceeded the limited scope of the COA analysis. The COA statute sets forth a two-step process: an initial determination whether a claim is reasonably debatable, and, if so, an appeal in the normal course. 28 U. S. C. §2253. At the first stage, the only question is whether the applicant has shown that ``jurists of reason could disagree with the district court's resolution of his constitutional claims or . . . could conclude the issues presented are adequate to deserve encouragement to proceed further.'' *Miller-El* v. *Cockrell*, 537 U. S. 322, 327, 123 S. Ct. 1029, 154 L. Ed. 2d 931. Here, the Fifth Circuit phrased its determination in proper terms. But it reached its conclusion only after essentially deciding the case on the merits, repeatedly faulting Buck for having failed to demonstrate extraordinary circumstances. The question for the Court of Appeals was not whether Buck had shown that his case is extraordinary; it was whether jurists of reason could debate that issue. The State points to the Fifth Circuit's thorough consideration of the merits to defend that court's approach, but this hurts rather than helps its case. Pp. 12-15.

© 2017 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

2. Buck has demonstrated ineffective **{197 L. Ed. 2d 8}** assistance of counsel under *Strickland*. Pp. 15-20.

(a) To satisfy *Strickland*, a defendant must first show that counsel performed deficiently. 466 U. S., at 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674. Buck's trial counsel knew that Dr. Quijano's report reflected the view that Buck's race predisposed him to violent conduct and that the principal point of dispute during the penalty phase was Buck's future dangerousness. Counsel nevertheless called Dr. Quijano to the stand, specifically elicited testimony about the connection between race and violence, and put Dr. Quijano's report into evidence. No competent defense attorney would introduce evidence that his client is liable to be a future danger because of his race. Pp. 15-17.

(b) *Strickland* further requires a defendant to demonstrate prejudice-``a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U. S., at 694, 104 S. Ct. 2052, 80 L. Ed. 2d 674. It is reasonably probable that without Dr. Quijano's testimony on race and violence, at least one juror would have harbored a reasonable doubt on the question of Buck's future dangerousness. This issue required the jury to make a predictive judgment inevitably entailing a degree of speculation. But Buck's race was not subject to speculation, and according to Dr. Quijano, that immutable characteristic carried with it an increased probability of future violence. Dr. Quijano's testimony appealed to a powerful racial stereotype and might well have been valued by jurors as the opinion of a medical expert bearing the court's imprimatur. For these reasons, the District Court's conclusion that any mention of race during the penalty phase was *de minimis* is rejected. So is the State's argument that Buck was not prejudiced by Dr. Quijano's testimony because it was introduced by his own counsel, rather than the prosecution. Jurors understand that prosecutors seek convictions and may reasonably be expected to evaluate the government's evidence in light of its motivations. When damaging evidence is introduced by a defendant's own lawyer, it is in the nature of an admission against interest, more likely to be taken at face value. Pp. 17-20.

3. The District Court's denial of Buck's Rule 60(b)(6) motion was an abuse of discretion. Pp. 20-26.

(a) Relief under Rule 60(b)(6) is available only in ``extraordinary circumstances." *Gonzalez*, 545 U. S., at 535, 125 S. Ct. 2641, 162 L. Ed. 2d 480. Determining whether such circumstances are present may include consideration of a wide range of factors, including ``the risk of injustice to the parties" and ``the risk of undermining the public's confidence in the judicial process." *Liljeberg* v. *Health Services Acquisition Corp.*, 486 U. S. 847, 863-864, 108 S. Ct. 2194, 100 L. Ed. 2d 855. The District Court's denial of Buck's motion rested largely on its determination that race played only a *de minimis* role in his sentencing. But there is a reasonable probability that Buck was sentenced to death in part because of his race. This is a disturbing departure from the basic premise that our criminal law punishes people for what they do, not who they are. That it concerned race **{197 L. Ed. 2d 9}** amplifies the problem. Relying on race to impose a criminal sanction ``poisons public confidence" in the judicial process, *Davis* v. *Ayala*, 576 U. S. ___, ___, 135 S. Ct. 2187, 192 L. Ed. 2d 323, a concern that supports Rule 60(b)(6) relief. The extraordinary nature of this case is confirmed by the remarkable steps the State itself took in response to Dr. Quijano's testimony in other cases. Although the State attempts to justify its decision to treat Buck differently from the other five defendants identified in the Attorney General's public statement, its explanations for distinguishing Buck's case from *Saldano* have nothing to do with the Attorney General's stated reasons for confessing error in that case. Pp. 20-24.

(b) Unless *Martinez* and *Trevino*, rather than *Coleman*, would govern Buck's case were it reopened, his

SCTHOT  6

© 2017 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

claim would remain unreviewable and Rule 60(b)(6) relief would be inappropriate. The State argues that *Martinez* and *Trevino* would not govern Buck's case because they announced a ``new rule'' under *Teague* v. *Lane*, 489 U. S. 288, 109 S. Ct. 1060, 103 L. Ed. 2d 334, that does not apply retroactively to cases (like Buck's) on collateral review. This argument, however, has been waived: the State failed to advance it in District Court, before the Fifth Circuit, or in its brief in opposition to Buck's petition for certiorari. Pp. 24-26.

623 Fed. Appx. 668, reversed and remanded.

## Opinion

**Opinion by:** ROBERTS

## Opinion

Chief Justice Roberts delivered the opinion of the Court.

A Texas jury convicted petitioner Duane Buck of capital murder. Under state law, the jury could impose a death sentence only if it found that Buck was likely to commit acts of violence in the future. Buck's attorney called a psychologist to offer his opinion on that issue. The psychologist testified that Buck probably would not engage in violent conduct. But he also stated that one of the factors pertinent in assessing a person's propensity for violence was his race, and that Buck was statistically more likely to act violently because he is black. The jury sentenced Buck to death.

Buck contends that his attorney's introduction of this evidence violated his Sixth Amendment right to the effective assistance of counsel. This claim has never been heard on the merits in any court, because the attorney who represented Buck in his first state postconviction proceeding failed to raise it. In 2006, a Federal District Court relied on that failure-properly, under then-governing law-to hold that Buck's claim was procedurally defaulted and unreviewable.

In 2014, Buck sought to reopen that 2006 judgment by filing a motion under Federal Rule of Civil Procedure 60(b)(6). He argued that this Court's decisions in *Martinez* v. *Ryan*, 566 U. S. 1, 132 S. Ct. 1309, 182 L. Ed. 2d 272 (2012), and *Trevino* v. *Thaler*, 569 U. S. ___, 133 S. Ct. 1911, 185 L. Ed. 2d 1044 **{197 L. Ed. 2d 10}** (2013), had changed the law in a way that provided an excuse for his procedural default, permitting him to litigate his claim on the merits. In addition to this change in the law, Buck's motion identified ten other factors that, he said, constituted the ``extraordinary circumstances'' required to justify reopening the 2006 judgment under the Rule. See *Gonzalez* v. *Crosby*, 545 U. S. 524, 535, 125 S. Ct. 2641, 162 L. Ed. 2d 480 (2005).

The District Court below denied the motion, and the Fifth Circuit declined to issue the certificate of appealability (COA) requested by Buck to appeal that decision. We granted certiorari, and now reverse.

I

A

On the morning of July 30, 1995, Duane Buck arrived at the home of his former girlfriend, Debra Gardner. He was carrying a rifle and a shotgun. Buck entered the home, shot Phyllis Taylor, his stepsister, and then shot Gardner's friend Kenneth Butler. Gardner fled the house, and Buck followed.

© 2017 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

So did Gardner's young children. While Gardner's son and daughter begged for their mother's life, Buck shot Gardner in the chest. Gardner and Butler died of their wounds. Taylor survived.

Police officers arrived soon after the shooting and placed Buck under arrest. An officer would later testify that Buck was laughing at the scene. He remained ``happy'' and ``upbeat'' as he was driven to the police station, ``[s]miling and laughing'' in the back of the patrol car. App. 134a-135a, 252a.

Buck was tried for capital murder, and the jury convicted. During the penalty phase of the trial, the jury was charged with deciding two issues. The first was what the parties term the ``future dangerousness'' question. At the time of Buck's trial, a Texas jury could impose the death penalty only if it found-unanimously and beyond a reasonable doubt-``a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society.'' Tex. Code Crim. Proc. Ann., Art. 37.071, §2(b)(1) (Vernon 1998). The second issue, to be reached only if the jury found Buck likely to be a future danger, was whether mitigating circumstances nevertheless warranted a sentence of life imprisonment instead of death. See §2(e).

The parties focused principally on the first question. The State called witnesses who emphasized the brutality of Buck's crime and his evident lack of remorse in its aftermath. The State also called another former girlfriend, Vivian Jackson. She testified that, during their relationship, Buck had routinely hit her and had twice pointed a gun at her. Finally, the State introduced evidence of Buck's criminal history, including convictions for delivery of cocaine and unlawfully carrying a weapon. App. 125a-127a, 185a.

Defense counsel answered with a series of lay witnesses, including Buck's father and stepmother, who testified that they had never known him to be violent. Counsel also called two psychologists to testify as experts. The first, Dr. Patrick Lawrence, observed that Buck had previously served time in prison and had been held in minimum custody. From this he concluded that Buck ``did not present any problems in the prison setting.'' Record in No. 4:04-cv-03965 **{197 L. Ed. 2d 11}** (SD Tex.), Doc. 5-116, pp. 12-13. Dr. Lawrence further testified that murders within the Texas penal system tend to be gang related (there was no evidence Buck had ever been a member of a gang) and that Buck's offense had been a ``crime of passion'' occurring within the context of a romantic relationship. *Id.,* at 4, 19, 21. Based on these considerations, Dr. Lawrence determined that Buck was unlikely to be a danger if he were sentenced to life in prison. *Id.,* at 20-21.

Buck's second expert, Dr. Walter Quijano, had been appointed by the presiding judge to conduct a psychological evaluation. Dr. Quijano had met with Buck in prison prior to trial and shared a report of his findings with defense counsel.

Like Dr. Lawrence, Dr. Quijano thought it significant that Buck's prior acts of violence had arisen from romantic relationships with women; Buck, of course, would not form any such relationships while incarcerated. And Dr. Quijano likewise considered Buck's behavioral record in prison a good indicator that future violence was unlikely. App. 36a, 39a-40a.

But there was more to the report. In determining whether Buck was likely to pose a danger in the future, Dr. Quijano considered seven ``statistical factors.'' The fourth factor was ``race.'' His report read, in relevant part: ``4. **Race.** Black: Increased probability. There is an over-representation of Blacks among the violent offenders.'' *Id.,* at 19a.

Despite knowing Dr. Quijano's view that Buck's race was competent evidence of an increased probability of future violence, defense counsel called Dr. Quijano to the stand and asked him to discuss the ``statistical factors'' he had ``looked at in regard to this case.'' *Id.,* at 145a-146a. Dr. Quijano responded that certain factors were ``know[n] to predict future dangerousness'' and, consistent with his report, identified race as one of them. *Id.,* at 146a. ``It's a sad commentary,'' he testified, ``that minorities, Hispanics and black people, are over represented in the Criminal Justice

© 2017 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

System." *Ibid.* Through further questioning, counsel elicited testimony concerning factors Dr. Quijano thought favorable to Buck, as well as his ultimate opinion that Buck was unlikely to pose a danger in the future. At the close of Dr. Quijano's testimony, his report was admitted into evidence. *Id.,* at 150a-152a.

After opening cross-examination with a series of general questions, the prosecutor likewise turned to the report. She asked first about the statistical factors of past crimes and age, then questioned Dr. Quijano about the roles of sex and race: ``You have determined that the sex factor, that a male is more violent than a female because that's just the way it is, and that the race factor, black, increases the future dangerousness for various complicated reasons; is that correct?" *Id.,* at 170a. Dr. Quijano replied, ``Yes." *Ibid.*

During closing arguments, defense counsel emphasized that Buck had proved to be ``controllable in the prison population," and that his crime was one of ``jealousy, . . . passion and emotion" unlikely to be repeated in jail. *Id.,* at 189a-191a. The State stressed the crime's brutal nature and Buck's lack of remorse, along with the inability of Buck's own experts to guarantee that he would not act violently {**197 L. Ed. 2d 12**} in the future-a point it supported by reference to Dr. Quijano's testimony. See *id.,* at 198a-199a (``You heard from Dr. Quijano, . . . who told you that . . . the probability did exist that [Buck] would be a continuing threat to society.").

The jury deliberated over the course of two days. During that time it sent out four notes, one of which requested the ``psychology reports" that had been admitted into evidence. *Id.,* at 209a. These reports-including Dr. Quijano's-were provided. The jury returned a sentence of death.

B

Buck's conviction and sentence were affirmed on direct appeal. *Buck* v. *State*, No. 72,810 (Tex. Crim. App., Apr. 28, 1999). His case then entered a labyrinth of state and federal collateral review, where it has wandered for the better part of two decades.

Buck filed his first petition for a writ of habeas corpus in Texas state court in 1999. The four claims advanced in his petition, however, were all frivolous or noncognizable. See *Ex parte Buck*, No. 699684-A (Dist. Ct. Harris Cty., Tex., July 11, 2003), pp. 6-7. The petition failed to mention defense counsel's introduction of expert testimony that Buck's race increased his propensity for violence.

But Dr. Quijano had testified in other cases, too, and in 1999, while Buck's first habeas petition was pending, one of those cases reached this Court. The petitioner, Victor Hugo Saldano, argued that his death sentence had been tainted by Dr. Quijano's testimony that Saldano's Hispanic heritage ``was a factor weighing in the favor of future dangerousness." App. 302a. Texas confessed error on that ground and asked this Court to grant Saldano's petition for certiorari, vacate the state court judgment, and remand the case. In June 2000, the Court did so. *Saldano* v. *Texas*, 530 U. S. 1212, 120 S. Ct. 2214, 147 L. Ed. 2d 246.

Within days, the Texas Attorney General, John Cornyn, issued a public statement concerning the cases in which Dr. Quijano had testified. The statement affirmed that ``it is inappropriate to allow race to be considered as a factor in our criminal justice system." App. 213a. In keeping with that principle, the Attorney General explained that his office had conducted a ``thorough audit" and ``identified eight more cases in which testimony was offered by Dr. Quijano that race should be a factor for the jury to consider in making its determination about the sentence in a capital murder trial." *Ibid.* Six of those cases were ``similar to that of Victor Hugo Saldano"; in those cases, letters had been sent to counsel apprising them of the Attorney General's findings. *Id.,* at 213a-214a. The statement closed by identifying the defendants in those six cases. Buck was one of them. *Id.,* at 215a-217a. By the close of 2002, the Attorney General had confessed error, waived any available procedural defenses, and

© 2017 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

consented to resentencing in the cases of five of those six defendants. See *Alba* v. *Johnson*, 232 F. 3d 208 (CA5 2000) (Table); Memorandum and Order in *Blue* v. *Johnson*, No. 4:99-cv-00350 (SD Tex.), pp. 15-17; Order in *Garcia* v. *Johnson*, No. 1:99-cv-00134 (ED Tex.), p. 1; Order in *Broxton* v. *Johnson*, No. 4:00-cv-01034 (SD Tex.), pp. 10-11; Final Judgment in *Gonzales* v. *Cockrell*, No. 7:99-cv-00072 (WD Tex.), p. 1.

Not, however, in Buck's. In 2002, **{197 L. Ed. 2d 13}** Buck's attorney filed a new state habeas petition alleging that trial counsel had rendered ineffective assistance by introducing Dr. Quijano's testimony. The State was not represented by the Attorney General in this proceeding-the Texas Attorney General represents state respondents in federal habeas cases, but not state habeas cases-and it did not confess error. Because Buck's petition was successive, the Texas Court of Criminal Appeals dismissed it as an abuse of the writ. *Ex parte Buck*, Nos. 57,004-01, 57,004-02 (Tex. Crim. App., Oct. 15, 2003) ( *per curiam*).

Buck turned to the federal courts. He filed a petition for habeas corpus under 28 U. S. C. §2254 in October 2004, by which time Attorney General Cornyn had left office. See *Buck* v. *Dretke*, 2006 U.S. Dist. LEXIS 101377, 2006 WL 8411481, *2 (SD Tex., July 24, 2006). Buck sought relief on the ground that trial counsel's introduction of Dr. Quijano's testimony was constitutionally ineffective. The State responded that the state court had dismissed Buck's ineffective assistance claim because Buck had failed to press it in his first petition, raising it for the first time in a procedurally improper second petition. The State argued that such reliance on an established state rule of procedure was an adequate and independent state ground precluding federal review. Texas acknowledged that it had waived similar procedural defenses in Saldano's case. But it argued that Buck's case was different because ``[i]n Saldano's case Dr. Quijano *testified for the State*''; in Buck's, ``it was Buck who called Dr. Quijano to testify.'' Answer and Motion for Summary Judgment in No. 4:04-cv-03965 (SD Tex.), p. 20.

Buck countered that, notwithstanding his procedural default, the District Court should reach the merits of his claim because a failure to do so would result in a miscarriage of justice. Buck did not argue that his default should be excused on a showing of ``cause'' and ``prejudice''-that is, cause for the default, and prejudice from the denial of a federal right. And for good reason: At the time Buck filed his §2254 petition, our decision in *Coleman* v. *Thompson*, 501 U. S. 722, 752-753, 111 S. Ct. 2546, 115 L. Ed. 2d 640 (1991), made clear that an attorney's failure to raise an ineffective assistance claim during state postconviction review could not constitute cause. The District Court rejected Buck's miscarriage of justice argument and held that, because of his procedural default, his ineffective assistance claim was unreviewable. *Buck* v. *Dretke*, 2006 U.S. Dist. LEXIS 101377, 2006 WL 8411481, at *8. Buck unsuccessfully sought review of the District Court's ruling. See *Buck* v. *Thaler*, 345 Fed. Appx. 923 (CA5 2009) ( *per curiam*) (denying application for a COA), cert. denied, 559 U.S. 1072, 130 S. Ct. 2096, 176 L. Ed. 2d 730 (2010).

In 2011, Buck sought to reopen his case, arguing that the prosecution had violated the Equal Protection and Due Process Clauses by asking Dr. Quijano about the relationship between race and future violence on cross-examination and referring to his testimony during summation. Buck also argued that the State's decision to treat him differently from the other defendants affected by Dr. Quijano's testimony justified relieving him of the District Court's adverse judgment. The Fifth Circuit disagreed, see *Buck* v. *Thaler*, 452 Fed. Appx. 423, 427-428 **{197 L. Ed. 2d 14}** (CA5 2011) ( *per curiam*), and we denied certiorari, *Buck* v. *Thaler*, 565 U. S. 1022, 132 S. Ct. 32, 181 L. Ed. 2d 411 (2011). Buck, still barred by *Coleman* from avoiding the consequences of his procedural default, did not pursue his ineffective assistance claim.

C

© 2017 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

In 2012, this Court "modif[ied] the unqualified statement in *Coleman* that an attorney's ignorance or inadvertence in a postconviction proceeding does not qualify as cause to excuse a procedural default." *Martinez*, 566 U. S., at 9, 132 S. Ct. 1309, 182 L. Ed. 2d 272. We held that when a state formally limits the adjudication of claims of ineffective assistance of trial counsel to collateral review, a prisoner may establish cause for procedural default if (1) "the state courts did not appoint counsel in the initial-review collateral proceeding," or "appointed counsel in [that] proceeding . . . was ineffective under the standards of *Strickland* v. *Washington*, 466 U. S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)"; and (2) "the underlying . . . claim is a substantial one, which is to say that . . . the claim has some merit." *Id.,* at 14, 132 S. Ct. 1309, 182 L. Ed. 2d 272.

By its terms, *Martinez* did not bear on Buck's ineffective assistance claim. At the time of Buck's conviction and appeal, Texas did not formally require criminal defendants to reserve such claims for collateral review. In *Trevino*, however, the Court concluded that the exception announced in *Martinez* extended to state systems that, as a practical matter, deny criminal defendants "a meaningful opportunity" to press ineffective assistance claims on direct appeal. 569 U. S., at ___, 133 S. Ct. 1911, 185 L. Ed. 2d 1044, 1056. The Court further concluded that the system in Texas, where petitioner had been convicted, was such a system. *Ibid.* The upshot: Had *Martinez* and *Trevino* been decided before Buck filed his §2254 petition, a federal court could have reviewed Buck's ineffective assistance claim if he demonstrated that (1) state postconviction counsel had been constitutionally ineffective in failing to raise it, and (2) the claim had "some merit." *Martinez*, 566 U. S., at 14, 132 S. Ct. 1309, 182 L. Ed. 2d 272.

D

When *Trevino* was decided, Buck's third state habeas petition was pending in Texas court. That petition was denied in November 2013. *Ex parte Buck*, 418 S. W. 3d 98 (Tex. Crim. App. 2013) ( *per curiam*). Two months later, Buck returned to federal court, where he filed a motion to reopen his §2254 case under Federal Rule of Civil Procedure 60(b)(6). Rule 60(b) enumerates specific circumstances in which a party may be relieved of the effect of a judgment, such as mistake, newly discovered evidence, fraud, and the like. The Rule concludes with a catchall category-subdivision (b)(6)-providing that a court may lift a judgment for "any other reason that justifies relief." Relief is available under subdivision (b)(6), however, only in "extraordinary circumstances," and the Court has explained that "[s]uch circumstances will rarely occur in the habeas context." *Gonzalez*, 545 U. S., at 535, 125 S. Ct. 2641, 162 L. Ed. 2d 480.

In his motion, Buck identified 11 factors that, in his view, justified reopening the judgment. These included his attorney's introduction of expert **{197 L. Ed. 2d 15}** testimony linking Buck's race to violence, the central issue at sentencing; the prosecution's questions about race and violence on cross-examination and reliance on Dr. Quijano's testimony in summation; the State's confession of error in other cases in which Dr. Quijano testified, but its refusal to concede error in Buck's case; and the change in law effected by *Martinez* and *Trevino*, which, if they had been decided earlier, would have permitted federal review of Buck's defaulted claim. App. 283a-285a.

The District Court denied relief on two grounds. First, the court concluded that Buck had failed to demonstrate extraordinary circumstances. To that end, the court observed that a change in decisional law is rarely extraordinary by itself. *Buck* v. *Stephens*, 2014 U.S. Dist. LEXIS 185635, 2014 WL 11310152, *4 (SD Tex., Aug. 29, 2014). It further determined that the State's "promise" not to oppose resentencing did not count for much, reasoning that "Buck's case is different in critical respects from the cases in which Texas confessed error" in that Buck's lawyer, not the prosecutor, had first elicited the objectionable testimony. 2014 U.S. Dist. LEXIS 185635, [WL] at *4-*5. The court also dismissed the contention that the nature of Dr. Quijano's testimony argued for reopening the case. Although "the

© 2017 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

introduction of any mention of race was," in the court's view, ``ill[ ]advised at best and repugnant at worst," it was also ``*de minimis*'': Dr. Quijano had discussed the connection between race and violence only twice. 2014 U.S. Dist. LEXIS 185635, [WL] at *5. The court accordingly concluded that Buck had failed to make out the predicate for Rule 60(b)(6) relief.

Second, the court determined that-even if the circumstances *were* extraordinary-Buck's claim would fail on the merits. The court noted that under *Strickland*, Buck was obliged to show that counsel's performance was both deficient and prejudicial. The court held that Buck's lawyer had indeed performed deficiently in calling Dr. Quijano to give testimony that ``len[t] credence to any potential latent racial prejudice held by the jury." 2014 U.S. Dist. LEXIS 185635, 2014 WL 11310152, at *6. But, the court concluded, Buck had failed to demonstrate prejudice. It observed that Buck's crime had been ``horrific." *Ibid.* And the court had already concluded that ``the introduction of any mention of race was . . . *de minimis*." 2014 U.S. Dist. LEXIS 185635, [WL] at *5. For those reasons, it held, Buck had failed to show a reasonable probability that he would not have been sentenced to death but for Dr. Quijano's testimony about race and violence.

Buck sought to appeal the denial of his Rule 60(b)(6) motion. He accordingly filed an application for a COA with the Fifth Circuit. To obtain a COA, Buck was required to make ``a substantial showing of the denial of a constitutional right." * 28 U. S. C. §2253(c)(2).

The Fifth Circuit denied a COA, concluding that Buck's case was ``not extraordinary at all in the habeas {197 L. Ed. 2d 16} context." *Buck* v. *Stephens*, 623 Fed. Appx. 668, 673 (2015). The panel agreed with the District Court that *Martinez* and *Trevino* were not significant factors in the analysis. It characterized most of the other factors Buck had identified as ``variations on the merits" of his claim, which was ``at least unremarkable as far as [ineffective assistance] claims go." 623 Fed. Appx., at 673. The panel likewise rejected Buck's argument that he was entitled to relief because the State had issued a press release indicating that his case would be treated like Saldano's, and then had confessed error in the other cases identified as similar in the statement, but not in Buck's. *Id.,* at 674. Because Buck had ``not shown extraordinary circumstances that would permit relief under Federal Rule of Civil Procedure 60(b)(6)," the panel ``den[ied] the application for a COA." *Id.,* at 669.

Buck's motion for rehearing en banc was denied over two dissenting votes. *Buck* v. *Stephens*, 630 Fed. Appx. 251 (CA5 2015) ( *per curiam*). We granted certiorari. *Buck* v. *Stephens*, 578 U. S. ___, 136 S. Ct. 2409, 195 L. Ed. 2d 779 (2016).

II

A state prisoner whose petition for a writ of habeas corpus is denied by a federal district court does not enjoy an absolute right to appeal. Federal law requires that he first obtain a COA from a circuit justice or judge. 28 U. S. C. §2253(c)(1). A COA may issue ``only if the applicant has made a substantial showing of the denial of a constitutional right." §2253(c)(2). Until the prisoner secures a COA, the Court of Appeals may not rule on the merits of his case. *Miller-El* v. *Cockrell*, 537 U. S. 322, 336, 123 S. Ct. 1029, 154 L. Ed. 2d 931 (2003).

The COA inquiry, we have emphasized, is not coextensive with a merits analysis. At the COA stage, the only question is whether the applicant has shown that ``jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Id.,* at 327, 123 S. Ct. 1029, 154 L. Ed. 2d 931. This threshold question should be decided without ``full consideration of the factual or legal bases adduced in support of the claims." *Id.,* at 336, 123 S. Ct. 1029, 154 L. Ed. 2d 931. ``When a court of appeals sidesteps [the COA] process by first deciding the merits of an appeal, and then justifying its denial of a COA based on its adjudication of the actual merits, it is in essence deciding an

© 2017 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

appeal without jurisdiction." *Id.,* at 336-337, 123 S. Ct. 1029, 154 L. Ed. 2d 931.

The court below phrased its determination in proper terms-that jurists of reason would not debate that Buck should be denied relief, 623 Fed. Appx., at 674-but it reached that conclusion only after essentially deciding the case on the merits. As the court put it in the second sentence of its opinion: ``Because [Buck] has not shown extraordinary circumstances that would permit relief under Federal Rule of Civil Procedure 60(b)(6), we deny the application for a COA." *Id.,* at 669. The balance of the Fifth Circuit's opinion reflects the same approach. The change in law effected by *Martinez* and *Trevino,* the panel wrote, was ``not an extraordinary circumstance." 623 Fed. Appx., at 674. **{197 L. Ed. 2d 17}** Even if Texas initially indicated to Buck that he would be resentenced, its ``decision not to follow through" was ``not extraordinary." *Ibid.* Buck ``ha[d] not shown why" the State's alleged broken promise ``would justify relief from the judgment." *Ibid.*

But the question for the Fifth Circuit was not whether Buck had ``shown extraordinary circumstances" or ``shown why [Texas's broken promise] would justify relief from the judgment." *Id.,* at 669, 674. Those are ultimate merits determinations the panel should not have reached. We reiterate what we have said before: A ``court of appeals should limit its examination [at the COA stage] to a threshold inquiry into the underlying merit of [the] claims," and ask ``only if the District Court's decision was debatable." *Miller-El,* 537 U. S., at 327, 348, 123 S. Ct. 1029, 154 L. Ed. 2d 931.

The dissent does not accept this established rule, arguing that a reviewing court that deems a claim nondebatable ``must necessarily conclude that the claim is meritless." *Post,* at 2 (opinion of Thomas, J.). Of course when a court of appeals properly applies the COA standard and determines that a prisoner's claim is not even debatable, that necessarily means the prisoner has failed to show that his claim is meritorious. But the converse is not true. That a prisoner has failed to make the ultimate showing that his claim is meritorious does not logically mean he failed to make a preliminary showing that his claim was debatable. Thus, when a reviewing court (like the Fifth Circuit here) inverts the statutory order of operations and ``first decid[es] the merits of an appeal, . . . then justif[ies] its denial of a COA based on its adjudication of the actual merits," it has placed too heavy a burden on the prisoner *at the COA stage. Miller-El,* 537 U. S., at 336-337, 123 S. Ct. 1029, 154 L. Ed. 2d 931. *Miller-El* flatly prohibits such a departure from the procedure prescribed by §2253. *Ibid.*

The State defends the Fifth Circuit's approach by arguing that the court's consideration of an application for a COA is often quite thorough. The court ``occasionally hears oral argument when considering whether to grant a COA in a capital case." Brief for Respondent 50. Indeed, in one recent case, it ``received nearly 200 pages of initial briefing, permitted a reply brief, considered the parties' supplemental authorities, invited supplemental letter briefs from both sides, and heard oral argument before denying the request for a COA." *Id.,* at 50-51.

But this hurts rather than helps the State's case. ``[A] claim can be debatable even though every jurist of reason might agree, after the COA has been granted and the case has received full consideration, that petitioner will not prevail." *Miller-El,* 537 U. S., at 338, 123 S. Ct. 1029, 154 L. Ed. 2d 931. The statute sets forth a two-step process: an initial determination whether a claim is reasonably debatable, and then-if it is-an appeal in the normal course. We do not mean to specify what procedures may be appropriate in every case. But whatever procedures are employed at the COA stage should be consonant with the limited nature of the inquiry.

Given the approach of the court below, it is perhaps understandable that the parties have essentially briefed and argued the underlying **{197 L. Ed. 2d 18}** merits at length. See, *e.g.,* Brief for Petitioner 32 (``[T]rial counsel rendered deficient performance under *Strickland.*"); *id.,* at 39 (``[T]here is a reasonable probability that Dr. Quijano's race-as-dangerousness opinion swayed the judgment of jurors in favor of death." (internal quotation marks and alteration omitted)); *id.,* at 59 (Buck ``has

SCTHOT                                             13

© 2017 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

demonstrated his entitlement to relief under Rule 60(b)(6)"); Brief for Respondent 40 (``The particular facts of petitioner's case do not establish extraordinary circumstances justifying relief from the judgment." (boldface type deleted)). With respect to this Court's review, §2253 does not limit the scope of our consideration of the underlying merits, and at this juncture we think it proper to meet the decision below and the arguments of the parties on their own terms.

III

Buck's request for a COA raised two separate questions for the Fifth Circuit, one substantive and one procedural: first, whether reasonable jurists could debate the District Court's conclusion that Buck was not denied his right to effective assistance of counsel under *Strickland*; and second, whether reasonable jurists could debate the District Court's procedural holding that Buck had not made the necessary showing to reopen his case under Rule 60(b)(6).

A

We begin with the District Court's determination (not specifically addressed by the Fifth Circuit) that Buck's constitutional claim failed on the merits. The Sixth Amendment right to counsel ``is the right to the effective assistance of counsel." *Strickland*, 466 U. S., at 686, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (quoting *McMann* v. *Richardson*, 397 U. S. 759, 771, n. 14, 90 S. Ct. 1441, 25 L. Ed. 2d 763 (1970)). A defendant who claims to have been denied effective assistance must show both that counsel performed deficiently and that counsel's deficient performance caused him prejudice. 466 U. S., at 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674.

1

*Strickland*'s first prong sets a high bar. A defense lawyer navigating a criminal proceeding faces any number of choices about how best to make a client's case. The lawyer has discharged his constitutional responsibility so long as his decisions fall within the ``wide range of professionally competent assistance." *Id.,* at 690, 104 S. Ct. 2052, 80 L. Ed. 2d 674. It is only when the lawyer's errors were ``so serious that counsel was not functioning as the 'counsel' guaranteed . . . by the Sixth Amendment" that *Strickland*'s first prong is satisfied. *Id.,* at 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674.

The District Court determined that, in this case, counsel's performance fell outside the bounds of competent representation. We agree. Counsel knew that Dr. Quijano's report reflected the view that Buck's race disproportionately predisposed him to violent conduct; he also knew that the principal point of dispute during the trial's penalty phase was whether Buck was likely to act violently in the future. Counsel nevertheless (1) called Dr. Quijano to the stand; (2) specifically elicited testimony about the connection between Buck's race and the likelihood of future violence; and (3) put into evidence Dr. Quijano's **{197 L. Ed. 2d 19}** expert report that stated, in reference to factors bearing on future dangerousness, ``**Race.** Black: Increased probability." App. 19a, 145a-146a.

Given that the jury had to make a finding of future dangerousness before it could impose a death sentence, Dr. Quijano's report said, in effect, that the color of Buck's skin made him more deserving of execution. It would be patently unconstitutional for a state to argue that a defendant is liable to be a future danger because of his race. See *Zant* v. *Stephens*, 462 U. S. 862, 885, 103 S. Ct. 2733, 77 L. Ed. 2d 235 (1983) (identifying race among factors that are ``constitutionally impermissible or totally irrelevant to the sentencing process"). No competent defense attorney would introduce such evidence about his own client. See *Buck* v. *Thaler*, 565 U. S., at 1022, 132 S. Ct. 32, 181 L. Ed. 2d 411 (statement of Alito, J., joined by Scalia and Breyer, JJ., respecting denial of certiorari) (Buck's case ``concerns bizarre and objectionable testimony").

2

© 2017 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

To satisfy *Strickland*, a litigant must also demonstrate prejudice-``a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'' 466 U. S., at 694, 104 S. Ct. 2052, 80 L. Ed. 2d 674. Accordingly, the question before the District Court was whether Buck had demonstrated a reasonable probability that, without Dr. Quijano's testimony on race, at least one juror would have harbored a reasonable doubt about whether Buck was likely to be violent in the future. The District Court concluded that Buck had not made such a showing. We disagree.

In arguing that the jury would have imposed a death sentence even if Dr. Quijano had not offered race-based testimony, the State primarily emphasizes the brutality of Buck's crime and his lack of remorse. A jury may conclude that a crime's vicious nature calls for a sentence of death. See *Wong* v. *Belmontes*, 558 U. S. 15, 130 S. Ct. 383, 175 L. Ed. 2d 328 (2009) ( *per curiam*). In this case, however, several considerations convince us that it is reasonably probable-notwithstanding the nature of Buck's crime and his behavior in its aftermath-that the proceeding would have ended differently had counsel rendered competent representation.

Dr. Quijano testified on the key point at issue in Buck's sentencing. True, the jury was asked to decide two issues-whether Buck was likely to be a future danger, and, if so, whether mitigating circumstances nevertheless justified a sentence of life imprisonment. But the focus of the proceeding was on the first question. Much of the penalty phase testimony was directed to future dangerousness, as were the summations for both sides. The jury, consistent with the focus of the parties, asked during deliberations to see the expert reports on dangerousness. See App. 187a-196a, 198a-203a, 209a.

Deciding the key issue of Buck's dangerousness involved an unusual inquiry. The jurors were not asked to determine a historical fact concerning Buck's conduct, but to render a predictive judgment inevitably entailing a degree of speculation. Buck, all agreed, had committed acts of terrible violence. Would he do so again?

Buck's prior violent acts had occurred outside of prison, and within **{197 L. Ed. 2d 20}** the context of romantic relationships with women. If the jury did not impose a death sentence, Buck would be sentenced to life in prison, and no such romantic relationship would be likely to arise. A jury could conclude that those changes would minimize the prospect of future dangerousness.

But one thing would never change: the color of Buck's skin. Buck would always be black. And according to Dr. Quijano, that immutable characteristic carried with it an ``[i]ncreased probability'' of future violence. *Id.,* at 19a. Here was hard statistical evidence-from an expert-to guide an otherwise speculative inquiry.

And it was potent evidence. Dr. Quijano's testimony appealed to a powerful racial stereotype-that of black men as ``violence prone.'' *Turner* v. *Murray*, 476 U. S. 28, 35, 106 S. Ct. 1683, 90 L. Ed. 2d 27 (1986) (plurality opinion). In combination with the substance of the jury's inquiry, this created something of a perfect storm. Dr. Quijano's opinion coincided precisely with a particularly noxious strain of racial prejudice, which itself coincided precisely with the central question at sentencing. The effect of this unusual confluence of factors was to provide support for making a decision on life or death on the basis of race.

This effect was heightened due to the source of the testimony. Dr. Quijano took the stand as a medical expert bearing the court's imprimatur. The jury learned at the outset of his testimony that he held a doctorate in clinical psychology, had conducted evaluations in some 70 capital murder cases, and had been appointed by the trial judge (at public expense) to evaluate Buck. App. 138a-141a. Reasonable jurors might well have valued his opinion concerning the central question before them. See *Satterwhite* v. *Texas*, 486 U. S. 249, 259, 108 S. Ct. 1792, 100 L. Ed. 2d 284 (1988) (testimony

© 2017 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

from ``a medical doctor specializing in psychiatry'' on the question of future dangerousness may have influenced the sentencing jury).

For these reasons, we cannot accept the District Court's conclusion that ``the introduction of any mention of race'' during the penalty phase was ``*de minimis*.'' 2014 U.S. Dist. LEXIS 185635, 2014 WL 11310152, at *5. There were only ``two references to race in Dr. Quijano's testimony''-one during direct examination, the other on cross. *Ibid.* But when a jury hears expert testimony that expressly makes a defendant's race directly pertinent on the question of life or death, the impact of that evidence cannot be measured simply by how much air time it received at trial or how many pages it occupies in the record. Some toxins can be deadly in small doses.

The State acknowledges, as it must, that introducing ``race or ethnicity as evidence of criminality'' can in some cases prejudice a defendant. Brief for Respondent 31. But it insists that this is not such a case, because Buck's own counsel, not the prosecution, elicited the offending testimony. We are not convinced. In fact, the distinction could well cut the other way. A prosecutor is seeking a conviction. Jurors understand this and may reasonably be expected to evaluate the government's evidence and arguments in light of its motivations. When a defendant's own lawyer puts in the offending evidence, it is in the nature of an admission against interest, more likely to be taken at face value.

The effect of Dr. Quijano's testimony on Buck's sentencing cannot be **{197 L. Ed. 2d 21}** dismissed as ``*de minimis*.'' Buck has demonstrated prejudice.

B

1

We now turn to the lower courts' procedural holding: that Buck failed to demonstrate that he was entitled to have the judgment against him reopened under Rule 60(b)(6). We have held that a litigant seeking a COA must demonstrate that a procedural ruling barring relief is itself debatable among jurists of reason; otherwise, the appeal would not ``deserve encouragement to proceed further.'' *Slack* v. *McDaniel*, 529 U. S. 473, 484, 120 S. Ct. 1595, 146 L. Ed. 2d 542 (2000) (quoting *Barefoot* v. *Estelle*, 463 U. S. 880, 893, n. 4, 103 S. Ct. 3383, 77 L. Ed. 2d 1090 (1983)).

The Rule 60(b)(6) holding Buck challenges would be reviewed for abuse of discretion during a merits appeal, see 11 C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure §2857 (3d ed. 2012), and the parties agree that the COA question is therefore whether a reasonable jurist could conclude that the District Court abused its discretion in declining to reopen the judgment. See Brief for Petitioner 54-57; Brief for Respondent 34.

Buck brought his Rule 60(b) motion under the Rule's catchall category, subdivision (b)(6), which permits a court to reopen a judgment for ``any other reason that justifies relief.'' Rule 60(b) vests wide discretion in courts, but we have held that relief under Rule 60(b)(6) is available only in ``extraordinary circumstances.'' *Gonzalez*, 545 U. S., at 535, 125 S. Ct. 2641, 162 L. Ed. 2d 480. In determining whether extraordinary circumstances are present, a court may consider a wide range of factors. These may include, in an appropriate case, ``the risk of injustice to the parties'' and ``the risk of undermining the public's confidence in the judicial process.'' *Liljeberg* v. *Health Services Acquisition Corp.*, 486 U. S. 847, 863-864, 108 S. Ct. 2194, 100 L. Ed. 2d 855 (1988).

In the circumstances of this case, the District Court abused its discretion in denying Buck's Rule 60(b)(6) motion. The District Court's conclusion that Buck ``ha[d] failed to demonstrate that this case presents extraordinary circumstances'' rested in large measure on its determination that ``the introduction of any mention of race''-though ``ill[ ]advised at best and repugnant at worst''-played only a ``*de minimis*'' role in the proceeding. 2014 U.S. Dist. LEXIS 185635, 2014 WL 11310152, at *5. The

SCTHOT  **16**

© 2017 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

Fifth Circuit, for its part, failed even to mention the racial evidence in concluding that Buck's claim was ``at least unremarkable as far as [ineffective assistance] claims go.'' 623 Fed. Appx., at 673. But our holding on prejudice makes clear that Buck may have been sentenced to death in part because of his race. As an initial matter, this is a disturbing departure from a basic premise of our criminal justice system: Our law punishes people for what they do, not who they are. Dispensing punishment on the basis of an immutable characteristic flatly contravenes this guiding principle. As petitioner correctly puts it, ``[i]t stretches credulity to characterize Mr. Buck's [ineffective assistance of counsel] claim as run-of-the-mill.'' Brief for Petitioner 57.

This departure from basic principle was exacerbated because it concerned {197 L. Ed. 2d 22} race. ``Discrimination on the basis of race, odious in all aspects, is especially pernicious in the administration of justice.'' *Rose* v. *Mitchell*, 443 U. S. 545, 555, 99 S. Ct. 2993, 61 L. Ed. 2d 739 (1979). Relying on race to impose a criminal sanction ``poisons public confidence'' in the judicial process. *Davis* v. *Ayala*, 576 U. S. ___, ___, 135 S. Ct. 2187, 192 L. Ed. 2d 323, 344 (2015). It thus injures not just the defendant, but ``the law as an institution, . . . the community at large, and . . . the democratic ideal reflected in the processes of our courts.'' *Rose*, 443 U. S., at 556, 99 S. Ct. 2993, 61 L. Ed. 2d 739 (internal quotation marks omitted). Such concerns are precisely among those we have identified as supporting relief under Rule 60(b)(6). See *Liljeberg*, 486 U. S., at 864, 108 S. Ct. 2194, 100 L. Ed. 2d 855.

The extraordinary nature of this case is confirmed by what the State itself did in response to Dr. Quijano's testimony. When the case of Victor Hugo Saldano came before this Court, Texas confessed error and consented to resentencing. The State's response to Saldano's petition for certiorari succinctly expressed the injustice Saldano had suffered: ``the infusion of race as a factor for the jury to weigh in making its determination violated his constitutional right to be sentenced without regard to the color of his skin.'' App. 306a.

The Attorney General's public statement, issued shortly after we vacated the judgment in Saldano's case, reflected this sentiment. It explained that the State had responded to Saldano's troubling petition by conducting a ``thorough audit'' of criminal cases, finding six similar to Saldano's ``in which testimony was offered by Dr. Quijano that race should be a factor for the jury to consider.'' *Id.,* at 213a. The statement affirmed that ``it is inappropriate to allow race to be considered as a factor in our criminal justice system.*'' Ibid.* Consistent with this position-and to its credit-the State confessed error in the cases of five of the six defendants identified in the Attorney General's statement, waiving all available procedural defenses and consenting to resentencing.

These were remarkable steps. It is not every day that a State seeks to vacate the sentences of five defendants found guilty of capital murder. But then again, these were-as the State itself put it at oral argument here-``extraordinary'' cases. Tr. of Oral Arg. 41; see *Buck* v. *Thaler*, 565 U. S., at 1030, 132 S. Ct. 32, 181 L. Ed. 2d 411 (Sotomayor, J., joined by Kagan, J., dissenting from denial of certiorari) (``Especially in light of the capital nature of this case and the express recognition by a Texas attorney general that the relevant testimony was inappropriately race charged, Buck has presented issues that 'deserve encouragement to proceed further.'" (quoting *Miller-El*, 537 U. S., at 327, 123 S. Ct. 1029, 154 L. Ed. 2d 931)).

To be sure, the State has repeatedly attempted to justify its decision to treat Buck differently from the other five defendants identified in the Attorney General's statement, including on asserted factual grounds that the State has been required to abjure. See Brief for Respondent 46, n. 10 (the State's initial opposition to Buck's habeas petition ``erroneously'' argued that Buck was treated differently because defense counsel, not the State, called Dr. Quijano as a witness; that was also true of two of the other {197 L. Ed. 2d 23} defendants). The State continues its efforts before this Court, arguing

© 2017 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

that Buck's was the only one of the six cases in which defense counsel, not the prosecution, first elicited Dr. Quijano's opinion on race. See also *post*, at 8 (opinion of Thomas, J.).

But this is beside the point. The State's various explanations for distinguishing Buck's case have nothing to do with the Attorney General's stated reasons for confessing error in *Saldano* and the cases acknowledged as similar. Regardless of which party first broached the subject, race was in all these cases put to the jury ``as a factor . . . to weigh in making its determination.'' App. 306a. The statement that ``it is inappropriate to allow race to be considered as a factor in our criminal justice system'' is equally applicable whether the prosecution or ineffective defense counsel initially injected race into the proceeding. *Id.*, at 213a. The terms of the State's announcement provide every reason for originally including Buck on the list of defendants situated similarly to Saldano, and no reason for later taking him off.

In opposition, the State reminds us of the importance of preserving the finality of judgments. Brief for Respondent 34. But the ``whole purpose'' of Rule 60(b) ``is to make an exception to finality.'' *Gonzalez*, 545 U. S., at 529, 125 S. Ct. 2641, 162 L. Ed. 2d 480. And in this case, the State's interest in finality deserves little weight. When Texas recognized that the infusion of race into proceedings similar to Saldano's warranted confession of error, it effectively acknowledged that the people of Texas lack an interest in enforcing a capital sentence obtained on so flawed a basis. In concluding that the value of finality does not demand that we leave the District Court's judgment in place, we do no more than acknowledge what Texas itself recognized 17 years ago.

2

Our Rule 60(b)(6) analysis has thus far omitted one significant element. When Buck first sought federal habeas relief in 2004, *Coleman* barred the District Court from hearing his claim. Today, however, a claim of ineffective assistance of trial counsel defaulted in a Texas postconviction proceeding may be reviewed in federal court if state habeas counsel was constitutionally ineffective in failing to raise it, and the claim has ``some merit.'' *Martinez*, 566 U. S., at 14, 132 S. Ct. 1309, 182 L. Ed. 2d 272; see *Trevino*, 569 U. S., at ___, 133 S. Ct. 1911; 185 L. Ed. 2d 1044, 1053. Buck cannot obtain relief unless he is entitled to the benefit of this rule-that is, unless *Martinez* and *Trevino*, not *Coleman*, would govern his case were it reopened. If they would not, his claim would remain unreviewable, and Rule 60(b)(6) relief would be inappropriate. See 11 Wright & Miller, Federal Practice and Procedure §2857 (showing ``a good claim or defense'' is a precondition of Rule 60(b)(6) relief ).

Until merits briefing in this Court, both parties litigated this matter on the assumption that *Martinez* and *Trevino* would apply if Buck reopened his case. See Pet. for Cert. 27-28; Brief in Opposition 11-13; Amended Application for Certificate of Appealability and Brief in Support 26, Respondent-Appellee's Opposition to Pet. for En Banc Rehearing 9-11, and Respondent's Opposition to Application for Certificate of Appealability 15-17 in {**197 L. Ed. 2d 24**} No. 14-70030 (CA5); Amended Response to Motion for Relief from Judgment in No. 4:04-cv-03965 (SD Tex.), pp. 11-13. But the State's brief adopts a new position on this issue. The State now argues that those cases announced a ``new rule'' that, under *Teague* v. *Lane*, 489 U. S. 288, 109 S. Ct. 1060, 103 L. Ed. 2d 334 (1989) (plurality opinion), does not apply retroactively to cases (like Buck's) on collateral review. Brief for Respondent 38-40. Buck responds that *Teague* analysis applies only to new rules of criminal procedure that govern trial proceedings-not new rules of habeas procedure that govern collateral proceedings-and that the State has in any event waived its *Teague* argument. Reply Brief 20.

We agree that the argument has been waived. See *Danforth* v. *Minnesota*, 552 U. S. 264, 289, 128 S. Ct. 1029, 169 L. Ed. 2d 859 (2008) (``States can waive a *Teague* defense . . . by failing to raise it in a timely manner . . . .''). It was not advanced in District Court, before the Fifth Circuit, or in the State's

SCTHOT ( 18 )

© 2017 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

brief in opposition to Buck's petition for certiorari. Although we may reach the issue in our discretion, we have observed before that a State's failure to raise a *Teague* argument at the petition stage is particularly ``significant'' in deciding whether such an exercise of discretion is appropriate. *Schiro* v. *Farley*, 510 U. S. 222, 228-229, 114 S. Ct. 783, 127 L. Ed. 2d 47 (1994). When ``a legal issue appears to warrant review, we grant certiorari in the expectation of being able to decide that issue.'' *Id.,* at 229, 114 S. Ct. 783, 127 L. Ed. 2d 47. If we were to entertain the State's eleventh-hour *Teague* argument and find it persuasive, Buck's *Strickland* and Rule 60(b)(6) contentions-the issues we thought worthy of review-would be insulated from our consideration. We therefore decline to reach the *Teague* question and conclude that *Martinez* and *Trevino* apply to Buck's claim. We reach no broader determination concerning the application of these cases.

C

For the foregoing reasons, we conclude that Buck has demonstrated both ineffective assistance of counsel under *Strickland* and an entitlement to relief under Rule 60(b)(6). It follows that the Fifth Circuit erred in denying Buck the COA required to pursue these claims on appeal.

The judgment of the United States Court of Appeals for the Fifth Circuit is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

© 2017 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.