## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **Gregory Holden,** | : | |
| **Petitioner** | : | **Civil Action** |
| | : | |
| **v.** | : | **No. 06-cv-5202** |
| | : | |
| **Kevin Ransom, et. al.** | : | |
| **Respondents** | : | |
| | : | |

## COUNSELED MOTION FOR RELIEF FROM FINAL ORDER AND JUDGMENT PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 60(B)

Petitioner Gregory Holden, by and through undersigned counsel, and pursuant to Federal Rule of Civil Procedure 60(b), hereby moves the Court to set aside the final order and judgment denying habeas corpus relief in this matter (ECF No. 17), on the grounds that new evidence has come to light confirming his long-asserted actual innocence and he has thus satisfied the fundamental miscarriage of justice exception to the procedural bar to this Court's consideration of the merits of the constitutional claims raised in his Petition for Writ of Habeas Corpus (ECF No. 1).

Should the Court grant Petitioner's request to re-open his federal habeas corpus proceedings under Rule 60(b), Petitioner also requests leave to file an Amended Petition for Writ of Habeas Corpus in order to present new, reliable evidence to support the constitutional claims raised in his original Petition for Writ of Habeas Corpus in addition to newly available constitutional claims stemming from the discovery of previously suppressed evidence. In support of this Motion, Petitioner files and incorporates the attached Brief in Support of his Counseled Motion for Relief from Final Order and Judgment Pursuant to Federal Rule of Civil Procedure 60(b) and all exhibits cited therein.

WHEREFORE, Petitioner Gregory Holden respectfully requests that this Honorable Court grant his Counseled Motion for Relief from Final Order and Judgment Pursuant to Federal Rule of Civil Procedure 60(b), vacate the prior judgment denying Petitioner's Petition for Writ of Habeas Corpus, and grant him leave to file an Amended Petition for Writ of Habeas Corpus and/or any other relief that furthers the interests of justice.

Respectfully submitted,

Grace Harris (PA ID 328968)
Kairys, Rudovsky, Messing, Feinberg &
    Lin LLP
The Cast Iron Building
718 Arch Street, Suite 501 South
Philadelphia, PA 19106
(215) 925-4400

*Counsel for Petitioner Gregory Holden*

Date:  August 15, 2023

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 2

**FACTUAL BACKGROUND AND PROCEDURAL HISTORY** ................................................ 4

    I.   Eric "Kaboobie" DeLegal's death on December 16, 1980 .................................. 4

    II.  Mr. Holden's first arrest and preliminary hearing ............................................ 5

    III. Douglas Haughton's statement to police and plea deal .................................... 6

    IV. Joint trial of Mr. Holden, Mr. Murray and Mr. Wesson ................................... 8

    V.  Mr. Haughton and Mr. Wesson's early recantations ...................................... 11

    VI. PCRA hearing in 1991 ................................................................................... 12

    VII. Gregory Strickland and Anthony Smith affidavits ......................................... 14

    VIII.Mr. Holden's extensive postconviction procedural history ............................ 15

    IX. Mr. Murray's recent postconviction relief ..................................................... 16

**LEGAL STANDARDS** ................................................................................................... 19

**ARGUMENT** ................................................................................................................ 22

    I.   Significant newly discovered evidence demonstrates Mr. Holden's actual innocence. ..... 22

       A. Evidence regarding eyewitness Strickland directly contradicts the testimony of the prosecution's only witness against Mr. Holden and its trial theory. ............................... 23

       B. Evidence regarding alternative suspect Burton further disputes the prosecution's trial theory and exculpates Mr. Holden. .............................................. 24

    II.  In light of the new evidence that has emerged since trial, no reasonable jury could have convicted Mr. Holden. ................................................................ 25

       A. Recantations of Douglas Haughton and Tyrone Wesson's inculpatory statements and testimony support Mr. Holden's innocence. ............................... 25

       B. The evidence recently discovered in the investigatory homicide file corroborates Mr. Wesson and Mr. Haughton's recantations and Mr. Holden's innocence. ...................... 28

       C. The limited and flawed inculpatory evidence presented at trial reinforces that a reasonable jury could not convict Mr. Holden. ............................................... 29

          1.  Douglas Haughton's trial testimony contained numerous inconsistencies. ................ 29

          2.  No physical or otherwise competent evidence was presented at trial. ....................... 30

       D. Mr. Holden's trial presentation of alibi evidence further supports his innocence. ......... 31

    III. Based on the same evidence described above, the District Attorney's Office conceded that co-defendant Bruce Murray met the Schlup standard for demonstrating actual innocence. ............................................................................... 31

    **CONCLUSION** ....................................................................................................... 32

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| Gregory Holden, | : | |
| Petitioner | : | Civil Action |
| | : | |
| v. | : | No. 06-cv-5202 |
| | : | |
| Kevin Ransom, et. al. | : | |
| Respondents | : | |
| | : | |

### BRIEF IN SUPPORT OF COUNSELED MOTION FOR RELIEF FROM FINAL ORDER AND JUDGMENT PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 60(B)

**Kairys, Rudovsky, Messing, Feinberg & Lin LLP**
Grace Harris (PA ID 328968)
The Cast Iron Building
718 Arch Street, Suite 501 South
Philadelphia, PA 19106
(215) 925-4400

*Counsel for Petitioner Gregory Holden*

Date: August 15, 2023

**INTRODUCTION**

Petitioner Gregory Holden has been serving a life sentence for more than forty years for a crime he did not commit. His conviction was a result of police misconduct and fabricated testimony. He has never wavered from his assertions of innocence, which he has consistently attempted to present in state and federal courts since he testified in his own defense at trial decades ago.

Mr. Holden was convicted of conspiring with Bruce Murray, Tyrone Wesson, and Douglas Haughton to rob and kill Eric "Kaboobie" DeLegal after a joint-trial in 1983; specifically he was accused of serving as a lookout during the robbery turned murder. The only evidence presented against him was the uncorroborated accomplice testimony of Mr. Haughton, who pled guilty to third degree murder prior to trial and testified against the other three men. Mr. Haughton testified that he and Mr. Holden stayed outside Kaboobie's house keeping watch while Mr. Wesson and Mr. Murray went inside, attempted to rob Kaboobie, and ultimately shot and killed him.

As early as 1985, Mr. Haughton recanted his trial testimony and confirmed that he and Mr. Wesson alone were present when Kaboobie was killed, that they were the only two men who entered Kaboobie's house, and that Mr. Holden and Mr. Murray were in no way involved in the planning or effectuation of the crime. Mr. Wesson corroborated the version of events detailed in Mr. Haughton's recantation at Mr. Wesson's sentencing hearing in 1984 and again when both men separately testified at a 1991 joint post-conviction evidentiary hearing for Mr. Murray and Mr. Holden. In response to that testimony, the District Attorney's Office ("DAO") argued at the time that these recantations were not credible and post-conviction relief was denied.

In November 2022, new evidence came to light, giving renewed hope to Mr. Holden and his decades-long efforts to reopen his case. During the course of his own post-conviction proceedings, Mr. Murray gained access to the Philadelphia Police Department (PPD) homicide file detailing the DeLegal murder investigation and discovered that Mr. Murray and Mr. Holden's convictions resulted from police and prosecutorial misconduct, including the suppression of exculpatory evidence. Critically, several pieces of evidence not disclosed to defendants demonstrated that Mr. Haughton's trial testimony was untruthful and that he, not Mr. Murray had entered Kaboobie's house with Mr. Wesson, thus corroborating the post-conviction hearing testimony of Mr. Haughton and Mr. Wesson exonerating Mr. Holden and Mr. Murray.

This evidence revealed that the Commonwealth's entire trial theory was patently false and that investigators were aware that Mr. Haughton's testimony was fabricated. Additionally, in the intervening years the police detectives responsible for investigating the DeLegal murder and obtaining the statements used to inculpate Mr. Holden have become marred in scandal due to substantial accusations of misconduct, including coercing witnesses and manufacturing false inculpatory statements. This newly discovered evidence supports what Mr. Holden and Mr. Murray have claimed from the time of their arrests in the early-1980s: that they did not participate in Kaboobie's death, that Mr. Haughton lied on the stand, and that his 1985 recantations detailing police coercion were truthful.

In response to Mr. Murray's presentation of this new evidence in his own petition for relief under Rule 60(b) and subsequent amended petition for a writ of habeas corpus, the DAO reversed its previous position, acknowledging that Mr. Haughton and Mr. Wesson's recantations were in fact credible and that numerous *Brady* violations tainted the proceedings so thoroughly that Mr. Murray was entitled to a new trial. On June 2, 2023, the Honorable Anita B. Brody

vacated Mr. Murray's conviction and sentence based on Mr. Murray's presentation of new evidence and the DAO's corresponding concessions.

The evidence presented to the Court on behalf of Mr. Murray demonstrates Mr. Holden's innocence as well. The recantations of Mr. Haughton and Mr. Wesson, now undisputedly credible, make clear that Mr. Holden was not involved in any plan to rob Mr. DeLegal and that he was not present at the time of the killing. In light of the DAO's concessions as to Mr. Murray, no competent evidence remains implicating Mr. Holden in the crime for which he is currently serving a life sentence. The overwhelming, reliable, new evidence of his innocence necessitates the extraordinary relief contemplated by Rule 60(b)(6).

## FACTUAL BACKGROUND[1] AND PROCEDURAL HISTORY

### I.      Eric "Kaboobie" DeLegal's death on December 16, 1980

On December 16, 1980 around 5:45pm, Eric "Kaboobie" DeLegal was found suffering from serious gunshot wounds inside his house at 2414 Montrose Street. Trial N.T. 05/31/83 at 38. PPD Officer Daniel Kleinkurt was the first officer on the scene when he responded to George "Reds" Young's report of a shooting. *Id.* at 36-38. Officers Stephen Freels and Timothy Fitzgerald arrived shortly thereafter and transported Kaboobie to Graduate Hospital, where he was pronounced dead around 6:40pm. *Id.* at 49-51. Ofcs. Kleinkurt, Freels, and Fitzgerald did not search the home for evidence, although Ofc. Fitzgerald noted that it was dark outside, there was no light on in the living room, and he recovered a small envelope containing suspected cannabis from Kaboobie's pocket. *Id.* at 41-42, 52-54.

---

[1] In addition to the facts Mr. Holden provides herein, he incorporates the extensive factual background provided by co-defendant Bruce Murray in his recent motion for relief under Rule 60(b). *Murray v. Clark, et. al.,* No. 98-cv-05866-AB, ECF 101, 5-79 (E.D. Pa. November 16, 2022), attached as Exhibit 23.

Officer Lyle Sprague, of the Mobile Crime Detection Unit did search the house, though he did not search the cellar. *Id.* at 78-79. He found no damage to the furniture or the walls of the home, but recovered several pounds of cannabis as well as drug paraphernalia from the second floor. *Id.* at 73-74. Ofc. Sprague also recovered from the area around the pool of Kaboobie's blood a bolt from a 20-guage shotgun, a 20-guage spent shotgun shell, and wadding from a shotgun shell. *Id.* at 63-65, 72-73. Although Ofc. Sprague testified at trial that he did not know whether the shotgun bolt was tested for fingerprints, *id.* at 73, police paperwork indicates that PPD may have obtained fingerprint evidence as part of its investigation. *See* Ex. 1, PPD Homicide Case Summary. If so, this evidence was not disclosed to Mr. Holden. The police did not recover any firearms in connection with their investigation into Kaboobie's death.

## II. Mr. Holden's first arrest and preliminary hearing

On February 25, 1981, PPD officers sought and received a warrant to search Mr. Holden's home for firearms based on information purportedly received from one to two confidential informants. *See* Ex. 2, Feb. 25, 1981 Search Warrant Affidavit. The search warrant affidavit described Mr. Holden's home as a "repository" for street guns and contained a description of the Kaboobie murder that Mr. Holden supposedly told a confidential informant. *Id.* This version of the killing did not specifically implicate Mr. Holden as a participant, but as someone with information as to what occurred. *Id.* No charges or arrests resulted from this search and there is no record of any firearms being recovered from Mr. Holden's home. He was not interviewed at that time about his knowledge of the Kaboobie murder or any other offense. The identity of the "confidential informant(s)" mentioned in the affidavit is still unknown to Mr. Holden.

A few weeks later, on March 11, 1981, Edward Randolph made a statement to police regarding the Kaboobie murder. *See* Ex. 3, March 11, 1981 Randolph Statement. Like the confidential informant who was the source of information in the affidavit of probable cause to search Mr. Holden's home, Mr. Randolph purportedly told detectives that Mr. Holden had told him all about the Kaboobie shooting. *Id.* at 1. In Mr. Randolph's version of events, Mr. Holden told him that he, Larry Thorpe, Mr. Murray, Mr. Haughton, and "Scotty" decided to rob Kaboobie and that Mr. Holden, Mr. Thorpe, and Mr. Haughton waited in the schoolyard near Kaboobie's house, but that they left the area upon hearing shots from inside the house. *Id.* at 2.

Based solely on Mr. Randolph's statement, Mr. Holden was initially arrested for Kaboobie's murder on March 20, 1981. *See* Ex. 4 March 17, 1981 Arrest Warrant Aff. of Probable Cause. At the time of his first arrest, Mr. Holden voluntarily provided a statement to detectives. *See* Ex. 5, March 20, 1981 Holden Statement. Mr. Holden told detectives that he was not involved in Kaboobie's death and that he was likely with his girlfriend, Jean El, on December 16, 1980 when the shooting occurred as he was usually with her at her house. *Id.* Mr. Holden was held in jail until May 13, 1981, when the charges against him were dismissed. Trial N.T. 06/17/83 at 1260-63, 1267. Mr. Randolph had been subpoenaed to come to court and testify against Mr. Holden but he did not appear. *Id.* There is no indication in the record as to what, if any, efforts homicide detectives undertook to locate or arrest Mr. Randolph for his failure to honor his subpoena. Mr. Randolph did not testify at trial and the prosecutor referred to him as "not available." *Id.* at 1286.

### III. Douglas Haughton's statement to police and plea deal

The investigation was seemingly dormant until Douglas Haughton was arrested on federal bank robbery charges in February 1982. Trial N.T. 06/02/83 at 546-47. PPD detectives

were present during Mr. Haughton's arrest by federal law enforcement and his subsequent interview. Trial N.T. 06/01/83 at 405. The interrogating FBI agents and PPD detectives, including Detective Larry Gerrard, showed Mr. Haughton evidence of his involvement in the federal bank robbery case and explained that he would need to cooperate with the PPD's investigation into Kaboobie's death to receive a lighter punishment. *Id.* During this interrogation, PPD detectives gave Mr. Haughton a copy of Mr. Randolph's previous statement implicating Mr. Holden and others in the shooting. Trial N.T. 06/02/83 at 517.

After being threatened by law enforcement and reading Mr. Randolph's statement, Mr. Haughton provided a statement to Detective Gerrard and other investigators claiming that he had conspired with Mr. Holden, Mr. Murray, and "Scottie" to rob Kaboobie. *See* Ex. 6, March 4, 1982 Haughton Statement. According to Mr. Haughton's statement at that time, he and Mr. Holden served as lookouts while Mr. Murray and "Scottie" entered Kaboobie's home and ultimately shot and killed him. *Id.* at 1 Mr. Haughton specified that the shotgun used in the shooting came from Mr. Murray's house. *Id.* at 5.

Several weeks later, Mr. Haughton was arrested and charged with Kaboobie's death, after which he gave another statement identifying "Scottie" as Mr. Wesson. *See* Ex. 7, April 1, 1982 Haughton Statement. On April 21, 1982, Mr. Haughton pled guilty to the federal bank robbery charge and on September 16, 1982 he was sentenced to five years' incarceration with the expectation that he would actually serve 32-40 months. *See* Ex. 8, December 8, 1982 Presentence Report at 3. Mr. Haughton then filed a motion to suppress his statements regarding the Kaboobie murder, claiming that he did not intelligently, knowingly, or voluntarily waive his constitutional rights during his interrogation. *See* Ex. 9, June 8, 1982 Haughton Motion to Suppress. When this

motion was denied, Mr. Haughton pled guilty to third degree murder in exchange for his testimony against Mr. Holden, Mr. Murray and Mr. Wesson. Trial N.T. 06/01/83 at 401-07.

After testifying against the three other defendants, Mr. Haughton was sentenced to 5-10 years' incarceration to run concurrently with his existing five-year federal sentence in a low-security federal prison in Colorado. *See* Ex. 10 Haughton Docket. As the trial court noted, a sentence of imprisonment running concurrent with an existing federal sentence was "no sentence at all." Trial N.T. 06/01/83 at 406. By the trial court's standards, Mr. Haughton ultimately received "no sentence at all" for murder because of his testimony against Mr. Holden, Mr. Murray and Mr. Wesson. He was released on March 18, 1989 after serving approximately seven years for both a federal bank robbery and third degree murder. PCHA N.T. 7/25/91 at 15.

### IV.    Joint trial of Mr. Holden, Mr. Murray and Mr. Wesson

The only evidence presented at trial implicating Mr. Holden in Kaboobie's death was Mr. Haughton's testimony. Trial N.T. 06/01/83, 06/02/83, 06/15/83. In contrast to his police statement, Mr. Haughton testified at trial that the shotgun used in the robbery came from Mr. Holden's house, not Mr. Murray's house. Trial N.T. 06/01/83 at 226-227. He testified that he and Mr. Holden had conflicts with Kaboobie, so Mr. Holden decided that they would serve as lookouts. *Id.* at 233-234. He also testified that Mr. Holden made the plan to rob Kaboobie, but struggled to recollect what was said or by whom. *Id.* at 258-265.

On cross examination, each of the three defense lawyers questioned and impeached Mr. Haughton extensively. *Id.* at 250-409, Trial N.T. 06/02/83 at 420-471, 497-579. These examinations revealed several inconsistencies between Mr. Haughton's trial testimony and his statements to police and prior testimony at preliminary hearings, including the number of gunshots he heard, Trial N.T. 06/01/83 at 288-290, the number of guns involved in the robbery,

*id.* at 269-270, who led the plan, *id.* at 297-308, whether or not he knew the witness Gregory "Dap" Strickland, *id.* at 318-319, how much cannabis they expected to steal, *id.* at 270-275, whether he saw Mr. Holden after the robbery, *id.* at 320-322, whether he saw who opened the door to Kaboobie's house, *id.* at 324-325, how much cannabis he had smoked prior the robbery, *id.* at 339-342, and where he went after the shooting, *id.* at 372-374.

In response to these undeniable inconsistencies, Mr. Haughton made several excuses to explain why his trial testimony did not match his prior sworn statements. He claimed that the lawyers were trying to "trick" him, *id.* at 308, that a stenographer made a mistake transcribing his preliminary hearing testimony, *id.* at 391-392, and that he was angry at one of the lawyers questioning him. Trial N.T. 06/03/83 at 449. On several occasions, he could not explain the discrepancies at all, simply stating "I'm not sure." Trial N.T. 06/01/83 at 311, 312. He also admitted to lying under oath during prior testimony. Trial N.T. 06/02/83 at 452.

Although Mr. Haughton's testimony was the only evidence presented at trial directly inculpating Mr. Holden, the jury also heard a redacted statement made by Mr. Wesson to police, read into evidence by Detective Lubiejewski. Trial N.T. 06/15/83 at 681-686. Upon his arrest, PPD detectives obtained a statement attributed to Mr. Wesson detailing his and his co-defendants' participation in the Kaboobie murder. Prior to trial, in May 1983, Mr. Wesson recanted the accusations made in this police statement in a motion to suppress, arguing that police had fabricated the statement and coerced him to adopt it. Wesson MTS N.T. 05/23/83 at 387-391. His motion was denied and although the jury was instructed to use this statement only against Mr. Wesson and not as evidence against Mr. Holden or Mr. Murray, no other names were redacted and Mr. Holden and Mr. Murray's names were simply replaced by references to "the other guys." Trial N.T. 06/15/83 at 681-686. The narrative contained in this statement generally

matched the statement attributed to Mr. Randolph, including the involvement of Larry Thorpe. *Id.* Counsel for Mr. Holden and Mr. Murray expressed serious concern with the effectiveness of the redactions and potential prejudice to their clients, which had been the subject of a prior defense motion to sever. *Id.* at 647-648.

Mr. Holden presented three alibi witnesses and testified on his own behalf. Trial N.T. 06/16/83 at 997-1124, 06/17/83 at 1193-1346. All three of Mr. Holden's witnesses testified that Mr. Haughton had a reputation for dishonesty and theft in the community. *Id.* Mr. Holden's girlfriend and the mother of his child, Janine El, testified that she was with Mr. Holden for the entirety of the day on December 16, 1980, when Kaboobie was killed. Trial N.T. 06/16/83 at 1040-1047. She described in detail what they did throughout the course of that day, including waking up together, going to Mr. Holden's mother's house to ask for money to go shopping, taking the bus to Center City to buy Christmas presents for their son, eating lunch together, returning home, fighting with her mother, making dinner, and going to bed together. *Id.* She even recalled the specifics of what they ate, what presents they purchased, and the substance of her argument with her mother (that she had bought Christmas presents too early as they were not supposed to celebrate Christmas until January in accordance with their Moorish religion). *Id.*

Mattie Holden, Mr. Holden's mother, corroborated this account and testified that Mr. Holden and Janine El did in fact come to her house that day to request money to buy toys for their son. *Id.* at 1007-1009. Janine's mother, Jean El, also testified in Mr. Holden's defense and corroborated Janine's testimony. *Id.* at 1113-1124. She stated that she saw Mr. Holden that morning in her daughter's room, that he left the house in the early afternoon to go to his mother's house with Janine, that she and Janine fought that day about buying Christmas presents too early for the Moorish holiday, and that Mr. Holden stayed over at their house that night. *Id.* At the time

of trial, Jean El had pending charges relating to concealing Mr. Holden's whereabouts while police were attempting to arrest him and counsel agreed upon the appropriate scope of her cross-examination as to not trigger the necessity of Fifth Amendment protections. Trial N.T. 06/17/83 at 1181. The prosecutor failed to accord to this agreement, and Jean El invoked the Fifth Amendment on the stand. *Id.* at 1194. Mr. Holden's defense counsel moved for a mistrial in response, which was denied. *Id.* at 1206-107.

Detective Gerrard testified as to the circumstances of Mr. Holden's arrest, in which he was found hiding inside a piano at Jean El's house. Trial N.T. 06/15/83 at 773. The prosecution contended during closing argument that this showed Mr. Holden's consciousness of guilt. Trial N.T. 06/20/83 at 1553. Mr. Holden testified in his own defense, asserting his innocence and corroborating Janine El's testimony as to what they did together on December 16, 1980. Trial N.T. 6/17/83. at 1214-1221. With regard to his arrest, Mr. Holden explained that he was afraid of being arrested without an attorney to accompany him given his prior experience being arrested and incarcerated pretrial for this same crime in 1981. *Id.* at 1222-1223. He adamantly denied that he was in any way involved in the plan to rob Kaboobie that resulted in his death. *Id.* at 1338. At sentencing, Mr. Holden reiterated his innocence, stating, "When I got arrested for this crime, I was not guilty then and I'm still not guilty now." Sentencing N.T. 04/23/84 at 24.

V.     **Mr. Haughton and Mr. Wesson's early recantations**

In addition to his testimony at his suppression hearing, after trial Mr. Wesson continued his efforts to recant his police statement. At his sentencing hearing in April 1984, he expressed "a lack of my understanding of my right to actually take the stand" and went on to explain that "I would have, I could have exonerated and made things much clearer and it wouldn't have took too much time. I would have cleared the other two defendants." *Id.* at 16-17.

11

Mr. Haughton also began recanting his testimony shortly after trial. He wrote two separate affidavits dated April 11, 1985 stating that his trial testimony was untrue and that police coerced him into accusing Mr. Holden and Mr. Murray of being involved in the crime. *See* Ex. 11, April 11, 1985 Haughton Affidavit 1 and Ex. 12 April 11 1985 Haughton Affidavit 2. In his first affidavit, Mr. Haughton wrote that Detective Gerrard and federal agents "bullied and insisted that I sign statements naming Bruce Murray and Gregory Holden in this murder...I was frightened and I believed that they would not stop and that things would not get better until I signed the statements that they wanted and agreed to testify at trial." Ex. 11. He went on to explain that he and Mr. Wesson alone went to Kaboobie's house to buy cannabis and that the interaction turned sour and Kaboobie was accidentally killed. *Id.*

In his second affidavit, Mr. Haughton repeated his claims of police coercion, explaining that law enforcement showed him significant evidence of his guilt as to the federal bank robbery charge and promised him less time for his cooperation in the Kaboobie murder investigation. Ex. 12. He concluded his second affidavit with "I Douglas Haughton, now state in the absence of 'Duress!' that 'Gregory Holden' and 'Bruce Murry' are victims of an earlier statement obtained 'VIA DURESS.'" *Id.* Mr. Haughton continued his efforts to tell the truth in a May 11, 1985 letter to Mr. Murray's trial counsel, Pamela Cohen. *See* Ex. 13, May 11, 1985 Ltr to Atty Cohen. In this letter, he reiterated that he and Mr. Wesson went to Kaboobie's house alone on December 16, 1980 and that "Gregorie and Bruce receive life for something they had nothing to do with." *Id.*

## VI.     PCRA hearing in 1991

In 1991 these developments led to a joint evidentiary hearing for Mr. Holden and Mr. Murray under the Pennsylvania Post-Conviction Hearing Act ("PCHA") (now known as the

Post-Conviction Relief Act or "PCRA"). PCHA N.T. 07/25/91. Both Mr. Haughton and Mr. Wesson testified consistently with their earlier recantations. *Id.* The testimony began with Mr. Haughton's former cellmate at SCI Camp Hill, Eugene Thomas. *Id.* at 3. Mr. Thomas testified that when they were housed together, Mr. Haughton told him that he "was under a lot of pressure...he had a lot of cases on him and he had made a mistake." *Id.* at 5. In speaking about Mr. Holden and Mr. Murray, Mr. Thomas testified that "[Mr. Haughton] said that neither of them was there at the robbery." *Id.* at 8. Mr. Thomas specifically stated that Mr. Haughton told him he had lied at trial. *Id.* at 9.

Mr. Haughton then testified without the expectation of receiving any benefit. *Id.* at 20. In fact, the PCHA court clarified that Mr. Haughton's initial recantations exposed him to potential perjury charges. *Id.* In response to Mr. Holden's attorney asking, "Sir, would you tell the court whether Gregory Holden was in any way, shape or form involved in the murder of Eric DeLegal for which he was sentenced to life imprisonment?" Mr. Haughton replied, "No, he wasn't." *Id.* Mr. Haughton went on to explain that he was certain of Mr. Holden's innocence because he was present when the crime occurred and Mr. Holden was not a participant. *Id* at 20-21. He reiterated the same version of events that he had laid out in his 1985 recantations: that he and Mr. Wesson went to Kaboobie's house to purchase cannabis and that a dispute evolved into an accidental shooting turned shootout in which Kaboobie was killed and Mr. Wesson was shot in the arm. *Id.* at 22-23. He also testified that his fabricated trial testimony was the result of police coercion, explaining, "The reason why I lied, your Honor, is because the police offered me a deal, showed me photo pictures of these people and put them in it. And they said if I don't cooperate with them, I was going to get the electric chair or a life sentence." *Id.* at 29.

Mr. Wesson's testimony was consistent with Mr. Haughton's. *Id.* at 40. He stated that he and Mr. Haughton went to Kaboobie's house alone to buy cannabis, that there was a dispute about money owed to Mr. Haughton, that he tussled with Kaboobie and a shotgun, the shotgun went off and a shootout ensued. *Id.* at 42-44. He reaffirmed the statement he made under oath at sentencing, "that Mr. Holden and Mr. Murray, they didn't have anything to do with it." *Id.* at 46. In response to the question, "And Gregory Holden was not there?" he replied, "No, they were not." *Id.* at 47. Additionally, he responded, "No, they did not" to the questions, "[d]id [Mr. Holden and Mr. Murray] have anything to do with planning your trip to that scene?" and "[d]id they assist you or encourage you in any way, going there or being there or doing anything?" *Id.* Mr. Wesson also explained that, during his initial interrogation, the police denied him access to an attorney unless he signed a prewritten statement. *Id.* at 54-55.

Upon information and belief, at the time of the 1991 PCHA evidentiary hearing, the Commonwealth argued that Mr. Thomas, Mr. Haughton and Mr. Wesson's testimonies were not credible. The PCHA court agreed and denied relief. *See* Ex. 14, February 6, 1996 PCHA Court Opinion.

## VII.    Gregory Strickland and Anthony Smith affidavits

Further evidence that Mr. Haughton's recantations were truthful has emerged throughout the years. Gregory "Dap" Strickland, an eyewitness who was 16 years old at the time of the crime and was present in Kaboobie's basement while the shooting took place, wrote a letter in 2000 and an affidavit in 2011 explaining that police were aware that he was a witness, that they attempted to coerce him into identifying Mr. Murray as one of the killers, and that he refused. *See* Ex. 15, Dec. 1, 2000 Gregory Strickland Ltr, and Ex. 16, July 20, 2011 Gregory Strickland Aff. Mr. Strickland, known as "Dap," explained that he saw and heard Mr. Haughton, who he

knew, in Kaboobie's house at the time of the shooting. Ex. 15 at 1. In his affidavit, he wrote that police brought him in for a photo lineup, but when he refused to select Mr. Murray's photograph, police ended the lineup and dismissed him. Ex. 16 at 1.

Also in 2011, another incarcerated person who knew Mr. Haughton at SCI Camp Hill, Anthony Smith, came forward with a sworn affidavit bolstering Mr. Haughton's recantation. *See* Ex. 17, June 19, 2011 Anthony Smith Aff. Smith explained that he and Mr. Haughton would regularly discuss their respective cases and that Mr. Haughton "would ask me and his cellie what can he do to clear these guys that the Detectives forced him to say was part of a plan, but in all honesty had nothing to do with the crime." *Id.* at 1. He specified that "Doug went on to say Bruce Murray nor Gregory Holden had nothing to do with the killing of Eric Delegal." *Id.* Mr. Smith was also able to provide a substantive narrative of what actually occurred at Kaboobie's house on December 16, 1980, which matched both Mr. Haughton and Mr. Wesson's recantations. *Id.* at 2. In addition to speaking with Mr. Haughton, Mr. Smith had the opportunity to discuss the case with Mr. Strickland, who told him that Detectives Gerrard and Gilbert attempted to coerce Mr. Strickland into implicating Mr. Murray. *Id.*

## VIII.   Mr. Holden's extensive postconviction procedural history

Mr. Holden challenged his conviction from the time of trial. In post-trial motions, he argued that his motion to sever was erroneously denied, that the redactions of Mr. Wesson's police statement were insufficient, as well as other claims regarding the trial court's jury instructions, voir dire decisions, and prejudicial statements made by the trial prosecutor. He did not file a direct appeal. In 1985, Mr. Holden filed a *pro se* PCHA petition, to which he was appointed counsel in 1988 who then filed an amended petition raising claims of trial counsel ineffectiveness as to trial counsel's withdrawal of the motion to sever and failure to advise Mr.

Holden of his direct appeal rights. This petition led to the 1991 PCHA evidentiary hearing discussed *supra* § VI. After he was denied PCHA relief in 1995, he appealed to the Superior Court and his appeal was dismissed for failure to file a brief in 1996. *See Commonwealth v. Holden,* No. 4154 Philadelphia 1995, Order (Superior Court, July 9, 1996). Mr. Holden proceeded to file seven subsequent *pro se* petitions seeking relief under the PCRA in 1999, 2005, 2007, 2009, 2012, 2016, and 2019. Each were dismissed as untimely.

In 1996, Mr. Holden sought federal habeas relief and his petition was dismissed for failure to exhaust state remedies. *See Holden v. Larkins,* No. 2:96-cv-05957-JCJ (E.D. Pa. 1996). A decade later, Mr. Holden sought federal relief again in a second *pro se* habeas petition, *Holden v. Wydner, et. al.,* 2:06-cv-05202-JCJ (E.D. Pa. 2006), which was dismissed as time-barred on September 21, 2007. He then filed a motion for relief under Rule 60(b), which was denied on October 11, 2007. *Holden v. DAO,* No. 2:07-cv-04107-JCJ (E.D. Pa. 2007).[2] On February 3, 2016, Mr. Holden filed a motion for relief under Rule 60(d)(1), which was denied that same day. *Holden v. Wydner,* 06-cv-05202, ECF 19-20. On June 2, 2017, Mr. Holden again attempted to reopen his 2006 habeas petition under Rule 60(b) based on the Supreme Court decision *Buck v. Davis, Holden v. Wydner,* 06-cv-05202, ECF 21, however he was denied on July 12, 2017. *Holden v. Wydner,* 06-cv-05202, ECF 22.

## IX.    Mr. Murray's recent postconviction relief

It was not until November 2022 that Mr. Murray's post-conviction efforts made public suppressed evidence supporting the unreliability of Mr. Haughton's trial testimony and affirming Mr. Holden's innocence. In the PPD's homicide file of the DeLegal murder investigation, Mr.

---

[2] It is not clear why Mr. Holden's 2007 motion for relief under Rule 60(b) was docketed under a separate number from the habeas petition it challenged (*Holden v. Wydner,* 06-cv-5202).

Murray discovered: (1) handwritten police notes, *see* Ex. 18, PPD Handwritten Notes, and (2) a PPD activity sheet, *see* Ex. 19, March 11, 1981 PPD Activity Sheet, both indicating that Mr. Strickland, the 16 year old eyewitness, told Mr. Randolph that he had seen Mr. Haughton, not Mr. Murray, in Kaboobie's house directly after the shooting, (3) Mr. Strickland's polygraph results indicating he later lied to police when he said he did not know who killed Kaboobie, *see* Ex. 20, March 13, 1981 Strickland Polygraph Report, (4) a tip made to police that local gang member and police informant, Elliott Burton, was seen leaving the scene of the shooting carrying a shotgun, *see* Ex. 21, Jan. 5, 1981 PPD Activity Sheet, and (5) an audio recording of Elliott Burton, in his capacity as a police informant, speaking with Mr. Holden on a police-arranged and recorded phone call in which Mr. Holden denies any involvement with the robbery-turned-shooting, *see* Ex. 22, PPD Recording of Phone Conversation with Transcription. *See also* Ex. 23, November 16, 2022 Murray Motion for Relief, *Murray v. Vaughn, et. al.,* No. 98-cv-05866, ECF 101, 140-154 (exhibits omitted) for full explanation of suppressed evidence.

The newly discovered police notes memorializing detectives' conversations with Mr. Randolph, Ex. 18 and Ex. 19, make clear both that Mr. Strickland told Mr. Randolph that Mr. Strickland had seen Mr. Haughton in Kaboobie's house after the shooting, and that police were aware that Mr. Strickland communicated these observations to Mr. Randolph. This version of events directly contradicts the prosecution's representations at trial that Mr. Haughton never entered Kaboobie's house, that Mr. Haughton was outside the house during the incident—in a position to see Mr. Holden acting as a lookout—and that Mr. Murray was involved in the shooting. Mr. Strickland's suppressed polygraph test results, Ex. 20, demonstrate that his later statement to police, that he did not know who shot Kaboobie and that Mr. Burton told him that "Bruce and Scot" shot Kaboobie, was not truthful.

On January 5, 1981, investigating detectives received information from an identified source implicating Elliot Burton in Kaboobie's death, specifically that he saw Mr. Burton running away from Kaboobie's house carrying a shotgun on the day of the murder. Ex. 21. While this information was recorded on an activity sheet, *id,* there is no indication in the investigatory record that detectives explored Mr. Burton as a potential suspect, even with the knowledge that the murder weapon was a shotgun and no shotgun was recovered at the scene or from any of the charged defendants. Instead, detectives proceeded to use Mr. Burton as an informant and arranged a recorded phone call between Mr. Burton and Mr. Holden in an attempt to secure an inculpatory statement from Mr. Holden. Ex. 22. These efforts failed because during the call with Mr. Burton, Mr. Holden denied any participation in the robbery-turned-murder of Kaboobie and expressed concern that others were falsely accusing him of being involved. *Id.*

Upon information and belief, neither Mr. Holden nor his trial counsel were previously aware of any of these pieces of evidence, which contradict Mr. Haughton's trial testimony and the Commonwealth's case theory. The new evidence caused the DAO to reverse its prior position and concede that it now views "Haughton and Wesson's recantations and testimony as credible and agree[s] that Murray has overcome section 2254(e)(1)'s presumption of correctness by clear and convincing evidence as to the finding that Haughton and Wesson were not credible." *See* Ex. 24 Jan. 18, 2023 DAO 60(b)(6) Response, *Murray v. Vaughn,* No. 98-cv-05866, ECF 108 at 15. This change in position resulted from the acknowledgement that the new evidence "strengthen[s] the recantations, which in turn strengthen each other." *Id.* Ultimately, the DAO acknowledged that upon review of Mr. Murray's Motion for Relief under Rule 60(b)(6), "Murray has satisfied the actual innocence gateway for excusing procedural default....his habeas proceeding should be reopened to permit review of the merits of his claims." *Id.* at 1.

Following the DAO's concessions as to 60(b)(6) relief, Mr. Murray filed an Amended Petition for Writ of Habeas Corpus outlining the constitutional violations entitling him to relief. *See* Ex. 25, May 5, 2023 Memo of Law in Support of Amended Petition, *Murray v. Clark,* No. 98-cv-05866, ECF 113 (exhibits omitted). In response, the DAO filed joint stipulations of fact and proposed conclusions of law in collaboration with Mr. Murray's post-conviction counsel. *See* Ex. 26, June 2, 2023 Joint Stipulations of Fact and Proposed Conclusions of Law, *Murray v. Clark,* No. 98-cv-05866, ECF 119. In this joint filing, both parties agreed that the Commonwealth had suppressed favorable and material evidence at the time of trial. *Id.* at 6-10.

The DAO also stipulated that "the prosecution's case against Murray rested on Douglas Haughton's testimony and Tyrone Wesson's inculpatory statement, both of which were recanted almost immediately after trial. As the Commonwealth has previously conceded, these recantations are reliable." *Id.* at 8. Additionally, "the parties agree and contend that the above-described suppressed, favorable exculpatory and impeachment evidence was material under *Brady* because, considered collectively, it undermines confidence in the outcome of Murray's trial." *Id.* at 9. The Honorable Anita B. Brody agreed with the parties' conclusions of law and granted Mr. Murray's Petition for Writ of Habeas Corpus later that same day. *See* Ex. 27, June 2, 2023 Order, *Murray v. Clark,* No. 98-cv-05866, ECF 120.

**LEGAL STANDARDS**

"[T]he conviction of an innocent person [is] perhaps the most grievous mistake our judicial system can commit,' and thus, the contours of the actual innocence gateway must be determined with consideration for correcting 'such an affront to liberty." *Reeves v. Fayette SCI*, 897 F.3d 154,164 (3d Cir. 2018) (quoting *Satterfield v. Dist. Att'y of Phila*., 872 F.3d 152, 154 (3d Cir. 2017)). As the U.S. Supreme Court has explained,

> Of greater importance [than the preservation of judicial resources and respect for finality and comity], the individual interest in avoiding injustice is the most compelling in the context of actual innocence…. Indeed, concern about the injustice that results from the conviction of an innocent person has long been at the core of our criminal justice system. That concern is reflected, for example, in the 'fundamental value determination of our society that it is far worse to convict an innocent man than to let a guilty man go free.'

*Schlup v. Delo*, 513 U.S. 298, 324–25 (1995) (quoting *In re Winship*, 397 U.S. 358, 372 (1970) (Harlan, J., concurring)); *id*. at 325 ("The maxim of the law is…that it is better that ninety-nine…offenders should escape, than that one innocent man should be condemned." Thomas Starkie, Evidence 756 (1824))). Thus, in compelling cases, other factors "must yield to the imperative of correcting a fundamentally unjust incarceration." *Engle v. Isaac,* 456 U.S. 107, 135 (1982).

Due to this significant interest in correcting the horrific injustice of a wrongful conviction, a showing of actual innocence can excuse a petitioner's procedural defects in seeking federal relief under the catchall clause of Federal Rule of Civil Procedure 60(b)(6). As the Third Circuit has clarified, "actual innocence," for purposes of the "miscarriage of justice" exception to procedural default of a habeas corpus claim under Rule 60(b)(6) requires "factual innocence, not legal insufficiency." *Reeves*, 897 F.3d at 161. In order to ensure all relevant information is considered, the scope of review is "not limited to the existing record[,]' and consideration of 'any admissible evidence' is proper." *Howell v. Superintendent Albion SCI*, 978 F.3d 54, 59 n.9 (3d Cir. 2020) (alteration in original) (quoting *Bousley v. United States,* 523 U.S. 614, 624 (1998)). The district court must "undertak[e] an individualized analysis of the proffered evidence," and cannot discredit "recantations on a categorical basis." *Id*. at 60 (instructing that all forms of evidence under the standard set forth in *Schlup* "should be analyzed on an individual

and fact-specific basis"). "'[T]here are no categorical limits on the types of evidence that can be offered' under *Schlup*." *Id*. (quoting *Hyman v. Brown*, 927 F.3d 639, 660 (2d Cir. 2019)).

To obtain relief from the procedural default judgment under Rule 60(b)(6), a petitioner must make a two-step showing: "[F]irst, the petitioner must present 'new reliable evidence' of actual innocence; and then, second, that evidence must 'persuade[] the district court that...no juror, acting reasonably, would have voted to find [the petitioner] guilty beyond a reasonable doubt.'" *Id*. (footnotes omitted) (alterations and omissions in original) (first quoting *Schlup*, 513 U.S. at 324; then quoting *Satterfield*, 872 F.3d at 163). Extraordinary relief is warranted under Rule 60(b)(6) if the petitioner meets this standard, "and the habeas petition can be considered on the merits despite a procedural default..." *Id*. (quoting *Satterfield*, 872 F.3d at 163).

To satisfy the first step of the *Schlup* standard, the petitioner must offer evidence that is "both 'new' and 'reliable.'" *Id*. To constitute "new" evidence, the evidence must have been "not available at trial and could not have been discovered earlier through the exercise of due diligence," *Reeves*, 897 F.3d at 162 (quoting *Amrine v. Bowersox*, 238 F.3d 1023, 1028 (8th Cir. 2001)). Under *Schulp*, "the newly presented evidence may indeed call into question the credibility of the witnesses presented at trial." 513 U.S. at 330. In assessing the reliability of the new evidence, "the court 'may consider how the timing of the petitioner's submission and the likely credibility of the witnesses bear on the probable reliability of that evidence,' as well as the circumstances surrounding the evidence and any supporting corroboration." *Reeves*, 897 F.3d at 161 (quoting *House v. Bell,* 547 U.S. 518, 538, 551 (2006)) (internal alterations omitted). With regards to recantations, "multiple recantations may themselves be mutually corroborating evidence, with each one having the potential to bolster the reliability of the others." *Howell,* 978 F.3d at 61.

The second step of the *Schlup* standard requires the petitioner to "show by a preponderance of the evidence 'that it is more likely than not that no reasonable juror would have convicted him in light of the new evidence,' or stated differently, that it is 'more likely than not any reasonable juror would have reasonable doubt.'" *Reeves*, 897 F.3d at 160–61 (first quoting *Houck v. Stickman*, 625 F.3d 88, 93 (3d Cir. 2010); then quoting *House*, 47 U.S. at 538). As the Third Circuit thoroughly explained in *Reeves*,

> [T]he court "must consider all the evidence, old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under rules of admissibility that would govern at trial." *House*, 547 U.S. at 538 (internal quotation marks and citation omitted). "[M]ere impeachment evidence is generally not sufficient to satisfy the [actual innocence gateway] standard." *Munchinski v. Wilson*, 694 F.3d 308, 338 (3d Cir. 2012). However, new, reliable evidence that "undermine[s] the [trial] evidence pointing to the identity of the [perpetrator] and the motive for the [crime]" can suffice to show actual innocence. *Goldblum v. Klem*, 510 F.3d 204, 233 (3d Cir. 2007); *see also Munchinski*, 694 F.3d at 33-37 (explaining that actual innocence was demonstrated where new evidence both showed that the crime could not have happened in the way the Commonwealth presented at trial and provided an alternative theory that was more appropriate and better fit the facts of the case). In weighing the evidence, "[t]he court's function is not to make an independent factual determination about what likely occurred, but rather to assess the likely impact of the evidence on reasonable jurors"; the actual innocence standard "does not require absolute certainty about the petitioner's guilt or innocence." *House*, 547 U.S. at 538.

*Id*. at 161.

**ARGUMENT**

Mr. Holden is innocent of the crime for which he is currently incarcerated and based on his discovery of new, reliable evidence, there remains no credible evidence in the record suggesting his guilt.

I. **Significant newly discovered evidence demonstrates Mr. Holden's actual innocence.**

Each of piece of suppressed evidence, found in the PPD's Kaboobie homicide investigatory file through co-defendant Mr. Murray's post conviction efforts—now newly

presented to this Court—support Mr. Holden's claims of innocence by undermining Mr. Haughton's trial testimony, supporting his later recantations, and foreclosing the prosecution's trial theory.

### A. Evidence regarding eyewitness Strickland directly contradicts the testimony of the prosecution's only witness against Mr. Holden and its trial theory.

As the DAO has conceded, the new evidence discovered by co-defendant Mr. Murray in the PPD's investigatory homicide file seriously undermines the Commonwealth's trial theory that the four co-defendants conspired to rob Kaboobie and the roles they each supposedly played in the alleged conspiracy. Ex. 24 at 15. The suppressed evidence regarding Mr. Strickland, the teenager who was present at Kaboobie's house at the time of his murder, clearly indicates that Mr. Haughton, not Mr. Murray, entered Kaboobie's house and participated in the shootout, disaffirming Mr. Haughton's testimony in its entirety. The handwritten police notes, Ex. 18, and activity sheet, Ex. 19, memorializing conversations between investigating detectives and Mr. Randolph, a source they later relied on to charge Mr. Holden with murder, indicate that Mr. Randolph told them that Mr. Strickland described seeing Mr. Haughton in Kaboobie's house directly following the murder. These interview notes contradict Mr. Haughton's description of the "conspiracy" to rob Kaboobie. The suppression of these notes, as well as Mr. Strickland's polygraph test results, Ex. 20, indicating that he later lied when he told a police he did not know who killed Kaboobie, all demonstrate that detectives knew that Mr. Haughton's story did not accord to the facts and suppressed evidence contrary to their preferred theory of the crime.

This newly discovered evidence as to Mr. Strickland's true observations the day Kaboobie was killed is supported by Mr. Strickland's later letter and affidavit detailing that he did in fact see Mr. Haughton in Kaboobie's house and describing how the police attempted to coerce him into falsely accusing Mr. Murray. Ex. 15 and Ex. 16. These statements made by Mr.

Strickland in 2000, Ex. 15, and 2011, Ex. 16, also speak to the reliability of the suppressed

polygraph report showing he lied to police when he said he did not know who killed Kaboobie,

as Mr. Strickland explained that he kept quiet about Mr. Haughton's involvement out of fear of

retribution from Mr. Haughton or his associates. Ex. 15 at 1; Ex. 16 at 1-2. In identifying Mr.

Haughton as the true shooter, the information suppressed as to Mr. Strickland reveals Mr.

Haughton's trial testimony to be false, causing the case against Mr. Holden to unravel.

**B. Evidence regarding alternative suspect Burton further disputes the prosecution's trial theory and exculpates Mr. Holden.**

Additional newly discovered evidence relates to alternative suspect and police informant,

Elliot Burton. Ex. 21 and Ex. 22. As detailed in a suppressed PPD activity sheet, an eyewitness

saw Mr. Burton leaving the scene of the crime with a shotgun, *id.,* raising more, significant

doubts as to the veracity of the Commonwealth's case theory at trial. A shotgun was determined

to be the murder weapon. Trial N.T. 5/31/83 at 101-102. Responding police recovered several

items from a shotgun at the crime scene including a bolt from a shotgun, a shotgun shell, and

shotgun shell wadding. *Id.* at 63-64. However, it appears no shotgun was recovered from the

scene or any of the defendants. *Id.* at 185 (list of Commonwealth evidence recovered from crime

scene). In particular, Mr. Holden's house was searched for guns and none were found. Ex. 2.

Information that Mr. Burton was seen fleeing Kaboobie's house with a shotgun fills a significant

hole in the physical evidence and calls into question the entire PPD investigation and the

narrative presented at trial.

Finally, the suppressed recorded phone call between Mr. Burton and Mr. Holden, in

which Mr. Holden denies involvement in the crime, Ex. 22, further supports Mr. Holden's

innocence. Mr. Holden was not aware that informant Burton was working with the police.

During their phone call, which Mr. Holden did not know was arranged by police and being

recorded, Mr. Holden denied participating in the Kaboobie robbery and shooting and expressed frustration that others were attempting to implicate him. *Id*. In contrast, the February 1981 search warrant affidavit to search Mr. Holden's home, Ex. 2, and the March 1981 warrant for Mr. Holden's arrest, Ex. 4, both relied on witnesses claiming that Mr. Holden had told them all about the crime and his involvement therein. However, the only piece of evidence reliably memorializing a conversation between Mr. Holden and a member of the community regarding the shooting shows that he adamantly denied any involvement. Ex. 22.

These new pieces of evidence, unavailable to Mr. Holden and his prior counsel for decades because they were previously undisclosed, are reliable corroboration of Mr. Holden's innocence.

## II. In light of the new evidence that has emerged since trial, no reasonable jury could have convicted Mr. Holden.

With all evidence taken into consideration, that which was presented at trial, that which has been presented in the intervening decades, and that which has never been presented to a reviewing court, no competent evidence remains to suggest that Mr. Holden played any part in Kaboobie's death. The sole evidence presented at trial that inculpated Mr. Holden was Mr. Haughton's testimony, which he has thoroughly recanted. Mr. Haughton's recantations are corroborated by co-defendant Mr. Wesson's recantations and newly discovered suppressed evidence.

### A. Recantations of Douglas Haughton and Tyrone Wesson's inculpatory statements and testimony support Mr. Holden's innocence.

Even prior to the DAO's concession that Mr. Haughton and Mr. Wesson's recantations were in fact credible, they provided persuasive evidence of Mr. Holden's innocence. Before trial, Mr. Wesson argued that he never made the police statement attributed to him and that it was a

product of police fabrication and coercion.[3] Wesson MTS N.T. 05/23/83 at 387-391. After trial,

he continued to repudiate the statement. Initially, he explained at sentencing that Mr. Murray and

Mr. Holden were not involved and that if he had testified he could have "exonerated" them.

Sentencing N.T. 04/23/84 at 16-17. Mr. Wesson's recantations are particularly reliable given that

the police statement he was refuting was not credible to begin with as it also implicated Larry

Thorpe, who was likely incarcerated on December 16, 1980. Ex. 28, Larry Thorpe Criminal

Extract.

Mr. Haughton also began recanting his inculpatory testimony shortly after trial. His April

11, 1985 affidavits detail police coercion,[4] promises of leniency (which he ultimately received),

and the truth of Kaboobie's death. Ex. 11 and Ex. 12. Less than a month later, he wrote to Mr.

Murray's attorney with the same information provided in the affidavits. Ex. 13. These early and

---

[3] Mr. Wesson's description that Detectives Gerrard and Gilbert pre-wrote the inaccurate statement attributed to him and coerced him into signing it is corroborated by the substantial allegations of police misconduct that have emerged accusing Detectives Gerrard and Gilbert—as well as other officers assigned to investigate the Kaboobie murder, Shelton, McNesby, and Lubiejewski—of fabricating evidence and using coercive, inappropriate tactics to secure, often false, witness and suspect statements. *See* Ex. 29, Samantha Melamed*, Losing Conviction,* Phila. Inquirer (last updated Dec. 26, 2021) (a series of articles detailing allegations against PPD officers including Gerrard, Shelton, McNesby, Gilbert, and Lubiejewski). *See also* Ex. 23 at 91-101 for full account of relevant police misconduct allegations.

The accusations discovered during the Inquirer's investigations specifically include coercing confessions and fabricating statements, the very conduct Mr. Haughton and Mr. Wesson accused the investigating officers of engaging in with regard to the Kaboobie murder investigation. The independent press investigation detailing these types of allegations from other cases add weight to Mr. Haughton and Mr. Wesson's accusations and severely limit the reliability and credibility of the testifying officers' trial testimony. In its response to Mr. Murray's Rule 60(b) filing, the DAO agreed that egregious allegations against Det. Gerrard in particular "strengthen[] Haughton and Wesson's accounts of police coercion contained in their recantations." Ex. 24 at 15 n. 4.

[4] Mr. Haughton's description of police coercion, specifically that Detective Gerrard "bullied and insisted that I sign statements naming Bruce Murray and Gregory Holden in this murder" is also supported by the new evidence that Detective Gerrard and the other homicide detectives assigned to this case routinely engaged in such misconduct. *See supra* note 3.

corroborating recantations provide powerful and reliable evidence of Mr. Holden's innocence as Mr. Haughton and Mr. Wesson had nothing to gain by attempting to reopen their co-defendants' cases. In particular, Mr. Haughton opened himself up to potential perjury charges as he admitted to lying on the stand and risked complicating his own chances at early parole.

Mr. Wesson and Mr. Haughton's recantations gained reliability over the years as they never again waivered from their description that the two of them went to Kaboobie's house alone on December 16, 1980 and that they did not conspire with Mr. Holden or Mr. Murray to rob or kill Kaboobie. Their testimony in 1991 remained consistent with this version of events. PCHA N.T. 07/25/91. Both separately testified that Mr. Holden and Mr. Murray were innocent and did not deviate from these claims under cross-examination. *Id.* at 20-55. They provided corroborating accounts of the shooting and the police coercion that led them to implicate the other two defendants. *Id.*

The recantations were supported by testimony from Mr. Thomas, Mr. Haughton's former cellmate, who described Mr. Haughton's anguish at falsely accusing Mr. Holden and Mr. Murray for a crime they did not commit. *Id.* at 5-9. Further corroboration came from Mr. Strickland's later letter and affidavit indicating that police attempted to coerce him into falsely implicating Mr. Murray. Ex. 15 and Ex. 16. Additionally, another person incarcerated with Mr. Haughton, Mr. Smith, also provided a sworn affidavit explaining that Mr. Haughton had told him that he had lied on the stand and that Mr. Holden and Mr. Murray were actually innocent. Ex. 17. The combination of Mr. Wesson and Mr. Haughton's repeated, consistent recantations in writing and by sworn testimony and the corroboration provided by third parties demonstrate Mr. Holden's long-proclaimed innocence.

As Mr. Haughton's testimony was the only direct evidence of Mr. Holden's guilt presented at trial, if his recantations are found credible, no reasonable jury could have possibly convicted Mr. Holden of this offense.

**B. The evidence recently discovered in the investigatory homicide file corroborates Mr. Wesson and Mr. Haughton's recantations and Mr. Holden's innocence.**

With all the new evidence in the record, including the suppressed evidence found in the homicide file as well as the corroborating affidvits of Mr. Thomas and Mr. Strickland, Mr. Haughton and Mr. Wesson's recantations have become even more reliable than when they were originally made. As the DAO stressed in its concession as to the credibility of the co-defendants' recantations, "[w]hen the PCRA court considered Haughton and Wesson's recantations in 1991, it did not have the benefit of Strickland's letter, affidavit, polygraph results, or the police material strengthening those things. It also did not have...the information from and about Elliot Burton." Ex. 24 at 15.

These new pieces of evidence support the reliability and truth of Mr. Haughton and Mr. Wesson's recantations in demonstrating the impossibility of the prosecution's theory as presented at trial and the clear dishonesty of Mr. Haughton's trial testimony. Mr. Strickland's early statements to Mr. Randolph, as memorialized by the investigating detectives in Ex. 18 and Ex. 19, make clear that Mr. Strickland saw Mr. Haughton in Kaboobie's house just after Kaboobie was killed and that it was Mr. Haughton rather than Mr. Murray who entered Kaboobie's house with Mr. Wesson and ultimately participated in the shootout that left Kaboobie dead. *Id.* This evidence is completely incompatible with Mr. Haughton's trial testimony that he stayed outside with Mr. Holden while Mr. Murray and Mr. Wesson went inside Kaboobie's house. Similarly, Mr. Strickland's suppressed polygraph report indicates that he was not being

honest with the police when he told them he did not know who killed Kaboobie. Ex. 20. The suppressed evidence supports the narrative Mr. Haughton and Mr. Wesson have maintained is true for decades, that they alone killed Kaboobie, that Mr. Strickland saw Mr. Haughton leaving the scene of the crime, and that Mr. Holden and Mr. Murray were not involved.

The suppressed evidence implicating Elliot Burton as a suspect casts additional doubt on the prosecution's trial theory. Mr. Burton was identified as a potential participant in Kaboobie's death when he was seen running from the scene of the crime holding a shotgun. Ex. 21. Not only does this information fill a gaping hole in the story presented at trial—the unexplained absence of the murder weapon—it also raises concerns about the police investigation and the attempt to use Mr. Burton as an informant against Mr. Holden. Mr. Burton's failed attempt to obtain an inculpatory statement from Mr. Holden via police-recorded phone call, Ex. 22, further demonstrates Mr. Holden's innocence and corroborates Mr. Haughton and Mr. Wesson's assertions that Mr. Holden was not involved in the offense.

### C. The limited and flawed inculpatory evidence presented at trial reinforces that a reasonable jury could not convict Mr. Holden.

The jury in this case heard very limited inculpatory evidence against Mr. Holden and the evidence that was presented against him was unreliable. The inadequacies in the originally presented case lend additional support to Mr. Holden's current claim that no reasonable jury could find him guilty beyond a reasonable doubt.

### 1. Douglas Haughton's trial testimony contained numerous inconsistencies.

Even prior to Mr. Haughton's numerous recantations, his testimony at trial was highly flawed and contained numerous inconsistencies. On cross examination, he was unable to credibly explain the differences between his direct examination testimony and his prior police statements and sworn testimony. *See supra* pp. 8-9. Perhaps most crucially as to Mr. Holden's innocence,

Mr. Haughton could not explain why he initially testified at Mr. Murray and Mr. Wesson's joint preliminary hearing that there were no leaders of the plan to rob Kaboobie but then changed his testimony at trial to claim that Mr. Holden led the plan. Trial N.T. 06/01/83 at 295-297. Similarly, while his original statement to police specified that the shotgun came from Mr. Murray's house, Ex. 6, at trial, he testified that it came from Mr. Holden's house. Trial N.T. 06/01/83 at 226-227.

It is understandable that the prosecution and investigators would need Mr. Haughton to directly implicate Mr. Holden in the planning of the robbery and the provision of firearms, as the testimony as to Mr. Holden's participation in the robbery itself was extremely limited: no one testified to actually seeing him during or after the robbery-turned-shooting. *Id.* at 320-321, 382. The unreliability and convenient refashioning of Mr. Haughton's trial testimony to implicate Mr. Holden further supports Mr. Holden's innocence.

### 2. No physical or otherwise competent evidence was presented at trial.

In addition to the untrustworthiness of Mr. Haughton's trial testimony, there was a stark lack of any reliable evidence in the trial record. The jury was provided no physical evidence tying Mr. Holden to the crime or suggesting his presence at Kaboobie's house. Investigators seemingly did not test the shotgun bolt for fingerprints, or if they did, the results were not inculpatory and were not presented at trial. Trial N.T. 05/31/82 at 73. The police found no guns in Mr. Holden's house upon searching it. No guns were shown to the jury at all. Trial N.T. 06/20/83 at 1469. The prosecution did not present testimony from Edward Randolph or the confidential informant(s) who, according to the 1981 warrants to search Mr. Holden's home and arrest him, supposedly provided police with information directly inculpating Mr. Holden. The

dearth of reliable evidence presented at trial is yet another factor demonstrating Mr. Holden's innocence and the unreasonableness of the jury's verdict.

### D. Mr. Holden's trial presentation of alibi evidence further supports his innocence.

In contrast to the prosecution's failure to provide sufficient inculpatory evidence, Mr. Holden presented significant, detailed alibi evidence and testified in his own defense. *See supra* pp. 10-11. Mr. Holden's defense witnesses each corroborated one another's descriptions of Mr. Holden's whereabouts on December 16, 1980. *Id*. His entire day was accounted for, including the period during which Kaboobie was killed. *Id.* Mr. Holden's own testimony aligned with his alibi. *Id.* Considered together, Mr. Holden's credible alibi, supported by three separate witnesses and his own testimony, and the Commonwealth's lack of reliable inculpatory evidence all underscore Mr. Holden's innocence and the unreasonableness of the jury's decision to convict.[5]

### III. Based on the same evidence described above, the District Attorney's Office conceded that co-defendant Bruce Murray met the *Schlup* standard for demonstrating actual innocence.

The DAO's response to Mr. Murray's most recent plea for relief demonstrates Mr. Holden's actual innocence. Mr. Holden and Mr. Murray were tried in a joint trial and the sole evidence placing them at the scene of Kaboobie's killing was the accomplice testimony of Mr. Haughton. In light of newly presented evidence, the DAO made the definitive concession that "the state court's 1991 finding that Haughton and Wesson were not credible" has been overcome and a District Court reviewing a claim for relief under Rule 60(b) "is not bound by that

---

[5] Although the trial prosecutor went to great lengths to emphasize that Mr. Holden was found hiding from the police upon his arrest, Trial N/T 06/20/83 at 1553, this evidence is far less significant or inculpatory in light of his prior arrest, interrogation, and incarceration on these charges and the numerous, credible reports that the police in question had long histories of abuse and other misconduct, *see supra* note 3.

determination." Ex. 24 at 15-16. Specifically, the DAO found that "it is likely that any reasonable juror would have had a reasonable doubt as to Murray's guilt if they'd had the complete picture now available to the Court." *Id.* at 18.

Although some of the evidence discussed in the DAO's response to Mr. Murray's Rule 60(b) filing was specific to Mr. Murray and the role he was accused of playing in the robbery turned murder, the conclusions reached regarding the unreliability of Mr. Haughton's trial testimony, the only inculpatory evidence presented as to either defendant, unquestionably supports Mr. Holden's actual innocence as strongly as it does Mr. Murray's. Simply put, there is no indication that Mr. Haughton's trial testimony was any more reliable or truthful as to Mr. Holden's supposed involvement. In finding that Mr. Haughton's post-trial recantations were credible, the DAO has acknowledged that the evidence presented against both Mr. Holden and Mr. Murray at trial was so flawed that no reasonable juror could convict them. This acknowledgment alone should entitle Mr. Holden to relief under Rule 60(b)(6). As the DAO already determined that, "Murray has made a showing sufficient to satisfy *Schlup*," *id.* at 18, based on the same factual record and exculpatory evidence that Mr. Holden presents here, there would be no basis for reaching a different conclusion as to Mr. Holden.

**CONCLUSION**

For the foregoing reasons, petitioner Gregory Holden respectfully requests that this Court grant his Motion for Relief from Judgment under Fed. R. Civ. P. 60(b)(6), thereby permitting the Court to reach the merits of any procedurally defaulted claims in his Petition for Writ of Habeas Corpus. Mr. Holden also requests leave to file an Amended Petition for a Writ of Habeas Corpus to present the newly discovered evidence supporting his constitutional claims for further relief.

Respectfully submitted,

_____

Grace Harris (PA ID 328968)
Kairys, Rudovsky, Messing, Feinberg &
    Lin LLP
The Cast Iron Building
718 Arch Street, Suite 501 South
Philadelphia, PA 19106
(215) 925-4400

*Counsel for Petitioner Gregory Holden*

Date: August 15, 2023