# IN THE UNITED STATES DISTRICT COURT FOR
# THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| GREGORY HOLDEN, | : | |
|    Petitioner, | : | |
| | : | CIVIL ACTION |
| v. | : | |
| | : | No. 06-5202 (AB) |
| WYNDEN, et al., | : | |
|    Respondents. | : | |

## RESPONDENTS' 60(b)(6) RESPONSE

Petitioner Gregory Holden was convicted of second-degree murder and related offenses in 1983 on the basis of testimony from a single co-conspirator who later recanted. In August 2023, Holden filed his fourth 60(b) motion for relief from final judgment.

After careful review, and considering all of the evidence included in Holden's recent filing, Respondents agree that Holden has satisfied the actual innocence exception to procedural bars announced in *Schlup v. Delo*, 513 U.S. 298 (1995), and that his habeas petition should be reopened.

**I.   FACTUAL AND PROCEDURAL HISTORY**

**A. The crime and investigation.**

On December 16, 1980, Eric "Kaboobie" DeLegal was shot and killed during a robbery in his home in Philadelphia. During their initial investigation into this crime, an informant and member of the 20th and

1

Carpenter street gang named Elliott Burton told former ADA Frank DeSimone that a 16-year-old named Gregory Strickland was in DeLegal's cellar at the time of the crime. *Commonwealth v. Watts*, 412 A.2d 474, 476 (Pa. 1980). The police then interviewed Strickland, who told them that he was indeed in DeLegal's cellar at the time of the crime, heard the gunshots and what sounded like two people go up and down the stairs, but didn't see anyone. *See* DAO App'x at 002–05. Strickland told the police he waited in the cellar after the men left for about 12 minutes before going upstairs, where he saw a neighbor, George Young, tending to DeLegal's wounds. Strickland again denied seeing anything relevant to the shooting. *Id*. An unknown witness also told police that he saw Burton fleeing the crime scene carrying a shotgun. This was not disclosed to the defense.

The police also spoke to Eric Randolph, another informant, who told them that Strickland told him that he had seen Douglas Haughton as the second man in DeLegal's house. This was not disclosed to the defense. The police re-interviewed Strickland, who denied this, and then they administered a polygraph exam that indicated deception on the questions of who killed DeLegal and what Strickland saw. DAO App'x at 007. The results of Strickland's polygraph exam were not disclosed to the defense. *See* DAO App'x at 008–09.

2

The police then obtained a search warrant for the residence of Gregory Holden, who was also allegedly involved in DeLegal's killing. According to the search warrant, Holden told an unknown Informant that he was in possession of the shotgun used in the murder and that the crime was committed by Haughton, "Bruce," and "another male." No arrests or charges resulted from this search and no weapons were recovered.

The police then again spoke with Edward Randolph, who told police that Holden had told him about the killing of DeLegal and implicated himself, Bruce Murray, Douglas Haughton, and others in the crime. Pet's Ex. 3. Based on this statement, Holden was arrested in March 1981. Holden told police that he was not involved with DeLegal's killing and that he was with his girlfriend at the time. The charges against Holden were dismissed when Randolph failed to appear at the preliminary hearing. *See* N.T., 6/17/1983 at 1260–63, 1267. The police then arranged a recorded conversation between Burton and Holden that did not bear fruit as Holden denied any involvement with the killing during the conversation. Pet.'s Ex. 22. This conversation was never disclosed to the defense.

This case then seemingly went cold until February 1982, when Douglas Haughton was arrested on federal bank robbery charges. Haughton was interrogated by the FBI as well as Philadelphia Detectives Gilbert and

3

Gerrard related to his alleged role in DeLegal's death. Haughton was shown Randolph's statement implicating him in the crime as well as a litany of evidence tying him to the subject bank robberies. Haughton ultimately accepted a deal whereby he pleaded guilty to third-degree murder regarding DeLegal in exchange for a lenient sentence and his assistance in prosecuting Holden and his co-defendants, all of whom Haughton implicated.[1] Holden was arrested and charged again for killing DeLegal shortly after.

**B. The trial**

Holden proceeded to a joint jury trial in May and June 1983 with Tyrone Wesson and Bruce Murray as co-defendants, at which the prosecution presented testimonial evidence from Douglas Haughton, uniformed police officers and detectives, and the assistant medical examiner.

Haughton testified that he was with Holden and his co-defendants on the day of the murder when the four of them decided they wanted to rob DeLegal. N.T., 6/1/1983 at 223–24. He testified that they all agreed that he and co-defendant Holden would serve as lookouts because they had an

---

[1] After testifying at Murray's trial, Haughton was sentenced to 5-10 years imprisonment to run concurrently with his federal bank robbery sentence. He was released on parole in 1989.

4

ongoing dispute with DeLegal over money and marijuana and did not think he would open the door for them. *Id*. at 233–34, 247. Haughton testified that Wesson carried a shotgun and Murray carried a .32 pistol. *Id*. at 226. Murray and Wesson knocked on the door, someone opened it, and they went inside. *Id*. at 241. A couple of seconds after they entered the house, Haughton told the court, he heard the sound of a shotgun blast followed by three shots coming from a handgun. N.T., 6/1/1983 at 242–43. At that point, Haughton and Holden reportedly fled.

Though no firearms were recovered in this case, police did recover a 20-gauge shotgun bolt and a spent shotgun shell from the scene, along with marijuana and drug paraphernalia. N.T., 5/31/1983 at 63–65; 72–74. The assistant medical examiner testified that DeLegal was shot once by a shotgun and at least four times by a revolver. *Id*. at 143–46. Also, Detective Lubejiewsi read into the record a redacted version of Wesson's police statement confessing to the shooting and implicating "the other guys," *i.e.*, Murray and Holden, in the crime. N.T., 6/15/1983 at 681–86. Wesson attempted to recant his statement pre-trial in a motion to suppress, claiming it was fabricated by police, but the motion was denied.

In his defense, Holden called three alibi witnesses and testified himself consistently with his alibi. Gregory Strickland, Eric Randolph, and Elliott Burton were not called by anyone.

**c. Conviction, sentencing, and appellate proceedings**

After three full days of deliberation, the jury convicted Holden and his co-defendants of second-degree murder, robbery, and related offenses.

At the defendants' joint sentencing in April 1984, Wesson told the court that he did not understand that he could have taken the stand at trial and that, if he had, he would have "cleared the other two defendants," meaning Murray and Holden. N.T., 4/23/1984 at 16–17. Murray and Holden also testified and told the court that they were innocent of the crime. *Id*. at 20, 24. Holden was sentenced to a mandatory term of life in prison without parole. Holden's post-trial motions were denied and he did not file a direct appeal.

The following year, in 1985, Haughton recanted his trial testimony and pretrial statement in affidavits and letters and claimed he was physically coerced by Detective Gerrard into inculpating Holden and Murray. *See* Pet.'s Ex. 11, 12. Haughton then sent a third letter to Murray's lawyer, Pamela Cohen, again recanting his testimony and exculpating Holden and Murray. Pet's Ex. 13.

6

At a 1991 joint PCHA (a precursor to the PCRA) hearing regarding the recantations, Haughton (who had been released on parole) testified consistently with his recantation that he had lied earlier both because he received a favorable deal and because he was coerced by police. N.T., 7/25/1991 at 22–31. Tyrone Wesson also testified, recanting his police statement and reiterating what he said at the sentencing hearing, *i.e.*, that Holden was not involved in the crime. He also added that the police tricked him into signing a premade statement confessing to the crime and implicating Holden without an attorney present. *Id*. at 46–47, 53–55. Haugton and Wesson then gave largely matching descriptions of the crime to the court: that the two of them went to DeLegal's house alone to buy marijuana, that only Haughton was armed at the time, that DeLegal pulled out a shotgun that Wesson grabbed, leading to a struggle during which the shotgun went off into DeLegal's chest, and then Haughton and DeLegal fired shots at each other. *See id*. at 19–23, 40–43. The PCHA court found both Haughton and Wesson incredible and denied relief and the Superior Court affirmed. *See* Pet.'s Ex. 14.[2]

---

[2] Holden would file seven subsequent *pro se* PCRA petitions, which were each dismissed as untimely filed.

In 2001, Gregory Strickland, the boy in the basement, wrote a letter to the Innocence Project of Centurion Ministries claiming that he was in DeLegal's cellar at the time of the crime when he was 15 and that he knew the other man in the house was Haughton and not Murray and that he didn't say anything out of fear. Pet.'s Ex. 15. He also alleges in the letter that Detective Gerrard and an unknown ADA took Strickland to a lineup and tried to get him to identify Murray as the other man, but he refused on counsel of his father, so they canceled the lineup. *Id*.

In 2011, Strickland signed an affidavit reiterating what he had put in his prior letter. In his letter and affidavit, Strickland again said that Haughton was the second man and that the police presented him with a lineup in 1982, asking him to ID Murray. He writes that he told the police that Murray was not there and he could not make such an ID. He then says the lineup was canceled and he was never contacted again. Pet.'s Ex. 16. That year another prisoner, Anthony Smith, also came forward with an affidavit swearing that Haughton had confessed to him that neither Holden nor Murray was involved in DeLegal's death. Pet.'s Ex. 17.

In 2006 Holden filed a *pro se* federal habeas petition raising three claims: one *Batson* claim, one ineffective assistance of counsel claim, and one weight-of-the-evidence claim. ECF No. 1. That petition was dismissed as

8

untimely filed. ECF No. 17. Holden then filed three Rule 60 motions in 2007, 2016, and 2017 attempting to reopen his closed habeas petition, and each of which was denied. *See* ECF Nos. 20, 22; *see also Holden v. DAO*, E.D. Pa. No. 07-4107, ECF No. 2.

In 2022, during voluntary discovery engaged in as part of co-defendant Bruce Murray's litigation, Murray found in the police department's investigative file: (1) confirmation that a lineup was scheduled for February 1983 and that Strickland and his father were transported to participate in it and that, upon arriving, the lineup was canceled; (2) Strickland's polygraph results; (3) Police activity sheets regarding conversations with Strickland and Randolph implicating Haughton in the crime; (4) notes that a witness claimed to see Burton fleeing the scene with a shotgun; and (5) the secretly recorded conversation between Burton and Holden. This information was never disclosed to the defense, strengthens Gregory Strickland's prior letter and affidavit regarding his experience in this case, and helps corroborate the after-trial recantations of both Haughton and Wesson. Co-defendant Murray was ultimately granted 60(b) and habeas relief on the basis of these discoveries. *See Murray v. Vaughn*, E.D. Pa. No. 98-5866, ECF Nos. 101, 110, 120.

Holden now files this motion under Federal Rule of Civil Procedure 60(b)(6), arguing that he also meets the "actual innocence" gateway recognized in *Schlup v. Delo*, 513 U.S. 298 (1995) and extended/clarified in *McQuiggin v. Perkins*, 569 U.S. 383 (2013) and *Satterfield v. Dist. Att'y of Phila.*, 872 F.3d 152 (3d Cir. 2017). He further contends that the discoveries made public in co-defendant Murray's litigation operate to make his motion timely.

Respondents now respond.

## II. DISCUSSION

### A. Respondents agree that Holden's motion is timely filed.

A petitioner must be diligent in seeking review of his claims under 60(b) and motions filed under Rule 60(b)(6) specifically must be filed "within a reasonable time." *Cox v. Horn*, 757 F.3d 113, 116 (3rd Cir. 2014); Fed. R. Civ. P. 60(c)(1). Rule 60(b)(6) allows for relief for "any reason" other than those specifically listed in the Rule and "provides a grand reservoir of equitable power to do justice in a particular case." *Cox*, 757 F.3d at 122. Lastly, "a district court may only grant relief under Rule 60(b)(6) in extraordinary circumstances where, without such relief, an extreme an unexpected hardship would occur." *Satterfield*, 872 F.3d at 158 (quotation marks and citations omitted).

Here, Respondents agree that Holden's motion is timely as he has been diligent in pursuing his rights. Though this motion comes five years after the Third Circuit's decision in *Satterfield*, which represented a "change in law" sufficient to reopen a closed habeas petition on actual innocence grounds[3], it comes only nine months after the evidentiary underpinnings of this motion were first made public as part of co-defendant Murray's federal litigation. Respondents agree that the publication or release of evidence existing exclusively in the Commonwealth's control, and operating to show the movant may be actually innocent of the crime of which he was convicted, is an "extraordinary circumstance" allowing for merits review of a 60(b)(6) motion rooted in a claim of actual innocence so long as said motion is filed within one-year of the release or publication of the subject evidence. *See Cox*, 757 F.3d at 120 (an extraordinary circumstance exists where, without relief, "an extreme and unexpected hardship would occur"); *Satterfield*, 872 F.3d at 162 (other principles "must yield to the imperative of correcting a fundamentally unjust incarceration"); *cf. Bracey v. Superintendent Rockview SCI*, 986 F.3d 274, 293 (3d Cir. 2021) (claims rooted in undisclosed evidence are timely if brought within one year of the discovery of previously undisclosed evidence).

---

[3] *See Murray v. Vaughn*, No. 98-5866, ECF No. 83.

11

**B. Respondents agree that Holden has made a sufficient showing of actual innocence to allow him to reopen his federal habeas petition.**

**1. Applicable legal standard**

In *Schlup v. Delo*, 513 U.S. 298 (1995), the United States Supreme Court held that a credible showing of actual innocence can allow a habeas petitioner to overcome a procedural bar that would otherwise foreclose review of a defaulted constitutional claim. In *McQuiggin v. Perkins*, 569 U.S. 383 (2013), the Court extended *Schlup*'s "fundamental miscarriage of justice exception" to allow habeas petitioners to overcome AEDPA's statute of limitations.

In order to meet the actual innocence standard announced in *Schlup*, (1) a petitioner must present new, reliable evidence of innocence, and, (2) in light of all the evidence, old and new, it must be more likely than not that any reasonable juror would have a reasonable doubt as to the petitioner's guilt. *House v. Bell*, 547 U.S. 518, 538 (2006).

As none of the evidence at issue here was either available or presented at the time of trial, it is "new" for purposes of his Rule 60(b) motion. *Reeves v. Fayette SCI*, 897 F.3d 154, 164 (3d Cir. 2018). Therefore, "[t]he question is whether it is reliable." *Howell v. Superintendent Albion SCI*, 978 F.3d 54, 60 (3d Cir. 2020). Under *Schlup*'s first step, in determining reliability, "the timing of the petitioner's submission and the likely credibility of the

witnesses bear on the probable reliability of that evidence, as well as the circumstances surrounding the evidence and any supporting corroboration." *Id*. (quoting *Reeves v. Fayette SCI*, 897 F.3d 154, 161 (3d Cir. 2018)). Moving to the second step, assuming the new evidence is reliable, Holden must show that it is more likely than not that that no reasonable juror would have convicted him in light of it. *Schlup*, 513 U.S. at 324. In making this determination, the Court must consider "all the evidence, old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under the rules of admissibility that would govern at trial." *House*, 547 U.S. at 538. To meet this standard, "absolute certainty" is not required, and *House* held that the standard was met even though it was "not a case of conclusive exoneration" and aspects of the prosecution's evidence still supported an inference of guilt. *Id*. at 538, 553–54.

2. **Analysis**

As his co-defendant did before him, Holden presents a plethora of evidence to support his claim of actual innocence including: Haughton and Wesson's recantations and PCRA hearing testimony; Strickland's 2001 letter and 2011 affidavit as well as his undisclosed polygraph results and other undisclosed material from the police file supporting Strickland's

version of events; the undisclosed evidence concerning Elliott Burton as an informant; undisclosed activity sheets regarding Strickland and Edward Randolph; and the undisclosed recorded conversation between Holden and Burton.

First, as Respondents previously conceded in Murray's case, Respondents view Haughton and Wesson's recantations and testimony as credible, despite the state courts' view to the contrary. *See Murray*, No. 98-5866, ECF No. 108 at 14–16. When the PCRA court considered Haughton and Wesson's recantations in 1991, it did not have the benefit of Strickland's letter, affidavit, polygraph results, or the police notes and activity sheets strengthening those things. It also did not have the benefit of information from and about Elliott Burton or the conversation transcript between Burton and Holden. All those materials, either undisclosed or not yet in existence at the time of the PCRA hearing, strengthen the recantations, which in turn strengthen each other. *See Howell*, 978 F.3d at 61 (noting that recantations can be "mutually corroborating evidence," with each one having the potential to bolster the reliability of the others).

For instance, handwritten notes and undisclosed activity sheets and polygraph results from the police investigative file support and corroborate Strickland's letters and affidavit that it was Haughton, and not Murray, in

14

DeLegal's home that day, thereby calling all of Haughton's trial testimony into question as well as the good faith of the larger investigation.[4] Also, newly discovered evidence that Burton was seen fleeing DeLegal's house with a shotgun, and his recorded conversation with Holden, further support Holden's claims of innocence. Indeed, though a shotgun shell was recovered from DeLegal's house, no shotgun was recovered either from his home or Holden's. *See* Pet.'s Ex. 2. And the conversation between Holden and Burton shows Holden professing his innocence, even in private, as early as 1981.

The only evidence of Holden's guilt presented at trial was Haughton's testimony and Wesson's police statement, which they almost immediately recanted. Indeed, Tyrone Wesson began recanting his statement before trial and then again at the sentencing hearing. Given the recently discovered evidence in this case, *e.g.*, undisclosed evidence that Gregory Strickland's 2001 and 2011 affidavits offer a truthful account and the undisclosed evidence concerning Elliot Burton and Edward Randolph, Respondents are

---

[4] The detectives accused in this case of "bullying" Haughton and fabricating Wesson's statement, Gilbert and Gerrard, have faced substantial allegations of similar misconduct in numerous cases. *See* Samantha Melamed, *Losing Conviction*, THE PHILADELPHIA INQUIRER (Pub. May 7, 2021), *available at* https://www.inquirer.com/crime/a/philadelphia-murder-exonerations-wrongful-convictions-20210507.html.

15

constrained to conclude that Holden has made a showing sufficient to satisfy *Schlup.* Considering all the evidence, old and new, regardless of admissibility, Respondents agree that it is likely that any reasonable juror would have had a reasonable doubt as to Holden's guilt. *Reeves*, 897 F.3d at 161.

Holden, like Murray, has put forward compelling evidence supporting his claim of innocence, and "although the issue is close," *House*, 547 U.S. at 554, Respondents agree that he has satisfied *Schlup* and may reopen his initial habeas petition pursuant to Federal Rule of Civil Procedure 60(b)(6).

Respectfully submitted,

*/s/ David Napiorski*
DAVID J. NAPIORSKI
ASSISTANT DISTRICT ATTORNEY

# IN THE UNITED STATES DISTRICT COURT FOR
# THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| GREGORY HOLDEN, | : | |
|   Petitioner, | : | |
| | : | CIVIL ACTION |
| v. | : | |
| | : | No. 06-5202 (AB) |
| WYNDEN, et al., | : | |
|   Respondents. | : | |

## CERTIFICATE OF SERVICE

I, David J. Napiorski, hereby certify that on this 27th day of November, 2023, the foregoing response was served via the Court's electronic filing system on the following counsel for Holden:

**GRACE HARRIS
KAIRYS RUDOVSKY MESSING FEINBERG AND LIN LLP
718 ARCH STREET
SUITE 501 SOUTH
PHILADELPHIA, PA 19106**

                                    Respectfully submitted,

                                      <u>/s/ *David Napiorski*</u>
                                      DAVID J. NAPIORSKI
                                      ASSISTANT DISTRICT ATTORNEY