**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **Gregory Holden,** | : | |
| **Petitioner** | : | **Civil Action** |
| | : | |
| **v.** | : | **No. 06-cv-5202-AB** |
| | : | |
| **Kevin Ransom, et. al.** | : | |
| **Respondents** | : | |
| | : | |

## <u>AMENDED PETITION FOR RELIEF UNDER 28 U.S.C. § 2254</u>

Petitioner Gregory Holden, by and through undersigned counsel, and pursuant to this Court's November 28, 2023 Order (ECF No. 36) permitting petitioner to file the present Amended Petition, hereby petitions this Court to grant habeas corpus relief in this matter based on the clear violations of his constitutional rights and his innocence of the crime for which he has been incarcerated for the past 41 years.

WHEREFORE, Petitioner Gregory Holden respectfully requests that this Honorable Court grant his Amended Petition for Writ of Habeas Corpus under 28 U.S.C. § 2254, vacating his conviction and sentence.

Respectfully submitted,

Grace Harris (PA ID 328968)
Kairys, Rudovsky, Messing, Feinberg &
    Lin LLP
The Cast Iron Building
718 Arch Street, Suite 501 South
Philadelphia, PA 19106
(215) 925-4400

*Counsel for Petitioner Gregory Holden*

Date:  December 19, 2023

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **Gregory Holden,** | **:** | |
| **Petitioner** | **:** | **Civil Action** |
| | **:** | |
| **v.** | **:** | **No. 06-cv-5202-AB** |
| | **:** | |
| **Kevin Ransom, et. al.** | **:** | |
| **Respondents** | **:** | |
| | **:** | |

## <u>MEMORANDUM IN SUPPORT OF AMENDED PETITION</u><br><u>FOR WRIT OF HABEAS CORPUS</u>

Grace Harris (PA ID 328968)

Kairys, Rudovsky, Messing,
    Feinberg & Lin LLP
The Cast Iron Building
718 Arch Street, Suite 501 South
Philadelphia, PA 19106
(215) 925-4400

*Counsel for Petitioner Gregory Holden*

Date: December 19, 2023

## **TABLE OF CONTENTS**

I.   INTRODUCTION ............................................................................................................... 1

II.  PROCEDURAL AND FACTUAL BACKGROUND ..................................................... 2

   A.  Investigation and Pretrial Proceedings ..................................................................... 2

   B.  The Joint Trial of Mr. Holden, Mr. Murray and Mr. Wesson ................................. 6

      i.   Jury Selection ..................................................................................................... 6

      ii.  Evidence Presented at Trial ............................................................................... 7

      iii. Sentencing .......................................................................................................... 8

   C.  Post-Conviction Proceedings and New Evidence ..................................................... 9

      i.   Post-Trial Motions and Early Post-Conviction Filings ..................................... 9

      ii.  Mr. Haughton's Recantations ............................................................................ 9

      iii. PCRA hearing in 1991 ..................................................................................... 10

      iv. Mr. Holden's Further Post-Conviction Filings ............................................... 12

      v.  Gregory Strickland and Anthony Smith Affidavits ........................................ 13

      vi. Mr. Murray's Discovery of Withheld Evidence and Post-Conviction Relief ............... 14

      vii. DAO and Court Determinations of Mr. Holden's Innocence ......................... 16

III. STANDARD OF REVIEW ........................................................................................... 17

IV. MR. HOLDEN'S FEDERAL HABEAS CORPUS CLAIMS ..................................... 17

   A.  Claim One: Mr. Holden's due process rights under Brady were violated when Philadelphia Police detectives suppressed material evidence favorable to him. ..................................... 18

      i.   Evidence regarding eyewitness Mr. Strickland's reports to police informant Mr. Randolph and to PPD detectives ....................................................................... 20

      ii.  Evidence regarding alternative suspect Mr. Burton ........................................ 22

      iii. Cumulative materiality of withheld evidence ................................................. 23

   B.  Claim Two: Mr. Holden was denied his Sixth Amendment right to confront his accusers when the trial court allowed a statement by co-defendant Wesson to be read to the jury with inadequate redactions. ........................................................................................ 25

   C.  Claim Three: Mr. Holden's rights under the Equal Protection Clause of the Fourteenth Amendment were violated by the Commonwealth's systemic practice of racial discrimination in its use of peremptory challenges during voir dire. ............................... 28

   D.  Claim Four: The cumulative effect of the constitutional violations at Mr. Holden's trial rendered it fundamentally unfair, violating his due process rights. .................................... 36

   E.  Claim Five: Mr. Holden is actually innocent. ......................................................... 37

V.  CONCLUSION .............................................................................................................. 38

## I.    INTRODUCTION

Petitioner Gregory Holden has been serving a life sentence for more than forty years for a crime he did not commit. His conviction, which resulted from grave violations of his constitutional rights, including police and prosecutorial misconduct, fabricated inculpatory evidence, and the suppression of exculpatory evidence, is a great injustice that must be corrected. Mr. Holden has never wavered from his assertions of innocence, which has finally been vindicated by the District Attorney's concessions to and this Court's granting of his Motion for Relief Pursuant to Rule 60(b). *See* ECF 35 and 36. Both the District Attorney and this Court have agreed that Mr. Holden has presented sufficient evidence of his actual innocence to meet the requirements of *Schlup v. Delo,* 513 U.S. 298 (1995), allowing him to re-open and litigate any untimely or procedurally defaulted claims in the instant amended federal habeas corpus petition. ECF 36.

Mr. Holden respectfully submits the following claims in this amended petition for relief under 29 U.S.C. § 2254 and supporting memorandum of law[1]:

1) Mr. Holden's due process rights under *Brady v. Maryland,* 373 U.S. 83 (1963) were violated when Philadelphia police detectives withheld evidence that directly contradicted their case theory, impeached their sole inculpatory witness, Douglas Haughton, and was favorable to Mr. Holden. Specifically, Philadelphia police detectives suppressed police investigatory materials demonstrating that Mr. Haughton was lying about his role in the murder, that the crime did not occur the way in which the Commonwealth presented it at trial, that an alternative suspect had been identified

---

[1] In the interests of judicial economy, undersigned counsel respectfully requests that the Court accept Mr. Holden's amended petition and memorandum of law in a single document.

early in the investigation, and that the police had arranged a phone call between that

suspect and Mr. Holden in an unsuccessful attempt to record Mr. Holden inculpating

himself.

2) Mr. Holden was denied his Sixth Amendment right to confront his accusers when the

trial court allowed a statement by co-defendant Wesson to be read to the jury, with

inadequate redactions in violation of *Bruton v. United States,* 391 U.S. 123 (1968).

3) Mr. Holden's rights under Equal Protection Clause of the Fourteenth Amendment

were violated due to the Commonwealth's systemic use of peremptory challenges

against black venirepersons over a period of time in violation of *Swain v. Alabama,*

380 U.S. 202 (1965).

4) The cumulative prejudice of these constitutional violations warrant habeas relief.

5) Mr. Holden is actually innocent.

## II.   PROCEDURAL AND FACTUAL BACKGROUND[2]

### A.  Investigation and Pretrial Proceedings

On December 16, 1980 around 5:45pm, Eric "Kaboobie" DeLegal was found suffering

from serious gunshot wounds inside his house at 2414 Montrose Street and he was pronounced

dead at Graduate Hospital around 6:40pm. Trial N.T. 05/31/83 at 38, 49-51. Philadelphia Police

Department ("PPD") officers recovered from the area around the pool of Kaboobie's blood a bolt

from a 20-guage shotgun, a 20-guage spent shotgun shell, and wadding from a shotgun shell. *Id.*

---

[2] In addition to the facts Mr. Holden provides herein, he incorporates the extensive factual
backgrounds provided in his own motion for relief under Rule 60(b) and by co-defendant Bruce
Murray in Mr. Murray's motion for relief under Rule 60(b). *Holden v. Ransom,* No. 06-cv-5202-
AB, ECF 26, 4-19 (E.D. Pa. August 15, 2023), attached as Exhibit 1 (exhibits omitted). *Murray
v. Clark, et. al.,* No. 98-cv-05866-AB, ECF 101, 5-79 (E.D. Pa. November 16, 2022), attached as
Exhibit 2 (exhibits omitted).

at 63-65, 72-73. The police did not recover any firearms in connection with their investigation

into Kaboobie's death.

On February 25, 1981, PPD officers sought and received a warrant to search Mr.

Holden's home for firearms based on information purportedly received from one to two

confidential informants. *See* Exhibit 3, Feb. 25, 1981 Search Warrant Affidavit. The search

warrant affidavit described Mr. Holden's home as a "repository" for street guns and contained a

description of the Kaboobie murder that Mr. Holden supposedly told a confidential informant. *Id.*

The affidavit's version of the offense did not specifically implicate Mr. Holden as a participant,

but as someone with information as to what occurred. *Id.* No charges or arrests resulted from this

search and there is no record of any firearms being recovered from Mr. Holden's home. He was

not interviewed at that time about his knowledge of the Kaboobie murder or any other offense.

The identity of the "confidential informant(s)" mentioned in the affidavit is still unknown to Mr.

Holden.

A few weeks later, on March 11, 1981, Edward Randolph made a statement to police

regarding the Kaboobie murder. Exhibit 4, March 11, 1981 Randolph Statement. Like the

confidential informant who was the source of information in the affidavit of probable cause to

search Mr. Holden's home, Mr. Randolph purportedly told detectives that Mr. Holden had told

him all about the Kaboobie shooting. *Id.* at 1. In Mr. Randolph's version of events, Mr. Holden

told him that he, Larry Thorpe, Bruce Murray, Douglas Haughton, and Tyrone "Scotty" Wesson

decided to rob Kaboobie and that Mr. Holden, Mr. Thorpe, and Mr. Haughton waited in the

schoolyard near Kaboobie's house, but that they left the area upon hearing shots from inside the

house. *Id.* at 2.

Based solely on Mr. Randolph's statement, Mr. Holden was initially arrested for Kaboobie's murder on March 20, 1981. Exhibit 5, March 17, 1981 Arrest Warrant Aff. of Probable Cause. At the time of his first arrest, Mr. Holden voluntarily provided a statement to detectives and denied any involvement in Kaboobie's death. Exhibit 6, March 20, 1981 Holden Statement. He was held in jail until May 13, 1981, when the charges against him were dismissed due to Mr. Randolph's failure to appear in court and the lack of any other evidence implicating Mr. Holden in the murder. Trial N.T. 06/17/83 at 1260-63, 1267.

The investigation was seemingly dormant until Douglas Haughton was arrested on federal bank robbery charges in February 1982. Trial N.T. 06/02/83 at 546-47. The interrogating FBI agents as well as several PPD detectives, including Detective Larry Gerrard, showed Mr. Haughton evidence of his involvement in the federal bank robbery case and explained that he would need to cooperate with the PPD's investigation into Kaboobie's death to receive a lighter punishment. *Id.* During this interrogation, PPD detectives gave Mr. Haughton a copy of Mr. Randolph's previous statement implicating Mr. Holden and others in the shooting. Trial N.T. 06/02/83 at 517.

After being threatened by law enforcement and reading Mr. Randolph's statement, Mr. Haughton provided a statement to Detective Gerrard and other investigators claiming that he had conspired with Mr. Holden, Mr. Murray, and "Scottie" to rob Kaboobie. Exhibit 7, March 4, 1982 Haughton Statement. According to Mr. Haughton's statement at that time, he and Mr. Holden served as lookouts while Mr. Murray and "Scottie" entered Kaboobie's home and ultimately shot and killed him. *Id.* at 1. Several weeks later, Mr. Haughton was arrested and charged with Kaboobie's death, after which he gave another statement identifying "Scottie" as Mr. Wesson. Exhibit 8, April 1, 1982 Haughton Statement. On April 21, 1982, Mr. Haughton

4

pled guilty to the federal bank robbery charge and on September 16, 1982 he was sentenced to five years' incarceration with the expectation that he would actually serve 32-40 months. Exhibit 9, Dec. 8, 1982 Presentence Report at 3. Mr. Haughton then filed a motion to suppress his statements regarding the Kaboobie murder, claiming that he did not intelligently, knowingly, or voluntarily waive his constitutional rights during his interrogation. Exhibit 10, June 8, 1982 Haughton Motion to Suppress. When this motion was denied, Mr. Haughton pled guilty to third degree murder in exchange for his testimony against Mr. Holden, Mr. Murray and Mr. Wesson, which ultimately resulted in his receiving a concurrent sentence to run alongside his existing five-year federal sentence. Trial N.T. 06/01/83 at 401-07.

Upon Mr. Wesson's arrest for Kaboobie's murder, PPD detectives obtained a statement that they attributed to Mr. Wesson detailing his and his co-defendants' participation in the robbery turned shooting. Prior to trial, in May 1983, Mr. Wesson recanted the accusations made in this police statement in a motion to suppress, arguing that police had fabricated the statement and coerced him to adopt it. Wesson MTS N.T. 05/23/83 at 387-391. His motion was denied and although the jury was instructed to use this statement only against Mr. Wesson and not as evidence against Mr. Holden or Mr. Murray, references to Mr. Holden and Mr. Murray were not redacted in full, rather their names were simply replaced by references to "the other guys." Trial N.T. 06/15/83 at 681-686. The narrative contained in this statement generally matched the statement attributed to Mr. Randolph, including the involvement of Larry Thorpe. *Id.* Counsel for Mr. Holden and Mr. Murray expressed serious concern with the effectiveness of the redactions and potential prejudice to their clients, which had been the subject of a prior defense motion to sever. *Id.* at 647-648.

### B.  The Joint Trial of Mr. Holden, Mr. Murray and Mr. Wesson

### i.      Jury Selection

Jury selection in the joint trial of Mr. Holden, Mr. Murray, and Mr. Wesson, who are all

Black men, spanned five days, from May 19-27, 1983. During the course of the voir dire

proceedings, Assistant District Attorney ("ADA") Robert Marano exercised at least fourteen, and

possibly as many as seventeen, peremptory challenges to exclude Black people from the jury.

Defendants' trial counsel raised repeated objections to the exclusion of Black venirepersons.

Voir Dire N.T. 5/19/83 at 105, 145-46, 204, 214-15; Voir Dire N.T. 5/20/83 at 282-83.

By the second day of jury selection, after acknowledging that five of the

Commonwealth's six peremptory challenges thus far had been used to exclude Black individuals,

the trial court stated, "I have been presiding in several murder cases, and it does appear that there

are substantial number of challenges where the defendants are Black and it is out of proportion to

what would ordinarily be expected. Voir Dire N.T. 5/20/83 at 284-85. The trial court then took

note of "what is occurring," alluding to ADA Marano's disproportionate use of peremptory

challenges to exclude Black venirepersons from the jury. *Id.* at 287.

As voir dire continued into a third and then a fourth day, ADA Marano continued to

strike Black potential jurors. Voir Dire N.T. 5/25/83 at 436, 438, 484-85; Voir Dire N.T. 5/26/83

at 591, 636-37, 764, 771, 783, 807. On the fifth and final day, ADA Marano used three

additional peremptory challenges, one against a Black individual and two more against

individuals whose race is not included in the record. Voir Dire N.T. 5/27/83 at 893, 898, 963.

With regard to eight of these struck venirepersons, ADA Marano made no response to defense

counsel's objections to his racially discriminatory use of peremptory challenges. Voir Dire N.T.

5/19/82 at 147, 204, 214-15; Voir Dire N.T. 5/26/83 at 485; Voir Dire N.T. 5/26/83 at 764, 771;

Voir Dire N.T. 5/27/83 at 898. In response to the trial court's multiple requests for ADA Marano to explain his use of peremptory strikes, ADA Marano made vague responses that he was using his strikes to pick a "fair, unprejudiced, impartial, and competent" jury. *Id.* at 285; Voir Dire N.T. 5/26/83 at 809-10. Ultimately, Mr. Holden and his co-defendants were tried by a jury consisting of, in all likelihood, one Black juror.[3]

### ii.      Evidence Presented at Trial

The only evidence presented at trial implicating Mr. Holden in Kaboobie's death was Mr. Haughton's accomplice testimony. Trial N.T. 06/01/83, 06/02/83, 06/15/83. He testified that he and Mr. Holden had conflicts with Kaboobie, so Mr. Holden decided that they would serve as lookouts. *Id.* at 233-234. He also testified that Mr. Holden made the plan to rob Kaboobie, but struggled to recollect what was said or by whom. *Id.* at 258-265. On cross examination, each of the three defense lawyers questioned and impeached Mr. Haughton extensively. *Id.* at 250-409, Trial N.T. 06/02/83 at 420-471, 497-579. These examinations revealed several inconsistencies between Mr. Haughton's trial testimony and his statements to police and prior testimony at preliminary hearings, including the number of gunshots he heard, Trial N.T. 06/01/83 at 288-290, the number of guns involved in the robbery, *id.* at 269-270, who led the plan, *id.* at 297-308, whether or not he knew the witness Gregory "Dap" Strickland, *id.* at 318-319, how much cannabis they expected to steal, *id.* at 270-275, whether he saw Mr. Holden after the robbery, *id.* at 320-322, whether he saw who opened the door to Kaboobie's house, *id.* at 324-325, how much cannabis he had smoked prior the robbery, *id.* at 339-342, and where he went after the shooting,

---

[3] Kenneth Robinson, Sr. was the only Black juror. Voir Dire N.T. 5/26/83 at 789, 791. Although the race of the two alternate jurors is not specified in the record, questions posed to them suggest that they were both white, including whether the fact that the defendants were Black would affect their ability to reach a fair and impartial verdict. Voir Dire N.T. 5/27/83 at 989-91, 995.

*id.* at 372-374. In response to cross-examination questions, he could not provide meaningful explanations for these discrepancies, simply stating "I'm not sure" multiple times. Trial N.T. 06/01/83 at 311, 312. He also admitted to lying under oath during prior testimony. Trial N.T. 06/02/83 at 452.

Although Mr. Haughton's testimony was the only evidence presented at trial directly inculpating Mr. Holden, the jury also heard the redacted statement made by Mr. Wesson to police, read into evidence by Detective Lubiejewski. Trial N.T. 06/15/83 at 681-686.

Mr. Holden presented three alibi witnesses and testified on his own behalf. Trial N.T. 06/16/83 at 997-1124, 06/17/83 at 1193-1346. All three of Mr. Holden's witnesses testified that Mr. Haughton had a reputation for dishonesty and theft in the community. *Id.* Mr. Holden's girlfriend and the mother of his child, Janine El, testified that she was with Mr. Holden for the entirety of the day on December 16, 1980, when Kaboobie was killed, describing in detail their whereabouts and actions. Trial N.T. 06/16/83 at 1040-1047. Mattie Holden, Mr. Holden's mother, corroborated Janine El's account. *Id.* at 1007-1009. Janine's mother, Jean El, also testified in Mr. Holden's defense and corroborated Janine's testimony. *Id.* at 1113-1124. Mr. Holden testified consistently with his alibi witnesses and asserted his innocence, adamantly denying that he was in any way involved in the plan to rob Kaboobie or in causing his death. Trial N.T. 06/17/83 at 1338.

On June 24, 1983, Mr. Holden and his co-defendants were found guilty of second-degree murder, criminal conspiracy, robbery, and possession of an instrument of a crime.

### iii.    Sentencing

At a joint sentencing hearing on April 23, 1984, Mr. Wesson again recanted the statement that PPD detectives had attributed to him and had been read to the jury at trial. He expressed "a

lack of my understanding of my right to actually take the stand" and went on to explain that "I would have, I could have exonerated and made things much clearer and it wouldn't have took too much time. I would have cleared the other two defendants." Sentencing N.T 04/23/84 at 16-17. Mr. Holden reiterated his innocence at sentencing, stating, "When I got arrested for this crime, I was not guilty then and I'm still not guilty now." *Id.* at 24.

### C. Post-Conviction Proceedings and New Evidence

#### i. Post-Trial Motions and Early Post-Conviction Filings

Mr. Holden challenged his conviction from the time of trial. In post-trial motions, he argued that his motion to sever was erroneously denied, that the redactions of Mr. Wesson's police statement were insufficient, as well as other claims regarding the trial court's jury instructions, voir dire decisions, and prejudicial statements made by the trial prosecutor. He did not file a direct appeal. In 1985, Mr. Holden filed a *pro se* Post-Conviction Hearing Act ("PCHA") (now known as the Post-Conviction Relief Act or "PCRA") petition, to which he was appointed counsel in 1988, who then filed an amended petition raising claims of trial counsel ineffectiveness as to trial counsel's withdrawal of the motion to sever and failure to advise Mr. Holden of his direct appeal rights.

#### ii. Mr. Haughton's Recantations

Mr. Holden's post-conviction efforts were aided by Mr. Haughton's early and adamant recantations. Mr. Haughton wrote two separate affidavits dated April 11, 1985 stating that his trial testimony was untrue and that police coerced him into accusing Mr. Holden and Mr. Murray of being involved in the crime. Exhibit 11, April 11, 1985 Haughton Affidavit 1 and Exhibit 12, April 11 1985 Haughton Affidavit 2. In his first affidavit, Mr. Haughton wrote that Detective Gerrard and federal agents "bullied and insisted that I sign statements naming Bruce Murray and

Gregory Holden in this murder...I was frightened and I believed that they would not stop and that things would not get better until I signed the statements that they wanted and agreed to testify at trial." Exhibit 11. He went on to explain that he and Mr. Wesson alone went to Kaboobie's house to buy cannabis and that the interaction turned sour and Kaboobie was accidentally killed. *Id.*

In his second affidavit, Mr. Haughton repeated his claims of police coercion, explaining that law enforcement showed him significant evidence of his guilt as to the federal bank robbery charge and promised him less time for his cooperation in the Kaboobie murder investigation. Exhibit 12. He concluded his second affidavit with "I Douglas Haughton, now state in the absence of 'Duress!' 'that 'Gregory Holden' and Bruce Murry' are victims of an earlier statement obtained 'VIA DURESS.'" *Id.* Mr. Haughton continued his efforts to tell the truth in a May 11, 1985 letter to Mr. Murray's trial counsel, Pamela Cohen. Exhibit 13, May 11, 1985 Ltr to Atty Cohen. In this letter, he reiterated that he and Mr. Wesson went to Kaboobie's house alone on December 16, 1980 and that "Gregorie and Bruce receive life for something they had nothing to do with." *Id.*

### iii.    PCRA hearing in 1991

In 1991 these developments and Mr. Holden's counseled and amended PCHA filing led to a joint evidentiary hearing for Mr. Holden and Mr. Murray. PCHA N.T. 07/25/91. Both Mr. Haughton and Mr. Wesson testified consistently with their earlier recantations. *Id.* The testimony began with Mr. Haughton's former cellmate at SCI Camp Hill, Eugene Thomas. *Id.* at 3. Mr. Thomas testified that when they were housed together, Mr. Haughton told him that he "was under a lot of pressure...he had a lot of cases on him and he had made a mistake." *Id.* at 5. In speaking about Mr. Holden and Mr. Murray, Mr. Thomas testified that "[Mr. Haughton] said that

neither of them was there at the robbery." *Id.* at 8. Mr. Thomas specifically stated that Mr. Haughton told him he had lied at trial. *Id.* at 9.

Mr. Haughton then testified without the expectation of receiving any benefit. *Id.* at 20. In fact, the PCHA court clarified that Mr. Haughton's initial recantations exposed him to potential perjury charges. *Id.* In response to Mr. Holden's attorney asking, "Sir, would you tell the court whether Gregory Holden was in any way, shape or form involved in the murder of Eric DeLegal for which he was sentenced to life imprisonment?" Mr. Haughton replied, "No, he wasn't." *Id.* Mr. Haughton went on to explain that he was certain of Mr. Holden's innocence because he was present when the crime occurred and Mr. Holden was not a participant. *Id* at 20-21. He reiterated the same version of events that he had laid out in his 1985 recantations: that he and Mr. Wesson went to Kaboobie's house to purchase cannabis and that a dispute evolved into an accidental shooting turned shootout in which Kaboobie was killed and Mr. Wesson was shot in the arm. *Id.* at 22-23. He also testified that his fabricated trial testimony was the result of police coercion, explaining, "The reason why I lied, your Honor, is because the police offered me a deal, showed me photo pictures of these people and put them in it. And they said if I don't cooperate with them, I was going to get the electric chair or a life sentence." *Id.* at 29.

Mr. Wesson's testimony was consistent with Mr. Haughton's. *Id.* at 40. He stated that he and Mr. Haughton went to Kaboobie's house alone to buy cannabis, that there was a dispute about money owed to Mr. Haughton, that he tussled with Kaboobie and a shotgun, the shotgun went off and a shootout ensued. *Id.* at 42-44. He reaffirmed the statement he made under oath at sentencing, "that Mr. Holden and Mr. Murray, they didn't have anything to do with it." *Id.* at 46. In response to the question, "And Gregory Holden was not there?" he replied, "No, they were not." *Id.* at 47. Additionally, he responded, "No, they did not" to the questions, "[d]id [Mr.

11

Holden and Mr. Murray] have anything to do with planning your trip to that scene?" and "[d]id they assist you or encourage you in any way, going there or being there or doing anything?" *Id.* Mr. Wesson also explained that, during his initial interrogation, the police denied him access to an attorney unless he signed a prewritten statement. *Id.* at 54-55.

At the time of the 1991 PCHA evidentiary hearing, the Commonwealth argued that Mr. Thomas, Mr. Haughton and Mr. Wesson's testimonies were not credible. The PCHA court agreed and denied relief. Exhibit 14, Feb. 6, 1996 PCHA Court Opinion.

### iv.    Mr. Holden's Further Post-Conviction Filings

After he was denied PCHA relief in 1996, Mr. Holden appealed to the Superior Court and his appeal was dismissed for failure to file a brief in 1996. *See Commonwealth v. Holden,* No. 4154 Philadelphia 1995, Order (Superior Court, July 9, 1996). Mr. Holden proceeded to file seven subsequent *pro se* petitions seeking relief under the PCRA in 1999, 2005, 2007, 2009, 2012, 2016, and 2019. Each were dismissed as untimely.

In 1996, Mr. Holden also sought federal habeas relief and his petition was dismissed for failure to exhaust state remedies. *See Holden v. Larkins,* No. 2:96-cv-05957-JCJ (E.D. Pa. 1996). A decade later, Mr. Holden sought federal relief again in a second *pro se* habeas petition, *Holden v. Wydner, et. al.,* 2:06-cv-05202-JCJ (E.D. Pa. 2006), which was dismissed as time-barred on September 21, 2007. He then filed a motion for relief under Rule 60(b), which was denied on October 11, 2007. *Holden v. DAO,* No. 2:07-cv-04107-JCJ (E.D. Pa. 2007).[4] On February 3, 2016, Mr. Holden filed a motion for relief under Rule 60(d)(1), which was denied that same day. *Holden v. Wydner,* 06-cv-05202, ECF 19-20. On June 2, 2017, Mr. Holden again attempted to

---

[4] It is not clear why Mr. Holden's 2007 motion for relief under Rule 60(b) was docketed under a separate number from the habeas petition it challenged (*Holden v. Wydner,* 06-cv-5202).

reopen his 2006 habeas petition under Rule 60(b) based on the Supreme Court decision *Buck v. Davis, Holden v. Wydner,* 06-cv-05202, ECF 21, however he was denied on July 12, 2017. *Holden v. Wydner,* 06-cv-05202, ECF 22.

### v.    Gregory Strickland and Anthony Smith Affidavits

Throughout the years, as Mr. Holden continued to challenge his conviction, further evidence of his innocence and the truthfulness of Mr. Haughton's recantations emerged. Gregory "Dap" Strickland, an eyewitness who was 16 years old at the time of the crime and was present in Kaboobie's basement while the shooting took place, wrote a letter in 2000 and an affidavit in 2011 explaining that police were aware that he was a witness, that they attempted to coerce him into identifying Mr. Murray as one of the killers, and that he refused. Exhibit 15, Dec. 1, 2000 Gregory Strickland Ltr, and Exhibit 16, July 20, 2011 Gregory Strickland Aff. Mr. Strickland explained that he saw and heard Mr. Haughton, who he knew, in Kaboobie's house at the time of the shooting. Exhibit 15 at 1. In his affidavit, he wrote that police brought him in for a photo lineup, but when he refused to select Mr. Murray's photograph, police ended the lineup and dismissed him. Exhibit 16 at 1.

Also in 2011, another incarcerated person who knew Mr. Haughton at SCI Camp Hill, Anthony Smith, came forward with a sworn affidavit bolstering Mr. Haughton's recantation. Exhibit 17, June 19, 2011 Anthony Smith Aff. Smith explained that he and Mr. Haughton would regularly discuss their respective cases and that Mr. Haughton "would ask me and his cellie what can he do to clear these guys that the Detectives forced him to say was part of a plan, but in all honesty had nothing to do with the crime." *Id.* at 1. He specified that "Doug went on to say Bruce Murray nor Gregory Holden had nothing to do with the killing of Eric Delegal." *Id.* Mr. Smith was also able to provide a substantive narrative of what actually occurred at Kaboobie's

13

house on December 16, 1980, which matched both Mr. Haughton and Mr. Wesson's recantations. *Id.* at 2. In addition to speaking with Mr. Haughton, Mr. Smith had the opportunity to discuss the case with Mr. Strickland, who told him that Detectives Gerrard and Gilbert attempted to coerce Mr. Strickland into implicating Mr. Murray. *Id.*

###### vi.    Mr. Murray's Discovery of Withheld Evidence and Post-Conviction Relief

Despite the repeated, corroborated recantations and supporting evidence in the record, both Mr. Holden and Mr. Murray's post-conviction efforts were unsuccessful until November 2022, when Mr. Murray gained access to the PPD homicide file documenting the DeLegal murder investigation. In the file Mr. Murray discovered suppressed, exculpatory evidence, including: (1) handwritten police notes, Exhibit 18, PPD Handwritten Notes, and (2) a PPD activity sheet, Exhibit 19, March 11, 1981 PPD Activity Sheet, both indicating that Mr. Strickland, the 16 year old eyewitness, told Mr. Randolph that he had seen Mr. Haughton, not Mr. Murray, in Kaboobie's house directly after the shooting, (3) Mr. Strickland's polygraph results indicating he later lied to police when he said he did not know who killed Kaboobie, Exhibit 20, March 13, 1981 Strickland Polygraph Report, (4) a tip made to police that local gang member and police informant, Elliott Burton, was seen leaving the scene of the shooting carrying a shotgun, Exhibit 21, Jan. 5, 1981 PPD Activity Sheet, and (5) an audio recording of Elliott Burton, in his capacity as a police informant, speaking with Mr. Holden on a police-arranged and recorded phone call in which Mr. Holden denies any involvement with the robbery-turned-shooting, Exhibit 22, PPD Recording of Phone Conversation with Transcription. *See also* Exhibit 2, November 16, 2022 Murray Motion for Relief, *Murray v. Vaughn, et. al.,* No. 98-cv-05866, ECF 101, 140-154 (exhibits omitted) for further explanation of suppressed evidence.

14

The newly discovered police notes memorializing detectives' conversations with Mr. Randolph, Exhibits 18 and 19, demonstrate both that Mr. Strickland told Mr. Randolph that Mr. Strickland had seen Mr. Haughton in Kaboobie's house after the shooting, and that police were aware that Mr. Strickland communicated these observations to Mr. Randolph. This version of events directly contradicts the prosecution's representations at trial that Mr. Haughton never entered Kaboobie's house, that Mr. Haughton was outside the house during the incident—in a position to see Mr. Holden acting as a lookout—and that Mr. Murray was involved in the shooting. Mr. Strickland's suppressed polygraph test results, Exhibit 20, demonstrate that his later statement to police, that he did not know who shot Kaboobie and that Mr. Burton told him that "Bruce and Scot" shot Kaboobie, was not truthful.

On January 5, 1981, investigating detectives received information from an identified source implicating Elliot Burton in Kaboobie's death, specifically that he saw Burton running away from Kaboobie's house carrying a shotgun on the day of the murder. Exhibit 21. While this information was recorded on an activity sheet, *id,* there is no indication in the investigatory record that detectives explored Mr. Burton as a potential suspect, even with the knowledge that the murder weapon was a shotgun and no shotgun was recovered at the scene or from any of the charged defendants. Instead, detectives proceeded to use Mr. Burton as an informant and arranged a recorded phone call between Mr. Burton and Mr. Holden in an attempt to secure an inculpatory statement from Mr. Holden. Exhibit 22. These efforts failed because during the call with Mr. Burton, Mr. Holden denied any participation in the robbery-turned-murder of Kaboobie and expressed concern that others were falsely accusing him of being involved. *Id.*

Neither Mr. Holden nor his trial counsel were previously aware of any of these pieces of evidence, which contradict Mr. Haughton's trial testimony and the Commonwealth's case theory.

15

The new evidence caused the DAO to reverse its prior position and concede that Mr. Haughton and Mr. Wesson's recantations were in fact credible. *See* ECF 35; *see also Murray v. Vaughn,* No. 98-cv-05866, ECF 108 at 15. After Mr. Murray's Motion for Relief under Rule 60(b)(6) was granted on March 27, 2023, he filed an amended petition for habeas corpus relief based on violations of his constitutional rights under *Brady, Bruton, Batson v. Kentucky,* 476 U.S. 79 (1986), and *Swain. Murray v. Clark,* No. 98-cv-05866, ECF 113. This Court granted Mr. Murray's petition on June 2, 2023 based on the previously withheld evidence. *Id.* at ECF 120.

### vii.    DAO and Court Determinations of Mr. Holden's Innocence

On August 15, 2023, Mr. Holden presented this recently discovered evidence to this Court in a Motion for Relief under Rule 60(b), asserting his innocence as newly demonstrated by the withheld evidence found in the PPD's homicide file. Exhibit 1. In response to his motion, the DAO reiterated the concessions it made in Mr. Murray's case, stating unequivocally, "that Holden has satisfied the actual innocence exception to procedural bars announced in *Schulp v. Delo...*" ECF 35 at 1. The DAO specified that it "view[s] Haughton and Wesson's recantations and [1991 PCHA] testimony as credible, despite the state courts' views to the contrary." *Id.* at 14. Additionally, the DAO's response acknowledges that the material found in the PPD's homicide file had not been disclosed to Mr. Holden or his co-defendants at the time of trial. *Id.* at 13-14. Ultimately the DAO "agree[d] that it is likely that any reasonable juror would have had a reasonable doubt as to Holden's guilt." *Id.* at 16.

This Court agreed with the DAO's concessions and granted Mr. Holden's motion on November 11, 2023, vacating the denial of his prior habeas corpus petition and allowing him to file the instant amended petition. ECF 36.

## III.    STANDARD OF REVIEW

Petitioner is in the custody of the Commonwealth of Pennsylvania in violation of the

United States Constitution. He seeks a writ of habeas corpus pursuant to 28 U.S.C § 2254(a). The

writ of habeas corpus "stands as a safeguard against imprisonment of those held in violation of

the law," and this Court must be "vigilant and independent" in reviewing the Petition.

*Harrington v. Richter,* 131 S. Ct. 770, 781 (2011). Where a state court has not previously

adjudicated the merits of a claim, the Court exercises pre-AEDPA *de novo* plenary review of

legal-factual findings. *Chadwick v. Janecka,* 312 F.3d 597, 606 (3d Cir. 2002). Only claims

adjudicated on the merits by the state court are subject to AEDPA's limitations on a federal

court's power to grant relief. 28 U.S.C. § 2254(d).

The Court can adjudicate each of the claims presented herein on the merits and the

standard of review is *de novo*. Although Mr. Holden did not exhaust these claims in the state

court and they are procedurally defaulted, Mr. Holden's prior showing of actual innocence, as

found by the Court in its grant of the Rule 60(b)(6) motion, overcomes any procedural bars to

this Court's review of these claims. *Schlup,* 513 U.S. at 320-21. Because the state courts have not

previously adjudicated these claims on the merits, this Court applies a pre-AEDPA *de novo*

plenary review of legal arguments and factual findings. *Chadwick,* 312 F.3d at 606.

## IV.    MR. HOLDEN'S FEDERAL HABEAS CORPUS CLAIMS

Mr. Holden presents five claims in this amended habeas corpus petition and incorporated

memorandum of law: (1) his federal due process rights were violated when *Brady* evidence was

suppressed; (2) his Sixth Amendment right to confront his accusers was violated when an

inculpatory statement attributed to his co-defendant Mr. Wesson was read to the jury with

inadequate redactions; (3) his rights to equal protection of law were violated when the

Commonwealth systemically used peremptory challenges against venirepersons in a racially discriminatory manner; (4) the cumulative prejudice of these constitutional violations warrants habeas relief; and (5) Mr. Holden is actually innocent.

### A. Claim One: Mr. Holden's due process rights under *Brady* were violated when Philadelphia Police detectives suppressed material evidence favorable to him.

Mr. Holden's due process rights under *Brady v. Maryland,* 373 U.S. at 87, were violated when PPD detectives withheld material evidence favorable to Mr. Holden. PPD detectives withheld numerous pieces of exculpatory evidence that should have been disclosed under *Brady,* including police paperwork documenting police interviews with Mr. Randolph (during which they learned the eyewitness, Mr. Strickland, told Mr. Randolph that he had seen Mr. Haughton rather than Mr. Murray in the decedent's house shortly following the shooting), Mr. Strickland's polygraph results indicating that he was lying when he said he didn't know who killed the decedent, police paperwork documenting that an alternative suspect, Mr. Burton, may have been involved in the shooting, and an audio recording of a police-arranged and recorded phone call between Mr. Burton and Mr. Holden during which Mr. Holden denied involvement in the shooting.

The Due Process Clause requires the prosecution to disclose material evidence that is favorable to the defense, and the suppression of such evidence requires a new trial "irrespective of the good faith or bad faith of the prosecution." *Brady,* 373 U.S. at 87. A "*Brady* violation has occurred if: (1) the evidence at issue is favorable to the accused, because either exculpatory or impeaching; (2) the prosecution withheld it; and (3) the defendant was prejudiced because the evidence was 'material.'" *Breakiron v. Horn,* 642 F.3d 126, 133 (3d Cir. 2011). Exculpatory and impeachment evidence that must be disclosed under *Brady* includes any evidence affecting the credibility of a prosecution witness. *Giglio v. United States,* 405 U.S. 150, 153-56 (1972); *United*

18

*States v. Bagley,* 473 U.S. 667, 676 (1985). Evidence has been suppressed, or withheld, under

*Brady* even when the evidence was known only to the police and not the prosecutor. *Youngblood*

*v. West Virginia,* 547 U.S. 867, 870 (2006); *Kyles v. Whitley,* 514 U.S. 419, 437-38 (1995);

*Giglio,* 405 U.S. at 154.

Evidence is material when "there is a reasonable probability that, had the evidence been

disclosed to the defense, the result of the proceeding would have been different. A reasonable

probability is [defined as] a probability sufficient to undermine confidence in the outcome."

*Bagley,* 473 U.S. 681. "[M]ateriality does not require demonstration by a preponderance that

disclosure of the suppressed evidence would have ultimately resulted in the defendant's

acquittal." *Kyles,* 514 U.S. at 434. The materiality of withheld evidence must be assessed

cumulatively. *Id.* at 436 (materiality is to be "considered collectively, not item by item").

Favorable and material evidence is not limited only to admissible evidence. Undisclosed

evidence that is inadmissible can still be favorable and material under *Brady* if it could have led

to the discovery of admissible evidence. *Johnson v. Folino,* 705 F.3d 117, 130 (3d Cir. 2013).

Undisclosed evidence can also be material if it would have altered the defense strategy, the lines

of cross-examination, or the type of investigation conducted. *Dennis v. Sec'y, Pennsylvania*

*Dep't of Corr.,* 834 F.3d 263, 308 (3d Cir. 2016) (*en banc*) (holding that evidence of another lead

was material because it "would have impacted the course of the trial, which includes

investigative activities"), 311 ("Alterations in defense preparation and cross-examination at trial

are precisely the types of qualities that make evidence material under *Brady*"). In particular,

impeachment evidence can be considered material and a basis for a new trial when it "would

have undermined a critical element of the prosecution's case." *United States v. Leary,* 206 F.

App'x 111, 115 (3d Cir. 2006) (internal citations and quotation marks omitted).

To establish prejudice, a petitioner "need not show that he 'more likely than not' would have been acquitted had the new evidence been admitted." *Wearry v. Cain,* 577 U.S. 385, 392 (2016) (*per curiam*) (citations omitted). Rather, evidence is material "when there is any reasonable likelihood it could have affected the judgment of the jury." *Id.* (internal citations and quotation marks omitted). It follows that a petitioner can still prevail even if "the undisclosed information may not have affected the jury's verdict." *Id.* at 392 n.6. The relevant question is whether, in the absence of the suppressed evidence, the defendant "received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles,* 514 U.S. at 434. Thus, the "touchstone of materiality is the reasonable probability of a different result." *Dennis,* 834 F.3d at 285 (internal quotation marks omitted). A different result "includes not only an acquittal, but also a hung jury or a verdict of a lesser included offense." *Haskins v. Superintendent,* 755 F. App'x 184, 189 (3d Cir. 2018). A reasonable probability of a different result is established when the government's suppression of exculpatory evidence simply undermines confidence in the trial's outcome. *Dennis,* 834 F.3d at 285.

### i.    Evidence regarding eyewitness Mr. Strickland's reports to police informant Mr. Randolph and to PPD detectives

PPD detectives failed to disclose handwritten notes and an activity sheet documenting their discussions with Mr. Randolph, an informant whose police interviews provided the basis of the first arrest warrant issued against Mr. Holden in this case. The handwritten police notes, Exhibit 18, and activity sheet, Exhibit 19, memorializing conversations between investigating detectives and Mr. Randolph, indicate that Mr. Randolph told them that Mr. Strickland, the teenager who was present at Kaboobie's house at the time of his murder, had described seeing Mr. Haughton in Kaboobie's house directly following the murder. This information directly contradicts Mr. Haughton's trial testimony and the prosecution's trial theory that Mr. Haughton

stayed outside with Mr. Holden and Mr. Murray went inside the house with Mr. Wesson. The suppressed evidence regarding Mr. Randolph's conversations with Mr. Strickland clearly indicates that police had information that Mr. Haughton, not Mr. Murray, entered Kaboobie's house and participated in the shootout, disaffirming Mr. Haughton's trial testimony in its entirety. These interview notes directly challenge Mr. Haughton's description of the "conspiracy" to rob Kaboobie.

Further, PPD detectives also suppressed Mr. Strickland's polygraph test results, Exhibit 20, which indicated that he later lied when he told a police he did not know who killed Kaboobie. The polygraph results support the narrative that Mr. Randolph reported to PPD detectives: that Mr. Strickland *did* know who killed Kaboobie, and that he knew the killer to be Mr. Haughton. The handwritten notes, Exhibit 18, the activity sheet, Exhibit 19, and the polygraph results, Exhibit 20, were all withheld from the defense. ECF 35 at 13-14.

As in *Kyles,* the failure of the police to disclose *Brady* evidence is imputed to the prosecution. In identifying Mr. Haughton as the true shooter, the information suppressed regarding Mr. Strickland reveals Mr. Haughton's trial testimony to be false, causing the case against Mr. Holden to unravel. This evidence is favorable to Mr. Holden and material as it significantly undermines the prosecution's case theory that Mr. Haughton stood outside and kept watch with Mr. Holden while Mr. Murray went inside the house and shot the decedent. Had this evidence been disclosed to the defense, the defense could have interviewed Mr. Strickland and called him to testify in order to dispute the account of Mr. Haughton, the sole inculpatory witness at trial. Additionally, this information may very well have altered defense counsel's cross-examination of Mr. Haughton. The materiality of this suppressed exculpatory evidence does not depend on its admissibility but rather on whether disclosure would have impacted the course of

21

the trial, which includes defense investigation and alternative defense preparations and strategies.

*Dennis,* 834 F.3d at 308.

### ii. Evidence regarding alternative suspect Mr. Burton

PPD detectives additionally withheld evidence relating to alternative suspect and police informant, Elliot Burton. *See* Exhibit 21 and Exhibit 22. As detailed in a suppressed PPD activity sheet, an eyewitness saw Mr. Burton leaving the scene of the crime with a shotgun, Exhibit 21. A shotgun was determined to be the murder weapon. Trial N.T. 5/31/83 at 101-102. Responding police recovered several items from a shotgun at the crime scene including a bolt from a shotgun, a shotgun shell, and shotgun shell wadding. *Id.* at 63-64. However, it appears no shotgun was recovered from the scene or any of the defendants. *Id.* at 185 (list of Commonwealth evidence recovered from crime scene). In particular, Mr. Holden's house was searched for guns and none were found. Exhibit 3.

Further, police withheld evidence of a recorded phone call between Mr. Burton and Mr. Holden, in which Mr. Holden denies involvement in the crime, Exhibit 22. Mr. Holden was not aware that Mr. Burton was working with the police or that the phone call was arranged by the police and being recorded. During the phone call, Mr. Holden denied participating in the Kaboobie robbery and shooting and expressed frustration that others were attempting to implicate him. *Id.* In contrast, the February 1981 search warrant affidavit to search Mr. Holden's home, Exhibit 3, and the March 1981 warrant for Mr. Holden's arrest, Exhibit 5, both relied on witnesses claiming that Mr. Holden had told them all about the crime and his involvement therein. However, the only piece of evidence reliably memorializing a conversation between Mr. Holden and a member of the community regarding the shooting shows that he adamantly denied any involvement, Exhibit 22, and it was suppressed.

Both of these pieces of withheld evidence are favorable to Mr. Holden and material to his defense. Information that Mr. Burton was identified as an alternative suspect could have been used to impeach the investigating detectives as to the strength of their investigation. Further, evidence that Mr. Burton was seen fleeing Kaboobie's house with a shotgun fills significant hole in the physical evidence and calls into question the police investigation and the narrative presented at trial. The suppressed phone call also implicates the validity of the PPD investigation, demonstrating that police used an identified suspect as a confidential informant rather than investigating him.

### iii.   Cumulative materiality of withheld evidence

When considering *Brady* violations, the materiality of withheld evidence must be assessed cumulatively. *Kyles,* 514 U.S. at 436. Additionally, in assessing materiality, the Court considers not only how the suppressed evidence could have been used at trial but also how it could have shaped the course of the defense's investigation and trial preparation. *Dennis,* 824 F.3d at 308. When there is a reasonable probability that withheld evidence, had it been disclosed to the defense, would have changed the result of the proceeding, that evidence is deemed material. *Bagley,* 473 U.S. at 681. That reasonable probability is defined by the evidence's ability to undermine confidence in the verdict. *Id.*

Here, the cumulative impact of the suppressed evidence is more than sufficient to undermine confidence in the verdict. The DAO and this Court have already determined as much in acknowledging that the new evidence supports the conclusion that "no juror, acting reasonably, would have voted to find [Mr. Holden] guilty beyond a reasonable doubt." ECF 36. *See also* ECF 35 at 16. The suppressed evidence demonstrates that the Commonwealth's trial theory that Mr. Holden was a participant in Kaboobie's murder, that he stood outside with Mr.

23

Haughton while Mr. Murray and Mr. Wesson entered Kaboobie's house, was false. Mr. Randolph told police that Mr. Strickland told him that Mr. Strickland had seen Mr. Haughton inside Kaboobie's house shortly after the shooting. This version of events directly contradicts Mr. Haughton's trial testimony and would have provided Mr. Holden's defense counsel with impeachment evidence as well as information to aid in the pretrial investigation. Certainly, defense counsel could have used the information contained in the withheld police paperwork, including Mr. Strickland's failed polygraph examination, to competently interview Mr. Randolph and Mr. Strickland as to their knowledge of the murder.

The information regarding alternative suspect, Mr. Burton, and Mr. Burton's role in the police investigation, including his staging and recording a phone call with Mr. Holden, would have similarly constituted impeachment evidence and investigatory material. Defense counsel could have used the evidence of an alternative suspect to impeach investigating officers as to their efforts to interrogate Mr. Burton or investigate his potential role in the murder. This line of questioning would have been all the more persuasive given that the suppressed tip identifying Mr. Burton also specified that Mr. Burton was seen fleeing with a shotgun, the missing murder weapon. The absence of the shotgun was never explained to the jury. Denying Mr. Holden this information, as well as Mr. Burton's role as a confidential informant in the case against him, essentially "denied [him] the right to effective cross-examination" which "'would be constitutional error of the first magnitude and no amount of showing of want of prejudice would cure it." *Davis v. Alaska,* 415 U.S. 308, 318 (1974) (internal quotations and citations omitted).

No physical evidence connecting Mr. Holden to Kaboobie's death was presented at trial and in addition to testifying in his own defense, Mr. Holden provided several alibi witnesses who testified consistently and corroborated one another's accounts. Had the defense been provided

24

with the withheld evidence undermining the prosecution's case theory, the PPD's investigation, and the credibility of the prosecution's only inculpatory witness, there is a reasonable probability that the outcome of the trial would have been different. Habeas relief should be granted on the basis of this *Brady* violation.[5]

### B. Claim Two: Mr. Holden was denied his Sixth Amendment right to confront his accusers when the trial court allowed a statement by co-defendant Wesson to be read to the jury with inadequate redactions.

Mr. Holden's rights under the Sixth Amendment's Confrontation Clause were violated when the trial court permitted a prosecution witness to read a statement attributed to his non-testifying co-defendant, Mr. Wesson, to the jury. Trial N.T. 06/15/83 at 681-686. Mr. Holden and Mr. Murray's names were redacted from Mr. Wesson's statement and they were replaced by references to "the other guys" *Id.* Under the Confrontation Clause, "a defendant's right to confrontation is violated when a non-testifying codefendant's confession is introduced in a joint trial, and that confession implicates the other defendant." *Johnson v. Superintendent Fayette SCI,* 949 F.3d 791, 795 (3d Cir. 2020) (citing *Bruton,* 391 U.S. 123). A limiting instruction that the jury only use the statement against the declarant defendant is insufficient in cases where "such 'powerfully incriminating extrajudicial statements of a codefendant, who stands accused side-by-side with the defendant, are deliberately spread before the jury in a joint trial[.]'" *Id.* (quoting *Bruton,* 391 U.S. at 137).

Although redactions can be sufficient to avoid a *Bruton* violation, the "redactions cannot be so ineffectual that they actually could signal to the jury that the co-defendant's name was

_____

[5] The DAO and this Court have both already agreed that the above-described withheld evidence constituted a *Brady* violation warranting a new trial as to Mr. Holden's co-defendant, Mr. Murray. *Murray v. Clark,* No. 98-cv-05866 at ECF 119 and 120.

deleted." *Id.* at 795-96 (citing *Gray v. Maryland,* 523 U.S. 185, 195 (1998)). The redactions must "eliminate 'not only the defendant's name, but any reference to his or her existence.'" *Id.* (quoting *Richardson v. Marsh,* 481 U.S. 200, 211 (1987)). The court must "take a holistic approach" and "view[] the redaction in the context of the entire record." *Id.* at 796. The Third Circuit has rejected the use of a "generic term" like "the other guy" in place of the defendant's name to cure a *Bruton* violation if "[t]he limited participants in [the] case made it obvious to a juror who 'need only lift his eyes to [the defendant], sitting at counsel table' to determine that he was 'the other guy,'" *Johnson,* 949 F.3d at 797 (quoting *Gray,* 523 U.S. at 193); *see also Williams v. Folino,* 625 F. App'x 150, 157 (3d Cir. 2015) (finding *Bruton* violation where a redacted confession referred to the non-confessing defendant as "his boy").

The Third Circuit has had to admonish Pennsylvania state courts for repeatedly failing to safeguard defendants' rights under the Confrontation Clause in factual circumstances similar to Mr. Holden's case. *Freeman v. Superintendent Fayette SCI,* 62 F. 4th 789, 802 n.7 (3d Cir. 2023) ("It is unfortunate and an unnecessary draw on judicial resources that Pennsylvania courts continue to abide by a rule which we have repeatedly held is an unreasonable application of clearly established U.S. Supreme Court precedent"). In *Freeman,* defendants' names were replaced by "the first guy" and "the second guy," leading the Third Circuit to "easily conclude that the Pennsylvania Superior Court's application of *Bruton* and its progeny [finding the use of the statement constitutional] was unreasonable." *Id.* at 801.

Whether a *Bruton* violation constitutes a harmless error is determined by consideration of the following "five nonexclusive factors:"

> [1] the importance of the witness' testimony in the prosecution's
> case. [2] whether the testimony was cumulative, [3] the presence or
> absence of evidence corroborating or contradicting the testimony
> of the witness on material points, [4] the extent of cross-

26

examination otherwise permitted, and, of course, [5] the overall
strength of the prosecution's case.

*Freeman,* 62 F.4th at 802 (quoting *Delaware v. Van Arsdall,* 475 U.S. 673, 684 (1986)).

Here, the prosecution's use of the generic terms, "the first guy" and "the other guys," as substitutes for Mr. Holden's name in Mr. Wesson's redacted statement was a clear *Bruton* violation. The substitutions appear throughout Mr. Wesson's statement and, within the context of the trial and the prosecution's case theory, clearly referred to the two defendants, Mr. Holden and Mr. Murray. Trial N.T. 06/15/83 at 681-686. Mr. Wesson's redacted statement closely matched the prosecution's case theory, making it very easy for a jury to distinguish who the "other guys" are to which it refers. *Id.* For example, the statement refers to "two guys" who "waited outside somewhere," while Mr. Wesson went inside with "one other guy..." *Id.* at 682. In the context of the prosecution presenting Mr. Haughton's accomplice testimony that he and Mr. Holden waited outside while Mr. Wesson and Mr. Murray went inside, the redacted statement was obviously referring to the co-defendants against whom it was not permitted to be used.

As in *Washington v. Secretary of Pennsylvania Department of Corrections,* 801 F.3d 160 (3d Cir. 2015) and *Freeman,* 62 F.4th at 801, Mr. Holden's case involves multiple defendants, a cooperating accomplice whose testimony assigned specific roles to each codefendant, and a non-testifying codefendant's statement with codefendants' names replaced with generic terms like "the other guy." The Third Circuit held definitively that these circumstances violate defendants' Sixth Amendment rights. *Id.*

This was not a harmless error as to Mr. Holden because the only other evidence presented to the jury inculpating Mr. Holden came from the otherwise uncorroborated accomplice testimony of Mr. Haughton, who was impeached significantly and whose credibility was limited at best. Given Mr. Haughton's numerous credibility issues, the exceedingly favorable deal he

27

received for his testimony, and the lack of other inculpatory evidence presented, Mr. Wesson's statement was not merely cumulative, and the prosecution's case was very weak without it. Mr. Holden had no opportunity to cross-examine Mr. Wesson as Mr. Wesson invoked his right not to testify. In light of Mr. Haughton and Mr. Wesson's recantations, Mr. Holden's alibi evidence presented at trial, and further demonstrations of his innocence since trial, the use of Mr. Wesson's inadequately redacted statement was not a harmless error. Accordingly, Mr. Holden is entitled to relief on his *Bruton* claim.

### C. Claim Three: Mr. Holden's rights under the Equal Protection Clause of the Fourteenth Amendment were violated by the Commonwealth's systemic practice of racial discrimination in its use of peremptory challenges during voir dire.[6]

The Equal Protection Clause of the Fourteenth Amendment prohibits the state from purposefully using peremptory challenges against venirepersons based on their race. *See Strauder v. West Virginia*, 100 U.S. 303, 305 (1879). In *Swain v. Alabama*, the U.S. Supreme Court held that state prosecutors cannot use peremptory challenges to exclude Black citizens from the jury "for reasons wholly unrelated to the outcome of the particular case on trial" or to deny to Black citizens "the same right and opportunity to participate in the administration of justice enjoyed by the white population." 380 U.S. at 224. Although discriminatory use of peremptory challenges in the defendant's individual case is not enough to constitute a *Swain* violation, the *Swain* Court held that a Black defendant could make out a prima face case of purposeful discrimination on proof that the peremptory challenge system was "being perverted" by

---

[6] Mr. Holden does not bring a claim under the revised and more expansive standard for Equal Protection violations with regard to racially discriminatory jury selection as defined by *Batson v. Kentucky,* 476 U.S. 79 (1986), because Mr. Holden's conviction was finalized in 1984 and the Supreme Court determined that *Batson* is not to "be applied retroactively on collateral review of convictions that became final before our opinion." *Allen v. Hardy,* 478 U.S. 255, 258 (1986).

excluding Black citizens from jury service based on their race. *Id.* at 223. The defendant bears the burden of "show[ing] a pattern and practice of racial discrimination in jury selection across multiple prosecutions." *Sistrunk v. Vaughn*, 96 F.3d 666, 668 (3d Cir. 1996). Crucially, the defendant "is not required to show that the prosecution always struck every black" venireperson to infer discriminatory intent. *Love v. Jones*, 923 F.2d 816, 818 (11th Cir. 1991).

Ordinarily, under *Swain*, a prosecutor's use of peremptory challenges in a particular case is given a presumption of correctness. *Swain*, 380 U.S. at 222. However, in cases where the prosecutor has "offered reasons for the exercise of peremptory challenges, a court could, consistent with *Swain*, scrutinize such reasons for compliance with the equal protection clause." *Walton v. Caspari*, 916 F.2d 1352, 1359 (8th Cir. 1990) (citing *Garrett v. Morris*, 815 F.2d 509, 511 (8th Cir. 1987)); *see also Ford v. Norris*, 67 F.3d 162, 169 (8th Cir. 1995) (finding *Swain* violation where prosecutor offered pretextual justifications for striking Black venirepersons). In such cases, the defendant bears a less stringent burden of proof, as the court can consider the prosecutor's statements in addition to evidence of the prosecution's systemic exclusion of Black venirepersons in other cases.

Here,  the trial court called upon ADA Marano three times to justify his use of the peremptory challenges against Black citizens and to comment on the policy within the District Attorney's Office to exclude Black citizens. Voir Dire N.T. 05/20/83 at 284–85, 291. In response to the court's questions and defense counsel's objections, ADA Marano provided pretextual reasons for striking Black venirepersons and offered bare assertions of good faith. For example, with regard to venireman Edward Boyd, ADA Marano initially challenged him for cause citing Mr. Boyd's potential tendency to "lean against the criminal element," Voir Dire N.T. 05/25/83 at 427, which the court denied, noting "[t]hat would be a reason for the defense challenging him."

*Id.* at 425. ADA Marano then used a peremptory strike against Mr. Boyd with no further

explanation. In response to a defense objection to his peremptory challenge against Black

venireman Reginald Johnson, ADA Marano explicitly cited the race of the defendants. *Id.* at 809–

10. Accordingly, the presumption of correctness does not apply to ADA Marano's use of

peremptory challenges against Black venirepersons in Murray's case.

A defendant can establish a *Swain* violation with evidence that other participants in the

criminal justice system have observed a pattern or practice of purposeful discrimination in the

prosecutor office's use of peremptory challenges across multiple cases. *See Love*, 923 F.2d at 820

(*Swain* claim established where three attorneys, including trial counsel, testified that they had

observed a pattern of purposeful discrimination in the prosecutor office's use of peremptory

challenges); *Jones v. Davis*, 835 F.2d 835, 838-39 (11th Cir. 1988) (finding *Swain* violation where

six defense attorneys testified that they believed the prosecutor's office systematically struck most

Black people from jury venires); *see also Horton v. Zant*, 941 F.2d 1449, 1455–1457 (11th Cir.

1991) (finding *Swain* violation where evidence showed the prosecutor's office had a policy of

striking Black citizens, as well as other groups, from juries, and where defendant offered

statistical analysis of the prosecuting attorney's use of peremptory strikes in other cases).

Here, the evidence raises a strong inference that around the time of Mr. Holden's trial in

1983, the Philadelphia District Attorney's Office had an unofficial policy of using peremptory

challenges to strike Black venirepersons from juries. There are numerous cases that, when

viewed together, strongly suggest that the Philadelphia District Attorney's Office had such a

policy. *See, e.g.*, *Lark v. Sec'y Pa. Dep't of Corr. (Lark IV)*, 566 F. App'x 161 (3d Cir. 2014)

(upholding grant of habeas relief based on *Batson* violation), *aff'g Lark v. Beard (Lark III)*, 2012

WL 3089356 at *4 (E.D. Pa. July 30, 2012) (Philadelphia District Attorney's Office used thirteen

of fifteen peremptory strikes against Black potential jurors); *Williams v. Beard*, 637 F.3d 195, 206 (3d Cir. 2011) (Philadelphia District Attorney Office used fourteen out of sixteen peremptory strikes against Black potential jurors in 1986 murder prosecution); *Abu-Jamal v. Horn (Abu-Jamal II)*, 520 F.3d 272, 287 (3d Cir. 2008) (Philadelphia District Attorney's Office used ten of fifteen peremptory challenges against Black venirepersons in 1982 murder prosecution); *Brinson v. Vaughn*, 398 F.3d 225, 227–28 (3d Cir. 2005) (Philadelphia District Attorney's Office used thirteen out of fourteen peremptory strikes against Black potential jurors in 1986 murder prosecution); *Holloway v. Horn*, 355 F.3d 707, 710–11 (3d Cir. 2004) (Philadelphia District Attorney's Office used eleven of twelve peremptory strikes against potential Black jurors in 1985 murder prosecution); *Sistrunk*, 96 F.3d at 674 (Philadelphia District Attorney's Office used thirteen peremptory strikes against every potential Black potential juror in 1981 murder prosecution); *Harrison v. Ryan*, 909 F.2d 84, 85 (3d Cir. 1990) (Philadelphia District Attorney's Office used only six peremptory strikes, all against Black venirepersons, in 1982 robbery prosecution); *Smith v. Wetzel*, 2016 WL 8761773 at *18 (E.D. Pa. June 30, 2016) (Philadelphia District Attorney's Office used 82% of his peremptory challenges against Black venirepersons in 1985 murder prosecution); *Hardcastle v. Horn (Hardcastle III)*, 521 F. Supp. 2d 388, 392 (E.D. Pa. 2007) (Philadelphia District Attorney's Office used twelve of fifteen peremptory challenges against Black potential jurors in 1982 murder prosecution); *Rollins v. Horn*, 2005 WL 1806504, at *30 (E.D. Pa. July 26, 2005) (Philadelphia District Attorney's Office used at least six of his the first seven peremptory challenges against Black potential jurors in 1987 murder prosecution); *McKendrick v. Zimmerman*, 1990 WL 135712 at *1 (E.D. Pa. Sept. 12, 1990) (Philadelphia District Attorney's Office peremptorily challenged four of five prospective Black jurors and challenged the fifth for cause in 1978 murder prosecution); *Diggs v. Vaughn  (Diggs  I)*,  1990

31

WL 117986 at *1 (E.D. Pa. Aug. 8, 1990) (Philadelphia District Attorney's Office used fourteen of fifteen peremptory strikes to exclude Black venirepersons from jury in 1977 murder prosecution); *Commonwealth v. Cook*, 952 A.2d 594, 590 (Pa. 2008) (Philadelphia District Attorney's Office used fourteen of nineteen peremptory challenges against Black venirepersons); *Commonwealth v. Dinwiddie*, 601 A.2d 1216, 1219 (Pa. 1992) (Philadelphia District Attorney's Office used five of six peremptory challenges to exclude Black venirepersons in 1986 robbery prosecution); *Commonwealth v. Henderson*, 438 A.2d 951, 952 (Pa. 1981) (Philadelphia District Attorney's Office used peremptory challenges to strike all five Black venirepersons in 1977 prosecution for rape, robbery, and aggravated assault); *Commonwealth v. Brown*, 417 A.2d 181, 186 (Pa. 1980) (Philadelphia District Attorney's Office used all sixteen peremptory challenges against potential Black jurors in 1977 murder prosecution); *Commonwealth v. Weaver*, 568 A.2d 1252, 1253 (Pa. Super. 1989) (Philadelphia District Attorney's Office used five of eight peremptory challenges to remove all Black venirepersons in 1986 prosecution for sexual assault); *Commonwealth v. Jackson*, 562 A.2d 338, 341 (Pa. Super. 1989) (Philadelphia District Attorney's Office used all seven peremptory challenges to dismiss Black potential jurors in 1986 robbery prosecution); *Commonwealth v. Edney*, 464 A.2d 1386, 1391 (Pa. Super. 1983) (Philadelphia District Attorney's Office used peremptory challenges to exclude all Black venirepersons from jury in 1979 robbery prosecution); *Commonwealth v. Green*, 400 A.2d 182, 183–84 (Pa. Super. 1979) (Philadelphia District Attorney's Office exercised seventeen peremptory challenges to exclude Black venirepersons from the jury in 1977 robbery conviction); *Commonwealth v. Fowler*, 393 A.2d 844, 846 (Pa. Super. 1978) (en banc) (Philadelphia District Attorney's Office exercised peremptory challenges to exclude all Black jurors in 1975 prosecution for aggravated assault); *Commonwealth v. Jones*, 371 A.2d 957, 958 (Pa. Super.

1977) (Philadelphia District Attorney's Office excluded all twenty-two Black venirepersons from the jury in 1974 prosecution for rape and burglary).[7]

Those who have studied this phenomenon have found additional, statistical evidence of the Philadelphia District Attorney's Office's racially discriminatory voir dire practices. A comprehensive study by Professors David Baldus and George Woodworth of the University of Iowa documented a pattern and practice of racial discrimination in jury selection by the Philadelphia District Attorney's Office from 1983 to 1993. In particular, the study found that the District Attorney's Office was more than two-and-one-third times more likely (2.36) to peremptorily strike Black venirepersons from the jury than prospective non-Black jurors. The study also showed that, during this ten-year-period, the District Attorney's Office struck Black venirepersons roughly 55.28% of the time (1,209 strikes of a possible 2,187 jurors), as opposed to a strike rate of only 23.43% for non-Black venirepersons (749 strikes of a possible 3,196). *See generally* David C. Baldus et al., *Racial Discrimination and the Death Penalty in the Post-Furman Era: An Empirical and Legal Overview with Recent Findings from Philadelphia*, 83 CORNELL L. REV. 1368 (1998).

A subsequent, similarly comprehensive study by Professors Baldus and Woodworth further documented this pattern and practice of racial discrimination in jury selection by the Philadelphia District Attorney's Office from 1981 to 1997. The prosecutorial strike rate against Black venirepersons was 0.53, whereas the prosecutorial strike rate against non-black venirepersons was only 0.22. *See* David C. Baldus et al., *The Use of Peremptory Challenges in Capital Murder Trials:*

---

[7] These cases are be cited solely to show a pattern in the use of peremptory challenges by the Philadelphia District Attorney's Office over a period of time. For a variety of reasons, such as waiver or insufficient corroborating evidence, not all of these decisions resulted in findings of purposeful discrimination.

*A Legal and Empirical Analysis*, 3 U. PA. J. CON. L. 1, 75, 154 (2001). Taken together, these two studies present strong statistical evidence that the Philadelphia District Attorney's Office had a policy of using peremptory challenges to exclude Black citizens from jury service at the time of Mr. Holden's trial.

Further, all three defense attorneys at Mr. Holden and his co-defendants' joint trial accused the Philadelphia District Attorney's Office of having an unofficial policy of using peremptory challenges against black venirepersons based on race. Voir Dire N.T. 05/20/83 at 282-293. Senator Hardy Williams, who represented Mr. Wesson, stated after ADA Marano peremptorily challenged venireman Reginald Johnson:

> Your Honor, I would just like to note for the record that another Black juror or venireman was struck. I just want to comment he's a young man and he wants to participate. They never get a chance. They end up over here. That's part of the reason. So often you hear young people say we don't have a jury of our peers. They come and they don't get a chance, based on a policy of racial discrimination...
>
> . . . . [T]he de facto policy of the District Attorney's Office is legally discriminatory based on race and deprives the defendants of a fair trial. I wasn't talking about social policy. I was talking about a legal policy with a personal impact on Black people by the state representative of this Commonwealth.

Voir Dire N.T. 05/26/83 at 807-9. The trial judge, Judge David Savitt, acknowledged, "[I]f, in fact, the District Attorney is doing what Mr. Williams suggests they are doing, th[en] that is highly inappropriate." *Id.* at 810.

Significantly, Judge Savitt noted that he had also observed a pattern of discrimination in other cases,

> I have been presiding in several murder cases, and it does appear that there are substantial number of challenges where the defendants are Black and it is out of proportion to what would ordinarily be expected. Now in this case,

> counsel suggests that there is a pattern to exclude jurors peremptorily because
> they are Black.

Voir Dire N.T. 05/20/83 at 284–85. Judge Savitt also acknowledged "what [was] occurring" in response to defense objections. *Id.* at 287. Judge Savitt was not the only judge to have recognized that the Philadelphia District Attorney's Office had a pattern of using peremptory challenges against Black venirepersons. Sometime in 1982 or 1983, the late Justice Juanita Kidd Stout described the peremptory striking of Black jurors in homicide cases as "the practice" of the Philadelphia District Attorney's Office. *Commonwealth v. Hardcastle (Hardcastle I)*, No. 3288-93, June Term, 1982 (C.P. Phila.). Additionally, Anthony Jackson, a former Philadelphia prosecutor, has  acknowledged that around the time of his then-client's 1982 trial, "trying cases in City Hall, I know most D.A.'s, most homicides, will get rid of as many blacks as they possibly can, first to the death qualification and then peremptory." *Commonwealth v. Abu-Jamal (Abu-Jamal I)*, Nos. 1357-1358, Jan. Term, 1982, PCRA N.T. 07/28/95, at 208.

Perhaps most blatantly, in 1986, Philadelphia ADA Jack McMahon created a training film teaching prosecutors to exclude Black citizens from juries. In this video, ADA McMahon explained that "Blacks from the low-income areas are less likely to convict," "you don't want those people on your jury," and "it may appear as if you are being racist, but again, you're just being realistic." *See* Exhibit 23, Jury Selection with Jack McMahon Transcript (1986). The ADA McMahon training video reflected an attempt by the Philadelphia District Attorney's Office to modify, in light of the U.S. Supreme Court's decision in *Batson*, the policy that existed at the time of Mr. Holden's trial. Although the Jack McMahon training video alone is insufficient to establish that the Philadelphia District Attorney's Office had a policy of using peremptory challenges against Black venirepersons based on race, courts have noted that "the McMahon tape 'could conceivably reflect a culture of discrimination that is relevant to . . . [a] *Batson/Swain*

claim.'" *Lark v. Sec'y, Pa. Dep't of Corr. (Lark II)*, 645 F.3d 596, 615 n.26 (3d Cir. 2011) (quoting *Lark v. Beard (Lark I)*, 2006 WL 1489977 at *8 n.15 (E.D. Pa. May 23, 2006)). When viewed together with the other evidence proffered in support of Mr. Holden's *Swain* claim, the McMahon tape is probative of a culture of discrimination that is relevant to his claim.

Accordingly, this Court should find that a *Swain* violation occurred in Mr. Holden's case because the presumption of correctness cannot justify ADA Marano's use of peremptory challenges, and there is evidence that the Philadelphia District Attorney's Office had a policy and practice of using peremptory challenges against Black venirepersons based on their race. A *Swain* violation constitutes a structural error because "harmless error analysis is inappropriate in cases involving discrimination in the jury selection process." *Ramseur v. Beyer,* 983 F.2d 1215, 1225 n.6 (3d Cir. 1992). *See also Norris*, 67 F.3d at 170 (holding that a *Swain* violation constitutes a structural error). Therefore, Mr. Holden's conviction should be reversed based on the violation of his Fourteenth Amendment rights under *Swain*.

### D. Claim Four: The cumulative effect of the constitutional violations at Mr. Holden's trial rendered it fundamentally unfair, violating his due process rights.

In the alternative, should the Court determine that Mr. Holden is not entitled to relief based on any of the individual claims described above, it should nevertheless grant him relief due to the cumulative effect of the constitutional errors he raises, which rendered his trial fundamentally unfair and violated his right to due process. *See Albrecht v. Horn,* 485 F.3d 103, 138-139 (3d Cir. 2007) (writing, "we recognize that errors that individually do not warrant habeas relief may do so when combined."). Here, the combination of the *Brady*, *Bruton*, and *Swain* violations rendered Mr. Holden's trial fundamentally unfair. Habeas relief should be granted.

**E.  Claim Five: Mr. Holden is actually innocent.**

A claim of actual innocence may be a cognizable and free-standing basis for relief under the Eighth and Fourteenth Amendments to the United States Constitution. *See Herrera v. Collins*, 506 U.S. 390, 416-19 (1993) (outlining what a freestanding actual innocence claim, one not tied to an underlying claim of constitutional error at trial, would require and evaluating the petitioner's claim of actual innocence on its merits); *In Re Davis*, 557 U.S. 952, 557-558 (2009) (noting "decisions of this Court clearly support the proposition that it would be an atrocious violation of our Constitution and the principles upon which it is based to execute an innocent person") (internal quotation marks omitted)). This Court, with the agreement of parties, has already found that Mr. Holden has met the *Schlup* standard for showing that he is actually innocent of these crimes. *See* ECF No. 36. Mr. Holden respectfully incorporates the arguments previously made regarding his actual innocence. See ECF 26 at 22-31.

In summary, Mr. Haughton and Mr. Wesson have both explained on numerous occasions that they alone participated in the robbery turned murder of Eric DeLegal (aka Kaboobie). *See* Exhibits 11-13 and PCHA N.T. 07/25/91. Both Mr. Haughton and Mr. Wesson gave sworn testimony in 1991 explaining that Mr. Holden and Mr. Murray were innocent and they did not deviate from these claims under cross-examination. *Id.* at 20-55. They provided corroborating accounts of the shooting and the police coercion that led them to implicate the other two defendants. *Id.* The recantations were supported by testimony from Eugene Thomas, Mr. Haughton's former cellmate, who described Mr. Haughton's anguish at falsely accusing Mr. Holden and Mr. Murray for a crime they did not commit. *Id.* at 5-9. Further corroboration came from Mr. Strickland's later letter and affidavit indicating that police attempted to coerce him into falsely implicating Mr. Murray. Exhibits 15 and 16. Additionally, another person incarcerated

with Mr. Haughton, Anthony Smith, also provided a sworn affidavit explaining that Mr.

Haughton had told him that he had lied on the stand and that Mr. Holden and Mr. Murray were

actually innocent. Exhibit 17. The combination of Mr. Wesson and Mr. Haughton's repeated,

consistent recantations in writing and by sworn testimony, the corroboration provided by third

parties, Mr. Holden's alibi evidence, and the complete dearth of inculpatory evidence against

him, demonstrates Mr. Holden's long-proclaimed innocence.

Mr. Holden has proven his actual innocence of the crime for which he has been

imprisoned for over forty years. His conviction should be vacated.

## V.    CONCLUSION

For the foregoing reasons, this Court should grant petitioner Holden's habeas petition,

vacate his conviction, and order a new trial.

Respectfully submitted,

Grace Harris (PA ID 328968)
Kairys, Rudovsky, Messing, Feinberg &
       Lin LLP
The Cast Iron Building
718 Arch Street, Suite 501 South
Philadelphia, PA 19106
(215) 925-4400

*Counsel for Petitioner Gregory Holden*

Date: December 19, 2023