# Exhibit 1

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **Gregory Holden,** | : | |
| **Petitioner** | : | **Civil Action** |
| | : | |
| **v.** | : | **No. 06-cv-5202** |
| | : | |
| **Kevin Ransom, et. al.** | : | |
| **Respondents** | : | |
| | : | |

## COUNSELED MOTION FOR RELIEF FROM FINAL ORDER AND JUDGMENT PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 60(B)

Petitioner Gregory Holden, by and through undersigned counsel, and pursuant to Federal Rule of Civil Procedure 60(b), hereby moves the Court to set aside the final order and judgment denying habeas corpus relief in this matter (ECF No. 17), on the grounds that new evidence has come to light confirming his long-asserted actual innocence and he has thus satisfied the fundamental miscarriage of justice exception to the procedural bar to this Court's consideration of the merits of the constitutional claims raised in his Petition for Writ of Habeas Corpus (ECF No. 1).

Should the Court grant Petitioner's request to re-open his federal habeas corpus proceedings under Rule 60(b), Petitioner also requests leave to file an Amended Petition for Writ of Habeas Corpus in order to present new, reliable evidence to support the constitutional claims raised in his original Petition for Writ of Habeas Corpus in addition to newly available constitutional claims stemming from the discovery of previously suppressed evidence. In support of this Motion, Petitioner files and incorporates the attached Brief in Support of his Counseled Motion for Relief from Final Order and Judgment Pursuant to Federal Rule of Civil Procedure 60(b) and all exhibits cited therein.

WHEREFORE, Petitioner Gregory Holden respectfully requests that this Honorable Court grant his Counseled Motion for Relief from Final Order and Judgment Pursuant to Federal Rule of Civil Procedure 60(b), vacate the prior judgment denying Petitioner's Petition for Writ of Habeas Corpus, and grant him leave to file an Amended Petition for Writ of Habeas Corpus and/or any other relief that furthers the interests of justice.

Respectfully submitted,

Grace Harris (PA ID 328968)
Kairys, Rudovsky, Messing, Feinberg &
    Lin LLP
The Cast Iron Building
718 Arch Street, Suite 501 South
Philadelphia, PA 19106
(215) 925-4400

*Counsel for Petitioner Gregory Holden*

Date:  August 15, 2023

## <u>TABLE OF CONTENTS</u>

**INTRODUCTION** ............................................................................................................. 2

**FACTUAL BACKGROUND AND PROCEDURAL HISTORY** ................................. 4

    I.  Eric "Kaboobie" DeLegal's death on December 16, 1980 ................................. 4

    II.  Mr. Holden's first arrest and preliminary hearing ....................................... 5

    III. Douglas Haughton's statement to police and plea deal ................................ 6

    IV. Joint trial of Mr. Holden, Mr. Murray and Mr. Wesson ............................... 8

    V.  Mr. Haughton and Mr. Wesson's early recantations ..................................... 11

    VI. PCRA hearing in 1991 ...................................................................................... 12

    VII. Gregory Strickland and Anthony Smith affidavits ..................................... 14

    VIII.Mr. Holden's extensive postconviction procedural history ........................ 15

    IX. Mr. Murray's recent postconviction relief .................................................... 16

**LEGAL STANDARDS** ................................................................................................... 19

**ARGUMENT** ................................................................................................................... 22

    I.  Significant newly discovered evidence demonstrates Mr. Holden's actual innocence. ..... 22

       A. Evidence regarding eyewitness Strickland directly contradicts the testimony of the prosecution's only witness against Mr. Holden and its trial theory ............................. 23

       B. Evidence regarding alternative suspect Burton further disputes the prosecution's trial theory and exculpates Mr. Holden. .................................................. 24

    II. In light of the new evidence that has emerged since trial, no reasonable jury could have convicted Mr. Holden. ................................................................... 25

       A. Recantations of Douglas Haughton and Tyrone Wesson's inculpatory statements and testimony support Mr. Holden's innocence. ................................... 25

       B. The evidence recently discovered in the investigatory homicide file corroborates Mr. Wesson and Mr. Haughton's recantations and Mr. Holden's innocence. ...................... 28

       C. The limited and flawed inculpatory evidence presented at trial reinforces that a reasonable jury could not convict Mr. Holden. ........................................ 29

          1.  Douglas Haughton's trial testimony contained numerous inconsistencies. ................ 29

          2.  No physical or otherwise competent evidence was presented at trial. ....................... 30

       D. Mr. Holden's trial presentation of alibi evidence further supports his innocence. ......... 31

    III. Based on the same evidence described above, the District Attorney's Office conceded that co-defendant Bruce Murray met the Schlup standard for demonstrating actual innocence. ......................................................................... 31

**CONCLUSION** ................................................................................................................ 32

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| Gregory Holden, | : | |
| Petitioner | : | Civil Action |
| | : | |
| v. | : | No. 06-cv-5202 |
| | : | |
| Kevin Ransom, et. al. | : | |
| Respondents | : | |
| | : | |

## BRIEF IN SUPPORT OF COUNSELED MOTION FOR RELIEF FROM FINAL ORDER AND JUDGMENT PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 60(B)

**Kairys, Rudovsky, Messing,
Feinberg & Lin LLP**
Grace Harris (PA ID 328968)
The Cast Iron Building
718 Arch Street, Suite 501 South
Philadelphia, PA 19106
(215) 925-4400

*Counsel for Petitioner Gregory Holden*

Date: August 15, 2023

## INTRODUCTION

Petitioner Gregory Holden has been serving a life sentence for more than forty years for a crime he did not commit. His conviction was a result of police misconduct and fabricated testimony. He has never wavered from his assertions of innocence, which he has consistently attempted to present in state and federal courts since he testified in his own defense at trial decades ago.

Mr. Holden was convicted of conspiring with Bruce Murray, Tyrone Wesson, and Douglas Haughton to rob and kill Eric "Kaboobie" DeLegal after a joint-trial in 1983; specifically he was accused of serving as a lookout during the robbery turned murder. The only evidence presented against him was the uncorroborated accomplice testimony of Mr. Haughton, who pled guilty to third degree murder prior to trial and testified against the other three men. Mr. Haughton testified that he and Mr. Holden stayed outside Kaboobie's house keeping watch while Mr. Wesson and Mr. Murray went inside, attempted to rob Kaboobie, and ultimately shot and killed him.

As early as 1985, Mr. Haughton recanted his trial testimony and confirmed that he and Mr. Wesson alone were present when Kaboobie was killed, that they were the only two men who entered Kaboobie's house, and that Mr. Holden and Mr. Murray were in no way involved in the planning or effectuation of the crime. Mr. Wesson corroborated the version of events detailed in Mr. Haughton's recantation at Mr. Wesson's sentencing hearing in 1984 and again when both men separately testified at a 1991 joint post-conviction evidentiary hearing for Mr. Murray and Mr. Holden. In response to that testimony, the District Attorney's Office ("DAO") argued at the time that these recantations were not credible and post-conviction relief was denied.

2

In November 2022, new evidence came to light, giving renewed hope to Mr. Holden and his decades-long efforts to reopen his case. During the course of his own post-conviction proceedings, Mr. Murray gained access to the Philadelphia Police Department (PPD) homicide file detailing the DeLegal murder investigation and discovered that Mr. Murray and Mr. Holden's convictions resulted from police and prosecutorial misconduct, including the suppression of exculpatory evidence. Critically, several pieces of evidence not disclosed to defendants demonstrated that Mr. Haughton's trial testimony was untruthful and that he, not Mr. Murray had entered Kaboobie's house with Mr. Wesson, thus corroborating the post-conviction hearing testimony of Mr. Haughton and Mr. Wesson exonerating Mr. Holden and Mr. Murray.

This evidence revealed that the Commonwealth's entire trial theory was patently false and that investigators were aware that Mr. Haughton's testimony was fabricated. Additionally, in the intervening years the police detectives responsible for investigating the DeLegal murder and obtaining the statements used to inculpate Mr. Holden have become marred in scandal due to substantial accusations of misconduct, including coercing witnesses and manufacturing false inculpatory statements. This newly discovered evidence supports what Mr. Holden and Mr. Murray have claimed from the time of their arrests in the early-1980s: that they did not participate in Kaboobie's death, that Mr. Haughton lied on the stand, and that his 1985 recantations detailing police coercion were truthful.

In response to Mr. Murray's presentation of this new evidence in his own petition for relief under Rule 60(b) and subsequent amended petition for a writ of habeas corpus, the DAO reversed its previous position, acknowledging that Mr. Haughton and Mr. Wesson's recantations were in fact credible and that numerous *Brady* violations tainted the proceedings so thoroughly that Mr. Murray was entitled to a new trial. On June 2, 2023, the Honorable Anita B. Brody

vacated Mr. Murray's conviction and sentence based on Mr. Murray's presentation of new evidence and the DAO's corresponding concessions.

The evidence presented to the Court on behalf of Mr. Murray demonstrates Mr. Holden's innocence as well. The recantations of Mr. Haughton and Mr. Wesson, now undisputedly credible, make clear that Mr. Holden was not involved in any plan to rob Mr. DeLegal and that he was not present at the time of the killing. In light of the DAO's concessions as to Mr. Murray, no competent evidence remains implicating Mr. Holden in the crime for which he is currently serving a life sentence. The overwhelming, reliable, new evidence of his innocence necessitates the extraordinary relief contemplated by Rule 60(b)(6).

## FACTUAL BACKGROUND[1] AND PROCEDURAL HISTORY

### I. Eric "Kaboobie" DeLegal's death on December 16, 1980

On December 16, 1980 around 5:45pm, Eric "Kaboobie" DeLegal was found suffering from serious gunshot wounds inside his house at 2414 Montrose Street. Trial N.T. 05/31/83 at 38. PPD Officer Daniel Kleinkurt was the first officer on the scene when he responded to George "Reds" Young's report of a shooting. *Id.* at 36-38. Officers Stephen Freels and Timothy Fitzgerald arrived shortly thereafter and transported Kaboobie to Graduate Hospital, where he was pronounced dead around 6:40pm. *Id.* at 49-51. Ofcs. Kleinkurt, Freels, and Fitzgerald did not search the home for evidence, although Ofc. Fitzgerald noted that it was dark outside, there was no light on in the living room, and he recovered a small envelope containing suspected cannabis from Kaboobie's pocket. *Id.* at 41-42, 52-54.

---

[1] In addition to the facts Mr. Holden provides herein, he incorporates the extensive factual background provided by co-defendant Bruce Murray in his recent motion for relief under Rule 60(b). *Murray v. Clark, et. al.,* No. 98-cv-05866-AB, ECF 101, 5-79 (E.D. Pa. November 16, 2022), attached as Exhibit 23.

Officer Lyle Sprague, of the Mobile Crime Detection Unit did search the house, though he did not search the cellar. *Id.* at 78-79. He found no damage to the furniture or the walls of the home, but recovered several pounds of cannabis as well as drug paraphernalia from the second floor. *Id.* at 73-74. Ofc. Sprague also recovered from the area around the pool of Kaboobie's blood a bolt from a 20-guage shotgun, a 20-guage spent shotgun shell, and wadding from a shotgun shell. *Id*. at 63-65, 72-73. Although Ofc. Sprague testified at trial that he did not know whether the shotgun bolt was tested for fingerprints, *id.* at 73, police paperwork indicates that PPD may have obtained fingerprint evidence as part of its investigation. *See* Ex. 1, PPD Homicide Case Summary. If so, this evidence was not disclosed to Mr. Holden. The police did not recover any firearms in connection with their investigation into Kaboobie's death.

## II. Mr. Holden's first arrest and preliminary hearing

On February 25, 1981, PPD officers sought and received a warrant to search Mr. Holden's home for firearms based on information purportedly received from one to two confidential informants. *See* Ex. 2, Feb. 25, 1981 Search Warrant Affidavit. The search warrant affidavit described Mr. Holden's home as a "repository" for street guns and contained a description of the Kaboobie murder that Mr. Holden supposedly told a confidential informant. *Id.* This version of the killing did not specifically implicate Mr. Holden as a participant, but as someone with information as to what occurred. *Id.* No charges or arrests resulted from this search and there is no record of any firearms being recovered from Mr. Holden's home. He was not interviewed at that time about his knowledge of the Kaboobie murder or any other offense. The identity of the "confidential informant(s)" mentioned in the affidavit is still unknown to Mr. Holden.

A few weeks later, on March 11, 1981, Edward Randolph made a statement to police regarding the Kaboobie murder. *See* Ex. 3, March 11, 1981 Randolph Statement. Like the confidential informant who was the source of information in the affidavit of probable cause to search Mr. Holden's home, Mr. Randolph purportedly told detectives that Mr. Holden had told him all about the Kaboobie shooting. *Id.* at 1. In Mr. Randolph's version of events, Mr. Holden told him that he, Larry Thorpe, Mr. Murray, Mr. Haughton, and "Scotty" decided to rob Kaboobie and that Mr. Holden, Mr. Thorpe, and Mr. Haughton waited in the schoolyard near Kaboobie's house, but that they left the area upon hearing shots from inside the house. *Id.* at 2.

Based solely on Mr. Randolph's statement, Mr. Holden was initially arrested for Kaboobie's murder on March 20, 1981. *See* Ex. 4 March 17, 1981 Arrest Warrant Aff. of Probable Cause. At the time of his first arrest, Mr. Holden voluntarily provided a statement to detectives. *See* Ex. 5, March 20, 1981 Holden Statement. Mr. Holden told detectives that he was not involved in Kaboobie's death and that he was likely with his girlfriend, Jean El, on December 16, 1980 when the shooting occurred as he was usually with her at her house. *Id.* Mr. Holden was held in jail until May 13, 1981, when the charges against him were dismissed. Trial N.T. 06/17/83 at 1260-63, 1267. Mr. Randolph had been subpoenaed to come to court and testify against Mr. Holden but he did not appear. *Id.* There is no indication in the record as to what, if any, efforts homicide detectives undertook to locate or arrest Mr. Randolph for his failure to honor his subpoena. Mr. Randolph did not testify at trial and the prosecutor referred to him as "not available." *Id.* at 1286.

## III.    Douglas Haughton's statement to police and plea deal

The investigation was seemingly dormant until Douglas Haughton was arrested on federal bank robbery charges in February 1982. Trial N.T. 06/02/83 at 546-47. PPD detectives

were present during Mr. Haughton's arrest by federal law enforcement and his subsequent interview. Trial N.T. 06/01/83 at 405. The interrogating FBI agents and PPD detectives, including Detective Larry Gerrard, showed Mr. Haughton evidence of his involvement in the federal bank robbery case and explained that he would need to cooperate with the PPD's investigation into Kaboobie's death to receive a lighter punishment. *Id.* During this interrogation, PPD detectives gave Mr. Haughton a copy of Mr. Randolph's previous statement implicating Mr. Holden and others in the shooting. Trial N.T. 06/02/83 at 517.

After being threatened by law enforcement and reading Mr. Randolph's statement, Mr. Haughton provided a statement to Detective Gerrard and other investigators claiming that he had conspired with Mr. Holden, Mr. Murray, and "Scottie" to rob Kaboobie. *See* Ex. 6, March 4, 1982 Haughton Statement. According to Mr. Haughton's statement at that time, he and Mr. Holden served as lookouts while Mr. Murray and "Scottie" entered Kaboobie's home and ultimately shot and killed him. *Id.* at 1 Mr. Haughton specified that the shotgun used in the shooting came from Mr. Murray's house. *Id.* at 5.

Several weeks later, Mr. Haughton was arrested and charged with Kaboobie's death, after which he gave another statement identifying "Scottie" as Mr. Wesson. *See* Ex. 7, April 1, 1982 Haughton Statement. On April 21, 1982, Mr. Haughton pled guilty to the federal bank robbery charge and on September 16, 1982 he was sentenced to five years' incarceration with the expectation that he would actually serve 32-40 months. *See* Ex. 8, December 8, 1982 Presentence Report at 3. Mr. Haughton then filed a motion to suppress his statements regarding the Kaboobie murder, claiming that he did not intelligently, knowingly, or voluntarily waive his constitutional rights during his interrogation. *See* Ex. 9, June 8, 1982 Haughton Motion to Suppress. When this

motion was denied, Mr. Haughton pled guilty to third degree murder in exchange for his

testimony against Mr. Holden, Mr. Murray and Mr. Wesson. Trial N.T. 06/01/83 at 401-07.

After testifying against the three other defendants, Mr. Haughton was sentenced to 5-10

years' incarceration to run concurrently with his existing five-year federal sentence in a low-

security federal prison in Colorado. *See* Ex. 10 Haughton Docket. As the trial court noted, a

sentence of imprisonment running concurrent with an existing federal sentence was "no sentence

at all." Trial N.T. 06/01/83 at 406. By the trial court's standards, Mr. Haughton ultimately

received "no sentence at all" for murder because of his testimony against Mr. Holden, Mr.

Murray and Mr. Wesson. He was released on March 18, 1989 after serving approximately seven

years for both a federal bank robbery and third degree murder. PCHA N.T. 7/25/91 at 15.

### IV. Joint trial of Mr. Holden, Mr. Murray and Mr. Wesson

The only evidence presented at trial implicating Mr. Holden in Kaboobie's death was Mr.

Haughton's testimony. Trial N.T. 06/01/83, 06/02/83, 06/15/83. In contrast to his police

statement, Mr. Haughton testified at trial that the shotgun used in the robbery came from Mr.

Holden's house, not Mr. Murray's house. Trial N.T. 06/01/83 at 226-227. He testified that he and

Mr. Holden had conflicts with Kaboobie, so Mr. Holden decided that they would serve as

lookouts. *Id.* at 233-234. He also testified that Mr. Holden made the plan to rob Kaboobie, but

struggled to recollect what was said or by whom. *Id.* at 258-265.

On cross examination, each of the three defense lawyers questioned and impeached Mr.

Haughton extensively. *Id.* at 250-409, Trial N.T. 06/02/83 at 420-471, 497-579. These

examinations revealed several inconsistencies between Mr. Haughton's trial testimony and his

statements to police and prior testimony at preliminary hearings, including the number of

gunshots he heard, Trial N.T. 06/01/83 at 288-290, the number of guns involved in the robbery,

*id.* at 269-270, who led the plan, *id.* at 297-308, whether or not he knew the witness Gregory

"Dap" Strickland, *id.* at 318-319, how much cannabis they expected to steal, *id.* at 270-275,

whether he saw Mr. Holden after the robbery, *id.* at 320-322, whether he saw who opened the

door to Kaboobie's house, *id.* at 324-325, how much cannabis he had smoked prior the robbery,

*id.* at 339-342, and where he went after the shooting, *id.* at 372-374.

In response to these undeniable inconsistencies, Mr. Haughton made several excuses to

explain why his trial testimony did not match his prior sworn statements. He claimed that the

lawyers were trying to "trick" him, *id.* at 308, that a stenographer made a mistake transcribing

his preliminary hearing testimony, *id.* at 391-392, and that he was angry at one of the lawyers

questioning him. Trial N.T. 06/03/83 at 449. On several occasions, he could not explain the

discrepancies at all, simply stating "I'm not sure." Trial N.T. 06/01/83 at 311, 312. He also

admitted to lying under oath during prior testimony. Trial N.T. 06/02/83 at 452.

Although Mr. Haughton's testimony was the only evidence presented at trial directly

inculpating Mr. Holden, the jury also heard a redacted statement made by Mr. Wesson to police,

read into evidence by Detective Lubiejewski. Trial N.T. 06/15/83 at 681-686. Upon his arrest,

PPD detectives obtained a statement attributed to Mr. Wesson detailing his and his co-

defendants' participation in the Kaboobie murder. Prior to trial, in May 1983, Mr. Wesson

recanted the accusations made in this police statement in a motion to suppress, arguing that

police had fabricated the statement and coerced him to adopt it. Wesson MTS N.T. 05/23/83 at

387-391. His motion was denied and although the jury was instructed to use this statement only

against Mr. Wesson and not as evidence against Mr. Holden or Mr. Murray, no other names were

redacted and Mr. Holden and Mr. Murray's names were simply replaced by references to "the

other guys." Trial N.T. 06/15/83 at 681-686. The narrative contained in this statement generally

9

matched the statement attributed to Mr. Randolph, including the involvement of Larry Thorpe. *Id.* Counsel for Mr. Holden and Mr. Murray expressed serious concern with the effectiveness of the redactions and potential prejudice to their clients, which had been the subject of a prior defense motion to sever. *Id.* at 647-648.

Mr. Holden presented three alibi witnesses and testified on his own behalf. Trial N.T. 06/16/83 at 997-1124, 06/17/83 at 1193-1346. All three of Mr. Holden's witnesses testified that Mr. Haughton had a reputation for dishonesty and theft in the community. *Id.* Mr. Holden's girlfriend and the mother of his child, Janine El, testified that she was with Mr. Holden for the entirety of the day on December 16, 1980, when Kaboobie was killed. Trial N.T. 06/16/83 at 1040-1047. She described in detail what they did throughout the course of that day, including waking up together, going to Mr. Holden's mother's house to ask for money to go shopping, taking the bus to Center City to buy Christmas presents for their son, eating lunch together, returning home, fighting with her mother, making dinner, and going to bed together. *Id.* She even recalled the specifics of what they ate, what presents they purchased, and the substance of her argument with her mother (that she had bought Christmas presents too early as they were not supposed to celebrate Christmas until January in accordance with their Moorish religion). *Id.*

Mattie Holden, Mr. Holden's mother, corroborated this account and testified that Mr. Holden and Janine El did in fact come to her house that day to request money to buy toys for their son. *Id.* at 1007-1009. Janine's mother, Jean El, also testified in Mr. Holden's defense and corroborated Janine's testimony. *Id.* at 1113-1124. She stated that she saw Mr. Holden that morning in her daughter's room, that he left the house in the early afternoon to go to his mother's house with Janine, that she and Janine fought that day about buying Christmas presents too early for the Moorish holiday, and that Mr. Holden stayed over at their house that night. *Id.* At the time

of trial, Jean El had pending charges relating to concealing Mr. Holden's whereabouts while police were attempting to arrest him and counsel agreed upon the appropriate scope of her cross-examination as to not trigger the necessity of Fifth Amendment protections. Trial N.T. 06/17/83 at 1181. The prosecutor failed to accord to this agreement, and Jean El invoked the Fifth Amendment on the stand. *Id.* at 1194. Mr. Holden's defense counsel moved for a mistrial in response, which was denied. *Id.* at 1206-107.

Detective Gerrard testified as to the circumstances of Mr. Holden's arrest, in which he was found hiding inside a piano at Jean El's house. Trial N.T. 06/15/83 at 773. The prosecution contended during closing argument that this showed Mr. Holden's consciousness of guilt. Trial N.T. 06/20/83 at 1553. Mr. Holden testified in his own defense, asserting his innocence and corroborating Janine El's testimony as to what they did together on December 16, 1980. Trial N.T. 6/17/83. at 1214-1221. With regard to his arrest, Mr. Holden explained that he was afraid of being arrested without an attorney to accompany him given his prior experience being arrested and incarcerated pretrial for this same crime in 1981. *Id.* at 1222-1223. He adamantly denied that he was in any way involved in the plan to rob Kaboobie that resulted in his death. *Id.* at 1338. At sentencing, Mr. Holden reiterated his innocence, stating, "When I got arrested for this crime, I was not guilty then and I'm still not guilty now." Sentencing N.T. 04/23/84 at 24.

V.     **Mr. Haughton and Mr. Wesson's early recantations**

In addition to his testimony at his suppression hearing, after trial Mr. Wesson continued his efforts to recant his police statement. At his sentencing hearing in April 1984, he expressed "a lack of my understanding of my right to actually take the stand" and went on to explain that "I would have, I could have exonerated and made things much clearer and it wouldn't have took too much time. I would have cleared the other two defendants." *Id.* at 16-17.

Mr. Haughton also began recanting his testimony shortly after trial. He wrote two separate affidavits dated April 11, 1985 stating that his trial testimony was untrue and that police coerced him into accusing Mr. Holden and Mr. Murray of being involved in the crime. *See* Ex. 11, April 11, 1985 Haughton Affidavit 1 and Ex. 12 April 11 1985 Haughton Affidavit 2. In his first affidavit, Mr. Haughton wrote that Detective Gerrard and federal agents "bullied and insisted that I sign statements naming Bruce Murray and Gregory Holden in this murder...I was frightened and I believed that they would not stop and that things would not get better until I signed the statements that they wanted and agreed to testify at trial." Ex. 11. He went on to explain that he and Mr. Wesson alone went to Kaboobie's house to buy cannabis and that the interaction turned sour and Kaboobie was accidentally killed. *Id.*

In his second affidavit, Mr. Haughton repeated his claims of police coercion, explaining that law enforcement showed him significant evidence of his guilt as to the federal bank robbery charge and promised him less time for his cooperation in the Kaboobie murder investigation. Ex. 12. He concluded his second affidavit with "I Douglas Haughton, now state in the absence of 'Duress!' that 'Gregory Holden' and 'Bruce Murry' are victims of an earlier statement obtained 'VIA DURESS.'" *Id.* Mr. Haughton continued his efforts to tell the truth in a May 11, 1985 letter to Mr. Murray's trial counsel, Pamela Cohen. *See* Ex. 13, May 11, 1985 Ltr to Atty Cohen. In this letter, he reiterated that he and Mr. Wesson went to Kaboobie's house alone on December 16, 1980 and that "Gregorie and Bruce receive life for something they had nothing to do with." *Id.*

## VI.     PCRA hearing in 1991

In 1991 these developments led to a joint evidentiary hearing for Mr. Holden and Mr. Murray under the Pennsylvania Post-Conviction Hearing Act ("PCHA") (now known as the

Post-Conviction Relief Act or "PCRA"). PCHA N.T. 07/25/91. Both Mr. Haughton and Mr.
Wesson testified consistently with their earlier recantations. *Id.* The testimony began with Mr.
Haughton's former cellmate at SCI Camp Hill, Eugene Thomas. *Id.* at 3. Mr. Thomas testified
that when they were housed together, Mr. Haughton told him that he "was under a lot of
pressure...he had a lot of cases on him and he had made a mistake." *Id.* at 5. In speaking about
Mr. Holden and Mr. Murray, Mr. Thomas testified that "[Mr. Haughton] said that neither of them
was there at the robbery." *Id.* at 8. Mr. Thomas specifically stated that Mr. Haughton told him he
had lied at trial. *Id.* at 9.

Mr. Haughton then testified without the expectation of receiving any benefit. *Id.* at 20. In
fact, the PCHA court clarified that Mr. Haughton's initial recantations exposed him to potential
perjury charges. *Id.* In response to Mr. Holden's attorney asking, "Sir, would you tell the court
whether Gregory Holden was in any way, shape or form involved in the murder of Eric DeLegal
for which he was sentenced to life imprisonment?" Mr. Haughton replied, "No, he wasn't." *Id.*
Mr. Haughton went on to explain that he was certain of Mr. Holden's innocence because he was
present when the crime occurred and Mr. Holden was not a participant. *Id* at 20-21. He reiterated
the same version of events that he had laid out in his 1985 recantations: that he and Mr. Wesson
went to Kaboobie's house to purchase cannabis and that a dispute evolved into an accidental
shooting turned shootout in which Kaboobie was killed and Mr. Wesson was shot in the arm. *Id.*
at 22-23. He also testified that his fabricated trial testimony was the result of police coercion,
explaining, "The reason why I lied, your Honor, is because the police offered me a deal, showed
me photo pictures of these people and put them in it. And they said if I don't cooperate with
them, I was going to get the electric chair or a life sentence." *Id.* at 29.

13

Mr. Wesson's testimony was consistent with Mr. Haughton's. *Id.* at 40. He stated that he and Mr. Haughton went to Kaboobie's house alone to buy cannabis, that there was a dispute about money owed to Mr. Haughton, that he tussled with Kaboobie and a shotgun, the shotgun went off and a shootout ensued. *Id.* at 42-44. He reaffirmed the statement he made under oath at sentencing, "that Mr. Holden and Mr. Murray, they didn't have anything to do with it." *Id.* at 46. In response to the question, "And Gregory Holden was not there?" he replied, "No, they were not." *Id.* at 47. Additionally, he responded, "No, they did not" to the questions, "[d]id [Mr. Holden and Mr. Murray] have anything to do with planning your trip to that scene?" and "[d]id they assist you or encourage you in any way, going there or being there or doing anything?" *Id.* Mr. Wesson also explained that, during his initial interrogation, the police denied him access to an attorney unless he signed a prewritten statement. *Id.* at 54-55.

Upon information and belief, at the time of the 1991 PCHA evidentiary hearing, the Commonwealth argued that Mr. Thomas, Mr. Haughton and Mr. Wesson's testimonies were not credible. The PCHA court agreed and denied relief. *See* Ex. 14, February 6, 1996 PCHA Court Opinion.

**VII.    Gregory Strickland and Anthony Smith affidavits**

Further evidence that Mr. Haughton's recantations were truthful has emerged throughout the years. Gregory "Dap" Strickland, an eyewitness who was 16 years old at the time of the crime and was present in Kaboobie's basement while the shooting took place, wrote a letter in 2000 and an affidavit in 2011 explaining that police were aware that he was a witness, that they attempted to coerce him into identifying Mr. Murray as one of the killers, and that he refused. *See* Ex. 15, Dec. 1, 2000 Gregory Strickland Ltr, and Ex. 16, July 20, 2011 Gregory Strickland Aff. Mr. Strickland, known as "Dap," explained that he saw and heard Mr. Haughton, who he

knew, in Kaboobie's house at the time of the shooting. Ex. 15 at 1. In his affidavit, he wrote that

police brought him in for a photo lineup, but when he refused to select Mr. Murray's photograph,

police ended the lineup and dismissed him. Ex. 16 at 1.

Also in 2011, another incarcerated person who knew Mr. Haughton at SCI Camp Hill,

Anthony Smith, came forward with a sworn affidavit bolstering Mr. Haughton's recantation. *See*

Ex. 17, June 19, 2011 Anthony Smith Aff. Smith explained that he and Mr. Haughton would

regularly discuss their respective cases and that Mr. Haughton "would ask me and his cellie what

can he do to clear these guys that the Detectives forced him to say was part of a plan, but in all

honesty had nothing to do with the crime." *Id.* at 1. He specified that "Doug went on to say

Bruce Murray nor Gregory Holden had nothing to do with the killing of Eric Delegal." *Id.* Mr.

Smith was also able to provide a substantive narrative of what actually occurred at Kaboobie's

house on December 16, 1980, which matched both Mr. Haughton and Mr. Wesson's

recantations. *Id.* at 2. In addition to speaking with Mr. Haughton, Mr. Smith had the opportunity

to discuss the case with Mr. Strickland, who told him that Detectives Gerrard and Gilbert

attempted to coerce Mr. Strickland into implicating Mr. Murray. *Id.*

## VIII.  Mr. Holden's extensive postconviction procedural history

Mr. Holden challenged his conviction from the time of trial. In post-trial motions, he

argued that his motion to sever was erroneously denied, that the redactions of Mr. Wesson's

police statement were insufficient, as well as other claims regarding the trial court's jury

instructions, voir dire decisions, and prejudicial statements made by the trial prosecutor. He did

not file a direct appeal. In 1985, Mr. Holden filed a *pro se* PCHA petition, to which he was

appointed counsel in 1988 who then filed an amended petition raising claims of trial counsel

ineffectiveness as to trial counsel's withdrawal of the motion to sever and failure to advise Mr.

Holden of his direct appeal rights. This petition led to the 1991 PCHA evidentiary hearing discussed *supra* § VI. After he was denied PCHA relief in 1995, he appealed to the Superior Court and his appeal was dismissed for failure to file a brief in 1996. *See Commonwealth v. Holden,* No. 4154 Philadelphia 1995, Order (Superior Court, July 9, 1996). Mr. Holden proceeded to file seven subsequent *pro se* petitions seeking relief under the PCRA in 1999, 2005, 2007, 2009, 2012, 2016, and 2019. Each were dismissed as untimely.

In 1996, Mr. Holden sought federal habeas relief and his petition was dismissed for failure to exhaust state remedies. *See Holden v. Larkins,* No. 2:96-cv-05957-JCJ (E.D. Pa. 1996). A decade later, Mr. Holden sought federal relief again in a second *pro se* habeas petition, *Holden v. Wydner, et. al.,* 2:06-cv-05202-JCJ (E.D. Pa. 2006), which was dismissed as time-barred on September 21, 2007. He then filed a motion for relief under Rule 60(b), which was denied on October 11, 2007. *Holden v. DAO,* No. 2:07-cv-04107-JCJ (E.D. Pa. 2007).[2] On February 3, 2016, Mr. Holden filed a motion for relief under Rule 60(d)(1), which was denied that same day. *Holden v. Wydner,* 06-cv-05202, ECF 19-20. On June 2, 2017, Mr. Holden again attempted to reopen his 2006 habeas petition under Rule 60(b) based on the Supreme Court decision *Buck v. Davis, Holden v. Wydner,* 06-cv-05202, ECF 21, however he was denied on July 12, 2017. *Holden v. Wydner,* 06-cv-05202, ECF 22.

## IX. Mr. Murray's recent postconviction relief

It was not until November 2022 that Mr. Murray's post-conviction efforts made public suppressed evidence supporting the unreliability of Mr. Haughton's trial testimony and affirming Mr. Holden's innocence. In the PPD's homicide file of the DeLegal murder investigation, Mr.

---

[2] It is not clear why Mr. Holden's 2007 motion for relief under Rule 60(b) was docketed under a separate number from the habeas petition it challenged (*Holden v. Wydner,* 06-cv-5202).

Murray discovered: (1) handwritten police notes, *see* Ex. 18, PPD Handwritten Notes, and (2) a PPD activity sheet, *see* Ex. 19, March 11, 1981 PPD Activity Sheet, both indicating that Mr. Strickland, the 16 year old eyewitness, told Mr. Randolph that he had seen Mr. Haughton, not Mr. Murray, in Kaboobie's house directly after the shooting, (3) Mr. Strickland's polygraph results indicating he later lied to police when he said he did not know who killed Kaboobie, *see* Ex. 20, March 13, 1981 Strickland Polygraph Report, (4) a tip made to police that local gang member and police informant, Elliott Burton, was seen leaving the scene of the shooting carrying a shotgun, *see* Ex. 21, Jan. 5, 1981 PPD Activity Sheet, and (5) an audio recording of Elliott Burton, in his capacity as a police informant, speaking with Mr. Holden on a police-arranged and recorded phone call in which Mr. Holden denies any involvement with the robbery-turned-shooting, *see* Ex. 22, PPD Recording of Phone Conversation with Transcription. *See also* Ex. 23, November 16, 2022 Murray Motion for Relief, *Murray v. Vaughn, et. al.,* No. 98-cv-05866, ECF 101, 140-154 (exhibits omitted) for full explanation of suppressed evidence.

The newly discovered police notes memorializing detectives' conversations with Mr. Randolph, Ex. 18 and Ex. 19, make clear both that Mr. Strickland told Mr. Randolph that Mr. Strickland had seen Mr. Haughton in Kaboobie's house after the shooting, and that police were aware that Mr. Strickland communicated these observations to Mr. Randolph. This version of events directly contradicts the prosecution's representations at trial that Mr. Haughton never entered Kaboobie's house, that Mr. Haughton was outside the house during the incident—in a position to see Mr. Holden acting as a lookout—and that Mr. Murray was involved in the shooting. Mr. Strickland's suppressed polygraph test results, Ex. 20, demonstrate that his later statement to police, that he did not know who shot Kaboobie and that Mr. Burton told him that "Bruce and Scot" shot Kaboobie, was not truthful.

17

On January 5, 1981, investigating detectives received information from an identified source implicating Elliot Burton in Kaboobie's death, specifically that he saw Mr. Burton running away from Kaboobie's house carrying a shotgun on the day of the murder. Ex. 21. While this information was recorded on an activity sheet, *id,* there is no indication in the investigatory record that detectives explored Mr. Burton as a potential suspect, even with the knowledge that the murder weapon was a shotgun and no shotgun was recovered at the scene or from any of the charged defendants. Instead, detectives proceeded to use Mr. Burton as an informant and arranged a recorded phone call between Mr. Burton and Mr. Holden in an attempt to secure an inculpatory statement from Mr. Holden. Ex. 22. These efforts failed because during the call with Mr. Burton, Mr. Holden denied any participation in the robbery-turned-murder of Kaboobie and expressed concern that others were falsely accusing him of being involved. *Id.*

Upon information and belief, neither Mr. Holden nor his trial counsel were previously aware of any of these pieces of evidence, which contradict Mr. Haughton's trial testimony and the Commonwealth's case theory. The new evidence caused the DAO to reverse its prior position and concede that it now views "Haughton and Wesson's recantations and testimony as credible and agree[s] that Murray has overcome section 2254(e)(1)'s presumption of correctness by clear and convincing evidence as to the finding that Haughton and Wesson were not credible." *See* Ex. 24 Jan. 18, 2023 DAO 60(b)(6) Response, *Murray v. Vaughn,* No. 98-cv-05866, ECF 108 at 15. This change in position resulted from the acknowledgement that the new evidence "strengthen[s] the recantations, which in turn strengthen each other." *Id.* Ultimately, the DAO acknowledged that upon review of Mr. Murray's Motion for Relief under Rule 60(b)(6), "Murray has satisfied the actual innocence gateway for excusing procedural default....his habeas proceeding should be reopened to permit review of the merits of his claims." *Id.* at 1.

18

Following the DAO's concessions as to 60(b)(6) relief, Mr. Murray filed an Amended Petition for Writ of Habeas Corpus outlining the constitutional violations entitling him to relief. *See* Ex. 25, May 5, 2023 Memo of Law in Support of Amended Petition, *Murray v. Clark,* No. 98-cv-05866, ECF 113 (exhibits omitted). In response, the DAO filed joint stipulations of fact and proposed conclusions of law in collaboration with Mr. Murray's post-conviction counsel. *See* Ex. 26, June 2, 2023 Joint Stipulations of Fact and Proposed Conclusions of Law, *Murray v. Clark,* No. 98-cv-05866, ECF 119. In this joint filing, both parties agreed that the Commonwealth had suppressed favorable and material evidence at the time of trial. *Id.* at 6-10.

The DAO also stipulated that "the prosecution's case against Murray rested on Douglas Haughton's testimony and Tyrone Wesson's inculpatory statement, both of which were recanted almost immediately after trial. As the Commonwealth has previously conceded, these recantations are reliable." *Id.* at 8. Additionally, "the parties agree and contend that the above-described suppressed, favorable exculpatory and impeachment evidence was material under *Brady* because, considered collectively, it undermines confidence in the outcome of Murray's trial." *Id.* at 9. The Honorable Anita B. Brody agreed with the parties' conclusions of law and granted Mr. Murray's Petition for Writ of Habeas Corpus later that same day. *See* Ex. 27, June 2, 2023 Order, *Murray v. Clark,* No. 98-cv-05866, ECF 120.

**LEGAL STANDARDS**

"[T]he conviction of an innocent person [is] perhaps the most grievous mistake our judicial system can commit,' and thus, the contours of the actual innocence gateway must be determined with consideration for correcting 'such an affront to liberty." *Reeves v. Fayette SCI*, 897 F.3d 154,164 (3d Cir. 2018) (quoting *Satterfield v. Dist. Att'y of Phila.*, 872 F.3d 152, 154 (3d Cir. 2017)). As the U.S. Supreme Court has explained,

> Of greater importance [than the preservation of judicial resources and respect for finality and comity], the individual interest in avoiding injustice is the most compelling in the context of actual innocence…. Indeed, concern about the injustice that results from the conviction of an innocent person has long been at the core of our criminal justice system. That concern is reflected, for example, in the 'fundamental value determination of our society that it is far worse to convict an innocent man than to let a guilty man go free.'

*Schlup v. Delo*, 513 U.S. 298, 324–25 (1995) (quoting *In re Winship*, 397 U.S. 358, 372 (1970) (Harlan, J., concurring)); *id*. at 325 ("The maxim of the law is…that it is better that ninety-nine…offenders should escape, than that one innocent man should be condemned." Thomas Starkie, Evidence 756 (1824))). Thus, in compelling cases, other factors "must yield to the imperative of correcting a fundamentally unjust incarceration." *Engle v. Isaac,* 456 U.S. 107, 135 (1982).

Due to this significant interest in correcting the horrific injustice of a wrongful conviction, a showing of actual innocence can excuse a petitioner's procedural defects in seeking federal relief under the catchall clause of Federal Rule of Civil Procedure 60(b)(6). As the Third Circuit has clarified, "actual innocence," for purposes of the "miscarriage of justice" exception to procedural default of a habeas corpus claim under Rule 60(b)(6) requires "factual innocence, not legal insufficiency." *Reeves*, 897 F.3d at 161. In order to ensure all relevant information is considered, the scope of review is "not limited to the existing record[,]' and consideration of 'any admissible evidence' is proper." *Howell v. Superintendent Albion SCI*, 978 F.3d 54, 59 n.9 (3d Cir. 2020) (alteration in original) (quoting *Bousley v. United States,* 523 U.S. 614, 624 (1998)). The district court must "undertak[e] an individualized analysis of the proffered evidence," and cannot discredit "recantations on a categorical basis." *Id*. at 60 (instructing that all forms of evidence under the standard set forth in *Schlup* "should be analyzed on an individual

and fact-specific basis"). "'[T]here are no categorical limits on the types of evidence that can be offered' under *Schlup*." *Id*. (quoting *Hyman v. Brown*, 927 F.3d 639, 660 (2d Cir. 2019)).

To obtain relief from the procedural default judgment under Rule 60(b)(6), a petitioner must make a two-step showing: "[F]irst, the petitioner must present 'new reliable evidence' of actual innocence; and then, second, that evidence must 'persuade[] the district court that...no juror, acting reasonably, would have voted to find [the petitioner] guilty beyond a reasonable doubt.'" *Id*. (footnotes omitted) (alterations and omissions in original) (first quoting *Schlup*, 513 U.S. at 324; then quoting *Satterfield*, 872 F.3d at 163). Extraordinary relief is warranted under Rule 60(b)(6) if the petitioner meets this standard, "and the habeas petition can be considered on the merits despite a procedural default..." *Id*. (quoting *Satterfield*, 872 F.3d at 163).

To satisfy the first step of the *Schlup* standard, the petitioner must offer evidence that is "both 'new' and 'reliable.'" *Id*. To constitute "new" evidence, the evidence must have been "not available at trial and could not have been discovered earlier through the exercise of due diligence," *Reeves*, 897 F.3d at 162 (quoting *Amrine v. Bowersox*, 238 F.3d 1023, 1028 (8th Cir. 2001)). Under *Schulp*, "the newly presented evidence may indeed call into question the credibility of the witnesses presented at trial." 513 U.S. at 330. In assessing the reliability of the new evidence, "the court 'may consider how the timing of the petitioner's submission and the likely credibility of the witnesses bear on the probable reliability of that evidence,' as well as the circumstances surrounding the evidence and any supporting corroboration." *Reeves*, 897 F.3d at 161 (quoting *House v. Bell,* 547 U.S. 518, 538, 551 (2006)) (internal alterations omitted). With regards to recantations, "multiple recantations may themselves be mutually corroborating evidence, with each one having the potential to bolster the reliability of the others." *Howell,* 978 F.3d at 61.

The second step of the *Schlup* standard requires the petitioner to "show by a preponderance of the evidence 'that it is more likely than not that no reasonable juror would have convicted him in light of the new evidence,' or stated differently, that it is 'more likely than not any reasonable juror would have reasonable doubt.'" *Reeves*, 897 F.3d at 160–61 (first quoting *Houck v. Stickman*, 625 F.3d 88, 93 (3d Cir. 2010); then quoting *House,* 47 U.S. at 538). As the Third Circuit thoroughly explained in *Reeves*,

> [T]he court "must consider all the evidence, old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under rules of admissibility that would govern at trial." *House*, 547 U.S. at 538 (internal quotation marks and citation omitted). "[M]ere impeachment evidence is generally not sufficient to satisfy the [actual innocence gateway] standard." *Munchinski v. Wilson*, 694 F.3d 308, 338 (3d Cir. 2012). However, new, reliable evidence that "undermine[s] the [trial] evidence pointing to the identity of the [perpetrator] and the motive for the [crime]" can suffice to show actual innocence. *Goldblum v. Klem*, 510 F.3d 204, 233 (3d Cir. 2007); *see also Munchinski*, 694 F.3d at 33-37 (explaining that actual innocence was demonstrated where new evidence both showed that the crime could not have happened in the way the Commonwealth presented at trial and provided an alternative theory that was more appropriate and better fit the facts of the case). In weighing the evidence, "[t]he court's function is not to make an independent factual determination about what likely occurred, but rather to assess the likely impact of the evidence on reasonable jurors"; the actual innocence standard "does not require absolute certainty about the petitioner's guilt or innocence." *House*, 547 U.S. at 538.

*Id*. at 161.

## ARGUMENT

Mr. Holden is innocent of the crime for which he is currently incarcerated and based on his discovery of new, reliable evidence, there remains no credible evidence in the record suggesting his guilt.

### I.   Significant newly discovered evidence demonstrates Mr. Holden's actual innocence.

Each of piece of suppressed evidence, found in the PPD's Kaboobie homicide investigatory file through co-defendant Mr. Murray's post conviction efforts—now newly

presented to this Court—support Mr. Holden's claims of innocence by undermining Mr.

Haughton's trial testimony, supporting his later recantations, and foreclosing the prosecution's

trial theory.

### A. Evidence regarding eyewitness Strickland directly contradicts the testimony of the prosecution's only witness against Mr. Holden and its trial theory.

As the DAO has conceded, the new evidence discovered by co-defendant Mr. Murray in

the PPD's investigatory homicide file seriously undermines the Commonwealth's trial theory

that the four co-defendants conspired to rob Kaboobie and the roles they each supposedly played

in the alleged conspiracy. Ex. 24 at 15. The suppressed evidence regarding Mr. Strickland, the

teenager who was present at Kaboobie's house at the time of his murder, clearly indicates that

Mr. Haughton, not Mr. Murray, entered Kaboobie's house and participated in the shootout,

disaffirming Mr. Haughton's testimony in its entirety. The handwritten police notes, Ex. 18, and

activity sheet, Ex. 19, memorializing conversations between investigating detectives and Mr.

Randolph, a source they later relied on to charge Mr. Holden with murder, indicate that Mr.

Randolph told them that Mr. Strickland described seeing Mr. Haughton in Kaboobie's house

directly following the murder. These interview notes contradict Mr. Haughton's description of

the "conspiracy" to rob Kaboobie. The suppression of these notes, as well as Mr. Strickland's

polygraph test results, Ex. 20, indicating that he later lied when he told a police he did not know

who killed Kaboobie, all demonstrate that detectives knew that Mr. Haughton's story did not

accord to the facts and suppressed evidence contrary to their preferred theory of the crime.

This newly discovered evidence as to Mr. Strickland's true observations the day

Kaboobie was killed is supported by Mr. Strickland's later letter and affidavit detailing that he

did in fact see Mr. Haughton in Kaboobie's house and describing how the police attempted to

coerce him into falsely accusing Mr. Murray. Ex. 15 and Ex. 16. These statements made by Mr.

Strickland in 2000, Ex. 15, and 2011, Ex. 16, also speak to the reliability of the suppressed polygraph report showing he lied to police when he said he did not know who killed Kaboobie, as Mr. Strickland explained that he kept quiet about Mr. Haughton's involvement out of fear of retribution from Mr. Haughton or his associates. Ex. 15 at 1; Ex. 16 at 1-2. In identifying Mr. Haughton as the true shooter, the information suppressed as to Mr. Strickland reveals Mr. Haughton's trial testimony to be false, causing the case against Mr. Holden to unravel.

### B. Evidence regarding alternative suspect Burton further disputes the prosecution's trial theory and exculpates Mr. Holden.

Additional newly discovered evidence relates to alternative suspect and police informant, Elliot Burton. Ex. 21 and Ex. 22. As detailed in a suppressed PPD activity sheet, an eyewitness saw Mr. Burton leaving the scene of the crime with a shotgun, *id.,* raising more, significant doubts as to the veracity of the Commonwealth's case theory at trial. A shotgun was determined to be the murder weapon. Trial N.T. 5/31/83 at 101-102. Responding police recovered several items from a shotgun at the crime scene including a bolt from a shotgun, a shotgun shell, and shotgun shell wadding. *Id.* at 63-64. However, it appears no shotgun was recovered from the scene or any of the defendants. *Id.* at 185 (list of Commonwealth evidence recovered from crime scene). In particular, Mr. Holden's house was searched for guns and none were found. Ex. 2. Information that Mr. Burton was seen fleeing Kaboobie's house with a shotgun fills a significant hole in the physical evidence and calls into question the entire PPD investigation and the narrative presented at trial.

Finally, the suppressed recorded phone call between Mr. Burton and Mr. Holden, in which Mr. Holden denies involvement in the crime, Ex. 22, further supports Mr. Holden's innocence. Mr. Holden was not aware that informant Burton was working with the police. During their phone call, which Mr. Holden did not know was arranged by police and being

recorded, Mr. Holden denied participating in the Kaboobie robbery and shooting and expressed frustration that others were attempting to implicate him. *Id*. In contrast, the February 1981 search warrant affidavit to search Mr. Holden's home, Ex. 2, and the March 1981 warrant for Mr. Holden's arrest, Ex. 4, both relied on witnesses claiming that Mr. Holden had told them all about the crime and his involvement therein. However, the only piece of evidence reliably memorializing a conversation between Mr. Holden and a member of the community regarding the shooting shows that he adamantly denied any involvement. Ex. 22.

These new pieces of evidence, unavailable to Mr. Holden and his prior counsel for decades because they were previously undisclosed, are reliable corroboration of Mr. Holden's innocence.

## II.    In light of the new evidence that has emerged since trial, no reasonable jury could have convicted Mr. Holden.

With all evidence taken into consideration, that which was presented at trial, that which has been presented in the intervening decades, and that which has never been presented to a reviewing court, no competent evidence remains to suggest that Mr. Holden played any part in Kaboobie's death. The sole evidence presented at trial that inculpated Mr. Holden was Mr. Haughton's testimony, which he has thoroughly recanted. Mr. Haughton's recantations are corroborated by co-defendant Mr. Wesson's recantations and newly discovered suppressed evidence.

### A.  Recantations of Douglas Haughton and Tyrone Wesson's inculpatory statements and testimony support Mr. Holden's innocence.

Even prior to the DAO's concession that Mr. Haughton and Mr. Wesson's recantations were in fact credible, they provided persuasive evidence of Mr. Holden's innocence. Before trial, Mr. Wesson argued that he never made the police statement attributed to him and that it was a

product of police fabrication and coercion.[3] Wesson MTS N.T. 05/23/83 at 387-391. After trial,

he continued to repudiate the statement. Initially, he explained at sentencing that Mr. Murray and

Mr. Holden were not involved and that if he had testified he could have "exonerated" them.

Sentencing N.T. 04/23/84 at 16-17. Mr. Wesson's recantations are particularly reliable given that

the police statement he was refuting was not credible to begin with as it also implicated Larry

Thorpe, who was likely incarcerated on December 16, 1980. Ex. 28, Larry Thorpe Criminal

Extract.

Mr. Haughton also began recanting his inculpatory testimony shortly after trial. His April

11, 1985 affidavits detail police coercion,[4] promises of leniency (which he ultimately received),

and the truth of Kaboobie's death. Ex. 11 and Ex. 12. Less than a month later, he wrote to Mr.

Murray's attorney with the same information provided in the affidavits. Ex. 13. These early and

---

[3] Mr. Wesson's description that Detectives Gerrard and Gilbert pre-wrote the inaccurate statement attributed to him and coerced him into signing it is corroborated by the substantial allegations of police misconduct that have emerged accusing Detectives Gerrard and Gilbert—as well as other officers assigned to investigate the Kaboobie murder, Shelton, McNesby, and Lubiejewski—of fabricating evidence and using coercive, inappropriate tactics to secure, often false, witness and suspect statements. *See* Ex. 29, Samantha Melamed, *Losing Conviction,* Phila. Inquirer (last updated Dec. 26, 2021) (a series of articles detailing allegations against PPD officers including Gerrard, Shelton, McNesby, Gilbert, and Lubiejewski). *See also* Ex. 23 at 91-101 for full account of relevant police misconduct allegations.

The accusations discovered during the Inquirer's investigations specifically include coercing confessions and fabricating statements, the very conduct Mr. Haughton and Mr. Wesson accused the investigating officers of engaging in with regard to the Kaboobie murder investigation. The independent press investigation detailing these types of allegations from other cases add weight to Mr. Haughton and Mr. Wesson's accusations and severely limit the reliability and credibility of the testifying officers' trial testimony. In its response to Mr. Murray's Rule 60(b) filing, the DAO agreed that egregious allegations against Det. Gerrard in particular "strengthen[] Haughton and Wesson's accounts of police coercion contained in their recantations." Ex. 24 at 15 n. 4.

[4] Mr. Haughton's description of police coercion, specifically that Detective Gerrard "bullied and insisted that I sign statements naming Bruce Murray and Gregory Holden in this murder" is also supported by the new evidence that Detective Gerrard and the other homicide detectives assigned to this case routinely engaged in such misconduct. *See supra* note 3.

corroborating recantations provide powerful and reliable evidence of Mr. Holden's innocence as

Mr. Haughton and Mr. Wesson had nothing to gain by attempting to reopen their co-defendants'

cases. In particular, Mr. Haughton opened himself up to potential perjury charges as he admitted

to lying on the stand and risked complicating his own chances at early parole.

　　Mr. Wesson and Mr. Haughton's recantations gained reliability over the years as they

never again waivered from their description that the two of them went to Kaboobie's house alone

on December 16, 1980 and that they did not conspire with Mr. Holden or Mr. Murray to rob or

kill Kaboobie. Their testimony in 1991 remained consistent with this version of events. PCHA

N.T. 07/25/91. Both separately testified that Mr. Holden and Mr. Murray were innocent and did

not deviate from these claims under cross-examination. *Id.* at 20-55. They provided

corroborating accounts of the shooting and the police coercion that led them to implicate the

other two defendants. *Id.*

　　The recantations were supported by testimony from Mr. Thomas, Mr. Haughton's former

cellmate, who described Mr. Haughton's anguish at falsely accusing Mr. Holden and Mr. Murray

for a crime they did not commit. *Id.* at 5-9. Further corroboration came from Mr. Strickland's

later letter and affidavit indicating that police attempted to coerce him into falsely implicating

Mr. Murray. Ex. 15 and Ex. 16. Additionally, another person incarcerated with Mr. Haughton,

Mr. Smith, also provided a sworn affidavit explaining that Mr. Haughton had told him that he

had lied on the stand and that Mr. Holden and Mr. Murray were actually innocent. Ex. 17. The

combination of Mr. Wesson and Mr. Haughton's repeated, consistent recantations in writing and

by sworn testimony and the corroboration provided by third parties demonstrate Mr. Holden's

long-proclaimed innocence.

As Mr. Haughton's testimony was the only direct evidence of Mr. Holden's guilt presented at trial, if his recantations are found credible, no reasonable jury could have possibly convicted Mr. Holden of this offense.

**B. The evidence recently discovered in the investigatory homicide file corroborates Mr. Wesson and Mr. Haughton's recantations and Mr. Holden's innocence.**

With all the new evidence in the record, including the suppressed evidence found in the homicide file as well as the corroborating affidavits of Mr. Thomas and Mr. Strickland, Mr. Haughton and Mr. Wesson's recantations have become even more reliable than when they were originally made. As the DAO stressed in its concession as to the credibility of the co-defendants' recantations, "[w]hen the PCRA court considered Haughton and Wesson's recantations in 1991, it did not have the benefit of Strickland's letter, affidavit, polygraph results, or the police material strengthening those things. It also did not have...the information from and about Elliot Burton." Ex. 24 at 15.

These new pieces of evidence support the reliability and truth of Mr. Haughton and Mr. Wesson's recantations in demonstrating the impossibility of the prosecution's theory as presented at trial and the clear dishonesty of Mr. Haughton's trial testimony. Mr. Strickland's early statements to Mr. Randolph, as memorialized by the investigating detectives in Ex. 18 and Ex. 19, make clear that Mr. Strickland saw Mr. Haughton in Kaboobie's house just after Kaboobie was killed and that it was Mr. Haughton rather than Mr. Murray who entered Kaboobie's house with Mr. Wesson and ultimately participated in the shootout that left Kaboobie dead. *Id.* This evidence is completely incompatible with Mr. Haughton's trial testimony that he stayed outside with Mr. Holden while Mr. Murray and Mr. Wesson went inside Kaboobie's house. Similarly, Mr. Strickland's suppressed polygraph report indicates that he was not being

28

honest with the police when he told them he did not know who killed Kaboobie. Ex. 20. The suppressed evidence supports the narrative Mr. Haughton and Mr. Wesson have maintained is true for decades, that they alone killed Kaboobie, that Mr. Strickland saw Mr. Haughton leaving the scene of the crime, and that Mr. Holden and Mr. Murray were not involved.

The suppressed evidence implicating Elliot Burton as a suspect casts additional doubt on the prosecution's trial theory. Mr. Burton was identified as a potential participant in Kaboobie's death when he was seen running from the scene of the crime holding a shotgun. Ex. 21. Not only does this information fill a gaping hole in the story presented at trial—the unexplained absence of the murder weapon—it also raises concerns about the police investigation and the attempt to use Mr. Burton as an informant against Mr. Holden. Mr. Burton's failed attempt to obtain an inculpatory statement from Mr. Holden via police-recorded phone call, Ex. 22, further demonstrates Mr. Holden's innocence and corroborates Mr. Haughton and Mr. Wesson's assertions that Mr. Holden was not involved in the offense.

### C. The limited and flawed inculpatory evidence presented at trial reinforces that a reasonable jury could not convict Mr. Holden.

The jury in this case heard very limited inculpatory evidence against Mr. Holden and the evidence that was presented against him was unreliable. The inadequacies in the originally presented case lend additional support to Mr. Holden's current claim that no reasonable jury could find him guilty beyond a reasonable doubt.

### 1. Douglas Haughton's trial testimony contained numerous inconsistencies.

Even prior to Mr. Haughton's numerous recantations, his testimony at trial was highly flawed and contained numerous inconsistencies. On cross examination, he was unable to credibly explain the differences between his direct examination testimony and his prior police statements and sworn testimony. *See supra* pp. 8-9. Perhaps most crucially as to Mr. Holden's innocence,

Mr. Haughton could not explain why he initially testified at Mr. Murray and Mr. Wesson's joint preliminary hearing that there were no leaders of the plan to rob Kaboobie but then changed his testimony at trial to claim that Mr. Holden led the plan. Trial N.T. 06/01/83 at 295-297. Similarly, while his original statement to police specified that the shotgun came from Mr. Murray's house, Ex. 6, at trial, he testified that it came from Mr. Holden's house. Trial N.T. 06/01/83 at 226-227.

It is understandable that the prosecution and investigators would need Mr. Haughton to directly implicate Mr. Holden in the planning of the robbery and the provision of firearms, as the testimony as to Mr. Holden's participation in the robbery itself was extremely limited: no one testified to actually seeing him during or after the robbery-turned-shooting. *Id.* at 320-321, 382. The unreliability and convenient refashioning of Mr. Haughton's trial testimony to implicate Mr. Holden further supports Mr. Holden's innocence.

### 2. No physical or otherwise competent evidence was presented at trial.

In addition to the untrustworthiness of Mr. Haughton's trial testimony, there was a stark lack of any reliable evidence in the trial record. The jury was provided no physical evidence tying Mr. Holden to the crime or suggesting his presence at Kaboobie's house. Investigators seemingly did not test the shotgun bolt for fingerprints, or if they did, the results were not inculpatory and were not presented at trial. Trial N.T. 05/31/82 at 73. The police found no guns in Mr. Holden's house upon searching it. No guns were shown to the jury at all. Trial N.T. 06/20/83 at 1469. The prosecution did not present testimony from Edward Randolph or the confidential informant(s) who, according to the 1981 warrants to search Mr. Holden's home and arrest him, supposedly provided police with information directly inculpating Mr. Holden. The

dearth of reliable evidence presented at trial is yet another factor demonstrating Mr. Holden's

innocence and the unreasonableness of the jury's verdict.

### D. Mr. Holden's trial presentation of alibi evidence further supports his innocence.

In contrast to the prosecution's failure to provide sufficient inculpatory evidence, Mr.

Holden presented significant, detailed alibi evidence and testified in his own defense. *See supra*

pp. 10-11. Mr. Holden's defense witnesses each corroborated one another's descriptions of Mr.

Holden's whereabouts on December 16, 1980. *Id*. His entire day was accounted for, including

the period during which Kaboobie was killed. *Id*. Mr. Holden's own testimony aligned with his

alibi. *Id.* Considered together, Mr. Holden's credible alibi, supported by three separate witnesses

and his own testimony, and the Commonwealth's lack of reliable inculpatory evidence all

underscore Mr. Holden's innocence and the unreasonableness of the jury's decision to convict.[5]

### III. Based on the same evidence described above, the District Attorney's Office conceded that co-defendant Bruce Murray met the *Schlup* standard for demonstrating actual innocence.

The DAO's response to Mr. Murray's most recent plea for relief demonstrates Mr.

Holden's actual innocence. Mr. Holden and Mr. Murray were tried in a joint trial and the sole

evidence placing them at the scene of Kaboobie's killing was the accomplice testimony of Mr.

Haughton. In light of newly presented evidence, the DAO made the definitive concession that

"the state court's 1991 finding that Haughton and Wesson were not credible" has been overcome

and a District Court reviewing a claim for relief under Rule 60(b) "is not bound by that

---

[5] Although the trial prosecutor went to great lengths to emphasize that Mr. Holden was found hiding from the police upon his arrest, Trial N/T 06/20/83 at 1553, this evidence is far less significant or inculpatory in light of his prior arrest, interrogation, and incarceration on these charges and the numerous, credible reports that the police in question had long histories of abuse and other misconduct, *see supra* note 3.

determination." Ex. 24 at 15-16. Specifically, the DAO found that "it is likely that any reasonable juror would have had a reasonable doubt as to Murray's guilt if they'd had the complete picture now available to the Court." *Id.* at 18.

Although some of the evidence discussed in the DAO's response to Mr. Murray's Rule 60(b) filing was specific to Mr. Murray and the role he was accused of playing in the robbery turned murder, the conclusions reached regarding the unreliability of Mr. Haughton's trial testimony, the only inculpatory evidence presented as to either defendant, unquestionably supports Mr. Holden's actual innocence as strongly as it does Mr. Murray's. Simply put, there is no indication that Mr. Haughton's trial testimony was any more reliable or truthful as to Mr. Holden's supposed involvement. In finding that Mr. Haughton's post-trial recantations were credible, the DAO has acknowledged that the evidence presented against both Mr. Holden and Mr. Murray at trial was so flawed that no reasonable juror could convict them. This acknowledgment alone should entitle Mr. Holden to relief under Rule 60(b)(6). As the DAO already determined that, "Murray has made a showing sufficient to satisfy *Schlup*," *id.* at 18, based on the same factual record and exculpatory evidence that Mr. Holden presents here, there would be no basis for reaching a different conclusion as to Mr. Holden.

**CONCLUSION**

For the foregoing reasons, petitioner Gregory Holden respectfully requests that this Court grant his Motion for Relief from Judgment under Fed. R. Civ. P. 60(b)(6), thereby permitting the Court to reach the merits of any procedurally defaulted claims in his Petition for Writ of Habeas Corpus. Mr. Holden also requests leave to file an Amended Petition for a Writ of Habeas Corpus to present the newly discovered evidence supporting his constitutional claims for further relief.

Respectfully submitted,

_____

Grace Harris (PA ID 328968)
Kairys, Rudovsky, Messing, Feinberg &
    Lin LLP
The Cast Iron Building
718 Arch Street, Suite 501 South
Philadelphia, PA 19106
(215) 925-4400

*Counsel for Petitioner Gregory Holden*

Date: August 15, 2023

# Exhibit 2

**ARMSTRONG TEASDALE LLP**
Michael J. Engle, Esquire (Pa. ID No. 85576)
Ryan Aloysius Smith, Esquire (Pa. ID No. 329246)
2005 Market Street, 29th Floor
One Commerce Square
Philadelphia, PA 19103
mengle@atllp.com
rasmith@atllp.com
T: (267) 780-2000
F: (215) 405-9070

*Counsel for Petitioner*
*Bruce Murray*

---

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **BRUCE MURRAY,**<br>　　　　　**Petitioner,**<br><br>　　**v.**<br><br>**DONALD VAUGHN and THE**<br>**DISTRICT ATTORNEY FOR**<br>**PHILADELPHIA COUNTY,**<br>　　　　　**Respondents.** | **Civil Action**<br>**No. 98-5866** |

---

## COUNSELED AND AMENDED MOTION FOR RELIEF FROM FINAL ORDER AND JUDGMENT PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 60(B)

**TO THE HONORABLE JUDGE ANITA B. BRODY:**

Petitioner Bruce Murray, by and through undersigned counsel, and pursuant to Federal Rule of Civil Procedure 60(b), hereby moves the Court to set aside the final order and judgment denying habeas corpus relief in this matter (ECF No. 27), on the grounds that he has proven his actual innocence and thus satisfied the fundamental miscarriage of justice exception to the procedural bar to this Court's consideration of the merits of the constitutional claims raised in his Petition for Writ of Habeas Corpus. (ECF No. 1). Petitioner also moves this Court to issue an order granting him leave to file an Amended Petition for Writ of Habeas Corpus in light of the new,

reliable evidence of his actual innocence that also supports the constitutional claims raised in his original Petition for Writ of Habeas Corpus. In support of this Motion, Petitioner contemporaneously files and incorporates by reference his Brief in Support of his Counseled and Amended Motion for Relief from Final Order and Judgment Pursuant to Federal Rule of Civil Procedure 60(b) and all exhibits cited therein.

WHEREFORE, Petitioner Bruce Murray respectfully requests that this Honorable Court grant his Counseled and Amended Motion for Relief from Final Order and Judgment Pursuant to Federal Rule of Civil Procedure 60(b), vacate the prior judgment denying Petitioner's Petition for Writ of Habeas Corpus, and issue an order granting him leave to file an Amended Petition for Writ of Habeas Corpus and/or any other relief warranted in the interests of justice.

Respectfully submitted,

Date: November 16, 2022

BY: <u>SIGNATURE CODE: MJE5849</u>
**ARMSTRONG TEASDALE, LLP**
Michael J. Engle (Pa. ID No. 85576)
Ryan Aloysius Smith (Pa. ID No. 329246)
2005 Market Street, 29th Floor
One Commerce Square
Philadelphia, PA 19103
mengle@atllp.com
rasmith@atllp.com
T: (267) 780-2000
F: (215) 405-9070

*Counsel for Petitioner Bruce Murray*

2

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **BRUCE MURRAY,**<br>              **Petitioner,**<br><br>**v.**<br><br>**DONALD VAUGHN and THE**<br>**DISTRICT ATTORNEY FOR**<br>**PHILADELPHIA COUNTY,**<br>              **Respondents.** | **Civil Action**<br>**No. 98-5866** |

## BRIEF IN SUPPORT OF COUNSELED AND AMENDED MOTION FOR RELIEF FROM FINAL ORDER AND JUDGMENT PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 60(B)

**ARMSTRONG TEASDALE LLP**
Michael J. Engle, Esquire (Pa. ID No. 85576)
Ryan Aloysius Smith, Esquire (Pa. ID No. 329246)
2005 Market Street, 29th Floor
One Commerce Square
Philadelphia, PA 19103
mengle@atllp.com
rasmith@atllp.com
T: (267) 780-2000
F: (215) 405-9070

Dated: November 16, 2022                    *Counsel for Petitioner Bruce Murray*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................... viii

PRELIMINARY STATEMENT .......................................................................1

FACTUAL BACKGROUND...........................................................................5

I.   The Three-Person Shootout and Initial Investigation .............................................6

  A.  The Night of the Shooting .........................................................................6

  B.  The Tip: Elliot Burton Fled with the Scene with a Shotgun ...............................8

  C.  Gregory Strickland Listens to His Father and Lies About Seeing Douglas Haughton Inside Kaboobie's House Due to His Reasonable Fear of Retaliation...............................9

  D.  Police Use Burton as a Confidential Informant, Record Gregory Holden Denying Any Involvement in the Shootout, and Obtain a Search Warrant for His House ...................11

  E.  Edward Randolph's Statement and Inconclusive Polygraph Results..............................15

  F.  Detectives Learn Strickland Lied About Not Knowing Who Killed Kaboobie..............18

II.  First Arrest and Preliminary Hearing of Gregory Holden (March 1981–May 1981)...........20

III. Flashback: Bruce Murray Beat Up Douglas Haughton After Haughton Robbed Murray's Girlfriend and Sisters at Gunpoint (Oct. 1980 to Nov. 1980)...............................21

IV.  The Arrest and Cooperation of Douglas Haughton  (Feb. 1982 to Sept. 1982) .................23

V.   The Arrest and Interrogation of Tyrone Wesson (Sept. 11, 1982) ......................................28

VI.  The Arrest and Interrogation of Bruce Murray (Sept. 11, 1982)........................................36

VII. Murray-Wesson Preliminary Hearing (Nov. 4, 1982)...........................................................37

VIII.Second Arrest and Preliminary Hearing of Gregory Holden (Jan. 1983)...........................43

IX.  Detective Gerrard and a Prosecutor Attempt to Coerce Gregory Strickland into Identifying Murray as a Perpetrator (Feb. 9, 1983) ...............................................................46

X.   Motions for Severance (Jan. and May 1983)........................................................................47

XI.  Nondisclosure of Witness Polygraph Results .....................................................................48

i

XII. Wesson's Motion to Suppress His Police Statement (May 1983) ........................................48

XIII. ADA Marano's Racially Discriminatory Use of Peremptory Strikes During Voir Dire ...49

XIV. The Trial (May 1983 – June 1983) ...................................................................................54

    A.  Douglas Haughton's Testimony ................................................................................54

    B.  Bruce Murray's Alibi Evidence ................................................................................57

        1.  Robin Johnson .....................................................................................................57

        2.  David Elliott .........................................................................................................61

        3.  Deborah Frazier ...................................................................................................62

        4.  Bruce Murray .......................................................................................................63

    C.  Tyrone Wesson's Redacted Statement .....................................................................66

    D.  Misleading Stipulation Regarding "An Individual by the Name of Bruce Murray".....69

    E.  Verdict and Sentence ................................................................................................70

XV. Tyrone Wesson's Statements Exculpating Murray at Sentencing (April 1984) .................70

XVI. Douglas Haughton's 1985 Recantations ..........................................................................71

XVII. The 1991 PCHA Hearing ...............................................................................................73

XVIII. Gregory Strickland's Exculpatory Eyewitness Account ................................................75

XIX. Anthony Smith Affidavit .................................................................................................76

XX. Brenda Murray's Unsigned, Unsworn Affidavit ..............................................................77

**STANDARD AND SCOPE OF REVIEW** ..............................................................**80**

**ARGUMENT** ........................................................................................................**83**

I.   Murray's claim rests on new, reliable evidence of his actual innocence. ...........................84

    A.  Gregory Strickland's statements are reliable evidence of Murray's actual innocence. ...85

1.  The newly discovered report from Strickland's polygraph test corroborates that Strickland listed to his father and did not tell the police the entire truth because he feared retaliation from Haughton and Burton. ....................................................86

2.  Strickland's motive for coming forward increases the reliability of his statement ..87

3.  There is little evidence corroborating Strickland's police statements, and the available evidence tends to contradict them. ...........................................................88

4.  Strickland's prior statements contain a crucial internal inconsistency related to Haughton fleeing the scene. ....................................................................................88

5.  Documents and physical evidence corroborate Strickland's statements. .................89

B.  Tyrone Wesson's recantation is reliable evidence of Murray's actual innocence. ..........90

1.  Wesson recanted his statement in open court at the earliest possible opportunities, and he would have exonerated Murray at trial had he not been advised against doing so by counsel. ................................................................................................90

2.  Wesson's prior statement did not even support the prosecution's theory, and his statement is contradicted by documentary evidence strongly suggesting that Larry Thorpe was in custody on the date of the shooting. ........................................91

3.  Homicide detectives did not provide credible testimony regarding the taking of Wesson's statement, and their credibility should be reassessed in light of their histories of misconduct and their misconduct in Murray's case. .............................91

4.  Wesson provided sufficiently credible testimony regarding the circumstances surrounding the taking of his statement, and the homicide detectives did not. ......102

5.  Wesson would not have falsely used Murray's identity to hide from the police if Murray was the other shooter. .............................................................................103

C.  Douglas Haughton's recantation is reliable evidence of Murray's actual innocence. ...103

1.  Haughton recanted against his penal interest. ........................................................103

2.  Haughton had no motive for recanting his testimony other than his own guilt and desire to tell the truth. ..........................................................................................106

3.  Haughton's truthful statements about what happened at Kaboobie's house are wholly consistent with Wesson's statements. ........................................................106

4.  The promptness of Haughton's recantation enhances the reliability of his statements exonerating Murray.....................................................................107

5.  Two of Haughton's companions in prison have given sworn statements corroborating the reliability of Haughton's recantation..........................................107

6.  Haughton's recantation is far more reliable than his prior statements...................107

D.  Wesson's and Haughton's recantations are corroborated by Gregory Strickland and the trail of evidence from the original homicide investigation pointing to Haughton as the second shooter. ...................................................................109

E.  Murray's conviction rests solely on the uncorroborated, since-recanted testimony of a purported accomplice (Douglas Haughton). ...........................................109

1.  Haughton was a career criminal with a history of using aliases to hide his criminal activities.................................................................................112

2.  Haughton had a well-established reputation for being a liar and a thief. ..............113

3.  The prosecution conceded during closing argument that Haughton's testimony hinged on other corroborating evidence, yet no competent evidence corroborated that Murray was at the scene of the crime. ...........................................113

4.  Law enforcement interrogated Haughton off-the-record about his involvement in Kaboobie's death eight days before he gave a formal statement.......................114

5.  Haughton read Edward Randolph's statement before giving any formal statement to the police. .........................................................................114

6.  Haughton falsely accused Murray to avoid a life sentence and to exact revenge against Murray for their prior altercation.................................................115

7.  Gregory Strickland saw Haughton inside Kaboobie's house at the time of the shootout, and Haughton's testimony about Strickland was not credible. ...............118

8.  Physical evidence contradicts Haughton's trial testimony as to the number of shots allegedly fired by Kaboobie and Murray. .................................................123

9.  Haughton gave contradictory testimony regarding whether and when Murray had a gun at the time of the incident, as well as from where Murray obtained the gun...................................................................................124

10. Haughton gave contradictory testimony regarding whether he had a gun at the time of the shootout................................................................................125

11. Haughton stated to police that the shotgun came from Murray's house, but he testified multiple times that the shotgun came from Holden's house. .........125

12. Haughton gave contradictory testimony regarding whether he saw Holden later that night after the shooting. .........................................................126

13. Haughton gave contradictory testimony regarding when the plan to rob Kaboobie was developed. .......................................................................126

14. Haughton gave contradictory testimony regarding who knocked on Kaboobie's front door and whether he saw Kaboobie answer the door.....................................127

15. Haughton gave contradictory testimony regarding which of Wesson's arms Kaboobie shot. ..................................................................................127

16. Haughton's testimony that he saw Wesson with a bandage around his arm at Murray's house following the shootout is not credible. ...........................................128

17. Haughton gave contradictory testimony regarding how much marijuana he smoked before the shooting, and admitted that he lied during Murray and Wesson's preliminary hearing. ...............................................................128

18. Haughton gave inconsistent testimony regarding when he had given Kaboobie the money for marijuana that gave rise to their personal dispute. .........................129

19. Haughton gave inconsistent testimony regarding how much marijuana Kaboobie had at his residence...............................................................130

20. Haughton gave contradictory testimony regarding whether Gregory Holden planned the robbery alone. .....................................................................130

21. Haughton gave inconsistent testimony regarding which of his brothers he visited immediately after the shooting.................................................................131

22. Haughton gave contradictory testimony regarding whether the school building blocked his view of Kaboobie's street. ...............................................................131

23. Haughton's testimony concerning the timeline of the events immediately preceding the shooting is not credible. ...............................................................132

24. As Haughton tried to explain away his contradictory testimony about whether Murray had a gun, the jury was more worried about missing the 76ers 1980 NBA Championship parade.............................................................................................132

II. Bruce Murray is factually innocent because any fully informed juror, acting reasonably, would have reasonable doubt as to his guilt. .......................................................133

   A. The jury's credibility assessments and final verdict deserve little, if any, deference due to the prosecution's racially discriminatory use of peremptory challenges. ...........136

   B. A clear *Bruton* violation casts skepticism on the jury's credibility assessments and the reasonableness of the final verdict. .........................................................137

   C. Probable *Brady* violations further undermine the reliability of the jury's credibility assessments and the reasonableness of the final verdict. ...............................................140

     1. Suppression of handwritten notes and a March 11, 1981 police activity sheet that would have led to admissible exculpatory evidence in the form of Gregory Strickland's trial testimony. ...................................................................................141

     2. Suppression of polygraph results that would have led to admissible exculpatory evidence and impeached Haughton's trial testimony and the police's paltry investigation into whether Strickland saw Haughton inside Kaboobie's house. .....142

     3. Suppression of evidence concerning Elliot Burton, who was Kaboobie's marijuana supplier, the first suspect, and a confidential informant whose role in the investigation was previously unknown. ........................................................148

     4. Suppression of Haughton's motion to suppress his police statement. ....................152

     5. Suppression of notes of testimony from Haughton's preliminary hearing, which the prosecution falsely claimed did not exist. ..............................................153

     6. Belated disclosure of the Form 229 and the HUP records for Tyrone Wesson, who falsely claimed he was "Bruce Murray" when he received treatment for the gunshot wound he suffered during the shootout at Kaboobie's house. ..................153

   D. Prosecutorial misconduct undermines confidence in the verdict. ..................................155

   E. The prosecution offered no evidence to rebut Murray's credible alibi defense, aside from the uncorroborated testimony of a purported accomplice (Haughton).........163

     1. The prosecution could muster only weak arguments to challenge the credibility of Murray's alibi witnesses....................................................................................163

2. Murray testified credibly at trial, corroborating his alibi defense and his prior statement denying any involvement in Kaboobie's death. ....................................165

3. There is no eyewitness evidence proving that Murray was there, and the court-ordered lineup was never held because the police simply canceled it. .........167

4. There is no physical or forensic evidence establishing that Murray was there, and the police may have suppressed fingerprint evidence.....................................172

5. The prosecution offered no individualized motive for Murray's participation in the purported robbery conspiracy. ........................................................................173

F. A preponderance of the evidence shows that any fully informed juror, acting reasonably, would find that Haughton was the third participant in the three-person shootout with Kaboobie and Wesson, which means Murray must be actually innocent. ....................174

**CONCLUSION AND RELIEF REQUESTED** ....................................................................179

# <u>TABLE OF AUTHORITIES</u>

**Cases**                                                           **Page(s)**

*Allen v. Hardy*,
478 U.S. 255 (1986)................................................................................135

*Almeida v. Jeffes*,
566 F. Supp. 852 (E.D. Pa. 1983) ...............................................109–10, 113

*Amrine v. Bowersox*,
238 F.3d 1023 (8th Cir. 2001) ....................................................................80

*Anderson v. City of Bessemer City*,
470 U.S. 564 (1985)....................................................................................84

*Andrews v. Scuilli*,
853 F.3d 690 (3d Cir. 2017).......................................................................168

*Avalos v. United States*,
No. 1:10-cr-134, 2014 WL 12709022 (E.D. Va. Aug. 19, 2014) ................84

*Batson v. Kentucky*,
476 U.S. 79 (1986) ........................................................................... *passim*

*Bousley v. United States*,
523 U.S. 614 (1998)....................................................................................79

*Brady v. Maryland*,
373 U.S. 83 (1963)........................................................................... *passim*

*Bruton v. United States*,
391 U.S. 123 (1968) ......................................................................... *passim*

*Calderon v. Thompson*,
523 U.S. 538 (1998)....................................................................................83

*Commonwealth v. Almeida*,
452 A.2d 512 (Pa. Super. 1982)...............................................109–10, 113

*Commonwealth v. Cheatham*,
239 A.2d 293 (Pa. 1968) ..........................................................................115

*Commonwealth v. Chimel*,
777 A.2d 459 (Pa. Super. 2001).................................................................155

*Commonwealth v. Cox*,
17 A. 227 (Pa. 1889) ............................................................................110–11

*Commonwealth v. Davenport*,
386 A.2d 543 (Pa. Super. 1978)................................................................103

*Commonwealth v. Dinwiddie*,
 601 A.2d 1216 (Pa. 1992) .........................................................................53

*Commonwealth v. Elliott*,
140 A. 537 (Pa. 1928) ..............................................................................109

*Commonwealth v. Harris*,
884 A.2d 920 (Pa. Super. 2005) .............................................................. 112

*Commonwealth v. Hudson*,
414 A.2d 1381 (Pa. 1980) ........................................................................127

*Commonwealth v. Jackson*,
562 A.2d 338 (Pa. Super. 1989)...............................................................52

*Commonwealth v. Johnson*,
437 A.2d 1175 (Pa. 1981) ......................................................................9, 49

*Commonwealth v. Jones*,
247 A.2d 624 (Pa. Super. 1968)..............................................................109

*Commonwealth v. King*,
939 A.2d 877 (Pa. 2007) ..........................................................................103

*Commonwealth v. Lester*,
572 A.2d 694 (Pa. Super. 1990)................................................................96

*Commonwealth v. McCormick*,
519 A.2d 442 (Pa. 1986) ............................................................................49

*Commonwealth v. McKenna*,
213 A.2d 223 (Pa. Super. 1965)...............................................................110

*Commonwealth v. McKnight*,
457 A.2d 931 (Pa. Super. 1983)..................................................88, 170–71

*Commonwealth v. Robinson*,
491 A.2d 107, (Pa. 1985) ..........................................................................115

*Commonwealth v. Rodgers*,
372 A.2d 771 (Pa. 1977) ................................................................163

*Commonwealth v. Turner*,
80 A.2d 708 (Pa. 1951) ..................................................................109

*Commonwealth v. Watts*,
412 A.2d 474 (Pa. 1980) ...............................................8, 86, 149–150

*Commonwealth v. Weaver*,
568 A.2d 1252 (Pa. 1989) ................................................................53

*Commonwealth v. Williams*,
118 A. 617 (Pa. 1922) ................................................................109–10

*Cool v. United States*,
409 U.S. 100 (1972) ........................................................................115

*Dennis v. City of Phila.*,
9 F.4th 279 (2021) ...........................................................................162

*Dennis v. Sec., Pa. Dep't Corr.*,
834 F.3d 263 (3d Cir. 2016) ............................................................140

*Diggs v. Vaughn*,
CIV. A. No. 90-2083, 1990 WL 117986 (E.D. Pa. Aug. 8, 1990) ...............53

*Doe v. Menefee*,
391 F.3d 147 (2d Cir. 2004) ..............................................................84

*Domenech v. City of Phila.*,
No. 06-1325, 2009 WL 1109316 (E.D. Pa. Apr. 13, 2009) .........................99

*Goldblum v. Klem*,
510 F.3d 204 (3d Cir. 2007) ..............................................................81

*Gray v. Maryland*,
523 U.S. 185, 195 (1998) .................................................................137

*Harrison v. Ryan*,
909 F.2d 84 (3d Cir. 1990) ................................................................53

*Harris v. City of Phila.*,
47 F.3d 1311 (3d Cir. 1995) .............................................................170

*Haskins v. Superintendent Greene SCI*,
755 Fed. App'x 184 (3d Cir. 2018)...................................................147

*Houck v. Stickman*,
625 F.3d 88 (3d Cir. 2010)...................................................80–81, 83, 133

*House v. Bell*,
547 U.S. 518 (2006).................................................... *passim*

*Howell v. Superintendent Albion SCI*,
978 F.3d 54 (3d Cir. 2020)................................................... *passim*

*In re Winship*,
397 U.S. 358 (1970)...................................................79

*Johnson v. Folino*,
705 F.3d 117 (3d Cir. 2013)...................................................140

*Johnson v. Superintendent Fayette SCI*,
949 F.3d 791 (3d Cir. 2020)...................................................136–37

*Kyles v. Whitley*,
514 U.S. 419 (1995)................................................... *passim*

*Lambert v. Blackwell*,
134 F.3d 506(3d Cir. 1997)...................................................103

*Matter of Extradition of Contreras*,
800 F. Supp. 1462 (S.D. Texas 1992)...................................................89

*McQuiggin Perkins*,
569 U.S. 383 (2013)...................................................81, 133

*Mendez v. Artuz*,
303 F.3d 411 (2d Cir. 2002)...................................................168

*Miller v. Alabama*,
567 U.S. 460 (2012)...................................................102

*Mooney v. Holohan*,
294 U.S. 103, 112 (1935)...................................................162

*Mosley v. Folino*,
No. 3:14CV468, 2019 WL 626457 (M.D. Pa. Feb. 14, 2019)...................................................170

*Munchinski v. Wilson*,
694 F.3d 308 (3d Cir. 2012)...................................................................81, 83, 133, 141

*On Lee v. United States*,
343 U.S. 747 (1952)...................................................................................................115

*People v. Dawson*,
406 N.E.2d 771 (N.Y. 1980).....................................................................................164

*People v. Fonfrias*,
204 A.D.2d 736 (N.Y. Supr. App. 1994).................................................................105

*Priester v. Vaughn*,
382 F.3d 394 (3d Cir. 2004).....................................................................................137

*Reeves v. Fayette SCI*,
897 F.3d 154 (3d Cir. 2018).............................................................................. *passim*

*Republic of France v. Moghadam*,
617 F. Supp. 777 (N.D. Cal. 1985)..........................................................................107

*Richardson v. Marsh*,
481 U.S. 200  (1987).................................................................................................137

*Satterfield v. Dist. Att'y of Phila.*,
872 F.3d 152 (3d Cir. 2017)................................................................................78–80

*Schlup v. Delo*,
513 U.S. 298 (1995)............................................................................................ *passim*

*Smith v. Holtz*,
210 F.3d 186 (3d Cir. 2000).....................................................................................147

*State v. Silva*,
621 A.2d 17 (N.J. 1993).............................................................................................164

*Stokes v. City of Phila.*,
Civ. Action No. 22-0338, 2022 WL 16578285 (E.D. Pa. Oct. 31, 2022).....................97

*Swain v. Alabama*,
380 U.S. 202 (1965)............................................................................................49, 135

*Tillery v. United States*,
411 F.2d 644 (5th Cir. 1969) ............................................................................ *passim*

*United States v. Agurs*,
427 U.S. 97 (1982)..................................................................................146

*United States v. Alvin*,
30 F. Supp.3d 323 (E.D. Pa. 2014) .............................................147, 151

*United States v. Bagley*,
473 U.S. 667 (1985)................................................................................140

*United States v. Blackwood*,
456 F.2d 526 (2d Cir. 1972)...................................................................115

*United States v. Carthen*,
681 F.3d 94 (2d Cir. 2012)......................................................................106

*United States v. Casoni*,
950 F.2d 893 (3d Cir. 1991)...........................................................115, 146

*United States v. Clark*,
382 F. Supp. 3d 1 (D.D.C. 2019) ...........................................................84

*United States v. Gardner*,
244 F.3d 784 (10th Cir. 2001) ...............................................................110

*United States v. Harris*,
403 U.S. 573 (1971)................................................................................104

*United States v. Harvey*,
547 F.2d 720 (2d Cir. 1976)................................................................... 115

*United States v. Higgs*,
713 F.2d 39 (3d Cir. 1983)......................................................................153

*United States v. Isaac*,
134 F.3d 199 (3d Cir. 1998).............................................................115–16

*United States v. John*,
391 F. Supp. 3d 458 (E.D. Pa. 2019) .....................................................153

*United States v. Johnson*,
816 F.2d 918 (3d Cir. 1987)....................................................................153

*United States v. Jones*,
520 F. Supp. 842 (E.D. Pa. 1981) ..........................................................116

*United States v. King*,
No. 5:10-HC-2009, 2012 WL 4447577 (E.D.N.C. Mar. 1, 2012) ................................................84

*United States v. Ojeda*,
23 F.3d 1473 (8th Cir. 1994) ....................................................................................................111

*United States v. Reyeros*,
537 F.3d 270 (3d Cir. 2008) .....................................................................................................140

*United States v. Richards*,
241 F.3d 335 (3d Cir. 2001) .....................................................................................................137

*United States v. Rojas*,
520 F.3d 876 (8th Cir. 2008) ....................................................................................................106

*United States v. Rosales*,
74 M.J. 702 (A.F.C.C.A. 2015) ................................................................................................116

*United States v. Sanchez*,
40 M.J. 782 (A.F.C.M.R. 1994) ...............................................................................................116

*United States v. Schnanerman*,
150 F.2d 941 (3d Cir. 1945) .....................................................................................................109

*United States v. Williams*,
463 F.2d 393 (10th Cir. 1972) ..................................................................................................110

*Vazquez v. Wilson*,
550 F.3d 270 (3d Cir. 2008) .....................................................................................................137

*Watson v. Commonwealth*,
95 Pa. 418 (1880) .....................................................................................................................110

*Williams v. Folino*,
625 Fed. App'x 150 (3d Cir. 2015) ...........................................................................................137

*Williamson v. United States*,
512 U.S. 594 (1994) ..................................................................................................................114

*Wynn v. United States*,
397 F.2d 62 (D.D.C. 1967) .......................................................................................................116

## PRELIMINARY STATEMENT

For more than forty years, Petitioner Bruce Murray has served a sentence of life without parole for a crime he did not commit. His conviction rests on the uncorroborated testimony of a purported accomplice, Douglas Haughton (alias Bryant Miles), who first recanted in 1985 and confessed that he, and not Murray, was one of the two men who participated in the shootout that resulted in the death of Eric "Kaboobie" DeLegal. Other new, reliable evidence confirms the credible alibi that Murray presented at trial with testimony by himself and three alibi witnesses. Newly discovered evidence obtained from the Philadelphia Police Department's (PPD) homicide file and the files of the Philadelphia District Attorney's Office (DAO) also shows Murray's wrongful conviction resulted from egregious police and prosecutorial misconduct, such as the withholding of material exculpatory and impeachment evidence, the brazenly discriminatory use of peremptory strikes, improper coaching of witnesses, and an overall slovenly investigation into Kaboobie's death.

The most important witness for Murray's actual innocence claim is Gregory "Dap" Strickland, who considered Kaboobie his "friend and childhood mentor." On December 16, 1980, Strickland was present at Kaboobie's house when the shootout occurred, and he has stated under oath that he saw and heard Haughton inside Kaboobie's house at the time of the shootout. He heard Haughton's voice after Kaboobie let Haughton and one other man, Tyrone Wesson, inside the house to purchase marijuana. Kaboobie then went downstairs to the cellar, where he and Strickland had been playing an electronic football game, to retrieve the marijuana and said that Haughton and another man was inside the house. After Kaboobie went upstairs, Strickland heard a loud boom, followed by five or six gunshots and Kaboobie yelling like he was hurt. Strickland went upstairs and saw Kaboobie lying on the floor and bleeding as Haughton and Wesson were leaving the

1

house.

Strickland, who was sixteen years old at the time of his police interviews, listened to his father and did not tell the police the truth about what he witnessed at Kaboobie's house. Strickland also feared retaliation from Haughton, who later admitted to a fellow inmate that he did in fact plot to have Strickland killed, and from Elliot Burton, whom homicide detectives used as a confidential informant to manufacture evidence against Gregory Holden despite having a tip that Burton fled the scene with the shotgun used in Kaboobie's death.[1]

Strickland, out of fear, heeded his father's advice and denied knowing who participated in the shootout; however, he specifically told police that he did not see Murray at Kaboobie's house and cautioned them against relying on false hearsay implicating Murray in the shootout. At a court-ordered lineup in February 1983, PPD Homicide Detective Larry Gerrard and an unidentified Assistant District Attorney (ADA), likely the assigned prosecutor, Robert Marano, tried to pressure Strickland into falsely identifying Murray as one of the participants in the shootout. Strickland refused, reiterating that he did not see Murray at Kaboobie's house. Given the numerous inconsistencies in Haughton's trial testimony and the lack of other evidence implicating Murray in the shootout, Strickland's eyewitness account, standing alone, is sufficient to prove Murray's actual innocence.

But there is more. Tyrone "Scotty" Wesson, who was tried, convicted, and sentenced with Murray, has disavowed the statement attributed to him by Gerrard and other homicide detectives, including Leon Lubiejewski, James McNesby, and William Shelton, all of whom have faced credible allegations of misconduct in other homicide investigations. During suppression

---

[1] Holden was one of Murray's three codefendants, and he has also long maintained his actual innocence.

2

proceedings in May 1983, Wesson admitted that he was involved in the shootout at Kaboobie's house, but he testified that Gerrard, Lubiejewski, and Shelton deceived him into signing a statement that contained false information. During his allocution at sentencing in April 1984, Wesson said he would have testified at trial and exonerated Murray but for their attorneys advising against it. One year later, Haughton recanted his trial testimony and in a sworn affidavit confessed that he and Wesson were the only two men who went inside Kaboobie's house. At a state postconviction hearing in 1991, he and Wesson both reaffirmed their recantations, confessed to their own involvement in the shootout, and testified that Murray is actually innocent.

Physical descriptions from the only other eyewitness also confirm that Murray could not have been one of the two men who fled the house. The eyewitness saw a shorter, slimmer sixteen-year-old male (between 5'3" and 5'6" and 130–150 lbs.) and a taller, heavier nineteen-year-old male (between 5'11" and 6'1" and 185–200 lbs.). Wesson was sixteen years old at the time of the shooting, and less than one year after the shooting he stood only 5'6" tall and weighed only 137 lbs. Since it is undisputed that Wesson was one of the two shooters, he must have been the shorter suspect. Between Haughton and Murray, Haughton more closely matches the description of the taller, heavier male: Haughton was 5'9" tall and weighed 157 lbs. approximately one month before the shootout, while Murray was only 5'4" and 110 lbs. several months after the shootout.

Police documents confirm that the police believed Haughton was one of the two participants in the shootout until he told them otherwise (and even then, the police charged Haughton as one of the shooters). A trail of documentary evidence from the police investigation, including some material evidence that was withheld from Murray until voluntary discovery between the parties, corroborates Haughton's and Wesson's recantations and supports the inescapable conclusion that Haughton was the second participant in the shootout with Kaboobie.

3

Police initially suspected Murray was involved in the shootout based on false hearsay and an unfounded report that on December 17, 1980, "Bruce Murray" had reported he had been shot in the upper right arm on the highway of Tasker Street and 23rd Street. In truth, Kaboobie shot Wesson in the left forearm during the shootout, and afterwards Wesson received treatment at the University of Pennsylvania Hospital and lied and claimed he was "Bruce Murray." This fact is indisputable, and it presumably gave rise to the false rumor that the real Bruce Murray was involved in the shootout.

Now, more than forty years after his arrest, Murray beseeches this Honorable Court to recognize his factual innocence and grant him relief from the final judgment and orders that have long barred the Court from considering the merits of the constitutional errors raised in his 1998 Petition for a Writ of Habeas Corpus. (ECF No. 1). When the new, reliable evidence of Murray's actual innocence is viewed together with the credible alibi evidence that Murray presented at trial in 1983, the preponderance of the evidence establishes that any juror, acting reasonably, would have reasonable doubt about Murray's guilt. Thus, Murray has proven his actual innocence.

Accordingly, for the reasons set forth in this Brief in Support of his Counseled and Amended Motion for Relief from Final Order and Judgment Pursuant to Federal Rule of Civil Procedure 60(b), Murray is entitled to relief on his actual innocence claim, and he respectfully requests that the Court rectify this miscarriage of justice by granting his Counseled and Amended Motion and granting him leave to file an Amended Petition for Writ of Habeas Corpus.

## FACTUAL BACKGROUND

(NOTE: The following narrative includes documents discovered as a result of reviewing the PPD homicide file and the DAO files related to the investigation and prosecution of Bruce Murray, Tyrone Wesson, Gregory Holden, and Douglas Haughton for the death of Eric "Kaboobie" DeLegal. References to documents that, to the best of undersigned counsel's knowledge after a reasonable investigation, contain either newly disclosed information from those files or other new evidence that was unavailable at the time of Murray's trial include the designation "(New Evidence)" after the Exhibit Number and description of the document. References to all other documents are designated solely by the Exhibit Number and a description of the document. In order to minimize this Brief's length, all subsequent citations to an Exhibit omit the description.

References to the joint jury trial transcript are designated "Trial N.T.," followed by the date of the trial proceeding and then the page number. For example, testimony on page 483 from June 2, 1983 is indicated as "Trial N.T. 06/02/83 at 483."

References to the transcript of Bruce Murray and Tyrone Wesson's November 4, 1982 preliminary hearing will be designated as "MW Prelim. N.T.," followed by the hearing date and then the page number. For example, testimony on page 10 is indicated as "M&W Prelim. N.T. 11/04/82 at 10."

References to the transcript of Gregory Holden's preliminary hearing will be designated as "Holden Prelim. N.T.," followed by the date of the hearing and then the page number. For example, testimony on page 10 is indicated as "Holden Prelim. N.T. 01/19/83 at 10." A true and correct copy of the transcript of Holden's preliminary hearing, which includes handwritten notes and was obtained from the DAO files, is appended hereto as Exhibit 61.

References to the transcript of Tyrone Wesson's suppression hearing will be designated as "Wesson MTS N.T.," followed by the date of proceeding and then the page number. For example, testimony on page 161 from May 18, 1983 is indicated as "Wesson MTS N.T. 05/18/83 at 161."

References to the January 20, 1980 hearing on Bruce Murray's motion for severance are designated as "First Severance N.T.," followed by the date of the hearing and then the page number. For example, information on page 10 is indicated as "Severance N.T. 01/20/83 at 10."

References to the May 18, 1983 pretrial hearing are designated "Pretrial Hr'g N.T.," followed by the date of the hearing and then the page number. For example, information on page 5 is indicated as "Pretrial Hr'g N.T. 05/18/83 at 5."

References to the April 23, 1984 sentencing hearing transcript are designated "Sentencing N.T.," followed by the date of the hearing and then the page number. For example, testimony on page 16 is indicated as "Sentencing N.T. 04/23/84 at 16."

References to the transcript of the Bruce Murray and Gregory Holden's joint evidentiary hearing on their petitions under the Post-Conviction Hearing Act will be designated as "PCHA N.T.," followed by the date of the hearing and then the page number. For example, testimony on page 15 is indicated as "PCHA N.T. 7/25/91 at 152.").

## I.   **The Three-Person Shootout and Initial Investigation**

This case arises from a shooting that occurred in the Graduate Hospital neighborhood of Philadelphia on December 16, 1980, at 5:47 p.m. (Ex. 1, PPD Mobile Crime Detection Service Report (12/17/80)). The decedent, Kaboobie, was found inside his house at 2414 Montrose Street between 24th and 25th Streets. He was taken to Graduate Hospital where he was pronounced dead at 6:40 p.m. (Trial N.T. 5/31/83 at 51). The cause of death, initially determined to be the six gunshot wounds of the trunk, (Ex. 2, Postmortem Report (12/17/80)), was later opined to be one shotgun blast and five gunshot wounds of the trunk. (Trial N.T. 05/31/83 at 98, 107–10).

### A. **The Night of the Shooting**

On December 16, 1980, PPD Officer Daniel Kleinkurt received a radio call at around 5:45 p.m. regarding a report of a shooting at 2414 Montrose Street. (Trial N.T. 05/31/83 at 36–37). A man named George "Reds" Young, who had reported the shooting, met Kleinkurt at the door of the residence and told him that a male inside had been shot. (*Id.* at 38). Kleinkurt entered the residence and observed Kaboobie lying on his side in the fetal position in a large pool of blood. (*Id.*). Kleinkurt did not search the residence for any weapons. (*Id.* at 41–42).

Officers Stephen Freels and Timothy Fitzgerald arrived at 2414 Montrose Street in an ambulance with a stretcher shortly thereafter. (*Id.* at 49–51). They put Kaboobie, who was still conscious but unable to communicate with the officers, onto the stretcher and brought him to the ambulance. (*Id.*). While inside, Fitzgerald observed that it was dark outside and that there was no light in the living room. (*Id.* at 53–54). He also recovered a small manila envelope containing suspected marijuana from one of Kaboobie's pockets. (*Id.* at 52). Fitzgerald and Freels did not search for any weapons or drugs; they were inside the residence for "at most, two minutes." (*Id.*). The officers took Kaboobie to Graduate Hospital, where he was pronounced dead at approximately 6:40 p.m.. (*Id.* at 51). Dr. Silvio Rodriguez removed from Kaboobie's body what police described

as a .25-caliber projectile, which was given to Officer Freels and placed on a property receipt. (Ex. 3, Property Receipt No. 810496).

Officer Lyle Sprague, a member of the Mobile Crime Detection Unit, arrived at 2414 Montrose Street at approximately 6:30 p.m. (*Id.* at 60–61). He searched the entire residence except for the cellar. (*Id.* at 78–79). Officer Sprague observed no damage to the furniture or walls of the residence. (*Id.* at 71). He searched the second floor and recovered approximately 3.5 pounds marijuana and drug paraphernalia from the middle bedroom. (*Id.* at 73–74; Ex. 4, Property Receipt No. 810984; Ex. 5, PPD Homicide Record (12/17/80)). There were a couple sandwich bags containing marijuana laying on the bureau, and some were inside a drawer. (Trial N.T. 05/31/83 at 74–75). None of these items were concealed. (*Id.* at 75). Marijuana was not recovered from any other room in the residence. (*Id.* at 74, 79).

Officer Sprague recovered a bolt from a 20-guage shotgun, a 20-guage spent shotgun shell, and wadding from a shotgun shell, all located within about two-to-three feet away from the pool of Kaboobie's blood. (*Id.* at 63–65, 72–73). Officer Sprague did not know whether the shotgun bolt was tested for fingerprints or whether detectives asked for the bolt to be tested for fingerprints. (*Id.* at 73).[2] The only other evidence recovered from the scene was a size-38 brown suede coat that was lying in the blood on the living room floor. (*Id.*) The police never recovered any firearms in connection with the shooting reported at 2414 Montrose Street.

That evening, Young told police that he was walking westward on Montrose Street when he heard "one, very loud" shot. (Ex. 7, George Young Stmt. (12/16/80)). He then saw two black males flee Kaboobie's house. (*Id.*). He described the one male as "approx. 18yrs., 5'3" to 5'6",

---

[2] However, police paperwork suggests that the police may have obtained fingerprint evidence during their investigation. (Ex. 6, PPD Homicide Case Summary). If any fingerprint evidence was recovered from the scene, it was never disclosed to Mr. Murray's trial counsel.

130 to 150 lbs., wearing a brown ski cap, brown pants, light brown jacket," with no further description. (Ex. 5). He described the other male as "approx. 19yrs., 5'11" to 6'1, 185 to 200 lbs., wearing a blue ski cap, brown pants." (*Id.*).

Importantly, Young was later polygraphed and described the shorter male as approximately 16 years old and 5'6" tall. (Ex. 8, George Young Polygraph Report (12/16/80) (<u>New Evidence</u>)). Young gave no further description of the males. (Ex. 7). He also told police that he "didn't see anything in their hands." (*Id.*). Young then went inside the residence and observed Kaboobie injured and lying in a pool of blood. (*Id.*). He called 911 and reported the shooting, and he stayed at the scene until after the first responders arrived on the scene. (Trial N.T. 05/31/83 at 41). Young never mentioned Gregory Strickland, "the boy in the cellar" of Kaboobie's house who witnessed the shooting. (Ex. 9, Douglas Haughton Police Stmt. (03/4/82)).[3]

**B. The Tip: Elliot Burton Fled with the Scene with a Shotgun**

On December 22, 1980, the police learned that Elliot Burton had told former ADA Frank DeSimone that a sixteen-year-old black male named Gregory Strickland was present inside Kaboobie's residence at the time of the shooting. (Ex. 13, PPD Handwritten Notes (12/22/80) (<u>New Evidence</u>); Ex. 14, PPD Activity Sheet (01/06/81) (<u>New Evidence</u>)).[4] DeSimone passed this

---

[3]    Gregory "Dap" Strickland was a 16-year-old boy and Kaboobie's friend. (Ex. 10, Gregory Strickland Police Stmt. (01/06/81)). Haughton, who confessed to falsely accusing Murray and admitted that he and Tyrone "Scotty" Wesson were the only men who went inside the house, (FB Sections XVI, XVII), acknowledged that Strickland was "the boy in the cellar" of Kaboobie's house at the time of the shooting, (Ex. 9). Strickland also told police that he was in the cellar of Kaboobie's house at the time of the shooting, (Ex. 10), and he has admitted that he saw Haughton—and not Murray—inside the house, (Ex. 11, Gregory Strickland Aff. (07/20/11) (<u>New Evidence</u>)); Ex. 12, Ltr. from Gregory Strickland to Centurion Ministries (12/01/00) (<u>New Evidence</u>)).

[4]    Elliot Burton was a member of the Twentieth and Carpenter Street Gang, which was a violent criminal organization located in the same neighborhood as Kaboobie's house. *See Commonwealth v. Watts*, 412 A.2d 474, 475 (Pa. 1980). Before the shootout on December 16, 1980, Burton was the "key prosecution witness" in a homicide case against two other members

information to then-ADA Joe Murray, who then shared it with the homicide detectives investigating Kaboobie's death. (Ex. 14). Detective Albert Lory, who was the lead detective assigned to the DeLegal homicide investigation, contacted DeSimone and "[q]uestioned [him] relative to Burton's whereabouts." (*Id.*). However, "DeSimone stated he had received a phone call from Burton and has no idea how to contact him." (*Id.*).

Crucially, sometime before January 5, 1981, homicide detectives received a tip from a man named John Howard, who told them that he saw Elliot Burton flee Kaboobie's residence carrying a shotgun, get into a 1977/1978 Buick, and drive away. (*Id.*). Howard left a phone number and requested that police not come to his home. (*Id.*). Police attempted to call Howard, but the number was disconnected. (*Id.*). Police also went to Howard's residence and surveyed the neighborhood, but everyone denied knowing Howard. (*Id.*).

## C. Gregory Strickland Listens to His Father and Lies About Seeing Douglas Haughton Inside Kaboobie's House Due to His Reasonable Fear of Retaliation.

Based on the information provided by Burton, on January 6, 1981, Detective Lory and another detective went to Strickland's house and asked him for an interview regarding Kaboobie's death. (Ex. 15, PPD Activity Sheet (01/06/81) (New Evidence)).  Strickland went with his father and the detectives to the Police Administration Building (also known as the "Roundhouse") and gave a statement to Detective Lory in which he admitted to being present during the shooting. (Ex. 10; Ex. 15). Strickland told police that he went over to Kaboobie's house "like twice a week," and that on December 16, 1980, he went to Kaboobie's house to play "an electronic football game" in the basement. (Ex. 10). Around fifteen minutes later, Kaboobie's doorbell rang, and Kaboobie went upstairs and answered the front door. (*Id.*).

---

of the Twentieth and Carpenter Street Gang. *See id.*; *Commonwealth v. Johnson*, 437 A.2d 1175, 1177 n.3 (Pa. 1981).

Strickland then heard "loud footsteps on the floor in the living room," followed by "a real boom and then like 5–6 smaller sounding shots." (*Id.*). He heard Kaboobie "yell like he was hurt." (*Id.*). Strickland then "heard what sounded like someone running up the steps to the second floor," followed by "someone run[ning] down those same steps to the first floor." (*Id.*). Strickland said that he did not know how many people were upstairs when Kaboobie answered the door but that "it sounded like more than one." (*Id.*). Strickland claimed that "they ran outside" while he was in the basement, and that he "waited down in the basement for about 12 minutes" before going upstairs, where he observed Kaboobie "lying on the living room floor" and "bleeding from his stomach." (*Id.*). Strickland claimed that "Reds" (George Young) was inside the house trying to help Kaboobie, and that Young "told [him] to go call the ambulance." (*Id.*). Strickland told police he "went to [his] house and did that." (*Id.*). Strickland denied seeing anyone inside the residence at the time of the shooting. (*Id.*).

Detective Lory specifically asked Strickland: "After the shooting, when the person/s left the house, did you hear a car drive away?" (*Id.*). Strickland replied, "Not that I remember." (*Id.*). Detective Lory then asked whether Strickland "knew where Elliott Burton live[d.]" (*Id.*). Strickland said he did not know. (*Id.*).

Strickland also stated that a few days after the shooting, Burton approached Strickland and told him that he knew Strickland was in Kaboobie's cellar at the time of the shooting, and that he should tell police what he knew. (*Id.*; Ex. 15). Burton approached Strickland again a few days later and told him that if Strickland did not voluntarily go and tell the police what he knew, then Burton would tell police that Strickland was there. (Ex. 10; Ex. 15).  Strickland did not listen to Burton, which led Burton to contact the DAO through DeSimone. (Ex. 14). Strickland also told Detective Lory about two incidents of likely witness tampering:

- Strickland told them that a couple days after the shooting, a man wearing a tan wool hat pulled over his face followed him on the street. Each time Strickland turned around, the man would duck behind a car or building.

- On December 22, 1980, Strickland was at school when his friends told him that there were men waiting outside for him. He waited inside the school building until his mother arrived, and by that time the men had left.

(Ex. 10).[5] The police attempted to have Strickland take a polygraph test "to determine the truth and honesty of his statement but his father refused to allow him to take the test." (Ex. 15). As Strickland later stated, his father had advised him not to tell the police the truth about what he had witnessed at Kaboobie's house. (Ex. 11).

### D. Police Use Burton as a Confidential Informant, Record Gregory Holden Denying Any Involvement in the Shootout, and Obtain a Search Warrant for His House

On February 25, 1981, the police applied for and obtained a search warrant for Gregory Holden's residence, Philadelphia based on information shared by Alcohol, Tobacco, and Firearm (ATF) and allegedly obtained from two confidential informants. (Ex. 17, Search Warrant & Probable Cause Aff. (02/25/81) (New Evidence) (the "Feb. 25, 1981 Search Warrant")). According to the Feb. 25, 1981 Search Warrant, sometime during the week of February 2, 1981, one of the informants (Confidential Informant #1) spoke with Holden, who allegedly told Confidential Informant #1 that he was in possession of a bolt-action sawed-off shotgun that was used in the robbery and killing of Kaboobie. (*Id.*). Holden allegedly said the homicide was committed by "Bruce," whom police "believed to be Bruce Murray," Douglas Horton (aka Haughton),[6] and

---

[5] Strickland corroborated this account in a sworn affidavit dated July 20, 2011, (Ex. 11), and a letter date-stamped "Dec 01, 2000," (Ex. 12). Anthony "Blue" Smith, a friend of Haughton during their time together at State Correctional Institution (SCI) Camp Hill, told Strickland that Haughton had attempted to kill him because he saw Haughton inside Kaboobie's house at the time of the shootout. (Ex. 11; Ex. 16, Anthony Smith Aff. (06/19/11) (New Evidence)).

[6] Haughton had a history of using aliases in order to hide his criminal activities. (Trial N.T. 06/02/1983 at 420–23). Some of these aliases included Douglas Horton, Bryant Miles, and William Douglas. (Ex. 18, Bryant Miles Criminal Record Extract).

"another male." (*Id.*). Holden went on to say that during the robbery, Kaboobie pulled out a .32-caliber revolver with tape on the butt and fired the weapon striking Bruce in the upper arm. (*Id.*). Holden also purportedly told the informant that the bolt from the shotgun fell off and remained at Kaboobie's residence, and that a young black male witnessed the murder, picked up Kaboobie's .32-caliber revolver, and fled with it after the perpetrators had already run away. (*Id.*).

The exact identity of Confidential Informant #1 is unknown; however, sometime before Gregory Holden's arrest on March 20, 1981, the police used Elliot Burton as a confidential informant and recorded a phone conversation between him and Holden in which Burton asked leading questions about the shootout at Kaboobie's house. (Ex. 19, Audio Recording Labeled "Recording of Phone Conversation, Elliot – Gregory Holden," Side B at 00:00–04:53 (<u>New Evidence</u>)).[7] Upon information and belief, Holden did not know the conversation was recorded. The police recorded the entire conversation between Burton and Holden, though some is inaudible:

| | |
|---|---|
| Burton: | Hey man, I was just talking to Larry. You know what he told me now? |
| Holden: | Huh? |
| Burton: | I said I was just talking to Larry. You know what he told me now? |
| Holden: | What? |
| Burton: | He said you took 'em up there. He was in the hospital. |
| Holden: | He said I took him up there? |
| Burton: | Yeah. He said he was in the hospital and he didn't know nothing about it and he got home and you told him that Eric got killed. |
| Holden: | [Inaudible: Seems to be asking what Larry told Burton] |

---

[7]   On June 14, 2022, a paralegal who coordinated with Petitioner's representatives in the review of the DAO and PPD files provided written confirmation in an email that the recording was entitled "recording of phone conversation, elliot – gregory holden." Counsel does not know why the audio files on the CD include a compilation of music by Stevie Wonder and Teddy Pendergrass, but this fact certainly raises more questions than answers.

Burton:     I don't know. I know he was whispering kind of low when he told me that.

Holden:     Fuck this.

Burton:     He said that uh, that Bruce and Scottie was supposed to get even and that you was in it. And that it never got to that and they told him that they had blast him when they got in there.

Holden:     And he says that I was there?

Burton:     He said you was outside.

Holden:     There ain't no god in hell [inaudible] I ain't do this one.

Burton:     I'm gonna tell you. He trying to pass it to you.

Holden:     Huh?

Burton:     He trying to pass it you now, he's trying to blame it on you. He said one of them got shot?

Holden:     Huh?

Burton:     One of them got shot?

Holden:     Who got shot?

Burton:     Bruce one of them?

Holden:     I'm not sure. I don't know. They ain't never tell me [inaudible]. I ain't never know one of them got shot.

Burton:     You said that uh, what, Bruce had a um a sawed-off shotgun or some shit. Bolt action?

Holden:     Yeah?

Burton:     And that Scottie had a [inaudible] or something. Larry said that you told him.

Holden:     That I told him?

Burton:     What'd they tell you?

13

| Holden: | What'd they tell me? |
|---|---|
| Burton: | Yeah. |
| Holden: | They told me they went up to the jamb, and they said uh this is what they said: They said they ain't go do the killing. That's what they told me. |
| Burton: | But they never said Larry sent them? |
| Holden: | Nah. They didn't say, all they was worried about was that he got killed. |
| Burton: | They both shot him? |
| Holden: | Yup. They were saying that uh if he uh if they was gonna bang him, he was gonna bust them. He was jammed and didn't [inaudible]. They told me they didn't go up there to kill him. They wanted some money. But somebody had to tell 'em about it, but. |
| Burton: | Yeah somebody sent 'em up there. |
| Holden: | You know what I'm saying? Someone told 'em. But you know, after they told me that happened, they had no more rap. They had no nothing to say. They was just fucked up because he made them kill 'em. |
| Burton: | Larry gonna be there in morning? |
| Holden: | Yeah he gonna be here. |
| Burton: | I'm gonna call at about 12:00 o'clock, alright? |
| Holden: | Alright. |

(*Id.*). After the phone hung up, someone redials the phone, and the following conversation took place between, upon information and belief, Burton and a police officer:

| Police: | Go ahead. |
|---|---|
| Burton: | You hung up? |
| Police: | Yeah I hung and made sure it wasn't… [trails off] |
| Police: | Yeah, hold on a minute I'm going to rewind it. |

Crucially, the police did not know for certain whether Bruce Murray was the "Bruce" who Burton claimed had been shot in the arm. Instead, the police simply "believed" that this person was Bruce Murray. (Ex. 17). To corroborate this hunch, the police relied on an undisclosed report by a man identifying himself as "Bruce Murray" who told police on or about December 17, 1980 that he had been shot in the upper right arm on the highway of Tasker Street and 23rd Street. (*Id.*).

Neither the DAO files nor the PPD homicide file contained the December 17th police report. Nor did either contain any other reference to the report. The only mention of the December 17th police report is in the Feb. 25, 1981 Search Warrant. As discussed further below, Tyrone Wesson, who is Bruce Murray's first cousin, was shot in the left forearm by Kaboobie on December 16, 1980, and within two hours received treatment at the Hospital of the University of Pennsylvania (HUP)—but lied about his identity and claimed to be "Bruce Murray." (FB Section XIV.D).

The Feb. 25, 1981 Search Warrant also contained uncorroborated allegations from a second confidential informant (Confidential Informant #2) that Holden's house was used as a weapons depository for a local gang, and that Murray was a member of that gang. (*Id.*). Like the December 17th police report, neither the DAO Files nor the homicide files contained any other paperwork or evidence suggesting that Murray was gang affiliated. Upon information and belief, at some point in late February or early March of 1981,[8] the police executed the Feb. 25, 1981 Search Warrant and did not seize any firearms.

### E. Edward Randolph's Statement and Inconclusive Polygraph Results

On March 11, 1981, Detective James McNesby and another detective brought Edward Randolph (aka Edward Randall) to the Roundhouse for an interview about an unrelated

---

[8]   In his March 20, 1981 statement to the police, Holden indicated that he had been served the search warrant a few weeks earlier. (Ex. 32, Gregory Holden Stmt. (03/20/81)).

investigation into the shooting death of Lamar Reddick. (Ex. 20, PPD Activity Sheet (03/11/81) (New Evidence)).  At around 11:15 a.m. Randolph gave a statement in connection with that Reddick homicide investigation, which implicated a man named Larry Thorpe. (Ex. 21, Edward Randolph Stmt. on Lamar Reddick Murder (03/11/81)). During his interview with homicide detectives, Randolph disclosed that he had information related to Kaboobie's death and said that "Larry was supposed to be the mastermind." (Ex. 21).

Homicide detectives recorded two separate interview statements and a polygraph statement by Randolph in connection with Kaboobie's death. (Ex. 22, Edward Randolph First Stmt. on Kaboobie's Death (03/11/81); Ex. 23, Edward Randolph Second Stmt. on Kaboobie's Death (03/11/81); Ex. 24, Edward Randolph Polygraph Stmt. (03/11/81)). In his first interview statement regarding Kaboobie's death, which was recorded by Detective McNesby, Randolph said that the day after Kaboobie was killed, Gregory Holden told him what happened to Kaboobie. (Ex. 22).[9] According to Randolph, Holden told him the following:

- Larry Thorpe, an uncharged alleged accomplice, developed a plan to rob Kaboobie's residence for marijuana, money, and jewelry.

- Thorpe and Holden waited outside in the schoolyard across the street from Kaboobie's residence, while "Bruce and Scotty" went to Kaboobie's house.

- Bruce rang the doorbell, Kaboobie answered the door, and Bruce asked to buy an ounce of marijuana.

- Kaboobie allowed Bruce into the house, but "as [Kaboobie] was shutting the door, Scotty ran up on the steps and tapped on the window. Boob opened the door back up and Scotty stuck a shotgun in his face and told 'Boob' to get back in the house because this was it."

- Kaboobie then "backed up and tried to grab his gun which was in his pants. That's when Boob got shot in the chest with a shotgun by Scotty."

---

[9] This statement lacks a timestamp, (Ex. 22), but it is expressly referenced in Randolph's second interview statement, which confirms the chronological order of the statements. (Ex. 23).

16

- Bruce shot Kaboobie twice in the back while Kaboobie laid on the floor.

- Once Holden and Thorpe heard the gunshots, they left the area.

Critically, Randolph also told police that Gregory Strickland told him on the following Sunday that he was in the cellar at Kaboobie's house at the time of the shooting and that he saw someone run downstairs from the second floor. (*Id.*). According to Randolph,

> Gregory Strickland told me the following Sunday that he was in the cellar [of] Kaboob's house and all he heard was shooting. He hid behind a curtain in the cellar which Kaboob used to separate his bed from the rest of the cellar. Gregory said he started up the steps and see Kaboob laying on the floor. That is when some old lady came down from the second floor and ran outside. They never saw him but **Gregory [Strickland] saw the guy who ran down the stairs. Greg [Holden] told me the person who ran down the steps was Douglas Haughton**.

(*Id.*) (emphasis added). Crucially, however, omitted from Randolph's first statement was the fact that Holden *and* Strickland, separately, told Randolph that Strickland had seen "Douglas Haughton run down the steps." (Ex. 25, PPD Handwritten Notes (New Evidence); Ex. 20).

Between 4:30 p.m. and 5:55 p.m., Randolph took a polygraph test, and in his polygraph statement, Randolph represented as follows:

> Kaboobie got killed on Tues. 12-16 & the next day I called [illegible] Ginene [*sic*] El & I asked her did they have any reefer & she asked did Kaboobie die. I told her I didn't know. I asked her was Gregory there and she put Gregory Holden on the line. Gregory told me Scotty & Bruce [illegible] Kaboobie & he said Scotty had a shotgun & Brucie had a .38 pistol. When Scotty announced the holdup Kaboobie tried to reach for his gun and Scotty shot him in the chest. While he was laying on the floor Bruce was supposed to have shot him in the back with his pistol. That's when they ran out of the house. Larry & Greg were waiting in the Pierce school yard for them. He said Larry set it up but I believe both them set it up.

(Ex. 24). The polygraph report reflects that Randolph answered "Yes" to the following questions, and the results were "inconclusive":

```
RESULTS OF EXAMINATION
                    Lt. Woody, Homicide, was notified that the Subject
                    was asked the following questions and the results were
              INCONCLUSIVE:
1- Did Holden tell you he was involved in the killing of Kaboobie?          Yes
2- Have you now told the entire truth as to your knowledge
   of Kaboobie's death?                                                     Yes
3- Did Holden tell you that Bruce and Scotty killed Kaboobie?               Yes
```

(Ex. 26, Edward Randolph Polygraph Report (03/11/81) (New Evidence)). Randolph gave his
second interview statement at 6:05 p.m. and stated, in pertinent part, as follows:

> Greg said: "We went around Boob's to take him off (slang for rob him) and Bruce
> and Scotty went in the house wound up having a shootout with Boob." He said he
> & Larry waited in the schoolyard across the street for them and when he & Larry
> heard the shooting, they left. Everything else I said in the other statement is what
> Greg Holden told me what happened.

(Ex. 23). Randolph was also shown photographs of Bruce Murray, Gregory Holden, Larry Thorpe,
and Douglas Haughton. He identified each individual and confirmed that they were the four men
whom he implicated in the DeLegal's death (*Id.*). Sometime after Randolph's second interview,
homicide detectives notified ADA Murray about Randolph's statements and the inconclusive
polygraph results. (Ex. 20). They also specifically notified ADA Murray that Gregory Strickland
was in the house at the time of the shooting and saw Haughton run down the steps: "ADA Murray
was given a rundown of the interview and said that before we get a warrant out for Holden we
should try to get Strickland again and confront him with what Randolph told us. If Strickland opens
up we could then get a warrant for both Haughton and Holden." (*Id.*).

## F. Detectives Learn Strickland Lied About Not Knowing Who Killed Kaboobie

On March 13, 1981, homicide detectives reinterviewed Strickland and renewed their
request that Strickland take a polygraph test, and this time both he and his father consented. (Ex.
27, Gregory Strickland Police Stmt. (03/13/81); Ex. 28, Strickland Polygraph Report (03/13/81)

(New Evidence)). He took the polygraph test from 5:12 p.m. until 7:49 p.m. (*Id.*). During the test, Strickland was specifically asked to identify the person that he saw run down the stairs:



(*Id.*).

The polygraph examination was interrupted at 7:00 p.m., when Detective Lory "re-interviewed" Strickland and asked about what Randolph had told police. (Ex. 27). Strickland expressly denied "tell[ing] Randolph that [Strickland] saw Haughton run out of Kaboobie's house just after [Kaboobie] was shot[.]" (*Id.*). When asked why Randolph would lie and tell police this, Strickland answered: "I don't know." (*Id.*). Strickland was also shown a photo array and was able to identify Haughton but not Murray. (*Id.*). He told police he had never heard of Bruce Murray before, and he cautioned the police against relying on hearsay that implicated Murray. (*Id.*).

The examiner specifically reported "DECEPTION INDICATED" based on Strickland's

responses to the following questions and ultimately concluded that Strickland was "[l]ying":



```
RESULTS OF EXAMINATION  Capt. Demski and Sgt. Rosenstein notified that subject
exhibited DECEPTION INDICATED when asked the following questions:

Do you know for sure who shot "Kaboobie"?        (No)

Did you see anyone shot "Kaboobie" ?             (No)

Right now can you take me to the Gun used to kill "Kaboobie"? (No)

Did Elliot tell you Bruce & Scot shot "Kaboobie" ?  (Yes)
```

(Ex. 28). In essence, the police had obtained evidence that Strickland most likely knew who killed Kaboobie and what Burton did with the shotgun. Nearly twenty years later, Strickland confirmed he always knew who killed Kaboobie: Douglas Haughton and not Bruce Murray. (Ex. 11, 12).

## II.   First Arrest and Preliminary Hearing of Gregory Holden (March 1981–May 1981)

On March 17, 1980, police obtained a warrant for Holden's arrest based solely on Randolph's statement. (Ex. 29, Probable Cause Aff. for Arrest Warrant for Gregory Holden (New Evidence)). The next day police issued an alert about the warrant and claimed that Holden conspired with four other black males. (Ex. 30, NCIC Alert (03/19/81) (New Evidence)). Two days later, police arrested Holden. (Ex. 31, Return of Arrest Warrant for Gregory Holden (03/20/81)).

Following his arrest, Holden gave a statement to police. (Ex. 32, Gregory Holden Stmt. (03/20/81)). He denied having any involvement in Kaboobie's death and stated that he was with his girlfriend, Janine El, at 2125 Montrose Street on the night of the shootout. (*Id.*) Holden also denied knowing about the shootout until he received the search warrant. (*Id.*). He was shown pictures of Murray, Haughton, and Kaboobie, and he denied knowing them. (*Id.*). Holden also took

a polygraph test and was specifically asked the following questions:



(Ex. 33, Gregory Holden Polygraph Report (03/20/81)). The examiner detected deception. (*Id.*).

The Commonwealth prosecuted Holden for murder, robbery, criminal conspiracy, and weapons offenses in connection with Kaboobie's death. Holden was not accused of being one of the participants in the shootout. (Ex. 34, Crim. Compl. Against Gregory Holden (03/17/81)). His preliminary hearing was initially scheduled for March 25, 1981, and the sole prosecution witness—Randolph—received a court subpoena in the mail ordering his attendance. (Ex. 35, Edward Randolph Receipt of Subpoena (New Evidence)). Michelle Randolph signed and returned the receipt of subpoena on Edward Randolph's behalf. (*Id*). On May 13, 1981, however, the charges against Holden were dismissed because Randolph refused to testify at Holden's preliminary hearing. (Trial N.T. 06/17/83 at 1260–63).

## III. Flashback: Bruce Murray Beat Up Douglas Haughton After Haughton Robbed Murray's Girlfriend and Sisters at Gunpoint (Oct. 1980 to Nov. 1980)

In the fall of 1980, starting around late October, Douglas Haughton visited Murray's house at times, though never to see Murray. (Trial N.T. 06/16/83 at 887-A to 888, 955). Rather, he would usually ask Murray's sisters or girlfriend, Robin Johnson, for something to eat since Haughton was transient and did not have a permanent home or stream of income. (*Id.*). However, Haughton stopped visiting because sometime around Thanksgiving in 1980 Haughton robbed Johnson and

Murray's sisters at gunpoint. (*Id.*). Bruce Murray was not home at the time of the robbery. (*Id.*).

On the night of the robbery, Haughton knocked on the door, and Barbara Murray answered the door and let him inside. (*Id.*). As she, Haughton, Johnson, and Brenda Murray went upstairs, Haughton pulled a gun out and ordered the women to lay on the floor and empty their purses. (*Id.*). The women obeyed, and Haughton took everything they had. (*Id.*). Haughton then pulled the trigger, laughed because the gun was not loaded, and left. (*Id.*). The women told Bruce Murray about the incident when he returned home later that night. (*Id.*). They did not report the incident to the police because they knew their money would never be returned nor repaid, and they were skeptical of whether the police would be able to provide them proper assistance. (*Id.* at 893, 965).[10]

A couple weeks later, but before the night of Kaboobie's death, Murray was walking with his stepbrother, John Lott, near the intersection of 20th Street and Federal Street when they encountered Haughton. (*Id.* at 954–55, 966–68). Murray had not been actively seeking out Haughton, but he confronted Haughton about the robbery: "[Haughton] started getting really boasty with me, smart. I asked him could I talk to him. So we walked to Annin Street, and from there I asked him what happened. He told me he didn't want to replace nothing that he took, so I just took it up into my own fashion." (*Id.* at 966–68). Murray and Haughton then immediately began to argue and fight, and within seconds Murray's stepbrother joined the fray to help him. (*Id.* at 970–75). The entire fight lasted for about fifteen minutes and involved Murray and Lott both

---

[10] "Research consistently shows that minorities are more likely than whites to view law enforcement with suspicion and distrust." DOJ, Nat'l Inst. Just., *Race, Trust and Police Legitimacy*, Office of Justice Programs (Jan. 9, 2013), https://nij.ojp.gov/topics/articles/race-trust-and-police-legitimacy; Jake Horowitz, *Making Every Encounter Count: Building Trust and Confidence in the Police*, Nat'l Inst. Just. J., Jan. 2007 ("In neighborhoods with higher crime rates—where racial and ethnic minorities are disproportionately represented—the level of community satisfaction with police is substantially lower."), available at https://nij.ojp.gov/topics/articles/making-every-encounter-count-building-trust-and-confidence-police.

hitting Haughton. (*Id.*). At one point during the fight, Murray picked up a stick around the size of a baseball bat and used it to beat Haughton in his face, head, legs, and all over the rest of his body. (*Id.*). Murray beat Haughton with the baseball-bat-sized stick for five minutes straight. (*Id.*). He did not see Haughton again until after Murray's September 1982 arrest. (*Id.* at 954–55).

## IV. The Arrest and Cooperation of Douglas Haughton  (Feb. 1982 to Sept. 1982)

Given the absence of any investigative leads in the PPD homicide file, there was seemingly no progress in the police's investigation into Kaboobie's death until February 24, 1982, when Douglas Haughton was arrested in connection with a federal bank robbery case in Philadelphia.[11] (Trial N.T. 06/02/83 at 546–47). Haughton was arrested at his house, and PPD homicide detectives, including Larry Gerrard, were in the car with Federal Bureau of Investigation (FBI) agents when Haughton was picked up. (Trial N.T. 06/01/83 at 405, 546; PCHA N.T. 07/25/91 at 13; Ex. 36, Douglas Haughton Affs. (04/11/85), attached to Defendant Bruce Murray's Motion for Remand (05/13/85) (New Evidence)). Haughton was brought to the Federal Building in Philadelphia and interrogated by an FBI agent, Detective Gerrard, and one other officer. (PCHA N.T. 07/25/91 at 13; Ex. 36). The FBI Agent told Haughton they had photographs and information proving his involvement in the federal bank robbery case, and they told him they knew he was involved in Kaboobie's death. (Trial N.T. 06/01/83 at 405; PCHA N.T. 14, 29–30).

Detective Gerrard asked Haughton questions about Kaboobie's death, and then he and the FBI agent threatened him with severe penalties if he refused to cooperate. (PCHA N.T. 14–14, 29–30). They told Haughton that if he refused to cooperate, he "was going to get the electric chair or

---

[11]  The date of Haughton's arrest is incorrectly listed as February 24, 1981, in Haughton's affidavits. (Ex. 36). The presentence report in Haughton's case confirms that February 24, 1982 was the date of his arrest. (Ex. 37, Douglas Haughton Presentence Report (12/14/82) (New Evidence)).

a life sentence," but that "if [he] agreed with them,…they would give [him] a lighter sentence." (*Id.* at 29). Haughton told them that he "will say anything," as he "was scared" and "said anything that would benefit [him]." (*Id.* at 31, 37–38). He did not offer the names of Murray and Holden until after he was promised a more lenient sentence in exchange for his cooperation. (*Id.* 27–38).

Crucially, at some point on February 24, 1982, Haughton read Edward Randall's (aka Randolph) police statement and learned of the allegations others had made against him, Murray, Scotty, and Holden. (Trial N.T. 06/02/83 at 516–17). On March 4, 1982, Haughton gave a written statement to Detectives Gerrard and Ernest Gilbert at the Federal Building in connection with their investigation into Kaboobie's death. Haughton's statement contained the (false and later-recanted) allegation that Murray was the second man with "Scotty" who went inside Kaboobie's residence on the night of the shooting. (Ex. 9). Haughton stated as follows, in pertinent part:

> Gregory Holden, Scotty, Bruce Murray, and myself were at Gregory's house on Carpenter Street between 19th and 20th. We planned to take Kaboobie off and we left the house about 25 minutes to 6. We went to Montrose Street. Gregory Holden was on the corner of 24th St. at Montrose he was a lookout and so was I. Scott & Bruce proceeded to Montrose St. Kaboobie's house. I stayed in the school yard while Scott and Bruce approached his house and knocked on his door he answered it. Scott had a bag with a shotgun in it sawed off. Bruce had a .32 on his hip. Scott knocked twice on the door. Kaboobie answered the door and let him in. They went in and I heard a blast of a shotgun and I heard the sound of a gun 3 times and I heard two more gunshots the door flew open and I began to walk away toward 25th St.
>
> *Dap hollered my name, "Doug. Kaboobie just got shot to death." I ignored him and kept walking.*
>
> A little while later I met up with the guys at Bruce's house. Scotty had got hit in the arm and Scott said I think we killed him meaning him and Bruce.
>
> . . . .
>
> They [Bruce and Scott] said (Scott) I pulled the gauge out and Kaboobie pushed it away and when he swung it back and Kaboobie was pulling his .32 and that's when Scott said he blasted him. Bruce said everything happened so fast we didn't get a chance to go down the cellar. Scott said when he opened the bolt on the gun he dropped it and left it in the house and they broke and ran.

(*Id.*) (emphasis added). Haughton also told detectives that Scotty had his left arm bandaged from the gunshot wound he suffered to his wrist when Kaboobie shot him, that the shotgun came from Murray's house, and that Murray told Haughton that "he shot [Kaboobie] twice" with the .32-caliber revolver. (*Id.*).

Critically, Haughton told the detectives that Gregory Strickland (aka "Dap") called out his name as Haughton was walking away from Kaboobie's residence. (*Id.*).[12] Haughton described "Dap" as "the boy that was in the cellar" and claimed he knew Dap "was in the cellar" only because "Scotty told [him] that this little boy Dap came running out of the cellar. He ran past them [and] at the time he ran out he called my name." (*Id.*).

Based on this information, on March 23, 1982, Detective Leon Lubiejewski filed a criminal complaint against Haughton and obtained a warrant for his arrest. (Ex. 38, Criminal Complaint Against Douglas Horton (03/23/82) (New Evidence); Ex. 39, Aff. of Probable Cause and Arrest Warrant for Douglas Horton (03/23/82) (New Evidence)). Notably, unlike the complaint against Gregory Holden, which did not accuse him of shooting Kaboobie, the criminal complaint against Haughton specifically accused him of "shoot[ing] and kill[ing] Eric DeLegal inside of his residence." (Ex. 38; Ex. 34). The difference in the word choice between the Holden criminal complaint and the Haughton criminal complaint indicates that the police believed Haughton was one of the shooters.

On April 1, 1982, Haughton was formally arrested and charged with shooting and killing

---

[12] Haughton did not know Dap's real name was Gregory Strickland, but Haughton testified at trial that he knew Dap because Dap hung out occasionally with Haughton's nephews. (Trial N.T. 06/01/83 at 316–17). Strickland had also told detectives he knew Haughton because he hung out with Haughton's nephews. (Ex. 10). Additionally, a DAO copy of the transcript from Murray and Wesson's preliminary hearing includes handwritten notes identifying "Dak (sic)" as "Greg Strickland." (M&W Prelim. N.T. 11/04/82 at 26).

Kaboobie "[d]uring an attempted robbery." (Ex. 40, Post-Arrest Paperwork for Douglas Haughton (04/01/82) (New Evidence)). He was taken into custody at the Chester County Prison by Detective Gerrard and Detective Gilbert and brought to the Roundhouse, where he was fed a cheesesteak, strawberry milkshake, and potato chips. (Ex. 41, Douglas Haughton Interrogation and/or Custody Chronology (04/01/82) (New Evidence)). Haughton then gave another statement in which he identified Tyrone Wesson as the "Scottie" who was inside Kaboobie's residence at the time of the shootout. (Ex. 42, Douglas Haughton Police Stmt. (04/01/82)).

On April 21, 1982, Haughton pleaded guilty to the federal bank robbery charge, and was cooperative with the federal government's investigation. (Ex. 37). On April 29, 1982, Haughton's murder case was held for court following a preliminary hearing. (Ex. 43, Docket Sheet, *Commonwealth v. Haughton*, MC-51-CR-0342321-1982). On June 8, 1982, Haughton, through counsel, filed a motion to suppress his arrest, the search, and his police statements. (Ex. 44, Douglas Haughton Motion to Suppress (06/08/82) (New Evidence)). In support of his motion, Haughton averred as follows, in pertinent part:

- "[B]efore and after [his] arrest and search, defendant was interrogated by the arresting officers, as a result of which interrogation defendant may have made certain oral statements admissions concerning his recently past activities, which statements and admissions were, and will be, used against him in the above proceedings."

- "[F]ollowing such search, defendant was taken into custody and again interrogated by the Philadelphia Police and others and that during his interview with said police officers, defendant may have made certain oral statements and admissions concerning his recently past activities, which statements and admissions were, and will be, used against him in the above proceedings."

- "[D]efendant did not intelligently, knowingly or voluntarily waive his constitutional rights with regard to his interrogation."

- "[A]t the preliminary hearing he was apparently identified by a witness or the basis of a prior out of court identification of defendant which was improper and therefore tainted the in-court identification."

- "[D]efendant was detained for an unreasonable long period of time before being taken before a Judge for his preliminary arraignment."

- "[A]s a result of such unreasonable delay and other duress, coercion and improper police conduct, a statement was obtained which will be used against him at trial."[13]

(*Id.*)

On September 8, 1982, Haughton pleaded guilty to third-degree murder. (Ex. 37). Haughton entered into a plea agreement with the Commonwealth, and his agreement was entirely contingent upon him testifying for the prosecution against Murray and his alleged coconspirators. (Trial N.T. 06/01/83 at 403–05; Trial N.T. 06/02/83 at 554–55; PCHA N.T. 07/25/91 at 38). In fact, Haughton's original sentencing date was supposed to be March 7, 1983, (Ex. 37), which strongly suggests that the reason his sentencing hearing was postponed until June 28, 1983, (Ex. 45, Docket Sheet, *Commonwealth v. Haughton*, CP-51-CR-0504631-1982), was because his agreement depended on him providing incriminating testimony against Murray, Holden, and Wesson. In exchange for his testimony, Haughton agreed to plead guilty to third-degree murder and would receive, at most, a sentence of 10–20 years' imprisonment run concurrently with the sentence he would receive for his federal bank robbery conviction. (Trial N.T. 06/01/83 at 215–17, 403). He would also serve that sentence at a low-security federal prison in Colorado. (*Id.* at 215–17). The trial court astutely observed, "It's no sentence at all. Ten to twenty concurrent with the sentence he is already serving is not a sentence at all, [ADA] Marano." (*Id.* at 406).

On September 16, 1982, Haughton was sentenced to five years' imprisonment, but "[t]he estimated length of the actual time to be served [was only] 32 to 40 months." (Ex. 37). Ultimately, on June 28, 1983, after testifying at Murray's trial, Haughton was sentenced to 5–10 years' imprisonment run concurrently with his federal sentence. (Ex. 45). On March 18, 1989, Haughton

---

[13]   Nazario Jimenez, Jr., later a Philadelphia Municipal Court Judge, represented Haughton.

was released on parole. (PCHA N.T. 07/25/91 at 15).

### V. The Arrest and Interrogation of Tyrone Wesson (Sept. 11, 1982)

On September 9, 1982, Detective Lubiejewski sought and obtained a warrant for Tyrone Wesson's arrest based on Douglas Haughton's statement and photographic identification inculpating Wesson as one of the perpetrators. (Wesson MTS N.T. 05/16/83 at 83). On September 11, 1982, Lubiejewski and Detective McNesby arrested Wesson at approximately 10:00 a.m. (*Id.*). Wesson was brought to the Roundhouse and placed into an interview room in the Homicide Division at 10:25 a.m. (*Id.* at 84).

According to Lubiejewski's testimony at Wesson's suppression hearing that at around 10:30 a.m. Detective Gerrard attempted to notify Wesson's father, Lamont Wesson, about his son's arrest. (*Id.* at 91). Wesson's father was then a Philadelphia police officer assigned to the 22nd District, (Wesson MTS N.T. 05/18/83 at 199), and was later promoted to a detective position, (PCHA N.T. 07/25/91 at 52). Lubiejewski stated under oath that he "heard" Gerrard speaking to Officer Wesson before he came to the Roundhouse at around 11:00 a.m. (Wesson MTS N.T. 05/16/83 at 91). However, Gerrard denied calling Officer Wesson about his son's arrest prior to his arrival at the Roundhouse and claimed he did not know how Officer Wesson learned about the arrest. (Wesson MTS N.T. 05/23/83 at 356). At trial, Lubiejewski testified that he (Lubiejewski) did not know how Officer Wesson learned about his son's arrest. (Trial N.T. 06/15/83 at 688–91).

Lubiejewski also testified at the suppression hearing that he was present in the interrogation room from 10:35 a.m. to 10:45 a.m. when McNesby recorded Wesson's biographical information on a standard police form (the "Form 229"). (Wesson MTS N.T. 05/16/83 at 59, 63; Ex. 46, Tyrone Wesson Form 229 (09/11/82); Ex. 47, Tyrone Wesson Interrogation and/or Custody Chronology (09/11/82)). However, the chronology of Wesson's interrogation, which was recorded shortly after the occurrence of each event, (Wesson MTS N.T. 05/23/83 at 362–63), does not corroborate

Lubiejewski's testimony that he was present at that time, (Wesson MTS N.T. 05/16/83 at 73, 76–77; Ex. 47). He conceded he "didn't have anything to do with [the Form 229] officially." (Wesson MTS N.T. 05/16/83 at at 77).

Lieutenant Shelton testified at Wesson's suppression hearing that he "did not call the father [Officer Wesson] nor did any detectives call the father to come down the first time, to my knowledge." (Wesson MTS N.T. 05/23/83 at 261). However, Officer Wesson testified both at trial and at his son's suppression hearing that Shelton called the Wesson family residence and left a voicemail notifying him that the police had his son in custody at the Roundhouse. (Wesson MTS N.T. 05/18/83 at 200; Trial N.T. 06/20/83 at 1404). Shelton did not specifically ask Officer Wesson to come to the Roundhouse, but he did tell Officer Wesson that if he wanted to come down to the Roundhouse, then to come down. (Wesson MTS N.T. 05/18/83 at 211). Upon arriving at the Roundhouse at around 11:00 a.m., Officer Wesson immediately asked to speak with Shelton. (Trial N.T. 06/20/83 at 1404). Officer Wesson was then told by Shelton "roughly, briefly, what [the police] had him down there for." (*Id.*). Shelton told Officer Wesson that "somebody was supposed to be involved with the same case was picked up and made allegations that my son and my nephew was involved in the homicide." (Wesson MTS N.T. 05/18/83 at 215). He also confirmed that someone had identified Wesson as one of the shooters and had agreed to testify against him. (Wesson MTS N.T. 05/23/83 at 384).

Homicide detectives then asked Officer Wesson if he wanted to speak to his son, (Wesson MTS N.T. 05/18/83 at 216),[14] and Officer Wesson and his wife went into the interrogation room

---

[14] This contradicts Gerrard's testimony that Officer Wesson, not the homicide detectives, asked to speak to his son when he first arrived at the Roundhouse. (Wesson MTS N.T. 05/23/83 at 358). Gerrard's testimony is also inconsistent with Shelton's testimony that he did not recall Officer Wesson asking him any questions. (*Id.* at 273).

and spoke with their son alone for 5–10 minutes. (Wesson MTS N.T. 05/23/83 at 354–55, 384; Trial N.T. 06/20/83 at 1405–06). After exiting the interrogation room, Officer Wesson and his wife spoke to Detective Gerrard and Lieutenant Shelton about the evidence that the police had against their son. (Trial N.T. 06/20/83 at 1406). Officer Wesson testified at trial: "They had some pictures they showed me and wanted to know if I knew of the other supposed participants in the homicide." (*Id.* at 1406, 1431). The police indicated they had obtained a statement from Haughton, telling Officer Wesson that Haughton "was locked up on a prior case and had turned evidence on the other defendants." (*Id.*; Wesson MTS N.T. 05/23/83 at 354–55). Officer Wesson was even shown a picture of Haughton, but he did not know who Haughton was. (Trial N.T. 06/20/83 at 1431). Detectives also told Officer Wesson that his nephew, Bruce Murray, was also "supposed to be implicated in the case." (*Id.* at 1406, 1430). Detective Gerrard "explained to [Officer Wesson] the circumstances of the case as [the police] knew it" and "told him his son was a shooter and there was probably nothing we could do for him." (Wesson MTS N.T. 05/23/83 at 356). At Wesson's suppression hearing, however, Lieutenant Shelton denied that anyone informed Officer Wesson that police had obtained Haughton's statement. (*Id.* at 271–72).

Before leaving the Roundhouse, at 11:20 a.m. Officer Wesson asked to go back into the interrogation room and talk to his son again because he "wanted to reiterate in his [son's] mind the fact that it would be best for him not to say anything." (*Id.* at 217–18; Trial N.T. 06/20/83 at 1411). Officer Wesson also wanted "to remind him [about] the fact that they can't promise him anything." (Wesson MTS N.T. 05/18/83 at 202). He could not recall whether he told his son that detectives had a statement from an accomplice (Douglas Haughton) accusing Wesson of participating in a robbery and shooting Kaboobie. (*Id.* at 202–03).

Officer Wesson also "wanted to talk to him to find out exactly what took place," (Trial

N.T. 06/20/83 at 1407–08), and he told his son what the detectives told him about the evidence police had against him. Officer Wesson testified: "I possibly could have, but I don't remember telling him [about the evidence police had against his son]. But it's possible I could have said something." (*Id.*). However, his son testified that while he and his father talked alone in the interrogation room, his father told him that someone agreed to testify against him. (Wesson MTS N.T. 05/23/83 at 384–85). According to Officer Wesson, his son "said he didn't know anything about it," and in response Officer Wesson "told him that it would be better not to say anything at that point." (Trial N.T. 06/20/83 at 1407–08). At some point before Officer Wesson left the Roundhouse at around 11:25 a.m., either before or after he spoke to his son, Gerrard told him "that the case was pretty solid" against his son. (*Id.* at 1421; Wesson MTS N.T. 05/18/83 at 203–04). Officer Wesson assumed the police would attempt "to get something from [his son] if he had been in a homicide investigation" because "they wouldn't be [just] standing there looking at him." (Wesson MTS N.T. 05/18/83 at 209).

At around 12:00 p.m., McNesby, Lubiejewski, and Shelton were all inside the interrogation room with Wesson. (Wesson MTS N.T. 05/16/83 at 30; Wesson MTS N.T. 05/23/83 at 331). According to McNesby and Lubiejewski, Wesson was verbally given general warnings from a standard police interrogation card from 12:00 p.m. to 12:15 p.m. (Wesson MTS N.T. 05/16/83 at 30; Wesson MTS N.T. 05/23/83 at 296–98, 331). At around 12:15 p.m., McNesby asked Wesson if he wanted to speak about Kaboobie's death, and in response Wesson told the detectives that he wanted to speak to his father about that particular investigation before answering any questions. (Wesson MTS N.T. 05/23/83 at 316). There was no paperwork memorializing what detectives discussed with Wesson at 12:15 p.m. (Wesson MTS N.T. 05/18/83 at 141). However, the chronology of Wesson's interrogation indicates that the detectives and Wesson "orally discuss[ed]

case *and* other invest[igation]," referring to the murder of Lamar Reddick." (Ex. 47 (emphasis added); Ex. 48, Tyrone Wesson Stmt. on Reddick Murder (09/11/82 12:30 P.M.)).

McNesby and Lubiejewski maintained that they did not actually ask Wesson any further questions related to Kaboobie's death until after Wesson spoke to his father. (*Id.* at 154; Wesson MTS N.T. 05/23/83 at 316–17). According to Shelton, however, McNesby and Lubiejewski asked Wesson questions about Kaboobie's death while Shelton was still present in the interrogation room. (Wesson MTS N.T. 05/23/83 at 278–80, 286). He testified under oath at Wesson's suppression hearing that "immediately [after Wesson was given his warnings, Wesson] was talked to about the DeLegal case." (*Id.* at 278–80). Wesson asked to speak to his father only after questions were asked related to his "exact status as far as the DeLegal case." (*Id.* at 280).[15]

At some point after Wesson asked to speak to his father on the phone, Lieutenant Shelton made arrangements for Wesson to talk to his father. (Wesson MTS N.T. 05/18/83 at 206). Before speaking to his son, Officer Wesson spoke to Shelton and Gerrard separately. (Trial N.T. 06/20/83 at 1408–09). Gerrard reiterated to Officer Wesson that "the case was pretty well put together" and that "[i]t was pretty well noted, the participation that my son had in the case." (*Id.* at 1419–20). Shelton told Officer Wesson that the police "were talking to my son, but my son said he didn't want to talk with them until he talked to me." (Wesson MTS N.T. 05/18/83 at 221). The police did not disclose that they had already questioned his son about the Reddick murder. (*Id.* at 208; Trial N.T. 06/20/83 at 1420). In fact, the police apparently told Officer Wesson and told him that his

---

[15] Crucially, after reading a copy of Wesson's statement, Shelton backtracked his earlier testimony and said the questions were limited exclusively to McNesby advising Wesson of the charges and giving him his constitutional warnings. (Wesson MTS N.T. 05/23/83 at 290–91). However, once the court pointed out the inconsistency in his testimony, Shelton conceded that, in addition to the warnings, "Detective McNesby asked questions and got answers on the DeLegal case while [Shelton was] present" for the interrogation. (*Id.* at 297–99). Shelton's concession is consistent with Wesson's testimony at his suppression hearing. (*Id.* at 387–91).

son had not yet made a statement up to that point, (Wesson MTS N.T. 05/18/83 at 209), even

though Wesson had in fact already given a statement about the Reddick case, (Ex. 48; Wesson

MTS N.T. 05/23/83 at 396).

At around 12:55 p.m., Wesson was escorted out of the interrogation room and taken to the

phone to speak to his father. (Wesson MTS N.T. 05/16/83 at 56). He spoke to his father on the

phone while in Lieutenant Shelton's presence. (Wesson MTS N.T. 05/23/83 at 281). According to

Wesson, he and his father had the following conversation over the phone:

> I asked to speak to my father before I signed anything. Okay. The conversation was
> that, you know, I told him that they were trying to offer me a deal involving another
> case, what should I do. He told me the same thing. He said, you know, you're old
> enough to make your own decision, you know what I mean, and if you know, you
> ask for a lawyer to be present.

(*Id.* at 431–32; *see also id.* at 391–92). Officer Wesson corroborated his son's account, testifying

that his son "asked me what I think he should do, should [he] say anything." (Wesson MTS N.T.

05/18/83 at 221). Officer Wesson told him:

> I further explained to him the situation that being an adult, I said it's going to be
> your responsibility to make the decision what you want to do. It's gonna be your
> life, and I am not going to take the responsibility to tell you. Just remember that
> they can't promise you anything, and that you have to make a decision. If you want
> to talk to a lawyer, tell them you want to talk to a lawyer, and that was the end of
> the conversation.

(*Id.*). Officer Wesson emphasized to his son: "I told him not to say anything. That's what I told

him. I told him the best thing to do was not say anything." (*Id.* at 210).  He told his son:

"Remember, they can't promise you anything, and whatever they say that they could do for you,

if they say anything, they can't hold no promises." (*Id.* at 221–22).

 The phone conversation between Wesson and his father was "more or less type of a rush,"

(Wesson MTS N.T. 05/23/83 at 434–36), though Officer Wesson made clear to his son that "all I

had to do was ask [for an attorney]" in order to obtain counsel's assistance before making a

decision on how to proceed, (*id.* at 427). Tyrone Wesson finished the phone conversation, went to the restroom, drank some water, and then returned to the interrogation room. (Ex. 47).

Tyrone Wesson has consistently maintained that he asked for an attorney upon returning to the interrogation room, and that the detectives told him they could not get him a lawyer because it was a Saturday. (*Id.* at 391–93; PCHA N.T. 07/25/91 at 53–54). His "exact words" were "I'd like to have a lawyer present." (Wesson MTS N.T. 05/23/83 at 433). Wesson has also consistently maintained that the detectives presented him with paperwork, including warnings forms and a "premade," "pre-typed" statement attributed to Wesson regarding Kaboobie's death. (*Id.* at 387–91; PCHA N.T. 07/25/91 at 66). Wesson has stated that the detectives intimated that he would be able to see an attorney after signing the paperwork (PCHA N.T. 07/25/91 at 55). Wesson signed the paperwork, (Wesson MTS N.T. 05/23/83 at 394–95; Ex. 49, Tyrone Wesson Unredacted Stmt. in DeLegal Case (09/11/83); Ex. 50, Tyrone Wesson Warning Forms (09/11/82)), was then escorted to his preliminary arraignment, where he met with a public defender and signed a form affirming that he did not make a statement:



34

(Ex. 51, Tyrone Wesson Prelim. Arraign. Stmt. (09/11/83); Wesson MTS N.T. 05/23/83 at 428).

Detective Gerrard was alone with Wesson from 2:40 p.m. until his arraignment at 3:35 p.m. (Wesson MTS N.T. 05/23/83 at 376). At Wesson's suppression hearing and at trial, Gerrard downplayed his role in procuring Wesson's statement and gave elusive answers in response to simple questions on cross-examination. For example, Gerrard said he "might" have talked to Wesson while in the interrogation room during the time when Wesson verbally answered the other detectives' questions, and he denied ever telling Wesson that he knew Wesson's father. (Wesson MTS N.T. 05/23/83 at 356, 363). Gerrard also testified he was present when the other detectives allegedly re-read Wesson his constitutional warnings at 1:00 p.m., (Trial N.T. 06/15/83 at 813–14), even though Wesson was still in the bathroom at that time, (Ex. 47). This contradicted his earlier testimony that he "didn't know" whether he was present when the warnings were given. (Wesson MTS N.T. 05/23/83 at 374). The chronology of Wesson's interrogation also indicates that Gerrard was not present either time the warnings were given. (Ex. 47).

Detective Gerrard was alone with Wesson in the interrogation room when he noticed a round scar on Wesson's left forearm. (Wesson MTS N.T. 05/23/83 at 376). He asked Wesson how he got the scar, but he did not give Wesson a new set of constitutional warnings. (Wesson MTS N.T. 05/23/83 at 374). Wesson then admitted he suffered a gunshot wound at Kaboobie's house during the incident. (Trial N.T. 06/15/83 at 760–63; Ex. 49). **Wesson also told Detective Gerrard that he went to the Hospital of the University of Pennsylvania afterwards and claimed he was "Bruce Murray."** (Trial N.T. 06/15/83 at 760–63; Ex. 46; Ex. 47). Detective Gerrard, who later obtained the records from Wesson's hospital visit, (Ex. 52, Hosp. Univ. of Penn. Records (12/16/80)), recorded this information on the back page of the Form 229 but did not record on the chronology sheet that he had elicited an additional statement from Wesson, (Ex. 46; Ex. 47).

Gerrard brought Wesson to his preliminary arraignment at 3:35 p.m. (Ex. 47). Wesson was represented by a public defender, who immediately advised him not to make a statement. (Wesson MTS N.T. 05/23/83 at 428–30). Wesson verbally confirmed he did not want to make a statement, and he signed the form and memorialized that he did not wish to make a statement. (*Id.*; Ex. 50).

## VI.  The Arrest and Interrogation of Bruce Murray (Sept. 11, 1982)

On September 9, 1982, Detective Lubiejewski obtained a warrant for Murray's arrest, and the accompanying affidavit of probable cause was based solely on the false accusations contained in Haughton's interview statement. (Ex. 53, Aff. of Probable Cause for Arrest Warrant for Bruce Murray (09/09/82)). On September 11, 1982, Murray was arrested at 3:05 p.m., shortly before Wesson's preliminary arraignment, at 1817 Wharton Street by McNesby and Detective Lawrence Grace. (Ex. 54, Bruce Murray Custody and/or Interrogation Chronology (09/11/82)).

The detectives searched Murray incident to his arrest, and Detective Gerrard claimed in a subsequent criminal complaint and a property receipt that police seized drugs from Murray's person during the search. (Ex. 55, Crim. Compl. Against Bruce Murray in Case No. 82-4717 (09/12/82); Ex. 56, Property Receipt No. 889210 and Seizure Analysis Report (09/11/83)). At 3:15 p.m., two police officers drove him to the Roundhouse, and at 3:30 p.m. the officers frisked Murray inside an interrogation room and claimed to have found an envelope containing nine pills. (Ex. 54). Then, at 3:50 p.m., Gerrard claimed he found twenty-six more pills after searching Murray a second time. (*Id.*). However, in the criminal complaint Gerrard stated that all thirty-four pills were found at 3:05 p.m. during the search incident to arrest. (Ex. 55). As discussed below, a court later acquitted Murray of the charged drug offenses because, upon information and belief, the court found the police had planted the drugs during his arrest. (Arg. Section I.B.3).

Murray gave a statement to the police and denied any involvement in Kaboobie's death. (Ex. 57, Bruce Murray Police Stmt. (09/11/83)). He denied knowing Kaboobie and denied shooting

him with a .32-caliber pistol. (*Id.*). He told police that on the afternoon of December 16, 1980, he "was over across the tracks on 1017 S. 18th Street at my grandmother's [house]. I go around there every day." (*Id.*). When asked why someone would accuse him of shooting Kaboobie, Murray responded: "I don't know probably jealous." (*Id.*).

## VII.  Murray-Wesson Preliminary Hearing (Nov. 4, 1982)

On November 4, 1982, Haughton testified as the sole Commonwealth witness in Murray and Wesson's joint preliminary hearing.[16] (M&W Prelim. N.T. 11/04/82 at 2). Haughton testified that on December 16, 1980, he, Holden, Murray, and Wesson were at Holden's house when they all participated in developing the plan to rob Kaboobie. (*Id.* at 8). Haughton initially testified that when the four men were at Holden's house, he had a gun, Scotty had a shotgun, and Murray had a .32-caliber revolver. (*Id.* at 6–7, 9). He then changed his testimony and said that neither he nor Holden had any guns at that time. (*Id.* at 9). Haughton stated that the four men went to Kaboobie's residence, and that he and Holden served as lookouts while Murray and Wesson went to Kaboobie's door. (*Id.* at 10, 24). Wesson knocked on the door a couple times, and Kaboobie let him and Murray inside. (*Id.* at 11).

On cross-examination, Haughton reiterated that all four men participated in the development of the plan to rob Kaboobie, but he could not recall "the exact words" each person said. (*Id.* at 17). He said there no "leaders" in creating the plan, and he did not know who directed them to go to Holden's house to discuss the plan. (*Id.* at 19). He was pressed about this point multiple times, and Haughton contradicted himself: He initially testified that "[t]here was a plan [to rob Kaboobie] before [they] got to Holden's house[,]" but he then stated that "the plan started"

---

[16]  Wesson was represented by Hardy Williams, who became a state senator in January 1983 and continued to represent Wesson through his trial. Murray was represented by Pamela Pryor Dembe (née Cohen), who later became a Philadelphia Court of Common Pleas Judge.

at "Gregory's house." (*Id.* at 20). He said that "the plan first was talked about" when the men were "[a]t Gregory's house," and that no one talked about the plan "until [they] got to Greg's house," (*id.* at 21), which contradicts his testimony that the plan had been made ahead of time.

Haughton testified that he, Wesson, and Murray went to Holden's house "to get high" on marijuana. (*Id.* at 21). According to Haughton, the men did get high off marijuana ("everybody [was] getting high") and stayed at Holden's for "about half an hour." (*Id.* at 21–22). Haughton said "[a]ll four of us" smoked "a few" joints of marijuana in "a few minutes." (*Id.* at 30–31). Haughton also admitted that, in addition to marijuana, he consumed two ounces of cough syrup with codeine. (*Id.* at 25–26, 31–32). Haughton testified that he was with Murray and Scotty "all day," starting "[e]arly in the morning." (*Id.* at 33). Throughout the day, Haughton "smoked a whole bag of reefer," which "[c]ould have been from five to ten to 20" marijuana joints. (*Id.* at 34). He also testified as follows:

| | |
|---|---|
| Ms. Cohen: | Did you see Bruce or Scotty smoke any reefers, or drinking any syrup? |
| Haughton: | Not in the morning. |
| Ms. Cohen: | When did you first see them smoking reefers? |
| Haughton: | When I was at Gregory's house. I don't know if he was smoking during the day or not, you know. |
| Ms. Cohen: | Why don't you know? Weren't you with them all day? |
| Haughton: | I was with them. I mean, they go somewhere and meet back up, but I was with them the day. |
| Ms. Cohen: | So, you were not actually together during the whole day. |
| Haughton: | Probably, you know, went to the store and I may have been somewhere else on Carpenter Street, and they went back up. Things like that, you know, I am not glued to them, man. |

(*Id.* at 35).

38

Haughton said "[n]ot to my knowledge" when asked whether Murray and Scotty had guns on them when he first met them on Carpenter Street on the way to Holden's house. (*Id.*). When pressed regarding how he could not have seen Wesson holding the sawed-off shotgun, however, Haughton's testimony wavered:

> Mr. Williams: Now, you didn't see anything two feet in Scotty's hand when you saw him on Carpenter Street?
>
> Haughton: He had it [the shotgun] in his bag.
>
> Mr. Williams: Did you see a bag in his hand?
>
> Haughton: He was standing with the bag.
>
> Mr. Williams: On Carpenter Street?
>
> Haughton: He was carrying it towards Kaboobie's house, yes.
>
> Mr. Williams: All I want to ask you is, when you met these fellows earlier, did they have guns?
>
> Haughton: No.
>
> Mr. Williams: So, the guns appeared when you all got to Holden's house?
>
> Haughton: Right.

(*Id.* at 23). Haughton ultimately testified that Holden "provided the guns," including a shotgun and other guns. (*Id.* at 35–36). This contradicts Haughton's statement to police that the shotgun came from Murray's house. (Ex. 9).

According to Haughton, Holden started the conversation at his house about robbing Kaboobie, talking "about how much reefer he had, and we all decided to take him off, meaning rob him." (M&W Prelim. N.T. 11/04/82 at 24). The plan "was Gregory's idea." (*Id.* at 43). Kaboobie was supposed to have "a couple of pounds of reefer," and Haughton knew this because "[t]hat is all [Kaboobie] deals in." (*Id.*). Holden gave out the assignments to the other men:

Haughton was to be "the look out man" for police, and Murray and Scotty were to go to Kaboobie's house. (*Id.*). Haughton stood in the schoolyard "[d]irectly across the street from [Kaboobie's] house," and there were no lights on in the schoolyard. (*Id.*). The lighting in the schoolyard was "dim." (*Id.* at 38). The "school building" directly adjacent to the schoolyard did not "block [Haughton's] view up and down the street one way or another[.]" (*Id.* at 39). He said he "could see both ends of the block" from where he was standing in the schoolyard. (*Id.*). Haughton testified that "[i]t was getting dark" at the time of the 5:47 p.m. shootout, (*id.* at 38), but on December 16, 1980 in the area of Kaboobie's house (2414 Montrose St.) the sun set at 4:38 p.m. (Ex. 58, Sunrise and Sunset Times for Zip Code 19146; Ex. 59, USPS Zip Code Lookup for 2414 Montrose Street).

Haughton testified that he, Wesson, and Murray all agreed to Holden's plan. He agreed by telling Holden "I don't care," but he did not "remember what [Murray and Scotty] said." (M&W Prelim. N.T. 11/04/82 at 43). All he remembered was that "we all agreed on it." (*Id.*). Only Haughton and Holden actually knew that Kaboobie had marijuana at his house; Murray and Scotty did not. (*Id.* at 44). Before they agreed to execute the plan, there was no discussion about how to divide up the marijuana. (*Id.* at 55).

Haughton testified Wesson and Murray waited "about a second or two" after knocking on Kaboobie's door before someone opened the door. (*Id.* at 41). Contrary to his earlier testimony on direct examination and his police statement police, Haughton admitted he saw "the door open" but "didn't see" Kaboobie open the door. (*Id.* at 41). He testified that "[a]bout a second" after Wesson and Murray entered, he "heard the sound of a shotgun blast." (*Id.* at 11). He further testified:

ADA Boland:          And, did you hear any other shots?

Haughton:            Yes, I heard a shot of a gun three times.

ADA Boland:          Is that a total of four shots?

| Haughton: | I heard a shotgun blast, and I heard the sound of a gun three times, then I heard a sound of another gun two times. |
| ADA Boland: | You heard a total of six noises, or six shots? |
| Haughton: | No, five. |

(*Id.* at 11–12). Later on cross-examination, Haughton testified that he heard a total of six noises, not five. (*Id.* at 48). He said he was only "[a]bout five or six steps away, maybe a little more," from the house when he heard the shotgun blast. (*Id.* at 47).

After hearing the shots, Haughton "turn[ed] around and started walking towards 25th Street, and Dap then ran out of the house to see who just got shot." (*Id.* at 12). To be clear, Haughton saw Dap—Gregory Strickland—run outside from "[f]rom the inside of [Kaboobie's] house." (*Id.* at 49–50). On direct examination, Haughton testified that Dap "hollered my name," and then Haughton lied under oath: "*I didn't know him*, and I kept walking." (*Id.* at 12) (emphasis added). On cross examination, Haughton admitted that he "know[s] him." (*Id.* at 50). Haughton testified further as follows:

| Haughton: | He [Strickland] called my name, and I turned around and I seen his face. |
| Ms. Cohen: | When you saw his face, where was he? Was he in the school yard, sidewalk, where? |
| Haughton: | He was in the middle of the street; Montrose Street, hollering. |
| Ms. Cohen: | So, you never actually saw him in Kaboobi's house? |
| Haughton: | I seen him run out of Kaboobi's house. |
| Ms. Cohen: | Now, you said that you were leaving, and you turned around to look at him, and you were standing in the middle of the street? |
| Haughton: | After the shots, the boy ran out of the house, and I started walking. He ran out of the house. He hollered Kaboobie name and he hollered my name. |
| Ms. Cohen: | You watched him run out of the house before you turned around and |

started to walk away?

Haughton:     No, at the same time I heard the shots, I started walking.

Ms. Cohen:    You turned around and walked through the parking lot?

Haughton:     Yes.

Ms. Cohen:    And then, the next thing, you heard a noise?

Haughton:     Kaboobie just got shot to death, he hollered.

Ms. Cohen:    You kept turning around?

Haughton:     I ignored him. I turned my head.

Ms. Cohen:    You turned your head?

Haughton:     Yes.

Ms. Cohen:    And you saw this boy in the middle of the street?

Haughton:     Yes, hollering Kaboobie just got show to death, and he called my
              name.

Ms. Cohen:    What name did he call you?

Haughton:     Doug.

Ms. Cohen:    How long have you known him?

Haughton:     Not long, from around the neighborhood.

Ms. Cohen:    Not long; months, years?

Haughton:     Months. I don't know how many months?

Ms. Cohen:    And how do you know him?

Haughton:     Excuse me?

Ms. Cohen:    How do you know him?

Haughton:     He used to play around with my little nephews. He used to walk
              around with my little nephews.

(*Id.* at 51–52).

According to Haughton, he did not stay at the scene long enough to see either Wesson or Murray exit Kaboobie's house. (*Id.* at 61–62). After Haughton fled the scene, he went to his brother's house on Madison Square near the corner of Christian Street and stayed there for less than one hour. (*Id.* at 54). Then he went to Murray's house "[t]o find out what happened." (*Id.*). He saw Murray and Wesson (but not Holden) later that evening at Murray's house. Wesson told him that the events "happened so fast, didn't get a chance to go in the cellar," where the marijuana and money were supposed to be. (*Id.* at 13–14). Wesson also said that he pulled out the shotgun as they "[w]alked in[to] the house," that Kaboobie pushed the weapon and pulled out his own gun, and that "Scotty just shot it." (*Id.* at 14). Haughton reiterated his accusation that Murray shot Kaboobie twice, and he testified that nothing was taken from Kaboobie's house. (*Id.* at 15).

## VIII.   Second Arrest and Preliminary Hearing of Gregory Holden (Jan. 1983)

Detectives had obtained an arrest warrant for Holden on or about September 28, 1982, but he was not arrested until January 6, 1983. (Ex. 60, Crim. Compl. Against Gregory Holden (09/28/83); Trial N.T. 06/15/83 at 778–80). As he admitted at trial, Holden consciously avoided the police because he feared he would be arrested a second time and prosecuted again for a crime that he did not commit. (Trial N.T. 06/17/83 at 1222–23). Detectives found Holden hiding inside a piano at the house of Jean El, his girlfriend Janine's mother, (Trial N.T. 06/15/83 at 778–83), who was subsequently arrested and charged with concealing Holden from the police, (Trial N.T. 06/17/83 at 1088). To be clear, the fact that Holden was found inside a piano has absolutely no bearing on Murray's innocence claim, except to the extent that its introduction at trial was unfairly prejudicial spillover evidence because, based on undersigned counsel's review of the record, it does not appear that the jury was ever specifically instructed that evidence of a codefendant's consciousness of guilt cannot be considered as evidence of the defendant's guilt. (Trial N.T.

43

06/21/83 at 1642–43). The fact that Jean El was charged with concealing Holden is relevant only because she testified at Murray's trial, and the prosecutor intentionally violated an on-the-record agreement with defense counsel regarding the scope of cross-examination. (Arg. Section II.D).

On January 19, 1983, Holden had his second preliminary hearing on charges related Kaboobie's death.[17] Douglas Haughton was the only Commonwealth witness, and his testimony contained inconsistencies and directly contradicted either his testimony at Murray and Wesson's preliminary hearing, his police statement, or both:

- Haughton quoted the exact words Holden purportedly used when the four men discussed robbing Kaboobie. (Holden Prelim. N.T. 01/19/83 at 5–6 (Ex. 61)). Haughton previously testified that did not know "the exact words" the men used during their discussion. (M&W Prelim. N.T. 11/04/82 at 17).

- Haughton stated the shotgun came from Holden's house, specifically from "[u]nder the sofa" in his "[l]iving room." (Holden Prelim. N.T. 01/19/83 at 6, 14 (Ex. 61)). However, this contradicted his statement to police that the shotgun came from Murray's house. (Ex. 9).

- Contrary to his police statement and earlier testimony, Haughton said "Scotty, I believe. *I'm not sure*" when asked to whom Holden gave the shotgun. (Holden Prelim. N.T. 01/19/83 at 6 (Ex. 61) (emphasis added)).

- Contrary to his prior testimony, Haughton stated that he did not have a gun on him at the time. (*Id.* at 18).

- Contrary to his prior testimony and his police statement, Haughton testified that Murray did not have a gun at the time, and that "between the four of [them] there was one gun." (*Id.* at 18–19).

- Inconsistent with his police statement, where he said that Holden served as a lookout on the corner of 24th Street and Montrose Street, Haughton testified that he did not "see where Mr. Holden went." (*Id.* at 22). Haughton also implied that Holden continued to walk with the other three men to Kaboobie's house "in the middle of the [2400] block" of Montrose Street. (*Id.* at 20). The men had supposedly come from Holden's house on the 1900 block of Carpenter Street, (*id.* at 19), which means they would have passed by the corner of 24th and Montrose on their way to Kaboobie's house.

---

[17] Holden was represented by Lydia Y. Kirkland, who later became a Philadelphia Municipal Court Judge.

- Contrary to his prior testimony, Haughton stated that he saw Kaboobie open the door. (*Id.* at 22).

- Inconsistent with his prior testimony, Haughton testified that he heard "[t]ussle sounds" from inside Kaboobie's house after Kaboobie answered the door but before the shooting. He stated that it "[s]ounded like somebody scraping, like a fight or something." (*Id.* at 25).

- Contrary to his police statement, where he indicated he saw Holden at Murray's house after the shooting, Haughton testified that he did not see Holden afterwards. (*Id.* at 26).

- Haughton testified that he, Murray, and Wesson arrived at Holden's house sometime between 5:00 p.m. and 6:00 p.m. and stayed there for around 25 minutes, (*id.* at 9–10); however, the shooting occurred at 5:47 p.m., (Ex. 1), which means the men would have arrived at Holden's house much earlier than 6:00 p.m.

Haughton's testimony also contained internal inconsistencies. First, on direct examination Haughton testified that the reason he and Holden served as lookouts was "[b]ecause [Kaboobie] knew us." (Holden Prelim. N.T. 01/19/83 at 7 (Ex. 61)). However, on cross-examination when asked "if Mr. Holden knew Mr. DeLeagal," Haughton sounded less certain: "Yes, I believe so." (*Id.* at 10). Second, Haughton testified that there was "[n]o particular reason" that "kept [him] from going up to [Kaboobie's] door" other than the fact that Kaboobie knew him. (*Id.* at 11–12). He acknowledged that he and Kaboobie had "personal disputes" but said that Kaboobie still would have answered the door for him if he had gone up to Kaboobie's door. (*Id.* at 10–11).

Haughton also denied that he had any marijuana-related connection with Kaboobie. (*Id.* at 13). In fact, Haughton agreed that the fact Kaboobie knew him would have "impel[ed] him to open the door, instead of keeping it closed." (*Id.* at 11). Haughton stated that he "sent two strangers to DeLeagal's house because [he] figured [Kaboobie] would open the door for two strangers instead of two people he knew." (*Id.* at 12). Other key aspects of Haughton's testimony included:

- Holden had "[n]o particular reason" for bringing up the idea of robbing Kaboobie, other than "[b]ecause he knew [Kaboobie] was selling some reefers." (*Id.*).

- Haughton did not know whether the shotgun was loaded when Holden took it from underneath his sofa. (*Id.* at 14).

- Haughton did not see Holden load the shotgun. (*Id.*).

- Haughton had never seen that shotgun before. (*Id.*).

- Haughton had never heard the sound of that shotgun before. (*Id.*).

- No one told Wesson what to do with the shotgun (*Id.* at 15).

- Holden had "t[old] them" each what to do in terms of the plan. (*Id.*).

- Holden "g[ave] the *guns* to Scotty, or the gun to Scotty." (*Id.* at 18) (emphasis added).

- It was not "clear enough for [Haughton] to see across the street" from where he was standing in the schoolyard because there the lighting outside was "dim." (*Id.* at 22).

- He could not see the other corner of Montrose Street "from inside the school yard." (*Id.*).

## IX.  Detective Gerrard and a Prosecutor Attempt to Coerce Gregory Strickland into Identifying Murray as a Perpetrator (Feb. 9, 1983)

Sometime after Murray's and Wesson's arrests, the police asked Strickland to participate as the identifying witness in a police lineup. (Ex. 11, Ex. 12). Before the suspects were brought out, Gerrard and a prosecutor, perhaps Robert Marano who was present at the lineup, (Trial N.T. 06/20/83 at 1470), "showed [Strickland] pictures of Bruce and told [Strickland] to say" that Murray was one of the perpetrators.[18] (Ex. 12; Ex. 11). Strickland refused to cooperate with them and "told them [he] did not see Bruce and didn't know him." (Ex. 11).  Strickland refused to falsely accuse Murray "because he was not one of the killers." (Ex. 12). Gerrard and the ADA told him "Scotty told on his self and Murray so they only need[ed] [Strickland] to point Murray out" at the lineup.

---

[18]   This unidentified ADA may have been the prosecuting attorney, Robert Marano, because at trial he acknowledged that he was present for the lineup.

(*Id.*). The police canceled the lineup because Strickland refused to point out Murray. (*Id.*; Ex. 11).

This incident most likely occurred on February 9, 1983, which was the date set for a court-ordered lineup for Murray. (Ex. 62, Court Order for Lineup (01/20/83)). Police paperwork shows that on that date Detective Lory picked up Strickland and his father and transported them to the detention center. (Ex. 62, PPD Activity Sheet (02/09/83) (New Evidence)). Prosecuting ADA Robert Marano was also present for the lineup with an associate of Murray's prior counsel. (Trial N.T. 06/20/83 at 1470). The police unilaterally canceled the lineup for an uncredible reason:

```
At the detention center, Det Lory was met by Det Wynn of the MCD.  Wynn related that
there were to be no line-ups this date.  He stated that inmates who participated in the
line-ups on a voluntary basis were paid .75¢ by the city for acting as "fill ins".  With
this .75¢, the inamtes almost invariably purchased cigarettes.  Cigarettes at the detention
center have recently increased in price to .80¢.  The inmates have demanded payment of .80¢
for their participation in the line-ups.  Det. Wynn stated that he authorized the additional
payment of .05¢ to the inmates however he was admonished by his commanding officer for
doing so, and this payment was not going to be granted to the inmates this date.
Consequently, the inmates refused to participate in the line-ups and no suspects were
viewed this date.
```

(*Id.*). Upon information and belief, the lineup was never rescheduled. This means that the PPD and the DAO violated a court order, which "in and of itself, constitutes extreme misconduct." *Vallejo v. Santini-Padilla,* 607 F.3d 1, 8 (1st Cir. 2010). The prosecution did not call George Young or Gregory Strickland, the only two eyewitnesses, to testify at Murray's trial. (Arg. Section II.E.3).

## X.  **Motions for Severance (Jan. and May 1983)**

As a prosecutor, presumably ADA Marano, noted in a DAO copy of Tyrone Wesson's police statement, the prosecution faced a "Bruton Problem," (Ex. 63, DAO Copy of Tyrone Wesson Unredacted Statement on Kaboobie's Death (New Evidence)), referring to *Bruton v. United States*, 391 U.S. 123 (1968), which held that a defendant's Confrontation Clause rights are violated when a non-testifying codefendant's confession naming the defendant as a participant in the crime is introduced at their joint trial, even if the jury is instructed to consider the confession only against the codefendant. Murray, Wesson, and Holden each filed severance motions seeking

to be tried separately from each other, and argued that simply redacting the names of the four alleged coconspirators (Murray, Holden, Haughton, and Larry Thorpe) from Wesson's statement would be insufficient to preserve their confrontation clause rights. (Ex. 65, Murray Motion for Severance (Jan. 6, 1983)). Murray's motion for severance was denied on January 20, 1983, on the basis that the prosecution could use a redacted version of the statement, and if the redactions were insufficient, Murray would "have to object at that time, ask for a mistrial or seek whatever other remedy is appropriate." (Severance N.T. 01/20/83 at 10–11). After receiving the proposed redactions of the statement, on May 18, 1983, counsel for Murray, Wesson, and Holden withdrew their motions to sever. (Wesson MTS N.T. 05/18/83 at 114–15; Pretrial Hr'g N.T. 05/18/83 at 3).

## XI.     Nondisclosure of Witness Polygraph Results

At a May 18, 1983 pretrial hearing, Murray's counsel again requested that the prosecution produce the results of the polygraph examinations taken in connection with the homicide investigation. (Pretrial Hr'g N.T. 05/18/83 at 4). The presiding judge expressed skepticism about the request because "the results are not admissible in court, so what difference does it make?" (*Id.*). Murray's counsel responded, "I think it makes a difference in that the people questioned were asked very specific questions about the events of the crime." (*Id.*). The judge was not persuaded: "I know that, but the results are not admissible. What the polygraph operator, whether he thinks it's deception or not is not admissible." (*Id.*). Ultimately, the prosecution agreed to disclose Holden's polygraph results but refused to produce any polygraph results for the witnesses, including Gregory Strickland, George Young, and Edward Randolph. (*Id.* at 4–5).

## XII.     Wesson's Motion to Suppress His Police Statement (May 1983)

As noted above, Wesson moved to suppress his interview statement on the grounds that it was not intelligent, knowing, and voluntary. The suppression hearing spanned four days.

48

Ultimately, the trial court denied Wesson's motion to suppress.[19] (Ex. 66, Wesson MTS Opinion at 6, 9 (05/31/83)).

### XIII.    ADA Marano's Racially Discriminatory Use of Peremptory Strikes During Voir Dire

At the time of the Murray's trial, the law foreclosed the possibility of an equal protection claim based solely on a prosecutor's racially discriminatory use of peremptory challenges during jury selection without evidence "demonstrat[ing] systematic exclusion of a group of jurors from the venire." *See Batson v. Kentucky*, 476 U.S. 79, 83–84 (1986), *overruling in part Swain v. Alabama*, 380 U.S. 202 (1965). Consequently, then-existing law tolerated the prosecution's use of peremptory strikes to exclude a person from the petit jury solely on the basis of race. *Id.* at 83–86. The law changed on April 30, 1986, upon the U.S. Supreme Court's decision in *Batson v. Kentucky*. The Pennsylvania Supreme Court later held that "*Batson* shall be applied retroactively to cases pending on direct appeal at the time *Batson* was decided where the objection to the Commonwealth's use of peremptory challenges has been properly preserved." *Commonwealth v. McCormick*, 519 A.2d 442, 450 (Pa. 1986).

The notes of testimony from the voir dire examination in Murray's case show that of the eighteen peremptory challenges used by ADA Marano, he exercised at least thirteen, and possibly

---

[19]  The trial court's credibility determinations deserve little deference in light of the police misconduct uncovered in this case as well as the credible and, in some cases, substantiated allegations against Detectives Gerrard, Shelton, McNesby, and Lubiejewski in other homicide cases. (Arg. Section I.B.3). This evidence, along with inconsistencies and contradictions in the police witness testimony that came out at trial, (*id.*), undermine the credibility of their testimony at Wesson's suppression hearing. Even if Wesson's testimony about giving the statement were not credible, this would not absolve the Homicide detectives of unduly influencing Wesson into falsely accusing Murray. For instance, as discussed further below, Detective Gerrard falsely accused Murray of possessing drugs. (FB Section VI; Arg. Section I.B.3). Nonetheless, because the weight of the evidence strongly suggests that Wesson's testimony is more credible than that of the Homicide detectives, Murray respectfully requests that this Court not place undue weight on the trial court's suppression ruling, especially considering Murray had no opportunity to be heard at Wesson's suppression hearing.

as many as sixteen, to exclude black individuals from those ultimately selected to serve on the jury

at trial. Murray, Holden, and Wesson are black.

Murray's trial counsel raised her first objection after ADA Marano had exercised two of

his first three peremptory challenges the first day of voir dire to exclude black venirepersons

Deborah Barnes and Willie Reynolds. (Voir Dire N.T. 05/19/83 at 105, 145–46). Trial counsel

noted at that early stage that it appeared to be the prosecutor's "practice of striking every black

juror." (*Id.* at 146). When ADA Marano used two more peremptory challenges that day to exclude

venirepersons Clyde Jones and Thomas Hart, (*id.* at 204, 214), trial counsel objected both times,

noting that both prospective jurors were black, (*id.* at 204, 214).

On the second day of voir dire, ADA Marano exercised another peremptory challenge to

exclude a black person, Orilee Simpson. (Voir Dire N.T. 05/20/83 at 282–83). Trial counsel again

objected and requested that the court declare that a pattern of excluding black venirepersons was

taking place. (*Id.* at 283). After noting that five of the Commonwealth's six peremptory challenges

thus far were used to exclude black venirepersons, the court stated:

> I have been presiding in several murder cases, and it does appear that there are
> substantial number of challenges where the defendants are black and it is out of
> proportion to what would ordinarily be expected.

(*Id.* at 284–85). The court also acknowledged "what is occurring." (*Id.* at 287). Later that same

day, ADA Marano used another peremptory challenge to exclude John Daniel, whose background

and area of residence suggest that he was also black, though the record did not make that fact clear.

(*Id.* at 324–30).

During the third day of voir dire examination, ADA Marano exercised two peremptory

challenges to exclude Edward Boyd and Geneva Womack, both of whom were black. (Voir Dire

N.T. 05/25/83 at 436, 438, 484–85). On the fourth day, ADA Marano used six peremptory

challenges, five of which were used to exclude the following black venirepersons: Marcus Jones, Helen Williams, Dorothy Janifer, Gloria Courtney, and Reginald Johnson. (Voir Dire N.T. 05/26/83 at 591, 636–37, 764, 783, 807). On the final day of voir dire, ADA Marano used three peremptory challenges, at least one of which was used to exclude a black individual, Harvey Smaw. (Voir Dire N.T. 05/27/83 at 898). The record did not indicate the race of the two individuals (venirepersons Mamie Foster and Mamie Tillman) who were excluded by the other two peremptory challenges used by ADA Marano that day. (*Id.* at 893, 963).

In total, out of eighteen peremptory challenges exercised by ADA Marano, thirteen were noted on the record to have been used to exclude black venirepersons. Only two were used to against white venirepersons. The race of the remaining three venirepersons was not noted for the record. In other words, of the fifteen peremptory challenges exercised by ADA Marano where the race of the venireperson was recorded, thirteen were exercised to exclude black jurors. As a result, Murray was tried by a juror consisting of, in all likelihood, one black juror, with one black alternate juror. (Ex. 67, Dep. Judge Lydia Kirkland 10/28/92 at 18–19 (New Evidence)).

With regard to seven of the peremptory challenges during by the Commonwealth, ADA Marano simply maintained his silence after defense counsel lodged objections to his use of peremptory challenges to strike black venirepersons. (Voir Dire N.T. 05/19/83 at 146 (Barnes and Reynolds); *id.* at 204 (Jones); *id.* at 214–15 (Hart); Voir Dire N.T. 05/25/83 at 485 (Womack); Voir Dire N.T. 05/26/83 at 764 (Janifer); Voir Dire N.T. 05/27/83 at 898 (Smaw)). The trial court called upon ADA Marano *three times* to explain his use of peremptory challenges as to venireperson Orilee Simpson and to comment on an alleged policy within the DAO of excluding black jurors. (Voir Dire N.T. 05/20/83 at 284–85, 291). Marano twice replied that he had "nothing at all" to say, (*id.* at 284, 291), while the other time he gave only the following vague response:

51

My position is that the Court has awarded 21 peremptory challenges to the Commonwealth, and the Commonwealth can use them as it best sees fit to choose a fair, unprejudiced, impartial and competent juror, and that's what the Commonwealth is doing.

(*Id.* at 285). The prosecutor made a similar statement with regard to venireperson Reginald Johnson, stating that he was "using his peremptory challenges to pick a jury that he feels would be fair, unprejudiced, impartial and competent in this case." (Voir Dire N.T. 05/26/83 at 809–10).

ADA Marano's reasons for challenging Edward Boyd and Helen Williams were clearly pretextual. He initially challenged Boyd for cause, arguing that Boyd had testified that because of a recent burglary to his home, he might "lean against the criminal element." (Voir Dire N.T. 05/25/83 at 427). The trial court denied the challenge for cause, noting that "[t]hat would be a reason for the defense challenging him." (*Id.* at 425). Moreover, as defense counsel pointed out, Boyd had made it clear upon further questioning that he had no preconceived notions about this case, that he could apply the court's instructions, that he understood his duty to separate the burglary from the facts of this case, and that he felt he could be fair at that particular time. (*Id.* at 411, 415, 419–20, 429).

A clear indication that ADA Marano's stated reason was merely a pretext is that he found white panel member Hugh McNally acceptable—and even argued against a defense motion to strike McNally for cause—despite McNally's testimony that he might draw a negative inference against a defendant based merely on the fact that a policeman had arrested the defendant. (Voir Dire N.T. (Voir Dire N.T. 05/26/83 at 650–52, 655–57). Any inference that could be drawn from Edward Boyd's statement was no different from that which could be drawn from McNally's statement; the reason proffered by ADA Marano could not have been the true basis for his peremptory challenge against Body but, instead, was evidence of the prosecutor's discriminatory intent. *See*, *e.g.*, *Commonwealth v. Jackson*, 562 A.2d 338, 350 (Pa. Super. 1989) ("An explanation

52

which at first blush would appear to be clear, specific, and legitimate may be exposed as a pretext for racial discrimination when considered in light of the entire voir dire proceeding.").

Almost the same circumstances were present with regard to Helen Williams. ADA Marano attempted to challenge her for cause but, after the challenge was denied, used another peremptory challenge. (Voir Dire N.T. 05/26/83 at 636–37). ADA Marano then argued to the court that Williams had indicated that because she had a young son, she might be influenced by the youth of the defendants. (*Id.*). But, as the court noted, Williams had stated that she would follow the court's instructions. (*Id.*).

ADA Marano's responses to defense objections to his use of peremptory strikes also evidence his discriminatory intent. When defense counsel objected to the peremptory challenge against African American venireperson Marcus Jones, ADA Marano responded (inaccurately) that the defense "has struck all white veniremen, the last several veniremen all this morning." (Voir Dire N.T. 05/26/83 at 591). After the defense objected to his use of a peremptory strike against another black venireperson (Gloria Courtney), ADA Marano stated: "The one previously was a white venireman." (*Id.* at 783–84). These instinctive responses in themselves are an acknowledgment that race was the very basis for ADA Marano's use of peremptory challenges.

Importantly, there is evidence corroborating the existence of an DAO officewide policy during the early-to-mid 1980s regarding the use of peremptory strikes to strike black venirepersons when the defendant was black. This evidence goes beyond the "infamous" 1986 jury selection training video from former ADA Jack McMahon, who educated young DAO prosecutors on the importance of striking black jurors. (Ex. 78-A and 78-B, Transcript of Jury Selection with Jack

McMahon Training Video (<u>New Evidence</u>)).[20] Decisions in numerous cases show a pattern of conduct by the DAO to remove black citizens from the jury and subject black defendants to trial by mostly white juries.[21] A study on the use of peremptory challenges in capital murder trials in Philadelphia uncovered a pattern of prosecution strikes rates against black venire members during the early 1980s, (Ex. 68, Excerpts from David C. Baldus et al., *The Use of Peremptory Challenges in Capital Murder Trials: A Legal and Empirical Analysis*, 3 U. Pa. J. Con. L. 1 (2001)), including 1983 when the prosecutorial strike rate against black venirepersons was 0.53, *id.* at 75. By comparison, the prosecutorial strike rate against non-black venirepersons from 1981 to 1997 was only 0.22. *Id.* at 154.

## XIV.   The Trial (May 1983 – June 1983)

### A.  Douglas Haughton's Testimony

Haughton's testimony was the only evidence presented at trial that inculpated Murray in Kaboobie's death.[22] On direct examination, Haughton testified that he, Murray, Wesson, and Holden were present at Holden's house at 5:00 p.m. on December 16, 1980. (Trial N.T. 06/01/83

---

[20]   *See also* Michael Tanenbaum, *John Oliver Slams Philly Attorney Over Racial Bias in Infamous Jury Selection Training Video*, Philly Voice (Aug. 17, 2020), https://www.phillyvoice.com/john-oliver-philadelphia-attorney-jury-selection-racial-bias-last-week-tonight-hbo/. The full video of the Jack McMahon tape is available on YouTube at https://www.youtube.com/watch?v=Ag2I-L3mqsQ.

[21]   *See, e.g.*, *Diggs v. Vaughn*, CIV. A. No. 90-2083, 1990 WL 117986 (E.D. Pa. Aug. 8, 1990) (granting habeas corpus relief and ordering new trial where prosecutor used fourteen of sixteen peremptory strikes to exclude blacks from jury); *Harrison v. Ryan*, 909 F.2d 84 (3d Cir. 1990) (ordering new trial based on prosecutor's use of peremptory challenges to exclude one black juror); *Commonwealth v. Dinwiddie*, 601 A.2d 1216 (Pa. 1992) (remanding for new trial where prosecutor used five of six peremptory challenges to exclude black venirepersons); *Commonwealth v. Weaver*, 568 A.2d 1252 (Pa. 1989) (remanding for evidentiary hearing where prosecutor used five of eight peremptory challenges to remove all black venirepersons).

[22]   Wesson's redacted statement omitted explicit references to Murray, and the jury was instructed that the law prohibited it from considering Wesson's confession as evidence against Murray. (Trial N.T. 06/15/83 at 680–86).

54

at 217–18). Haughton testified that he smoked and shared two marijuana joints with Murray, Holden, and Wesson at Holden's house, and that he consumed "[t]wo ounces" of cough syrup with codeine in the evening. (*Id.* at 249, 357). According to Haughton, "all four" men discussed robbing DeLegal; Holden brought up the idea and the other three agreed to commit the robbery. (*Id.* at 223–24). The plan was to rob Kaboobie of marijuana, and Haughton did not even "know if [Kaboobie] had money." (*Id.* at 245–46). Holden was the person who decided that he and Haughton would serve as lookouts. (*Id.* at 224–25). The reason why he and Holden served as lookouts was "because Kakoobie had a misunderstanding with [Haughton] over some money and some reefer, and Gregory had a dispute with him also." (*Id.* at 233–34). Haughton claimed that he "knew [Kaboobie] wouldn't open [the door for him] because [Kaboobie] owned [Haughton] money for some marijuana." (*Id.* at 247). Haughton did not elaborate on the reason for the dispute between Holden and Kaboobie. (*Id.* at 233–34, 247).

Haughton further testified that Murray and Wesson "were supposed to go to the door and knock on the door." (*Id.* at 226). Murray had a .32-caliber handgun on his waistband at the time. (*Id.* at 226, 232). Holden gave Wesson a sawed-off 20-gauge, bolt-action shotgun that was underneath the sofa in Holden's house, and Wesson put the shotgun in a shopping bag. (*Id.* at 226–28, 232). After the discussion took place, the four men went to Kaboobie's house on Montrose Street. (*Id.* at 232).

Per Haughton's testimony, Holden stood lookout on "24th Street, right off of Montrose," and Haughton stood lookout in the school yard directly "across the street from Montrose Street." (*Id.* at 237). Haughton stood "right behind – behind the fence" on the opposite side of the street from Kaboobie's house, approximately twenty to twenty-five feet away from his front door. (*Id.* at 238–39). The schoolyard was "dim[ly] li[t]" because "[i]t was turning dark but [there was] a

street light right by [DeLegal's] house, and that was like turning on." (*Id.*). Kaboobie's front "door had a screen door and a door with glass on it." (*Id.* at 239).

Haughton alleged that Murray and Wesson walked to the door together, and that Wesson "knocked on the door, waited a couple second, and the door had opened, and [Haughton] seen him go in." (*Id.* at 239–40). Wesson was holding the shopping bag with the shotgun when he knocked on the door, and Haughton assumed Murray had the .32-caliber handgun when he approached DeLegal's house because Haughton did not see Murray ditch the gun before arriving at the house. (*Id.* at 241). Haughton testified that he "couldn't see who opened the door" and let Murray and Wesson inside the house. (*Id.*).

According to Haughton, "a couple seconds" after Murray and Wesson entered the house, he "heard the sound of a shotgun blast," followed by "the sound of three gunshots coming from a handgun." (*Id.* at 241–42). Then, Haughton "heard two more handgun shots." (*Id.* at 242). Once he heard the gunshots, Haughton "turned around and started walking through the school yard towards 25th Street." (*Id.*). He went to his brother's house and stayed there for "[n]o more than about twenty minutes." (*Id.* at 242–43).

After leaving his brother's house, Haughton claimed he went to Murray's house. (*Id.* at 243). Only Wesson and Murray were present. (*Id.*). Haughton testified that he saw Wesson with "a white gauze bandage around his arms" and that Wesson's arm was bleeding because he had been shot by Kaboobie. (*Id.* at 244, 246). Haughton asked Wesson what happened. (*Id.*). Wesson said that "it happened so fast" and that "when he walked in the house, him and Kaboobie had a tussle and, at the same time they had the tussle, Scottie [Wesson] had pulled out the shotgun, and Kaboobie had pushed it away, and as Scottie was pulling it back towards Kaboobie, [Wesson] had shot [Kaboobie]." (*Id.* at 244–45). Wesson also said that he dropped the shotgun bolt and "that

56

they didn't get enough time to go down the cellar to get anything." (*Id.* at 245). Murray allegedly "said it happened so fast, that he shot Kaboobie twice." (*Id.* at 246).

On cross-examination, all three defense lawyers attempted to impeach Haughton's credibility by pointing out the inconsistencies and contradictions among his police statements, preliminary hearing testimonies, and trial testimony. The inconsistencies and contradictions in Haughton's prior statements are discussed in Section I.E of the Argument.

### B. Bruce Murray's Alibi Evidence

Murray presented three alibi witnesses (Robin Johnson, David Elliott, and Deborah Frazier) at trial. Murray also waived his privilege against self-incrimination and testified in his own defense. Their testimonies are summarized below.

#### 1. Robin Johnson

Murray's then-girlfriend of four years, Robin Johnson, testified as his first alibi witness. (N.T. Trial 06/16/83 at 878). Johnson remembered December 16, 1980 because that was her friend Juanita Taylor's eighteenth birthday. (*Id.* at 878, 901–02). She recalled giving Taylor a birthday cake that morning around 8:00 a.m. and not seeing her again that day. (*Id.* at 901–02). Johnson went to class later that morning. (*Id.* at 879). Around 1:00 p.m., she was at lunch near 40th Street and Spruce Street and shortly thereafter left school to go to Mr. Murray's house at 2052 Ellsworth Street. (*Id.*).

When she arrived at Murray's house, Murray was home with his sister and his sister's four children. (*Id.* at 880). Murray told her that he wanted to take the children to the park because his sister was going shopping for supplies for their mother's birthday. (*Id.*). Johnson and Murray fixed the children something to eat, got the children dressed, and then took them to Chews Playground near the 1800 block of Ellsworth Street at around 4:00 p.m. (*Id.*).

While the children were playing, Johnson noticed her friends Deborah Frazier and Linda

Herring walking past. (*Id.* at 881). Frazier had just returned to Philadelphia earlier that day after living in North Carolina for over a year. (*Id.* at 883). Johnson called out her friends' names and told them to come into the playground. (*Id.* at 881). Frazier and Herring walked over and talked to Johnson while the children were still playing. (*Id.*). Because it was becoming too dark to play outside, Johnson and Murray decided to take the children to his grandmother's house on 18th Street between Washington and Carpenter Streets, and Johnson asked Frazier and Herring to walk there with them. (*Id.* at 881–82). Murray was with Johnson the entire time at the playground. (*Id.* at 881).

When they arrived at his grandmother's house at around 4:45 p.m., Murray took the children inside while Johnson talked with Frazier and Herring outside. (*Id.* at 925–26). The three women talked outside briefly, and then Frazier and Herring left. (*Id.* at 882–83). Johnson went inside the house and saw Murray socializing with the children and other family members. (*Id.*). After ten to fifteen minutes, she and Murray left with the children and went to the nearby candy store, which was located only a couple doors down from Murray's grandmother's house. (*Id.* at 924–25). They arrived at the candy store after 5:00 p.m. (*Id.* at 885). Murray and Johnson saw a worker named David Elliott and bought candy for the children. (*Id.* at 883).

After leaving the store, Johnson, Murray, and the children went to Johnson's mother's house on 18th Street and Wharton Street because Johnson needed to pick up a few items. (*Id.* at 883–84). They arrived somewhere between 5:30 p.m. and 5:45 p.m., and the house was located about twelve or thirteen blocks away from Kaboobie's house on the 2400 block of Montrose Street. (*Id.* at 927–30). They stayed at Johnson's house for about one hour, leaving at around 6:45 p.m., and then they went back to Murray's house on 20th Street and Ellsworth Street. (*Id.* at 883–84, 930). They arrived at Murray's house at 7:00 p.m. (*Id.* at 883–84). Murray never left his house

during the time he was there with Johnson and the children. (*Id.* at 885).

Murray and Johnson decided to go see a movie that night, so they went to Murray's room and looked at the newspaper to figure out what movie they wanted to see. (*Id.* at 884). They decided to see the new Richard Pryor movie[23] at the Duke and Duchess at 16th Street and Chestnut Street, but they missed the 9:00 p.m. show. (*Id.* at 884–85). They bought tickets for a later showing of the movie, and the movie ended somewhere between 11:30 p.m. and midnight. (*Id.*)

After the movie, Johnson and Murray walked down 17th Street, and when they reached Washington Avenue, they saw one of Murray's friends and asked him to drive them to the diner located at the corner of Broad Street and Ellsworth Street. (*Id.* at 931–32). The friend drove them and dropped them off, but the diner was closed. (*Id.*). Johnson and Murray decided to catch the bus at Broad Street and Federal Street, but the bus did not come for a while, so Murray and Johnson went inside a nearby bar and bought takeout dinners. (*Id.*). They exited the bar, and the bus came. (*Id.*). Murray and Johnson took the bus to Murray's house, where they ate and went to bed. (*Id.*). Johnson stayed at Murray's house overnight. (*Id.* at 923).

Johnson also testified about the incident where Haughton robbed her and Murray's sisters at gunpoint. (*Id.* at 887-A to 888). She testified Haughton "never had a permanent home" and that "[h]e stayed from place to place" in the same general area where Murray and Johnson lived. (*Id.* at 888–89). She said that Haughton has a reputation in the community for being "a liar and a thief," and that Haughton was not allowed to visit Murray's house after the robbery. (*Id.* at 887, 889).

On cross-examination, ADA Marano focused on Johnson's alibi testimony and expressed skepticism that Haughton had robbed her at gunpoint. ADA Marano questioned why Johnson did

---

[23]     Upon information and belief, the movie Murray and Johnson saw was *Stir Crazy*, released in the United States on December 12, 1980. (Ex. 106, Stir Crazy (1980) IMDB Release Info).

not report the robbery to the police if it actually happened, and Johnson replied that they did not

notify the police because "the police couldn't get [her] money back. All [Haughton] would have

done is probably done a little bit of time and came back and did the same thing all over again."

(*Id.* at 895). She said that at the time of the robbery Haughton was not as "thick in the chest and

up in the shoulders and arms" as he was at the time of trial. (*Id.* at 899–900). Johnson told Murray

about the robbery because she hoped that he would be able to get her money back:

> [P]eople in the vicinity knew Douglas and he didn't like to fight, you know. He
> always started things and was into something. But if you approached him about
> something wrong that he did, he would usually live up to it.

(*Id.* at 898–99).

Johnson testified that Murray knew Haughton well enough to potentially get her money

back, but in the fall of 1980 Haughton never came to Murray's house to "visit[] anyone in

particular." (*Id.* at 900–01). Instead, Haughton "was visiting to get a meal" and "could come in if

Bruce wasn't there." (*Id.*). She said she gave Haughton food because she felt sorry for him, and

she did not know his personality or reputation as being a "liar and thief" until after the robbery.

(*Id.* at 900–01, 934–35).

ADA Marano expressed skepticism that Johnson could have remembered what she did on

December 16, 1980, based on the fact that she gave a birthday cake to her friend Juanita Taylor in

the morning if she did not see her again later that day. (*Id.* at 911–12). However, Johnson testified

that she remembered certain dates from 1980 because that was a memorable year for her. (*Id.* at

912). She recalled that she graduated on June 19, 1980, and that two of her friends celebrated

birthdays on August 1, 1980, and August 2, 1980. (*Id.* at 913). She described these two friends and

Juanita Taylor as "close friend[s]," which is why she remembered their birthdays. (*Id.*). Johnson

also said that she could recall what she did on September 9th, November 17th, and December 18th,

but she was not asked to elaborate on why she remembered those days. (*Id.* at 912). ADA Marano questioned Johnson about what she did on December 12, 1980, and Johnson replied: "Nothing important. That's why I don't remember. I wasn't at a party. I didn't have any fun. I wasn't enjoying myself. Obviously, I was in the house. That's why I don't remember." (*Id.* at 910).

ADA Marano also questioned Johnson about why she did not give a statement to the police about Murray not being involved in Kaboobie's death when she was contacted by a detective. (*Id.* at 938, 941–42). She replied that she told the detective she did not want to make a statement because she "thought it was the right thing to do." (*Id.* at 941–42). When ADA Marano pressed Johnson about why she believed it was the right thing to do, the court asked Johnson: "Did you think you had any requirement to give him a statement?" (*Id.* at 942). Johnson answered: "I didn't think I had any requirement. I wasn't thinking about right and wrong. I just don't like giving statements without the presence of a lawyer." (*Id.*). Johnson said she "contacted the lawyer after [she] contacted" the detective. (*Id.*).

### 2. David Elliott

On direct examination, David Elliott testified that he remembered December 16, 1980, because his girlfriend called him the next day worried about a killing that occurred near 24th Street. (*Id.* at 1127). Elliott saw Murray that day, alongside his girlfriend Robin Johnson and a young boy, sometime between 5:00 p.m. and 5:15 p.m. in the store where he worked. (*Id.* at 1126–27). He recalled that Johnson, Murray, and the child had come to the store to purchase candy. (*Id.*).

On cross-examination, Elliott testified that at the time of trial he had known Murray for about six years. (*Id.* at 1127). He frequently saw Murray walk down his (Elliott's) street, and the two would talk from time to time but never really hung out. (*Id.* at 1127–28). Elliott did not know Johnson as well, only taking notice of her when she became pregnant and hung around with Murray. (*Id.* at 1128). Elliott did not know Murray had been arrested for the December 16th incident

until shortly before the trial. (*Id.* at 1129–30). He did not think much of what happened on December 16, 1980 until 1983 when Johnson asked him to verify that she and Murray had been in the store. (*Id.* at 1131).

ADA Marano questioned whether Elliott could really remember seeing them since he had not thought about it until the year of the trial. (*Id.* at 1131–32). When asked who else had come in that day, Elliott could remember his brother was there, as he also worked in the store. (*Id.* at 1132–33). ADA Marano continued probing whether Elliott could remember anyone else that day, and Elliott said that a friend of his named James Nelson had come in at 1:00 p.m. (*Id.* at 1133). Elliott could not name someone else who had been there at 5:00 p.m. on December 15, 1980. (*Id.* at 1134). He could not remember other specifics about December 16, 1980, such as the weather or how Murray and Johnson were dressed. (*Id.* at 1135). He did not inform anyone before trial that he had seen them that day. (*Id.* at 1136–37).

### 3. Deborah Frazier

On direct examination, Deborah Frazier testified that she remembered December 16, 1980 because that was the day she returned to Philadelphia after living in North Carolina for one year and two months. (Trial N.T. 06/20/83 at 1456). She spent the afternoon in downtown Philadelphia. (*Id.*). By the midafternoon, Frazier took the subway to Broad and Ellsworth, where she ran into her friend Linda Herring, who told Frazier that she had just finished up shopping. (*Id.* at 1456–57). Realizing that both were headed the same direction, Herring and Frazier walked together up Ellsworth Street until they got to the intersection of 18th and Ellsworth where they heard someone call out to them. (*Id.*). Frazier then saw Johnson calling her name from the nearby playground, and Johnson was with Bruce Murray and his nieces and nephews. (*Id.* at 1457). This was around 4:00–4:30 p.m. (*Id.* at 1458).

After chatting with Johnson and Herring at the playground, Frazier, Linda, and Johnson

went with Murray and his nieces and nephews to Murray's grandmother's house. (*Id.* at 1457–58). The three women talked outside, and then Herring and Frazier departed sometime between 4:45 p.m. and 5:00 p.m. (*Id.* at 1458–59). In all, Frazier spent around 20–25 minutes with Johnson, Murray, and the children. (*Id.* at 1458).

On cross-examination, Frazier recalled specific details about what she did on December 16, 1980. She testified that she arrived in Philadelphia that day at around 9:00 a.m., and that she planned to surprise her mother, who did not know she was coming home that day. (*Id.* at 1462–63). Frazier also planned to stay at her mother's house, but she could not go there until after he mother finished work at 5:00 p.m. (*Id.* at 1463). As a result, Frazier decided to stay downtown all day looking at new sites, walking around, and visiting friends. (*Id.* at 1462–63).

Frazier remembered she was still eating breakfast at 10:00 a.m. (*Id.* at 1465). She also recalled visiting the Locust Club, where her uncle worked, at around 12:00 p.m. (*Id.* at 1464). At around 2:00 p.m. Frazier was near Rittenhouse Square, and by 3:00 p.m. she was window shopping downtown. (*Id.* at 1464–65). ADA Marano attempted to attack Frazier's credibility by questioning her about what she did on December 17, 1980. She could not remember what she was doing at specific times on that day, but she recalled visiting her grandmother in Newark, New Jersey. (*Id.* at 1467).

Frazier did not learn until a few months before Murray's trial that he had been arrested for a murder he allegedly committed on December 16, 1980. (*Id.* at 1465). She did not give a statement when contacted by a detective before trial. (*Id.* at 1466). By the time of trial, Frazier had known Johnson through school for 10–15 years and had known Murray for about 8–9 years. (*Id.* at 1461).

### 4. Bruce Murray

Murray waived his Fifth Amendment privilege against self-incrimination and testified in his own defense. He candidly admitted on direct examination, that December 16, 1980 did not

stick out in his memory but that he remembered a day when he saw Johnson's friends and later saw a Richard Pryor movie with her. (Trial N.T. 06/16/83 at 951–52). Murray recalled that on the day he saw the Richard Pryor movie, his sister Barbara asked him to watch her children while she went and bought cakes for their mother, for whom they were planning a surprise birthday party. (*Id.* at 952–53). He testified Johnson came to his house, and they took his nieces and nephews to the playground. (*Id.*). At the playground, they ran into Frazier and Herring, and Johnson asked them to walk with her, Murray, and the children to Murray's grandmother's house. (*Id.*). He remembered spending time at his grandmother's house and then going to Johnson's house so that she could get clothes to go to the movies. (*Id.*). They then went back to Murray's house. (*Id.*).

Murray also testified about his fight with Haughton after Haughton robbed Johnson and Murray's sisters at gunpoint. (*Id.* at 954–55). He explained that Haughton came over to his house multiple times but that he did not associate with Haughton. (*Id.*). Murray could not recall the exact day, but he remembered that the last time he saw Haughton was when they fought on 20th Street and Federal Street, and that the fight occurred before he and Johnson saw the Richard Pryor movie. (*Id.*). Murray admitted he and his stepbrother "had beat [Haughton] up quite badly." (*Id.*).

On cross-examination Murray said that he remembered the day he and Johnson saw the Richard Pryor movie because of "what [his] sister asked [him] to do and the reason why she asked [him] to do what she wanted to do." (*Id.* at 990). He acknowledged that he did not think back to what he had been doing on December 16, 1980, until after his arrest in September 1982. (*Id.* at 991). He also readily admitted that he could not recall the specific date on which they saw the Richard Pryor movie, but he maintained that they saw the movie sometime in December 1980. (*Id.* at 985). Murray did not remember what time they left the playground or what time they left his grandmother's house that day, but he recalled that the movie started sometime around 10:00 p.m.

because he and Johnson "looked in the paper before [they] left" for the theater. (*Id.* at 985–86).

ADA Marano expressed skepticism that Murray, who was much shorter and lighter than Haughton, would take on Haughton in a fight. (*Id.* at 966). ADA Marano specifically asked Murray for his height and weight, and Murray replied that he might be 5'2" tall and weigh 110 lbs. (*Id.*). Murray testified that he was not looking for Haughton, let alone to fight him, and that he and his stepbrother simply ran into Haughton while walking on the street one evening. (*Id.* at 968–69). When Haughton and Murray ran into each other, they talked and then Haughton "started getting really boasty with [Murray], smart." (*Id.* at 970). Murray remembered: "I asked him could I talk to him. So we walked to Annin Street, and from there I asked him what happened. He told me he didn't want to replace nothing that he took, so I just took it up into my own fashion." (*Id.*). Murray began to fight Haughton, and his stepbrother joined the fray "a second or so" later. (*Id.* at 970). Murray testified that the fight lasted about fifteen minutes, and that both he and Lott were hitting Haughton during that time. (*Id.* at 972–75). At one point, Murray picked up a stick roughly "the size of a baseball bat" and then for five minutes beat Haughton with the stick while Lott held Haughton's arms. (*Id.*).

ADA Marano asked if there was a police station "right there on the southwest corner" of 20th Street and Federal Street. (*Id.* at 966–97). Murray answered in the affirmative, (*id.*), but in fact the police station is located in the middle of the 1200 block of 20th Street, right next to a fire station that is closer to Annin Street where the fight took place:



(Ex. 69, Map of Area Surrounding PPD 17th District). ADA Marano asked whether anyone at the police station or fire station heard the fight, and Murray testified that they must not have because no police officer or fireman came to Annin Street where the fight took place. (Trial N.T. 06/16/83 at 975–76). Murray also acknowledged his prior robbery conviction stemming from an unrelated incident. (*Id.* at 982).

### C. Tyrone Wesson's Redacted Statement

Detective Lubiejewski read a redacted version of Wesson's statement into evidence:

Q.     You understand that you are arrested for the murder of Eric DeLegal, also known as Kaboobie. I want you to go in your own words and tell what you know concerning this incident.

A.     A guy I know had been talking about robbing Kaboobie for several days. On the day of the incident, I saw this guy, Larry Thorpe, and three other guys at one of their houses. The first guy I know was planning this robbery. Larry Thorpe was like overseeing the whole thing. Kaboobie had worked for Elliot Burton dealing drugs. He was doing marijuana, cocaine, cough syrup, and things like that.

66

There was this thing between Larry Thorpe, the second guy, and Elliot Burton over some guns, and they wanted to get even, so they decided on robbing Kaboobie. We all decided that two of us would be lookouts, while me and another guy went in.

We all walked over to Montrose Street, where Kaboobie lived. Two guys waited outside somewhere. I don't know exactly where they waited, but they waited. Larry Thorpe didn't go with us. I don't know where he went.

Me and one other guy went to the door. I knocked on the door, and Kaboobie answered. The guy with me asked if he had any reefer. Kaboobie asked what he wanted. The guy with me said he was looking for some weight, an ounce. Kaboobie then said to come in.

Nobody else was inside. Kaboobie went down into the cellar and came back with the marijuana.

When he came back, he wanted to see the money. The guy with me was stalling around when Kaboobie asked for the money, and Kaboobie noticed the stall, and right after that, he reached for his gun.

He looked at me, and I looked at him, and went to reach for his gun, and I tried to grab it.

He had a .32 revolver in his front waistband under his shirt. It was a .32 short, nickel-plated with plastic rose-colored red handles.

We began to tussle for it at the same time. My gun, I had a sawed-off twenty-gauge bolt action shotgun in a paper bag, fell to the carpet during the struggle.

I had grabbed Kaboobie and had hold of him and his gun, and was trying to pick my gun off the floor, and as I got hold of it, Kaboobie got a little loose and grabbed the shotgun, and his fingers was on the trigger, and as we scuffled, the shotgun went off.

When it went off, it hit Kaboobie in the chest area. Kaboobie went down, and I lost my grip on the gun, and I saw Kaboobie going for his gun while he was on the floor, and I just tried to get away from him, and then I hear the guy with me shooting. By this time, Kaboobie had gotten his gun out and was shooting, and the gun [*sic*] with me was shooting back at Kaboobie. I ran out of the house to one of the others guys' houses.

Q.    What happened to the shotgun?

67

A.    I don't know I never saw it anymore.

Q.    Where did you get the shotgun.

A.    At one of the other guys' houses. I don't know whose gun it was.

Q.    What kind of gun did the guy who went with you have?

A.    A revolver. I don't know what kind.

Q.    When did you next see the guy who went inside with you?

A.    The same night.

Q.    What did Larry Thorpe, who was overseeing the robbery, say about the planning?

A.    Larry Thorpe was advising us about Elliot Burton, about how Burton is armed and would shoot, telling us the best time to do it, stuff like that. Thorpe said that all the stuff would be in the basement.

Q.    How long have you known Douglas Haughton?

A.    Through the neighborhood for years.

Q.    How long have you known the other three guys?

A.    For years.

Q.    Have you ever discussed this shooting with anybody?

A.    No, I have never discussed it with anyone.

Q.    "Do you know this male (showing police photo No. 566429)?"

A.    "Yes, that's Kaboobie."

Q.    "Can you read and write the English language?"

A.    "Yes."

Q.    "How far did you go in school?"

A.    Eleventh grade, Rittenhouse Academy.

Q.    Have you understood everything that has been said to you?

A.    Yes.

Q.    You have had a chance to speak to your father and mother prior to this interview; is that correct?

A.    Yes.

Q.    Is there anything you wish to add?

A.    Yes. This shooting was accidental. I was just trying to stop Kaboobie from shooting me. he pulled on the gun and it went off. I just ran after that.

Q.    Was anything taken from Kaboobie's house?

A.    No.

(Trial N.T. 06/15/83 at 681–86; *see also* Ex. 106, Redacted Version of Tyrone Wesson Statement, attached to Interrogatories Addressed to Prior Counsel).

### D.  Misleading Stipulation Regarding "An Individual by the Name of Bruce Murray"

Detective Gerrard testified about Wesson's admission that Kaboobie shot him during the December 16th incident:

I was noting a round scar on his left forearm, which he then – I made note of it to him, made note of the scar, and asked him, and he stated that he was shot in the arm when Kaboobie got killed. He also told me that he had went to the University of Pennsylvania Hospital that same night, was treated under the name of Bruce Murray, and the hospital took the bullet out; that it went in on an angle.

(*Id.* at 761).

After Gerrard's testimony, which included his acknowledgment that he later obtained copies of the medical records from HUP via a subpoena, (*id.* at 761–62; Ex. 52), ADA Marano stated as follows in the presence of the jury:

There is a stipulation by and between [Tyrone Wesson's] counsel, Judge, that if a Mr. David Moore of the Hospital of the University of Pennsylvania were called to testify, that he would testify that he is the custodian of records of that institution; that the records reflect that on December 16, 1980, at approximately 8:32 p.m., that an individual by the name of Bruce Murray, or using the name Bruce Murray, came into the hospital; that he indicated that he was twenty years old; that he was a black male; that he had been shot two hours ago in the left forearm by a .32 pistol at eight

feet away.

Also, that the patient was right-handed, and he stated that he had numbness, tingling and pain at the entrance site. And those are the comments that are recorded on Commonwealth Ex. C-16.

(*Id.* at 820–21).

### E.  Verdict and Sentence

On June 24, 1983, after three days of deliberation, the jury found Murray guilty of second-degree murder, criminal conspiracy, robbery, and possessing an instrument of crime. (Trial N.T. 06/24/1983). Holden and Wesson were also found guilty of second-degree murder and related offenses. (*Id.*). On April 23, 1984, all three men were sentenced to mandatory life imprisonment without the possibility of parole. (Sentencing N.T. 04/23/1983).

### XV.  Tyrone Wesson's Statements Exculpating Murray at Sentencing (April 1984)

On April 23, 1984, in his allocution to the trial court Tyrone Wesson testified that Murray and Holden were actually innocent. He stated as follows:

Another thing I would like to state is the fact that my failure to take the stand, I feel as though for one, that it was a lack of my understanding of my right to actually take the stand.

**I know I had a right to take the stand or not take the stand and I really felt that if I would have, I could have exonerated and made things much clearer and it wouldn't have took too much time. *I would have cleared the other two defendants if possible*** because at one time in the trial, I felt as though people thought I needed a psychiatric evaluation. They requested it, that I see a psychiatrist but that was denied – not denied, but they never brought that up.

During the course of the trial, I somewhat enlightened the other two co-defendant lawyers as far as if I were to take the stand, what my testimony would be. This way I feel there was a conflict of interest involved. I also feel as though I was coerced because I was told if I took the stand, one, the jury would not believe me. Second of all, they would have to, you know, you know, they would have to prove that I was still a liar so that would mess my judgment up or confuse me in my judgment of taking the stand or not.

(Sentencing N.T. 04/23/84 at 16–17) (emphasis added).

70

Murray stated during his own allucation:

I have been incarcerated something like twenty months now for a crime that I really didn't participate in, right, where this man here can actually clear, you know, there whereabouts of where I was, you know, that I had no participation in any crime, where they wouldn't even let him say what actually happened, and he was there. He admitted he was there. He was shot and everything else, where he can say what actually happened. He was in the house of the guy.

(*Id.* at 20).

Gregory Holden also reiterated his actual innocence, saying:

[W]hen I got arrested for this crime, I was not guilty then and I'm still not guilty now. I want to say most of the things that Mr. Wesson said, that Mr. Wesson has the answers in this case as far as clearing me and [Murray]. That's all I have to say.

(*Id.* at 24).

## XVI. Douglas Haughton's 1985 Recantations

In two separate affidavits dated April 11, 1985, Douglas Haughton recanted his trial testimony and police statement and claimed he was coerced into accusing Murray and Holden of murder. The one affidavit provided as follows:

I was arrested on February 24, 1981 [*sic*], and taken to the Federal Building in Philadelphia. I was kept there for approximately a half a day without being able to talk to an attorney and without being told of my right to have a lawyer or to be silent. A federal agent named Carpinelli told me that they had photographs and films proving my involvement in a bank robbery. I was also questioned by a Philadelphia detective named Girard about the murder of Eric "Kaboobie" DeLegal. I was punched, shoved, and slapped in the face by Agent Carpinelli, who threatened me with a stiff sentence on the bank robbery and with a murder charge. Detective Girard kept suggesting that I cooperate. They bullied and insisted that I sign statements naming Bruce Murray and Gregory Holden in this murder, as well as Tyrone "Scotty" Wesson. I was frightened and I believed that they would not stop and that things would not get better until I signed the statements that they wanted and agreed to testify at trial.

What really happened when "Kaboobie" died is this: I met "Scottie" on 22d Street and he asked where we could go buy some reefer. We went to "Kaboobie's" house because "Kaboobie" owed me $150.00. We could see that "Kaboobie" was high on drugs as soon as we went in his house. "Kaboobie" noticed that there was a stall and he reached for a sawed off shotgun that he kept right behind the front door. As he reached for it the gun fell and "Scotty" grabbed "Kaboobie" and the gun.

"Kaboobie" got loose and grabbed the gun and got his finger on the trigger and they kept scuffling and the gun went off and hit "Kaboobie" in the chest. "Kaboobie" went down and I saw him going for his gun while he was on the floor. "Kaboobie" started shooting and he hit "Scotty" in the arm. At that time I grabbed "Kaboobie" and the gun and he shot himself twice while I was trying to stop him from shooting "Kaboobie" again.

(Ex. 36). In the second affidavit, Haughton stated:

I, Douglas Haughton, upon arrest on February 24, 1981 [*sic*], at my home located at 1002 S. 25th St./ I was transported to the Federal Building; at which time without the benefit of counsel, or mention of the Miranda Decision, I was vigorously questioned. Federal agent Carpenelli initiated the interrogation with questions concerning a bank robbery as local officer Girard quickly follow up with still more questions concerning the "Eric Delego Murder." They presented photographs of me inside the bank "they stated that if I failed to cooperate that I would never get out of prison." They promised less time for cooperation. Officer Carpenelli, he physically shoved and punched me while the other's suggested cooperation. I was terrified, question after question, suggestion after question, question after suggestion; continuously pounded and compounded until it seemed as if the names were grains of sand slapping me in the face, "Kabobie!, "Eric Delego!" and "Bruce Murry" along with "Gregory Holden," and "Tyrone Wesson" and myself. All that I could remember was the demand that I sign, and suggestion that all would be better afterwards, I signed.

For the benefit of all parties concerned and especially on behalf of the innocent, and the Judicial Body, that may have been mislead. I Douglas Haughton, now state in the absence of "Duress!" that "Gregory Holden" and "Bruce Murry" are victims of an earlier statement obtained "VIA DURESS."

(*Id*.).

On May 11, 1985, Douglas Haughton wrote a letter to Murray's former trial counsel, who was then representing Murray on his direct appeal. (Ex. 70, Ltr. from Haughton to Pamela Cohen (05/11/85) (New Evidence)). Haughton recanted his trial testimony and stated as follows:

[T]his is the truth because when I told you when the police had me in there [*sic*] custody they scared me into saying and signing a statement that wasn't true. So hear's [*sic*] the truth! I ran into Scotty and his girlfriend on 22nd St. and Scotty told me he was taking his girlfriend to the movies for her birthday which was 12-16-80 and he wanted to by [*sic*] some (weed) and asked me were [*sic*] to get some; and I told him I'll take him. So his girlfriend went to her co[illegible] house until Scotty came back. I meant [*sic*] Scotty at a party were [*sic*] he was d-jaying. That's how we meant [*sic*]. But I haven't seen him anymore till I ran into him on 22nd St. at the bar.

72

And I know everything that happen at Kaboobie house. Scotty and me went to his house. I knocked on the door. Kaboobie let us in so I asked Kaboobie did he have any (weed) he said "how much do you want to by [*sic*]." So I asked him about the money he owed me, right, then he noticed the stall and Kaboobie started to reach for the shotgun that was behind the door. As he reached for it the shotgun fell Scotty had grabbed Kaboobie and hold of him and the shotgun and somehow Kaboobie got a little loose and grabbed the shotgun and his finger was on the trigger and as they scuffled the shotgun went off and hit Kaboobie in the chest area.

Kaboobie went down and I saw Kaboobie going for his gun while he was on the floor and he started shooting, hitting Scotty in the arm; and at that time I grabbed Kaboobie and the gun and he shot himself twice. I was trying to stop him from shooting Scotty again. That's what happen. The reason I'm telling you this now is because I found out that Gregorie and Bruce receive life for something they had nothing to do with.

(*Id.*).

## XVII.  The 1991 PCHA Hearing

On July 25, 1991, a joint evidentiary hearing was held on Murray's and Holden's petitions for postconviction relief. The first witness was Eugene Thomas, Haughton's former cellmate at SCI Camp Hill. (PCHA N.T. 07/25/91 at 3). Thomas testified Haughton initiated a conversation with him and told him Murray was innocent: "He told me that he told the police that Bruce Murray was on the scene of a robbery that resulted into a homicide, a homicide robbery and Bruce Murray wasn't there." (*Id.* at 4–5). Haughton told Thomas "[h]e made a deal with the Commonwealth and with the federal government for a lenient sentence, if he testified against Bruce Murray." (*Id.* at 7). Thomas did not know Murray at the time Haughton told him about the false conviction, and he later contacted Murray and told him "[w]hat Douglas had told me." (*Id.* at 4).

Haughton also testified at the hearing, with no expectation of receiving any benefit. (*Id.* at 20). He testified about the terms of his plea agreement with the Commonwealth, and he affirmed the truthfulness of the May 11, 1985 letter he sent to Murray's prior counsel. (*Id.* at 18–20). He recanted his trial testimony and police statement, testifying that Murray and Holden are actually

innocent and confessing that he was the man with Wesson inside Kaboobie's house at the time of

the shootout. (*Id.* at 22–24). Haughton asserted on the stand:

> What I am saying is this, what I am saying today is the truth and what I said before
> is a lie because I was scared and I said anything that would benefit me. Now, I am
> here today because I have a guilty feeling and I am telling the truth of what
> happened.

(*Id.* at 31). Haughton emphasized that he did not care if he was punished for his recantation: "I am

saying, if they do give me punishment, it doesn't matter, I am telling the truth." (*Id.*).

Wesson testified at the hearing as well and discussed what actually happened on December

16, 1980. He recanted his police statement and reiterated that the police tricked him into signing a

premade statement with false information and false accusations. (*Id.* at 53–55). He also reaffirmed

that, at their sentencing hearing, "I made a statement which I know to be truth, that Mr. Holden

and Mr. Murray, they didn't have anything to do with it." (*Id.* at 46). Murray and Holden had no

involvement in Wesson and Haughton's plan to go to Kaboobie's house, nor did they encourage

or assist Wesson and Haughton in any way. (*Id.* at 47). Murray and Holden did not even know

Wesson and Haughton were going to Kaboobie's house. (*Id.*). Wesson also confirmed that he had

told his defense attorney, Murray's attorney, and Holden's attorney that Murray and Holden were

not present at Kaboobie's house. (*Id.*).

Haughton and Wesson provided consistent narratives about what happened at Kaboobie's

house. Both men testified that they randomly bumped into one another on 22nd Street, (*id.* at 22,

40), that Wesson asked where he could purchase marijuana, (*id.* at 22, 41), that the two men went

to Kaboobie's house so that Wesson could buy marijuana, (*id.* at 22, 41–42), that only Haughton

was armed at the time, (*id.* at 23, 42–43), that Kaboobie pulled out a shotgun after he and Haughton

exchanged words, (*id.* at 22–23, 42), that Wesson grabbed the shotgun, that Wesson and Kaboobie

struggled for control of the shotgun, (*id.* at 23, 42–43), that the shotgun discharged and struck

Kaboobie, (*id.*), and that Haughton returned fire after Kaboobie fired shots, (*id.*). Most importantly,

they both testified that Murray and Holden were neither present nor involved in whatever happened

at Kaboobie's house. (*Id.* at 19, 46).

## XVIII.    Gregory Strickland's Exculpatory Eyewitness Account

Strickland wrote a letter (date-stamped December 1, 2000) to the Innocent Project of

Centurion Ministries concerning Bruce Murray. In his letter, Strickland wrote the following:

> I have testimony that can help someone who is innocent, he's been falsely
> convicted. I seen the brother Bruce Murry name in the Graterfriend's Volunteers
> and I remembered the whole situation. I remember talking with a attorney of his
> many years ago about coming forward and I never heard from her again. Through
> research I found out her name was Irene Cotton but sometime later I found out she
> was dead. And because I was on drugs and always on the run, this is the reason she
> could never contact me. I heard that Centurion Ministries, Inc. help innocent
> people. I heard they helped this guy name Edward Baker win his freedom.
>
> I'm trying to find out who Bruce Murry's lawyer is? When I was 15 years old a
> murder of my friend happened and when I was question by Phila Homicide
> Detective Gerrard and the DA they showed me pictures of Bruce and told me to say
> it was him. But I didn't because he was not one of the killers. I seen Douglas
> Haughton and heard his voice and they told me that Scotty old on his self and Murry
> so they only need me to point Murry out and because I wouldn't they counseled
> [*sic*] the lineup and that I was so afraid to say anything at that time because of Elliot
> Burton and guys around the way and Douglas two nephews I just said nothing as
> my father said. Thank you please get back to me and let me know how I can contact
> Bruce Murray's lawyer or help him in some way.

(Ex. 12).

In a July 20, 2011 affidavit, Strickland reaffirmed the truthfulness of his earlier letter and

stated as follows under penalty of perjury:

> Yes, I did reach out to Mr. Hepburn of the Innocent Project of Centurion Ministries
> concerning Bruce Murry. No one have attempted to reach me so I thought my help
> was not needed. Yes, I was interviewed in 1981 by police. I was contacted by police
> and made to participate in a lineup in 1982 as a witness. I did not cooperate because
> the police showed me a picture of Bruce Murry and told me to pick him out of this
> lineup. I told them I did not see Bruce and didn't know him. I eventually refused
> the lineup and it was ended.
>
> I, as you know, was with my friend and childhood mentor Eric Delegal when he

was killed and all I'm trying to do is be a voice for him! I was there, I know who was inside his home the night he was killed, he told me he let Douglas Horton [aka Haughton] and another guy in when they came to get the weed from the cellar for them. Plus after the shots I ran upstairs as Douglas Horton and the other guy was leaving. They went separate ways. Douglas went toward his home on 25th Street and the other guy ran towards 24th. I knew Douglas all my life so I called out to him saying why did you have to kill him?

While in SCI Forest, I came to meet Blue [aka Anthony Smith] for he was talking with some younger guys about old-heads from the hood and him having family down there, and being locked up with a lot of guys from South Philly, heard someone called me Dap, and he ask[ed] me about Omar (Douglas) and he told me they were at Camp Hill together and how he was trying to help Douglas with his case, that Douglas told him all about the shooting and me being there. Blue knew things I didn't even know! Like Douglas having a gun and that Scott Wesson was shot, and that Doug tried to get me (killed) a few times on the street. I don't know Bruce Murray, I heard of him from the guys in the hood that told me things they heard and because they heard stuff I could not go against what they heard for it would have been like siding against them. I already was being stalked, and I didn't want Douglas on my back and all his friends from my end, so I kept quiet.

(Ex. 11).

## XIX.    **Anthony Smith Affidavit**

On June 19, 2011, Anthony Smith, one of Haughton's fellow inmates at Camp Hill,

submitted a sworn affidavit corroborating Haughton's recantation. Smith stated, in pertinent part:

I was arrested and sentence[d] and sent to Camp Hill Prison at which time I came to meet and know Omar (Douglas Haughton). We were not cellmates but we use to stay up all hours of the night on the gate talking and smoking and we come to find out we know a lot of the same people. We talked about our cases, not in detail on the gate just general things seeking advice, and once we could talk openly together in the yard it came out about how he got such a light sentence for a Bank Robbery and a Murder.

He would ask me and his cellie what can he do to clear these guys that the Detectives forced him to say was part of a plan, but in all honesty had nothing to do with the crime. He said he only did it out of fear for he was being beat and threaten[ed], to be charged with first degree murder and the electric chair, so I was taking notes and told him I would try to help him because he was my Muslim Brother and made a mistake which we all do. Doug went on to say Bruce Murray nor Gregory Holden had nothing to do with the killing of Eric Delegal and that while he was out he ran into Scotty (Tyrone Wesson) and some girl and they wanted some weed so he took Scotty to Kaboobi.

76

Douglas said he carried a handgun because of his drug problem and him doing dirt in the hood. He also said Kaboobi didn't know he had someone with him until he open[ed] the door and once inside and he was behind them he reached for a shotgun kept behind the door. Douglas said Kaboobi was pointing this shotgun at them, and Scotty didn't know what was going on and he pushed the gun from his direction, at which time Kaboobi was losing his grip as him and Wesson was tussling for the shotgun, and out of the clear blew [*sic*] Kaboobi pulled out a smaller gun shooting Scotty, then Doug said he heard a larger boom and he started shooting and you see Kaboobi go down that's when Doug says he notice it was Kaboobie got hit with his own gun.

So Doug says him and Scotty started for the door and this little boy name Dap came running out of the house calling his name. On June 12, 2011, I just found out who Dap was for he just came to SCI-Forest and we got to talk as he was introduced into the community and he confirmed everything I've been told by Douglas Haughton and Gregory Strickland backs up that the Detective Gerrard and Gilbert try to get him to lie on Bruce Murray at a line up but he refused and it was ended at that point.

(Ex. 16).

## XX.    **Brenda Murray's Unsworn, Unsigned Affidavit**

In the very late stages of counsel's investigation into Murray's actual innocence claim, counsel has located a copy of an unsigned, unsworn affidavit written by Murray's sister, Brenda, that is dated August 7, 2019 and addressed to this the Court, specifically the Honorable Judge Anita Brody. (Ex. 108, Brenda Murray Aff. (08/07/19)). Although the affidavit does not bear her name, Brenda's last known address, which has been redacted in Exhibit 108 in accordance with Local Rule of Civil Procedure 5.1.3, appears in the top lefthand corner of the affidavit. Additionally, as noted below, Brenda drove Wesson to the Hospital of the University of Pennsylvania after Wesson was injured during the shootout at Kaboobie's house in December 1980, (Ex. 108), and this fact is corroborated by the notation in the HUP medical records that the "Sister" of "Bruce Murray" was the person who brought Wesson to the emergency room. (Ex. 52).

Counsel intends on supplementing the Counseled and Amended Motion with an updated, authenticated version of Brenda's affidavit. Since learning about the affidavit, counsel has made

several attempts to contact Brenda for the purpose of obtaining a sworn affidavit. Counsel's associate recently made good contact with Brenda and obtained her phone number, but counsel was unable to obtain a sworn affidavit in time to meet the filing deadline for Murray's Counseled and Amended Motion. Counsel proffers Brenda's unsworn, unsigned affidavit for the Court's awareness:

> **December 1980, I took Scotty [Tyrone Wesson] to the hospital after he was shot, he told me someone attempted to rob him and because he was underage I took him and used Bruce's medical information;** at the time I never knew that Scotty was involved in a murder, I would never have used Bruce's ID; knowing it would have involving Bruce in a murder, that he was not involved in. I wanted to testify to this fact, but [Bruce's] attorney never called [me] down to testify. I was incarcerated myself at the time of Bruce's trial. No one ever came to see me or talk to me regarding Bruce's case. I don't understand why the attorney did that? his attorney had no regard for my brother's life, I truly believe if they would have heard my testimony, the outcome would have been different.

> **Bruce was with his girlfriend watching my son and niece.** While I was out shopping for our mother's surprise party. Bruce always spent time with all of our children, that was what he did. They often went to the park and different neighborhood parties; I remember this so clearly because we had this planned out because of our mother's birthday. I was out early that day until the evening getting things ready for the party. When I came back it was evening, Bruce was going to the movies with his girlfriend. **Scotty needed to go the hospital because he said he was robbed** so I just jumped up and took him. A lot of things I don't remember but this isn't one of them, my brother was taken from his family, and it left a hole in our family over the past 39 years. Please help us get my brother back to his family.

(Ex. 108 (paragraphing altered) (emphasis added)).

Brenda Murray's account answers questions that have remained open in her brother's case for more than forty years. Her account explains how Wesson got to HUP after the shootout and provides a reasonable explanation as to why he lied about his identity and claimed to be "Bruce Murray." Brenda's account also explains how HUP obtained accurate personal information about the real Bruce Murray. Brenda's account is also credible because if her brother were actually involved the shootout (and he was not), she would not have recommended that Wesson use her

brother's personal information. Crucially, Brenda's affidavit also corroborates Wesson's testimony at the July 25, 1991 PCHA hearing, where he stated that he went to Kaboobie's house simply to purchase marijuana and believed he had been set up as the victim of a robbery when Kaboobie took out the sawed-off shotgun after having words with Haughton.

## STANDARD AND SCOPE OF REVIEW

"[T]he conviction of an innocent person [is] perhaps the most grievous mistake our judicial system can commit,' and thus, the contours of the actual innocence gateway must be determined with consideration for correcting 'such an affront to liberty." *Reeves v. Fayette SCI*, 897 F.3d 154, 164 (3d Cir. 2018) (quoting *Satterfield v. Dist. Att'y of Phila.*, 872 F.3d 152, 154 (3d Cir. 2017)). As the U.S. Supreme Court has explained,

> Of greater importance [than the preservation of judicial resources and respect for finality and comity], the individual interest in in avoiding injustice is the most compelling in the context of actual innocence….Indeed, concern about the injustice that results from the conviction of an innocent person has long been at the core of our criminal justice system. That concern is reflected, for example, in the 'fundamental value determination of our society that it is far worse to convict an innocent man than to let a guilty man go free.'

*Schlup v. Delo*, 513 U.S. 298, 324–25 (1995) (quoting *In re Winship*, 397 U.S. 358, 372 (1970) (Harlan, J., concurring)); *id.* at 325 ("The maxim of the law is…that it is better that ninety-nine…offenders should escape, than that one innocent man should be condemned." Thomas Starkie, Evidence 756 (1824))).

"Actual innocence," for purposes of the "miscarriage of justice" exception to procedural default of a habeas corpus claim under Federal Rule of Civil Procedure 60(b)(6), means "factual innocence, not legal insufficiency." *Reeves*, 897 F.3d at 161. The scope of review is "not limited to the existing record[,]' and consideration of 'any admissible evidence' is proper." *Howell v. Superintendent Albion SCI*, 978 F.3d 54, 59 n.9 (3d Cir. 2020) (alteration in original) (quoting *Bousley v. United States*, 523 U.S. 614, 624 (1998)). The district court must "undertak[e] an individualized analysis of the proffered evidence," and cannot discredit "recantations on a categorical basis." *Id.* at 60 (instructing that all forms of evidence under the standard set forth in *Schlup* "should be analyzed on an individual and fact-specific basis"). "'[T]here are no categorical

80

limits on the types of evidence that can be offered' under *Schlup*." *Id.* (quoting *Hyman v. Brown*, 927 F.3d 639, 660 (2d Cir. 2019)).

To obtain relief from the procedural default judgment, the petitioner must make a two-step showing: "[F]irst, the petitioner must present 'new reliable evidence' of actual innocence; and then, second, that evidence must 'persuade[] the district court that...no juror, acting reasonably, would have voted to find [the petitioner] guilty beyond a reasonable doubt.'" *Id.* (footnotes omitted) (alterations and omissions in original) (first quoting *Schlup*, 513 U.S. at 324; then quoting *Satterfield*, 872 F.3d at 163). Relief is warranted under Rule 60(b)(6) if the petitioner meets this standard, "and the habeas petition can be considered on the merits despite a procedural default, 'unless the totality of equitable circumstances ultimately weight heavily in the other direction.'" *Id.* (quoting *Satterfield*, 872 F.3d at 163).

To satisfy the first step of the *Schlup* standard, the petitioner must offer evidence that is "both 'new' and 'reliable.'" *Id.* To constitute "new" evidence, the evidence must have been "not available at trial and could not have been discovered earlier through the exercise of due diligence," *Reeves*, 897 F.3d at 162 (quoting *Amrine v. Bowersox*, 238 F.3d 1023, 1028 (8th Cir. 2001)), with an exception in cases "when a petitioner asserts ineffective assistance of counsel based on counsel's failure to discover or present to the fact-finder the very exculpatory evidence that demonstrates his actual innocence," *id.* at 164; *accord Houck v. Stickman*, 625 F.3d 88, 94–95 (3d Cir. 2010) (citing *Amrine*, 238 F.3d 1023). In assessing the reliability of the new evidence, "the [district] court may consider how the timing of the petitioner's submission and the likely credibility of the witnesses bear on the probable reliability of that evidence, as well as the circumstances surrounding the evidence and any supporting corroboration." *Id.* at 60 (quoting *Reeves*, 897 F.3d at 161) (alterations and omissions in original).

To satisfy the second step of the *Schlup* standard, the petitioner must "show by a preponderance of the evidence 'that it is more likely than not that no reasonable juror would have convicted him in light of the new evidence,' or stated differently, that it is 'more likely than not any reasonable juror would have reasonable doubt.'" *Reeves*, 897 F.3d at 160–61 (first quoting *Houck*, 625 F.3d at 93; then quoting *House v. Bell*, 547 U.S. 518, 538 (2006)). As the Third Circuit Court of Appeals has explained,

> [T]he court "must consider all the evidence, old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under rules of admissibility that would govern at trial." *House*, 547 U.S. at 538 (internal quotation marks and citation omitted). "[M]ere impeachment evidence is generally not sufficient to satisfy the [actual innocence gateway] standard." *Munchinski v. Wilson*, 694 F.3d 308, 338 (3d Cir. 2012). However, new, reliable evidence that "undermine[s] the [trial] evidence pointing to the identity of the [perpetrator] and the motive for the [crime]" can suffice to show actual innocence. *Goldblum v. Klem*, 510 F.3d 204, 233 (3d Cir. 2007); *see also Munchinski*, 694 F.3d at 33–37 (explaining that actual innocence was demonstrated where new evidence both showed that the crime could not have happened in the way the Commonwealth presented at trial and provided an alternative theory that was more appropriate and better fit the facts of the case). In weighing the evidence, "[t]he court's function is not to make an independent factual determination about what likely occurred, but rather to assess the likely impact of the evidence on reasonable jurors"; the actual innocence standard "does not require absolute certainty about the petitioner's guilt or innocence." *House*, 547 U.S. at 538.
>
> The gateway actual innocence standard is "demanding" and satisfied only in the "rare" and "extraordinary" case where "a petition presents evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error." *McQuiggin* [*v. Perkins*], 569 U.S. [383,] 386, 392, 401 [(2013)] (internal quotation marks and citations omitted).

*Id.* at 161.

# ARGUMENT

To obtain relief under Fed. R. Civ. P. 60(b), a habeas petitioner must present new, reliable evidence of actual innocence and show that is more likely than not that, had the new evidence been presented at trial, "any reasonable juror would have reasonable doubt." *Reeves*, 897 F.3d at 160 (quoting *House*, 547 U.S. at 538). Here, Murray's entitlement to relief turns on one factual question, all else being peripheral: Whether Douglas Haughton or Bruce Murray was the third participant in the three-person shootout with Kaboobie and Wesson on December 16, 1980. The police initially suspected "Scotty (Douglas Haughton) and Bruce Murray" were the two men who went inside the house, (Ex. 20), only to later find out that Wesson was "Scotty," (Ex. 46). Presently, there is no dispute that only two men entered and fled Kaboobie's residence or that Wesson was one of the two men. The only question is whether the second man was Murray or Haughton.

The truth of what actually happened that day (i.e., whether Kaboobie's shooting death was an accident or the result of an attempted robbery gone awry) is not the focus of the analysis. To the extent any of the Commonwealth's original allegations against his codefendants are accurate, and the evidence strongly suggests that many (if not most) of them are not, the fact remains that Murray did not and could have had any involvement in the shootout because he simply was never there. A robbery could have occurred without Murray's participation, or Wesson and Haughton could have gone to Kaboobie's house to purchase marijuana and the situation could have escalated unnecessarily and accidentally. Regardless of whatever happened, Murray has proven his factual innocence because it is more likely than not that any fully informed juror, acting reasonably, would find that Haughton was the other participant with Wesson in the shootout at Kaboobie's house. This necessarily entails that any juror, acting reasonably, would have reasonable doubt about Murray's guilt. Thus, Murray is entitled to relief from final judgment.

I.  **Murray's claim rests on new, reliable evidence of his actual innocence.**

Aside from the alibi evidence Murray presented at trial, most of the actual innocence evidence proffered here is "new" because the evidence was "unavailable at trial," *Reeves*, 897 F.3d at 162, and "not presented at trial," *id.* at 163 (quoting *Calderon v. Thompson*, 523 U.S. 538, 559 (1998)); *see also Munchinski*, 694 F.3d at 339 (finding that habeas petitioner's "new, reliable evidence that was not presented at trial" was sufficient to make the threshold showing of actual innocence (quoting *Houck*, 625 F.3d at 93)).

The information falling into this class of "new evidence" includes, but is not limited to, the following: Haughton's 1985 letter and affidavits; Wesson's April 1984 allocution; Haughton's and Wesson's exculpatory testimony at the July 1991 PCHA hearing; Eugene Thomas's testimony at the 1991 PCHA hearing; Anthony Smith's July 2011 sworn affidavit; the George Young polygraph report, which included his undisclosed statement that the shorter, skinnier male was sixteen years old; the Edward Randolph polygraph report; the Gregory Strickland polygraph report; the letter from Strickland date-stamped December 2000; Strickland's July 2011 sworn affidavit; the evidence concerning Elliot Burton's role as a confidential informant; the Feb. 25, 1981 Search Warrant; and the tip from John Howard, who told police he saw Burton flee Kaboobie's house with a shotgun after the shootout.

Haughton's recantations recanting his prior statements, confessing to his role as the other shooter, and exonerating Murray; Wesson's recantations of his police statement falsely inculpating Murray; Gregory Strickland's sworn affidavit and letter; Eugene Thomas's testimony at the PCHA hearing corroborating Haughton's recantation; Anthony Smith's affidavit corroborating Haughton's recantation; and the tip from John Howard, who told police he saw Elliot Burton flee Kaboobie's house with the missing shotgun after the shooting.

In assessing the reliability of the new evidence, the district court must "undertak[e] an

individualized analysis of the proffered evidence." *Howell*, 978 F.3d at 60. There are no limitations on the evidence that the court may consider, *id.* (citing *Hyman*, 927 F.3d at 660), and the court cannot discredit "recantations on a categorical basis," *id.* at 60. Indeed, "courts must give due consideration to any colorable claim based on recanted testimony, 'out of concern for the possibility that the integrity of the trial's truth-finding function was compromised through a fraud on the Court.'" *United States v. Clark*, 382 F. Supp. 3d 1, 20 (D.D.C. 2019) (quoting *Avalos v. United States*, No. 1:10-cr-134, 2014 WL 12709022, at *2 (E.D. Va. Aug. 19, 2014)).

In considering the reliability of a recantation, the court must evaluate the recantation "in light of *all* the evidence." *See Schlup*, 513 U.S. at 328 (emphasis added). The court must consider the witness's motive for recanting, the inconsistency of the witness's prior statements, and the lack of evidence corroborating the prior statements. *See Doe v. Menefee*, 391 F.3d 147, 164–65 (2d Cir. 2004) (quoting *Anderson v. City of Bessemer City*, 470 U.S. 564, 575 (1985)). By the same token, the court should also consider any "[d]ocuments or objective evidence" contradicting the witness's prior statements, *see United States v. King*, No. 5:10-HC-2009, 2012 WL 4447577, at *25 (E.D.N.C. Mar. 1, 2012) (quoting *Anderson*, 470 U.S. at 575), as well as the timing of the recantation, any evidence corroborating the recantation, the consistency of the witness's explanations for recanting, the witness's motives for fabricating the prior statements, and any other circumstances surrounding the recantation that bear on its reliability, *see Howell*, 978 F.3d at 60.

## A. Gregory Strickland's statements are reliable evidence of Murray's actual innocence.

Strickland has provided a sworn affidavit and a handwritten letter, disavowing his prior statements to homicide detectives in which he denied knowing who shot Kaboobie. (Ex. 11; Ex. 12). Strickland's statements exonerate Murray by establishing that Douglas Haughton was other man with Tyrone Wesson inside Kaboobie's residence at the time of the shooting. Strickland's statements are reliable for a variety of reasons.

85

1.  **The newly discovered report from Strickland's polygraph test corroborates that Strickland listed to his father and did not tell the police the entire truth because he feared retaliation from Haughton and Burton.**

Strickland has stated that he did not tell the police the entire truth about what he observed at Kaboobie's because he feared retaliation from Haughton and Burton, and his father told him to lie. (Ex. 11; Ex. 12). Strickland took a polygraph examination in March 1981, and the results of the examination confirm that he did not tell the police the entire truth. (Ex. 28). He told the detectives that, in the days after the shootout, unidentified individuals were stalking him. Strickland told police that he saw a man wearing a tan wool hat pulled over his face followed him on the street. Each time Strickland turned around, the man would duck behind a car or building. Strickland also told detectives that on December 22, 1980, he was at school when he friends told him that there were men waiting outside for him. He waited inside the school building until his mother arrived, and by that time the men had left. (Ex. 10).

These incidents corroborate Strickland's letter and affidavit, wherein he admitted that he did not tell detectives the truth about he saw—especially the fact that he saw Haughton inside Kaboobie's house at the time the shooting—because he feared retaliation from Haughton and Burton. (Ex. 11; Ex. 12). In fact, Strickland found out years later from Anthony Smith that Haughton "tried to get me (killed) a few times on the street" because Haughton knew Strickland was one of the men who shot and killed Kaboobie. (Ex.11).

The reasons for Strickland's fear of Burton are less clear, but considering Strickland may have seen Burton flee Kaboobie's house with the sawed-off shotgun used in the shootout, (Ex. 14), one could reasonably infer that Strickland feared mentioning something that might have tipped the police off to the fact that Burton took the shotgun. Burton was a member of the Twentieth and Carpenter Street Gang, and he had previously testified in an unrelated homicide case that he was present during a discussion in which the leader of the gang and two other members planned the

assassination of a "suspected spy for a rival gang." *Watts*, 412 A.2d at 475.  The gang leader and the two other members drove the suspected spy to a particular location "on the pretext they were initiating him into the gang," and then "they shot him while he was in the back seat of the car and again while he was in the front seat, and…left his body in the front of the car." *Id.* Burton also had his own extensive criminal history, which included convictions of violent crimes and charges as serious as attempted murder:



(Ex. 105, Elliott Burton Criminal Extract and Mugshot (10/10/80) (<u>New Evidence</u>)).  Strickland was not the only person fearful of Burton, considering John Howard told police not to come to his house and later fell off the police's radar after he told them that he saw Burton flee Kaboobie's house with a shotgun after the shootout. (Ex. 14).  In short, Strickland's statements that he feared retaliation from Haughton and Burton and the fact that he was only sixteen years old and lied to police based on his father's advice increase the reliability of his statements inculpating Haughton.

### 2. Strickland's motive for coming forward increases the reliability of his statement.

Strickland's only motive for coming forward was to ensure that justice is done for the sake of his Kaboobie, whom Strickland called his "friend and childhood mentor." (Ex. 11).  Strickland simply had no motive to fabricate his accusation against Haughton. If anything, Strickland's

motive for *increases* his credibility because his statement exonerates one of the men convicted of murdering his "friend and childhood mentor." (Ex. 11).

### 3. There is little evidence corroborating Strickland's police statements, and the available evidence tends to contradict them.

First, there is no evidence corroborating Strickland's prior statement that he called the ambulance. Strickland claimed that George "Reds" Young told him to call an ambulance, and that he did call an ambulance from his house. (Ex. 10). However, Young did not mention Strickland during his interview with detectives, and Young told them that he personally called the police after seeing Kaboobie lying on the floor. (Ex. 7). There is also no indication in the PPD homicide file that Strickland ever called an ambulance. For example, the homicide record as of the next day indicated that Young called the police, but there is no mention of Strickland at all. (Ex. 5). Police did not even know until five days later that Strickland was inside Kaboobie's house. (Ex. 13).

Second, Strickland's original statement that he waited downstairs for around twelve minutes after hearing the gunshots is not credible. (Ex. 10). If this statement were true, then the first responders would have encountered Strickland there before he left Kaboobie's house. The shootout occurred at 5:47 p.m., (Ex. 1), which means Strickland would not have come upstairs until approximately 6:00 p.m. (Ex. 10). Yet, multiple officers had arrived at Kaboobie's residence before 6:00 p.m., which means they would have encountered Strickland before he left. (Trial N.T. 05/31/83 at 50).

### 4. Strickland's prior statements contain a crucial internal inconsistency related to Haughton fleeing the scene.

Edward Randolph informed the police that Strickland had said that he saw Haughton inside Kaboobie's house. (Ex. 22). Strickland denied this but did tell police that someone "ran outside" after running down the stairs to the first floor. (Ex. 10; Ex. 27). However, Strickland's statement that someone "ran outside" is facially incredible. If Strickland had actually been waiting in the

cellar, then how could he have known someone ran outside? This internal inconsistency tends to corroborate Strickland's sworn statement because it indicates that Strickland saw actually Haughton run outside after the shooting.

### 5. Documents and physical evidence corroborate Strickland's statements.

Strickland stated that Kaboobie went downstairs into the cellar to get the marijuana for Wesson, told him that Haughton was one of the men upstairs, and went back upstairs with the marijuana to complete the transaction with Wesson. (Ex. 11). Crucially, Officer Fitzgerald found a small manila envelope containing marijuana from one of Kaboobie's pockets, (Trial N.T. 05/31/83 at 52), which is consistent with Strickland's sworn statement that Kaboobie went downstairs to get the marijuana to complete the transaction with Haughton and Wesson, (Ex. 11).

Moreover, Strickland stated that he was brought to the police station for a lineup where he was shown pictures of Murray and faced with pressure by Detective Gerrard and an ADA to falsely identify Murray as one of the shooters. (Ex. 11). He also stated that the lineup was canceled after he refused to falsely accuse Murray. (Ex. 11; Ex. 12). Crucially, there is documentary evidence confirming that the police canceled a lineup that Strickland was supposed to attend.[24] (Ex. 62). This documentary and physical evidence corroborate Strickland's sworn statement exonerating Murray.

---

[24] Strickland's statement refutes the police's proffered excuse for canceling the lineup, which was simply incredible on its face. The police purportedly canceled the lineup because the volunteer fill-ins went on strike and refused to participate in the lineup after the police refused to give them each an additional nickel to cover the increased price of cigarettes. (Ex. 62). To believe this, the Court would need to find that the police could only find prisoners who smoke and who would also turn down free money. If anything, the prisoners could have pooled each of their .75 cents together and *shared* the cigarettes. The very suggestion that the police could not find any nonsmokers who would accept free money to participate in the lineup is simply incredible. Furthermore, the police's incredible excuse flies in the face of the then-standard procedure, which allowed the defendant to select his own fill-ins for his lineup. *See Commonwealth v. McKnight*, 457 A.2d 931, 935 (Pa. Super. 1983).

**B. Tyrone Wesson's recantation is reliable evidence of Murray's actual innocence.**

Wesson recanted his false accusations against Murray as early as the May 1983 suppression hearing, when Wesson disavowed the statement attributed to him by the Homicide detectives. (Wesson MTS N.T. 05/23/83). Wesson reaffirmed his recantation in April 1984 at his joint sentencing hearing with Murray and Holden, when during his allocution Wesson swore that he "could have exonerated" Murray and Holden. (Sentencing N.T. 04/23/84 at 16–17). Had the judge not prevented him from doing so, Wesson would have proceeded to tell the entire truth of what happened at Kaboobie's house. (*Id.*). Seven years later at the 1991 PCHA Hearing, Wesson again denied giving the answers in the statement attributed to him by detectives, and testified that Kaboobie's death was an accident and that Murray and Holden did not participate in the shootout. (PCHA N.T. 07/25/91 at 46–47, 53–55).

> **1. Wesson recanted his statement in open court at the earliest possible opportunities, and he would have exonerated Murray at trial had he not been advised against doing so by counsel.**

A recantation is more reliable if "the original statements were recanted at the first opportunity after being given," especially if "done so in open court." *See Matter of Extradition of Contreras*, 800 F. Supp. 1462, 1468–69 (S.D. Texas 1992). Here, Wesson first recanted in open court his statement at the hearing on his motion to suppress, where he denied giving the statement attributed to him by police. (Wesson MTS N.T. 05/23/83). Wesson also recanted his statement in open court at his second earliest opportunity—in April 1984 during allocution at his sentencing hearing with Murray and Holden. (Sentencing N.T. 04/23/84 at 16–17). The timing of Wesson's recantation increases its reliability.

Crucially, Wesson also stated at his April 1984 sentencing hearing that he would have exonerated Murray (and Holden) at trial had he better understood his privilege against self-incrimination and not been advised against testifying at trial. (Sentencing N.T. 04/23/84 at 16–17).

Wesson wanted to tell the sentencing court the whole truth about what happened, but the sentencing judge refused to let Wesson do so. (*Id.*). The fact that Wesson first expressed his desire to exonerate Murray at their sentencing hearing increases the reliability of his recantation.

> **2. Wesson's prior statement did not even support the prosecution's theory, and his statement is contradicted by documentary evidence strongly suggesting that Larry Thorpe was in custody on the date of the shooting.**

The Commonwealth's theory of the case was that Haughton, Wesson, Murray, and Holden developed a plan to rob Kaboobie because they simply wanted his marijuana, that the Kaboobie's death resulted from a botched robbery, that Murray and Wesson were the two shooters, and that Haughton and Holden served as the two lookouts. Wesson's prior statement is inconsistent with the Commonwealth's theory. According to the prior statement, the robbery plan originated from Larry Thorpe and Gregory Holden's desire "to get even" with Elliot Burton (Kaboobie's marijuana supplier) because the three men had a dispute "over some guns." (Ex. 49). The original statement attributed to Wesson also indicated that "Larry Thorpe was like overseeing the whole thing." (*Id.*). However, there is simply no evidence corroborating the claim that a desire for revenge motivated the purported robbery, or that Thorpe oversaw the alleged plot. In fact, documentary evidence *contradicts* this claim—in particular, Thorpe's criminal extract shows that he was arrested December 13, 1980, on an unrelated charge of aggravated assault just three days before Kaboobie's death. (Ex. 71, Larry Thorpe Criminal Extract (<u>New Evidence</u>)). Given the nature of the lead charge, it is reasonable to assume that Thorpe was still in custody on December 16, 1980, when the shooting incident occurred. Thus, Wesson's prior statement simply lacks credibility, and it should be discredited.

> **3. Homicide detectives did not provide credible testimony regarding the taking of Wesson's statement, and their credibility should be reassessed in light of their histories of misconduct and their misconduct in Murray's case.**

The detectives did not provide credible testimony regarding Wesson's statement, which

only bolsters the reliability of his recantation. Although there are still unanswered questions as to what exactly occurred during the custodial interrogation and why Wesson signed the statement presented to him by the detectives, the credibility of the Homicide detectives should be reconsidered in light of their misconduct in both this case and other homicide investigations.

Below are some examples of the inconsistencies, contradictions, and incidences that undermine the credibility of the Homicide detectives' testimony regarding Wesson's statement:

- Detective Gerrard testified that he did not ask Wesson any questions and that he "might" have talked to Wesson during his actual interview. (Wesson MTS N.T. 05/23/83 at 363). However, Detective Lubiejewski testified that he, Gerrard, and Detective McNesby "all took turns asking questions." (Wesson MTS N.T. 05/18/83 at 128).

- McNesby and Lubiejewski both testified that no one asked Wesson any questions about the DeLegal investigation between 12:15 p.m. and 12:30 p.m. (*Id.* at 154; Wesson MTS N.T. 05/23/83 at 316–17). Lieutenant Shelton, however, testified that he, McNesby, and Lubiejewski continued to ask Wesson questions about the DeLegal investigation after he asked to speak to his father, (Wesson MTS N.T. 05/23/83 at 286), which happened around 12:15 p.m., (*id.* at 316; Wesson MTS N.T. 05/18/83 at 156). Lieutenant Shelton then changed his testimony and stated that no questions were asked about the DeLegal case between 12:15 p.m. and 12:30 p.m. (Wesson MTS N.T. 05/23/83 at 296–99). When the pressed by the trial court to stop being evasive and answer questions on cross-examination, Shelton conceded that he earlier testified that the detectives questioned Wesson about the DeLegal investigation between 12:15 p.m. and 12:30 p.m. (*Id.* at 299).

- Shelton testified that he did not call Officer Lamont Wesson, Tyrone Wesson's father, on the morning of his son's arrest to let him know they had his son in custody. (*Id.* at 261). However, Officer Wesson testified that he found out about his son's arrest because Shelton called him that same morning. (Wesson MTS N.T. 05/18/83 at 200; Trial N.T. 06/20/83 at 1403).

- Lubiejewski testified that Shelton and McNesby gave Wesson warnings "regarding DeLegal and the other matter [i.e., the Reddick murder]," (Wesson MTS N.T. 05/16/83 at 142), but Shelton and McNesby both testified that Wesson was not given any warnings in connection with Reddick murder investigation because he was not a suspect. (Wesson MTS N.T. 05/23/18 at 277–78, 329–30).

- Lubiejewski initially testified that Wesson indicated he wanted to talk about DeLegal "prior to" the phone call with his father. (Wesson MTS N.T. at 147). However, Lubiejewski later testified that Wesson first indicated he wanted to talk

about DeLegal "at the end of the phone conversation." (*Id.* at 153).

- Lubiejewski testified that the reason the detectives asked Wesson about Reddick murder was because Wesson had "requested more time to think about talking about the DeLegal matter" and indicated he wanted to speak to his father. (*Id.* at 143–44). However, Shelton testified the detectives "immediately went into the Reddick case because [Shelton] had a concern about [the Reddick case]." (Wesson MTS N.T. 05/23/83 at 291).

- Lubiejewski testified that only he and McNesby questioned Wesson about Reddick murder. (Wesson MTS N.T. 05/18/83 at 169). However, Shelton testified that he also questioned Wesson about the Reddick murder, and that the questions he asked did not appear in the typed statement attributed to Wesson. (Wesson MTS N.T. 05/23/83 at 291–93).

- Lubiejewski testified at the suppression hearing that before Officer Wesson arrived at the Roundhouse, he heard Gerrard talking to Officer Wesson over the phone letting him know that his son had been arrested. (Wesson MTS N.T. 05/16/83 at 90–91). However, Gerrard denied calling Officer Wesson. (Wesson MTS N.T. 05/18/83 at 353, 356). At trial Lubiejewski changed his testimony and stated that he did not know how Officer Wesson learned about his son's arrest. (Trial N.T. 06/15/83 at 688–91, 704).

- Gerrard testified that Officer Wesson asked to speak to his son after arriving at the Roundhouse. (Wesson MTS N.T. 05/23/83 at 358). However, Shelton testified that he did not remember Officer Wesson asking any questions, (*Id.* at 273), and Officer Wesson testified that the Homicide detectives had asked *him* if he wanted to speak to his son, (Trial N.T. 06/20/83 at 1404–05).

- Gerrard testified on direct examination at the suppression hearing that he gave Wesson and pack of Kools cigarettes and some dimes for the payphone to call his girlfriend. (Wesson MTS N.T. 05/23/83 at 343–44). Wesson's testimony and the chronology of his custodial interrogation corroborate this fact. (*Id.* at 412; Ex. 47). However, on cross-examination Gerrard denied giving Wesson any cigarettes. (Wesson MTS N.T. 05/23/83 at 377).

- Shelton testified that, to his knowledge, no one told Officer Wesson that Haughton had given a statement accusing Tyrone Wesson of being one of the shooters in the killing. (*Id.* at 271–72). However, Officer Wesson testified that Lieutenant Shelton was present when Officer Wesson was informed that a person had given the police a statement against his son. (Wesson MTS N.T. 05/18/83 at 215; Trial N.T. 06/20/83 at 1406). Gerrard also indicated that Shelton was present when detectives told Officer Wesson that someone had identified his son as one of the perpetrators. (Wesson MTS N.T. 05/23/83 at 354, 357).

- Lubiejewski testified that he verbally gave Wesson his constitutional warnings, but

he conceded that there is no written record that he did. (Wesson MTS N.T. 05/18/83 at 133).

- Lubiejewski testified that he had "no idea why [he] did not put it down [on the chronology sheet] at the time" that Wesson requested to speak to his father on the phone. (*Id.* at 156).

- Gerrard initially testified that he believed he was present when either McNesby or Lubiejewski gave Wesson his constitutional warnings. However, when asked for a more definitive answer, Gerrard conceded that he did not remember. (Wesson MTS N.T. 05/23/83 at 351–52). At trial, Gerrard initially testified that he was not present for the entire warnings, (Trial N.T. 06/15/83 at 813–14), but he later stated that he could not remember whether he was present the entire time, (*id.* at 816). He said he remembered being present for at least a portion of the time. (*Id.*).

- Lubiejewski admitted that the detectives' primary objective was to get a statement from Wesson. (*Id.* at 705). He also admitted that he read Haughton's statement in order to be more prepared to question Wesson about what happened at Kaboobie's house. (*Id.* at 720–23).

- Lubiejewski testified that Wesson asked to speak to his father on the phone specifically because Wesson wanted to make a statement regarding DeLegal. (*Id.* at 714, 727–29).

- The trial court asked Lubiejewski and Shelton why they could not answer straightforward questions on cross-examination. (*Id.* at 746–47 (Lubiejewski); Wesson MTS N.T. 05/23/83 at 296–99 (Shelton)).

- Gerrard initially testified at trial that he had made only two attempts to execute an arrest warrant at Gregory Holden's house. However, when asked again later, Gerrard said he had made around a dozen attempts to execute the warrant. The trial court remarked: "I heard you say twice yourself." When Gerrard said he made two attempts at Holden's house and the rest were in public places, the trial court said: "I haven't heard any other attempts to execute this warrant except two, when [Gerrard] went to the house. Walking around in the neighborhood with a lot of warrants in your pocket isn't necessarily an attempt to execute the warrant." (Trial N.T. 05/23/18 at 780–87). Gerrard asked the trial court not to disclose the police log with entries related to his attempts to execute the Holden arrest warrant. (*Id.* at 803–07). The log contained, at most, one entry indicating Gerrard had attempted to execute the warrant. (*Id.*).

- Lubiejewski testified that detectives attempted to contact Wesson's father from 12:15 p.m. to 12:55 p.m. (Wesson MTS N.T. 05/18/83 at 168). However, Officer Wesson testified that he received the detectives' call at his mother-in-law's house at around 12:55 p.m., and that his mother-in-law did not tell him she had received any calls before then. (Wesson MTS N.T. 05/28/83 at 205–06).

94

- One of the detectives, seemingly Lieutenant Shelton, apparently threatened or attempted to intimidate one of Wesson's and Murray's relatives at the courthouse during a recess in the trial, simply because their relative was staring at Haughton. (Trial N.T. 06/02/83 at 483–96)).

At a minimum, the foregoing inconsistencies, contradictions, and incidences establish that the homicide detectives were not very credible witnesses. Crucially, as indicated above, Officer Wesson, who testified credibly at his son's suppression hearing and trial and who was later promoted to a detective position, (PCHA N.T. 07/25/91 at 52), contradicted the homicide detectives' testimony on several key points.

Furthermore, the homicide detectives' misconduct in both this case and other homicide investigations should tip the scales in favor of Wesson's credibility. In 1977, investigative reporting by *The Philadelphia Inquirer* exposed that PPD detectives routinely elicited confessions from suspects by beating them "with lead pipes, blackjacks, brass knuckles, handcuffs, chairs and table legs." (Ex. 72, Johnathan Neumann & William K. Marimow, *The Homicide Files: How Phila. Detectives Compel Murder 'Confessions,'* Phila. Inquirer (Apr. 23, 1977) (New Evidence); Ex, 73, Samantha Melamed, *Losing Conviction: Philadelphia Murder Exonerations Raise Questions about Decades of Homicide Investigations—and Whether the Misconduct Alleged in Those Cases Was Part of a Pattern That Led to Many More Wrongful Convictions*, Phila. Inquirer (May 7, 2021) (New Evidence)).

PPD detectives around that period did not receive formal training to meet the challenge of investigating "upward of 400 murders a year, hampered by witnesses too fearful to come forward." (Ex. 73). As one former PPD detective said, "There was no set standard. It was just: Solve the case." (*Id.*). That same year, former Philadelphia Police Commissioner and then-Mayor Frank L. Rizzo remarked: "You tell me they (police) bring in the wrong people and question them?

Unfortunately, that happens, but unfortunately, these are the times we live in." (Ex. 72). In the face of rising gun violence and murders, PPD "detectives felt pressured to do whatever it took to close cases." (Ex. 73).

Most of the homicide detectives assigned to work on the investigation into Kaboobie's death have faced allegations of police misconduct, many of which have been proven in court and resulted in discharges, acquittals, and exonerations. These individuals include Larry Gerrard, Ernest Gilbert, Leon Lubiejewski, James McNesby, Lawrence Grace, and William Shelton. The available evidence shows Gerrard, Gilbert, Lubiejewski, McNesby, and Shelton each likely committed police misconduct in some form or another in the investigation and subsequent prosecution of Murray.

In 1974, Detective Grace was found to have conducted an illegal interrogation after questioning a suspect in a fatal shooting investigation after she invoked her right to have counsel present. (Ex. 72). After a two-and-a-half-hour interrogation, the suspect "signed a statement denying any involvement in the shooting." (*Id.*). Two hours later, the suspect's attorney arrived, yet Grace and another detective "continued the interrogation while [her attorney] was kept outside." (*Id.*). After twenty minutes, the suspect signed a statement saying that the decedent "had pulled a gun from his pocket and 'I pushed him and the gun went off.'" (*Id.*). "Immediately after the statement was signed, [the attorney] met with [his client] and instructed her to remain silent. He also told Detective Grace not to interrogate his client further." (*Id.*). Grace ignored the attorney's instruction, and the suspect "was interrogated throughout the afternoon," with Grace telling her: "Don't pay any attention to [your attorney]. All he wants is his fee. I'm here to help you." (*Id.*). The suspect was held for another 19 hours, and the police illegally elicited "three more statements, each more damaging to her legal position than the last." *Id.* The trial court held that

the interrogation was illegal and suppressed the suspect's statement. *Id.* Without the illegally obtained statement, the prosecution failed to convict the suspect, who was acquitted at trial. (*Id.*).

Detective Gerrard is notorious for his direct involvement in the infamous "Sex for Lies" scandal, where he and other detectives, including Detective Gilbert, granted male prisoners regular visits to the Roundhouse so that they could have sex with women in interview rooms. (Ex. 74, *See* Samantha Melamed, *'Sex for Lies,'* Phila. Inquirer (July 20, 2021) (New Evidence)). In 1983, **the same year as Murray's trial,** Gerrard and Gilbert allowed three women to have sex with a criminal defendant in exchange for his confession to committing murder. *See generally Commonwealth v. Lester*, 572 A.2d 694 (Pa. Super. 1990). The trial court found Gerrard's testimony not credible and  suppressed Lester's statement. The Superior Court upheld the decision on appeal, holding that "the police's offer of sex constituted a provocation powerful enough to coerce Lester to cooperate" and emphasizing that "the Commonwealth [did] not contest that Lester was provided with sex while he was incarcerated." *Id.* at 697.

In 1984, Gerrard and Gilbert allowed Franklin Lee, a suspect in an unrelated homicide and rape case, to have sex with women in exchange for his false statement that Willie Stokes was involved in the murder of Leslie Campbell. (Ex. 75, Samantha Melamed, *A Man Who Served 37 Years May Be Freed After Informant Said Cops Provided Sex for False Testimony*, Phila. Inquirer (Jan. 3, 2022) (New Evidence)). Lee testified at Stokes's preliminary hearing and falsely stated that Stokes "bragg[ed]" to him about killing Campbell. (Ex. 76, Excerpts from Willie Stokes Prelim. N.T. 05/30/84 at 41–42 (New Evidence)). However, at Stokes's trial Lee recanted his false statement and preliminary hearing testimony, saying: "[The statement] was something [Detectives Gerrard and Gilbert] had put together. They told us they wanted Willie Stokes' body, that they would make deals and everything."  (Ex. 77, Excerpts from Willie Stokes Trial N.T. 08/20/84 at

4.09–4.10 (Underline{New Evidence})).

The detectives had showed Lee a copy of another supposed eyewitness's (Anthony Singleton) interview statement and encouraged him to make a false statement consistent with that one. (*Id.* at 4.36–4.37). Lee waited until trial to recant because Detective Gerrard told him that "if [he] didn't cooperate with them they would talk to Judge Sabo and hang [Lee]." (*Id.* at 4.12). The detectives did not physically abuse Lee, but "[t]hey scared [him] enough" because they told him that if he did not make a false statement, then they would get Singleton to testify against him in his unrelated murder case. (*Id.* at 4.15, 4.17). In response to Lee's recantation, one of the prosecutors, John DiDonato, introduced Lee's cooperation agreement into evidence and said "You know right now we are going to go back before Judge Sabo and say, 'Judge, he reneged on his deal with us. He admitted to lying on the stand and he should get the maximum.'" (*Id.* at 4.39). Lee was later charged and convicted of perjury for his false statement and false preliminary hearing testimony, not his trial testimony. (Ex. 74; Ex. 75). Lee was also sentenced in his unrelated murder case, and he served a total of 35 years in prison. (Ex. 74; Ex. 75).

**The other prosecutor who knowingly used Lee's false testimony to convict Stokes was former ADA Robert Marano,** *id.,* **the same prosecutor in Murray's trial**. ADA Marano also allegedly "instruct[ed]" police "personnel to maintain any evidence underlying Lee's perjury prosecution in their own files rather than transferring it to Stokes' DAO file." *Stokes v. City of Phila.*, Civ. Action No. 22-0338, 2022 WL 16578285, at *9 (E.D. Pa. Oct. 31, 2022). A federal court recently denied ADA Marano's motion to dismiss Stokes's Section 1983 claims for deprivation of liberty without due process and civil rights conspiracy. (*Id.*).

Anthony Singleton backed out of his cooperation agreement before trial and received a lengthy prison sentence. Singleton had also been facing unrelated murder charges when Gerrard

and Gilbert told him that in exchange for his cooperation he would "only end up doing 7 years and be back on the streets" and would be able to "have visits with [his] girl—have sex," but the detectives needed him to cooperate or else he would "never see the streets again." (Ex. 74). Singleton's girlfriend corroborated his account in 1997 at a post-conviction hearing. (*Id.*)

Two other Commonwealth witnesses in Stokes's case, Darryl Hargrove and the surviving victim, Francis Dinkins, also recanted their false statements and testimony against Stokes. Hargrove stated in an affidavit that he "only testified to what the detectives told [him] to say." (*Id.*) At a 1989 hearing, Dinkins testified that Stokes was not the shooter, and in 2011 he stated in an affidavit that Detective Gerrard and Detective Gilbert "physical assaulted [him] and forced [him] to sign a statement saying that Mr. Stokes told [him] that he was sorry for shooting me." (*Id.*) Ultimately, Stokes was convicted in 1984 of first-degree murder and sentenced to life imprisonment without the possibility of parole. *Id.* In 2022, after serving 37 years in prison for a crime he did not commit, Willie Stokes was exonerated and released from incarceration. (Ex. 75).

Four officers—Gerrard, Gilbert, McNesby, and Shelton—have been implicated in an actual innocence claim raised in a pending habeas corpus proceeding initiated by Major Tillery, stemming from his 1984 conviction for a fatal shooting in 1976 at a pool room in North Philadelphia. (Ex. 79, Excerpts from Counseled and Amended Petition for Writ of Habeas Corpus, *Tillery v. Eason*, No. 20-cv-02675 (E.D. Pa. June 2, 2022) (New Evidence); Ex. 80, Samantha Melamed, *The Homicide Files*, Phila. Inquirer (last updated Dec. 26, 2021) (Lawrence Gerrard) (New Evidence)). The PPD claimed that the shooting occurred during a meeting between two rival gangs, and that Tillery was a drug kingpin involved in the shooting. (Ex. 80). Tillery was convicted "based solely on the testimony of two jailhouse informants," both of whom disclosed thirty years later "that their statements were concocted by Philadelphia police officers and had no basis in

fact," and that "[t]hey were coached to lie under oath about the [s]hooting, as well as about threats, deals, bail, and parole favors they received in exchange for their false testimony." (Ex. 79, at 3). The two jailhouse informants "also failed to disclose, until their recantations, that they were offered (and received) private time for sex inside the police administration building while they were still incarcerated in what has become known as the sex for lies scandal." (*Id.*). After Tillery spent over thirty-eight years in prison, the Commonwealth conceded that "Tillery raise[d] a potentially meritorious argument that the state courts unreasonably denied his *Brady* claim and that his claim has merit." (*Id.* at 4–5).

Lubiejewski and Shelton both participated in securing the wrongful conviction of Alen Lee in 1988 for a robbery and fatal shooting. (Ex. 81, Samantha Melamed, *The Homicide Files*, Phila. Inquirer (last updated Dec. 26, 2021) (Leon Lubiejewski)). The police disregarded tips pointing to a different perpetrator and instead pursued Lee based on one witness's identification. (*Id.*). Lee was exonerated in 2004 after it came to light that the "police had suppressed credible evidence pointing to the real killer." (*Id.*). The "undisclosed evidence included a statement from an informant identifying the real killer, and an eyewitness who picked the alternate suspect out of a photo array." (*Id.*). Lubiejewski, when asked about the case, "called it an instance of eyewitness error, saying that the witness simply could not tell Lee and the other suspect apart." (*Id.*).

Lubiejewski was also found to have committed negligence in securing the wrongful convictions of Alfredo Domenech and Ivan Serrano. Specifically, Lubiejewski was found to have acted "negligen[tly]" in failing to turn over exculpatory witness statements to the DAO that contradicted the facts set forth in the criminal complaint that Lubiejewski prepared. *Domenech v. City of Phila.*, No. 06-1325, 2009 WL 1109316, at *2–4, 9 (E.D. Pa. Apr. 13, 2009). Domenech and Serrano were convicted in 1988, but they were granted a new trial after additional exculpatory

evidence surfaced. *Id.* at *4. Consequently, the Commonwealth declined to retry their cases. *Id.*

In Murray's case, for the reasons described further below, the investigative work of the homicide detectives was sloppy and reckless. There is also evidence that the homicide detectives rigged, or at least attempted to rig, the trial against Murray. For instance, Gregory Strickland has alleged that Detective Gerrard tried to pressure him into falsely identifying Murray during the court-ordered lineup that the police later canceled and never rescheduled. (Ex. 11; Ex. 12; Ex. 63).

Additionally, Detective Gerrard fabricated evidence against Murray by planting drugs on him in connection with arrest in this case. According to a criminal complaint filed against Murray, at the time of Murray's arrest the police conducted a search incident to arrest "and confiscated from [Murray's] left pants leg were (25) light green pills and from his right pant leg in a manila envelope were (9) light green pills." (Ex. 55). The property receipt associated with these confiscated items specifically provides that they were "confiscated from [Murray] on 9/11/82 at approx. 3:05PM inside 1817 Wharton St. after [Murray] was arrested." (Ex. 56).

However, homicide detectives on the chronology of Murray's custody on September 11, 1982, indicated that drugs were recovered *twice* from Murray's person *after* he had already been taken to the Roundhouse. One entry indicates that at 3:30 p.m. Officers Fitzgerald and White frisked Murray, found an "envelope" with "pills," and placed him in the interview room. (Ex. 54). Another entry indicates that at 3:50 p.m. Gerrard found drugs in the "cuffs of [Murray's] sweatpants." (*Id.*). These entries are plainly inconsistent with the property receipt and the criminal complaint associated with the pills allegedly seized from Murray's person following his arrest.

Murray was ultimately found not guilty of knowing and intentional possession of a controlled substance (K&I). (Ex. 82, Excerpt of Docket Sheet, *Commonwealth v. Murray*, CP-51-CR-1206031-1982). On November 12, 1982, Murray was not present for a trial in Philadelphia

Municipal Court where he was convicted of K&I and possession with the intent to distribute (PWID) in connection with this related matter. (Ex. 83, Docket Sheet, *Commonwealth v. Murray*, MC-51-CR-0908441-1982). Murray successfully appealed his conviction to the Court of Common Pleas, where the PWID charge was nolle prossed and the court acquitted Murray of K&I. (Ex. 82). Upon information and belief, Murray was acquitted because the trial court found that the police had likely planted the drugs on Murray. For all the forgoing reasons, the credibility of homicide detectives as witnesses and investigators in this case must be reevaluated in light of their past misconduct both here and in other murder cases.

### 4. Wesson provided sufficiently credible testimony regarding the circumstances surrounding the taking of his statement, and the homicide detectives did not.

Wesson is a credible witness: He did not deny his involvement in the incident when confronted during cross-examination at the hearing on his motion to suppress. (Wesson MTS N.T. 05/23/83 at 437). Wesson admitted he was injured at Kaboobie's house, and he maintained that the shooting was an accident. (*Id.*). Wesson vehemently denied giving the answers attributed to him by the detectives, claiming they tricked him into signing the statement and the warnings forms. (*Id.* at 391–93, 438–39). Wesson gave the same exact testimony eight years later at the postconviction hearing, (PCHA N.T. 07/25/91 at 53–54, 66), and there is no dispute that at his arraignment Wesson signed a form affirming that he did not wish to give a statement to the police. (Wesson MTS N.T. 05/23/83 at 428; Ex. 51). He specifically asked to speak to his father, a Philadelphia police officer, on the telephone during the interrogation because he wanted his father's advice on whether to cooperate. (Wesson MTS N.T. 05/23/83 at 431–36). Officer Wesson said his son needed to make the decision for himself, but he also emphasized: "I told him not to say anything. That's what I told him. I told him the best thing to do was not say anything." (Wesson MTS N.T. 05/18/83 at 210; Trial N.T. 06/20/83 at 1407–08). Wesson was no longer a juvenile as

102

of two months before his interrogation, but clearly he was still "[un]abl[e] to deal with police officers." *Miller v. Alabama*, 567 U.S. 460, 476 (2012).

> **5. Wesson would not have falsely used Murray's identity to hide from the police if Murray was the other shooter.**

One question has gone unasked for forty-plus years: Why on earth would Wesson use "Bruce Murray" as an alias to hide from the police if the real Bruce Murray was the other shooter? If Murray was actually one of the shooters, Wesson would have given a different name so that he could avoid detection. Giving the name of the other shooter would not have reduced the likelihood of Wesson's arrest, especially considering the police could have (and eventually did) easily figure out that Wesson and Murray are first cousins. Common sense should thus dictate that Murray was not the other shooter.

**C. Douglas Haughton's recantation is reliable evidence of Murray's actual innocence.**

Haughton admitted that he falsely accused Murray. Haughton—not Murray—was the one who went inside Kaboobie's house with Wesson. As explained below, Haughton's recantation constitutes reliable evidence of Murray's actual innocence, especially because there is no dispute that only two men went inside Kaboobie's house and that one of those men was Wesson.

> **1. Haughton recanted against his penal interest.**

Haughton's recantation most likely violated his plea agreement, which presumably contained a term requiring that he agree to provide "complete and truthful information" in exchange for his testimony in the prosecution of his codefendants. *See, e.g.*, *Commonwealth v. Bricker*, 581 A.2d 147, 154 (Pa. 1990) (noting that coconspirators' plea agreements contained a provision requiring that they provide "complete and truthful information" in exchange for their testimony); *id.* at 161 (Flaherty, J., dissenting) ("[I]f [the prosecution] did put [the coconspirators] on to testify and found that they made false statements or told less than the whole truth, it would,

presumably, prosecute them for perjury. This is true in every case, not just this one,….").

This breach exposed Haughton to criminal prosecution for murder and a potential sentence of life imprisonment without the possibility of parole.[25] Haughton understood at the time of trial that if he testified contrary to his police statement, then "[t]hat would or could spoil" his plea agreement. (PCHA N.T. 07/25/91 at 17–18, 38; Trial N.T. 06/01/83 at 403–05, 554–55).

Haughton also exposed himself to an untold number of perjury charges because he made numerous false statements under oath at Murray and Wesson's preliminary hearing, Holden's preliminary hearing, and the joint trial. *See Commonwealth v. Davenport*, 386 A.2d 543, 549–50 & n.4 (Pa. Super. 1978) ("[W]here a witness testified that X threatened him and Y threatened him[,] such testimony could well support two convictions of making inconsistent statements."); *see also Commonwealth v. King*, 939 A.2d 877, 881 (Pa. 2007) ("[T]he essential inquiry in determining whether each individual falsehood could be considered an individual 'statement' must be whether each lie related to 'different matters' or a single event or were so interrelated as to a single subject matter that they could not amount to individual statements for purposes of [18 Pa.C.S. §] 4902.").

Haughton first recanted his false testimony in April 1985, well within the statute of limitations for perjury. (PCHA N.T. 07/25/91 at 19–20). Each perjury conviction carried a maximum sentence of seven years' imprisonment because perjury is a third-degree felony. 18 Pa.C.S. §§ 106(b)(4), 4902. As a result, Haughton faced significant criminal liability for perjury upon admitting that he testified falsely under oath.

---

[25] *See*, *e.g.*, *Lambert v. Blackwell*, 134 F.3d 506, 510 n.3 (3d Cir. 1997) ("Several weeks after [the petitioner's] murder trial was concluded, the Commonwealth determined that [his codefendant] had perjured himself at [the petitioner's] trial. Consequently, [the codefendant] breached the plea agreement and the Commonwealth charged him with third degree murder to which he pled *nolo contendere*.").

Additionally, Haughton could have been charged with falsely incriminating another person in violation of state law, which punishes "a person who knowingly gives false information to any law enforcement officer with intent to implicate another" person. 18 Pa.C.S. § 4906(a). Pennsylvania law grades a violation of 18 Pa.C.S. § 4906(a) as a second-degree misdemeanor, which means each violation carries a maximum sentence of two years' imprisonment. 18 Pa.C.S. § 106(b)(4). Because Haughton gave homicide detectives false information with the intent to implicate Murray and Holden, Haughton exposed himself to additional charges and harsher penalties by recanting his prior testimony.

Haughton's recantation also raised the risk that he would be denied parole because he made three statements (two under oath) recanting his testimony before he became eligible for parole in 1989. (Ex. 36; PCHA N.T. 07/25/91 at 15). Even if the Commonwealth did not feel confident in its cases against Haughton for murder, perjury, and falsely implicating Murray and Holden in Kaboobie's death, the Commonwealth could have pointed to Haughton's 1985 recantations as a basis for denying his application for parole. Haughton knew all this when he recanted his false testimony against Murray, yet he recanted anyway because he wanted to tell the truth. (PCHA N.T. 07/25/91 at 19–20).

For the foregoing reasons, Haughton's recantation against his penal interest is strong evidence that his recantation is reliable, *see United States v. Harris*, 403 U.S. 573, 584 (1971) (recognizing that "[a]dmissions of crime…carry their own indicia of reliability"), especially considering Haughton recanted against his penal interest on four separate occasions, *see Chambers v. Mississippi*, 410 U.S. 284, 300 (1973) (recognizing that a number of independent confessions provides "additional corroboration for each" and "considerable assurance of their reliability"); *see, e.g., People v. Fonfrias*, 204 A.D.2d 736, 738 (N.Y. Supr. App. 1994) (finding statement against

penal interest trustworthy where third party stated on four separate occasions that he shot the victim).

### 2.  Haughton had no motive for recanting his testimony other than his own guilt and desire to tell the truth.

Haughton testified at the 1991 PCHA hearing that he did not anticipate receiving any benefit for his recantation. (PCHA N.T. 07/25/91 at 20). Haughton simply wanted to tell the truth about what had happened to Kaboobie because he felt ashamed for falsely accusing Murray and Holden. (*Id.* at 31). He had no motive to lie; if anything, Haughton had a motive to maintain his false accusations because recanting was against his penal interest. (Arg. Section I.C.1). Yet, as Haughton testified, he did not care if the Commonwealth punished him for recanting. (PCHA N.T. 07/25/91 at 32). Because Haughton had no motive to fabricate his recantation, this increases the reliability of his recantation.

### 3.  Haughton's truthful statements about what happened at Kaboobie's house are wholly consistent with Wesson's statements.

In 1991, Tyrone Wesson, whose own recantation is also sufficiently reliable evidence of Murray's actual innocence, (Arg. Section I.B), corroborated Haughton's entire account of what happened at Kaboobie's house during the shootout. There were no contradictions between Wesson's and Haughton's testimonies about what actually happened: The two men went to Kaboobie's house simply to purchase marijuana, and Kaboobie took out a sawed-off shotgun and aimed it at Wesson after Kaboobie and Haughton got into an argument. Wesson and Kaboobie struggled over the shotgun, which discharged accidentally and struck Kaboobie in the chest area. Kaboobie pulled out his .32-caliber revolver and struck Wesson once in the arm. Haughton returned fire and struck Kaboobie. Wesson and Haughton each maintained that neither Murray nor Holden was involved in the incident. (Ex. 36; Ex. 70; PCHA N.T. 07/25/91 at 22–24, 31, 46). Crucially, Wesson and Haughton were never housed in the same prison between the time of trial

and the 1991 PCHA hearing, (PCHA N.T. 07/25/91 at 49), which means they could not have coordinated their statements before the hearing. Simply put, Wesson and Haughton could have corroborated each other's accounts only if they were both telling the truth.

### 4. The promptness of Haughton's recantation enhances the reliability of his statements exonerating Murray.

A recantation is generally more reliable if it occurs in close temporal proximity of the trial testimony. *See United States v. Carthen*, 681 F.3d 94, 102–03 (2d Cir. 2012) (explaining that courts should consider "the temporal proximity of the trial testimony and the purported recantation" when weighing the reliability of the recantation evidence (quoting *United States v. Rojas*, 520 F.3d 876, 884 (8th Cir. 2008))). Less than two years after his trial testimony, Haughton recanted his false accusations against Murray. (Ex. 36; Ex. 70). This is simply not a case where an accomplice waited decades to recant his trial testimony, which would have lessened the reliability of the recantation.

### 5. Two of Haughton's companions in prison have given sworn statements corroborating the reliability of Haughton's recantation.

Eugene Thomas, Haughton's former cellmate at SCI Camp Hill, testified at the 1991 PCHA hearing that Haughton "told [him] that [Haughton] told the police that Bruce Murray was on the scene of a robbery that resulted into a homicide, a homicide robbery and Bruce Murray wasn't there." (PCHA 07/25/91 at 5). Thomas also testified that Haughton said "[h]e made a deal with the Commonwealth and with the federal government for a lenient sentence, if he testified against Bruce Murray." (*Id.* at 7). Anthony Smith, one of Haughton's friends in prison, testified to the specific details that Haughton had told him about what happened at Kaboobie's house, (Ex. 16), and those details are consistent with Haughton's recantations. The statements of Smith and Thomas corroborate Haughton's recantation and therefore increases its reliability.

### 6. Haughton's recantation is far more reliable than his prior statements.

Crucially, the Court must consider the fact that Haughton's "recantation appears to have

more indicia of reliability than [his] original accusations." *See Republic of France v. Moghadam*, 617 F. Supp. 777, 783 (N.D. Cal. 1985). Indeed, as explained further below, Haughton's prior testimony and police statement inculpating Murray are not credible. (Arg Section I.E). They contain numerous inconsistencies and contradictions, and Haughton's desire for revenge and fear of punishment motivated his false accusations against Murray. The physical evidence also contradicted some of Haughton's testimony, and eyewitness Gregory Strickland has stated under oath that he saw and heard Haughton inside Kaboobie's house immediately after the shooting. Even without Haughton's recantation, no reasonable juror would conclude beyond a reasonable doubt that he was a mere lookout and that Murray played Haughton's actual role as the shooter.

Compared to his prior (false) accusations, Haughton's statements exonerating Murray are unassailable. Haughton made multiple confessions exonerating Murray, and none contained any noticeable inconsistencies or contradictions. In fact, Haughton's recantations were consistent on the material facts: He acknowledged that he falsely accused Murray because he knew law enforcement had evidence inculpating him in both Kaboobie's death and the unrelated federal bank robbery case, and he feared severe punishment for those offenses. Haughton also consistently maintained, for example, that he knew Wesson only because he saw Wesson working as a disc jockey; that he and Wesson ran into each other on 22nd Street where Wesson asked if Haughton knew where to purchase marijuana; that the two men went to Kaboobie's house to purchase marijuana; that the shotgun was already at Kaboobie's house; that Wesson and Kaboobie struggled for control of the shotgun after Kaboobie reached for it; and that he (Haughton) shot Kaboobie multiple times. Critically, Haughton maintained these consistent statements from April 1985 until his death at thirty-six years old in August 1994. (Ex. 84, SSA Death Record for Douglas Haughton).

**D. Wesson's and Haughton's recantations are corroborated by Gregory Strickland and the trail of evidence from the original homicide investigation pointing to Haughton as the second shooter.**

The critical facts in Wesson's and Haughton's recantation—namely, that they were the two shooters and that Murray was not involved in Kaboobie's death—have been corroborated by Strickland, who stated under oath that he knew Haughton was one of the two men inside Kaboobie's house at the time of the shootout. Moreover, there is a trail of decades-old evidence from the homicide investigation and the prosecution that independently corroborates the fact that Haughton was present inside Kaboobie's house at the time of the shootout, including: Randolph's police statement, which indicates that Haughton was one of the two men inside Kaboobie's house at the time of the shootout, (Ex. 22); the results of Strickland's polygraph examination, which confirm that Strickland lied when he said he did not see Haughton inside Kaboobie's house at the time of the shootout, (Ex. 28); Haughton's admission that he encountered Strickland "immediately" after the shootout, (Trial N.T. 06/01/83 at 331); and Haughton's description of Strickland as "the boy in the cellar," (Ex. 9). Taken together, Strickland's statements and the above pieces of evidence corroborate Wesson's and Haughton's recantations.

**E. Murray's conviction rests solely on the uncorroborated, since-recanted testimony of a purported accomplice (Douglas Haughton).**

There is absolutely no evidence corroborating Haughton's or Wesson's prior statements inculpating Murray in Kaboobie's death. As discussed further below, the prosecution presented no physical evidence or eyewitness testimony connecting Murray to the offense, nor did the prosecution offer any individualized motive for his purported participation in the conspiracy. (Arg. Section II.E.5). Moreover, Wesson's police statement, which was inadmissible evidence as to Murray at trial, is unreliable evidence against Murray and cannot corroborate Haughton's prior statements because "the testimony of one accomplice may not be used to corroborate the testimony

of another accomplice." *Almeida v. Jeffes (Almeida II)*, 566 F. Supp. 852, 854–55 (E.D. Pa. 1983) (quoting *Commonwealth v. Almeida (Almeida I)*, 452 A.2d 512, 518 (Pa. Super. 1982)); *see also Commonwealth v. Jones*, 247 A.2d 624, 627 (Pa. Super. 1968) ("The testimony of one accomplice may never be used to corroborate the testimony of another accomplice.").

Accomplice testimony "is inevitably suspect," *Bruton v. United States*, 391 U.S. 123, 136 (1968), and "should always be scrutinized carefully by the jury because of its inherent untrustworthiness," *Tillery v. United States*, 411 F.2d 644, 646 (5th Cir. 1969); *Almeida II*, 566 F. Supp. at 854–55 ("Because of the inherent unreliability of accomplice testimony, such testimony is to be scrutinized with great care."). Such evidence must "be carefully scrutinized, not only because of any interest [the accomplice] might have, but because his testimony is evidence from a corrupt source." *Commonwealth v. Turner*, 80 A.2d 708, 712 (Pa. 1951). The Third Circuit has recognized, "The testimony of an accomplice ought to be viewed with distrust. It is proper to advise [the jurors] that [their] scrutiny of the testimony of an accomplice should be specially close, careful and rigid, and if [they] do not have a full and positive conviction that he is telling the truth, [they] should discard his testimony." *United States v. Schnanerman*, 150 F.2d 941, 943 (3d Cir. 1945).

Although it does not prohibit a conviction based solely on uncorroborated accomplice testimony, Pennsylvania law "looks with disfavor on this character of proof, and" a jury generally should "not...rely upon it unless corroborated." *See Commonwealth v. Elliott*, 140 A. 537, 539 (Pa. 1928). Indeed, the "time-honored rule" is that jurors should be exceedingly cautious in "convicting upon the testimony of an uncorroborated accomplice, particularly when such testimony goes to the identification of the person accused." *Id.* at 540 (citation omitted) (quoting *Commonwealth v. Williams*, 118 A. 617, 619 (Pa. 1922)); *Watson v. Commonwealth*, 95 Pa. 418, 418 (1880) ("[I]t is

almost the universal opinion that testimony of the accomplice should be corroborated as to the person of the prisoner against whom he speaks."). Any evidence corroborating the accomplice's testimony should tend to connect the defendant to the offense.[26] *See Commonwealth v. Cox*, 17 A. 227, 227–28 (Pa. 1889).

The jury should not convict the defendant based on an accomplice's uncorroborated testimony unless "the testimony of the accomplice, his manner of testifying, [and] his appearance upon the witness stand[] impress a jury with the truth of his testimony." *Id.* Even then, reasonable jurors would not convict the defendant unless the accomplice's uncorroborated "testimony produces in their minds a conviction of the defendant's guilt beyond a reasonable doubt." *Id.* at 228. Such doubt exists "when the witness has manifested his unreliability by making previous conflicting statements concerning his knowledge of the crime." *See Tillery*, 411 F.2d at 646–47.

Here, the only inculpatory evidence against Murray presented at trial was Douglas Haughton's uncorroborated accomplice testimony, as it "is the only testimony directly tying [Murray] into the criminal transaction." *United States v. Gardner*, 244 F.3d 784, 789 (10th Cir. 2001) (quoting *United States v. Williams*, 463 F.2d 393, 395 (10th Cir. 1972)).  Haughton—the man who actually entered Kaboobie's house with Wesson—was the only person who identified Murray at trial.[27] The prosecution offered no evidence corroborating Murray's identity as the man who entered Kaboobie's house with Wesson, which means Haughton's testimony requires the

---

[26]   "Testimony to be classed as corroboration need not relate solely to the main fact involved, but may be considered as corroboration when the testimony relates to relevant and material facts which have a direct relation to the main fact involved." *Commonwealth v. McKenna*, 213 A.2d 223, 226 (Pa. Super. 1965).

[27]   Under *Bruton* and its progeny, Wesson's police statement is incompetent evidence as to Murray because his confession cannot be considered as evidence against Murray.  Moreover, "the testimony of one accomplice may [not] be used to corroborate that of another accomplice." *Almeida II*, 566 F. Supp. at 854–55 (quoting *Almeida I*, 452 A.2d at 518). Thus, Wesson's statement cannot corroborate Haughton's trial testimony against Murray.

strictest level of scrutiny. *Cf. Cox*, 17 A. at 228 (recognizing that trial judges have a "duty" to "caution[] the jury as to the danger of convicting upon the uncorroborated evidence of an accomplice"). This Court must reconsider Haughton's trial testimony and numerous inconsistent statements in light of his recantations and motives for falsely accusing Murray, Strickland's firsthand observations of Haughton inside Kaboobie's house, and other evidence pointing to Haughton as the third participant in the three-person shootout with Wesson and Kaboobie.

### 1. Haughton was a career criminal with a history of using aliases to hide his criminal activities.

Douglas Haughton admitted at trial that he used aliases to hide his criminal activities. (Trial N.T. 06/02/1983 at 420–23). He used the alias Bryant Miles on previous occasions, (Trial N.T. 06/01/1983 at 357), and his criminal record reflects that he had used at least three other aliases by the time of his arrest, including "Douglas Horton," "Douglas Haughgon," and "Douglas Williams." (Ex. 18). Haughton's use of aliases to hide his criminal activities undermines the credibility of his trial testimony. *See United States v. Ojeda*, 23 F.3d 1473, 1477 (8th Cir. 1994) ("If a man would lie about his name, a jury may reasonably infer that he would lie about other matters, even on the witness stand.").

Haughton's prior criminal record also undermines his trial testimony. By the time of Murray's trial, Haughton's criminal record included nine arrests, five convictions, one commitment, and one probation violation. (Ex. 37). His criminal convictions included: (1) a June 1980 guilty plea to robbery; (2) a guilty plea to carrying a firearm without a license stemming from a February 1981 arrest; (3) an October 1981 guilty plea to theft by unlawful taking or disposition; and (4) a guilty plea to the federal bank robbery offense in April 1982. (*Id.*). Haughton's robbery, theft, and bank robbery convictions undermine the credibility of his trial testimony. *See Commonwealth v. Harris*, 884 A.2d 920, 925 (Pa. Super. 2005) ("Robbery and burglary are

considered *crimen falsi* and convictions for these offenses are admissible for impeachment purposes.").

### 2. Haughton had a well-established reputation for being a liar and a thief.

Multiple witnesses, including Murray's and Holden's respective alibi witnesses, testified that Haughton had a reputation in the community for being a liar and a thief. Robin Johnson testified that Haughton is "known as a liar and a thief." (Trial N.T. 06/16/83 at 889). Mattie Holden, Gregory Holden's mother, testified that she had known Haughton since before her son Gregory was born, and that Haughton had a reputation in the community for "robbing people and stealing." (*Id.* at 1010). Janine El testified that Haughton had a reputation for "robbing people's houses." (*Id.* at 1047). Deborah Frazier testified that she had heard about Haughton and his reputation for being "a liar and a thief." (Trial N.T. 06/20/83 at 1457). When confronted about his reputation for lying and stealing, Haughton merely replied: "I'm not perfect." (Trial N.T. 06/20/83 at 561).

### 3. The prosecution conceded during closing argument that Haughton's testimony hinged on other corroborating evidence, yet no competent evidence corroborated that Murray was at the scene of the crime.

The prosecution conceded during closing argument that Haughton's credibility hinged on the jury's consideration of other evidence:

> I don't pick Douglas Haughton. I'm not telling you to take Douglas Haughton home with you and have him home for dinner. I am not telling you to take him to any church or social activity that you will be engaged in when you leave this courtroom.

> The Commonwealth witness is [*sic*] this case is Douglas Haughton. He is a convicted thief. He is a convicted robber. But, ladies and gentlemen of the jury, before you disregard his testimony in this case, please think about it in light of the other evidence in this case and how it dovetails or interlocks with the other evidence in this case.

> Who do you think gets involved in this type of criminal escapade? Do you think it's your brother, your son, your father? It's a man like Douglas Haughton. And, again, I don't tell you that he's the salt of the earth or anything like that. He's the witness in this case, but **before you throw out his testimony in toto, please consider it in light of the other evidence in this case.**

113

 (Trial N.T. 06/20/83 at 1539) (emphasis added).

Crucially, Wesson's redacted statement is the only other evidence interlocking with Haughton's testimony that could have possibly implicated Murray as one of the shooters. The "testimony of one accomplice may not be used to corroborate the testimony of another accomplice." *Almeida II*, 566 F. Supp. at 854–55 (quoting *Almeida I*, 452 A.2d at 518)). Although there is independent evidence that corroborates certain facts contained in both Wesson's statement and Haughton's testimony, such as the shotgun bolt recovered from the crime scene, none of those facts connect Murray to the offense because they are irrelevant to the other shooter's identity. *See Arnold*, 94 F.2d at 507 (explaining that evidence corroborating accomplice testimony "must relate to some fact or facts connecting the accused with the act of guilt"). Thus, ADA Marano's concession indicates that even the prosecution understood the evidence against Murray was weak.

### 4. Law enforcement interrogated Haughton off-the-record about his involvement in Kaboobie's death eight days before he gave a formal statement.

Haughton testified at trial that he discussed Kaboobie's death with an FBI agent and Detective Gerrard on the same date as his February 24, 1982 arrest in connection with the federal bank robbery investigation. (Trial N.T. 06/02/83 at 546–47). The PPD homicide file contains no reference to this discussion, but it also contains no evidence contradicting this particular tidbit in Haughton's testimony. Moreover, the Commonwealth never offered any evidence to rebut Haughton's testimony. The fact that Haughton discussed Kaboobie's death with detectives eight days before he signed a written statement establishes that Haughton had an opportunity to reflect on what police told him and craft a narrative to protect his own self-interests. (Ex. 9).

### 5. Haughton read Edward Randolph's statement before giving any formal statement to the police.

Haughton admitted at trial that he read Randolph's police statement at some point before

giving his own March 4, 1982 statement. (Trial N.T. 06/01/83 at 516–17). This critical fact establishes that Haughton learned the allegations the police had obtained so far, including that Strickland had seen him exit Kaboobie's house. (Ex. 22). At that point, Haughton knew the police had enough evidence to prosecute him as one of the two shooters—and, in fact, the police did accuse him as such. (Ex. 38).

Haughton was able to effectively lie because he knew exactly what happened—he was there—and could tailor his false statement to fit the investigators' lead narrative. *See Williamson v. United States*, 512 U.S. 594, 599–600 (1994) ("One of the most effective ways to lie is to mix falsehood with truth, . . . ."). Haughton's false testimony was also "particularly persuasive because of its self-inculpatory nature." *Id.* Crucially, Haughton knew the police would likely believe him if he falsely accused Murray because Haughton, by reading Randolph's statement, learned that the police already considered Murray a suspect. (Ex. 22).

### 6. Haughton falsely accused Murray to avoid a life sentence and to exact revenge against Murray for their prior altercation.

The police interrogated Haughton off the record about Kaboobie's death on February 24, 1982, more than one week before Haughton gave his formal March 4, 1982 statement to the police. He was in federal custody at the time, so there was no need for the Philadelphia police to prepare any paperwork for their visit. Detective Gerrard mentioned Murray's name during this off-the-record interrogation, and this planted the idea in Haughton's mind to falsely accuse Murray. He knew the police had photographs proving his guilt in the unrelated federal bank robbery case, and he knew there was evidence placing him at the scene of Kaboobie's death. Haughton realized that if he cooperated with the police and falsely accused Murray, he could kill two birds with one stone: he would avoid a murder conviction and life imprisonment and exact his revenge on Murray for beating him up after he robbed Murray's sisters and girlfriend. Haughton's motives for falsely

accusing Murray diminish the credibility of his trial testimony. *See Commonwealth v. Robinson*, 491 A.2d 107, 110 (Pa. 1985) ("[A] witness may be cross-examined for the purpose of showing a motive to give false testimony."). Indeed, as the Second Circuit Court of Appeals aptly stated, "Special treatment is accorded evidence which is probative of a special motive to lie 'for if believed it colors every bit of testimony given by the witness whose motives are bared.'" *United States v. Harvey*, 547 F.2d 720, 722 (2d Cir. 1976) (quoting *United States v. Blackwood*, 456 F.2d 526, 530 (2d Cir. 1972)).

a. **Haughton's knowledge of his personal risk of criminal liability gave him motive to falsely accuse Murray.**

When a witness is at "personal risk of criminal liability," he necessarily has a self-serving motive to falsely accuse someone else of committing the crime. *See United States v. Casoni*, 950 F.2d 893, 896–97 (3d Cir. 1991). As the Third Circuit has explained, "It has long been recognized that testimony of accomplices and informers raises particular credibility problems since these witnesses have strong incentives to fabricate or mold their testimony as the government desires in order to escape prosecution, lighten their sentences, obtain renumeration or receive protection." *United States v. Isaac*, 134 F.3d 199, 204 (3d Cir. 1998) (first citing *Cool v. United States*, 409 U.S. 100, 103 (1972); then citing *On Lee v. United States*, 343 U.S. 747, 757 (1952)).

Cooperating accomplices have "self-serving motives" that may "destroy[] or diminish[] their credibility" as witnesses. *Id.* 205. This is especially true where the witness harbors "a clear bias on [his] part to have the defendant convicted of a crime which he himself might be suspected of having committed." *Commonwealth v. Cheatham*, 239 A.2d 293, 296 (Pa. 1968). As a result, a reasonable jury would disbelieve the witness's testimony "to the extent it finds that the testimony was driven more by a self-serving desire for leniency than a sense of duty to tell the truth." *See Isaac*, 134 F.3d at 204.

Haughton clearly had a self-serving motive to falsely accuse someone else of shooting Kaboobie on December 16, 1980, because he was, in fact, one of the two men who shot Kaboobie. Haughton also knew that Gregory Strickland had told Edward Randolph that he saw Haughton inside Kaboobie's house. Haughton wanted to avoid prosecution for Kaboobie's murder and the possibility of spending the rest of his life in prison. The video evidence inculpating Haughton in the unrelated federal bank robbery case increased his desire for leniency and heightened his self-serving motive to falsely accuse someone else. Simply put, because he feared punishment for his involvement in Kaboobie's death, Haughton jumped at the opportunity and told the police what they wanted to hear. Haughton did not falsely accuse Murray until "after" the police offered him leniency in exchange for his testimony. (PCHA N.T. 07/25/91 at 38).

> **b. Haughton's prior altercation and feud with Murray motivated him to falsely accuse Murray.**

A reasonable jury would scrutinize the credibility of a prosecution witness who was prompted to testify against the defendant by a motive of revenge. *See United States v. Jones*, 520 F. Supp. 842, 846 (E.D. Pa. 1981); *Wynn v. United States*, 397 F.2d 62, 62–63 (D.D.C. 1967) (recognizing the impeachment value of evidence that "the Government's star witness" falsely accused the defendant because he wanted to "get even" with the defendant over an alleged prior theft). It is impossible to ignore the influence of such motives on a witness's credibility because "a motive to lie for revenge or to shift blame is a motive that is 'commonly understood and obvious.'" *See United States v. Rosales*, 74 M.J. 702, 705 (A.F.C.C.A. 2015) (quoting *United States v. Sanchez*, 40 M.J. 782, 785 (A.F.C.M.R. 1994), *aff'd*, 44 M.J. 174 (C.A.A.F. 1996)). Here, Haughton, in addition to being motivated to falsely accuse someone else of shooting Kaboobie because he himself was suspected of committing the shooting, was motivated by revenge to falsely accuse Murray. Murray and his stepbrother beat up Haughton for robbing Murray's girlfriend and

117

sisters at gunpoint. (FB Section III). **Tellingly, the prosecution presented no evidence, aside from Haughton's testimony, to rebut the evidence that Haughton had robbed Murray's girlfriend and sisters or that Murray had beat up Haughton in retaliation.** In short, Haughton's motive for revenge against Murray further undermines the credibility of his false, since-recanted accusations.

### 7. Gregory Strickland saw Haughton inside Kaboobie's house at the time of the shootout, and Haughton's testimony about Strickland was not credible.

Strickland has stated under penalty of perjury that he saw Haughton inside Kaboobie's house at the time of the shooting. (Ex. 11). His statement confirms what Edward Randolph told police back in March 1981 (Ex. 22), and it explains why deception was detected during Strickland's polygraph exam. (Ex. 28). The reality is that Strickland did in fact see Douglas Haughton inside Kaboobie's house and knew that Haughton was one of the shooters. Strickland lied to police because he harbored justifiable fears of retaliation from Haughton, (Arg. Section I.A.1), who admitted that he observed Strickland at the scene "immediately" after the shooting. (Trial N.T. 06/01/83 at 331). As explained below, Strickland's sworn statement is sufficiently trustworthy to constitute reliable evidence of actual innocence.

Haughton had told police in March 1982 that after he heard the shots fired inside Kaboobie's house, he "began to walk away toward 25th Street" when Strickland "hollered" to him: "Doug. Kaboobie just got shot to death." (Ex. 9). Haughton claimed he "ignored [Strickland] and kept walking." (*Id.*). Haughton described Strickland as "the boy that was in the cellar" and said he knew Strickland "was in the cellar" only because Wesson "told [him] that this little boy Dap came running out of the cellar. He ran past them [and] at the time he ran out he called my name." (*Id.*).

However, there appears to be no other evidence Wesson saw Strickland at Kaboobie's house.[28]

At Murray and Wesson's preliminary hearing, Haughton tried to downplay Strickland's presence by initially claiming he "didn't know" Strickland, but he later admitted he knew Strickland because Strickland "used to play around with [Haughton's] little nephews." (*Id.* 52). Haughton also admitted that he saw Strickland "run out of Kaboobie's house" after the shots were fired. (M&W Prelim. N.T. at 12, 52). Haughton acknowledged that he and Strickland saw each other, and that he saw Strickland's face. (*Id.*).

At trial, however, Haughton did not even mention Strickland on direct examination, even though he was specifically asked "what happened after the gunshot noises." (Trial N.T. 06/01/83 at 331–32). Curiously, handwritten notes found in the DAO files suggest that ADA Marano instructed Haughton to "leave out" the fact that "Dap hollered [Haughton's] name." (Ex. 85, Prosecutor Trial Preparation Notes (Undated) (New Evidence)). When asked why he did not mention Strickland in response to that question during direct examination, Haughton replied: "I don't know." (Trial N.T. 06/01/83 at 332). In fact, on cross-examination he initially denied seeing or hearing anyone at the scene after the shooting yet quickly backtracked when asked about "Dap":

| | |
|---|---|
| Ms. Kirkland: | After you heard the shotgun blast, did you see anybody in the street? |
| Haughton: | Excuse me? |
| Ms. Kirkland: | After you heard the shotgun blast, did you hear anyone in the street? |
| Haughton: | Did I hear anyone? |
| Ms. Kirkland: | Did you see anyone? |

---

[28] The statement attributed to Wesson never mentioned anyone being in the cellar at Kaboobie's house. (Ex. 49). Tyrone Wesson Unredacted Police Statement (09/11/82)). Additionally, although Strickland stated in his affidavit that he saw "the other guy leaving" Kaboobie's house with Haughton, (Ex. 11), this does not establish that Wesson saw him.

| | |
|---|---|
| Haughton: | No. |
| Ms. Kirkland: | You didn't hear anyone – see anyone? |
| Haughton: | No. |
| Ms. Kirkland: | Did anyone come up to you and say anything to you? |
| Haughton: | No. |

. . . .

| | |
|---|---|
| Ms. Kirkland: | Did you see Dap that day? |
| Haughton: | Yes. |
| Ms. Kirkland: | When did you see Dap? |
| Haughton: | He ran out of the house and --- |
| Ms. Kirkland: | My question to you a minute ago is after you heard the shotgun blast, did you see anyone? |
| Haughton: | Yes, I did. I seen a boy named Dap. |
| Ms. Kirkland: | You didn't say that; did you? |
| Haughton: | I didn't understand what you were saying. |
| Ms. Kirkland: | My question was the same. After you heard the shotgun blast, did you see anyone? |
| Haughton: | Yes, I did. |
| Ms. Kirkland: | Why was your answer different a minute ago? |
| Haughton: | I just told you, I didn't understand what you were saying. I thought probably you was talking about some cops or anything, did I see the cops or anything like that. |
| Ms. Kirkland: | I didn't say that. |
| Haughton: | No, you didn't, but that's what I was thinking. Yes, I did. I see a little boy named Dap. |

(*Id.* at 314–16). Crucially, Haughton testified that he and Strickland saw each other "[i]mmediately after the shooting." (*Id.* at 331).

Haughton also conceded at trial that he knew Strickland. (*Id.* at 320). However, he could not explain why the stenographer at Murray and Wesson's preliminary hearing recorded him previously testifying that he "didn't know" Strickland. (*Id.* at 318). Haughton claimed the stenographer made an error, saying "I don't recall even saying that. I recall me saying that I ignored him when he called my name." (*Id.* at 141).

Haughton's trial testimony regarding Strickland is not credible for multiple reasons. First, Haughton had a motive to fabricate his testimony regarding Strickland because he knew, based on reading Randolph's statement, that the police had information corroborating that Strickland saw him inside Kaboobie's house at the time of the shooting. (Arg. Section I.C.5). Second, ADA Marano apparently instructed Haughton to "leave out" references to Strickland in his trial testimony, (Ex. 85), presumably seeking to avoid undermining Haughton's credibility. Third, it is impossible to fathom how Strickland and Haughton could have recognized each other "immediately" after the shooting if their encounter took place outside Kaboobie's residence. (Trial N.T. 06/01/83 at 331). For reference, below is a police sketch of the 2400 block of Montrose Street:



(Ex. 86, Police Sketch of 2400 Block of Montrose Street).

Haughton testified at trial that he stood lookout behind the cyclone fence in the schoolyard across the street from Kaboobie's house. (Trial N.T. 06/01/83 at 237). This means that Haughton would have stood at least 30 feet away from Kaboobie's house (2414 Montrose Street), and that the cyclone fence would have partially obstructed his and Strickland's ability to see each other. (*Id.*). Haughton also testified that he started walking in the opposite direction from Kaboobie's residence as soon as he heard the shotgun blast and that he "turned [his] head" only after he heard Strickland holler his name. (M&W Prelim. N.T. 11/04/82 at 51–52). This mean that Haughton would have stood more than 30 feet away from Strickland. (Ex. 86). In fact, considering Haughton would have needed to walk around the school building to exit the schoolyard's south entrance, Haughton most likely would have stood *more than 35 feet away* from Kaboobie's front door. (*Id.*). The distance alone raises questions about how Strickland and Haughton could have seen each other outside Kaboobie's residence, as opposed to inside the residence as both men have since admitted.

The "dark lighting conditions" at the time of the shooting also cast skepticism on Haughton's trial testimony.[29] The darker the environment, the less reliable the eyewitness identification.[30] The sunset at 4:37 p.m. in the area of 2414 Montrose Street on the date of the shooting, (Ex. 58; Ex. 59), which took place at 5:47 p.m., (Ex. 1). It was also "[c]loudy" that evening, (*id.*), and the lighting in the schoolyard was "dim," (Trial N.T. 06/01/83 at 238–39). Simply put, the conditions of darkness outside Kaboobie's house at the time of the shooting

---

[29] *See* Sandra Guerra Thompson, *Beyond a Reasonable Doubt? Reconsidering Uncorroborated Eyewitness Identification Testimony*, 41 U.C. Davis L. Rev. 1487, 1493 (2008) (recognizing that "dark lighting conditions" can affect an eyewitness's view of "an armed robbery suspect").

[30] *See* Marloes de Jong et al., *Familiar Face Recognition as a Function of Distance and Illumination: A Practical Tool for Use in the Courtroom*, 11 Pscyhol. Crime & L. 87, 87 (2005).

undermine the credibility of Haughton's trial testimony.

Under these circumstances—conditions of darkness, a distance of more than 35 feet and a fence between them, and Haughton walking in the opposite direction—it is impossible to believe that Strickland could have identified Haughton from such a distance. In reality, as he affirmed in his sworn affidavit, Strickland saw Haughton inside Kaboobie's house because Haughton was one of the two men involved in the shootout with Kaboobie. (Ex. 11).

To be clear, the foregoing point is not that Haughton's and Strickland's identifications of one another are unreliable. **The point is that, as Haughton admitted at trial, he and Strickland saw each other "immediately" after the shooting *inside* Kaboobie's house, not outside**. This establishes that, contrary to the prosecution's evidence at trial, Murray could not have been the other shooter because it is undisputed that only two men were involved in the shootout with Kaboobie at his house. Those men were Tyrone Wesson and Douglas Haughton.

### 8. Physical evidence contradicts Haughton's trial testimony as to the number of shots allegedly fired by Kaboobie and Murray.

Haughton testified at trial that he heard one shotgun blast by Wesson followed by five gunshots: two from Murray's revolver, and three from DeLegal's handgun. (Trial N.T. 06/01/83 at 241–42, 246; Trial N.T. 06/02/83 at 604). However, the physical evidence contradicts Haughton's testimony. The deputy medical examiner concluded that Kaboobie was shot once by a shotgun and *at least four times* by a revolver. (Trial N.T. 05/31/83 at 143–46; Ex. 2). Moreover, the physical evidence shows Kaboobie fired only one shot (the bullet that struck Wesson in the left forearm) because there was no gunshot damage discovered in the residence's interior (e.g., walls, ceilings, furniture). (Trial N.T. 05/31/83 at 71).  Haughton knew that Kaboobie fired at least one shot, and that he himself fired multiple shots at Kaboobie. (PCHA N.T. 07/25/91 at 23). However, Haughton read Edward Randolph's interview statement before he gave his own police statement,

(Trial N.T. 06/02/83 at 516–17), and so he knew police already believed Murray had shot Kaboobie twice, (Ex. 22). Given that the physical evidence contradicts Haughton's testimony, there are sufficient grounds to believe Haughton used Randolph's statement to fabricate his allegation that Murray fired two shots. Haughton's testimony is simply unreliable.

### 9. Haughton gave contradictory testimony regarding whether and when Murray had a gun at the time of the incident, as well as from where Murray obtained the gun.

At trial Haughton testified that Murray had a .32-caliber revolver with him during the entire day. (Trial N.T. 06/01/83 at 333–37). However, at Wesson and Murray's preliminary hearing Haughton claimed Murray did not have the revolver until they arrived at Holden's house. (M&W Prelim. N.T. 11/04/82 at 23, 35). In his police statement Haughton said that Murray had a .32-caliber revolver but that he did not know where Murray got it from. (Ex. 9). At Gregory Holden's preliminary hearing, Haughton testified that Murray did not have a gun at the time of the incident. He stated that "between the four of [them] there was one gun," and that it was the shotgun Holden gave to Wesson. (Holden Prelim. N.T. 18–10 (Ex. 61)). In short, Haughton gave four inconsistent statements regarding whether and when Murray possessed the .32-caliber handgun.

Haughton also gave inconsistent testimony regarding from where Murray obtained the revolver. At Murray and Wesson's preliminary hearing, Haughton testified that Holden "provided the **guns**." (M&W Prelim. N.T. 35–36) (emphasis added). By contrast, at trial Haughton testified that Murray had a gun all day, and Haughton acknowledged the contradiction between his trial and preliminary hearing testimonies. (Trial N.T. 06/02/83 at 498). He attempted to reconcile the contradiction by testifying that when he said at Holden's preliminary hearing that Murray did not have a gun, he meant that Murray "had a gun but [Haughton] didn't see it." (*Id.* at 500–01). He also claimed that his prior testimony that Holden provided "the guns, plural" was not true. (*Id.* at 504). When asked why he "s[w]ore to it if it wasn't true[,]" Haughton initially gave no response

124

and then claimed that it was because of how "he was asking me" questions at the preliminary hearing. (*Id.*). However, the person who had asked the pertinent questions was Pamela Cohen, Murray's attorney, and Haughton had no response when asked: "[H]ow do you remember that you answered them that way because of the way they were asked, if you don't remember who asked them?" (*Id.* at 504–05). Haughton testified later that he "knew the *guns* was given at – a gun, a shotgun was given out at Holden's." (*Id.* at 507) (emphasis added). Simply put, Haughton's inconsistent testimony about whether, when, and from where Murray obtained the revolver he allegedly possessed at Kaboobie's house is not credible. *See Tillery*, 411 F.2d at 646–47.

### 10. Haughton gave contradictory testimony regarding whether he had a gun at the time of the shootout.

At trial, Haughton denied having possessed a gun on the date of the incident. (Trial N.T. 06/01/83 at 391–92). He gave similar testimony at Holden's preliminary hearing. (Holden Prelim. N.T. 01/19/83 at 18–19 (Ex. 61)). However, at Murray and Wesson's preliminary hearing, Haughton testified that he had a gun on him around the time of the incident. (M&W Prelim. N.T. 11/04/83 at 7–8). Haughton admitted at 1991 PCHA Hearing that he did, in fact, possess a handgun at the time of the incident and that he shot Kaboobie with that gun. (PCHA N.T. 07/25/91 at 23). Thus, Haughton's inconsistencies in pre-recantation statements that he did not possess a handgun at the time of the incident, coupled with his confession that he did, render his trial testimony not credible. *See Tillery*, 411 F.2d at 646–47.

### 11. Haughton stated to police that the shotgun came from Murray's house, but he testified multiple times that the shotgun came from Holden's house.

In his police statement, Haughton alleged that the shotgun came from Bruce Murray's house. (Ex. 9). By contrast, at both preliminary hearings Haughton testified the shotgun came from Holden's house. (W&M Prelim. N.T. 11/04/82 at 23; Holden Prelim. N.T. 01/19/83 at 6, 13–14 (Ex. 61)). At trial on direct examination Haughton again testified that the shotgun came from

Holden's house. (Trial N.T. 06/01/83 at 223–31). When confronted with his police statement in which he stated the shotgun came from Murray's house, Haughton for the first time claimed that the "shotgun is a corner gun," meaning that "the gun is available" for use by any member of "a certain group of people that stand on the corner." (Trial N.T. 06/02/83 at 470, 545). He claimed that he "had seen that shotgun before over Bruce's house," but that he saw "the shotgun the night of the incident at Greg Holden's house." (*Id.* at 470). Critically, however, at Holden's preliminary hearing Haughton testified that he had never seen the so-called "corner gun" before. (Holden Prelim. N.T. 01/19/83 at 14 (Ex. 61)). Thus, Haughton's trial testimony regarding the shotgun is not credible. *See Tillery*, 411 F.2d at 646–47.

### 12. Haughton gave contradictory testimony regarding whether he saw Holden later that night after the shooting.

In his police statement, Haughton claimed that he saw Holden, Murray, and Wesson later in the evening on December 16, 1980 at Murray's house. (Ex. 9). However, at Murray and Wesson's preliminary hearing, Haughton stated that he did not see Holden at Murray's house after the shooting. (M&W Prelim. N.T. 11/04/82 at 58–59). Haughton testified that the first time he saw Holden after the incident was at Holden's preliminary hearing. (Holden Prelim. N.T. 01/19/83 at 26 (Ex. 61)). Again, Haughton's contradictory testimony on this point diminishes the credibility of his testimony. *See Tillery*, 411 F.2d at 646–47.

### 13. Haughton gave contradictory testimony regarding when the plan to rob Kaboobie was developed.

At Murray and Wesson's preliminary hearing, Haughton initially testified that the men put together the plan for the robbery before they met at Holden's house. (M&W Prelim. N.T. 11/04/82 at 20). He later contradicted himself, however, in testifying that no one talked about any plan to rob Kaboobie "until [they] got to Greg's house." (*Id.* at 21, 26). Haughton testified at Holden's preliminary hearing and at trial that the plan was not proposed until the four men were at Holden's

126

house. Nonetheless, the contradiction between Haughton's initial testimony and his subsequent statements undercuts the credibility of his trial testimony. *See Tillery*, 411 F.2d at 646–47.

### 14. Haughton gave contradictory testimony regarding who knocked on Kaboobie's front door and whether he saw Kaboobie answer the door.

In his police statement and at Holden's preliminary hearing, Haughton claimed that Wesson and Murray both knocked on Kaboobie's front door. (Ex. 9; Holden Prelim. N.T. 01/19/83 at 22 (Ex. 61)). However, at trial and at Murray and Wesson's preliminary hearing Haughton testified that only Wesson knocked on Kaboobie's door. (M&W Prelim. N.T. 11/04/82 at 41; Trial N.T. 06/01/83 at 239–40). Additionally, Haughton told police that he saw Kaboobie answer the front door when after Wesson knocked on the door. (Ex. 9). At Murray and Wesson's preliminary hearing, Haughton initially testified he saw Kaboobie answer the front door, but he later conceded he did not see who answered the door and merely assumed it was Kaboobie. (M&W Prelim. N.T. 11/04/82 at 11, 41). At Holden's preliminary hearing, Haughton reverted back to his initial statement and testified he saw Kaboobie answer the door, but he then conceded (again) that he could not see who answered the door. (Holden Prelim. N.T. 01/18/83 at 7, 22 (Ex. 61)). At trial, Haughton testified he could not see who answered the door. (Trial N.T. 06/01/83 at 241). These inconsistencies undermine the credibility of his trial testimony. *See Tillery*, 411 F.2d at 646–47.

### 15. Haughton gave contradictory testimony regarding which of Wesson's arms Kaboobie shot.

In his statement to police, Haughton claimed Wesson had been shot in his left arm, based on Haughton's observation of Wesson at Murray's house following the shooting. (Ex. 9). However, at Murray and Wesson's preliminary hearing, Haughton testified that he was not sure in which arm Wesson was shot. (M&W Prelim. N.T. 11/04/82 at 56). At trial, when confronted with his contradictory statements, Haughton testified that he could not remember which of Wesson's arms Kaboobie had shot, (Trial N.T. 06/01/83 at 388), and that he had simply "presumed" it was

Wesson's left arm when he spoke to police. (Trial N.T. 06/02/83 at 595). This is yet another contradiction in Haughton's testimony regarding a critical piece of evidence, and it undermines the reliability of his trial testimony. *See Tillery*, 411 F.2d at 646–47.

### 16. Haughton's testimony that he saw Wesson with a bandage around his arm at Murray's house following the shootout is not credible.

The Commonwealth argued that, based on Haughton's testimony, Wesson obtained treatment at HUP *before* Haughton met up with Wesson and Murray later that night after the shooting. (Trial N.T. 06/20/83 at 1537). However, even when viewed in the light most favorable to the Commonwealth, Haughton's testimony that he saw Wesson with a bandage around his arm at Murray's house following the shooting is not credible. Haughton testified that he went to his brother's house after the shooting and left for Murray's "within an hour" (M&W Prelim. N.T. 11/04/82 at 54), or "no more than about twenty minutes," (Trial N.T. 06/01/83 at 242–43). Based on the timeline of events, this means that Haughton would have arrived at Murray's house well before 8:00 p.m. The HUP medical records contradict Haughton's testimony because Wesson did not receive treatment for his gunshot wound until 8:32 p.m. (Ex. 52). The HUP records also reflect that Wesson was not discharged from the hospital until at least 10:55 p.m., when he "returned from x-ray." (*Id.*). Thus, Haughton's testimony about his alleged conversation with Murray and Wesson after the shooting is simply incredible.

### 17. Haughton gave contradictory testimony regarding how much marijuana he smoked before the shooting, and admitted that he lied during Murray and Wesson's preliminary hearing.

At Wesson and Murray's preliminary hearing, Haughton admitted that he smoked anywhere from five to twenty joints of marijuana at Holden's house before leaving for Kaboobie's house. (M&W Prelim. N.T. 11/04/82 at 34). This fact alone affects Haughton's credibility as a witness. *See Commonwealth v. Hudson*, 414 A.2d 1381, 1385 (Pa. 1980) (recognizing that a

witness's "physical condition after consuming drugs is a matter of credibility"). At trial, however, Haughton testified that he smoked only two joints at Holden's house. (Trial N.T. 06/01/83 at 249). When confronted with his contradictory testimony, Haughton admitted that he "lie[d]" during Murray and Wesson's preliminary hearing when he said he smoked between five to twenty marijuana joints. (Trial N.T. 06/02/83 at 458). Haughton also admitted that ADA Marano had pointed out the inconsistency to him during trial preparation. (*Id.* at 459). Haughton's contradictory statements regarding how much marijuana he smoked before the shooting further undermines the credibility of his trial testimony. *See Tillery*, 411 F.2d at 646–47.

       **18. Haughton gave inconsistent testimony regarding when he had given Kaboobie the money for marijuana that gave rise to their personal dispute.**

      At trial, Haughton initially testified that he gave Kaboobie money for marijuana "about two weeks, maybe three weeks" before the shooting, and that the reason he did not go to Kaboobie's front door at the time of the incident was because of their dispute over the fact that Kaboobie had "stolen" his money. (Trial N.T. 06/01/83 at 363–64). Haughton later testified that he gave Kaboobie the money "[a]bout two, two weeks" before the incident, and that he subsequently spoke to Kaboobie about the money and marijuana "at least four times." (Trial N.T. 06/02/83 at 527–28). Haughton also admitted that the last time he spoke to Kaboobie about the marijuana was at Kaboobie's house. (*Id.* at 528). However, when asked specifically when he last spoke to Kaboobie about the marijuana, Haughton said that they last spoke "a couple weeks" before the shooting. (*Id.* at 529). When pressed further, Haughton conceded that he was "not sure" whether the last time he spoke to Kaboobie "was…in the last week before [the shooting]." (*Id.*). Incredibly, at Murray and Wesson's preliminary hearing Haughton had testified that he did not remember the last time he went to Kaboobie's house before the shooting. (M&W Prelim. N.T. 11/04/82 at 16). Haughton's inconsistent testimony regarding the last time he saw Kaboobie and

when he gave Kaboobie the money for the marijuana undermines the credibility of his trial testimony. *See Tillery*, 411 F.2d at 646–47.

### 19. Haughton gave inconsistent testimony regarding how much marijuana Kaboobie had at his residence.

Haughton initially testified at trial that Kaboobie was supposed to have "two or more" pounds of marijuana at his residence on the night of the shooting. (Trial N.T. 06/01/83 at 265–66). He was then asked several times how he knew Kaboobie had two pounds of marijuana in his house, and the stenographer recorded "[n]o response" from Haughton to that same question three times. (*Id.* at 270–76). Eventually, Haughton conceded that he was "not sure whether or not [Kaboobie] had two pounds in his house that day." (*Id.*). However, on the next day of trial, Haughton contradicted himself and acknowledged that "there was at least a couple pounds" of marijuana at Kaboobie's house "on the day of his death." (Trial N.T. 06/02/83 at 532). Haughton's inconsistent testimony regarding the amount of marijuana that the men had planned to rob from Kaboobie undermines the credibility of his trial testimony. *See Tillery*, 411 F.2d at 646–47.

### 20. Haughton gave contradictory testimony regarding whether Gregory Holden planned the robbery alone.

At trial, Haughton initially testified that Gregory Holden "made [the] entire plan" to rob Kaboobie. (Trial N.T. 06/01/83 at 278). However, Haughton later admitted he "helped plan" the robbery. (Trial N.T. 06/02/83 at 535). He then emphasized: "We all planned this together." (*Id.* at 541). This was consistent with his testimony at Murray and Wesson's preliminary hearing where he said that all four men "plann[ed] to rob [Kaboobie]," and that "[e]verybody was speaking at the same time." (M&W Prelim. N.T. 11/04/83 at 6, 19–20).

When asked at trial if he "remember[ed] testifying similarly at the preliminary hearing," Haughton initially said "[y]es" but then conceded he could not remember his "exact answer." (Trial N.T. 06/01/83 at 279). At trial Haughton also could not "remember the exact words" that anyone

130

said at Holden's house regarding the plan. (*Id.*). However, at Holden's preliminary hearing he remembered that the "only thing [Holden] said is that he wanted to rob—he asked, 'Do you want to rob Kaboobie?'" (Holden Prelim. N.T. 01/19/83 at 6 (Ex. 61)). He could not remember what Wesson or Murray said. (*Id.* at 8).

### 21. Haughton gave inconsistent testimony regarding which of his brothers he visited immediately after the shooting.

At Murray and Wesson's preliminary hearing, Haughton testified that immediately after the shooting he went to his brother's house "on Madison Square right around the corner of Christian Street." (M&W Prelim. N.T. 11/04/83 at 54). At trial, however, Haughton testified that he went to his other brother's house "[o]n 25th and Carpenter" after the shooting. (Trial N.T. 06/01/83 at 372–73). The fact that Haughton gave inconsistent testimony regarding his own whereabouts immediately after the shooting undermines the credibility of his trial testimony. *See Tillery*, 411 F.2d at 646–47.

### 22. Haughton gave contradictory testimony regarding whether the school building blocked his view of Kaboobie's street.

Haughton, who claimed he stood lookout in the schoolyard across from Kaboobie's house, testified at trial that the school building obstructed his view of the entire 2400 block of Montrose. (Trial N.T. 06/01/83 at 381–85). This was consistent with his testimony at Holden's preliminary hearing, where he indicated he could not "see the other corner from where [he] w[as]." (Holden Prelim. N.T. 01/19/83 at 22 (Ex. 61)). At Murray and Wesson's preliminary hearing, however, he testified that he "could see both ends of the block[,]" meaning "the entrance of Montrose Street and the other entrance." (M&W Prelim. N.T. 11/04/82 at 39). Haughton's inconsistent testimony on this point further lessens his trial testimony's credibility. *See Tillery*, 411 F.2d at 646–47.

### 23. Haughton's testimony concerning the timeline of the events immediately preceding the shooting is not credible.

According to Haughton's fabricated narrative, the entire robbery conspiracy—the spontaneous agreement to rob Kaboobie, the planning of the robbery, the preparation for the robbery, and the execution of the plan—occurred within a span of no more than 22 minutes. At Holden's preliminary hearing, Haughton testified that he arrived with Wesson and Murray at Holden's house sometime between 5:00 p.m. and 6:00 p.m., and that the idea of robbing Kaboobie did not come up until around 25 minutes after their arrival. (Holden Prelim. N.T. 01/19/83 at 5, 9–10 (Ex. 61)). At trial, however, Haughton testified that the four men discussed the plan for 30 minutes between 5:00 p.m. and 5:30 p.m. before leaving for Kaboobie's house. (M&W Prelim. N.T. 11/04/82 at 23). Crucially, Haughton had told Homicide detectives that the four men left for Kaboobie's house at around 5:35 p.m., (Ex. 9), and there is no dispute that the shooting occurred at 5:47 p.m., (Ex. 1).

Haughton's timeline of these events is simply incredible. Given that the shooting took place at 5:47 p.m., it is impossible that Haughton, Wesson, and Murray could have arrived at Holden's any time after 5:35 p.m., considering the four men would have needed time to walk to Kaboobie's house and execute the plan. Although Haughton specifically stated at trial that the four men discussed the plan from 5:00 p.m. to 5:30 p.m., this contradicts his testimony at Holden's preliminary hearing. These inconsistencies undermine the credibility of Haughton's trial testimony. *See Tillery*, 411 F.2d at 646–47.

### 24. As Haughton tried to explain away his contradictory testimony about whether Murray had a gun, the jury was more worried about missing the 76ers 1980 NBA Championship parade.

Incredibly, at a critical moment in the trial for Murray, the trial court interrupted Senator Hardy Williams's cross-examination of Haughton because the jury wanted to take a recess so that

they would not miss the parade celebrating the Philadelphia 76ers's victory two nights prior in the 1983 NBA Championship[31]:

| | |
|---|---|
| Sen. Williams: | Sure. When you testified in November at the preliminary hearing, you never said that Bruce Murray had a gun before you all got into Greg Holden's house. Isn't that true? |
| | |
| Haughton: | I don't remember saying it. |
| | |
| Court: | **Excuse me one minute. I'm sorry to interrupt you. Members of the jury, I received a note from the court officer that you wanted to stop and recess to see the parade.** If I do that, I would have to recess at this time, and I would have to incorporate that into the luncheon recess and ask you all to be back here at one o'clock. Now, I will accommodate that request, if that's what the jury would like to do. Is there a consensus? Seeing none, I am going to proceed because it does not appear to me from addressing you at this time that there's any strong desire to see the parade. If there is, I will recess. |
| | |
| | (Pause.) |
| | |
| Court: | All right. I'm going to recess. |

(Trial N.T. 06/02/83 at 472 (emphasis added)).

## II.  Bruce Murray is factually innocent because any fully informed juror, acting reasonably, would have reasonable doubt as to his guilt.

Under the second step of the actual-innocence analysis, the Court "must consider all the evidence, old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under rules of admissibility that would govern at trial." *Reeves*, 897 F.3d at 161 (omissions in original) (quoting *House*, 547 U.S. at 538). Although "mere impeachment evidence is generally not enough," the Third Circuit has acknowledged that such evidence is

---

[31]  Later, in reference to a detective's (seemingly Lieutenant Shelton) apparently racially motivated attempt at intimidating one of Murray and Wesson's relatives at the courthouse, (Trial N.T. 06/02/83 at 483–96), Senator Williams lamented that this happened "after the 76ers won the championship," (*id.* at 489; Ex. 94, 1983 NBA Finals Lakes vs. 76ers Summary).

sufficient to satisfy the actual-innocence threshold if it "call[s] into question the Commonwealth's entire theory of the case." *Munchinski*, 694 F.3d at 338. The Third Circuit has also recognized that "new, reliable evidence that 'undermine[s] the [trial] evidence pointing to the identity of the [perpetrator] and the motive for the [crime]' can suffice to show actual innocence." *Reeves*, 897 F.3d at 161 (alterations in original) (quoting *Klem*, 510 F.3d at 233).

Crucially, "[T]he actual innocence standard 'does not require absolute certainty about the petitioner's guilt or innocence." *Id.* (quoting *House*, 547 U.S. at 538). Rather, Murray need only "show by a preponderance of the evidence 'that it is more likely than not that no reasonable juror would have convicted him in light of the new evidence,' or stated differently, that it is 'more likely than not any reasonable juror would have reasonable doubt.'" *Reeves*, 897 F.3d at 160–61 (first quoting *Houck*, 625 F.3d at 93; then quoting *House*, 547 U.S. at 538).

As a preliminary matter, in evaluating the reliability of the new evidence against the jury's credibility determinations and final verdict against Murray, the Court should consider the prejudicial effect of the probable constitutional errors that led to his wrongful conviction. *See Reeves*, 897 F.3d at 161 (indicating that relevant to the actual-innocence analysis is whether "the court is also satisfied that the trial was free of nonharmless constitutional error" (quoting *McQuiggin*, 569 U.S. at 386 (omissions in original)). Although the merits of these constitutional claims are not before the Court at this stage (nor are they fully developed for purposes of this Rule 60(b) Motion), the reality is that, regardless of whether these errors ultimately require reversal, the prosecution's underlying conduct undermines the reliability of the jury's credibility assessments and the reasonableness of its verdict.  Indeed, by the time the trial commenced, the prosecution had sealed Murray's fate by manufacturing inculpatory evidence, withholding material exculpatory and impeachment evidence, and unabashedly using peremptory strikes in a racially

discriminatory manner. For similar reasons, the Court should also consider the slew of ethical violations that ADA Marano likely committed in securing Murray's wrongful conviction.

The Court should then assess the credible alibi evidence Murray presented at trial that went unrebutted, aside from Haughton's since-recanted, uncorroborated accomplice testimony. The prosecution failed to present any eyewitness testimony, physical evidence, or forensic evidence connecting Murray to Kaboobie's death. Nor did the prosecution provide an individualized motive for Murray's participation in the alleged conspiracy. Instead, the prosecution relied on unpersuasive arguments in an attempt to discredit Murray and his three alibi witnesses. Had the new, reliable evidence been presented at trial, the prosecution's arguments would have fallen flat.

Finally, the Court should proceed to address the dispositive question of Murray's factual innocence: Who was the third participant in the three-person shootout with Kaboobie and Wesson—Bruce Murray or Douglas Haughton? Murray has maintained his actual innocence for over forty years, and there is no evidence aside from Haughton's uncorroborated accomplice testimony inculpating Murray in the offense. By contrast, nearly forty years ago *Haughton confessed to being the third participant in the shootout*, and his confession is corroborated by sworn statements from his former cellmates, Strickland's and Wesson's eyewitness accounts, and a trail of evidence from the original investigation pointing to Haughton as the third participant.

Upon a preponderance of all the available evidence, the new evidence of his actual innocence corroborates the credible alibi Murray presented at trial forty years ago and compels the conclusion that any fully informed juror, acting reasonably, would have had reasonable doubt as to Murray's guilt. This conclusion is inescapable given that a preponderance of the evidence shows that any fully informed juror, acting reasonably, would find that Haughton was the third participant in the three-person shootout with Kaboobie and Wesson. Accordingly, Bruce Murray has proven

his actual innocence after forty years of wrongful imprisonment, and he is entitled to relief under Rule 60(b) to prevent a miscarriage of justice.

### A. The jury's credibility assessments and final verdict deserve little, if any, deference due to the prosecution's racially discriminatory use of peremptory challenges.

On September 9, 1999, Magistrate Judge Diane M. Welsh issued a report and recommendation on Murray's original Petition for a Writ of Habeas Corpus (ECF No. 1), concluding "that an evidentiary hearing [should] be held to afford the Respondent an opportunity to produce race neutral explanations for each peremptory challenge of a black venireperson the prosecutor exercise during jury selection in the Petitioner's 1983 trial." (ECF No. 17).[32] The prosecution's racially discriminatory use of peremptory challenges impugns the reasonableness of the jury's verdict and credibility assessments. Regardless of whether his conduct violated either *Batson v. Kentucky*, 476 U.S. 79 (1986), or *Swain v. Alabama*, 380 U.S. 202 (1965), ADA Marano's racist use of peremptory challenges resulted in a jury consisting of, in all likelihood, one black juror, with one black alternate juror. (Ex. 67 at 18–19). Even if the discriminatory use of peremptory strikes was constitutionally tolerable in Murray's case (and it was not), it lessened the "probability that the individual jurors seated in [his] particular case were free from bias" and undermines "public confidence in the administration of justice" in his case. *See Allen v. Hardy*, 478 U.S. 255, 260 (1986). Indeed, studies show that "[a]ll white and nearly all-white juries are less likely to hold prosecutors to their burden of proof, especially when the defendant is not white."

---

[32] For procedural reasons only, this Honorable Court declined to adopt and approve Magistrate Judge Welsh's first report and recommendation, disagreeing with the "determination that Petitioner is presently raising, and has properly exhausted a Fourteenth Amendment *Batson* claim." (ECF No. 25). The Court concluded that "[n]o *Batson* claim was exhausted in the state court system or alleged in the habeas petition." (*Id.*). The Court remanded the Petition to Magistrate Judge Welsh for consideration of Murray's freestanding Sixth Amendment claim predicated on *Bruton v. United States* and its progeny as well as an ineffective assistance of counsel claim in connection with a *Batson/Swain* violation. (*Id.*).

(Ex. 87, Excerpts from Equal Justice Initiative, Race and the Jury: Illegal Discrimination in Jury

Selection (2021), at 57). As one recent report found,

> Research demonstrates that white jurors are more likely to view Black defendants as cold-hearted, remorseless, and dangerous. They also tend to treat Black defendants more punitively than white defendants. In contrast, racially representative juries engage in a more thoughtful and deliberative fact-finding process. Studies have found that they consider more factual information, are more likely to discuss missing evidence, and are more willing to discuss issues that are often overlooked by all-white juries, like racial profiling. Likewise, representative juries are better able to assess the reliability and credibility of witness testimony, evaluate the accuracy of cross-racial identifications, and avoid presuming the defendant is guilty.

> These improvements are seen only when there is meaningful representation on the jury. Token diversity does not increase the quality of deliberations, because African Americans serving on white-dominated juries, especially when they are in a "minority of one," are more vulnerable to the formidable pressure exerted by the majority.

*Id.* at 58 (footnotes and citations omitted). At bottom, the prosecution's discriminatory use of

peremptory strikes undermines the reliability of the jury's credibility assessments and final verdict.

**B. A clear *Bruton* violation casts skepticism on the jury's credibility assessments and the reasonableness of the final verdict.**

A clear *Bruton* violation occurred at Murray's joint trial, as will be briefed in full upon the

Court's grant of his Rule 60(b) Motion. Well-settled law maintains that "a defendant's right to

confrontation is violated when a non-testifying codefendant's confession is introduced in a joint

trial, and that confession implicates the other defendant." *Johnson v. Superintendent Fayette SCI*,

949 F.3d 791, 795 (3d Cir. 2020) (citing *Bruton*, 391 U.S. 123). A curing instruction is insufficient

in cases where "such 'powerfully incriminating extrajudicial statements of a codefendant, who

stands accused side-by-side with the defendant, are deliberately spread before the jury in a joint

trial.'" *Id.* (quoting *Bruton*, 391 U.S. at 137).

Although redactions may suffice to avoid a *Bruton* violation, the "redactions cannot be so

ineffectual that they actually could signal to the jury that the co-defendant's name was deleted."

*Id.* at 795–96 (quoting *Gray v. Maryland*, 523 U.S. 185, 195 (1998)). Crucially, the redactions must "eliminate 'not only the defendant's name, *but any reference to his or her existence*.'" *Id.* (emphasis added) (quoting *Richardson v. Marsh*, 481 U.S. 200, 211 (1987)). The court must "take a holistic approach" and "view[] the redaction in the context of the entire record." *Id.* at 796.

The Third Circuit has routinely found that the use of a "generic term" like "the other guy" in place of the defendant's name is insufficient to avoid a *Bruton* violation if "[t]he limited participants in [the] case made it obvious to a juror who 'need only lift his eyes to [Murray], sitting at counsel table,' to determine that he was 'the other guy,' *i.e.* the shooter." *Johnson*, 949 F.3d at 797 (quoting *Gray*, 523 U.S. at 193); *see also*, *e.g.*, *Williams v. Folino*, 625 Fed. App'x 150, 157 (3d Cir. 2015) (finding *Bruton* violation where redacted confession referred to the non-confessing defendant as "his boy," "the jury knew that there were only two people involved in the shooting and only two people were on trial for the crime to which [the codefendant] confessed, and the Commonwealth argued that [the non-confessing codefendant] was the shooter").

Crucially, the Third Circuit has also held that the use of generic terms cannot avoid a *Bruton* violation if "the confession 'sharply incriminated'" the defendant, *see Johnson*, 949 F.3d at 797 (quoting *United States v. Richards*, 241 F.3d 335, 346 (3d Cir. 2001)), such as when the redacted confession referred to a shooter as "the other guy" and the prosecution theorized that the defendant is the only one who could have possibly been the possible shooter, *see*, *e.g.*, *Vazquez v. Wilson*, 550 F.3d 270 (3d Cir. 2008) (finding *Bruton* violation where the confessing codefendant told police that there were only two possible shooters, including the non-confessing codefendant and an uncharged third person, and the prosecution argued that the non-confessing defendant "fired the fatal shot"). *Compare Priester v. Vaughn*, 382 F.3d 394, 401 (3d Cir. 2004) (finding no *Bruton* violation where the phrase "the other guy" did not implicate the defendant because at least fifteen

138

people were involved in the crime), *with Eley v. Erickson*, 712 F.3d 837, 860–61 (3d Cir. 2013) (holding that *Bruton* violation occurred where non-testifying codefendant's statement "implicated exactly three people in the crimes and exactly three defendants appeared at the joint trial").

Here, the use of generic terms as substitutes for Murray's name in Wesson's statement n constituted a clear *Bruton* violation. The substitutions appear throughout the statement, starting at the planning session ("three other guys at one of their houses") through the post-incident meeting at "one of the other guys' houses." (Trial N.T. 06/15/83 at 681–86). The redacted statement divided the perpetrators into two groups: "two guys" who served as lookouts (Haughton and Holden) and the actual robbers (Wesson, against whom the statement was admissible, and Murray). (*Id.*). Crucially, the redacted statement indicated that Wesson "and another guy went in[to Kaboobie's house]" and referred to that "guy" as "[t]he guy with [Wesson]" and "the guy who went inside with [Wesson]." (*Id.*). The prosecution's theory has always been that Murray was the only other man who went inside Kaboobie's house with Wesson.

Murray's case is legally indistinguishable from a scenario in which the prosecution "use[s] a generic term in a two-defendant case involving a two-person crime." *Williams*, 625 Fed. App'x at 156–57. Although the joint trial involved three codefendants and one cooperating accomplice, Wesson's description of the division of labor among the four men created a one-on-one situation where Murray was the only person who could have been "the guy who went inside with [Wesson]." (Trial N.T. 06/15/83 at 681–86). As a result, while the jury believed that at least four men were allegedly involved in a conspiracy to commit the robbery, the prosecution led the jury to believe that "there were only two people involved in the shooting": Wesson and Murray. *Williams*, 625 Fed. App'x 156. Accordingly, based on how the prosecution presented its case and redacted Wesson's statement, all the jury had to do was look up at the three codefendants and see that

Murray was the only person who could have been "the other guy who went inside with [Wesson]." (Trial N.T. 06/15/83 at 681–86). Thus, this clear *Bruton* violation undermines confidence in the jury's credibility assessments and the reasonableness of its verdict.

### C. Probable *Brady* violations further undermine the reliability of the jury's credibility assessments and the reasonableness of the final verdict.

Murray submits that ADA Marano and the homicide detectives assigned to the investigation of Kaboobie's death committed a slew of *Brady* violations by intentionally concealing and failing to disclose material impeachment evidence and, most likely, manufacturing false or otherwise misleading evidence introduced at Murray's trial.[33] In *Brady v. Maryland*, the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. 83, 87 (1963). As the Third Circuit has explained,

> A *Brady* violation has three components: the evidence at issue must be favorable to the defendant; it must be material; and it must have been suppressed by the prosecution. Evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Material evidence can include evidence that may be used to impeach a witness.

> *Brady* prohibits the prosecution from "supress[ing]" material, favorable evidence, but that does not mean that the prosecution's duty to disclose is limited to evidence within the actual knowledge or possession of the prosecutor. It is well-settled that the prosecution has a duty to learn of and disclose information "known to the others acting on the government's behalf in the case...." Accordingly, it has been held that a state prosecutor has a duty to obtain and turn over to the defense favorable evidence known to a state police officer who investigated the case.

---

[33] Murray understands he "must pursue the proper channels" and file a successive petition for the *Brady* violations to be raised for this Court's consideration on the merits. *See* Explanation and Order at 1 n.1 (ECF No. 83). This discussion is merely to apprise the Court of the egregiousness of the misconduct.

*United States v. Reyeros*, 537 F.3d 270, 281 (3d Cir. 2008) (citations omitted) (first quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985); then quoting *Brady*, 373 U.S. at 87; last quoting *Kyles v. Whitley*, 514 U.S. 419, 437 (1995)).

The Third Circuit has also held that "inadmissible evidence may be material if it could have led to the discovery of admissible evidence" or "if it could have been used effectively to impeach or corral witnesses during cross-examination." *Dennis v. Sec'y, Pa. Dep't Corr.*, 834 F.3d 263, 310 (3d Cir. 2016) (alteration omitted) (quoting *Johnson v. Folino*, 705 F.3d 117, 130 (3d Cir. 2013)). Indeed, the Third Circuit "affirm[ed] the view that inadmissible evidence is often very material." *Id.* Accordingly, in assessing *Brady* violations, the district court must determine "whether the undisclosed evidence is admissible itself or could have led to the discovery of admissible evidence that could have made a difference in the outcome of the trial sufficient to establish a 'reasonable probability' of a different result." *Id.* (quoting *Johnson*, 705 F.3d at 130).

Here, the probable *Brady* violations involved both admissible and inadmissible evidence withheld by the prosecution. The cumulative prejudice of these violations most likely rendered Murray's trial fundamentally unfair. *Kyles*, 514 U.S. at 436 (holding that the materiality of undisclosed evidence must be "considered collectively, not item by item"). The different items of *Brady* material in Murray's case are discussed in turn below.

  **1. Suppression of handwritten notes and a March 11, 1981 police activity sheet that would have led to admissible exculpatory evidence in the form of Gregory Strickland's trial testimony.**

The prosecution disclosed to Murray's counsel a statement by Edward Randolph that omitted the fact that Randolph told homicide detectives that Strickland had said he saw Douglas Haughton run down the stairs inside Kaboobie's house after the shootout. (Ex. 88, Commonwealth Disco. Transmittal Ltr. (12/28/82)). The statement indicated that "Gregory [Strickland] saw the guy who ran down the stairs," and implied that Randolph learned "the person who ran down the

steps was Douglas Haughton" only from his separate conversation with Gregory Holden. (Ex. 22). Omitted from this statement was the fact that Randolph also expressly told homicide detectives that "Strickland told him he…saw Douglas Haughton run down the steps." (Ex. 25; Ex. 20). This fact was memorialized in handwritten notes by a homicide detective and in a police activity sheet around the time of Randolph's March 1981 interview. (*Id.*).

This evidence, if not admissible itself, would have led to admissible evidence in the form of trial testimony by Strickland, whom ADA Marano acknowledged was available to testify. (Trial N.T. 06/20/83 at 1470). Strickland's testimony that he saw Haughton down the stairs would have exculpated Murray because it would have established that Haughton was the third participant in the three-person shootout with Kaboobie and Wesson. Even if Strickland would have denied that he saw Haughton at the scene, this evidence would have impeached Strickland's denial and, by extension, undermined Haughton's testimony that he never went inside the house. In short, the evidence that Strickland saw Haughton inside Kaboobie's house was "material" because, at the very least, it would have impeached the testimony of the prosecution's "star witness," *Dennis*, 834 F.3d at 274, and more likely than not would have "call[ed] into question the Commonwealth's entire theory of the case." *Munchinski*, 694 F.3d at 338. Thus, because neither the notes nor the PPD activity sheet was disclosed to Murray's counsel, the Commonwealth's suppression of this evidence most likely constitutes a *Brady* violation.

### 2. Suppression of polygraph results that would have led to admissible exculpatory evidence and impeached Haughton's trial testimony and the police's paltry investigation into whether Strickland saw Haughton inside Kaboobie's house.

The Third Circuit has recognized that although polygraph results are themselves inadmissible, the prosecution's nondisclosure of polygraph results violates *Brady* if they would have led to admissible evidence. *Dennis*, 834 F.3d at 307–08. In assessing a *Brady* claim on this

basis, a court must consider "the way in which the suppression of the polygraph results affected preparation and trial." *Id.* at 308. Here, although the prosecution produced Holden's polygraph results, the prosecution refused to turn over the polygraph results of the other interviewees: George Young, Gregory Strickland, and Edward Randolph. (Pretrial Hr'g N.T. 05/18/83 at 4–5).

Indisputably, the prosecution's nondisclosure of the results of the Randolph, Strickland, and Young polygraphs hampered the preparation and presentation of Murray's defense. The nondisclosure of Young's polygraph report resulted in the suppression of the fact that Young had described the shorter, skinnier male as a sixteen years old. (Ex. 8).[34] This evidence proves that Wesson, who was sixteen years old on December 16, 1980 and who indisputably present at Kaboobie's house during the shootout, was the shorter, skinnier male. (Arg. Section II.E.3). Because Murray (5'4" and 110 lbs.) did not match the description of the taller, heavier male (5'11" to 6'1" and 185–200 lbs.), he could not have been one of the two males that Young saw flee the house. (Arg. Section II.E.3).

Additionally, without the polygraph results, Murray's counsel could only speculate as to whether Randolph and Strickland, whose statements inculpated Murray, gave credible police statements. Randolph answered "Yes" when asked whether "Holden t[old] [him] that Bruce and Scotty killed Kaboobie[.]" (Ex. 26). His polygraph results were "inconclusive." (*Id.*). Similarly, Strickland answered "Yes" when asked whether "Elliot [Burton] [t]old [him] that Bruce & Scot shot 'Kaboobie.'" (Ex. 28). However, the polygraph examiner concluded that Strickland was "[l]ying." (*Id.*). Had this information been disclosed, it would have compelled Murray's counsel

---

[34] Upon information and belief, the "polygraph statement" of George Young referenced in the December 28, 1982 discovery transmittal letter, (Ex. 88), refers to the polygraph statement appended to the end of his December 16, 1980 police statement, (Ex. 7). Only one polygraph statement by Young was disclosed. (Ex. 88).

to pursue further investigation into Strickland and to call him as a witness at trial to impeach Haughton's testimony and exonerate Murray.

More importantly, had the prosecution disclosed Strickland's polygraph report, the polygraph examiner's conclusion that Strickland was "[l]ying" would have altered the entire case. (Ex. 28). Strickland denied knowing who shot Kaboobie or seeing anyone shoot Kaboobie, (*id.*). and he has since admitted that he lied when he told police he did not seeing Haughton inside Kaboobie's house because he feared retaliation from Haughton, (Ex. 11; Ex. 12). If Murray's counsel would have had access to these results and known that Strickland was lying, she almost certainly would have called Strickland as a witness at trial because there was a plethora of evidence corroborating that Strickland did, in fact, see Haughton inside Kaboobie's house.

The polygraph results also would have led to admissible evidence to "challenge detectives at trial regarding their paltry investigation" into two critical leads that would have undermined the reliability of Haughton's trial testimony as well as Wesson's police statement. *See Dennis*, 834 F.3d at 311. Consider the following:

First, the fact that police had grounds to believe Strickland was lying raises significant questions as to why they did not further pursue the lead that Haughton was one of the two males who participated with Kaboobie in the three-person shootout. Randolph told police that Strickland had said he "saw Douglas Haughton run down the steps." (Ex. 22). The extent of the police investigation into this lead was: (1) a follow-up interview of Strickland that included a direct question about whether he told Randolph he had seen Haughton leave Kaboobie's residence; and (2) a question during the polygraph examination that expressly asked who Strickland had seen "run down the stairs?" (Ex. 28). The homicide detectives found out Strickland was lying based on the polygraph examiner's conclusion, yet there is no evidence that they conducted any further

144

investigation into whether Haughton was one of the two participants in the shootout with Kaboobie.

The polygraph results were not the only reason for skepticism of Strickland's denials. Indeed, detectives had every reason to be skeptical of his statement because the information then available to police contradicted key details in his narrative. Strickland claimed that George Young (aka "Reds") told him to call an ambulance, and that he did call an ambulance from his house. (Ex. 10). However, Young did not mention Strickland during his interview with detectives, and Young told them that he personally called 911 after seeing Kaboobie lying on the floor. (Ex. 7). Additionally, there is no evidence that Strickland ever called an ambulance.

Furthermore, if Strickland had actually waited in the cellar for twelve minutes after the shooting, then the first responders most likely would have encountered him there before he left the house. The shootout occurred at 5:47 p.m., which means Strickland would not have come upstairs until approximately 6:00 p.m. (Ex. 10). Yet, multiple officers had arrived at Kaboobie's house before 6:00 p.m., which means they would have encountered him before he left to return home. For instance, Officer Fitzgerald testified that he received the radio call regarding the shooting at around 5:45 p.m. and arrived on-scene with "a minute." (Trial N.T. 05/31/83 at 50). Moreover, Strickland's statement that someone "ran outside" after running down the stairs to the first floor is incredible, on its face, because how could he have known the person ran outside if he was still waiting in the cellar?

Ultimately, the detectives abandoned the lead that Haughton was one of the two perpetrators inside Kaboobie's house once he provided a statement inculpating Murray, Holden, and Wesson, *even though his statement further supported this lead.* At a minimum, Haughton admitted to being aware of Strickland's presence at Kaboobie's residence, and Haughton's

explanation for how could have possibly known that Strickland "was in the cellar" if he was never inside the house is simply incredible. (Arg. Section I.C.7). Strickland would not have called out Haughton's name if Strickland had not seen him; indeed, as he explained years later, "I knew Douglas [Haughton] all my life so I called out to him saying why did you have to kill him?" (Ex. 11).

Haughton told police that he was standing outside Kaboobie's residence in the schoolyard across the street, and that he started walking away from his "lookout" spot once he heard the shots. (Ex. 9). It is impossible to fathom how Strickland could have possibly seen Haughton standing across the street from Kaboobie's residence if Haughton had already walked away in the opposite direction. **ADA Marano apparently asked himself the same question at some point during trial preparation when he reviewed Haughton's statement: "Where was Dap [Strickland] when he called out Haughton name[?]"** (Ex. 89, Prosecutor Copy of Haughton First Police Stmt.) (New Evidence)).

The police's decision to rely on Haughton's statement without further investigation into the lead that Strickland saw Haughton inside Kaboobie's house constitutes "slopp[y]" investigative work that "diminish[es]" the probative value of Haughton's statement. *See Kyles*, 514 U.S. at 446 n.15. It is clear that the prosecution was skeptical of Haughton's accusations, considering the March 23, 1982, criminal complaint against Haughton specifically accused him of "shoot[ing] and kill[ing] Eric DeLegal inside of his residence." (Ex. 38).[35] The police uncovered no evidence to the contrary between March 4, 1982, when Haughton signed the written statement inculpating Murray, and September 7, 1982, when he pled guilty to the lesser charge of third-degree murder.

---

[35] By contrast, the criminal complaint against Gregory Holden was carefully worded to reflect that he was not accused of being one of the shooters inside the residence. (Ex. 34).

146

This signifies that the police slovenly decided to trust Haughton over its lead involving Strickland.

Indeed, Haughton had at least four prior felony convictions and history of using aliases, (Ex. 37), which he later admitted he used to conceal his criminal activities. (Trial N.T. 06/02/83 at 420–21). Haughton knew the FBI had evidence proving his involvement in the unrelated federal bank robbery. (Trial N.T. 06/02/83 at 547). He also knew the homicide detectives had evidence implicating him in Kaboobie's death because he had read Edward Randolph's statement that Gregory Strickland saw Haughton inside Kaboobie's house. (*Id.* at 516–17). Haughton thus had every motive to falsely accuse someone else because he was facing serious penalties for Kaboobie's shooting death and the unrelated federal bank robbery. *See United States v. Casoni*, 950 F.2d at 896–97. Yet the police blindly trusted his word anyway.

By contrast, Strickland was only sixteen years old when questioned by police, and there was no evidence inculpating him in Kaboobie's death. Detectives also knew Strickland was a close friend of Kaboobie, considering he went over to Kaboobie's house "like twice a week," (Ex. 10), which should have caused them to consider Strickland's motive for "[l]ying," (Ex. 28). His motive was completely obvious—he feared retaliation from whomever committed the offense—and the police's failure to realize this constitutes slovenly and negligent investigative work because Strickland told detectives about two separate instances where people were stalking him in public after Kaboobie's death. (Ex. 10). Those incidents corroborate Strickland's sworn statement in his letter and affidavit, where he admitted he did not tell detectives the truth about what he saw— namely, Haughton inside Kaboobie's house at the time the shooting—because he feared retaliation from both Haughton and Elliot Burton. (Ex. 11; Ex. 12).

In short, the polygraph results were "evidence highly probative of [Murray's] innocence." *See United States v. Agurs*, 427 U.S. 97, 110 (1982) ("If evidence highly probative of innocence

is in [the defendant's] file, [the prosecutor] should be presumed to recognize its significance even if he has actually overlooked it."). By the time of trial, the prosecution knew that only two suspects had entered Kaboobie's house and that Wesson was one of those two men. The prosecution also had evidence that Strickland may have seen Haughton inside Kaboobie's house, that Strickland was lying when he denied knowing or see the person who shot and killed Kaboobie, and that Strickland had credible motives to lie because he had been stalked in public in the days after the incident. Had the prosecution not withheld the polygraph results, the fallout would have destroyed Haughton's credibility and supported Murray's innocence because Haughton's testimony was the prosecution's only inculpatory evidence admissible against Murray.

### 3. Suppression of evidence concerning Elliot Burton, who was Kaboobie's marijuana supplier, the first suspect, and a confidential informant whose role in the investigation was previously unknown.

A credible lead regarding an alternative suspect, if suppressed, constitutes "*Brady* material." *See Smith v. Holtz*, 210 F.3d 186, 196–97 (3d Cir. 2000). A *Brady* violation occurs if the alternative-suspect evidence raises "a high likelihood of creating reasonable doubt" or "generat[ing] other evidence that might have been helpful to [the defendant]." *See United States v. Alvin*, 30 F. Supp. 3d 323, 338 (E.D. Pa. 2014); *see also Brady*, 373 U.S. at 85–86 (holding that due-process violation occurred where prosecution withheld a statement in which someone else confessed to committing the actual killing; *Haskins v. Superintendent Greene SCI*, 755 Fed. App'x 184 (3d Cir. 2018) (holding that prosecutor's failure to disclose witness's letter indicating that someone other than the defendant had shot the victim violated *Brady*).

Here, the prosecution failed to disclose the tip from John Howard stating that after the

148

shooting on December 16, 1980, he saw Elliot Burton—Kaboobie's marijuana supplier[36]—flee Kaboobie's residence with a shotgun and jump into a 1977/1978 Buick that then drove away. (Ex. 14). This tip was credible: Howard gave the police his name and a callback number, and he evinced an intent to speak further with detectives about his observations. (*Id.*). Plus, the police never found the shotgun, so they knew someone must have taken it from Kaboobie's house. Although the police were unable to make contact with Howard via the phone number he provided to police or at his home address, there is no evidence that the police conducted any further investigation to locate Howard aside from surveying an unreported number of neighbors. (Ex. 14).

The police *did*, however, ask Strickland whether "[a]fter the shooting, when the person/s left the house, did you hear a car drive away[.]" (Ex. 9). Strickland answered: "[N]ot that I remember." (*Id.*). Police also asked Strickland and former ADA Frank DeSimone about Burton's whereabouts, but neither Strickland nor DeSimone knew where Haughton was. (Ex. 10; Ex. 14).

Rather than continuing to investigate whether Burton had killed Kaboobie, homicide detectives decided to use Burton as a confidential informant to elicit information from Gregory Holden. As recorded on secretly recorded phone conversation between Burton and Holden, Burton asked Holden leading questions about the involvement of "Bruce" and "Scottie" in Kaboobie's death and claimed that someone else had accused Holden of planning the incident. (Ex. 19). In response, Holden denied his own involvement and cast blame on "Bruce" and "Scottie." (*Id.*). Although the date of the recording is unknown, there is only one other piece of evidence in the DAO and PPD files that references confidential informants—the Feb. 25, 1981 Search Warrant, which described Confidential Informant #1 as man "who in the past ha[d] provided information to

---

[36]   (Ex. 49 at 1). At trial Haughton confirmed Burton was involved in drug trafficking. (Trial N.T. 06/02/83 at 513).

two (2) arrests and convictions." (Ex. 17). Confidential Informant #1 was the first person to accuse Murray, Holden, Haughton, "and another male" of being involved in Kaboobie's death. (*Id.*).

Based on the audio recording, Burton's documented role as the key prosecution witness in two prior murder prosecutions,[37] the Feb. 25, 1981 Search Warrant's reference to Confidential Informant #1's assistance in two prior prosecutions, and the fact that the Feb. 25, 1981 Search Warrant is the only document in the homicide file that references the use of confidential informants in the investigation of Kaboobie's death, there are sufficient grounds to conclude that Burton was Confidential Informant #1. Indeed, Burton would have known "that a young black male witnessed the murder...and took [Kaboobie's] 32 cal. revolver and fled [the house] with the weapon, (Ex. 17), because Burton was near the scene at the time of the shootout, and he took the shotgun and fled as well, (Ex. 14).

If true, this would mean Burton—the man seen fleeing from Kaboobie's house holding the shotgun likely used in Kaboobie's death—was the first person to inculpate Murray. At a minimum, the Commonwealth's failure to disclose this evidence deprived Murray of the argument that "the police were irresponsible in relying on [Burton] to tip them off to...evidence damaging to [Murray]." *See Kyles*, 514 U.S. at 450 (finding *Brady* violation where the state's failure to disclose evidence tending to show police "fail[ed] to treat [a non-testifying informant] as a suspect and his statements with a presumption of fallibility").

When coupled with the new evidence of Strickland's fear of retaliation from Burton, (Ex. 12), and the polygraph examiner's undisclosed conclusion that Strickland was "[l]ying" in March 1981 when he stated he could not "take [the police] to the gun used to kill 'Kaboobie[,]'" (Ex. 28), the undisclosed evidence concerning Burton also raises questions about why the homicide

---

[37] *See Johnson*, 437 A.2d 1175, 1177 n.3; *Watts*, 412 A.2d 474, 475.

detectives did not piece together the highly plausible theory that Howard told police the truth and that Strickland knew Burton had taken the shotgun used to kill Kaboobie. The police had no leads as to what happened to the shotgun—except for Howard's tip and the possibility that Strickland knew where the shotgun was. The police were also already aware that Strickland had fears of retaliation from more than one person due to his knowledge of what happened to Kaboobie, and that Burton had twice threatened to tell the police Strickland was at Kaboobie's house if Strickland did not volunteer the information himself. Taken together, all the evidence concerning Burton suggests that he did, in fact, take the shotgun used to kill Kaboobie and that he pressured Strickland to omit this fact when talking to the police.

The John Howard tip *alone* would have compelled Murray's counsel to investigate Burton's role in the shooting's immediate aftermath. In addition to calling Howard as a witness after a reasonable investigation into his whereabouts, counsel could have subpoenaed Burton to testify and treated him as a hostile witness, given his role as a confidential informant and Kaboobie's marijuana supplier. Counsel could have examined Burton regarding what he was doing near Kaboobie's house at the time of the shooting; why he was there; why he took the shotgun and fled in a getaway car; why he tried to pressure Strickland into voluntarily telling police about what happened to Kaboobie; why he had asked an attorney to contact the DAO about Strickland; and whether he told the police about his personal stake in the outcome of the investigation into Kaboobie's death. Because nearly forty-two years have passed since the incident, undersigned counsel can only speculate as to why Burton, who was a member of the Twentieth and Carpenter Street Gang in Kaboobie's neighborhood, may have done this. *See Watts*, 412 A.2d at 475. Because "the uncertainty regarding what leads timely disclosure might have generated was created by the extreme length of the Government's evidentiary suppression," this Court should "resolve it against

the Government." *Alvin*, 30 F. Supp. 3d at 338.

Counsel also could have impeached the homicide detectives regarding their reckless and irresponsible decision to trust **their then-prime suspect** to serve as a confidential informant before they even ruled him out as a possible shooter. *See Kyles*, 514 U.S. at 450–51; *see also Dennis*, 834 F.3d at 311 (recognizing that withheld impeachment evidence is "material" if it could be used to "challenge detectives at trial regarding their paltry investigation"). **At the time the homicide detectives used Burton as a confidential informant, their only investigative lead pointed to Burton**. Until Randolph gave a statement, the police had no evidence exculpating Burton as a shooter.[38] The only evidence that definitively disproves Burton as one of the two shooters, however, are the confessions of the shooters themselves: TWesson and Douglas Haughton. For the foregoing reasons, the prosecution's withholding of evidence related to Elliot Burton is a probable *Brady* violation that unfairly prejudiced Murray in the jury's eyes.

### 4. Suppression of Haughton's motion to suppress his police statement.

The materiality of inadmissible evidence increases when it might lead to admissible evidence that would impeach the prosecution's "key witness." *See Dennis*, 834 F.3d at 274. Here, Haughton filed a motion to suppress his police statements because he "did not intelligently, knowingly or voluntarily waive his constitutional rights with regard to his interrogation." (Ex. 44). Had counsel been aware of the grounds for Haughton's motion to suppress, counsel could have used the grounds of the motion to develop a new line of inquiry into the voluntariness of his police statement for impeachment purposes. *Cf. State v. Gell*, 524 S.E.2d 332, 340 (N.C. 2000)

---

[38] Randolph, for his part, had his own credibility issues, most notably his refusal to testify against Holden after inculpating him in Kaboobie's death, (Trial N.T. 06/17/83 at 1260–64); the police's question connecting him to Burton, (Ex. 28); and, his inconclusive polygraph results, (*id.*).

(explaining that although the defendant was not entitled to cross-examine state witnesses as to the voluntariness of their inculpatory statements by introducing their motions to suppress, which were inadmissible hearsay because they were not signed by the witnesses personally, defendant could still impeach the witnesses by questioning them about the voluntariness of their statements).

### 5. Suppression of notes of testimony from Haughton's preliminary hearing, which the prosecution falsely claimed did not exist.

During a sidebar discussion at trial, it was revealed that ADA Marano had refused to produce the notes of testimony from Haughton's preliminary hearing, even though Holden's attorney had specifically requested them. (Trial N.T. 06/17/83 at 1268). Murray's counsel then joined Holden's motion for a mistrial regarding ADA Marano's withholding of evidence, including, but not limited to, the notes of testimony from Haughton's preliminary hearing. (*Id.* at 1268–79). The motion was ultimately denied. (*Id.*). ADA Marano claimed that "[w]hen [he] gave notes to [Holden's counsel], I gave her everything I have….I gave them in good faith." (*Id.* at 1286). While undersigned counsel has been unable to obtain the notes of testimony from Haughton's preliminary hearing, there is reason to believe that Haughton did not waive his preliminary hearing because he filed a motion to suppress "the in-court identification" made by a witness "at the preliminary hearing." (Ex. 44). If Marano did in fact withhold Haughton's notes of testimony, then this may constitute an additional *Brady* violation depending on what happened at Haughton's preliminary hearing.

### 6. Belated disclosure of the Form 229 and the HUP records for Tyrone Wesson, who falsely claimed he was "Bruce Murray" when he received treatment for the gunshot wound he suffered during the shootout at Kaboobie's house.

There is no evidence that the prosecution provided Murray's counsel with copies of Wesson's Form 229 or his HUP records before trial. (Ex. 88). Crucially, Wesson's Form 229 contained Detective Gerrard's notes that Wesson had confessed that he lied and said he was "Bruce

Murray" when he received medical treatment at HUP for his gunshot wound. (Ex. 46). The HUP records reflect that Wesson did, in fact, use Murray's name to avoid police detection. (Ex. 52). Murray's sister Brenda corroborated this fact in her unsworn, unsigned affidavit: She was the person who drove Wesson to HUP and told him to use her brother's personal information because Wesson was a minor and had told her he had been shot as the *victim* in what he believed was an attempted robbery. (Ex. 108).

The law is clear that "*Brady* material must be disclosed in time for its effective use by the defendant at trial." *United States v. John*, 391 F. Supp. 3d 458, 463 (E.D. Pa. 2019) (citing *United States v. Higgs*, 713 F.2d 39, 43–44 (3d Cir. 1983)). The prosecution violates *Brady* if it "makes *Brady* evidence available during the course of a trial in such a way that a defendant is [not] able to effectively use it." *Id.* at 463–64 (quoting *United States v. Johnson*, 816 F.2d 918, 924 (3d Cir. 1987)).

Murray could not effectively used Wesson's Form 229 or the HUP records as impeachment evidence. Although this information was brought out at trial, Murray was unable to effectively use it. Wesson invoked his privilege against self-incrimination and did not take the witness stand, (Trial N.T. 06/17/83 at 1395; Trial N.T. 06/20/83 at 1435–36), and Murray therefore had no opportunity to cross-examine Wesson about his motivations for lying. Furthermore, the belated disclosure of Wesson's Form 229 and his HUP records deprived Murray of the opportunity to make an effective objection to the stipulation between Wesson's counsel and ADA Marano that "an individual by the name of Bruce Murray, or using the name Bruce Murray, came into the hospital" for treatment of a gunshot wound he suffered "two hours ago in the left forearm by a .32 pistol at eight feet away." (Trial N.T. 06/16/83 at 820–21). This stipulation clearly inculpated Murray in the offense and gave the jurors a basis to discredit Wesson's admission and find instead

that Murray did, in fact, get shot at Kaboobie's house. The belated disclosure deprived Murray of

an opportunity to conduct an effective investigation into Wesson's admission and, by extension,

to form an effective basis for an objection. Additionally, timely disclosure of the Wesson Form

229 would have furnished even stronger grounds for severing Murray's trial from the others.

### D. Prosecutorial misconduct undermines confidence in the verdict.

At the time of trial, the American Bar Association's Model Code of Professional

Responsibility governed the conduct of Pennsylvania lawyers,[39] including ethical considerations

and disciplinary rules for public prosecutors. Disciplinary Rule 7-103 mandated: "A public

prosecutor or other government lawyer in criminal litigation shall make timely disclosure to

counsel for the defendant, or to the defendant if he has no counsel, of the existence of evidence,

known to the prosecutor or other government lawyer, that tends to negate the guilt of the accused,

mitigate the degree of the offense, or reduce the punishment." (Ex. 90, Excerpt from ABA Model

Code of Prof. Resp.). Ethical Consideration 7-13 provided as follows:

> The responsibility of a public prosecutor differs from that of the usual advocate; his
> duty is to seek justice, not merely to convict. This special duty exists because: (1)
> the prosecutor represents the sovereign and therefore should use restraint in the
> discretionary exercise of governmental powers, such as in the selection of cases to
> prosecute; (2) during trial the prosecutor is not only an advocate but he also may
> make decisions normally made by an individual client, and those affecting the
> public interest should be fair to all; and (3) in our system of criminal justice the
> accused is to be given the benefit of all reasonable doubts. With respect to evidence
> and witnesses, the prosecutor has responsibilities different from those of a lawyer
> in private practice: the prosecutor should make timely disclosure to the defense of
> available evidence, known to him, that tends to negate the guilt of the accused,
> mitigate the degree of the offense, or reduce the punishment. Further, a prosecutor
> should not intentionally avoid pursuit of evidence merely because he believes it
> will damage the prosecutor's case or aid the accused.

---

[39] *Am. Dredging Co. v. City of Phila.*, 389 A.2d 568, 571 (Pa. 1978). The Pennsylvania Rules of
Professional Conduct were not adopted until more than three years after Murray's trial. Pa.
Rules of Professional Conduct ("Adopted by Order of the Supreme Court of Pennsylvania
dated October 16, 1987, effective April 1, 1988."), http://www.padisciplinaryboard.org/for-
attorneys/rules/rule/3/the-rules-of-professional-conduct

(*Id.*).

In Murray's case, ADA Marano committed multiple acts of prosecutorial misconduct[40] both during and in preparation for Murray's joint trial with Holden and Wesson. Indeed, as Wesson's counsel stated during a sidebar conference at trial:

> I am calling upon the District Attorney at this point to give us what the accurate facts are, having had that information beforehand. And my last observation is any number of times in this case, the District Attorney has improperly and prejudicially done things that are improper and inaccurate, and I accuse him here and now of prosecutorial misconduct in this case.

(Trial N.T. 06/17/83 at 1284–85). The record and available evidence strongly suggest that, in addition to the probable constitutional violations discussed above, ADA Marano committed the following acts of prosecutorial misconduct:

- Communicating with Detective Gerrard while he was testifying on cross-examination. (Trial N.T. 06/15/83 at 803).

- Crafting a misleading stipulation that permitted the jury to infer, whether reasonably or not, that "an individual by the name of Bruce Murray" went to HUP for medical treatment after the shooting and stated "that he had been shot two hours ago in the left forearm by a .32 pistol at eight feet away." (*Id.* at 820).

- Seeking to elicit inadmissible and prejudicial testimony to impress upon the jury that Gregory Holden was discharged after his first arrest in connection with Kaboobie's death solely because Edward Randolph refused to come to court. (Trial N.T. 06/17/83 at 1260–63).[41] The trial court recognized what ADA Marano was doing and sustained an objection, noting that he "absolutely" was trying to suggest to the jury that Randolph refused to testify: "The refusal of a witness to come into a preliminary hearing has no place in this courtroom and this trial. The objection is sustained." (*Id.*). ADA Marano nonetheless maintained that his line of questioning

---

[40] "Prosecutorial misconduct includes actions intentionally designed to provoke the defendant into moving for a mistrial or conduct by the prosecution intentionally undertaken to prejudice the defendant to the point where he has been denied a fair trial." *See Commonwealth v. Chimel*, 777 A.2d 459, 464 (Pa. Super. 2001).

[41] *See Commonwealth v. Bricker*, 487 A.2d 346, 352 (Pa. 1985) ("Where...the prosecutor is aware that evidence is not admissible and is prejudicial to the defendant, the prosecutor has engaged in misconduct by deliberating questioning on an improper matter.").

was proper. (*Id.* at 1265).

- Failing to exercise reasonable diligence in determining the availability of Edward Randolph for purposes of trial.[42]

- Violating an agreement with defense counsel regarding the scope of cross-examination for Jean El, one of Holden's alibi witnesses, and inducing her to invoke her Fifth Amendment privilege against self-incrimination due to pending charges against her in a related matter.[43]

- Making blatantly improper remarks while examining witnesses, such as asking Gerrard whether Holden was holding "any sheet music in his hand at [the] time" detectives found him hiding inside the piano. (Trial N.T. 06/15/83 at 779).

- Preparing to challenge "any attempted introduction of [Murray's] exculpatory [statement]":



(Ex. 91, ADA Robert Marano's To-Do List (Undated) (<u>New Evidence</u>)).

---

[42] Defense counsel moved to compel ADA Marano to answer whether Randolph had always been unavailable or whether he was available to testify but not as far as the prosecution was concerned. (Trial N.T. 06/17/83 at 1283–91). Wesson's counsel stated, "I am suggesting prosecutorial misconduct. We were told the man was unavailable, and he [ADA Marano] said he refused to testify. That's not unavailable, and I need to know what is because we have all been told clearly and all assumed he was not available; therefore, we couldn't use him. There's a lot of stuff in there for us." (*Id.* at 1283–84).

[43] *See Commonwealth v. Francis*, 665 A.2d 821 (Pa. Super. 1995) (holding that Commonwealth's introduction of evidence at non-jury trial that defendant had a suspended license at the time of underlying vehicular accident constituted prosecutorial misconduct because the prosecutor breached an oral agreement with defense counsel that it would not introduce such evidence); *cf. Commonwealth v. Bricker*, 487 A.2d 346, 352 (Pa. 1985) ("Where...the prosecutor is aware that evidence is not admissible and is prejudicial to the defendant, the prosecutor has engaged in misconduct by deliberating questioning on an improper matter.").

There is also documentary evidence suggesting that ADA Marano improperly coached Haughton to change portions of his narrative in preparation for his trial testimony. At trial, Haughton acknowledged that he and ADA Marano discussed his anticipated testimony in preparation for trial. (Trial N.T. 06/02/83 at 458–59). Documentary evidence indicates that ADA Marano instructed someone to "leave stuff for Larry [i.e., Detective Gerrard] for Haughton," presumably referring to materials that ADA Marano annotated for Haughton's review:



(Ex. 91). These materials most likely included copies of the transcripts from Murray and Wesson's and Holden's preliminary hearings because they contained handwritten notes that are inconsistent with Haughton's preliminary hearing testimony but consistent with his trial testimony. (Ex. 62, Holden Prelim. N.T.; Ex. 92-A and 92-B, ADA Marano's Copy of Murray-Wesson Prelim. Tr. (New Evidence)). In fact, ADA Marano's copy of the Holden preliminary hearing transcript has "D. Haughton" written at the top:



(Ex. 61).

Handwritten notes on ADA Marano's copy of the Wesson-Murray preliminary hearing transcript suggests that he advised Haughton to testify that the stenographer erred in recording one of his answers ("I didn't know him [i.e., Gregory Strickland]."). This answer was circled and had a line pointing to the words, "Should be he ignored him":



(Ex. 92-A at 12).

There are also handwritten notes that corroborate the fact that ADA Marano improperly coached Haughton to "leave out" the fact that "Dap [Strickland] hollered [his] name":

(Ex. 91). At trial, Haughton denied previously testifying that he "didn't know him," and testified that he "said something different." (Trial N.T. 06/01/83 at 318–20).

Handwritten notes on the Wesson-Murray transcript suggest that ADA Marano may have advised Haughton to describe Holden as the "leader" of the alleged plan to rob Kaboobie:

(Ex. 92-A at 19). At trial, Haughton said Holden was the "leader" behind the plan and admitted he did not describe Holden as a "leader" at the preliminary hearing. (Trial N.T. 06/01/83 at 296–301).

Handwritten notes on the transcripts from the Murray-Wesson and Holden preliminary hearings show that ADA Marano may have instructed Haughton to testify that he heard a total of six shots, not five shots:



(Ex. 92-A at 12).



(Ex. 61 at 25).

At trial, Haughton acknowledged that he had testified at Murray and Wesson's preliminary hearing that he had heard a total of "six gunshots." (Trial N.T. 06/01/83 at 293). He also recognized that he testified at Holden's preliminary hearing "that the total number of shots fired were five."

(*Id.* at 283–85). His testimony at trial was consistent with what was written in ADA Marano's notes on the copies of the preliminary hearing transcripts. (Ex. 61 at 25; Ex. 92 at 12).

Handwritten notes on the Murray-Wesson transcript also strongly suggest that ADA Marano instructed Haughton not to testify "[t]here was a plan [to rob Kaboobie] before [Haughton] got to Holden's house":



(Ex. 92-A at 20). At trial, Haughton denied that the plan developed before arriving at Holden's house. (Trial N.T. 06/01/83 at 253–58).

Additionally, handwritten notes on an undated piece of paper with the heading "Haughton – redirect" includes the phrase "corner gun" enclosed in quotation marks on one page, and the same phrase enclosed in a circle on another page:



161



(Ex. 93, Handwritten Prosecutor Notes (Undated)).

Crucially, the first time Haughton *ever* used this phrase was on cross-examination at trial when he described the sawed-off bolt action shotgun and tried to reconcile the contradiction between his testimony that the shotgun came from Holden's house and his police statement that it came from Murray's house:

| | |
|---|---|
| Sen. Williams: | Now, if you said that Gregory provided the guns at the hearing in November, and yesterday you said that there was just one gun at Holden's house and that Murray had a gun all day, there's a contradiction. You agree with that; don't you? |
| Haughton: | Yes, I do. |
| Sen. Williams: | Would you explain that contradiction in those two sworn testimonies. |
| Haughton: | The shotgun, I had seen that shotgun before over Bruce's house, and that shotgun is a **corner gun**, and anybody that wants to use that -- |
| Sen. Williams: | Is a what? |
| Haughton: | A **corner gun**, and anybody that wants to use that gun is available to use it. I seen the shotgun the night of the incident at Greg Holden's house. |

(Trial N.T. 06/02/83 at 470 (emphasis added)).[44]

---

[44] By "corner," Haughton meant the following: "A certain group of people that stand on the corner. They be together all the time. The gun, what I mean by **corner gun**, the gun is available to any one of them that like be on a corner. They can use the gun." (N.T. Trial 06/02/83 at 545) (emphasis added).

In sum, there is sufficient evidence of prosecutorial misconduct that further undermines confidence in the jury's credibility assessments and verdict, including evidence that directly bears on the credibility of Haughton's trial testimony.[45]

**E.  The prosecution offered no evidence to rebut Murray's credible alibi defense, aside from the uncorroborated testimony of a purported accomplice (Haughton).**

Murray presented three credible alibi witnesses to support his defense: Robin Johnson, David Elliott, and Deborah Frazier. Murray also waived his privilege against self-incrimination, testified credibly at trial, and corroborated his alibi defense. Aside from Haughton's testimony, the prosecution did not offer any evidence to rebut Murray's defense and instead focused on attacking the credibility of the alibi witnesses. The prosecution did not present any physical or forensic evidence establishing that Murray was there, nor did it offer an individualized motive for Murray's participation in the purported conspiracy. The prosecution also failed to present any eyewitness testimony and unilaterally canceled a court-ordered lineup that was never rescheduled.

**1.  The prosecution could muster only weak arguments to challenge the credibility of Murray's alibi witnesses.**

The prosecution used the same method against all three of Murray's alibi witnesses. First, ADA Marano cast doubt on their ability to recall what they were doing two years earlier on December 16, 1980. (Trial N.T. 06/20/83 at 1565–66). All three witnesses, however, provided sufficient justification for their recollection. Johnson maintained that she remembered that date because it was her close friend Juanita Taylor's birthday. (FB Section XIV.B.1). Elliott remembered that date because it was the last day he worked at the candy store, and the next day

---

[45]  ADA Marano's conduct with respect to Haughton's testimony raises serious questions as to whether he violated Murray's "right not to be convicted on perjured testimony used by prosecutors at trial." *Dennis v. City of Phila.*, 19 F.4th 279, 289 (2021) (citing *Mooney v. Holohan*, 294 U.S. 103, 112 (1935)).

he heard that someone on Montrose had been killed. (FB Section XIV.B.2). Frazier remembered that date because it was the day she returned to Philadelphia after living in North Carolina for more than a year. (FB Section XIV.B.3). Crucially, all three witnesses also remembered specific details their activities on the date in question, and they credibly responded to ADA Marano's questions about their whereabouts at specific dates and times.

Second, ADA Marano attacked the witnesses' credibility by emphasizing their relationship to Murray. (Trial N.T. 06/20/83 at 1565–68). However, only Johnson had a real personal relationship with Murray. Contrary to ADA Marano's closing argument, (Trial N.T. 06/20/83 at 1567), Elliott did not consider Murray a "friend"; rather, he knew Murray only because he "used to see [Murray] coming through the block. His grandmother lived in our block." (Trial N.T. 06/16/83 at 1128–29). Frazier had known Murray for many years by the time of trial, but she did not even know about his arrest until a few months before trial. (Trial N.T. 06/20/83 at 1465).

Third, ADA Marano challenged the witnesses' credibility by asking questions about whether they gave a statement to police before trial. Frazier and Elliott both acknowledged on cross-examination that they did not give statements when contacted by the police, but they were never given the opportunity to explain why. (Trial N.T. 06/16/83 at 1136; Trial N.T. 06/20/83 at 1466). Johnson said she did not give a statement because she did not think she was required to give one, and she did not want "to give statements without the presence of a lawyer." (Trial N.T. 06/16/83 at 942). Although Pennsylvania law permits cross-examination into why a witness did not go to the police with alibi information, an alibi witness does not have any legal duty to come forward with such information. *See Commonwealth v. Rodgers*, 372 A.2d 771, 782 (Pa. 1977). Furthermore, in considering the reasonableness of the verdict against Murray, which is based on the uncorroborated testimony of an accomplice, this Court should take into account that "it would

164

generally appear to be true that cross-examination on this point [is] of little or no probative value with respect to the witness' credibility." *People v. Dawson*, 406 N.E.2d 771, 775–79 (N.Y. 1980) (Wachtler, J., concurring); *id.* at 775–77 (majority opinion) (holding that it is improper to suggest through cross-examination that a witness "has a flawed moral character or is generally unworthy of belief solely because he or she failed to come forward prior to trial"); *see also State v. Silva*, 621 A.2d 17, 20 (N.J. 1993) (affirming lower court ruling that a notice of alibi defense terminates any "arguable unnaturalness of an alibi witness's failure to come forward with his information" and thus the prosecution may not question or comment on an alibi witness's pretrial silence during any period after filing of alibi notice). ADA Marano's remarks during summation regarding the alibi witnesses' credibility were designed to impress upon the jurors that Murray's alibi witnesses were not trustworthy because they did not come forward sooner. Whether permissible or not, this credibility attack deserves little weight as this Court considers the reasonableness of the verdict.

### 2. Murray testified credibly at trial, corroborating his alibi defense and his prior statement denying any involvement in Kaboobie's death.

Murray has denied any involvement in Kaboobie's death ever since the date of his September 11, 1982 arrest. (Ex. 57). He waived his privilege against self-incrimination and testified credibly in support of his alibi defense. He was candid about what he could and could not remember, and there were no noticeable inconsistencies or contradictions within his testimony. He reiterated his innocence at sentencing that he "ha[d] been incarcerated something like twenty months now for a crime that I really didn't participate in." (Sentencing N.T. 04/23/84 at 20). For over forty years, Murray steadfastly and consistently maintained his actual innocence. In light of the other evidence of his actual innocence and the deficiencies in the investigation and prosecution that led to his wrongful conviction, the remarkable consistency in his story can mean only one thing: Bruce Murray is actually innocent.

The prosecution offered no evidence to rebut Murray's trial testimony, except for Haughton's since-recanted, uncorroborated accomplice testimony. The prosecution also focused almost exclusively on Murray's fight with Haughton to attack Murray's credibility, arguing that "this alleged robbery incident is another one that's made up to try and undermine the testimony of Douglas Haughton in this case[.]" (Trial N.T. 06/20/83 at 1561). Specifically, ADA Marano claimed Murray would never physically confront Haughton, even though Haughton robbed Murray's girlfriend and sister at gunpoint, because Murray is physically smaller than Haughton. (*Id.* at 1560–63). However, as Murray testified at trial, he did not seek out Haughton; by chance, they bumped into each other on the street while Murray was walking with his stepbrother. (FB Section XIV.B.4). Furthermore, neither Murray nor his girlfriend reported the incident to the police because they believed reporting the incident would not solve their problem with Haughton. (FB Section XIV.B.1, B.4). Reporting the incident might have resulted in Haughton's arrest, but as time had shown them, Haughton's prior arrests and convictions did not stop him from committing more crimes. (Ex. 18).

The reality is that a nearly all-white jury is far more likely than a representative jury to have a positive view of the police, which means that a nearly all-white jury is far less likely to credit testimony that implies that the police are ineffective at combating crime. (Ex. 95, Rich Morin & Renee Stepler, Pew Research Ctr., The Racial Confidence Gap in Police Performance 2 (2016) ("Roughly half of all blacks say local police do an excellent or good job combatting crime – a view held by about eight-in-ten whites."); Ex. 96, Steven A. Touch & Ronald Weitzer, *Racial Differences in Attitudes Toward the Police*, 61 Public Opinion Q. 642, 642 (1997) (noting that "race has long been a strong predictor of attitudes toward the police, with African Americans more likely than whites to express unfavorable attitudes toward various aspects of policing"); Ex. 97,

James Garofalo, Nat'l Institute of Justice, The Police and Public Opinion: An Analysis of Victimization and Attitude Data from 13 American Cities (1977) (finding that African Americans reported more antagonism toward police than white respondents); *id.* at 56 (reporting results from survey of Philadelphia crime victims' ratings of the police)).

The jury's assessment of Murray's credibility should therefore be given little weight, compared to the overwhelming evidence of Murray's actual innocence, especially considering the prosecution offered no evidence to rebut his testimony, aside from Haughton's uncorroborated, since-recanted accomplice testimony. Moreover, the jury did not have the benefit of knowing about all the new, reliable evidence that supports Murray's actual innocence claim. Had the jury been fully informed, it is more likely than not that the jury would have found Murray credible.

### 3. There is no eyewitness evidence proving that Murray was there, and the court-ordered lineup was never held because the police simply canceled it.

Only two individuals claimed to have seen both perpetrators: Gregory Strickland and George Young. As explained above, Strickland saw Haughton and "the other guy [Wesson] leaving" Kaboobie's house. (Ex. 11). On the same night of the shooting, Young told homicide detectives that he was walking westbound on Montrose Street when he saw two black males run out the front door of Kaboobie's residence. (Ex. 7). He did not see either male carrying anything in their hands, and he was not close enough to identify any distinguishing physical characteristics. *Id.* However, Young gave physical descriptions of the two males: (1) a shorter, skinner male and (2) a taller, heavier male. As explained below, neither Murray nor Wesson matches the description of the taller, heavier male, and Wesson matches the description of the shorter, skinner male. Since there is no longer any dispute that Wesson was one of the two males whom Young saw,[46] this must

---

[46]   The physical evidence proves Wesson was one of the participants in the shootout because Kaboobie shot Wesson inside the house, (Ex. 46; Ex. 52), and he has admitted on multiple

mean that Wesson was the shorter, skinnier male and that Young never saw Murray.

In an undisclosed polygraph statement to the police, Young described the shorter, skinner male as sixteen years old and 5'6" tall. (Ex. 8). In his police statement, Young described the shorter male as eighteen years old, 5'3" tall, and 130 lbs. (Ex. 7). He also apparently at some point told the police the shorter male may have weighed up to 150 lbs. (Ex. 5).

Crucially, at the time of the December 16, 1980 shooting Tyrone Wesson was sixteen years old and most likely weighed between 130 lbs. and 150 lbs. His birthday was July 1, 1964, which establishes that he was only sixteen years old when the shooting occurred. (Ex. 46). A November 23, 1981 mugshot of Wesson reflects that he weighed 137 pounds and was 5'10" tall:



(Ex. 98, Tyrone Wesson Mugshot (11/23/81)).[47] At trial, Haughton testified that Wesson had "got[ten] a little bit bigger" in terms of "his height and weight" by the time of trial. (Trial N.T.

___

occasions that he was inside the house and fled immediately after the shootout ended. (Ex. 46; Wesson MTS N.T. 05/23/83 at 437; PCHA N.T. 07/25/91 at 46–47, 53–55).

[47] Wesson was later acquitted of the charges related to his November 23, 1981 arrest, after the police obtained an illegal confession in violation of his rights as juvenile. (Ex. 99, Tyrone Wesson Criminal Extract; Wesson MTS N.T. 05/23/83 at 413, 415).

06/02/83 at 375). Thus, Wesson must have been the shorter, skinnier male.

In his police statement, Young described the taller, heavier male as approximately 19 years old, 6'1" tall, and 185 lbs. (Ex. 7). In his undisclosed polygraph statement, Young described the taller, heavier male as 6 feet tall, (Ex. 8), and he also apparently at one point told the police that this male might have been 5'11" and 200 lbs., (Ex. 5). Critically, a July 5, 1981 mugshot indicates that Bruce Murray was only 5'4" tall and weighed only 110 lbs.:



(Ex. 100, Bruce Murray Mugshot (07/05/81)).

The 50-pound discrepancy between the weight of the taller, heavier male and Murray's probable weight at the time of the shootout all but forecloses the possibility that he was the other participant in the three-person shootout with Kaboobie and Wesson. *Cf. Andrews v. Sciulli*, 853 F.3d 690, 702 n.14 (3d Cir. 2017) ("In the context of a habeas corpus case, where testimony described the shooter as between 5'4" and 5'8" and 130 pounds and the height and weight of the suspect was 6'2" and 190 pounds, the court said: '[t]he contradictory eyewitness testimony about the shooter's height and weight...gives us pause....These discrepancies are significant and troubling.'" (alteration and omissions in original) (quoting *Mendez v. Artuz*, 303 F.3d 411, 415 (2d

Cir. 2002)).

Indeed, between him and Murray, Haughton (aka Miles is the only one who could possibly

fit the physical description of the second man. Approximately one month before the shooting,

Haughton was 5'9" tall and weighed 156 lbs.:



(Ex. 101, Bryant Miles Mugshot (11/09/80)).[48] Considering Murray and Haughton are the only

suspects who could have been the third participant in the three-person shootout with Kaboobie and

Wesson,[49] the fact that Haughton more closely matches the description of the taller, heavier man

tends to prove that this man was Haughton. In view of the other evidence inculpating Haughton as

a participant, as well as the evidence exculpating Murray of any involvement in the incident, this

all but proves that Haughton was the third participant in the shootout with Kaboobie and Wesson.

Despite his availability, the prosecution did not call Young to testify at trial, presumably

---

[48] The age listed on Haughton's November 9, 1980 mugshot is incorrect. Haughton was born in June 1958, (Ex. 84), which means he was only twenty-two years old at the time of the December 16, 1980 shooting.

[49] No one has ever claimed that Gregory Holden was the man who accompanied Wesson inside Kaboobie's house. Moreover, Holden was around the same size as Murray, which means he definitely was not the second man. (Ex. 102, Gregory Holden Mugshot (11/24/80)).

because doing so would undermine Haughton's testimony that Wesson and Murray were the two men who went inside Kaboobie's house. Based on Young's descriptions, Wesson and Murray could not have both been participants in the three-person shootout with Kaboobie because neither man weighed anywhere close to 185 pounds. Since there is no dispute that Wesson was one of the two shooters, Wesson must have been the shorter, skinnier sixteen-year-old male that Young saw, and since Murray could not possibly fit the other man's description, Haughton must have been the other man.

Murray could have explored this problem in the prosecution's case had the police not unilaterally canceled the court-ordered lineup. (FB Section IX). Although a criminal defendant has no constitutional right to a lineup, *Mosley v. Folino*, No. 3:14CV468, 2019 WL 626457, at *4 (M.D. Pa. Feb. 14, 2019), noncompliance with a court order requiring that the police hold a lineup can be grounds for contempt of court, *cf. Harris v. City of Phila.*, 47 F.3d 1311, 1314–15 (3d Cir. 1995) (holding the city in contempt of court for noncompliance with court order). Here, a valid court order existed, requiring a lineup be held on February 9, 1983, to test the reliability of testimony expected from "witnesses George Young et al." (Ex. 62). The lineup was not held as ordered on February 9, 1982, nor was the lineup ever rescheduled. (Trial N.T. 06/20/83 at 1470).

Crucially, Strickland's statement refutes the police's proffered excuse for canceling the lineup, which was simply incredible on its face. By way of background, in the early 1980s the "[s]tandard procedure of the Philadelphia Police Department at the Detention Center [was] to allow suspects to choose their own fill-ins. They are allowed to select anyone of their fellow prisoners who is willing to appear. Volunteers are paid $.50 per appearance plus one free phone call for their services." *McKnight*, 457 A.2d at 935. Here, the police purportedly canceled the lineup because all the fill-ins went on strike and refused to participate in the lineup after the police refused to give

171

them each an additional nickel to cover the increased price of cigarettes. (Ex. 63).

To believe the police's excuse, the Court would need to find that every possible fill-in at the Detention Center was a smoker who refused to accept free money and a free phone call.  If anything, the prisoners could have pooled each of their .75 cents together and *shared* the cigarettes. The suggestion that the police actually determined that there were no nonsmokers who would accept free money and a free phone call is unbelievable. Furthermore, the police's excuse flies in the face of the then-standard procedure, which would have allowed Murray to select the fill-ins for his lineup. *See McKnight*, 457 A.2d at 935. If there were really a strike over the cost of cigarettes, Murray could have selected nonsmokers to serve as volunteer fill-ins for the lineup.

The true reason for the cancelation is obvious, in light of Strickland's sworn statement and Young's descriptions: The police did not want to risk Murray obtaining favorable evidence. Detective Gerrard and an unidentified ADA—presumably Robert Marano, who was present for the canceled lineup, (Trial N.T. 06/20/83 at 1470)—showed Strickland pictures of Murray and tried to pressure him into falsely accusing Murray, but Strickland refused. (Ex. 11; Ex. 12). There is no other reasonable explanation for why the police canceled the lineup. In any event, the PPD and DAO's failure to ever hold the lineup violated the court order and deprived Murray of the opportunity to test Young's identification.

### 4.  There is no physical or forensic evidence establishing that Murray was there, and the police may have suppressed fingerprint evidence.

The police never recovered any physical evidence connecting Murray to the offense. In fact, the physical evidence recovered from Kaboobie's house included: (1) one metal rifle or shotgun bolt; (2) one spent Remington-Peters, 20-guage shot shell; (3) one shot shell wadding; (4) one brown suede coat with red stains; (5) one clear plastic bag containing marijuana; (6) one brown paper bag containing marijuana; (7) nine manila envelopes each containing marijuana; and (8) one

clear plastic bag containing white power. (Ex. 103, Property Receipt Nos. 806238, 806239, and 810984). None of this physical evidence connects Murray to the offense.

Although the prosecution claimed to have not recovered any forensic evidence, the first page of the "Homicide Case Summary" located in the DAO files indicates that the police did, in fact, recover fingerprint evidence in connection with the shooting:

| TECHNICAL | | | | |
|---|---|---|---|---|
| BALLISTICS | CHEMICAL | FINGERPRINT | PHOTOGRAPH | OTHER *(Describe)* |
| ☒ YES ☐ NO | ☒ YES ☐ NO | ☒ YES ☐ NO | ☒ YES ☐ NO | |
| EVIDENCE *(LIST)* | | | | |

(Ex. 6). This contradicts paperwork found in the PPD homicide file, such as the notation in the official investigation report, which indicated that no latent prints were found. (Ex. 104, PPD Investigation Report (06/01/81)). At a minimum, the contradiction raises fresh questions about the slovenly police investigation and overzealous prosecution that resulted in Murray's wrongful conviction despite his actual innocence.

### 5. The prosecution offered no individualized motive for Murray's participation in the purported robbery conspiracy.

The prosecution maintained that Murray, Haughton, Holden, and Wesson decided to rob Kaboobie for the purpose of stealing his marijuana. There was no plan to steal any money— Haughton testified at trial that the plan was to seal Kaboobie's marijuana, (Trial N.T. 06/01/83 at 245–46). Haughton also conceded he did not even know exactly how much marijuana Kaboobie had at his residence, even though he previously claimed the plan involved two pounds of marijuana. (Trial N.T. 06/01/83 at 270–275; Trial N.T. 06/02/83 at 531). Moreover, at Murray and Wesson's preliminary hearing Haughton indicated that neither Murray nor Wesson knew whether Kaboobie had marijuana at his house. (M&W Prelim. N.T. 11/04/83 at 44). Murray and his three codefendants all shared the same purported motive for participating in the conspiracy, but aside from Haughton's testimony, there is simply no evidence that Murray shared that motive.

Moreover, there is little, if any, evidence corroborating Haughton's testimony that the four men had actually planned to rob Kaboobie at all. There was no evidence that anything, let alone marijuana, was stolen from Kaboobie's house. At Murray and Wesson's preliminary hearing, Haughton testified that nothing was taken from the house. (M&W Prelim. N.T. 15). He reiterated this fact at trial. (Trial N.T. 06/01/83 at 246). Eyewitness George Young told police he did not see the suspects carrying anything in their hands as they fled Kaboobie's house. (Ex. 7; Ex. 8). The police recovered 3.5 pounds of marijuana from a second-floor bedroom, (Ex. 5), and there was no evidence that anyone had taken anything from anywhere in the house. In short, there is no evidence against Murray that corroborates Haughton's testimony that the four men planned to rob Kaboobie.

Additionally, Haughton's testimony regarding the development of the alleged robbery plan was simply incredible. He claimed that the idea to rob Kaboobie of marijuana was discussed between 5:00 p.m. and 5:30 p.m.—*while the four men were already smoking marijuana*. (Trial N.T. 06/01/83 at 261–65). Haughton indicated that, aside from Holden, no one showed any enthusiasm about the thought of robbing Kaboobie. (*Id.*). In fact, Haughton testified that he, Murray, and Wesson were all largely indifferent about whether to attempt the robbery. (*Id.*).

There was also no discussion about how the marijuana would be divided among the four men or what the men planned to do with the marijuana, such as use for personal consumption or distribution and sale. (M&W Prelim. N.T. 11/04/83 at 55). The notion that four men would agree on whim to attempt an armed robbery without having had such discussions is simply unbelievable. There is simply no evidence, aside from Haughton's since-recanted claims, that Murray had any motive to participate in a conspiracy to rob Kaboobie.

**F. A preponderance of the evidence shows that any fully informed juror, acting reasonably, would find that Haughton was the third participant in the three-person shootout with Kaboobie and Wesson, which means Murray must be actually innocent.**

The prosecution lacked reliable evidence inculpating Murray in the December 16, 1980

shooting incident, and the police possessed information proving that Haughton was one of the two men who went inside Kaboobie's house. After Elliot Burton, Haughton was the police's first prime suspect in terms of who shot Kaboobie, as they had evidence that Gregory Strickland saw and heard Haughton inside Kaboobie's house at the time of the shooting. (Ex. 20). Strickland has since confirmed that he saw and heard Haughton inside Kaboobie's house, that he knew Haughton was one of the two participants in the three-person shootout with Kaboobie, that he saw the other participant (Tyrone Wesson), and that Murray was simply never there. (Ex. 11; Ex. 12).

Haughton's uncorroborated testimony—the only evidence inculpating Murray at trial—is not credible. (Arg. Section I.E). Haughton was willing to tell the police whatever they wanted to hear, including false confirmation of their incorrect hunch that Murray was one of the two participants in the three-person shootout with Kaboobie. (Arg. Section I.E.6). Contradictions and inconsistencies pervade Haughton's trial testimony, (Arg. Section I.E.9–23), and physical evidence contradict key parts of his false accusations against Murray. (Arg. Section I.E.8). Strickland's postconviction statements, (Ex. 11; Ex. 12), and the corroborating statements by Eugene Thomas and Anthony Smith, (Arg. Section I.C.5), further undermine the credibility of Haughton's trial testimony against Murray. Simply put, Haughton's trial testimony is incredible on its face.

By contrast, Haughton's recantation exonerating Murray is reliable. (FB Sections XVI, XVII). Haughton recanted against his penal interest by admitting to being the third participant in the three-person shootout with Kaboobie and Wesson, (Arg. Section I.C.1), and his multiple recantations were consistent, (Arg. Section I.C.6). He promptly recanted nearly 40 years ago, roughly one year after Murray's sentencing, (Arg. Section I.C.4). The critical facts in Haughton's recantation—namely, that Haughton was the other shooter and that Murray was not involved in

Kaboobie's death—is also corroborated by Wesson's recantation, (Arg. Section I.B.); Gregory Strickland's eyewitness account, (Arg. Section I.A); George Young's eyewitness description of Wesson and a taller, heavier male, (Arg. Section II.E.3); Eugene Thomas's and Anthony Smith's sworn statements corroborating Haughton's recantation, (Arg. Section I.C.5); and documentary evidence confirming that the police initially believed Haughton was one of the participants in the shootout, (Ex. 20; Ex. 28).

Haughton's recantation confirms what Wesson said nearly 40 years ago when he testified during his allocution: Murray is actually innocent. (FB Section XV). Had he not been advised against doing so, Wesson would have testified at trial and exonerated Murray. (*Id.*). The sentencing court would not allow Wesson to explain for the record what actually happened, (*id.*), but he reaffirmed his recantation in 1991 when he testified Murray was never there, (FB Section XVII). Wesson's recantations are reliable evidence of Murray's actual innocence. (Arg. Section I.B).

Gregory Strickland's postconviction statements are reliable, unbiased, and independent corroboration of Wesson's and Haughton's recantations. (Arg. Sections I.A, I.D). Strickland was present in the cellar at Kaboobie's house when the shootout occurred. (FB Section XVIII). He heard Haughton's voice, and when Kaboobie went downstairs to get the marijuana for Haughton and Wesson, he told Strickland that Haughton was upstairs. (*Id.*). Strickland heard the shotgun blast, the one gunshot by Kaboobie, and the five gunshots by Haughton. (Ex. 10). Strickland ran upstairs and saw Haughton, whom he knew from hanging out with Haughton's two nephews, and "the other guy [Wesson] leaving." (FB Section XVIII).

Over the last forty-two years, Strickland has stated on five separate occasions that he did not see Murray at Kaboobie's house. On January 6, 1981, he told police he did not see anyone. (Ex. 10). On March 13, 1981, he told police he did not see Murray at Kaboobie's house, and he

cautioned the police against believing false rumors that Murray participated in the shootout, (Ex. 27), which we now know is because he knew Murray was not involved at all, (Ex. 11; Ex. 12). In February 1983, Strickland refused to succumb to pressure by Detective Gerrard and an ADA, both of whom wanted Strickland to falsely accuse Murray of Kaboobie's murder. (FB Section IX). Circa 2000, Strickland wrote a letter confirming Murray's innocence, and in July 2011 he signed an affidavit that exonerates Murray of any involvement in Kaboobie's death. (*Id.*).

Strickland did not come forward at the time of Murray's trial because his father advised him not to tell the truth about what he witnessed, and Strickland feared retaliation from Haughton and Burton. (*Id.*). Strickland told police about two separate instances of him being followed in connection with the investigation, (Ex. 10), and Anthony Smith has since confirmed that Haughton plotted to kill Strickland because he knew Strickland heard and saw him inside Kaboobie's house, (Ex. 16). The reasons for Strickland's fear of Burton are less clear, but considering Strickland may have seen Burton flee Kaboobie's house with the sawed-off shotgun used in the shootout, (Ex. 14), and given Burton's membership in the Twentieth and Carpenter Street Gang, one could reasonably infer that Strickland feared mentioning something that might have tipped the police off to the fact that Burton took the shotgun. Any doubt resulting from the delay in his decision to confirm that Haughton was the other man who shot Kaboobie is negated by the fact that Strickland simply wants justice for Kaboobie, his "friend and childhood mentor." (Ex. 11).

The new, reliable evidence of Murray's actual innocence validates the credible alibi defense he raised nearly 40 years ago at his trial before a nearly all-white jury. Ever since his arrest on September 11, 1982, Murray has maintained his actual innocence. (Ex. 57; FB XIV.B.4). Robin Johnson testified that she was with Murray the entire day on December 16, 1980. (FB Section XIV.B.1). They watched Murray's nieces and nephews, took them to the park and candy store,

went to Murray's grandmother's house, and then eventually went to the movies. (*Id.*). David Elliott, who worked at the candy store on December 16, 1980, corroborated that he saw Murray and Johnson at the candy store around the time Murray was supposedly smoking marijuana and conspiring with his purported accomplices at Holden's house. (FB Section XIV.2). Deborah Frazier corroborated the fact that Johnson and Murray went to the park and then his grandmother's house with his nieces and nephews. (FB Section XIV.3). Neither Frazier nor Elliott had any personal stake in the outcome of Murray's trial, and they and Johnson testified credibly in support of Murray's alibi. (Arg. Section II.E.2). New evidence in the form of an unsworn, unsigned affidavit from his sister Brenda further corroborates his alibi defense, as she confirmed that she had asked her brother to watch her children in December 1980 so that she could run errands in preparation for their mother's surprise birthday party. (Ex. 108).

In sum, given that only two males participated in the shootout with Kaboobie, the new and reliable evidence before this Court proves Murray's actual innocence. There is no dispute that Wesson was one of the two males, and physical evidence (his gunshot wound) is unassailable proof that Wesson was there. Strickland's eyewitness account, Haughton's and Wesson's recantations, and the corroborating accounts from Smith and Thomas prove that Haughton was the third participant in the three-person shootout with Kaboobie and Wesson. Based on a preponderance of this new reliable evidence and the credible alibi that Murray presented at trial in June 1983, any juror, acting reasonably, would have reasonable doubt that Murray participated in the shootout with Kaboobie. Indeed, the new, reliable evidence proves Murray's alibi and what Murray has claimed for more than forty years: He was wrongfully convicted, and he is actually innocent.

## CONCLUSION AND RELIEF REQUESTED

For the foregoing reasons, which prove his actual innocence by a preponderance of the evidence, Petitioner Bruce Murray prays that this Honorable Court grant his Counseled and Amended Motion for Relief from Judgment Under Fed. R. Civ. P. 60(b), and issue an order granting him relief from the final judgments and/or final orders that have barred him from having the constitutional claims raised in his Petition for a Writ of Habeas Corpus, and allowing him the opportunity to file an amended petition in light of the new evidence bearing.

Dated: November 16, 2022                Respectfully submitted,

Signature Code: MJE5849
ARMSTRONG TEASDALE LLP
Michael J. Engle, Esquire (Pa. ID No. 85576)
Ryan Aloysius Smith, Esquire (Pa. ID No. 329246)
2005 Market Street, 29th Floor
One Commerce Square
Philadelphia, PA 19103
mengle@atllp.com
rasmith@atllp.com
T: (267) 780-2063
F: (215) 405-9070

*Counsel for Petitioner Bruce Murray*

# Exhibit 3

# Commonwealth of Pennsylvania SS:

## SEARCH WARRANT AND AFFIDAVIT

### CITY AND COUNTY OF PHILADELPHIA

| | | | |
|---|---|---|---|
| (Name of Affiant) | 164 (Badge No.) | SDD (District/Unit) | WARRANT CONTROL NO. 2059 |

being duly sworn (or affirmed) before me according to law, deposes and says that there is probable cause to believe that certain property is evidence of or the fruit of a crime or is contraband or is unlawfully possessed or is otherwise subject to seizure, and is located at particular premises or in the possession of particular person as described below.

ISSUED TO DIST/UNIT **S.D.D.**

DATE OF APPLICATION **02/25/81**

**IDENTIFY ITEMS TO BE SEARCHED FOR AND SEIZED (Be as specific as possible):**
Sawed-off Shot gun, with bolt missing, 357 revolver, 22 cal. automatics, 32 cal. revolver, rifles, capable of firing projectiles.

**SPECIFIC DESCRIPTION OF PREMISES AND/OR PERSONS TO BE SEARCHED (Street and No., Apt. No., Vehicle, Safe Deposit Box, etc.):**
City of Phila., Pa.
1910 Carpenter Street, three (3) story brick dwelling, private residence

**NAME OF OWNER, OCCUPANT OR POSSESSOR OF SAID PREMISES TO BE SEARCHED (If proper name is unknown, give alias and/or description):**
Gregory HOLDEN

**VIOLATION OF: (Describe conduct or specify statute):**
RECEIVING STOLEN PROPERTY 3925 F3
Pa. UFA Sections 6105

YEAR/DIST./COMPLAINT NO. **80-17-66758**

**PROBABLE CAUSE BELIEF IS BASED ON THE FOLLOWING FACTS AND CIRCUMSTANCES**

During the week of February 2nd 1981 and February 8th, 1981, ATF Agents BOWEN and WASYLUK met with a government confidential informant, who in the past has provided information leading to two (2) arrests and convictions (the nature of these arrests/crimes not revealed to protect the informants identy). The informant stated that during the week of 02/02/81 and 02/08/81 he had a conversation with Gregory HOLDEN, residence ██████ or ██████, Phila. Pa., and during this conversation, Gregory HOLDEN told the informant that he was in possession of a bolt-action sawed-off shotgun which was one (1) of two (2) weapons used in the murder of Eric DELEAGEL (aka "KABOOBIE") inside 2414 Montrose St. Phila, Pa during the commission of a narcotics robbery on/about December 14th, 1980.
HOLDEN further related to the informant, that the robbery/murder was committed by BRUCE (believed to be Bruce MURRAY ████) ████████ St, Douglas HORTON, from ████████ robbery. "KABOOBIE" (Eric DELEAGAL) resisted by producing a 32 cal. revolver and another male. HOLDEN went on to say that during the

ATTACH ADDITIONAL PAPER (75-51) IF NECESSARY ☑ CHECK HERE IF ADDITIONAL PAPER IS USED.

| SIGNATURE OF AFFIANT | BADGE NO. | DIST/UNIT | Sworn to (or affirmed) and subscribed before me this _____ day of _____ 19____ |
|---|---|---|---|
| | | SDD | (Signature of Issuing Authority) |

COURT LOCATION

Date Commission Expires

| RESULT OF SEARCH | DATE AND TIME OF SEARCH | ☐ A.M. ☐ P.M. | ARREST ☐ Yes ☐ No | JUDGE'S DISPOSITION ☐ Disc. ☐ Held for Court | ☐ Further Hearing ☐ Fined or Committed |
|---|---|---|---|---|---|

**PROPERTY SEIZED** (If "Yes" list inventory below)
☐ Yes ☐ No

**IF ADDITIONAL SPACE REQUIRED USE REVERSE SIDE — INVENTORY MUST APPEAR ON ALL COPIES OF THE WARRANT**

| SIGNATURE OF PERSON SEIZING PROPERTY | BADGE NO. | OTHER OFFICERS PARTICIPATING IN SEARCH |
|---|---|---|

SIGNATURE OF WITNESS TO INVENTORY (Name & Address)

**TO LAW ENFORCEMENT OFFICER:** WHEREAS, facts have been sworn to or affirmed before me by written affidavit(s) attached hereto from which I have found probable cause, I do authorize you to search the above described premises or person, and to seize, secure, inventory, and make return according to the Pennsylvania Rules of Criminal Procedure, the above described items.

* ☑ This Warrant should be served as soon as practicable but in no event later than 2 ☐ A.M. ☑ P.M. 2/27 19 81 and shall be served only during daytime hours of 6 A.M. to 10 P.M.

issued under my hand this 25 day of Feb

19__, at 2 ___ M o'clock. (Issue time must be stated)

(SEAL)
(Signature of Issuing Authority)
1307 J-3028
Court location
Date Commission Expires 1/86

** ☐ This Warrant should be served as soon as practicable but in no event later than _____ ☐ A.M. ☐ P.M. _____ 19____ and may be served anytime during day or night.

issued under my hand this _____ day of _____

19__, at _____ M o'clock. (Issue time must be stated)

(SEAL)
(Signature of Issuing Authority)

Title of Issuing Authority Judge

* The issuing authority should specify a date not later than two (2) days after issuance. PA. R. Crim. P. 2005(d).
** If issuing authority finds reasonable cause for issuing a nighttime warrant on the basis of additional reasonable cause set forth in the accompanying affidavits and wishes to issue a nighttime search warrant, only this section shall be completed. PA. R. Crim. 2006(b).

75-175 (Rev. 3/75)     REPORTS CONTROL     JP Crim Form 74-R20

H80-444BruceMurrayHFile172

INVESTIGATION REPORT

PHILADELPHIA POLICE DEPARTMENT

| | | INITIAL (49) ☐ | Class. Change ☐ | DISTRICT (60) | SECTOR (70) |
| --- | --- | --- | --- | --- | --- |
| | | SUPPLEMENTAL (52) ☐ | Status Change ☐ | | |
| | | Continuation (51) ☑ | Additional Info. ☐ | DIST./UNIT PREPARING | CODE (11-12) | REPORT DATE |
| PREVIOUS CLASSIFICATION | CODE | 51 Sheet 2 of 3 | Court Disposition ☐ | | | |

CONTINUATION OF APPLICATION FOR SEARCH WARRANT AND AFFIDAVIT # 2059

with tape on the butt and fired the weapon striking BRUCE (Bruce MURRAY), superficially in the upper arm.

After the shooting, the bolt of the shotgun became disengaged from the weapon and fell on the floor inside DELEGALS residence.

The informant stated that during a subsequent conversation with Gregory HOLDEN, HOLDEN told the informant that a young black male witnessed the murder and after the perpertrators fled, the youn male picked up the 32 cal. revolver and fled from 2414 Montrose St with the weapon.

The informant stated that he saw a number of other weapons inside HOLDENS residence in the late summer/early fall of 1980, which HOLDEN indicated were stolen, specifically a .357 Ruger Revolver, black.

The informant stated that HOLDENS residence is used as a weapons repository by area gang members including Bruce MURRAY and Douglas HORTON.

As a result of this information from the informant, ATF AGENTS BOWEN & WASYLUK contacted Lt. POTOCNAK #164, South Detective Division, Phila. Police who verified that on December 16th 1980 Eric DELEAGEL 2414 Montrose St., had been shot in the chest inside his residence and subsequently died as a result of being shot. It was also verified that a bolt from a shotgun had been recovered at the scene of the homicide.

It was further revealed that on/about 12/17/80 that a male i.d. as Bruce MURRY 2300 Dickinson Street, reported to police that he had been shot in the right arm on the highway at 23rd & Tasker Street.

On Tuesday 02/24/81 at about 7pm Lt. James POTOCNAK #164 received information from a confidential informant, who in the past has given Philadelphia Police information which has led to the arrest of two (2) persons for serious crimes (the nature of these crimes are not revealed to protect the informants idenity) and these two cases are still pending. The informant stated that he/she was inside the residdence of Gregory HOLDEN ████████████████ in the late afternoon to early evening hours on 02/24/81, and that there were two other people in the residence ( identies not revealed to protect the infomants idenity) along with Gregory HOLDEN. One of these people was there to purchase a firearm ████ from HOLDEN and after a short conversation with HOLDEN a price of $75.00 was agreed to. HOLDEN then left the informant and other two people downstairs and went upstairs and returned with a large brown paperbag which the informant saw contained numerous firearms, both revolvers & automatic type pistols, a rifle and sawed-off shotgun. One of the people picked out a 32 calibre revolver and this person asked HOLDEN if the weapon was clean, ( meaning that it was not stolen) HOLDEN replied that some were clean and some were stolen during burglaries, but he had so many he was not sure which was

INVESTIGATOR/ASSIGNED Sign (Name)        SERGEANT        LIEUTENANT

75-49 (Rev. 1/74)

**DISTRICT FILE**

H80-444BruceMurrayHFile173

# Exhibit 4

**INVESTIGATION INTERVIEW RECORD**

PHILADELPHIA
POLICE DEPARTMENT
HOMICIDE DIVISION

CASE NO. H80-444

INTERVIEWER McNesby

NAME Edward Randall

AGE 29

RACE N

ADDRESS ▓▓▓▓▓▓▓

APARTMENT NO.

NAME OF EMPLOYMENT/SCHOOL Unemployed

ADDRESS OF EMPLOYMENT/SCHOOL

PHONE

PLACE OF INTERVIEW Room 104 PAB

DATE AND TIME 3-11-81

BROUGHT IN BY Dets McNesby and Culbreth

DATE AND TIME 3-11-81

WE ARE QUESTIONING YOU CONCERNING The homicide by shooting of Eric De Leagal 21 M/m which occurred on 12-16-80

WARNINGS GIVEN BY

DATE AND TIME

ANSWERS

| (1) | (2) | (3) | (4) | (5) | (6) | (7) |
|-----|-----|-----|-----|-----|-----|-----|

Q - Do you know Eric De Leagal ?

A - Yes, I knew him by the name of Eric Stewart. We called him "Kaboobie"

Q - Tell me what you know of the shooting in which he was killed.

A - The next day after "Boob" got killed, I think he was killed on a Tuesday, So it must have been Wednesday. "Lil Greg (Gregory Holden) told me that Bruce and "Scotty went to "Kaboob's" house. Bruce rung the bell. When "Boob" answered the door Bruce said he wanted an ounce of reefer. "Boob" let Bruce in and as he was shutting the door Scotty ran up on the steps and tapped on the window Boob opened the door back up and Scotty stuck a shotgun in his face and told "Boob" to get back

RECORD ☐ Yes ☐ No

CHECKED BY

REVIEWED BY

Edward Randolph

H80-444BruceMurrayHFile318

| INVESTIGATION INTERVIEW RECORD | CITY OF PHILADELPHIA |
|---|---|
| CONTINUATION SHEET | POLICE DEPARTMENT |

| NAME Edward Randall | PAGE 2 | CASE NO. H80-444 |
|---|---|---|

IN THE house BECAUSE THIS WAY, I
BOOB BACKED up And Tried To grab
his gun which was in his pants. Thats
when BOOB got shot in THE chest with
A shot gun By Scotty. As BOOB was
laying on THE Floor BRUCE shot KABOOB
in THE BACK Two Times. Thatis all
GREG Told me. GREG ~~stated~~ Told me
That him And Larry WERE waiting in
THE school yard waiting For Scotty
And BRUCE To open THE door so That
They could come in And search THE
house For RAFTER, money And Jewelry
But when GREG and Larry heard THE
shooting They LEFT. GREG said Larry
had SET THE whole Thing up. But I
Think BoTh GREG and LARRY SET THE
whole Thing up TogeTHER.

Q- Did any one ELSE Tell you about This
incident

A- GREGORY STRICKLAND Told me The Following
Sunday That he was in THE cellar
KABOOB's house And all he heard
was shooting. He hid BEHiND A curtain
in THE cellar which KABOOB used To
SEPARATE his BED From THE RESt of

75-483 A

H80-444BruceMurrayHFile319

Edward Randolph

| INVESTIGATION INTERVIEW RECORD | CITY OF PHILADELPHIA |
|---|---|
| CONTINUATION SHEET | POLICE DEPARTMENT |

| NAME | PAGE | CASE NO. |
|---|---|---|
| Edward Randall | 3 | H80-444 |

The cellar, Gregory said he started
up the steps and seen Kaboon laying
on the floor. That is when somebody
came down from the second floor and
ran outside. They never saw him but
Gregory saw the guy who ran down
the stairs. Greg told me the person
who ran down the steps was Douglas
Haughton.

Q. Did Greg Holden say if any thing was
Taken out of Kaboon's house.

A. No. He said because of the shooting
started Scotty and Bruce got scared
and ran out of the house.

Q. What is Scotty's real name

A. I don't know him

Q. What is Bruce's real name

A. Bruce Murray. He's about 21-22 yrs
he lives in the 2000 block Ellsworth St.

Q. What is Larry's real name

A. Larry Thorpe. He's about 19 or 20 yrs and
lives 1921 Carpenter St.

Q. Describe Gregory Holden

A. N/m 20 yrs 5'3, full beard light comp-
and lives at 1910 Carpenter St.

75-483 A

H80-444BruceMurrayHFile321

Edward Randolph

**INVESTIGATION INTERVIEW RECORD**
CONTINUATION SHEET

CITY OF PHILADELPHIA
**POLICE DEPARTMENT**

| NAME | PAGE | CASE NO. |
|------|------|----------|
| Edward Randall | 4 | H80-444 |

Q- Did GREGORY Holder say what school yard he and Larry were waiting in while Scotty and Bruce went to KABOOB's house

A- Right across The street from KABOOB's house in PIERCE school yard

Q- What happened To The gun Kaboob had

A- I don't Know. They didn't say.

Q- Did Greg ever mention This incident To you again?

A. No

Q- is There anything else you can Tell me

A A couple days AFTER "KABOOBIE" was Killed a guy named Joseph Buxton "To Jo" supposed To have climbed in KABOOB's cellar and Took All The STEREO equipment. About $6,000 n $7,000 worth of STEREO EQUIPMENT. All The stuff is supposed To BE AT Bruce's house on Ellsworth St. That's where They All lay at.

H80-444BruceMurrayHFile323

Edward Randolph

# Exhibit 5

C# 80-17-66758

**WARRANT#** 99225

Commonwealth of Pennsylvania
County of Philadelphia                    ss:

## AFFIDAVIT
### of
### Probable Cause for Arrest Warrant

Det. Albert Lory                 #9186              Homicide Division
                                                                        , being
(Affiant)                        (Badge #)              (District/Unit)

duly sworn according to law, deposes and says:

1.  That after investigation I have probable cause to believe that a warrant of arrest should
    issue for

    Gregory Holden 20 N/M      ,  ███████████████████
         (NAME)                                (ADDRESS)

         2502 Murder F-1        907 PIC M-1        903 Conspiracy F-2
    charging  3701 Robbery F-1   908 PCW M-1
                              (CRIME/S)

2.  That the facts tending to establish the grounds for the issuance of the warrant of arrest
    and the probable cuase for my belief are as follows:

On 12-16-80 at approximately 5:45 P.M., police were called to the residence,
2414 Montrose Street, report of a shooting and a hospital case. Upon their
arrival at that location, police found the decedent, Eric Deleagal, aka,
Kaboobie, 21 N/M, lying on the livingroom floor, semi-conscious, suffering
from gunshot wounds of the chest and side. Police transported Deleagal to
the Graduate Hospital, where he was pronounced dead at 6:40 P.M., by Dr.
Laulks, of multiple gunshot wounds.

On 12-17-80, a post-mortum examination was conducted by Dr. Robert Catherman,
of the Office of the Medical Examiner, and after an autopsy, he declaired
Deleagal's death a homicide.

On 3-11-81, Det's Diegel, Curcio, Culbreth & McNesby, all of the homicide
division, interviewed one Edward Randolph 29 N/M, residence, █████████████
Street. Randolph stated that on 12-17-80, he had a conversation with one
Gregory Holden 20 N/M, residence, ███ ████████ █ Street and at that time
Holden stated to Randolph  that on 12-16-80, he, along with Larry Thorpe
                        (If additional space is necessary, use Form 75-51.)

SIGNATURE OF AFFIANT        #9186            Homicide Division
SIGNATURE OF AFFIANT        BADGE #          DISTRICT/UNIT

Sworn to (or affirmed) and subscribed before me this_____17th
day of ___March_____, 19_81.

                                            (SEAL)

SIGNATURE OF ISSUING AUTHORITY

H80-444BruceMurrayHFile215

ISSUING AUTHORITY COPY

(75-572)

INVESTIGATION REPORT                                        POLICE DEPARTMENT

| YR. | DIST. OF OCCUR. | DC. NO. (2-7) | | INITIAL (49) | | Class. Change | DISTRICT (8-9) | | SECTOR (10) |
|---|---|---|---|---|---|---|---|---|---|
| | | | | SUPPLEMENTAL (52) | | Status Change | | | |
| PREVIOUS CLASSIFICATION | | CODE | | Continuation (51) | | Additional Info. | DIST./UNIT PREPARING | CODE (11-12) | REPORT DATE |
| | | | | Sheet of | | Court Disposition | | | |
| CLASSIFICATION | | CODE (14-17) | PLACE OF OCCURRENCE (18-34) | | | | J.A.D. INVESTIGATIONS (35) 1. ☐ Male  2. ☐ Female | Juvenile Offenders 3. ☐ Adult Offenders | |
| COMPLAINANT (Use firm name) (36-52) | | AGE (80-81) | RACE (82) 1. ☐ W  2. ☐ N  3. ☐ C  4. ☐ PR  5. ☐ O | | SEX (83) 1. ☐ M  2. ☐ F | ADDRESS | | | PHONE |
| TYPE OF PREMISES (53-55) | DATE AND TIME REPORTED | | REPORTED BY | | | ADDRESS | | | |
| DATE OF OCCURRENCE (56-61) | | DAY CODE (62) | TIME (63-65) | FOUNDED (66) ☐ Yes  ☐ No | STATUS (67) 1. ☐ Active  2. ☐ Inactive — not cleared | | 3. ☐ Arrest — cleared  4. ☐ Exceptionally cleared | | UNIT |

| STOLEN PROPERTY (68) | 1. ☐ Currency, Bonds, etc. | 4. ☐ Jewelry, Precious Metals | 7. ☐ Autos | A. ☐ Furs | PROPERTY VALUE (69-73) | RECOVERED VALUE (74-78) | INSURED | OCCURRENCE (79) |
|---|---|---|---|---|---|---|---|---|
| | 2. ☐ T.V., Radio, Stereo | 5. ☐ Household Items (Furniture, Washers) | 8. ☐ Clothing | B. ☐ Misc. | $ | $ | ☐ Yes | ☐ Inside |
| | 3. ☐ Office Equipment | 6. ☐ Consumer Items (Liquor, Cigarettes, etc.) | 9. ☐ Firearms | C. ☐ Live Stk. | | | ☐ No | ☐ Out |

PAGE TWO OF PROBABLE CAUSE AFFIDAVIT FOR ARREST WARRANT __99225__

19-20 N/M, residence, ██████ ████ er ██ t, Bruce Murray 20 N/M, residence, ██████ ██ th ████ t, Douglas Haughton 25 N/M, and "Scotty" N/M, decided to rob the decedent Eric Deleagal, aka Kaboobie. Holden stated to Randolhp that he, Thorpe and Haughton waited in a school yard near the Deleagal residence and Murray and Scotty were to go inside at point of gun. Once inside, Holden, Thorpe and Haughton were to go inside the residence and assist in the robbery, taking money, marijuanna and jewelry. Holden stated to Randolph that Murray rang Deleagal's doorbell and when Deleagal answered, Murray told him that he wanted to buy an ounce of reefer. Deleagal let Murray come inside afterwhich Scotty tapped on the door. When Deleagal answered, Scotty stuck a shotgun into his face and ordered him to move back and Deleagal complied. At this point, Deleagal reached for a gun which he had in the waistband of his trousers and at this time Scotty shot him in the chest with the shotgun. After Deleagal fell to the floor, Murray shot him two times in the back with a handgun. Holden stated to Randolph that upon hearing the gunshots, he and Thorpe left the area.

In consideration of the aforementioned facts and circumstances I strongly feel probable cause exists for the issuance of a warrant of arrest charging Gregory Holden with the charges listed on page one, paragraph one of this affidavit.

_[signature]_                          9186              Homicide Division

SIGNATURE OF AFFIANT                   BADGE             DIST/UNIT

SWORN TO (OR AFFIRMED) AND SUBSCRIBED BEFORE ME THIS 17TH DAY OF MARCH 1980.

SIGNATURE OF ISSUING AUTHORITY                          (SEAL)

| INVESTIGATOR (Type and Sign Name) | SERGEANT | LIEUTENANT |
|---|---|---|
| | | |

75-49 (Rev. 12/74)                                                H80-444BruceMurrayHFile217

**STAFF SERVICES DIVISION**

# Exhibit 6

| INVESTIGATION INTERVIEW RECORD | PHILADELPHIA POLICE DEPARTMENT HOMICIDE DIVISION | CASE NO. H80-444 |
|---|---|---|
| | | INTERVIEWER LORY/CHECCHIA |

**NAME** GREGORY HOLDEN  **AGE** 21  **RACE** N

**APARTMENT NO.**

**NAME OF EMPLOYMENT/SCHOOL** UNEMPLOYED

**ADDRESS OF EMPLOYMENT/SCHOOL**  **PHONE**

**PLACE OF INTERVIEW** PAB 104  **DATE AND TIME** 3-20-81 10:45 AM

**BROUGHT IN BY** LORY 9186  **DATE AND TIME** 3-20-81 10:05 AM

**WE ARE QUESTIONING YOU CONCERNING** HOMICIDE BY SHOOTING OF ERIC DELEAGAL ON 12-16-80.

**WARNINGS GIVEN BY** Det. Checchia #796  **DATE AND TIME** 3-20-81 10:45 AM

**ANSWERS** (1) Yes (2) Yes (3) No (4) Yes (5) Yes (6) No (7) Yes

Q. Do you know Eric Deleagal who is also known as Kaboobie?

A. I heard of him.

Q. What kind of relationship did you have with him.

A. I heard of him from the search warrant that the police left at my house a couple of weeks ago. They were looking for guns in my house that was used to kill him.

Q. What do you know about his death?

A. Nothing — just what was on that search warrant.

Q. Give me a rundown of your whereabouts on 12-16-80?

A. I was probably in the house with my woman Janine 'El at ▇▇▇▇▇▇ — that's where I always be.

Q. Do you know Douglas Houghton?

**RECORD** ☐ Yes ☐ No  **CHECKED BY** Gregory Holden

**REVIEWED BY**

75-483 (Rev. 8/75)  H80-444BruceMurrayHFile359

| INVESTIGATION INTERVIEW RECORD | CITY OF PHILADELPHIA |
|---|---|
| CONTINUATION SHEET | POLICE DEPARTMENT |

**NAME** Gregory Holden   **PAGE** 2   **CASE NO.** H80-444

A. I don't know him. Holden

Q. I show you PP #559-895, do you know this man?

A. I never seen him before. This is the first time I seen the boy.

Q. Do you know Bruce Murray?

A. No.

Q. I show you PP #543983, do you know this man? *Murray*

A. I don't know him.

Q. Do you know Larry Thorpe?

A. Yes

Q. I show you PP #546-010, is this the Larry Thorpe you know?

A. Yes.

Q. Do you know a dude by the name of Scotty?

A. I know a Scotty — we play ball together at the playground, 19 & Washington. I don't know his last name or where he lives. I know he South of Washington Ave.

Q. Describe him?

A. 6'3, 20 yrs old. He's a muslim.

Q. I now show you PP #566429 — Eric DeLeagal. Do you know this man?

Gregory Holden

| INVESTIGATION INTERVIEW RECORD CONTINUATION SHEET | CITY OF PHILADELPHIA POLICE DEPARTMENT |
|---|---|

| NAME Gregory Holden | PAGE 3 | CASE NO. H80-444 |
|---|---|---|

A. I never saw him before in my life.

Q. You mentioned earlier, relating to the Search of your house at ███████ that your mother took the warrant to your attorney — Mr. Preminger. Did Mr. Preminger have any comments about that warrant?

A. He said to my mother — Don't worry about nothing — the police don't have anything on Gregory — they just have what some other people said.

Gregory Holden

75-483 A

# Exhibit 7

## INVESTIGATION INTERVIEW RECORD

PHILADELPHIA
POLICE DEPARTMENT
HOMICIDE DIVISION

INTERVIEWER Gilbert o Grimal

NAME Douglass Naughton

AGE 23

RACE N

APARTMENT NO.

NAME OF EMPLOYMENT/SCHOOL unemployed.

ADDRESS OF EMPLOYMENT/SCHOOL

PHONE

PLACE OF INTERVIEW Federal Building

DATE AND TIME 3-4-82  12 45 P.M.

BROUGHT IN BY

DATE AND TIME

WE ARE QUESTIONING YOU CONCERNING The homicide of Eric DiLegal 21-N-M 244 Montrose St 12-16-80

WARNINGS GIVEN BY Grimal

DATE AND TIME 3-4-82  12 49 P.M.

ANSWERS  (1) yes  (2) yes  (3) no  (4) yes  (5) yes  (6) no  (7) yes

Q. Do you know Eric DiLegal also known as Kaboobie?

A. Yes

Q. Go on in your own words & tell us what you know about his death?

A. Gregory Holden, Scott, Bruce Murray & myself were at Gregorys house on Carpenter street between 19th & 20th. & We planned to take Kaboobie off. & we left the house about 25 minutes to 6. We went to Montrose street & Gregory Holden was on the corner of 24th St at Montrose he was a lookout. & so was I Scott & Bruce proceeded to Montrose St Kaboobie's house. I layed in the

RECORD  ☐ Yes  ☐ No

CHECKED BY

REVIEWED BY

75-483 (Rev. 8/75)

H80-444BruceMurrayHFile048

Douglass Naughton  3/4/82

| INVESTIGATION INTERVIEW RECORD CONTINUATION SHEET | CITY OF PHILADELPHIA POLICE DEPARTMENT |
|---|---|

NAME **Douglass Haughton**    PAGE **2**    CASE NO.

school yard. while Scott & Bruce approached his house & knocked on his door. he answered it. Scott had a bag with a shotgun in it sawed off Bruce had a 32 on his hip. Scott knocked twice on the door. & Kaboobie answered the door & let him in. They went in & I heard a blast of a shotgun & I heard the sound of a gun 3 times & I heard two more gun shots The door flew open & I began to walk away. toward 25th St. Dap hollered my name. Doug. Kaboobie just got shot to death I ignored him & kept walking A little while latter I met up with the guys at Bruce house Scotty had got hit in the arm. & Scott said I think we killed him. meaning him & Bruce.

? Did you ask them Bruce & Scott what happened?

? They said (Scott) I pulled the guage out & Kaboobie pushed it away & when he swung it back & Kaboobie was pulling his 32 & thats when Scott said

Douglas Haughton 82

r-483 A

| INVESTIGATION INTERVIEW RECORD CONTINUATION SHEET | CITY OF PHILADELPHIA POLICE DEPARTMENT |
|---|---|

| NAME Douglass Houghton | PAGE 3 | CASE NO. |
|---|---|---|

him. Bruce said everything happened so fast we didn't get a chance to go down the cellar. Scott said when he opened the bolt on the gun he dropped it & left it in the house. & they broke & ran.

Q Did Bruce say if he shot Kaboobie?
A Yeah he said he shot him twice.

Q What is Scotty's full name
A I don't know they just call him Scotty.

Q Where does he live at?
A Somewhere in South Phila

Q Describe Scotty
A 5-8½ slim 18 & 20 light brown curly hair

Q When is the last time you saw Scotty
A That time at Bruces house he had his arm bandaged left one from the elbow to the wrist

H80-444BruceMurrayHFile050

-483 A

Douglas Haughton 82

| INVESTIGATION INTERVIEW RECORD | CITY OF PHILADELPHIA |
| CONTINUATION SHEET | POLICE DEPARTMENT |

NAME  Douglas Haughton       PAGE 4     CASE NO.

Q What happened to Scotty arm?
A He got shot by Kaboobie.

Q I am showing you a group of eight (8) photos
Do you recognize anyone?
A Picked photo marked on back 563421 as
being Gregory Holden.

Q What was Gregory part in this
A He was a lookout?

Q I am going to show you (8) eight more
photos Do you recognize anyone.
A Yeah Bruce Murray. indicating PP 543983
on rear of photo.

Q What did Bruce Murray do?
A Scotty knocked on door & Bruce went in with
him to take Kaboobie off.

Q What do you mean when you say take
him off?
A To rob him of his reefer & money.

H80-444BruceMurrayHFile051

-483 A                    Douglas Haughton 82

| INVESTIGATION  INTERVIEW  RECORD | CITY OF PHILADELPHIA |
| CONTINUATION  SHEET | POLICE  DEPARTMENT |

NAME **Douglass Houghton**    PAGE **5**    CASE NO.

Q Who is the boy Dap that called your name as you were walking away

A He is the boy that was in the cellar I don't know his real name.

Q How do you know he was in the cellar

A Scotty told me that this little boy Dap come running out of the cellar. he ran past them, at the time he ran out he called my name.

Q Where did the shotgun come from

A Out of Bruce house

Q Where is the shotgun now?

A I don't know.

Q What kind of gun did Bruce have

A A 32.

Q Where did he get that at?

A I don't know.

Q Do you know where the 32 is at

A No.

5-483 A

H80-444BruceMurrayHFile052

**Douglas Houghton 82**

| INVESTIGATION INTERVIEW RECORD | CITY OF PHILADELPHIA |
| CONTINUATION SHEET | POLICE DEPARTMENT |

| NAME Douglass Haughton | PAGE 6 | CASE NO. |

Q. How long have you know Kaboobie

A. A few years.

Q. How far did you go in school

A. 11th grade

Q. Can you read & write the English Language?

? Of course.

Douglas Haughton 8-2

H80-444BruceMurrayHFile053

# Exhibit 8

| INVESTIGATION INTERVIEW RECORD | PHILADELPHIA POLICE DEPARTMENT HOMICIDE DIVISION | INTERVIEWER DET. WITCHER & DET. BETH |
|---|---|---|

**NAME** DOUGLAS HAUGHTON   **AGE** 23   **RACE** B

DOB #917

**APARTMENT NO.**

**NAME OF EMPLOYMENT/SCHOOL** UNEMPLOYED

**ADDRESS OF EMPLOYMENT/SCHOOL**   **PHONE**

**PLACE OF INTERVIEW** Rm 104 P.A.B.   **DATE AND TIME** 4/1/82 3³⁰pm

**BROUGHT IN BY** DET. GILBERT AND DET. GERRARD   **DATE AND TIME**

**WE ARE QUESTIONING YOU CONCERNING**

**WARNINGS GIVEN BY** DET. ERNEST BETHEA #863   **DATE AND TIME** 4/1/82 3³⁰pm

**ANSWERS** (1) YES (2) YES (3) NO (4) YES (5) YES (6) NO (7) YES D.H.

Q. MR. DOUGLAS HAUGHTON, YOU HAVE BEEN WARNED OF YOUR CONSTITUTIONAL RIGHTS BY DET. BLITER AND YOU HAVE AGREED TO MAKE A STATEMENT CONCERNING THIS INCIDENT. IS THAT CORRECT?

A. YES.

Q. MR. HAUGHTON, WE ARE SHOWING YOU A SERIES OF PHOTOGRAPHS INCLUDING THE FOLLOWING: PP# - 483, 57796⁵, 53938⁵, 491103, D# A15299, 594940, 578866, 587249, 58265⁷. DO YOU RECOGNIZE ANY OF THESE MALES?

A. THIS ONE. (PICKED OUT PP# 594940) THIS IS SCOTTIE. HE IS THE ONE THAT HAD THE SHOT-GUN AND SHOT KABOOBIE IN HIS HOUSE ON MONTROSE ST. IN DECEMBER 1980.

Q. DOUGLAS IS THERE ANYTHING YOU WANT TO ADD TO THIS INTERVIEW?

A. NO.

Douglas Haughton

**RECORD** ☐ Yes ☐ No   **CHECKED BY**

**REVIEWED BY**

H80-444BruceMurrayHFile054,

# Exhibit 9

| **PRESENTENCE REPORT** | CITY OF PHILADELPHIA<br>**OFFICE OF COURT ADMINISTRATION**<br>PROBATION DEPARTMENT |
|---|---|

## IDENTIFYING DATA

| NAME<br>HAUGHTON, DOUGLAS | ALIAS(ES)<br>BRYANT, MILES; WILLIAM DOUGLAS;<br>DOUGLAS HORTON |
|---|---|
| CURRENT ADDRESS<br>CHESTER COUNTY PRISON ██████ | LEGAL RESIDENCE<br>██████████████ |

| AGE<br>24 | DATE OF BIRTH<br>██████ | PLACE OF BIRTH<br>PHILADELPHIA, PENNSYLVANIA | SEX<br>MALE | RACE<br>BLACK |
|---|---|---|---|---|

| EDUCATION<br>NINTH GRADE | OCCUPATION<br>NONE | |
|---|---|---|
| MARITAL STATUS<br>SINGLE | CHILDREN<br>NONE | RE██████████ |

| PROBATION NO.<br>█████ | PHILADELPHIA POLICE NO.<br>███████ | F.B.I. NO. █████ | SOCIAL SECURITY NO.<br>████████ |
|---|---|---|---|

## COURT DATA

| OFFENSE(S)<br>THIRD DEGREE MURDER, CRIMINAL CONSPIRACY, ROBBERY | DATE OF ARREST<br>4-1-82 |
|---|---|
| | DATE OF TRIAL<br>9-8-82 |

| BILL(S)<br>463, 464, 466 | TERM(S)<br>CP 8205 |
|---|---|
| TRIAL JUDGE<br>HONORABLE JOHN A. GEISZ | PLEA<br>GUILTY |
| ASSISTANT DISTRICT ATTORNEY<br>WILLIAM BOLAND | DEFENSE COUNSEL<br>NAZARIO JIMINEZ, JR. |

| CO-DEFENDANT(S) |
|---|

| OPEN CASES/HEARINGS<br>VOP - JUDGE SCHWARTZ |
|---|

| TIME INCARCERATED<br>SINCE 2-24-82 | DETAINERS/SENTENCES<br>FIVE YRS FED SENT. | BAIL AMOUNT<br>REMANDED |
|---|---|---|

## SUMMARY OF CRIMINAL HISTORY

| | JUVENILE | | | ADULT | | | | |
|---|---|---|---|---|---|---|---|---|
| ARRESTS | ADJUDICATIONS | | COMMITMENTS | ARRESTS | CONVICTIONS | COMMITMENTS | VIOLATIONS | REVOCATIONS |
| 3 | 0 | | 0 | 9 | 5 | 1 | 1 | 0 |

| DATE ORDERED<br>9-8-82 | DATE PREPARED<br>12-8-82 | DATE TYPED<br>12-14-82 | SENTENCING DATE<br>3-7-83 |
|---|---|---|---|
| INVESTIGATOR<br>EDWARD V. QUINN, JR. | | | |

## DISPOSITION

CONFIDENTIAL

| DATE | SENTENCING JUDGE |
|---|---|

DISTRICT ATTORNEY'S COPY

32-55 (Rev. 12/81)

B. MURRAY FED LIT 2022

Bruce Murray DAO File 05221

**PROBATION DEPARTMENT**

COURT OF COMMON PLEAS

OF PHILADELPHIA COUNTY

# Investigation

| | | | |
|---|---|---|---|
| Court | COMMON PLEAS | Special | PRESENTENCE INVESTIGATION |
| Judge | HONORABLE JOHN A GEISZ | Subject | HAUGHTON, DOUGLAS |

Term:  CP 8205

AKA BRYANT MILES; WILLIAM DOUGLAS; DOUGLAS HORTON

Bill(s) Number:  463, 464, 466

Charge(s):  THIRD DEGREE MURDER, CRIMINAL CONSPIRACY, ROBBERY

OFFICIAL VERSION OF THE OFFENSE:

On Tuesday, 12-16-80, the Defendant did along with others shoot
and kill Eric Deleagal in an attempted robbery inside the resi-
dence of the deceased at 2414 Montrose Street.

SUBJECT'S VERSION OF THE OFFENSE:

The Subject pled Guilty.  He stated that he and three others
were at the home of Eric Deleagal, who was also known as Caboobey,
whom they intended to rob.  The Subject was a lookout man.  Two
of the Defendants were armed when they went to DeLeagal's home,
where one of the Co-defendants began firing with a shotgun when
the deceased answered the door.

CRIMINAL HISTORY:

Juvenile:

The Subject's juvenile record consists of three arrests and no
adjudications of delinquency.

Adult:

The Subject's adult criminal record consists of nine arrests,
five convictions, one commitment, and one violation of Probation.
Following are those arrests which resulted in conviction:

4-16-80          Robbery.  (CP 8004-2006)
(age 21)
                 DISPOSITION:  The Subject appeared before
                 Judge Shiomos on 6-30-80 and pled Guilty.
                 He was sentenced to one year Probation.
                 The Probation was non-reporting and ran from
                 6-30-80 to 6-30-81 when the case was expired.

B. MURRAY
FED LIT 2022

30-410

BruceMurrayDAOFiles0528

HAUGHTON, DOUGLAS                                              PAGE 2

<u>CRIMINAL HISTORY (Adult Cont'd)</u>:

| | |
|---|---|
| 2-19-81<br>(age 22) | Carrying A Firearm Without A License.<br>(MC8102-2064) |

> **DISPOSITION:** The Subject appeared before
> Judge Schwartz and entered a Negotiated Guilty
> Plea, and was sentenced to three years Probation.
>
> A Detainer was lodged against the Subject and
> ordered to remain in force on 9-29-81 pursuant
> to another conviction before Judge Schwartz.
> On 10-31-81 Judge Schwartz continued the
> Violation of Probation hearing until disposi-
> tion of the open bill which was also before
> Judge Schwartz.  There is no record of further
> action on the violation.

| | |
|---|---|
| 7-23-81<br>(age 23) | Theft By Unlawful Taking or Disposition.<br>(MC 8107-2031) |

> **DISPOSITION:** The Subject appeared before
> Judge Schwartz on 10-29-81 and entered a
> Negotiated Guilty Plea, receiving two years
> Probation.  The present case is a violation
> of this Probation.

| | |
|---|---|
| 2-24-82<br>(age 23) | Taking Of Bank Money<br>(This is a Federal charge.  The date of<br> Criminal Act in this case is February, 1981.) |

> **DISPOSITION:** The Subject was arrested on 2-24-
> 82 by the FBI at his residence.  On 4-21-82
> the Subject pled Guilty to the charge of
> Taking Bank Money and according to federal
> records was cooperative with the Government
> in the investigation.  On 9-16-82 the Subject
> appeared before the Honorable John P. Fullam,
> and was sentenced to five years in the custody
> of the Attorney General, and was sentenced
> under the Youth Corrections Act.  The estimated
> length of the actual time to be served is 32
> to 40 months.
>
> In February of 1981 the Subject and Co-defend-
> ants robbed the Western Savings Bank at 8705
> Germantown Avenue in Philadelphia.  The Subject
> did not have a gun, the others were armed.

<u>FAMILY AND HOME ENVIRONMENT</u>:

The Subject was born in Philadelphia, Pennsylvania on ▇▇▇▇▇ to
the legal union of ▇▇▇▇▇▇▇▇▇▇ and ▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ,
and was the youngest of six children born to this union.  The

BruceMurrayDAOFiles0529

# Exhibit 10

IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY
TRIAL DIVISION                    CRIMINAL SECTION

COMMONWEALTH OF PENNSYLVANIA        :    MAY     TERM, 1982

                                    :    NO. 403

                VS                  :

                                    :    ATTY I.D. #  17745

DAUGLAS HAUGHTON                    :    CHARGES: MURDER/ROBBERY

## ORDER FOR HEARING

AND NOW, TO WIT, this //day of June, 1982, upon consideration of the within Petition, and upon Motion of Nazario Jimenez Jr., Esquire, Attorney for defendant herein, it is hereby Ordered and Decreed:

THAT, a hearing on defendant's Petition to Suppress Evidence be fixed for the    day of        , 1982, at      A,M. in Room

City Hall, Philadelphia, Pennsylvania.

Motion to Suppress AT TIME OF TRAIL

By the Court:

S/ J. ACGNER.
_____ J.

NAZARIO JIMENEZ JR.
ATTORNEY-AT-LAW

Ed appl'd J. Diaz

BruceMurrayDAOFiles0975

B. MURRAY
FED LIT 2022

COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY CRIMINAL DIVISION

COMMONWEALTH OF PENNSYLVANIA     :     MAY  TERM, 1982

                                 :     NO. 463

                vs               :     ATTY I.D. ████████

DAUGLAS HAUGHTON                 :     CHARGES : MURDER/ROBBERY

<u>DECREE</u>

AND NOW, TO WIT, this     day od        , 1982, upon consideration
of defendant's Petition to Suppress Evidence, and after hearing thereon
upon Motion of Nazario Jimenez Jr., Esquire, attorney for defendant
above-named, it is hereby Ordered:

That defendant's arrest, and all evidence allegedly seized as the
result of the search of defendant's person/area/residence/vehicle, are
suppressed, and shall not be received or admitted into evidence and no
testimony or comment respecting such evidence or his said arrest shall
be received in any criminal prosecution against said defendant.

That all oral, written, or recorded statements and admissions made
by defendant while in custody or otherwise be and they hereby are sup-
pressed; and no testimony or comment respecting same shall be received
either directly or indirectly in any criminal prosecution against said
defendant.

That all identification, in court and out of court are hereby sup-
pressed; and no testimony or comment respecting same shall be received
either directly or indirectlt in any criminal prosecution against said
defendant.

                                        By the Court:

BruceMurrayDAOFiles0976   J.

IN THE COURT OF COMMON PLEAS CRIMINAL TRIAL DIVISION

COMMONWEALTH OF PENNSYLVANIA      :      MAY   TERM, 1982

              VS                  :      NO. 463

DAUGLAS HAUGHTON                  :      CHARGES: MURDER/ROBBERY

### PETITION TO SUPPRESS EVIDENCE

TO THE HONORABLE, THE JUDGES OF THE SAID COURT:

The Petition of Defendant above-named by his attorney Nazario Jimenez

Jr., Esquire, respectfully represents:

1.   That the Philadelphia Police Officers unlawfully and without prob-

able cause or consent, conducted a search of the defendant's person/

residence/vehicle.

2.   That before and after such arrest and search, defendant was inter-

rogated by the arresting officers, as the result of which interrroga-

tion defendant may have made certain oral statements and admissions

concerning his recently past activities, which statements and admissions

were, and will be, used against him in the above proceedings.

3.   That following such search, the said police officers, without de-

fendant's consent and without probable cause to do so, might have seized

some property and other evidence of alleged criminal activities on his

part.

4.   That defendant was thereupon arrested without probable cause ar

charged with violating the laws of Pennsylvania.

BruceMurrayDAOFiles0977

5.   That the search of said person/residence/vehicle, the alleged seizure of property therefrom, and defendant's arrest were all illegal and violation of defendant's rights under the Fourth, Fifth, and Sixth Amendments to the United States Constitution, and under Article I, Section 8 of the Pennsylvania Constitution.   The Commonwealth intends to use same in evidence against the defendant.

6.   That following such search, defendant was taken into custody and again interrogated by the Philadelphia Police and others and that during his interview with said police officers, defendant may have made certain oral statements and admissions concerning his recently past activities, which statements and admissions were, and will be used against him in the above proceedings.

7.   That at no time during his interrogation or examination was defendant adequately advised of his rights under the Fourth, Fifth, Sixth, and Fourteenth Amendments to the United States Constitution in that he was not advised of any of his miranda warnings:

a)   Defendant was not advised of his right to remain silent.

b)   Defendant was not advised that anything he said would be used against him in a criminal prosecution.

c)   Defendant was not advised of the exact charges to be placed against him nor the possible consequences thereof.

d)   Defendant was not advised of his right to free counsel before answering any questions.

BruceMurrayDAOFiles0978

8.  That defendant did not intelligently, knowingly or voluntarily waive his constitutional rights with regard to his interrogation.

9.  That the defendant was apparently identified by witness on an improper one-on-one confrontation without waiver of counsel nor was there a lineup conducted.

10.  That at the preliminary hearing he was apparently identified by a witness or the basis of a prior out of court identification of defendant which was improper and therefore tainted the in-court identification.

11.  That both the out-court and in-court identification of defendant was made under such circumstances as to constitute a violation of defendant's rights under the Due Process Clause of the Fourteen Amendments to the United States Constitution.

12.  The defendant was detained for an unreasonable long period of time before being taken before a Judge for his preliminary arraigment.

13.  That as a result of such unreasonable delay and other duress, coercion and improper police conduct, a statement was obtained which will be used against him at trial.

WHEREFORE, Defendant prays that the arrest, search, statement and identification be suppressed.

_____
NAZARIO JIMENEZ JR., ESQUIRE
Attorney for Defendant

BruceMurrayDAOFiles0979

COMMON WEALTH OF PENNSYLVANIA  :

                        SS

COUNTY OF PHILADELPHIA

     NAZARIO JIMENEZ, JR., ESQUIRE, being duly sworn according
to law, deposes and says that he is the attorney in the foregoing
pleading and that the facts set forth therein are true and
correct to the best of his knowledge, information and/or belief.

                               _____
                                NAZARIO JIMENEZ, JR., ESQUIRE

Sworn to and subscribed to
before me this 8 day of
June A.D., 1982

_____
          NOTARY PUBLIC

B MURRAY FED LIT 2022

# Exhibit 11

## AFFIDAVIT

COMMONWEALTH OF PENNSYLVANIA :
COUNTY OF PHILADELPHIA          :SS
                                :


I, DOUGLAS HAUGHTON, being duly sworn according to law, depos___
and say that the following statements are true and correct to th__
best of my knowledge, information and belief:

Attached to this Affidavit are two affidavits recently prepar__
by me in which I discuss and recant my confession and testimo__
concerning the death of Eric DeLegal, also known as Kaboobie.
These affidavits were not notarized at the time they were ma__
because I am incarcerated in prison and did not have access to __
Notary Public. However, the statements made in those document_
are true and correct.

I was arrested on February 24, 1981, and taken to the Feder__
Building in Philadelphia. I was kept there for approximately __
half a day without being able to talk to an attorney and withou_
being told of my rights to have a lawyer or to be silent. A Feder__
agent named Carpinelli told me that they had photographs and fil__
proving my involvement in a bank robbery. I was also questioned by __
Philadelphia detective named Girard about the murder of Eric "Kaboob__
ie" DeLegal. I was punched, shoved, and slapped in the face by Age__
Carpinelli, who threatened me with a very stiff sentence on the ba__
robbery and with a murder charge. Detective Girard kept suggesti__
that I cooperate. They bullied and insisted that I sign statement_
naming Bruce Murray and Gregory Holden in this murder, as well a_
Tyrone "Scotty " Wesson. I was frightened and I believed that the_
would not stop and that things would not get better until I sign__
the statements that they wanted and agreed to testify at the trial.

What really happened when "Kaboobie" died is this: I met "Scot__
tie" on 22d Street and he asked where we could go to buy som_
reefer. We went to "Kaboobie's" house because "Kaboobie" owed m_
$150.00. We could see that "Kaboobie" was high on drugs as soon a_
we went in his house. "Kaboobie" noticed that there was a stal_
and he reached for a sawed off shot gun that he kept right behi__
the front door. As he reached for it the gun fell and "Scotty_
grabbed "Kaboobie" and the gun. "Kaboobie" got loose and grabbe_
the gun and got his finger on the trigger and they kept scuffli__
and the gun went off and hit "Kaboobie" in the chest. "Kaboobi_
went down and I saw him going for his gun while he was on th_
floor. "Kaboobie" started shooting and he hit "Scotty" in th_
arm: at that time I grabbed "Kaboobie" and the gun and he sho_
himself twice while I was trying to stop him from shooting "Kaboobi_
again.

Sworn to and subscribed before me
this _11_ day of _April_ 19 _85_

_This is my affidavit 4/11/85 Douglas Haughton_

Arlene Rudney Halpern
NOTARY PUBLIC
ARLENE RUDNEY HALPERN
Notary Public, Phila., Phila. Co.
My Commission Expires June 22, 1987

BruceMurrayDAOFiles0078

# Exhibit 12

Douglas Haughton

█████████████████

## A F F I D A V I T

     I, Douglas Haughton, upon arrest on February 24, 1981, at my home located at ████████████/ I was transported to the Federal Building; at which time without the benefiet of counsel, or mention of the Moranda Decision, I was vigorously questioned. Federal agent Carpenelli, initiated the interrogation with questions concerning a bank robbery as local officer, Girard quickly follow up with still more questions concerning the "Eric Delego Murder". They presented photographs of me inside of the bank "they stated that if I failed to cooperated that I would never get out of prison", They promised less time for cooperation. Officer Carpenelli, he physically shoved and punched me while the other's suggested cooperation, I was terrified, question after question, suggestion after question, question after suggestion; continuously pounded and compounded until it seemed as if names were grains of sand slapping me in the face, "Kabobie!, "Eric Delego" and "Bruce Murry" along with "Gregory Holden", and "Tyrone Wesson" and myself. All that I could remember was the demand that I sign, and suggestion that all would be better afterwoulds, I signed.

     For the benefiet of all parties concerned and especially on the behalf of the innocent, and the Judicul Body, that may have been mislead. I Douglas Haughton, now state in the absence of "Duress!" that "Gregory Holden" and "Bruce Murry" are victims of an earlier statement obtained "VIA DURESS". To wit on the date there abouts of the Delego Murder, "Gregory Holden", and "Bruce Murry" to the best of my recollection, understanding, and knowledge had nothing to do with the said;
                      "Eric Delego Murder"1

Respectfully submitted,

*Douglas Haughton*

Douglas Haughton, ████████

SWORN TO ON_____THIS DAY

OF_____1985.

BEFORE ME,_____
              NOTARY PUBLIC

*This is my AFFIDAVIT*     *4/11/85*  *Douglas Haughton*

# Exhibit 13

MAY 11 1985

To: MS. PAM COHEN

DOUGLAS HAUGHTO

I writing you to let you know I'm in 3 Western so if you want to get in contact wite me hehr. I'm not sure or not but when I talk to you wile I was at City Hall I went over my notes. And I'm not sure what I said there is the same thing I have in my notes. Ms cohen this is the truth. Because when I told you when the police had me in there costody they scared me into saying and sing. statement that wasn't true. So here's the truth. I ran into scotty and his Girlfriend on 22nd St. And scotty told me he was taking his Girlfriend to the movies for her birthday which was 12-16-80. And he wanted to by some (weed) and asked me were to get some; And I told him I'll take him. So his Girlfriend went to her cou house until scotty came back. I meant scotty at a party were he was D. Jaying that's how we meant. But I have'nt seen him any more till I ran into him on 22nd st at the bar. And I know everything that happen at Kaboobie house. Scotty and me went to his house I knot the door Kaboobie let us in so I asked Kaboobie did he have any (weed) he said, "how much do you want to by So I asked him about the money he olded me, right then he notice the stall. And Kaboobie started to reach for shotGun that was behind the door. As he reached for it the shotGun fell Scotty had grabed Kaboobie and had hold of him and the shotGun and some how Kaboobie got a little loose and grabed the shotGun and his finger was on the trigger and as they scuffled the shotGun went off!! And hit Kaboobie in th chest area. Kaboobie went down and I saw Kaboobie going for his gun while he was on the floor and he started shooting hiting Scotty in the arm, and at that time I grabed Kaboob. And the Gun and he shot himself twice I was trying to stop him from shoting scotty again

BlakeMurrayDAOFiles0471

thats what happen. the reason I'm telling you this now is because I found out yhat Gregorie and Bruce recieve Life for something they had nothing to do with. So if you want to contact write me heare at Pittsburgh. I still need and attorney to represent me.

Thank you
for your Patience
Douglas Haughton
3 Western state. ██████

B. MURRAY
FED LIT 2022

Exhibit 14



IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY

TRIAL DIVISION

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | NOVEMBER TERM, 1982 |
| | | NO. 1109 |
| v. | : | |
| BRUCE MURRAY | : | SUPERIOR COURT |
| | | NO. |

COMMONWEALTH OF PENNSYLVANIA    :    JANUARY TERM, 1983
NO. 2978

v.    :

**FILED**

GREGORY HOLDEN    :    SUPERIOR COURT
NO.    FEB   6 1996

**OPINION**

CRIMINAL APPEALS UNIT
FIRST JUDICIAL DISTRICT OF PA.

SAVITT, J.    FEBRUARY 6, 1996

**PROCEDURAL HISTORY**

Bruce Murray and Gregory Holden were tried before this court and a jury which on June 24, 1983 found each man guilty of second degree murder, robbery (F1), conspiracy and possession of an instrument of a crime. Post verdict motions were heard and denied on April 23, 1984.

Bruce Murray filed an appeal to Superior Court which affirmed the judgement of sentence on November 1, 1985. His petition for allowance of appeal was denied by the Pennsylvania Supreme Court on November 26, 1986. Murray filed a pro se petition on December 30, 1986 under what was then the Post Conviction Hearing Act. Irene Cotton, Esquire was appointed to represent him and filed a supplemental petition on March 14, 1988. The Commonwealth filed a motion to dismiss and on December 12, 1988 Judge James McCruden

D-37

dismissed all but the five of the petitioner's allegations here determined.

Gregory Holden filed his petition under the Post Conviction Hearing Act on November 22, 1985 and on February 28, 1986 the Honorable William A. Meehan, Jr., then in private practice, was appointed to represent him and subsequently filed an amended petition. On February 16, 1988 counsel filed a supplemental amended petition. The Commonwealth's Motion to Dismiss was filed on April 11, 1988 and subsequently denied.

A hearing concerning both petitioners Murray and Holden was held on July 25, 1991 and the matter was continued for testimony of Murray's trial counsel, Pamela Pryor Cohen. On January 16, 1992 the case was transferred to the Honorable Joseph I. Papalini. No further testimony was taken, petitioner Murray's trial counsel having become a judge in the interim. On February 17, 1993 Judge Pamela Pryor Cohen, submitted answers to interrogatories regarding her representation of him and subsequent to that Murray filed a brief in support of his request for PCHA relief.[1]

Following Irene Cotton's death and William Meehan's appointment to the bench, Thomas McGill, Esquire was appointed to represent Murray and Bernard Siegel, Esquire was appointed to represent Holden. The case was transferred to this court on March 2, 1995, which, after affording counsel an opportunity to file supplemental briefs, heard argument on September 21, 1995 and on November 30, 1995 denied both petitioners relief. This appeal followed.

## OPINION

In his petition, petitioner Murray argues that trial counsel was ineffective for

---

[1] The Honorable Lydia Kirkland, who represented Holden at trial was deposed by PCRA counsel William A. Meehan, Jr., Esquire on October 28, 1992.

failing to timely file a petition for allowance of appeal to the Pennsylvania Supreme Court. In his petition Holden avers that trial counsel was ineffective for withdrawing the motion to sever the case from that of co-defendant Wesson, and for not advising him of his right to appeal. Both petitioners further argue that they are entitled to a new trial on the basis of the recantation of Douglas Haughton and the after discovered evidence consisting of the testimony of co-defendant Tyrone Wesson.

With respect to the issue of ineffectiveness, counsel is presumed to be effective and the defendant has the burden of proving ineffectiveness. Commonwealth v. Williams, 524 Pa. 218, 570 A.2d 75 (1990); Commonwealth v. McNeil, 506 Pa. 607, 587 A.2d 802 (1985); Commonwealth v. Stinnet, 356 Pa.Super. 83, 514 A.2d 154 (1986). In order to carry this burden the defendant must first show that the claim which counsel failed to raise has arguable merit and that counsel's failure to raise it was without a reasonable basis which would effectuate the defendant's best interests. Strickland v. Washington, 466 U.S. 688 (1984); Commonwealth v. Basemore, 525 Pa. 512, 582 861 (1990); Commonwealth v. Buel, 510 Pa. 363, 508 A.2d 1167 (1986); Commonwealth ex rel Washington v. Maroney, 427 Pa. 599, 235 A.2d 349 (1967). Second, the defendant must show that counsel's ineffectiveness worked to his prejudice. Strickland v. Washington, supra; Commonwealth v. Pierce, 515 Pa. 153, 527 A.2d 973 (1987), Commonwealth v. Buel, supra; Commonwealth v. Garvin, 355 Pa. Super. 560 485 A.2d 36 (1984). In order to show prejudice the defendant must demonstrate that there is a reasonable possibility that, but for counsel's unprofessional errors, the result of the trial could have been different. Strickland v. Washington, supra, Commonwealth v. Pierce, supra. Finally to prevail at a second or subsequent PCRA hearing the petitioner must show that because of counsel's errors

3

a miscarriage of justice occurred. <u>Commonwealth v. Szuchon</u>, supra.

Petitioner Murray's claim that trial counsel was ineffective for failing to timely file a petition for allowance of appeal to the Pennsylvania Supreme Court has no arguable merit. Review by the Supreme Court following Superior Court review is not constitutionally guaranteed but is purely discretionary and will be granted only when there are special and important reasons therefor. Pa.R.A.P.,Rule 1114, 42 Pa.C.S.A., <u>Commonwealth v. Gilbert</u>, 407 Pa.Super. 491, 595 A.2d 1254, <u>allocatur denied</u>, 529 Pa. 640, 600 A.2d 1258 (1991). No such special or important reasons have been shown here and petitioner is not entitled to a new trial on this basis.

Petitioner Holden's claim that trial counsel was ineffective for withdrawing his motion for severance because the redaction of co-defendant Wesson's statement permitted the jury to infer that Holden was one of the guys named in the statement has no merit.

With respect to the issue of redaction, in <u>Commonwealth v. Wharton</u>, 530 Pa. 127, 607 A.2d 710 (1992) the Pennsylvania Supreme Court ruled on the admissibility of two confessions which had been redacted by replacing names with the "other guy". Where the confession of one defendant involves the co-defendant by contextual implication, the court must consider the other evidence presented at trial in order to determine whether the defendant was prejudiced by the admission of the statement. If the prejudicial effect of the admission of the statement is so insignificant when compared to the other evidence that it issclear beyond a reasonable doubt that the error was harmless, no new trial is required.

In the case at bar the statement was redacted by using the words guy and other guys to replace the names of the defendants. This evidence is merely corroborative of the testimony of Douglas Haughten who described the incident and each defendant's participation in

it in detail.  Accordingly, there has been no showing that petitioner by the redacted statement was prejudiced and he is not entitled to a new trial on this basis.

There is no merit to petitioner Holden's claim that he is entitled to a new trial because trial counsel failed to advise him of his right to appeal.  Petitioner was fully informed of his right to appeal and his right to appointed counsel by this court following his sentencing on April 23, 1984.  Further, Judge Kirkland, who had been privately retained, in her deposition, stated that following the outcome of the trial neither the petitioner nor his family ever asked her to appeal.  Accordingly, petitioner, is not entitled to a new trial on this basis.

Recanting testimony is exceedingly unreliable, it is the duty of the court to deny a new trial where it is not satisfied that such testimony is true...  There is no less reliable form of proof, especially when it involves an admission of perjury.  Commonwealth v. Gaddy, 492 Pa. 494, 496, 424 A.2d 1268, 1270 (1981); Commonwealth v. Coleman, 438 Pa. 373, 264 A.2d 649 (1970).  Haughton, a co-defendant, testified against Murray and Wesson at trial in return for a plea to third degree murder.  His testimony seven years after trial, at the July 1991 hearing bears no indicia of being true and indeed is incredible on its face.  He testified at the heaaringthat his testimony at trial was false, but was almost totally unable to recall what that testimony had been.  Nor did he remember the terms of his guilty plea to third degree murder.  Yet Haughton claimed he could recall the events surrounding the murder which occurred some eleven years prior to his testimony at the PCRA hearing.  Finally, Haughton risked no sanctions by so testifying having been sentenced in accordance with the plea agreement and on parole from that sentence at the time he testified.  Petitioners are not entitled to a new trial on this basis.

Petitioners' claim that they are entitled to a new trial on the basis of after

5

discovered evidence in the form of Tyrone Wesson's testimony at the July 1991 hearing that petitioners were not involved in the killing has no merit.[2]  In order to be entitled to a new trial on the basis of after discovered evidence, a petitioner must show first, that the evidence could not have been obtained prior to the conclusion of trial by the exercise of reasoonable diligence; second, it is not merely corroborative or cumulative; third, is not used solely for impeaching witnesses, and fourth, is of such a nature and character that a different verdict would likely result if a new trial were granted.  Commonwealth v. Smith, 518 Pa. 15, 540 A.2d 246 (1988); Commonwealth v. Buehl, 510 Pa. 363, 508 A.2d 1167, cert. denied, Buehl v. Pennsylvania, 488 U.S. 871 (1987).

Not only did Wesson risk nothing by testifying on behalf of petitioner since he was already serving a life sentence for his own conviction, but his testimony at the July 1991 hearing lacked credibility for the same reasons as the testimony of Haughton.  Accordingly, this testimony was not of such a nature that a different verdict would result if a new trial were granted and the petitioners are not entitled to relief on this basis.

Petitioners' other claims have no merit and will not be discussed further here.

For the reasons set forth herein petition's PCRA petitions were **denied.**

_____
                                                                    J.

_____

[2]Wesson did not testify at trial.

# Exhibit 15

TO: CENTURION MINISTRIES FROM: Gregory STRICKLAND
INC.

TO: MR. McCloskey C/o MR. Hepburn

RECEIVED DEC 0 1 2000

To Mr. McCloskey C/o Mr. Hepburn

Dear sir, I have testimony that can Help
Some one who is iNNocenT He's been
Falsely convicted. I seen the Brother
bruce Murry NAme in the Chapter freinds
Volunteers And I RemEmbered the whole
situation. I RemEmber Talking with A Attorney
of His MANY years Ago About coming forward
And I Never heard From her AgAiN. Through
Research I found out Her NAme was Irean
Cotton but sometime later I found out
She wAs Dead. And because I wAs oN Drugs.
And Always on the RuN this is the ReAson she
could Never contact me. I Heard thAt CeNTurioN
Ministies, Inc. Help iNnoceNT people. I heard
they Helped this guy NAme Edward baker wiN
His Freedom. Im trying To Find out who
bruce Murry's LAwyer is? When I wAs 15 years
old A Murder of my Freind HappeNs And when I
wAs question by PhilA Homicide Detective GerrArd
And the DA. they showed me pictures of bruce
And told me to sAy it wAs Him. but I Didn't
because He wAs NoT one of the Killers. I
seen Douglas Horghton And Heard His voice And
they told me thAt Scotty Told on His self And
Murry so they only Need Me To point Murry
out And because I wouldN't they counseled the
line up And thAt [redacted] I wAs so Afraid to say
Anything At that time because of Elliff burton And guys Around
the wAy And Douglas Two Nephews I just said Nothing As.

My Father said. Thank you Please get
BACK TO Me And Let Me Know How I
CAN Contact Bruce MuRRy's LawyeR oR
Help Him iN SOMe way.

Gregory Strickland

# Exhibit 16

To who it may concern, I Gregory Strickland, hereby under penalty of perjury offer this verified AFFIDAVIT To The Fact. Yes, I did reach out To Mr. Hepburn of the Innocent project of Centurion Ministries concerning Bruce Murry, no one have attempted to reach me so I thought my help was not needed. Yes, I was interviewed in 1981 by police. I was contacted by police and asked To participate in a line up in 1982 as a witness. I did not cooperate because the police showed me a picture of Bruce Murry and told me to pick him out of this line up. I told them I did not see Bruce and didn't know him. I eventually refused the line up and it was ended.

I, as you know, was with my freind and childhood Mentor Eric Delacal when he was killed and all I'm trying to do is be a voice for him. I was there. I know who was inside his home the night he was killed. He told me he let Douglas Horton and another guy in when he came to get the weed from the cellar for them. Plus after the shots I ran upstairs as Douglas Horton and the other guy was leaving. They went separate ways. Douglas went toward his home on 25th street and the other guy ran towards 24th. I knew Douglas all my life so I called out to him saying why did you have to kill him.

While in SCI Forest, I came to meet Blue. For he was talking with some younger guys about old-heads from the hood and him having family down there. And being locked up with a lot of guys from South Philly, heard some one called me Dad and he ask me about Omar (Douglas) and he told me they were at camp hill together and how he was trying to help Douglas with his case. That Douglas told him all about the shooting and me being there. Blue knew things I didn't even know! Like Douglas having a gun and that Scott Wesson was shot, and that Doug tried to get me (killed) a few times on the street. I don't know ~~Bruce Murry~~! I heard of him from the guys in the hood that told me things they heard and because they heard stuff could not go against what they heard for it

Ex: D

B. MURRAY
FED LIT 2022

BruceMurrayDAOFiles0152

would have been like siding against them, I already was
Being Stalked, and I didn't want Douglas on my Back
and all his Fields from my end, So I kept Quiet.

Gregory Strickland

7-20-11

Gregory Strickland

Commonwealth of Pennsylvania
County of Forest

Subscribed and sworn to me this 20th July 11 day of 20___

Laura B

COMMONWEALTH OF PENNSYLVANIA
Notarial Seal
Laura Bates, Notary Public
Jenks Twp., Forest County
My Commission Expires July 21, 2015

# Exhibit 17

VERIFICATION OF DOCUMENT

I _Mr. Anthony Smith_, being duly sworn according to the law
of the United States do say that the following statement is true
and correct to the best of my knowledge, and belief and it is
made subject to the penalties of 18 Pa. C.S.§ 4904 relating to
unsworn falsification to authorities.

I was arrested and sentence and sent to Camp Hill Prison at
which time I came to meet and know Omar (Douglas Haughton). We
were not cell-mates but we use to stay up all hours of the night
on the gate talking and smoking and we come to find out we know
a-lot of the same people. We talked about our cases, not in
detail on the gate just general things seeking advice, and once
we could talk openly together in the yard it came out about how
he got such a light sentence for a Bank Robbery and a Murder. He
would ask me and his cellie what can he do to clear these guys
that the Detectives forced him to say was part of a plan, but in
all honesty had nothing to do with the crime. He said he only did
it out of fear for he was being beat and threaten, to be charged
with first degree murder and the Electric chair, so I was taking
notes and told him I would try to help him because he was my
Muslim Brother and made a mistake which we all do. Doug went on
to say Bruce Murray nor Gregory Holden had nothing to do with the
killing of Eric Delegal that while he was out he ran into Scotty
(Tyrone Wesson) and some girl and they wanted some weed so he
took Scotty to Kaboobi.

-1-

Ex. A

BruceMurrayDAOFiles0198

Douglas said he carried a hand gun because of his drug problem and him doing dirt in the hood. He also said Kaboobi didn't know he had someone with him until he open the door and once inside and he was behind them he reached for a shot gun kept behind the door... Douglas said Kaboobi was pointing this shot gun at them, and Scotty didn't know what was going on and he pushed the gun from his direction, at which time Kaboobi was losing his grip as him and Wesson was tussling for the shotgun, and out of the clear blew Kaboobi pulled out a smaller gun shooting Scotty, then Doug said he heard a larger boom and he started shooting and you see Kaboobi go down that's when Doug says he notice it was Kaboobi who got hit with his own shot gun... so Doug says him and Scotty started for the door and this little boy name Dap came running out of the house calling his name... On 6-12-2016 2011 I just found out who Dap was for he just came to SCI-Forest and we got to talk as he was introduced into the community and he confirmed everything I've been told by Douglas Naughton and Gregory Strickland backs up that the Detective Gerrard and Gilbert try to get him to lie on Bruce Murray at a line up but he refused and it was ended at that point.

Date: 6-19-2011                          _____

Sworn to and subscribed before me this

6 day of 19 , 2011

_____

Notary Public

Commonwealth of Pennsylvania
County of Forest

COMMONWEALTH OF PENNSYLVANIA
Notarial Seal
Laura Blake, Notary Public
Jenks Twp., Forest County
My Commission Expires July 21, 2013

# Exhibit 18

12-16-80

1-6-81   Gregory Strickland — admits to being scene

3-11-81   Ed Randolph — Says he was told by Little
(Greg) [HOLDEN] that Bruce, Scotty shot Boos and
he (Greg) & Fossy were waiting outside.
Says Strickland told him he was there & saw
Douglas Haughton run down the steps

3-13-81   Gregory Strickland — Denies he spoke to
Randolph
Says [ANTHONY BURTON] Bruce & Scot did it.

Doesn't know who they are (last name)

3-20-80   Holden arrested based on
Randolph's statement

H80-444BruceMurrayHFile087

# Exhibit 19

ACTIVITY SHEET                    WEDNESDAY  3-11-81                    Sgt Rosenstein

H-80-444                    Dec'd:  Delegal                    Assn: A. Lory

On Wednesday March 11,1981 Edward Randolph 29N/M res. ▮▮▮▮▮▮▮▮he ▮▮.
was brought into the unit as a possible witness in the Lamar Bullock case
H-81-68. During question in this case by Det. McNesby and Culbreth, Randolph
disclosed that he had information pertaining to the Delegal case. He was
then turned over to Sgt.Rosenstein who assigned Dets. Diegel and Curcio to
pursue his knowledge of the case and polygraph him on what he says.
Randolph was thoroughly interviewed by Dets. Culbreth and McNesby and again
interviewed after Polygraph by Dets. Diegel and Curcio.

He was Polygraphed on the following questions:
1.  Did Greg Holden tell you he was involved in the killing of Kaboobie (Delegal) ?

2.  Have you told the entire truth as to the killing of Kaboobie ?

3.  Did Holden tell you that Bruce and Scotty killed Kaboobie ?

Polygraph by Georgine Taylor.    Inconclusive

During the interview of Randolph he stated that in a phone conversation
the day after the shooting of Delegal, Gregory Holden told him that he along
with three others (all named and identified) went to Delegals house to ▮▮▮
rob him. He said that he(Holden) waited across the street ▮▮▮▮▮▮▮▮ with a
Larry Thorpe while Scotty (Douglas Haughton)and  Bruce Murray went to the house
to gain entrance. He also said Greg Strickland was in the house at the time of
the shooting and saw Haughton run down the steps.

ADA murray was given a rundown of the interview and said that before we get a
Warrant out for HOLDEN we should try to get Strickland again and confront him
with what Randolph told us.   If Strickland opens up we could then get a warrant
for both Haughton and Holden.

H80-444BruceMurrayHFile128

Exhibit 20

Case 2:08-cv-05086-AB Document 8101 Filed 12/19/23 Page 298 of 379

# POLYGRAPH EXAMINATION REPORT

**CITY OF PHILADELPHIA POLICE DEPARTMENT**

EXAM. FILE NO. 81 - 400

NAME OF SUBJECT: Strickland, Gregory

ADDRESS: ▮▮▮▮▮▮

AGE: 16

DAY AND DATE: Friday , 3-13-81

TIME STARTED: 5:12PM

TIME FINISHED: 7:49PM

REQUESTED BY: Sgt. Rosenstein

DIVISION/UNIT: Homicide

APPROVED BY: Capt. Demski

INVESTIGATOR PRESENT: Det. Ken Cutico

CRIME/CLASSIFICATION: Homicide

NO. OF CHARTS: 5

I am questioning you concerning The shooting death of Eric Deligal 26 N/M AKA Kaboobie inside 2414 Montrose Dec. 16,1980 reported to Police 5:45PM

**INTERROGATION WARNINGS OF ACCUSED:**

Prior to asking the accused any questions, the accused was read the warnings of his/her Constitutional Rights, as they appear on the Standard Police Interrogation Card (75-Misc-3) and was then asked questions 1 thru 7 as they appear on the reverse side of the card. The answers of the accused to each of the questions were as follows:

(1) Not Warned (4) _____ (7) _____
(2) _____ (5) _____
(3) _____ (6) _____

Signature: _Det K. Cutico_

**RESULTS OF EXAMINATION**  Capt. Demski and Sgt. Rosenstein notified that subject exhibited DECEPTION INDICATED when asked the following questions:

Do you know for sure who shot "Kaboobie"?  (No)

Did you see anyone shot "Kaboobie" ?  (No)

Right now can you take me to the Gun used to kill "Kaboobie"? (No)

Did Elliot tell you Bruce & Scot shot "Kaboobie" ?  (Yes)

**INTERROGATION – REMARKS**

Gregory Strickland did state after Test 5 that Miss Philis and her Grandfather who live at ▮▮▮▮▮▮ had seen two boys outside 2414 Montrose after shots where fired. Also stated that he had spoken by phone with Shawn phone # ▮▮▮▮ Lonie Davis ▮▮▮▮ and with Antion Clark # ▮▮▮▮ and that they stated that Bruce and Scot had shot "Kaboobie"

☐ No attempt at deception
☐ Inconclusive
☒ Deception
☐ VERIFIED

EXAMINER: _Det Martin Connors_ ▮

DATE: 3-16-81

REVIEWED BY: _Sgt. ▮▮▮▮_ ▮

DATE: 3-?-81

Bruce Murray/DA Files 0150

75-47 2 (Rev. 7/70)

☐ Continued on Reverse

B. MURRAY FED LIT 2022

# Exhibit 21

ACTIVITY SHEET  #5 PLATOON  1-5-81  SGT. ROSENSTEIN

---

H80-444                    DEC: E. DELEGAL                    ASSGN: A. LORY

Information was received by the homicide division from a N/M who identified
himself as John Howard, ███████████████        Howard related that on the
day of this homicide he saw a N/M he knows as Elliott Burton flee the
Delegal residence carrying a shotgun. He stated that Burton then got into
a 77-78 Buick and drive away. Howard requested that detectives not come to
his home. He left a phone number ████████████ and requested that detectives
ask for "John" and not identify themselves as police. Det. Lory called
████████ at which time a recording came on stating that the number had been
changed to ████████    When that number was called, a recording came on saying
that the number had been disconnected. Det's Lory & Checchia proceeded to
the ███████████ and found that ███ is a bad address. The block
was then surveyed and no one on the block admitted to knowing a John Howard.

Information was also received from ADA Joe Murray who related that he had
been contacted by former ADA Frank DeSimone. DeSimone told Murray that he
been contacted by Elliott Burton and the Burton told him that Gregory
Strickland 16 N/M, residence, ███████████████ was inside the decedent's
house at the time of the shooting. Det. Lory contacted Attorney DeSimone
and he stated that he did give ADA Murray this information. When questioned
relative to Burton's whereabouts, DeSimone stated he had received a phone call
from Burton and has no idea how to contact him. Det's Lory & Checchia then
proceeded to ███████████ the Strickland residence, and he was found
not to be home. Det's spoke to his mother Heidi and she stated that some
arrangement would be made to interview her son on 1-6-81 after 5:30 PM in
company with her husband Thomas.

Investigation continuing.

H80-444BruceMurrayHFile129

# Exhibit 22

## <u>Recording of Phone Conversation, Elliot Burton– Gregory Holden</u>

# PRODUCED AS MP3 AUDIO FILES

| Title | Duration | Contents[1] |
|---|---|---|
| Side A | 23:43 mins. | Compilation of songs by Teddy Pendergrass, Harold Melvin & The Blue Notes, and Stevie Wonder (00:00–23:43) |
| Side B | 27:15 mins. | **Phone Conversation Between Elliot Burton and Gregory Holden (00:00–04:53)**<br><br>Compilation of songs by Stevie Wonder (04:54–23:38)<br><br>No Audio (23:39–27:15) |

---

[1] The MP3 audio files contained on the CD with the "Recording of Phone Conversation, Elliot – Gregory Holden" includes R&B music for unknown reasons. This music was included in the copy of the recording produced by the Philadelphia District Attorney's Office (DAO) during Mr. Murray's post-conviction discovery. Given that the DAO files and the Philadelphia Police Department's homicide file related to investigation into Eric "Kaboobie" DeLegal's death did not contain any other references to the secretly recorded phone conversation, the presence of the R&B music on the CD raises more questions than answers.

**Phone Conversation Transcription (as prepared by Counsel for Mr. Murray)**

Burton: Hey man, I was just talking to Larry. You know what he told me now?

Holden: Huh?

Burton: I said I was just talking to Larry. You know what he told me now?

Holden: What?

Burton: He said you took 'em up there. He was in the hospital.

Holden: He said I took him up there?

Burton: Yeah. He said he was in the hospital and he didn't know nothing about it and he got home and you told him that Eric got killed.

Holden: [Inaudible: Seems to be asking what Larry told Burton]

Burton: I don't know. I know he was whispering kind of low when he told me that.

Holden: Fuck this.

Burton: He said that uh, that Bruce and Scottie was supposed to get even and that you was in it. And that it never got to that and they told him that they had blast him when they got in there.

Holden: And he says that I was there?

Burton: He said you was outside.

Holden: There ain't no god in hell [inaudible] I ain't do this one.

Burton: I'm gonna tell you. He trying to pass it to you.

Holden: Huh?

Burton: He trying to pass it you now, he's trying to blame it on you. He said one of them got shot?

Holden: Huh?

Burton: One of them got shot?

Holden: Who got shot?

Burton: Bruce one of them?

Holden: I'm not sure. I don't know. They ain't never tell me [inaudible]. I ain't never know one of them got shot.

Burton: You said that uh, what, Bruce had a um a sawed-off shotgun or some shit. Bolt action?

Holden: Yeah?

Burton: And that Scottie had a [inaudible] or something. Larry said that you told him.

Holden: That I told him?

Burton: What'd they tell you?

Holden: What'd they tell me?

Burton: Yeah.

Holden: They told me they went up to the jamb, and they said uh this is what they said: They said they ain't go do the killing. That's what they told me.

Burton: But they never said Larry sent them?

Holden: Nah. They didn't say, all they was worried about was that he got killed.

Burton: They both shot him?

Holden: Yup. They were saying that uh if he uh if they was gonna bang him, he was gonna bust them. He was jammed and didn't [inaudible]. They told me they didn't go up there to kill him. They wanted some money. But somebody had to tell 'em about it, but.

Burton: Yeah somebody sent 'em up there.

Holden: You know what I'm saying? Someone told 'em. But you know, after they told me that happened, they had no more rap. They had no nothing to say. They was just fucked up because he made them kill 'em.

Burton: Larry gonna be there in morning?

Holden: Yeah he gonna be here.

Burton: I'm gonna call at about 12:00 o'clock, alright?

Holden: Alright.

After the phone hung up, someone redials the phone, and the following conversation took place between, upon information and belief, Burton and a police officer:

Police: Go ahead.

Burton: You hung up?

Police: Yeah I hung and made sure it wasn't… [trails off]

Police: Yeah, hold on a minute I'm going to rewind it.

# Exhibit 23

1

2

3

4                    - - - - - -

5

6              DATV   PRODUCTIONS

7

8    Ron  D.  Castille,  District  Attorney

9

10                   - - - - - -

11

12

                JURY  SELECTION
13                     WITH
              JACK  McMAHON
14

15

16

17

18

19

20

21

22

                    FOSTER
23        COURT  REPORTING  SERVICE,  INC.
     1800  Architects  Building  -  117  S.  17th  St.
24           Philadelphia,  PA  19103
                (215)  567-2670
25

1              MR. McMAHON:  When Taz
2     called me up and asked me to speak on jury
3     selection, I was thinking about it, and I
4     said to myself when you're talking about
5     jury selection, that is probably the single
6     most important part of a case.
7     preparation, evidence, witness' statements
8     doesn't mean anything unless you have a
9     good jury.  And I've seen more than one
10    case, great cases, and if you have a lousy
11    jury, it doesn't make a damn bit of
12    difference unless you have a good jury.  So
13    it is probably the single most important
14    thing that you're going to learn to do to
15    be a good jury lawyer, is to be able to
16    pick good juries.
17              And -- but, on the other
18    hand, it's the most important, yet it's the
19    most unscientific.  It is the most
20    difficult to learn.  It's -- it differs
21    from case to case.  And you're never going
22    to master it.  Anybody says, "I can" --
23    "Oh, I can pick great juries," they're
24    lying to you.  You can't.  You can do it a
25    thousand times and you're going to pick

 1     people that are just not good jurors.

 2                         But what is is you got to go

 3     by certain rules.  It's kind of like

 4     teaching blackjack.  I can teach you

 5     blackjack.  I can tell you all the rules to

 6     play blackjack and you'll know how to play

 7     blackjack, but there's going to be a

 8     certain amount of luck.  In other words,

 9     you can do all the right things.  You can

10     take a hit on 17 when he's got a 3 and all

11     this thinking.  You can still lose.  And

12     that's the way it is in jury selection.

13     But the key is, just as in playing

14     blackjack, is to stay by the rules.  You

15     know, when you're going in -- in -- down

16     Atlantic City, the people that generally

17     win at blackjack are the people that have

18     certain rules.  They stay by them; they

19     continue.  Some days they're going to lose;

20     they're going to get that bad card flipped

21     on them -- and you may get the bad juror

22     flipped on you -- but over the long haul,

23     these people playing blackjack are going to

24     win because they stayed by certain rules.

25                         And that's all I can tell

1    you when you talk to you about this, is to
2    play by certain rules and don't bend them
3    and don't change them.  And if you continue
4    with those rules throughout your career,
5    you're going to have more success than
6    failure, just as the blackjack player
7    would.
8                    Now, I thought I'd do two
9    things today.  One, I'd give you the basic
10   mechanics of how a jury is selected because
11   none of you, apparently, have tried a
12   jury.  And I know for me, when I first came
13   into the office, the first jury selection
14   process I saw or heard about was the one I
15   did, and that's not the way if should be.
16   So the first thing I'm going to tell you,
17   besides my talk about how the mechanics of
18   it go, after I talk to you about it, the
19   next time you have an opportunity where you
20   hear someone's picking a jury and you have
21   free time, go over and watch it.
22                    You know, most of these
23   judges, like Guarino or Kubacki, it only
24   takes an hour or a half and two hours.  You
25   can actually see the process, and it makes

1    a lots more sense to you when you see it.

2    Again, it's like explaining a game. But if

3    you play it one time, you understand it a

4    lot better than just giving you the rules

5    of it here today. So I urge each and every

6    one of you to go over to City Hall when a

7    jury is being picked. And it doesn't you

8    all day. It will take you a hour and a

9    half or two hours; even if you want to just

10   see part of it. You'll understand it a lot

11   better than my explanation here today as to

12   the actual mechanics of it and you'll feel

13   more comfortable when you go in on your

14   first jury; it won't be first one you've

15   ever seen.

16              Now, there's two types of

17   cases in which juries are picked on, and

18   that's the felony cases, which is the next

19   program that you will come to as DAs, the

20   felony majors program. And there's a way

21   to pick a jury there and there's a way to

22   pick them in homicide.

23              And basically there's two

24   different ways under each one of those. So

25   under the next step we'll go with the

1    felony major program, and that's the next

2    step that you'll come to.

3                    And, first -- now, I think

4    most of you know this -- but some people

5    you'd be surprised didn't; I've known

6    that -- you get seven  preemptory

7    challenges.  You get seven strikes.  And

8    that never changes.  It's always seven,

9    unless you have codefendants; okay?  Now,

10   if you have codefendants, they both -- the

11   other side gets what you get in total.  So

12   usually when there's codefendants, they'll

13   give you eight strikes and the two

14   defendants can use four and four for a

15   total of eight.  You as the DA get eight.

16   If there's three defendants, a lot of times

17   they'll give you nine.  Whatever is easy.

18   And it's up to the discretion of the

19   judge.  But most of the time, in my

20   experience, if there's three defendants,

21   you get nine.  If there's two defendants,

22   you get eight.  And if there's one

23   defendant, you're always going to get

24   seven.  And it never changes.

25                   Now, there's two different

1    ways that it happens in the Court of Common

2    Pleas, in my experience.  There is what I

3    guess is called the alternative method or

4    the random method.  There's two different

5    ways to pick a jury in that program, and

6    you have to find out.  When you first go in

7    there, in the room, you want to find out

8    which way that particular judge picks a

9    jury.  And he's going to either tell you

10   it's random or he'll call it the

11   alternating method or pass the pad or

12   whatever.  And it makes a difference.  It

13   makes a definite difference as to what

14   you're going to do in the next two or three

15   hours as to which method that judge

16   determines.

17                First of all, probably the

18   most common, probably 80% of the judges use

19   what I call the alternating or passing the

20   pad method.  And that is, break it down:

21   They bring in 40 people; okay?  They sit

22   there.  They introduce you, the DA, the

23   defendant, and whatnot.  And most of the

24   times what happens then, the next

25   procedure, they bring all of them in.

1    They're sworn.  They're sitting there,

2    you're sitting there, and you're

3    introduced.

4              The next -- the first thing

5    that you have to do is you're going to have

6    to give a brief summary of the case to that

7    40 people and potential witnesses that may

8    be called or may be heard of in the case.

9    And the reason for that is to see, A, if

10   anybody knows anything about the case, the

11   potential jurors; or, B, they know any of

12   the witnesses.  And it's not an opening

13   statement.  All it is is, "Ladies and

14   gentlemen, this is an incident that

15   occurred on January the 27 at 8 o'clock in

16   which Joe Smith was robbed at point of gun

17   and fled thereafter.  You may hear the name

18   Joe Smith; you'll hear from him.  And you

19   may hear 'Mary Jones' and you may hear from

20   Police Officer Smith and whatnot.  You just

21   mention the names either -- don't commit

22   yourself "you will hear from these."  Just

23   say "these are names that you will hear

24   from or about during the course of the

25   trial," because you don't want to commit

1    yourself to calling any individual at that
2    early stage of the case.
3                    And then you'll say or the
4    judge will say, "Does anyone here, A, know
5    anything about the incident or does anybody
6    know any of the people that have just been
7    mentioned?"
8                    The next step -- some judges
9    do this; some don't.  They may ask the
10   defense to not give out anything about
11   their defense, but just indicate names that
12   may come up during the course during the
13   course of the trial from the defense side
14   to whether they know anything about the
15   case at all.
16                    So now you're at that
17   situation.  The jurors, the 40 people, know
18   something about the case.  And they either
19   indicate they know something about it or
20   they don't.  Most of the times, in most of
21   our felony cases, they don't know anything
22   about it unless you have like a very high-
23   publicity felony case.  Most -- 99% of the
24   times they don't.  So then you sit back
25   down.

1          And then the judge takes
2     over at that point.  Now, you have the 40
3     people are sitting out like where you are
4     there, and the judge then asks a series of
5     questions to the potential jurors.  And the
6     questions that he basically asks are -- he
7     gives them like a brief summary of the law,
8     you know.  "The defendant's presumed
9     innocent.  The defendant has no right to --
10    doesn't have to testify and that it can't
11    be held against him if he does not
12    testify."  And he gives them just basic
13    general principles of law.  And then he'll
14    say to them, "Is there anybody here that
15    can't follow those basic premises of the
16    law?"  And nobody ever raises their hand.
17          Occasionally you get
18    somebody, the ones that raise their hand to
19    everything.  You know, I can't follow law,
20    you know, everything.  They raise their
21    hands to everything.  And you know those
22    right away because, anything, they answer
23    any question.
24          And the next question he
25    usually asks is, "Is anybody here related

1    by blood or marriage or has a close
2    personal friendship with a police officer
3    or law enforcement," they usually term it.
4    And a lot of people raise their hand in
5    there.  Everybody knows somebody that's in
6    law enforcement in some way and everybody
7    raises their hand.
8                    And the court officer then
9    will go around, and I've brought with me to
10   show to you -- some of you may never have
11   seen them -- when you first walk in, they
12   hand you two of these pieces of paper, Page
13   1, Page 2, and there's numbers down the
14   side of them here.  And what those numbers
15   are, they're the computer number that's
16   given to the individual juror.  Now, you're
17   given these, obviously, without the
18   markings on them and there will be 40
19   people, generally.  Sometimes 35, but
20   usually 40.
21                   And what the court officers
22   then go around and say, like, "Does anyone
23   here know any law enforcement?" And then
24   they'll raise their hand.  The court
25   officer will go, "If Your Honor pleases,

1    Juror 43, George Crane, III."

2                   Now, you have these pages

3    with you in front of you.  Now what you do

4    is mark on this page -- and the best thing

5    I can suggest is make a code for yourself

6    because you can't write out "knows law

7    enforcement" because there's going to be

8    like maybe 15 or 20 of them so I always

9    write -- for years I've just wrote "cop"

10   and I know what that means.  And you all do

11   your own little code to know what that

12   particular response means.  You can just

13   put a C for cop or L for law -- whatever it

14   is for you.  And you know that.  Because it

15   goes fast.  You know, they'll name five,

16   six, seven right in a row.  So you've got

17   to be able to look right down your sheets.

18                   And they've -- now, you've

19   got these two sheets.  They'll ask, "Is he

20   a cop?"

21                   Then they'll ask, "Has

22   anyone here been a victim of a crime?"

23   Generally speaking, they'll ask that.  Some

24   judges will say, "Have you been a" -- if

25   it's a -- they'll only ask it if it's like

1    if you're trying a crime of violence,

2    they'll say, "Has anybody here been a

3    victim of a crime of violence?" they may

4    limit it that much.  And that's all they're

5    really required to do, but some, you know,

6    will open it up even more, "any crime."

7    And people raise their hand again.  You'll

8    have your sheets here.  You mark it down, C

9    for crime or write anything down that you

10   can quickly so you'll have it on these

11   sheets.

12                   And then they'll ask,

13   besides following the law, "Does anybody

14   here have a severe hardship?"  This is

15   where you really get the people.  They

16   raise their hands and they all have a

17   severe hardship.  And you mark that down on

18   your page.  And whatever the judge's

19   questions ask.  And they differ from judge

20   to judge.  Then mark them down on these

21   page.

22                   Now, you've got these two

23   pages.  You've asked the general questions

24   by the judge.  What's the next step?  Well,

25   the next step is under this method, the

1    first method I told you about, the random,

2    passing the pad, is this:  They'll call 12

3    people's names out out of a hat.  They'll

4    pull them out.  And they're just numbers,

5    you know.  And they'll read them out.  And

6    they'll take -- the first one goes to Jury

7    Spot No. 1, the second goes in Jury Spot

8    No. 2, 3, 4, all wait up to 12.  Now you're

9    sitting there with 12 people sitting in the

10   box, you and the defense counsel and the

11   judge.

12             The first one -- now it's

13   time for the questioning by the attorneys;

14   okay?  Now, the first thing you're going to

15   ask -- you start.  The Commonwealth starts

16   first with Juror No. 1.  You ask individual

17   questions at this time.  Now, at this time

18   you're going to want to ask the questions

19   that corresponded to the things you put

20   down on Pages 1 and 2:  cop, hardship,

21   crime.  So you'd say to the first juror,

22   "Ma'am, you indicated that you had been a

23   victim of a crime.  How long ago was that?

24   What was the nature of the crime?  And

25   would it have any effect on your ability to

1   sit as a fair and impartial juror in it

2   case?"

3                        And here's a key.  And I was

4   going to get -- I'll get to like tips on

5   this later, but at this point I think it's

6   a good -- when you have a juror that you

7   obviously like by just their appearance,

8   okay, at this critical stage is how yo.

9   phrase your questions.  If it's this

10  wonderful looking Commonwealth juror, the

11  guy that would hang his mother, you know,

12  if she did anything, at this point you

13  don't want

14  to -- if they indicate that they're a

15  police officer or a victim of a crime, you

16  want to ask the questions in a fashion

17  that's going to make them not answer it in

18  a way that's going to get them excused for

19  cause.  In other words, the person says

20  he's been a victim of a crime, a woman.  So

21  you don't say to the woman, "You have been

22  a victim of a crime?  What was that,

23  robbery?  Yeah.  Well, what was it about?

24  Tell us about it.  Would that affect your

25  influence?"

1            No.   You be nice to her.
2    You say to her, "Ma'am, you indicated" --
3    and you lead her.   It's you leading the
4    witness just as you would do in a
5    cross-examination.   This is a favorable
6    witness to you.   This is somebody that you
7    want as a juror.   So you don't start
8    jumping on them or start asking them in
9    open-ended ways.   You don't want to say to
10   them, "Ma'am, would that have any effect on
11   you?"   Because then she may say, "Yes,"
12   right, and then that's not the answer you
13   want.
14            So what you do at that point
15   is you say to the woman, "Ma'am, I
16   indicated -- you indicated that you were
17   robbed at point of knife.   Now, this
18   defendant don't that, of course.   Now, that
19   wouldn't have any effect on -- of course,
20   that wouldn't have any effect on your
21   deciding whether this guy is innocent or
22   not or guilty, because that had nothing to
23   do with your incident, of course; right?"
24            And she'll say -- then if
25   it's phrased in those ways, she feels like

1   a jerk if she says, "Well, yeah, it would.
2   Yeah, it might bother me that do" -- but --
3   and then they look like foolish.  So you
4   want to put them in a situation where, the
5   juror that you like, because you're trying
6   to minimize you using those strikes, of not
7   letting her open-ended say, "Well, it might
8   bother me" or something.  Because you don't
9   want those answers.  Because that just
10  jumps out at the defense and then they'll
11  go all on it.  So what you want to do is
12  you want bring them right in to you.
13              Just the opposite.  If it's
14  somebody that looks like they're a
15  defendant themselves, you don't open-end up
16  the question then.  If they say they're a
17  crime of violence, right, "Yeah, my brother
18  was killed."
19              And you say, "Well, sir, the
20  fact that your brother was killed in a
21  violent crime like that, he was very --
22  that might affect you here, right, in
23  deciding whether this guy is guilty or not,
24  that terrible trauma that happened to you?"
25              And they said, "Yeah, it

1    might.  Yeah, come to think of it, it

2    might."  And you make it nice for him --

3    you give him an easy way out.  And the

4    other people that you want, you give them

5    an easy way to stay in.

6                    So that that's really

7    important.  I've seen so many lawyers and,

8    you know, you never want to open-end a

9    question to jurors you like and you want to

10   make it easy for the ones you hate to get

11   out; okay?  So that's just one little tip

12   at this point.

13                    And so you go through this

14   process.  You ask the questions on the

15   first one.  And now the defense will ask

16   questions of that first witness, first

17   potential juror.  And you'll go through

18   this process of all 12; okay?  You go

19   through all 12.  And besides the

20   questions -- other questions you want to

21   definitely ask, I just want -- those are a

22   response to what the people indicate on the

23   sheet, but you want to ask if they're

24   married, how long they've been married.

25   You want to ask them how many kids they've

1    had.  You want to ask them -- and, most
2    important, their employment, how long they
3    have been so employed.

4              Because as I'll get to
5    later, one of the things that you want as a
6    prosecutor is stable people.  You don't
7    want cuckadoos.  You want stable, solid
8    individuals as jurors.  And what is more of
9    an indication of their stability than a guy
10   who says, "Yeah, I've worked for General
11   Electric for, you know, 32 years."  You
12   want know that.

13             And by just saying to them,
14   "Well, I work at General Electric" and not
15   asking the other question, the guy might
16   have been unemployed for the last 15 years
17   and just got this rummy job at General
18   Electric.  And that doesn't give you the
19   indication of his stability.  So you want
20   to know how long he's been employed, how
21   long he's been married.

22             You know, you say, he's
23   married.  Oh, he's stable.  Well, the guy's
24   been divorced seven times, you know.  Worse
25   than me.  And you don't want to know

1      that -- you want to know that, that he's

2      been married for, you know, 27 years and

3      he's got five kids.  And that gives you an

4      indication as to his stability.  So that's

5      a question you want to ask.  And I think

6      to -- and the bottom line, those are the

7      most important questions, because what you

8      want is stability.

9                      Other questions that you

10     could -- that you may ask:  What section of

11     the city they live in.  You always want to

12     ask that, what section of the city they

13     live in, because that is a strong indicator

14     to you of their leanings.  I mean, well,

15     let's be honest.  I mean people that live

16     in North Philly have a different

17     perspective on law enforcement and the

18     government than people that live at K&A or

19     at Somerton or Chestnut Hill or any other

20     different areas.  You've to recognize those

21     things.  I mean, and if people -- a lot of

22     people -- I know I wasn't from

23     Philadelphia.  And when I came here, one of

24     the first things to learn, and I guess

25     most -- maybe you are from Philadelphia,

1   but I didn't know sections of the City.

2   And people would tell me, you know, I'm

3   from a certain location and it wouldn't

4   mean anything to me.  So if you're not

5   familiar with the City, get familiar with

6   the City, you know.

7                Get a list of all the

8   sections and let people that have been

9   around and try cases say people from

10  Mayfair are good and people from 33rd and

11  Diamond stink.  And get to know that.  I

12  mean 33rd and Diamond, when I first moved

13  here sounds nice, "Hey, 33rd and Diamond.

14  That sounds like a nice neighborhood."

15  But, you know, you don't want any jurors

16  from 33rd and Diamond.  And so be familiar

17  with the City before you start making these

18  decisions.

19                And as to -- sometimes I

20  like to ask -- and I don't like to get too

21  personal with these people because they

22  have a tendency to resent it.  "Why is this

23  guy asking me about all this stuff about my

24  life?"  Some people do.  So I don't think

25  you have to know all that much about them.

1    Because no matter if you spend a half an

2    hour with them, you're not going to learn

3    more than what you learn in those first

4    couple minutes, anyhow.  Because it's the

5    stability factor that you're concerned

6    with, you know.

7                    And -- but you can ask them

8    -- I like with younger kids, you know,

9    like 21, 22, because you don't know if

10   they're going to be stable people in the

11   future, so you're trying to ask them like

12   what school they went to.  You know, and

13   that may give you -- "What's the last

14   school that you attended?" is the best way

15   to phrase it, you know.  And that may give

16   you some indication.  Again, it's difficult

17   if you're not from Philadelphia, but you

18   can tell, generally speaking, if they've

19   come from -- and, again, you got to be

20   realistic about this thing.  This is a --

21   if they've come from a solid, you know,

22   Catholic school with good discipline and a

23   school of that nature, that's going to tell

24   you something, again, about their

25   stability, discipline, their way of life,

1   whatnot, which may give you an indication

2   as to what type of person they are when

3   you've just seen them for the first time

4   off the street.

5           And if they've come from

6   maybe the public school system, that's a

7   factor.  I mean it's not the determining

8   factor, but if they've come from the public

9   school system -- and we all know what the

10  public school system here is in

11  Philadelphia -- that is a factor to

12  consider as to whether or not you're going

13  to eventually accept this person.

14          So, you know, with older

15  people the schooling isn't -- but I mean

16  people from 20 to 25 I think that's -- I'll

17  ask that question to them to find out what

18  school they went to and if they graduated.

19  See, like they'll tell you -- I say,

20  "What's the last" -- another thing, the

21  last school and year.

22          And they'll say, "Well, you

23  know, 9th grade."  You know, it might be a

24  great school that they tell you, but they

25  only went to the 9th grade.  This, again,

1    tells you something about their stability.

2    But if they graduated or, you know, or they

3    tell you something else about it, that's

4    good to know about their stability.

5              So after those questions are

6    asked of those jurors, you go through all

7    12 alternating.  You go first.  You start

8    the questions with Juror No. 1.  The

9    defense follows up on your questions.

10   Defense goes first on Juror No. 2, asks

11   their questions; you follow up.  And then

12   it just switches all the way through the

13   12.

14             Now, now you've asked

15   questions of all the 12 people.  And my

16   suggestion, the way I did it for a hundred

17   of these cases, is I prepare a sheet.  And

18   I used to just prepare one of these and

19   then just go to the mimeograph machine and

20   make a hundred of them, you know, so I have

21   them when I go over to trial and just take

22   a stack of them over with me.  And it's

23   just numbered.  And in particular -- it

24   depends upon what room.  I worked in one

25   room, 232, with Judge Kubacki for like two

```
 1   years, and so I knew the configuration of
 2   the juror -- of the jury box, and I would
 3   make this corresponding to the
 4   configuration of the jury box.  So when I
 5   mark 1, 2, 3, 4, 5, 6, 7.  So what you do
 6   is, when they call the names out, okay,
 7   Juror No. 1, No. 20, Reynard Boiken.  I
 8   know I'm not taking Reynard; I can tell
 9   that already.  But you write down here,
10   they put -- that's another thing, never
11   take anybody named Reynard, that's a -- and
12   you put "Reynard Boiken" here in the thing
13   and the number.  And then when you're
14   questioning them, you write down the
15   things, like Mayfair -- because you're
16   going to have to go back to this.  You're
17   going to go through the 12 and going
18   through questions of 12 could take, you
19   know, 15, 20 minutes.  So you want to write
20   down in No. 1 the name of the witness and
21   the different things that you've learned
22   about them in Box No. 1.
23                 So that when you come back
24   to making a decision about that person, you
25   say, "What the hell did he say?"  Now you
```

1    know.  You have it marked down here.  He's
2    from Mayfair, he graduated from Bishop
3    Neumann and he's married, has three kids
4    and he works at Budd Company.  You know
5    that right now.  You're not going to have
6    any doubt in your mind.  Because if you
7    don't -- and I've seen people try to do
8    without it, you make a mistake because you
9    forget certain answers that they gave after
10   20 minutes or so.  And so you write that
11   down.  You go all the way through; okay?
12   Now you've got this sheet all marked up
13   with the person's names and all their
14   responses to their questions.

15             Now, what happens is this:
16   I remember the first time -- the first jury
17   I picked was in front of Judge Kubacki.
18   And I had, like I said, I never had the
19   benefit of a talk like this.  I knew
20   nothing.  I was thrown in.  Ray Harley, who
21   was in the majors program at the time, in
22   625 we had a calendar room.  And I had just
23   come into the felony jury program.  I was
24   in there like two days and I was just
25   learning and asking people things.  I get a

1    call.  I don't know if you all know Ray

2    Harley, but Ray says, "Jack, this is Ray.

3    Get over here.  Jury trial."

4                        I walked over.  He walks

5    over and he says, "Here's the case, 232,

6    go."

7                        I said, "Ray, what are you

8    talking about?  I don't even know how to

9    pick a jury.  What are you talking about?"

10                       He said, "That's why they

11   pay you, Jack.  Go down there and try the

12   case and shut up.  You know, they don't pay

13   you to sit down here and, you know, cry.

14   Take the case, go down, and try it."

15                       I had no idea how to pick a

16   jury.  I had never -- these sheets,

17   these -- I go down there.  I sit down.

18   They're handing me computer sheets and I

19   don't know what they're doing.  And, thank

20   God, though, if you're in 232, there's a

21   court officer by the name of Helen Wolf who

22   is, as best put it, very friendly to all of

23   the attorneys in the room, particularly the

24   district attorney.  She's very nice to

25   you.

```
 1              She -- and she helped me out
 2   and she showed me all the things I'm trying
 3   to say to you here today.  She sat me down
 4   and showed them to me and it made it a lot
 5   easier.  But if you didn't, you'd be lost.
 6              So, now that you're
 7   sitting -- your situation is this:  They
 8   hand you a pad.  Now, you've got all the 12
 9   things marked in your boxes.  There will be
10   a pad handed to you, yellow pages just like
11   this and there'll be a line down it and
12   they'll have 1 through 12 marked on the --
13   all the way down the side on every line.
14   And it will say "Commonwealth" and
15   "Defense" on this side.
16              Now, you get handed the pad
17   first; right?  And what you're being handed
18   the pad for -- I was handed the pad.  I
19   thought they wanted to know what my
20   luncheon order was.  I was going to, you
21   know, not to excise -- "I'll have a ham and
22   cheese and" -- and, just -- and, you know.
23   But that's not what it was for.  And, so,
24   number one, is you have to make a decision
25   on Jur -- you're the first one.  On
```

1    Venireman No. 1, you're the first one.

2    They hand you the pad.  You've got the pad

3    just like this.  If you like Juror No. 1,

4    you write "accepted"; okay?

5                        Now, nobody sees this but

6    yourself.  You know, the 12 people are just

7    sitting there.  You know, they're fat,

8    dumb, and happy just sitting there, the 12

9    of them there just looking at you like

10   this, you know.  And then you take the

11   pad.  And they don't know what you're

12   doing, either.  They see you handing the

13   pad back and forth and they're sitting

14   there looking at you.  They think you're

15   like all lunatics.  And you write

16    "accepted."  You hand the pad over to

17   the either -- the court officer will hand

18   it to the defense.

19                        Defense then will make a

20   choice, either "accepted" or "strike,"

21   simple as that.  The pad comes back to

22   you.  Now you have -- no, no.  The pad

23   stays with them.  The pad stays with them

24   for the second one.  They have to make the

25   first decision.  That's important

1    strategically, who makes the first
2    decision.  And so they have to make a
3    decision on No. 2 and hand it back to you.
4    You make a decision on No. 2 and No. 3.
5    It's handed back to them.  They make a
6    decision on 3 and 4 until you go through
7    all 12 this way.
8              And then the court officer
9    will read like, "Jurors 1, 5, 7, 9, and 12
10   remain.  All the rest are excused to go
11   back to Room 111."
12             Now you've picked five
13   jurors; okay?  And those five are like 1,
14   3, 5, 7, and 9.  So those jurors are taken
15   out into the room and probably held
16   somewhere until you continue.
17             The next process is the
18   court officer will then call -- she won't
19   call 12 names this time.  You've picked
20   five.  She'll call seven.  And she'll put
21   them into all the blanks where people were
22   excused; okay?  And you go through the
23   exact same process again.
24             And, again, you have the
25   sheet, because now you've used a second

1    sheet.  You've used this one, all 12.

2    You're going through it for the second

3    time.  You pull up another sheet.  And,

4    let's say, you've picked 1, so you X that 1

5    and 3 and 5 and 7 and 9 have been

6    accepted.  So I used to just X these out

7    knowing that -- you know, it keeps it, you

8    know, orderly so you're not putting them in

9    the same position.  You X these out.

10                   And now the first juror that

11   she calls out you don't start writing in

12   No. 1 again because you've X'd it out.  Now

13   you're in No. 2.  And you write No. 2 and

14   all the questions I just asked you -- we

15   just went through.  And then No. 4.  And

16   then you go through the same process again

17   of passing the pad back and forth and then

18   maybe you pick, you know, a couple more --

19   obviously you see how it works -- until you

20   get the 12 jurors.

21                   And then you pick

22   alternates.  After you've gone through this

23   process of picking 12 -- and you've used

24   seven chal -- it doesn't matter how many

25   challenges you've used.  If you've used

1    just two, it comes down to the alternates,

2    it all wipes clean.  The slate wipes clean.

3    You start all over again.  You each have

4    one strike for the alternates.  And it

5    doesn't matter how many you've used.  If

6    you've used all seven, you still each get

7    one for the alternates.

8                    And let me tell you one

9    thing:  Be careful on that first

10   alternate.  A lot -- I've seen a lot of

11   lawyers get very careless with that first

12   alternate juror.  And they say, "Aw, I got

13   the jury and, you know, it's only going to

14   be a three-day case."  Most felony cases,

15   you know -- homicide it's a little bit

16   longer because cases will take a couple

17   weeks so you're more concerned, but a

18   lot --  I saw a lot of people get casual in

19   the felony jury program with that alternate

20   juror.  They feel relieved, "I got that

21   jury," and they don't concentrate.  And

22   it's very important.

23                    And I know it's happened at

24   least seven, eight, nine times when I was

25   in that felony program where the first

1    juror went in.  Because a lot of times what
2    happens is these people go home, and
3    they'll go home that night -- because they
4    aren't sequestered jurors; they go home
5    that night and they'll say -- and the wife
6    comes home and says "I've been picked on a
7    jury" and the husband says, "The hell you
8    have."  And come -- and then you invariably
9    get a call the next day saying, "Well,
10   she's sick, you know.  Mary Beth is sick."
11   And it happens a lot.  And it really
12   happens, and you got to be careful with
13   that first alternate.  So concentrate and
14   don't lay down on that first alternate,
15   because it's very important.
16              And then you pick the second
17   alternate.  And, again, concentrate.  But
18   that first one is the one that I've seen.
19   I don't remember a felony jury case I had
20   that went to a second alternate, but many,
21   many went to the first alternate, so be
22   careful of that.
23              Now, the second method that
24   some judges use -- Judge Stiles uses it.
25   Judge Levy-Anderson uses it.  I don't know

1    because I haven't been in that felony

2    program for a while, so I don't know what

3    some of the new judges do, but it's called

4    the random method.  It's a little bit more

5    interesting and it's a little more

6    challenging, in a way.  It's a little bit

7    more gamesmanship.

8                    What happens in the random

9    method is this:  Same process that I

10   described before.  All 12 -- you mark your

11   sheet.  All 12 go in the box; okay?  You

12   get handed the pad.  It's not marked like

13   this.

14                    No, it is marked like this.

15   It has 1 through 12.  You can either -- you

16   can strike whoever you want in that group.

17   Like you look at the 12 and you say, "Well,

18   I don't like No. 7," so you mark on here

19   "strike No. 7"; okay?

20                    And then you hand it back to

21   the defense.  They look at it.  They say

22   "strike No. 3."  Now two people have been

23   struck.

24                    You got the pad back.  Now

25   you look at it; you like the rest of the

1      ten.  It gets a little bit of gamesmanship
2      here.  And you say you like the rest of the
3      ten, so you pass.  You say, "I pass" and
4      you hand it back.
5                  Now, the defense attorney --
6      it's up to him to decide.  Now, he can
7      continue to strike.  He can strike at this
8      point another one.  "No, I don't like 10."
9                  It still comes back to you.
10     Now you can make a decision again to
11     strike.
12                 But once the pad has been
13     passed twice -- in other words, I pass, I
14     like -- he strikes again.  Now we're left
15     with nine.  "I like those nine; pass."
16                 He likes those nine, "Pass."
17                 Two passes, those nine are
18     jurors; okay?
19                 And it gets interesting in
20     that way because you can start bluffing in
21     that way a little bit.  You can start
22     playing a little bit of games with this
23     thing.  I've gotten a pad, just to psych
24     the defense attorney out, just pick the 12
25     "Pass; I like them."

```
 1                      And he's looking at you
 2    like, you know -- and then he gets the pad
 3    and he's thinking, "Well, man, I got to
 4    start  striking people, you know."  And he
 5    strikes this one and passes.
 6                      And I pass it again.
 7                      And he's getting nervous
 8    now.  I'm thinking he's thinking, "Well,
 9    does he know something about these people
10    that I don't?"
11                      And you keep doing that.
12    Just keep --  let him keep striking
13    people.  And he's using up his strikes the
14    whole time.  And he may be striking people
15    that you were going to strike in the first
16    place.  So you just keep doing that to him,
17    "Pass, pass."  And the guy -- it really
18    freaks them out a lot of times.
19                      So I don't think that --
20    every time I've ever picked a
21    random-selected jury, I never strike first
22    one.  You know, I don't care who's in
23    there.  It bothers them every time.  "Pass;
24    I like those 12."  And they get -- they get
25    real -- it bends them all out of shape and
```

1    then they start -- they start striking.

2    They think, "This guy knows -- he's read

3    something about these guys.  They're all

4    his family or something" and he starts

5    writing them all down.  So that's the

6    second method.

7                    And, again, it gets -- and,

8    you know, you'll get comfortable with that,

9    but -- so first thing to do then is to go

10   in and ask the judge, "Judge, do you use

11   the random method or do you use the

12   alternating pad method?" because, like I

13   said, as you can see, it makes a big

14   difference.

15                   The second thing to ask the

16   judge is who is going to ask the

17   questions.  In other words, a lot of judges

18   will -- the questions about the -- that I

19   indicated, the individual ones by the

20   attorneys, like, say, your family, your

21   background, a lot of judges will do that

22   themselves.  You have no participation

23   unless you want to follow up on something

24   that the judge has asked.  Such as Judge

25   Kubacki, he asks, you know, "What section

1    of the City do you live in?  Are you

2    married?  Do you have kids?"  He asks all

3    those questions; okay?  So basically only

4    if something comes up in the judge's

5    questionings do you even get to say

6    anything to the juror.

7                    So ask him what method he

8    uses.  Two, does he ask the -- when the

9    jury is in the box, who asks the questions,

10   so you don't look like a fool.  You start

11   to ask the questions and the judge says,

12   "No; I'll do that" and then you look bad

13   in front of those jurors.  So make sure you

14   know what method, who's going to ask the

15   questions before you go out there in front

16   of the people.

17                    And, again, make sure you

18   have that little short summary of your

19   case.  And, again, don't make that a big

20   deal.  Just a short -- it means nothing to

21   the case.  I don't put any significance in

22   it other than just getting it done and

23   letting them know the people.

24                    Now, just -- I'll tell you

25   just briefly about homicide.  And it's a

1    lot better system as far as getting a
2    better juror for the Commonwealth, I feel.
3    But it's individual voir dire.  And the
4    only difference -- in a capital case, in a
5    potential capital case, it's mandated by
6    law that an individual voir dire take
7    place.  In other words, if you ever get --
8    when you get to homicide and they say,
9    "Well, I don't need individual voir dire,"
10   and you want it, because it is better for
11   you, you say, "It's mandated by rule" -- I
12   don't know what the Rule of Criminal
13   Procedure is, 11-something, 1114, I think,
14   is the Rule of Criminal Procedure that
15   mandates individual voir dire in a capital
16   case.
17              And so in a capital case,
18   when it's potential capital case, that is
19   with aggravating circumstances, you get 20
20   challenges.  And the only difference is
21   they bring the people in one at a time.
22   They go into the witness box.  And the
23   method with the sheets is exactly the same,
24   with these computer sheets is exactly the
25   same, except you don't really have to write

1   things down as much because you're asking

2   each juror one at a time.  You don't have

3   to come back and remember, "Well, what did

4   the guy say?"  You're asking him right then

5   and there.

6              And you don't pass any pad.

7   You'll ask a question.  And the defense

8   will ask some questions.  There's no pad.

9   There's nothing.  You just stand up and

10  say, "Accept.  This juror is acceptable to

11  the Commonwealth" or "Commonwealth

12  exercises a preemptory challenge."  And

13  that's what the -- and the same method

14  takes place; there's alternating.

15             But since it's individual

16  voir dire, you don't have to worry about

17  tipping your hand to other jurors because

18  the other jurors aren't sitting there and

19  they don't hear what you're saying.  So, as

20  a result, you have a little bit more

21  freedom in cross -- if you don't like the

22  person, you can jump all over them, if you

23  want.  Because you know that if they don't

24  like you, tough, you're going to strike

25  them, anyway.  So you try to get them out

1   for cause and you jump all over them.

2                  But you can't do that in the

3   felony jury program because you start

4   jumping all over a juror and there's 11

5   other people and they're saying, "What is

6   this jerk doing," you know.  "This person,"

7   you know -- and then they start to resent

8   you from the git-go.

9                  So it gives you that freedom

10  to be more of an ass in individual voir

11  dire, and that's why I like it.

12                 And if it's a non-death

13  case, you only get seven challenges.  And

14  just like in the other program, but it's

15  still -- I don't know a homicide judge that

16  doesn't do individual voir dire even if

17  it's not a non-capital case.  It's just

18  seven challenges then.

19                 And there's big controversy

20  going on now in homicide.  Some judges, you

21  can just tell them, "Look, this is" -- the

22  law is that every first degree murder case

23  is a potential death penalty case, that

24  it's up for the jurors to decide and that

25  the judge can't make a pretrial

1    determination that this is not a death

2    case, therefore you don't have 20.  But

3    that's the law and that's what the judges

4    are told and half of them don't do it.

5              A lot of the judges just

6    want you to articulate your aggravating

7    circumstances before the trial, you know,

8    such as, "Well, Judge, this is a police

9    officer who was killed" or -- that wouldn't

10   be one, but like one of the aggravating

11   circumstances is you endanger another

12   person during the course of your committing

13   the murder.  And that's the one we use all

14   the time for -- to get 20 challenges.  I

15   mean you shoot a guy in a lonely alley, and

16   we always say, "Well, it could have banked

17   off there and went up to the fifth floor

18   window and killed the lady-- baby in the

19   thing and he recklessly endangered, Judge,

20   it's clear.  We want 20 challenges."  And

21   they look dimly on that point.

22             But in certain situations

23   it's applicable.  I mean if you go into a

24   crowded bar and start firing away and hit

25   somebody, I mean you recklessly endangered

1    other people.  So it gets -- there's

2    degrees of that.

3                    But we are -- basically the

4    policy now in homicide is we do -- we've

5    tried to eliminate that phony attempts of

6    20 challenges because it's -- we did it for

7    a while.  We tried to follow the law

8    saying, "Everyone is 20, potentially,

9    Judge."  But now we basically, if it's

10   articulably a death penalty case, we go for

11   it and say 20.  If it's not, we basically

12   say, okay, we'll take the seven and just go

13   for the seven.  So that's the way the

14   system as it is in homicide.

15                   The only difference is,

16   again, is you have to ask the death penalty

17   question.  You have to say, "Is there

18   anybody here that's morally or

19   philosophically opposed to imposing the

20   death penalty in a proper case?"  And

21   again, this is a very -- this tool is very

22   good because, again, you can get off jurors

23   that you wouldn't -- possibly have to

24   strike preemptorily by that question,

25   because a lot of people don't want to

1    impose the death penalty for whatever
2    reason.  And so it's a good question in
3    that regards.
4                    And the law is that even
5    though they can say they are morally
6    opposed to it, the next question, followup
7    to that question, though, always is if
8    it's -- some rooms the judge does it; other
9    times it's the DA.  You say, "Well, even
10   though you're morally opposed to the death
11   penalty, could you put aside your personal
12   feelings and impose the death penalty
13   according to the law in a proper case?"
14                    And most people will say no,
15   but you'll get that occasional goofball
16   who'll say, "Yes, I'll put it aside."  So
17   that situation is a deal.  You really got
18   to jump over those people.  Because you're
19   going to strike them anyhow, so you jump
20   all over them and say, "Wait a minute.
21   You've got this great, deep conviction, you
22   know, and it's fixed opinion in your mind
23   and you can just take that and just throw
24   it aside, these opinions you've had all
25   your life because some judge tells you to?"

1    And I think --

2                    And so a lot of people will

3    say, "Well, you know, I probably couldn't,"

4    you know.  But some will stick to it, very

5    few, though, if you really get going on

6    them.  They start to realize the

7    ludicrousness of their position and most

8    will fade and you can usually get rid of

9    them for cause.

10                   Now, in -- those are the

11   basics; okay?  That's the basics.  Those

12   are the easy parts, the basics.

13                   The case law says that the

14   object of getting a jury is to get -- I

15   wrote it down.  I looked in the cases.  I

16   had to look this up because I didn't know

17   this was the purpose of a jury.  "Voir dire

18   is to get a competent, fair, and impartial

19   jury."  Well, that's ridiculous.  You're

20   not trying to get that.  You're -- both

21   sides are trying to get the jury most

22   likely to do whatever they want them to

23   do.

24                   And if you go in there and

25   any one of you think you're going to be

1    some noble civil libertarian and try to get
2    jurors, "Well, he says he can be fair; I'll
3    go with him," that's ridiculous.  You'll
4    lose and you'll be out of the office;
5    you'll be doing corporate law.  Because
6    that's what will happen.  You're there to
7    win, and in order to win -- and the defense
8    is there to win, too.
9                    And the only way you're
10   going to do your best is to get jurors that
11   are as unfair and more likely to convict
12   than anybody else in that room.  And to go
13   with that possibility -- because the
14   defense is doing the exact same thing.  So,
15   you know, you're not like -- if you think
16   that it's some noble thing, that it's some
17   esoteric game, you're wrong and you'll
18   lose.  Like I said, you have to go in there
19   with the idea that you want jurors who are
20   going to be most suited to convicting this
21   defendant; okay?
22                    Now, what does that mean?
23   That means that you want, as I said
24   earlier, stable, conservative people.
25   That's what you want; okay?  What do you do

1   to get those type of people?  Number one, I

2   told you:  you look at their married life,

3   their background, how long they've been

4   married, how long they've been employed,

5   those same things I just went through,

6   whether they've been schooled, how long

7   they stayed in school, all the different

8   factors to tell you that these are stable

9   people.

10           Now, I'm going to tell you

11   things that I think over the years that

12   have come to me of doing this.  And, again,

13   it's all an individual -- anybody tells you

14   anything about trying a case and says it in

15   dogma is wrong because things change and

16   it's different for every individual.  But

17   I've had fairly good success with these

18   rules and I think if you stay to them,

19   you'll have fairly good success, too.

20           And that is -- and, let's

21   face it, again, there's the blacks from the

22   low-income areas are less likely to

23   convict.  It's just -- I understand it.

24   It's understandable proposition.  There is

25   a resentment for law enforcement, there's a

1    resentment for authority and, as a result,
2    you don't want those people on your jury.
3    And it may appear as if you're being racist
4    or whatnot, but, again, you are just being
5    realistic.  You're just trying to win the
6    case.
7                    And the other side is doing
8    the same thing.  So to just try to be noble
9    and esoteric is not going to work.
10                    Now, besides those
11   questions, what else do you look for?
12   Well, in my experience you look for how
13   they're dressed.  That's a great
14   indicator.  If a guy who may be -- the
15   questions that you ask, you're not too sure
16   of this guy, you know.  Maybe he has been a
17   bit unemployed or he has a little bit
18   instability in his life, but yet he comes
19   to court in a three-piece suit, you know,
20   his shoes are shined, and he obviously has
21   some respect for the Court, respect for
22   law, respect for the authority that he's
23   faced with; okay?  And that is -- like that
24   could be the factor.  In other words,
25   you're wavering on the guy, but the guy is

1    well dressed and he shows that respect,

2    you're more likely to take him because of

3    that respect for the Court.

4                    And the same is true about a

5    guy -- sometimes you see a guy who is --

6    looks pretty good on the questions and he

7    comes in in shorts and cutoffs and T-shirts

8    and a T-shirt.  And what's that say to

9    you?  That guy doesn't have a lot of

10   respect for the law or authority.  So that

11   is not the only judge, but I'll tell you,

12   it's a big factor.  And I think that if

13   you -- if you take middle class people that

14   are well dressed, you're going to do well.

15   I mean it's that simple sometimes.  And so

16   look at their dress, how they act.

17                    And, again, look at --

18   another thing I've learned over the years

19   is to look at -- most jurors bring to

20   court, because they know they're going to

21   be sitting there all day, a book.  They'll

22   bring a book to read because they know

23   they're going to be sitting there a long

24   time.  And most of them when they come to

25   the room, they carry it with them and

 1    they'll carry it with them up to the

 2    witness stand.  They'll carry it in the

 3    box.  Look at the book, you know.  If

 4    they're reading, you know, Karl Marx, you

 5    know, you don't want this person, you

 6    know.  And/or, you know, they're reading

 7    Ben Lerner's book, you don't want them,

 8    either.  So you look at the book that

 9    they're reading, you know.  And then that

10    will give you some indication.  You got to

11    use your own common sense on this issue.

12    But, you know, if a guy's reading a book,

13    you know, that is maybe a spy book or a

14    police book, you're going to like that

15    person because it's a person that is, you

16    know, maybe more philosophically attuned to

17    conservative aspects.  And that may tell

18    you something about them.  I've seen that

19    happen on more than one occasion.

20              Besides the background, I've

21    learned and my opinion is you don't want

22    smart people.  You do not want smart

23    people.  Now, I wish that you could ask

24    everyone's IQ.  If you could know their IQ,

25    you could pick a great jury all the time.

1    You don't want smart people because smart
2    people will analyze the hell out of your
3    case.  They have a higher standard.  They
4    hold you up to a higher standard.  They
5    hold the courts up to a higher standard
6    because they're intelligent people.  They
7    take those words "reasonable doubt" and
8    they actually try to think about them.  And
9    you don't want those people.  You don't
10   want people who are going to think it out
11   and they're going to think about your case
12   and they're going to think, "Well, maybe
13   the angle was this way and maybe she didn't
14   see it like that."  And they're going to
15   analyze it.
16              You want people to come in
17   there and say, "Yep, she said he did it, he
18   did it."  And that's what you want.
19              And so you don't want
20   intelligent people.  That's been my
21   experience.  I don't know how many jurors
22   have gotten hung up -- and sometimes you
23   have to take them.  I mean you're down to
24   no strikes and the guy comes in and he's
25   otherwise okay, so you got to take him.

```
 1    But they hang you up.  I mean I've seen
 2    juries out and out and out.  And then --
 3    then, besides all that, they get all hung
 4    up on the law.  Then they start want --
 5    they want to be Oliver Wendell Holmes now.
 6    Well, I'm a --
 7                    Don't ever take a law
 8    student.  Don't ever take a lawyer.  Don't
 9    ever do that.  I did it once.  I'll never
10    do it again.  I tried a case, a murder
11    case, in which the defendant -- the jury
12    requested to see me afterwards.  Now, I
13    walked in and there was 11 of them.  I
14    said, "I know we picked 12.  Where's the
15    other guy?"
16                    And they said, the jurors
17    said to me that, "If he didn't get out of
18    here, we were going to kill him."  And he
19    was a lawyer.  He was a lawyer worked
20    for -- he came in, well dressed, he worked
21    for -- he's probably about 28 years old,
22    worked for like one of the big firms in
23    town, but he didn't do criminal work.  But
24    all of a sudden now all his law school
25    background came back to him, you know, and
```

1   now he was going to show these people what
2   is right.
3            Another thing smart people
4   do, they want to -- if they're with less
5   intelligent people, they want to show how
6   smart they are to those people and they
7   will like condescend to them.  And they'll
8   differ just to differ, you know.  They'll
9   differ -- you know, they may want to
10  convict a guy and all these people that are
11  beneath them, are not as intelligent say
12  they want to convict him, they say, "Wait a
13  minute.  I'm going to explain to you why
14  he's not guilty."  And they want to be
15  smart.
16            So you want people -- now,
17  you don't want, you know, the town idiot,
18  either, you know.  You don't want that,
19  either.  But you want somewhere people --
20  people that are realistic that are plain,
21  simple people.  And that is probably one of
22  the best keys I can give you, too:  plain,
23  simple, ordinary people.
24            Another tip is I've always
25  found -- and somebody told me this once

     1    when I was starting out and I found it to

     2    be true.  When you come in and they bring

     3    the person in and you start asking them

     4    questions, if you don't like that person

     5    for some reason -- you don't know why, you

     6    just don't like that person, then that

     7    person probably don't like you.  And that's

     8    true.  And it's true.  Because there's

     9    something wrong.  Your nature ain't

    10    agreeable to this guy's nature, so he's not

    11    going to like you, either.  So, you know,

    12    you go with your gut feelings.  I'll tell

    13    you, don't analyze it too much.  You know,

    14    I'm sitting here telling you all these

    15    different little things, but don't analyze

    16    it too much.

    17              If you see a guy come in and

    18    he -- and your initial reaction based on

    19    these little things that I've told you here

    20    and your own feelings is no, stick with no;

    21    you're going to be right.  And if you get

    22    in there and try to think, you go, "Oh, my

    23    God."

    24              I pick juries quick as could

    25    be.  I don't even hesitate because I've got

1   these the rules down.  I never debate.

2   I've got these rules down.  And I'm going

3   to be -- you're going to be wrong.  You're

4   going to say this guy -- I've picked jurors

5   that I thought -- I had a jury out for

6   three days, and it was a fireman that was

7   holding them up, a fireman.  This guy was

8   like the best, you know -- the guy came in,

9   I thought he was the best juror in the

10  world.  I would have died to have him.  And

11  the son of a gun was bad.  He was bad.  And

12  so you're going to get those people.  But,

13  again, like I said, you've got to stay with

14  these basic rules.

15              Another factor -- I'll tell

16  you, if -- you know, in selecting blacks,

17  again, you don't want the real educated

18  ones, again.  This goes across the board of

19  all races; you don't want smart people.

20  And, again, but if you're sitting down and

21  you're going to take blacks, you want older

22  blacks.  You want older black men and

23  women, particularly men.  Older black men

24  are very good.  Guys 70, 75 years old are

25  very good jurors, generally speaking.  So

1    when I said -- if you see a black man come

2    in who's 72 years old and he's well dressed

3    and he had worked, those are great jurors.

4             And I've seen DAs who strike

5    them because they're black, and that's kind

6    of like a rule, "Well, they're black, I've

7    got to get rid of them." But these people,

8    in my experience, are very good jurors. I

9    mean they're from a different era and

10    different time and they have a different

11    respect for the law. And I've found over

12    the years that they're very, very good

13    jurors.

14             Older black women, on the

15    other hand, when you have like a black

16    defendant who's a young boy and they can

17    identify as his, you know -- motherly type

18    thing, are a little bit more different.

19             But the men don't have that

20    same kind of maternal instinct towards them

21    and they're a little bit more demanding and

22    a little bit more law and order.

23             The other thing is blacks

24    from the South, excellent. Ask where

25    they're from. You know, if you can tell

1    they're -- if they say, "I've lived in

2    Philadelphia five years," if they're from,

3    you know, South Carolina and places like

4    that, I tell you, I don't think you will

5    ever lose a jury with blacks from South

6    Carolina.  They're dynamite.  They're

7    dynamite.  They just have a different way

8    of living down there, a differen·

9    philosophy.  And they're law and order and

10   they're on the cops' side.  And those

11   people are good.

12                 Again, I think black men are

13   -- in my experience, black women, young

14   black women, are very bad.  There's an

15   antagonism.  I guess maybe because they're

16   downtrodden on two respects, they got two

17   minorities, they're women and they're and

18   blacks, so they're downtrodden in two

19   areas.  And they somehow want to take it

20   out on somebody, and you don't want it to

21   be you.  And so younger black women are

22   difficult, I've found.

23                 Now, one other thing is

24   dynamics of a jury.  When you're picking a

25   jury, you got to remember that you're

1  picking a group.  You're not picking one

2  person to decide the case.  You're picking

3  a group that has to interact together.  And

4  that's why I'm saying you don't -- you want

5  people of all -- hopefully of all the same

6  intellectual capabilities, all middle

7  class, same economic background.  That's

8  the ideal jury because that's

9  dynamically -- they're cohesive.

10              You don't want a person

11  that's real smart and then you don't want

12  the real dumb ones down here because

13  they're not -- their dynamics are not going

14  to be there.  You're not going to have some

15  brain surgeon from Chestnut Hill with some

16  nitwit from 33rd and Diamond.  They're just

17  not going to have any dynamics there.  You

18  know that.  So you've got to remember what

19  your jury is.

20              And, again, some people say,

21  well, the best jury is an all white jury.

22  I don't buy that, particularly with a black

23  defendant, because you're going to have --

24  you could have reverse reaction there.  I

25  think that you need dynamics because you

1   don't want anybody to go back in there --
2   because a lot of times your witnesses are
3   going to be black; most of the time.  So
4   you don't want this all white jury to go
5   back there and say to themselves, "Aw, who
6   gives a shit?"  You know what I mean?  You
7   don't want that attitude at all, and you
8   may get that kind of reverse racism in your
9   case.
10              I've always felt that a jury
11  of like eight whites and four blacks is a
12  great jury, or nine and three, because then
13  you're not going to get any of that in
14  there.  You're not going to get any of that
15  racist type of attitude because a white guy
16  is not going to sit in that jury and say,
17  "Aw, them people live like this and that"
18  with other blacks sitting there in the
19  room.
20              So you got to remember
21  you're picking a whole jury and the jury
22  dynamics are very important.  When you pick
23  a person, think is he going to meld with
24  the last person I picked in any way, shape,
25  or form?  Is there -- I mean you're not

```
 1    going to pick his wife, but you're going to
 2    pick somebody that's going to hopefully be
 3    cohesive in your mind.  So the way -- you
 4    can't or always I forget the jurors
 5    after, but you want to pick them -- think
 6    of the one you picked.  Is this person --
 7    do you think these two people could discuss
 8    something?  Then go to the third one.  Can
 9    this one discuss it with the last one?  And
10    you better get a jury that is more cohesive
11    and dynamically better because that's what
12    it is all about, it's the unit.  And
13    sometimes, you know, the unit can be -- is
14    the key.  So you got to think about that
15    when you're doing it.
16              I'm of the opinion you don't
17    design a jury for a particular case.  Now,
18    there's DAs that will disagree with me on
19    this, but I'm just giving you my opinion.
20    In other words, you have a rape case and
21    you have a black -- a young, 20-year-old
22    black complainant.  Well, there's people
23    that will think we'll design it.  "Well,
24    it's a black complainant and I've got to
25    have people believe her, so I'll pick young
```

1    black women," you know.  And so you'll end
2    up getting four and five black women on
3    your jury thinking they're going to be
4    helpful to you because you got a black --
5    it doesn't work.  It just doesn't work.  I
6    don't think it works.
7                    I think your goal is the
8    same regardless of what kind of case you
9    have.  You want a jury that is cohesive
10   dynamically and that is attuned and that is
11   conviction-prone.  That's what you want.
12   You want a jury that is -- that you feel is
13   conservative, stable, and is more likely to
14   convict than you want to tailor it to any
15   individual case.
16                    I think you're wrong if you
17   do that because you're going to be picking
18   people in an attempt to make them believe
19   this woman.  You're going to be picking
20   people who inherently may be against the
21   government or against police or against the
22   Commonwealth in some way, shape, or form.
23   And they're going to go back there and make
24   a decision on the case.  They're not going
25   to go back and make a decision, "Do I like

1     this girl or not?"  They're going to make a
2     decision of guilt or innocence.  It's the
3     government that's prosecuting the case, the
4     DA, the police.  It's not this girl's
5     case.  They don't see it as that.
6              So my opinion -- and, again,
7     I've seen too many people try it.  I've
8     seen too many people come back with not
9     guiltys doing that.  I think you pick the
10    same jury.  I don't care if it's a black,
11    white, Puerto Rican, Chinese, or what.  You
12    pick the same jury.  You -- you know, if
13    you could pick that same jury over and use
14    it in every single case -- and, again, like
15    I told you with blackjack, you're going to
16    get, generally speaking, good results
17    because you've got a good dynamic jury, you
18    got people that are stable and conservative
19    and more likely to convict and not likely
20    to go off on flights of fancy.
21              And that's why you don't
22    want smart people.  That's why you don't
23    want like very esoteric people.  You don't
24    want social workers; that's obvious.
25    They're more -- you know, they've got the

1    intelligence, sensitivity, all this kind of
2    stuff.  You don't want them.  You don't
3    want social workers.  You don't --
4                      Teachers you don't like.
5    Teachers are bad, especially young
6    teachers, like teachers that teach in like
7    the grade school levels.
8                      Sometimes you get teachers
9    like from -- I've have good luck with
10   teachers that teach in the public school
11   system and teach in -- and ask them what
12   school they teach in, you know.  And they
13   may be so fed up with the garbage that
14   they've had in their schools that they're
15   like, "I know this kind of kid.  He's a
16   pain in the ass."  And that may be good.
17   If you get like a white teacher teaching in
18   a black school that's sick of these guys
19   maybe, that may be one that you accept.  So
20   don't just rule out teachers altogether.
21   But if there's somebody you feel is somehow
22   a little bit too liberal or esoteric,
23   because teachers generally are in that
24   area, don't take them.  Bad luck with
25   teachers.  Bad luck with social workers.

```
 1    Bad luck with -- intelligent doctors are
 2    bad.
 3               I always feel doctors are
 4    bad, too, because they want to dissect your
 5    case like in -- and generally our cases
 6    aren't that -- usually in the felony
 7    program, you have one witness, you know.
 8    You don't have -- they want you to --
 9    they're used to being -- doctors are used
10    to having, you know, everything set.  I
11    mean they've got all these little things
12    and everything is organized and set and you
13    can prove a point.  Well, we don't have
14    that.  And, again, so you have the
15    intelligence factor and you have their
16    ability to dissect and be very analytical,
17    and you don't want that.  You don't want
18    them to analyze your case because,
19    generally speaking, if they analyze it too
20    well, they're going to say, "This isn't
21    enough to convict."  So you don't want to
22    have people that are going to analyze your
23    case that carefully.  So I don't like
24    doctors, for a lot of reasons.
25               Another thing, avoid
```

1   afternoon panels.  In other words, if

2   you're picking a jury and you're assigned

3   to case and they say to you, the judge says

4   to you, "Well, we're going to get a panel

5   at 2 o'clock," tell them anything at that

6   point.  Tell them you got a doctor's

7   appointment, your wife is going to give

8   delivery to a baby, anything.  You got a --

9   you got a -- anything you got in the world,

10  use it as an excuse.  You don't want an

11  afternoon panel, generally speaking,

12  because they're rejects.  They're people

13  that have been asked questions in the

14  morning and they all were bad and they go

15  back to the jury room and they send them

16  back out at 2 o'clock again.  And they're

17  all nitwits and you don't want those

18  nitwits.  And you're going to end up -- so

19  do whatever you can to get -- avoid that.

20               And I mean I've used them

21  all, all the excuses in the world not to

22  get an afternoon panel.  I mean I've came

23  back from the bathroom and said I just

24  threw up and I was sick.  In fact, I've

25  done that -- well, sometimes I've walked in

1   when the panel comes in and you see what it
2   looks like, all of a sudden the illness
3   level becomes high.
4                    And I -- and one time we are
5   going picking a jury and this panel was
6   just unbelievable and I was getting
7   murdered.  I was like -- it was
8   ridiculous.  And so what I did is, I
9   started -- it was Judge Malmed.  I said,
10   "Your Honor, I just don't feel well.  I
11   really don't feel well."
12                    He said, "We'll just get
13   through the morning."
14                    And as I got another bad
15   one, bad one, I started to get really
16   worse.  I said, "Judge, I can't go on in
17   there.  I got diarrhea and I got eh, eh,
18   eh."
19                    And he said, "Oh, okay."
20                    Got rid of them.  Go the
21   next day, got a great panel.
22                    Another thing to do, little
23   tips, too, when a jury comes in the room,
24   the 40 people come in the room, count
25   them.  Count the blacks and whites.  You

1    want to know at every point in that case

2    where you are.  In other words, the 40 come

3    in -- you'll never get it just right.  You

4    don't want to look there or go, "Is there a

5    black back there?  Wait a minute.  Are you

6    a black guy?"  No, you don't want to do

7    that.  You just look and get a general

8    estimate.  Like I said, 40 come in, you get

9    25, you say it's 25/15.  I mark it down on

10   my sheet, 25/15, and then I know, and then

11   I know how many are left and I know where I

12   am at all times in my jury selection

13   process.  And if you lose track or you're

14   not sure of what's going on or you want

15   to -- you can always take a recess.

16              Because a lot of times what

17   they do is they'll like have the next

18   group -- the court officers want to set

19   them up.  Like remember in that method I

20   told you earlier where they have -- now

21   we've picked five, so they're going to

22   bring seven more in.  Usually they'll have

23   the next seven sitting right out there in

24   order.  So you can see -- you can say,

25   "Judge, I have to go to the bathroom."

1   You can go out and see what's left and
2   check out what's left, see what's, you
3   know -- because you know you got two
4   strikes left.  You want to know, look, you
5   know, if the first two are going to be bad,
6   I'm going to have to use strikes and the
7   next ones will be good.  But if they're
8   two, you know, good ones coming up, then
9   you know you're not going to strike them.
10  And it changes your philosophy and your
11  ability to make a decision knowing what's
12  coming up.  You know, if you're just
13  sitting there hoping and praying the next
14  one that comes in the room's going to be
15  good, go out there and find out.  You can
16  always get a recess.  If you got to go to
17  the bathroom, anything.  You can get out
18  there and find out what's going on and find
19  out who's out there and who's not.
20              One other -- now, I'm sure
21  you're all familiar, if we talk about the
22  case law -- I generally don't talk much
23  about case law, but the new case is Batson
24  versus Kentucky.  I'm sure you've all
25  become aware of that case.  And I think

 1    that the policy that we should all take in

 2    that case is that -- and your unit chiefs,

 3    I guess, will tell you when you get to that

 4    level, but I think the policy that we have

 5    been using is that -- for those of you not

 6    familiar with it, that's a case in which a

 7    guy was convicted of rape I think down in

 8    Kentucky and he was tried by an all white

 9    jury and the prosecutor had struck all

10    blacks, and under those -- and it was a

11    racial case.  And under those

12    circumstances, they ruled that that was not

13    due process under those circumstances.

14              But, again, you have to read

15    Batson.  It's very limited to the facts of

16    that particular case, because you had a

17    racial case, the prosecutor struck all

18    blacks, the -- every black on the panel.

19    In other words, there were six on the panel

20    and he struck all six.  And that often

21    isn't the case here.

22              But in the future we're

23    going to have to be aware of this case, and

24    the best way to avoid any problems with it

25    is to protect yourself.  And my advice

1    would be in that situation is when you do

2    have a black jury, you question them at

3    length.  And on this little sheet that you

4    have, mark something down that you can

5    articulate later time if something happens,

6    because if they -- because the way the case

7    is stated, that it's only after a prima

8    facie showing that you're doing this that

9    it becomes -- that the trial judge can then

10   order you to then start showing why you're

11   striking them not on racial basis.

12                  So if -- let's say you

13   strike three blacks to start with, the

14   first three people.  And then it's like the

15   defense attorney makes an objection saying

16   that you're striking blacks.  Well, you're

17   not going to be able to go back and say, oh

18   -- and make something up about why you did

19   it.  Write it down right then and there.

20   I'd write it write in my little box there,

21   you know,.  And question them, say, "well,

22   he had a -- had a" -- "Well, the woman had

23   a kid about the same age as the defendant

24   and I thought she'd be sympathetic to him"

25   or "She's unemployed and I just don't like

1    unemployed people because I find they're
2    not too stable."  Any of those reasons,
3    have them marked down in those situations,
4    so that if the judge does come to you and
5    says, "What about it McMahon," you can say,
6    "Judge, these are my reasons and I have
7    them marked down here," if he puts you into
8    that situation.
9              So that's happened to me in
10   the last two homicides I've tried, that
11   they're brought that objection up.  And by
12   marking it down, I have tried to make a
13   record of what my reasons are.  So
14   sometimes under that line you may want to
15   ask more questions of those people so it
16   gives you more ammunition to make an
17   articulable reason as to why you are
18   striking them, not for race.
19             So that's how to pick a
20   jury.  If you have any questions about that
21   or anything about it -- again, my only
22   advice is to go over and watch it.  I mean
23   I've told the basics and some of my rules.
24   But go over and watch it, the selection
25   process, and then when you go and do it,

1    you'll feel much more comfortable.

2                And lastly what I'd say is I

3    know some of you all out there and some of

4    you are in juvenile court and whatnot, but

5    I was telling Taz out there earlier that I

6    think one of the big mistakes our office

7    has is that we don't take advantage of

8    people that have experience.  Not that

9    they're any better or any worse; they just

10   have more experience.  And I think a lot --

11   I attribute a lot of that to the situation

12   in the office being that there's -- the way

13   the floors are.  When we were back in

14   Centre Square or City Hall, there was more

15   of a camaraderie, you know.  Your unit was

16   right here where homicide was and you got

17   to know the people.  As a result, you were

18   less -- you were more likely to go in and

19   talk to them about -- because you were

20   friends with them.  And you'd talk to them

21   about particular cases, and the wisdom of

22   the ages gets passed down, so to speak.

23                Under the situation it is

24   now, some of you I don't even know.  A lot

25   of people in the office I don't even know.

1    And, as a result, I think we're wasting

2    resources.

3                        And so all saying to you is

4    I'm Jack McMahon, and if anybody of you are

5    in when we get into the office, into the

6    regular office up there have a question

7    about a case, have a question to talk about

8    in a particular case, feel free to come to

9    me.  I like it.  I enjoy talking about

10   cases.  I enjoy talking about different

11   strategies and different problems.  And no

12   matter how stupid the question may seem to

13   any of all, I mean if it's a question, it's

14   a question.  I'll laugh a little bit and

15   then I'll answer the question.  So my

16   advice is, please, you know, don't -- feel

17   free to come up and see me, ask me about a

18   case, about a particular strategy or any

19   question that you have, and I'll be glad to

20   answer it.  And I think that's better for

21   the office professionally and personally.

22   So, thanks.

23                        - - - - - -

24

25   Reported by Ann V. Kaufmann, RPR, CRR