# IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| GREGORY HOLDEN, | : | |
|    Petitioner, | : | |
| | : | CIVIL ACTION |
| v. | : | |
| | : | No. 06-5202 (AB) |
| WYNDER, et al., | : | |
|    Respondents. | : | |

## JOINT STIPULATIONS OF FACT AND PROPOSED CONCLUSIONS OF LAW

Petitioner, Gregory Holden, through his counsel Grace Harris, and Respondents, through their counsel, the District Attorney of Philadelphia and his assistant David Napiorski, jointly move the Court to accept and adopt the following stipulated facts and the parties' proposed conclusions of law, derived from the record and the parties' independent post-conviction investigations.[1]

## I. STIPULATED FACTS

1.  Holden was charged with murder, robbery, and related firearms offenses under docket number CP-51-CR-1111091-1982 for the killing of victim Eric DeLegal.

---

[1] Factual stipulations are "'formal concessions ... that have the effect of withdrawing a fact from issue and dispensing wholly with the need for proof of the fact.'" *Christian Legal Soc. Chapter of the Univ. of California, Hastings Coll. of the L. v. Martinez*, 561 U.S. 661, 677–78 (2010) (quoting 2 K. Broun, McCormick on Evidence § 254, p. 181 (6th ed. 2006) (footnote omitted)).

2. Holden was convicted of second-degree murder, robbery, and related firearm offenses and sentenced to a mandatory term of life imprisonment.

**Ground One**

3. The following factual stipulations are relevant to Holden's Ground One in his counseled memorandum of law, *i.e.*, that the Commonwealth violated *Brady v. Maryland*, 373 U.S. 83 (1963), by failing to disclose favorable and material evidence.

4. Near the beginning of the police's investigation into DeLegal's murder, an informant and member of a local street gang named Elliott Burton told a prosecutor that a 16-year-old named Gregory Strickland was in the victim DeLegal's cellar at the time of the crime.

5. Strickland initially told police that he did not see anything relevant to the shooting.

6. The police then spoke to a second informant, Eric Randolph, who told them that Strickland told him that he had seen Douglas Haughton in DeLegal's house and didn't see anyone else. The police re-interviewed Strickland, who denied this, and then they administered a polygraph exam that indicated deception by Strickland on the questions of who killed DeLegal and what Strickland saw. The results of Strickland's polygraph exam and Randolph's full statement were not disclosed to the defense.

7. Yet a third informant then gave police their first lead that Gregory Holden was also involved. This informant said that Holden told him that he was in possession of

the shotgun used in the murder and that the crime was committed by Haughton, "Bruce," and "another male." Based on this tip, police obtained a search warrant for Holden's residence.

8. The police also received a tip that their informant, Elliott Burton, was seen leaving the scene with a shotgun. This was also not shared with the defense.

9. The following month, in a clandestinely recorded conversation with Burton, Holden denied any involvement with the crime and expressed frustration with others implicating him. This audio recording was not shared with the defense.

10. A year later, Douglas Haughton was arrested on an unrelated matter and interviewed by police regarding the murder of DeLegal.

11. Haughton told police that he, Wesson, Holden, and Murray were all involved in the murder.

12. In exchange for his cooperation, Haughton pleaded guilty to third-degree murder and received a 5–10-year sentence to run concurrently to a federal sentence for bank robbery.

13. At trial, the only evidence linking Holden to the crime was Haughton's testimony that he and Holden stood lookout while Murray and Wesson committed the murder.

14. At the defendants' joint sentencing, Wesson told the court that he did not realize that he could have taken the stand at trial and that, if he had, he would have "cleared the other two defendants," meaning Murray and Holden.

15. The following year, in 1985, Haughton recanted his trial testimony and pretrial statement in two affidavits claiming he was physically coerced by Detective Gerrard into inculpating Holden and Murray. Haughton then sent a letter to Murray's lawyer, again recanting his testimony and exculpating Murray and Holden. These recantations ultimately became the subject of Holden's first state postconviction petition.

16. At a 1991 state-court hearing regarding the recantations, Haughton (who had been released on parole) testified consistently with his recantations that he had lied earlier, explaining that he lied both because he received a favorable deal and because he was coerced by police. Tyrone Wesson also testified, recanting his police statement and reiterating what he said at the sentencing hearing, *i.e.*, that Murray and Holden were not involved in the crime. He also added that the police tricked him into signing a premade statement confessing to the crime and implicating Murray and Holden without an attorney present. The petition was denied.

17. In 2001, Gregory Strickland, the boy in the basement, wrote a letter to the Innocence Project of Centurion Ministries claiming that he knew the other man in the house was Haughton and not Murray and that he didn't say anything out of fear. Strickland also alleged in the letter that Detective Gerrard and an unknown ADA took

Strickland to a lineup and tried to get him to identify Murray as the other man but that he refused on counsel of his father, so they canceled the lineup.

18. In 2011, Strickland signed an affidavit reiterating what he stated in his prior letter.

19. During voluntary discovery engaged in as part of this litigation, Murray found in the police department's homicide file confirmation that a lineup was scheduled for February 1983 and that Strickland and his father were transported to participate in it and that, upon arriving, the lineup was canceled. This information was never disclosed to the defense, is favorable, and corroborates Strickland's repeated and consistent accounts.

## II. PROPOSED CONCLUSIONS OF LAW

### A. *Brady* standard

20. The Commonwealth has an obligation to disclose to the defense information that is favorable to the guilt or punishment of the defendant. *Brady v. Maryland*, 373 U.S. 83 (1963). To prove a *Brady* violation, the evidence must have been (1) favorable to the accused, meaning either exculpatory or impeaching, (2) suppressed by the state, either willfully or inadvertently, and (3) material enough that prejudice resulted from its suppression, meaning that there is a reasonable probability of a different result. *Dennis v. Secretary, Penn. Dep't of Corrs.*, 834 F.3d 263, 284–85 (3d Cir. 2016) (en banc). A reasonable probability is one sufficient to undermine confidence in

the outcome. Materiality of suppressed evidence must be "considered collectively, not item by item." *Id*. at 312.

### 1. Suppression and favorability

21.     The parties agree, based on the above-stipulated factual record, that the prosecution failed to disclose: (1) evidence that Gregory Strickland saw Douglas Haughton, and not Bruce Murray, in DeLegal's house after the murder, including information from Randolph and Strickland's polygraph results; (2) evidence pointing to the possible involvement of informant Elliott Burton; and (3) the audio recording of Holden's conversation with Burton. There is no requirement that the prosecution's failure be in bad faith or otherwise with intention. *Brady*, 373 U.S. at 87.

22.     The parties further agree and contend that the above-stipulated suppressed evidence was favorable to the guilt and/or punishment of Holden either as exculpatory or impeaching evidence. Indeed, evidence that Gregory Strickland saw Douglas Haughton leaving DeLegal's house and lied about it is powerful impeachment evidence of Haughton and bolsters his subsequent recantations. Similarly, evidence pointing to Elliott Burton as a possible alternative suspect would have been valuable impeachment evidence for Holden, as would his conversation with Holden during which Holden denied involvement in the crime. All of this evidence is considered favorable under controlling precedent. *See*, *e.g.*, *Dennis*, 834 F.3d at 286–87 (holding that evidence can be favorable as either exculpatory or impeaching, it does not need to conclusively establish

innocence, it does not need to "wholly undermine the prosecution's theory of guilt," and it may corroborate favorable testimony that otherwise received little reinforcement).

### 2. Materiality

23. Suppressed evidence is material if, had the evidence been presented to the jury, there is a reasonable probability of a different result. *Dennis*, 834 F.3d at 284–85. A reasonable probability is one sufficient to undermine confidence in the outcome. In assessing materiality, all the evidence, old and new, is considered together without regard to admissibility or whether the remaining evidence is sufficient to uphold the conviction. *See Kyles*, 514 U.S. at 434–35. As an example, suppressed evidence that would have bolstered a defendant's defense at trial may put the case in such a different light that *Brady* materiality is satisfied. *Dennis*, 834 F.3d at 295. In addition, suppressed evidence that could have been used to impeach the credibility of a key witness "in a manner not duplicated" by other evidence, or to attack the reliability of the investigation, is similarly sufficient to establish *Brady* materiality. *Id.* at 298, 308. Materiality is to be considered collectively, not item by item. Indeed, the "importance of cumulative prejudice cannot be overstated" in a materiality analysis as it "stems from the inherent power held by the prosecution, which motivated Brady." *Id.* at 312.

24. Here, the parties agree and contend that, taking all of the suppressed evidence together with the initial trial evidence and evidence developed during Holden's collateral proceedings, materiality is satisfied.

25. The prosecution's case against Holden rested on Douglas Haughton's testimony and Tyrone Wesson's inculpatory statement, both of which were recanted almost immediately after trial. As the Commonwealth has previously conceded, these recantations are reliable. *See* ECF No. 35; *see also Murray v. Vaughan*, No. 98-5866, ECF No. 108 (response to 60(b) motion).

26. Had Holden's counsel known that Strickland allegedly saw Haughton in DeLegal's house on the day of the murder, that his polygraph results indicated deception on this very issue, and that he refused to implicate co-defendant Murray before a hastily canceled lineup, his counsel could have investigated and called Strickland at trial, giving him the opportunity to tell the court in the first instance what he later admitted to in letters and affidavits. Competent counsel also could have used all this evidence to impeach Haughton's self-serving testimony.

27. Similarly, had Holden's counsel known at the time of trial that Elliott Burton had been implicated in the crime and/or that Holden privately denied involvement in the crime, he could have impeached not only Haughton's testimony but called the larger police investigation into question.

28. Thus, pursuant to the above-stipulated factual record, the parties agree and contend that the above-described suppressed, favorable exculpatory and impeachment evidence was material under *Brady* because, considered collectively, it undermines confidence in the outcome of Holden's trial. *See Dennis*, 834 F.3d at 285–311; *see also Kyles*,

8

514 U.S. at 420, 446 (evidence that could attack the reliability of an investigation, or that evinces a "remarkably uncritical attitude" on behalf of police, can be material under *Brady*); *Weary v. Cain*, 577 U.S. 385, 391–92 (2016) (per curiam) (finding that prosecution violated *Brady* in failing to disclose evidence that could have corroborated defense at trial and that the state courts, in holding otherwise, "egregiously misapplied settled law"); *Banks v. Dretke*, 540 U.S. 668, 702 (2004) (suppressed impeachment evidence required reversal of conviction where evidence was not duplicative of other impeachment evidence); *Haskins v. Superintendent Greene SCI*, 755 F. App'x 184, 189 (3d Cir. 2018) (non-precedential) (holding that suppressed evidence pointing to an alternative suspect that would have given the jury a competing version of events is material under *Brady*); *cf. Strickland v. Washington*, 466 U.S. 668, 696 (1984) ("[A] verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support.").

### III.    CONCLUSION

29.    The parties agree that, based upon the above-stipulated factual record, the prosecution suppressed favorable, material evidence in violation of *Brady v. Maryland*, 373 U.S. 63 (1963), and Holden is owed a new trial.

30.    A proposed order is including with this filing.

**SO STIPULATED**

| | |
|---|---|
| */s/ Grace Harris* | */s/ David Napiorski* |
| GRACE HARRIS | DAVID J. NAPIORSKI |
| Counsel for Petitioner | Counsel for Respondents |